1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3     ****************************************************************

4     JAMES BLACK, ET AL.

5                                   CIVIL ACTION NO.16-2708 "E"
      VERSUS                        NEW ORLEANS, LOUISIANA
6                                   MONDAY, JUNE 4, 2018, 9:00 A.M.

7

8     DMNO, LLC, ET AL.

      ****************************************************************
9

10                              **DAY 1**
                    TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
11              HEARD BEFORE THE HONORABLE SUSIE MORGAN
                     UNITED STATES DISTRICT JUDGE
12

13
      APPEARANCES:
14

15    FOR THE PLAINTIFFS:        VASQUEZ LAW OFFICE
                                 BY:  JESSICA M. VASQUEZ, ESQUIRE
16                               400 POYDRAS STREET
                                 SUITE 900
17                               NEW ORLEANS, LA 70130

18

19                               LAURA L. CATLETT
                                 ATTORNEY AT LAW
20                               650 POYDRAS STREET
                                 SUITE 1414
21                               NEW ORLEANS, LA 70130

22

      FOR THE DEFENDANT:         FISHER & PHILLIPS
23                               BY:  STEVEN R. CUPP, ESQUIRE
                                      JAKLYN L. WRIGLEY, ESQUIRE
24                               2505 14TH STREET
                                 SUITE 300
25                               GULFPORT, MS 39501

                         *OFFICIAL TRANSCRIPT*

2

```
 1    APPEARANCES CONTINUED:

 2

 3    OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                  CERTIFIED REALTIME REPORTER
 4                                REGISTERED MERIT REPORTER
                                  500 POYDRAS STREET, ROOM B-275
 5                                NEW ORLEANS, LA 70130
                                  (504) 589-7779
 6                                Cathy_Pepper@laed.uscourts.gov

 7

 8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
      PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*OFFICIAL TRANSCRIPT*

1                              **I N D E X**

2

3                                                          <u>PAGE</u>

4

5    **LARRY J. HUNT, JR.**....................................    6

6    DIRECT EXAMINATION BY MS. CATLETT....................    7

7    CROSS-EXAMINATION BY MR. CUPP.......................   49

8    REDIRECT EXAMINATION BY MS. CATLETT.................   85

9    **ITAI ELIRAN BEN ELI**..................................   91

10   DIRECT EXAMINATION BY MS. VASQUEZ...................   92

11   **PATRICE JONES**........................................  130

12   DIRECT EXAMINATION BY MS. CATLETT...................  130

13   CROSS-EXAMINATION BY MR. CUPP.......................  155

14   REDIRECT EXAMINATION BY MS. CATLETT.................  169

15   LUNCHEON RECESS.....................................  172

16   **MELISSA ROGERS**.......................................  173

17   DIRECT EXAMINATION BY MS. VASQUEZ...................  173

18   DIRECT EXAMINATION BY MR. CUPP......................  190

19   REDIRECT EXAMINATION BY MS. VASQUEZ.................  208

20   REDIRECT EXAMINATION BY MR. CUPP....................  210

21   FURTHER REDIRECT EXAMINATION BY MS. VASQUEZ.........  210

22   FURTHER REDIRECT EXAMINATION BY MR. CUPP............  213

23   **MARK GANDY**...........................................  215

24   DIRECT EXAMINATION BY MS. CATLETT...................  215

25   CROSS-EXAMINATION BY MR. CUPP.......................  227

*OFFICIAL TRANSCRIPT*

1   **ITAMAR LEVY**......................................... 230

2   DIRECT EXAMINATION BY MS. VASQUEZ................... 231

3   **ERIN LAWRENCE** ...................................... 256

4   DIRECT EXAMINATION BY MS. VASQUEZ................... 256

5   CROSS-EXAMINATION BY MR. CUPP...................... 265

6   REDIRECT EXAMINATION BY MS. VASQUEZ................ 272

7

8

9                        E X H I B I T S

10

11   <u>DESCRIPTION</u>                                    <u>PAGE</u>

12

13   PLAINTIFF'S EXHIBITS 1 THROUGH 5.....................   5

14   DEFENDANT'S EXHIBIT 4...............................   5

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

1              P-R-O-C-E-E-D-I-N-G-S

2          M O R N I N G   S E S S I O N

3              MONDAY, JUNE 4, 2018

4           (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  All rise.

8          THE COURT:  Be seated.

9              Good morning, everyone.

10         VOICES:  Good morning.

11         THE COURT:  Before we begin the trial testimony, by

12    agreement of the parties, with my approval, I'm going to admit

13    the exhibits that will be used by the parties into evidence.

14             With respect to the plaintiffs, I am admitting

15    Exhibits 1 through 5.

16         (Whereupon, Plaintiff's Exhibits 1 through 5 were

17    admitted.)

18         THE COURT:  The plaintiffs also included Exhibit 6,

19    which is a demonstrative exhibit.  I've informed them that they

20    may use that exhibit as a demonstrative exhibit, but it won't

21    be admitted into evidence.

22             With respect to the defendants, I'm admitting

23    Exhibit 4.

24         (Whereupon, Defendant's Exhibit 4 was admitted.)

25         THE COURT:  Also, the parties have agreed as to

*OFFICIAL TRANSCRIPT*

1   deposition designations that will be submitted for Tiffanie

2   Campbell.  So when you all have a minute, you can provide those

3   to me.

4           The parties have also reached a stipulation that

5   Itai Ben Eli did not personally receive tips, and that the

6   tips -- the tips in question, the 10 percent, were deposited

7   into the general account of the defendant L.L.C., I guess,

8   correct?

9           MS. CATLETT:  Yes.

10          THE COURT:  Any other preliminary matters we need to

11  cover?

12          The plaintiffs may call their first witness.

13          MS. CATLETT:  Good morning, Your Honor.  Laura Catlett

14  on behalf of the plaintiff.

15          The first witness we're going to call is

16  Larry Hunt.

17          THE DEPUTY CLERK:  Remain standing and raise your right

18  hand.  Do you solemnly swear the testimony you are about to

19  give to this Court will be the truth, the whole truth and

20  nothing but the truth?

21          THE WITNESS:  I do.

22                    **LARRY J. HUNT, JR.,**

23   was called as a witness and, after being first duly sworn by

24   the Clerk, was examined and testified on his oath as follows:

25          THE DEPUTY CLERK:  Have a seat.  Please state and spell

*OFFICIAL TRANSCRIPT*

1  your name for the record.

2        THE WITNESS:  My name is Larry J. Hunt, Jr., L-A-R-R-Y,

3  middle initial J, Hunt, H-U-N-T, Jr.

4                          DIRECT EXAMINATION

5  BY MS. CATLETT:

6  Q.    Larry, do you go by any other name?

7  A.    I go by L.J.

8  Q.    Do you mind if I call you that today?

9  A.    Please.

10  Q.    L.J., can you tell us when you started working for Doris

11  Metropolitan?

12  A.    Yes, ma'am.  Shortly after they opened.  My first day of

13  work there was November 1st of 2013.

14  Q.    And how long did you work there?

15  A.    I worked there until August of 2014.

16  Q.    What was your position at Doris Metropolitan?

17  A.    I was hired as a server.

18  Q.    Were you ever in any other positions there?

19  A.    No, ma'am.

20  Q.    And how much were you paid as a server?

21  A.    Servers are paid 2.13 an hour.  That's the federal minimum

22  wage for tipped employees.

23  Q.    When you first started working for the defendants, what

24  sort of procedure was there for tracking tips?

25  A.    There wasn't one.  This year -- actually, this month is my

*OFFICIAL TRANSCRIPT*

1   40th year in the service industry.  I had -- when I got there,

2   I knew that they were newly opened.  But when it came time to

3   check out, there were no checkout procedures.

4          You handed over -- they would kind of run your tape.

5   They would run the tape, and then you would hand over your

6   cash, and you would hand over your charge slips.  You knew what

7   you made, but all of that went over.

8          Then they were doing tip pool, so we had no idea

9   exactly what would be coming back to us.  This went on for

10  several weeks.  It was very dismaying.

11         When I had approached Itai about it, the question

12  that was -- this is the first time he posed this question, and

13  I have heard it several times, "What, don't you trust us?"  My

14  thought, in fact, was not -- it wasn't about trusting or not.

15  I don't know you.

16         There's a reason that we keep certain reasonable

17  boundaries in our personal and professional lives as far as

18  finances.  We do this with family members, so you're certainly

19  going to do this with people that you're not related to.

20         So what had happened was it really was reaching a

21  zenith.  People were talking about quitting and going off.  We

22  were making -- the money that we are were making seemed to be

23  good money.  The food was incredible.  It was the new hot spot

24  in the city.  The buzz was -- the buzz was -- we were right

25  where we needed to be, in my opinion.

*OFFICIAL TRANSCRIPT*

1          So I -- one night, we told them that we're not going

2     to turn in anything if we didn't have -- talked to Itai -- if

3     we didn't have some type of checkout procedure.  He said,

4     "Well, then, you've done checkouts before, right?"  I said,

5     "Yeah."

6          So I came up with a form.  I came up with the form --

7     most places in the city do not do tip pool because of optics.

8     The optics for tip pool are very bad.

9     Q.   Explain what you mean by tip pool.

10    A.   Well, tip pool -- like, actually, here in the gallery, you

11    have several of the top earners from Doris Metropolitan as

12    well.  Everyone puts all their tips, cash and credit card tips,

13    into the pool.  So, let's say it's $1,200, and there is 12

14    servers.  That would mean that each server would get $100.

15         But, before all that, you still have your tip-out.

16    Like we did 10 percent to the bar.  When I first was hired on,

17    we were doing 25 percent to the server assistants.  That's your

18    busboy.

19         So that meant that you were supposed to keep

20    65 percent of your tips.  But in a tip pool, that would mean

21    that you were entitled to 65 percent of the share, your

22    individual share of that pool.

23         The optics are really bad.  The only reason that you

24    don't really want to do tip sharing --

25              THE COURT:  What do you mean, optics?  I still don't

1   understand what you mean, optics.

2            THE WITNESS:  It looks -- it looks really bad, ma'am,

3   when you -- when you put in, let's say, $600 -- and this has

4   happened to me several times.  It's happened to people in

5   gallery.  You earn $600 that Friday or Saturday night.  So you

6   think, wow, I did great.  I did wonderful.

7                 So you put that $600 in.  Then you find out that

8   your share of that is, oh, $130.  You know, the optics are

9   bad.

10            THE COURT:  And the reality.

11            THE WITNESS:  The reality is harsh.

12                 Going back to that, too, with doing that.

13   Places -- the few places that I do know that do tip share, what

14   you do as a manager -- I'm the former maître d' of Commander's

15   Palace.  I'm also the former maître d' of the Ritz-Carlton.  So

16   I do know what I speak when I talk about these things.

17                 If you do tip pool, you focus on your lowest

18   ringers, the people that have the lowest check averages and

19   have the lowest tip percentages.  Those are the people that

20   initially you're trying to be proactive, and you will train --

21   you'll give them additional training, because sometimes -- you

22   know, even the best houses, the training can sometimes be

23   lackluster.  So you give them additional training.

24                 But if they don't come up to snuff, if they don't

25   have that value added, then at that time you will either demote

*OFFICIAL TRANSCRIPT*

1    them to a position that may be a little more within their skill

2    set, or you get rid of them.  That's just the hard line of

3    tip pool.

4              THE COURT:  Let's go back.  He's starting, he's setting

5    up the procedure.

6    EXAMINATION BY MS. CATLETT:

7    Q.    When you initially set up the procedure for recording the

8    distribution of tips, do you remember what that distribution

9    was?

10   A.    Yes, ma'am.  It was 10 percent to the bar.  It was

11   25 percent to SAs.

12   Q.    Then did that distribution change later?

13   A.    It did.  It did.  The reason -- the reason that it changed

14   was that the -- the SAs at the time were being paid 2.13 an

15   hour along with servers.  I guess they weren't making enough,

16   so it was increased from 25 percent to 35 percent.

17             But, there again, when you talk about the optics --

18   I'm talking about optics from the standpoint of a server, of an

19   employee -- you went from making -- having a -- your portion

20   was 65 percent.  Now it's 45 percent.  So 65 percent.  Then it

21   went down to 55 percent, I'm sorry.  You know, these are

22   substantial hits in the check -- in the checking -- in your --

23   on your check.  They are substantial hits to your income.

24   Q.    When did the server checkout sheets, the ones that you

25   created, when did those first start being used?

                        *OFFICIAL TRANSCRIPT*

A.    Probably the second week of November.

What had happened in that -- during that time was they used that for a couple nights.  Then the office had created their own, a much more simplistic sheet; but, I mean -- it got the job done, but it didn't show what people's percentages were.

Q.    By percentage, what do you mean?

A.    Well, what your tip -- what your tip ratio is compared to what you rang.

Q.    Can you break that down a little bit more, for people who maybe don't have --

A.    Sure, sure.  If you averaged a thousand dollars in gross sales, that's food and wine, you know, in fine dining, the standard tip the 20 percent.  So we look at that, we look at that as a benchmark.  That is job well done, if you will.

Anything above that 20 percent is that lagniappe that we love here in New Orleans so much, right?  I mean, it's like, you know, if you got a 30 percent tip, you're over the moon. If you got even higher than that, you were loving that customer.  You'd definitely remember them and make sure you took great care of them when you came back.

So what happens with that tip percentage is you're looking at other people that are basically profiting off of your hard work and your experience.  They are not -- they are not serving as many tables, so that would mean that they are

**OFFICIAL TRANSCRIPT**

1    ringing less money.  They are not engaging their tables,

2    selling wine.  They are not manicuring their tables, which

3    means making sure that it's clean, that it's presentable.  It's

4    just, you know, quiet and easy service.  That if you don't --

5    I'm sorry -- that if you don't do those things, then it hits

6    your tips.

7          But the reality was, was that same person that was

8    doing those things, those missteps, oftentimes because of lack

9    of training or experience or polish, was making the same amount

10   of money as myself or any of these other folks that are in the

11   gallery today.

12        THE COURT:  What you're saying is the form the employer

13   created wasn't transparent about that?

14        THE WITNESS:  That's why I go to the optics, again,

15   yes, ma'am.  Thank you.

16        THE COURT:  Now I understand.

17   EXAMINATION BY MS. CATLETT:

18   Q.   When you were working there, during your tenure at

19   Doris Metropolitan, who were the owners of the business that

20   you interacted with?

21   A.   Well, you know, we had -- initially, when I started, it

22   was, you know -- Dori was kind of like the chief guy, as far as

23   the owner.  Then we had Itai, who was a managing partner.

24          Then, later on, I met Itamar.  He had been in, and I

25   think he was back in LA for a period of time.  He was kind of

*OFFICIAL TRANSCRIPT*

1   in and back out at that time between Los Angeles and

2   New Orleans.

3   Q.   When you worked there, did Itai pull management shift?

4   A.   Yes, ma'am.  He was the manager.

5   Q.   Were there any other managers during your tenure?

6   A.   Yes, ma'am.  One of our coworkers, Stavros -- we called

7   him *Steve* -- Stavros was made a manager, as well.  Wonderful

8   young man.  He --

9       MR. CUPP:  I would object, Your Honor, to just the

10  soliloquy, the sort of off the top of his head discussion.

11      MS. CATLETT:  You can just name the other managers.

12      THE COURT:  Don't worry.  I'm capable of dealing with

13  that.

14      THE WITNESS:  So we had Stavros Kingopolous (spelled

15  phonetically), and then, several months later, they promoted

16  another server, Alise Warren, to manager as well.

17  EXAMINATION BY MS. CATLETT:

18  Q.   During your tenure at Doris Metropolitan, was there a

19  bookkeeper?

20  A.   Yes, ma'am.  The bookkeeper was -- for the bulk of the

21  time that I was there, was our chef's wife.  She was an Israeli

22  American.

23  Q.   How were you paid?  How often were you paid when you

24  worked?

25  A.   Every two weeks.

                    ***OFFICIAL TRANSCRIPT***

1   Q.    How were you paid?

2   A.    By check.

3   Q.    Did everyone receive a check?

4   A.    Well, that was -- that was another interesting thing, too,

5   that really started -- why I started paying attention to the

6   integrity of what we were really experiencing there.

7            Because I really was there for a job as a server.  I

8   wasn't trying to be the Yoda of the restaurant business.  I

9   wasn't trying to do any of those types of things.  I wasn't

10  hired in a consulting position.  I was a server.  I was there

11  to make money by providing people a dining experience.  I was

12  happy with that limitation.  I wasn't trying to overstep.

13           But one of the things that disturbed me was that we

14  also had several employees who were from Costa Rica and some

15  from elsewhere who were not paid through the same payroll as we

16  were paid.  They were paid like off the books.

17           One of them was our sous chef at this time, who

18  returned to Costa Rica, thinking that he would be back in a few

19  days, but it turns out that his visa was not the type of visa

20  that he was supposed to be here in the states working on.  So

21  it wasn't reissued.  So we had several of those types of

22  things.

23           There were a lot of -- to work at Doris Metropolitan,

24  there was a lot of quid pro quo going on.  There was a lot of

25  pay to play that was happening.  I can elucidate on that as we

*OFFICIAL TRANSCRIPT*

1    go on further.

2    Q.   When you created the server checkout sheet, did you

3    ultimately have instruction from someone else about how to

4    create it as far as the distribution of tips?

5    A.   Well, that was set by management.  The distribution of

6    tips was set by management.

7    Q.   By management, who are you referring to?

8    A.   Itai.

9    Q.   Where were these sheets kept?

10   A.   Well, they had blanks.  There was a drawer in a cabinet

11   underneath the checkout station, one which blanks would be kept

12   in there.  Then there was also, eventually, a binder that was

13   kept in there that would show -- that should have shown, like,

14   the previous days, months, year for that matter, shifts and

15   what the totals were.

16   Q.   Where was this checkout station inside the building?

17   A.   It's at a server station.  We had two computers there.  So

18   it was there.

19        Oftentimes, our tips were left there in envelopes.

20   Our cash tips were left there in envelopes.  If you got cut

21   early, they were unsecured.  We had several people who had been

22   issued with thinking that their money was wrong.

23        It didn't even have your name and how much was in

24   there.  It would be your name.  So you didn't know whether,

25   okay, do I have $100 in here, or do I have $200 in there.  You

**OFFICIAL TRANSCRIPT**

1    didn't know.

2    Q.   Was there not a procedure whereby the cash tips would be

3    kept, and you had to sign for them?

4    A.   No, ma'am.  If anything like that happened, it happened

5    later.  It was very -- like I said, it was very sloppy.

6    Q.   So that -- the cash tips were kept where this binder was

7    kept?  Was that --

8    A.   Well, that was for people who had had cash tips that were

9    cut before the end of the night.  Because what they would do is

10   they would pool all the cash tips together at the end of the

11   night.  Then they would, you know, pay out who needed to be

12   paid out at the bar, the server assistant, the manager, so.

13   Q.   Do you know whether or not any of these checkout sheets

14   would ever go missing?

15   A.   Oh, all time.  You would -- let's say you worked -- the

16   last day that you worked was Saturday, and your first day back

17   was Wednesday.

18            So you would go back to take a look and see what the

19   final take was from Saturday night.  You know, half the time,

20   the papers weren't there.

21   Q.   Do you know what would happen if cash tips were missing,

22   or if an envelope was short based upon the checkout sheet?

23   Were servers ever reimbursed for that?

24   A.   Well, I mean, I can -- I can't speak for other servers.  I

25   can only speak for myself.  I was always very good about

*OFFICIAL TRANSCRIPT*

1   staying after my money.  But the reality was, you didn't

2   necessarily know how much was in there.

3          The other aspect to it, too, was when I quit,

4   actually, I had had enough, honestly.  My comment was I wasn't

5   feeling it anymore.

6          So I went back the following week.  I dropped off my

7   uniform.  My paycheck should have been there because that was

8   towards when it was due.  They said it was upstairs, but there

9   was nobody that could get it.

10          So I left them my address.  I never received it.  I

11   called three or four times, never received it, my final

12   paycheck.  That spoke to the integrity as well.

13   Q.    Did you ever receive any other mail at the same address

14   you requested --

15   A.    Yes, ma'am.  If somebody would say they had the wrong

16   address, no, because I got my W-2 just fine.

17   Q.    To your knowledge, did anyone else in the restaurant get

18   paid in cash?

19   A.    Well, like I said, you had people that were there that

20   were working under the table in the kitchen, so.

21   Q.    Would they receive envelopes of cash on payday or nightly?

22   A.    I believe that they actually got checks, yeah.  The two --

23   the two that were cooks, I never really saw their pay package,

24   so I think they had a check as well.

25   Q.    L.J., tell me just a brief bit about your background in

*OFFICIAL TRANSCRIPT*

1    the service industry.

2    A.    Yes, ma'am.  Like I said, I actually started when I was

3    12 years old.  Back then, you could get a work permit when you

4    were 12.  I started working -- I worked weekends at a pizza

5    joint in high school.  At the age of 14, I started working as a

6    grill cook at Bob Evans Restaurants.  I did that all through

7    high school.

8          Then in college, I worked -- I started bartending.

9    Then I went to fine dining.  I stayed in fine dining for

10   several years.

11         Moved to New Orleans -- pardon me -- moved to

12   New Orleans, and then kind of bounced around here as well.

13   Then I went into the wine business.  I worked for a wholesaler.

14   I worked for Glazer's liquor wholesale and moved up in the

15   management there.

16         I was the creator of The Glazer's Beverage Institute,

17   which was a training program that we had that we would do for

18   our people, in food pairings, wine, liquor and spirits.  It

19   actually ended up being picked up and was replicated in all the

20   states that Glazer's was in.

21         I left there and then went on to become the maître d'

22   at Commander's Palace.  George Rico passed away, and I was the

23   first new maître d' there in 31 years.  I enjoyed my tenure

24   there.

25         The reason I left there, my partner and I were

*OFFICIAL TRANSCRIPT*

1   adopting two boys from Guatemala.  They are brothers.  I was

2   offered a job at the Ritz-Carlton with better hours and more

3   money, so that was somewhat of a no-brainer.

4          I went to the Ritz-Carlton, but I found that it was

5   too hard.  Both of us had big jobs, big high-profile jobs, and

6   I found that the quality of our family life was suffering, that

7   my kids were suffering.  You know, the language.  One was a

8   baby.  So I stayed home then for about 20 months.

9          I went back -- went back to work.  I went back to

10  work actually as a landscape designer.  I did that for a number

11  of years until I started -- we had a second home in the

12  French Quarter -- until I started renovating the second home in

13  the French Quarter.

14         You don't take out a second mortgage on a second

15  home.  I needed to make more money.  I was paying cash for my

16  renovations that I did.  So that's when I started going back to

17  the service industry.

18         But, like I said, I didn't want to go back as a

19  manager.  I worked at the Bombay Club for several years.  I was

20  the featured bartender there.  I basically managed the place

21  four nights a week because Richard, the owner, who was a dear

22  friend of mine, he would leave in the evenings.

23         Once Richard passed away, I didn't have the heart to

24  stay there, and I ended up at Doris Metropolitan.  So that's --

25  Q.   When you worked -- I think Commander's is a good example

                    *OFFICIAL TRANSCRIPT*

1   of this -- tell me a little bit about the style of service at

2   Commander's Palace.

3   A.    Well, in fine dining --

4            MR. CUPP:  Objection, Your Honor, relevance.

5            THE COURT:  Let me ask, how is that relevant?

6            MS. CATLETT:  Because they use captains at

7   Commander's Palace.

8            THE COURT:  Okay.  So let's get to making the

9   connection to this case.

10           THE WITNESS:  Okay.  Speaking about -- I can speak to

11   it as to how it affects Doris Metropolitan.

12               We had -- we had even suggested at one point that

13   we go to some type of captain service.  A three-person team,

14   one which you have the captain who is responsible for the team,

15   where you have a server who is responsible for maintaining the

16   table, and then where you have the server assistant or the

17   busboy who is responsible for the cleaning, the carting, the

18   watering, things like that, and the running of food.  That's --

19   that's pretty traditional in most restaurants.  Sometimes they

20   change terms.

21               Now, I will tell you this.  A captain -- a team,

22   that three-person team, has a section.  They might have four or

23   five, maybe even six tables, depending on which restaurant they

24   are in.  A captain is not over several sections.  A captain is

25   only over one section.

*OFFICIAL TRANSCRIPT*

1    The reason that you do this is to have continuity

2    of care and constant presence in the dining room, which was

3    something that the owners at Doris Metropolitan were very big

4    on.  They are very customer focused.  I give them credit for

5    their customer focus.  They are very good about that.

6    Now, how that relates to Doris Metropolitan and

7    the captains and how they are using the term, they are trying

8    to say that the manager was a captain.  They were not.  I'll

9    speak to that as well.  A captain does not go and sit at the

10   bar and drink with customers.  A captain does not go out on the

11   patio, which is the only place that you can smoke, and smoke

12   and have cocktails and nosh with their friends.  That doesn't

13   happen.  That's not what a captain is.  Managers, that's a

14   prerogative of a manager.

15   EXAMINATION BY MS. CATLETT:

16   Q.   Would a captain at a normal restaurant, say, at

17   Commander's, would a captain have supervisory authority?

18   A.   Only -- they only have supervisory authority during the

19   course of operating, during dinner or during lunch.

20   Q.   Would that supervisory capacity extend over everyone there

21   or just their team?

22   A.   Just their team.

23   Q.   Would they handle money?

24   A.   What's that?

25   Q.   Would they handle money at the end of the night?

*OFFICIAL TRANSCRIPT*

1   A.    Yes.  Either the captain -- yeah, the captain does check

2   out with the checkout manager.  But they basically hand it over

3   is what they do.

4   Q.    Is that just for their team, or do they count other

5   people?

6   A.    Just for their team.

7   Q.    Under normal circumstances, would a captain hire and fire?

8   A.    They can't.  They can't.  That's the prerogative of a

9   manager.

10  Q.    Would they have keys to a restaurant?

11  A.    That would be a recipe for disaster.

12  Q.    Would they make schedules?

13  A.    No, ma'am.

14  Q.    When you worked at Doris Metropolitan, give me just a

15  brief synopsis of what your duties were as a server.

16  A.    Well, as a server, you would greet your table.  You have a

17  server and server assistants.  A server assistant would go and

18  get the water and get the bread started for the table.

19        You would go, and you would greet the table.  You

20  would tell them about any specials that you happened to have

21  for the day.  You make yourself available for any selections

22  that they may need.  I always offered my wine service is what I

23  tried to do.

24        Then you would leave them alone.  You would tell

25  them, listen, I'll be back when you folks close up your menus.

*OFFICIAL TRANSCRIPT*

1          You go back over, take their order.  You would serve

2     their food.  You would check on them.

3          Once again, it became -- you know, different tables

4     are different.  Some tables love to have conversations with

5     their servers.  They go there to see their pal.  Others don't

6     want to have all that dialogue.  They want it to be very quiet.

7     It might be a romantic evening out for them.  So you just do it

8     low key and quiet and, once again, elegant.

9          The type of service that you do in fine dining is

10    called *Russian service*, which means that it's done by course.

11    There is two styles of service.  It's Russian and French.  The

12    French style of service is where everything gets laid on the

13    table at one time.  That would be what here in the states we

14    would consider like your appetizers would be laid out, your

15    entree would be laid out, your sides would be laid out.  You

16    might even have dessert on the table already.  So more like a

17    banquet, or more like going to grandma's for Thanksgiving,

18    right?  It's all there.  The spread's out.  So it's Russian

19    service.

20         This was another thing where they spoke to captains

21    as well.  That in doing a Russian service, all food is supposed

22    to come out per course together.  So that would mean that if

23    there were two people sitting there, that there should

24    preferably be two people putting down their food.  If there

25    were four people there, there should be four people putting

*OFFICIAL TRANSCRIPT*

1   down the food, and so on with increased numbers.

2        That being said, pouring a glass of wine at a table

3   for someone or even going and cutting a porterhouse for a table

4   precludes someone from them getting your tips, entre into your

5   tips.  Because if that were the case, every person that came

6   and put food down at your table would be entitled to a share of

7   your tips.

8   Q.   Would that even include a chef, sometimes, if they brought

9   a plate out?

10  A.   Well, chefs usually don't because they are usually dirty.

11  I mean, honestly.  That's why they have usually one white coat

12  hanging up somewhere.  Because, you know, if they are a good

13  chef, they are working, right?

14       Doris Metropolitan had a very clean kitchen.  I'll

15  give them credit for that, but -- yeah, so no, normally, the --

16  if the chef is coming out into the restaurant, that's a special

17  thing.  They have to make sure that everything else is in line

18  so they can step away for a minute or two.

19       But what I was speaking to, though, is that a captain

20  does not -- a manager can help do those things.  Other servers

21  can help do those things.  Busboys can help do those things.

22  That was not indicative of a service captain.

23  Q.   When you were worked at Doris Metropolitan, did you ever

24  hear the term *captain* or *service captain*?

25  A.   No.  No.

**OFFICIAL TRANSCRIPT**

1   Q.   What were the managers called?

2   A.   The managers were called *managers*.

3        Then when Alise was hired, they called Steve the

4   *manager* and Alise the *floor manager*.

5   Q.   What were the differences in what they did?

6   A.   Well, you know, honestly, they both had comparable skills.

7   They were both very bright.  But they ended up kind of doing

8   the same types of things.

9        Steve was more involved in -- with schedule and

10  things along those lines.  All those things were approved by

11  Itai.  Itai was working as like the general manager at that

12  point.

13  Q.   Do you remember whether or not either of those managers

14  hired or fired anyone?

15  A.   Yes, they did.

16  Q.   Did they did consult with Itai before they did that?

17  A.   I don't know.

18  Q.   You've said that, you know, you saw a problem with this

19  basically from the very beginning, with the tip distribution.

20  Did you ever talk to anyone about this?  Did you mention it to

21  anyone?

22  A.   Well, you know, it was interesting because, remember, I

23  told you we had the three owners.  Initially, trying to get to

24  know Dori or to -- the first time I had a serious question

25  about that, I tried to speak with Dori.  I found -- later I

*OFFICIAL TRANSCRIPT*

1   found out -- that was at the beginning of the -- the beginning

2   of the shift.  I found myself in a horrible station, when I was

3   normally always in the front dining room.

4   Q.    Did you feel like that was punitive?

5   A.    It was punitive.  It most definitely was.

6         He's very -- he was very -- I don't want to say

7   belligerent.  He just would blow you off and tell you to go

8   talk to Itai.  That was how that was done.

9   Q.    Did you ever talk to Itai --

10  A.    Yes.

11  Q.    -- about your displeasure?

12  A.    Yes, ma'am.  Itai was -- I will give Itai credit.  He will

13  listen, but he clearly didn't have the authority to make a lot

14  of decisions.  So then it would get bumped up.

15        I don't know who the powers that be necessarily were.

16  That would be conjecture on my part.  But, oftentimes --

17  like -- same thing with the tip pool.  We talked to him about

18  the tip pool.  We gave our case for ending the tip pool.  He

19  told us that we would do that sometime around the beginning of

20  the year.

21        Well, we gave him until the end of January, and we

22  said, okay --

23  Q.    Let me stop you just real quickly.  So that would have

24  been the beginning of 2014?

25  A.    Yes, ma'am.  Yes, ma'am.  Thank you.

*OFFICIAL TRANSCRIPT*

1   Q.    What happened at the beginning of 2014?

2   A.    Well, we gave him a bit of time.  It was --

3   Doris Metropolitan that year -- actually, later on -- I think

4   it came out in May -- won the best new restaurant.  We were

5   elated.  It was very exciting to be part of that team.  The

6   owners were very proud of what had been accomplished.

7            They -- I'm sorry, can you ask the question again?  I

8   regressed there.  I apologize.

9   Q.    What happened after the first of the year because that --

10  A.    We spoke with Itai again at the end of January.  He

11  said -- because he just wanted to make it through the holidays,

12  initially, when he put us off, through the first of the year.

13           We talked to him about it.  Once again, he said, "No,

14  this is the way that it's going to go.  We're going to stay

15  with tip share.  I think it's more equal."

16           So we said, "No, it's not more equal because you're

17  not managing the people.  If you were managing the people, then

18  you would be getting rid of or training more people that are

19  the low performers."

20           So it's not -- it's not respective of the work that

21  people are putting in, the rewards that they are getting, as

22  opposed to what's showing up on their check.

23  Q.    Did you also speak to him about managers being in the

24  tip pool?

25  A.    Oh, yes, yes.  I said that -- here again, we go back to

*OFFICIAL TRANSCRIPT*

1  optics.  Remember when I talked about the quid pro quo, as

2  well.  I said, "You know, nowhere else do I know do managers

3  get tipped out."

4          I put it to you like this:  I said, "Listen, I was as

5  high up the Brennan's food chain as you could get without being

6  a Brennan, okay?"  In this town, that's saying something.  But

7  having said that, "The Brennans, if they could, if they could,

8  legally, if they could take part of the servers' tips, I'm sure

9  they would, as would all the other restauranteurs in America,

10  right?"

11          But there are prohibitions.  Once again, I don't know

12  the law.  That's why we're here.  But the presumption is that

13  they don't do it because it's not legal.

14      THE COURT:  Let me ask you, when you say that you

15  complained about managers being in the tip pool, who are you

16  referring to?

17      THE WITNESS:  What had happened, Your Honor, what

18  happened in January, Stavros, Steve, who is the first -- who

19  was the first manager, he talked to me every day that I was at

20  work.  He was 25 years old.  He just graduated film school.

21  His student loans were hitting.  So he's got an apartment to

22  pay for and utilities, a car payment, and now his student loans

23  are hitting.  A lot of my friends are kids who are kind of in

24  similar spots.  You know, they are about the same age.

25          He was telling me, man, I don't know if I'm going

*OFFICIAL TRANSCRIPT*

1   to be able to stay, I don't know if I'm going to be able to

2   make it.  I said to him, I said, "Well, tell me, honestly, how

3   much are you making?"  He said that he was making 25.  They

4   were trying to get him higher.

5   EXAMINATION BY MS. CATLETT:

6   Q.   By 25, you mean?

7   A.   25,000.  That was his base, and they were going to try and

8   get him higher.  I said, "Steven, that's not a living wage, not

9   for somebody that's working full time doing what you're doing."

10  I said, "You need to talk to them."

11         Well, he then proceeded to talk to them.  Then I

12  didn't see him for a couple days.  Then when I saw him again,

13  they had announced that we were going to be tipping out the

14  manager, that there would be a percentage that went to the

15  manager.

16  Q.   Would this have happened around January?

17  A.   January 2014, yes, ma'am.

18  Q.   Prior to January of 2014, you testified that there was

19  no -- it wasn't kept up with, there weren't any checkout

20  sheets.  Do you know if managers or owners were participating

21  in the tip pool in 2013?

22  A.   Well, once again, remember when I spoke to optics, that

23  was the thing.  That's why we really kind of blew up was that

24  you were putting all this money in, and then you're getting

25  this -- what seemed to be a pittance back.  I'm fairly good at

**OFFICIAL TRANSCRIPT**

1    math, as were many of my coworkers, and the math just wasn't

2    adding up.

3            What I found really reprehensible, and what I found

4    to be fraudulent, if you will, is that when I would talk to

5    them about this -- respectfully, the same voice that I'm using

6    now, because I needed my job at the time -- when I would speak

7    to them, they would listen, and then they would do nothing.

8            That's where -- so it's one thing to say that, okay,

9    you don't know because maybe you're new to the U.S., or you're

10   new to the restaurant business, or you're new to something, but

11   there was that subterfuge, there was that underlying lack of

12   integrity that really was rife throughout the whole system

13   there.

14   Q.   When you questioned the legality of managers being in the

15   tip pool, what was said to you?

16   A.   I spoke to Itai initially, and then he told me to speak to

17   Itamar.  Itamar was in town then.  I spoke to Itamar about

18   that.  Then he got back to me a day later, and said he spoke

19   with his attorney and said it was completely legal.  That was

20   pretty much my whole experience with Itamar.

21           Similarly, too, we had children that would

22   occasionally sit at the bar.  I told him, I said, "Listen, in

23   New Orleans, kids -- in Louisiana, children don't sit at the

24   bar.  I don't know what's going, I don't know whether that's

25   legal or not, but I'm telling you, culturally, it's not done.

*OFFICIAL TRANSCRIPT*

1    I can tell you that much.  I can't speak to the legality of it,

2    but the optics, once again, are bad."

3          I spoke to Itamar about it.  I spoke to Itai

4    initially.  He bumped me over to Itamar.  I spoke to Itamar.  A

5    day or two later, he told me spoke with his attorney.

6          COURT REPORTER:  Sir, you need to speak slowly.

7          THE WITNESS:  I'm sorry.  I apologize.

8          He spoke with his attorney, and he told me that

9    it was fine.  I, at that point, had told him that he may need

10   to seek other legal counsel because I don't think that was good

11   advice.

12   EXAMINATION BY MS. CATLETT:

13   Q.   Let's talk a little bit about the managers' duties.  When

14   I'm saying managers, I mean Itai when he managed, I mean Alise,

15   and I mean Stavros, or Steve.

16          Did they have keys to the restaurant?

17   A.   They would lock up.  Usually, they would not lock up

18   unless one of the owners was bugging out for the evening.

19   Q.   So they would sometimes open and close?

20   A.   Yes, ma'am.

21   Q.   Did the managers train new staff?

22   A.   Oh, yeah, that was a big part of their job.

23   Q.   Did the managers perform service at every table?

24   A.   Once again, I found that laughable.  No.  They would go

25   and they would check on every table.

*OFFICIAL TRANSCRIPT*

1          Well, for example, just to kind of explain this.  I

2   went to Texas Roadhouse the other night --

3          MR. CUPP:  Objection, Your Honor.  Completely

4   irrelevant.

5          THE COURT:  Overruled.

6          THE WITNESS:  I went to Texas Roadhouse the other

7   night, and the manager stopped by the table and asked if

8   everything was to our satisfaction.  The onion mum was kind of

9   soggy, right.  So he went and got us a fresh one.  That type of

10   thing.  I don't believe he was entitled to a share of the tip

11   that I left for the server.

12   EXAMINATION BY MS. CATLETT:

13   Q.   What sort of table service, if we are calling it *table*

14   *service,* did managers perform at tables at Doris Metropolitan?

15   A.   The only time that you would see a manager at the table

16   oftentimes would be if a porterhouse was being delivered.

17   Oftentimes they like to kind of put that extra panache.

18          It also showed off to the rest of the dining room

19   that that table was getting attention from a manager because

20   they are over there cutting up the porterhouse.  That was the

21   only time that that was done.

22          If you -- if your manager was helping you run drinks

23   and was helping you run food, you were an issue there.  They

24   would tell you that you better get with it, or you won't be

25   here much longer.

***OFFICIAL TRANSCRIPT***

1    Q.    So would you say they were being proactive?

2    A.    No, it's doing what managers do.  Managers will go, and

3    they will go check on tables.  They will go -- if you have

4    somebody that's in the weeds, if you have somebody who is

5    falling greatly behind, and you don't want to have to be

6    comping the check and sending all kinds of free goodies to the

7    table, then you have to turn it around.

8              But that was not the case with the top employees.

9    That was --

10   Q.    When you worked there, who supervised the dishwashers?

11   A.    At that time, it was -- originally, it was Stavros.

12   Q.    One of the managers?

13   A.    Yes, yes.  It was Stavros or Alise, yes.

14   Q.    If you needed to do call off because you couldn't make it

15   to work, who was it appropriate for you to speak with when you

16   called?

17   A.    Either of the managers, Stavros or Alise.

18   Q.    If you ever needed to switch shifts with another employee

19   for some reason --

20   A.    It had to be approved.  They actually did come up with a

21   form for that, but it had to be manager approved.  So you had

22   to have one of their --

23   Q.    By manager --

24   A.    Stavros or Alise or Itai, any of the three.

25   Q.    Based upon your interaction with the non-owner managers of

**OFFICIAL TRANSCRIPT**

1   Doris Metropolitan, do you believe that they were acting on

2   behalf of Doris Metropolitan?

3   A.   Oh, undoubtedly, yes, ma'am.

4   Q.   Did any of the managers perform any type of side work?

5   A.   No.

6   Q.   Did you always pour your own wine?

7   A.   Yes.  The only times that -- we had a gentleman, he was a

8   wine purveyor.  He had the lion's share of his wines

9   represented.  He's with a small boutique house here.  His name

10  is Buck.  Buck was at the restaurant probably five or six

11  nights a week.

12       Buck oftentimes would go over and talk about --

13  especially if it was one of his wines, he would go over and

14  talk about his wines.  If somebody was really, really, you

15  know, enjoying something, I would go, like, well, let me

16  introduce you to Buck.  He represents these wines.  He would go

17  over.  There was that.  But Buck wasn't tipped.  Buck was paid

18  by the restaurant.

19  Q.   Can you tell me what your side work was at

20  Doris Metropolitan and, just to have it on record, what side

21  work actually is?

22  A.   Well, side work -- side work is a -- actually, there is

23  two aspects to it.  There is setup, which is at the beginning

24  of your shift.  That is when you go in, and you make sure that

25  your tables are clean, your silverware is polished, your

**OFFICIAL TRANSCRIPT**

1    glassware is polished, that your salt and pepper shakers are

2    full, that you've got your backups of other things, that you've

3    got enough napkins folded for the evening, that you have all of

4    your condiments ready to go.

5         So it takes about 45 minutes, usually, of setup work,

6    to get everything up and running to be ready for opening.

7         Side work traditionally is what you do at the end of

8    the shift.  So you have your setup work, and then you have your

9    side work.

10        Side work is done when you're told that your shift is

11   over.  So that's either at the very end of the night, or it's

12   whenever you're cut.  You'll find out what your side work is.

13        That can depend on where you fall and when you leave.

14   Some side work can't been done until the very end.  You know,

15   wiping down things and whatnot, that's the last one or two

16   people that are in the place.  The sweeping of the floors,

17   that's the last one or two people in the place.  The cleaning

18   of the bathroom, that's the last, you know, couple people.

19        So, those people would oftentimes fold more napkins,

20   would restock condiments, would restock any of the supplies

21   that needed to be restocked.

22   Q.   So was all of the side work at Doris Metropolitan

23   performed by servers or server assistants?

24   A.   Yes, ma'am.  Yes, ma'am.

25   Q.   You mentioned that porterhouses would sometimes be carved

*OFFICIAL TRANSCRIPT*

1    sometimes by managers.

2    A.    Uh-huh (affirmative).

3    Q.    How often were those sold?

4    A.    Well, you know, that was -- you were always trying to sell

5    a porterhouse.  Especially if you had a big guy like me come

6    in, oh, I love steak.  Oh, that's great, sir.  Have you ever

7    had a porterhouse?

8              You tell them it's a New York strip on one side and a

9    chateaubriand cut, the filet cut, on the other.  That's a great

10   way to sell it.  It ups your check average.

11             So you'd try and sell it as much as you could, but

12   oftentimes you might sell maybe one a night, if you're lucky.

13   Q.    Every time one was sold, would it be carved by a manager?

14   A.    Not necessarily, no.

15   Q.    Would servers sometimes carve?

16   A.    I carved many of them, yes, ma'am.  There were some tables

17   that were not -- they did not want a lot of extra attention.

18   Some tables would eat it up.  Like if you gave them a spoon,

19   they would just lap up the attention, but others they wanted --

20   it was a romantic evening out and --

21   Q.    Quiet diners?

22   A.    Yes.

23   Q.    When you worked at Doris Metropolitan, was there an

24   employee handbook or a manual of any kind?

25   A.    No.  That was something I had spoken to Itai about as

*OFFICIAL TRANSCRIPT*

1   well.  I had even offered to do it in trade.  I had just done

2   that for -- actually, I've done that for every place I've

3   worked over the past many years.  I had just done it for the

4   Bombay Club the year previous.  So I told him that I would do

5   it, and we could trade something out, you know, like trade out

6   a dining tab, that type of thing.

7         No, we didn't have -- standard operating procedures

8   were not put in any book.  They were not posted anywhere.

9   Q.   Was there any policy with regard to overtime?

10   A.   Yeah.  The interesting thing with overtime, we had

11   addressed -- it goes back to remember when I had said that the

12   question was, "Don't you trust us?"  That was one of the things

13   that came up periodically, "Don't you trust us?"

14         When the overtime question came up -- and this really

15   came up more with the SAs and some of the servers as well -- we

16   were told that you're paid 2.13 an hour, so that overtime is

17   based off of that 2.13.

18         It was the same way when we addressed being paid for

19   meetings.  We were told --

20   Q.   Who would have told you that?

21   A.   That was -- that came from -- being paid -- the part for

22   being paid for meetings was with Itamar.

23   Q.   Was there any policy that you were not allowed to have

24   overtime?

25   A.   It was discouraged.

*OFFICIAL TRANSCRIPT*

1    Q.    Who would have discouraged it?

2    A.    The managers.

3    Q.    You mentioned meetings, so that's my next topic.  Were you

4    required to go to mandatory meetings?

5    A.    Yes.  We had a meeting every Monday.  Regardless of

6    whether you're on the schedule or not, we had a meeting every

7    Monday.

8    Q.    When you say regardless of whether you were on the

9    schedule or not, you mean it was mandatory in that you had to

10   come in for it on your day off?

11   A.    Yes, you had to be there for, let's say, three o'clock, I

12   believe it was.

13   Q.    Were you told by managers to clock in for that meeting?

14   A.    No.

15   Q.    Did you ever o'clock in for it?

16   A.    Some did, some didn't.

17         The other aspect to it, too, was we were only paid

18   that 2.13 an hour.  When I asked Itamar about that -- once I

19   realized he was the money guy, I had asked him about that.  I

20   said, "Why are we only making 2.13 an hour?  Aren't you also

21   supposed to pay us for two hours?"

22         He said, "No, we only have to pay you -- like, the

23   federal minimum wage currently is 7.25 an hour.  We only have

24   to pay you the federal minimum wage of 7.25 an hour if your

25   hourly average drops below 7.25 an hour.  Do you think you're

*OFFICIAL TRANSCRIPT*

1  making less than 7.25 an hour?", is what he asked me.

2  Q.   By the hourly average, what you mean is the calculation of

3  2.13 plus tips?

4  A.   Right, exactly.

5  Q.   So did you ever get paid 7.25 an hour for a mandatory

6  meeting?

7  A.   No.  No.

8  Q.   How long would those meetings typically last?

9  A.   They were usually an hour.

10        THE COURT:  Did you get paid, but just not 7.25, or you

11  didn't get paid at all?

12        THE WITNESS:  Well, I mean, initially we weren't

13  punching in.  Then I started -- toward the end, started

14  punching in.  That was probably in the summertime, before I

15  left, just because I was fed up with it.  I was going to get my

16  2.13 if that's all they are going to pay me.

17            I will say this, also, too.  I'll reference

18  McDonald's.  If a McDonald's has a coterie of top attorneys,

19  and if we have a special meeting, and we call people in,

20  whether crew people or managers, we have to pay them for two

21  hours.  Regardless of whether they are there for half an hour

22  or an hour, that that is the standard, so...

23  EXAMINATION BY MS. CATLETT:

24  Q.   Was there always a Monday meeting?

25  A.   Yes.  We also had -- before each shift, we had a pre-shift

*OFFICIAL TRANSCRIPT*

1    meeting at 3:30.

2    Q.    Was there any opportunity to earn tips during the

3    mandatory Monday meeting?

4    A.    No.

5    Q.    Just to clarify, when you were talking about overtime and

6    how it was paid, and you said it was paid at 2.13, did you

7    receive straight time for overtime, or was the calculation

8    based on 2.13?

9    A.    No, the calculation -- so what they did is you would be

10   paid three -- whatever -- 3.21 an hour for that, for that

11   overtime.

12          So overtime for tipped employees didn't hurt them

13   because it's only basically a dollar more an hour.  That was

14   how they considered the time and a half.

15   Q.    To your knowledge, did the owners -- the owners were made

16   aware that they were violating the tip rule?

17   A.    Oh, yes, ma'am.

18   Q.    How long did your daily pre-shift meetings last?

19   A.    Well, they were supposed to be 20 minutes, 15 to

20   20 minutes.  Sometimes they could be literally that short.

21   Other times, they could go on for close to 45 minutes.  It

22   would really push us up right to opening time, which

23   necessitated us coming in earlier, before we even punched in,

24   to do our setup and our side work, because you never really

25   knew how long the -- how long the shift meeting was going to

*OFFICIAL TRANSCRIPT*

1    run.

2    Q.    Did you work overtime?

3    A.    I did.

4    Q.    Do you remember, as we sit here today, what rate you were

5    paid at for the overtime you worked?

6    A.    Well, that's -- it only showed 2.13 an hour, but the

7    calculations never made any sense.  It was a math that I was

8    not -- that -- unlike anything I've ever seen.

9    Q.    Did anyone else ever complain about overtime?

10   A.    Yes.  Yes.  I think the number one -- the number one

11   reason that people left employment at Doris Metropolitan -- I'm

12   talking about good staff -- was because of the inequity and the

13   inability to navigate what they were paid, and making head or

14   tails from it.  It was very frustrating.

15   Q.    With regard to that, how would you describe your employer?

16   A.    On the one hand, I really liked Itai.  Itamar and I always

17   got along very well.  Dori seems very pompous, but I got along

18   fine with him.

19            I found that their business practices lacked

20   integrity.  This is a contractual relationship we entered into,

21   one where the presumption is that we're both going to offer our

22   best.  I found that where they required you to give your best,

23   their best was not in that same sense returned.

24   Q.    Did you find their sort of lack of protocol haphazard?

25   A.    Well, it was negligent.  The reason I say that it was

*OFFICIAL TRANSCRIPT*

1  negligent was, you know, they knew who I was, and they knew

2  what my background was -- now, I will say this, there are a lot

3  of restaurants that won't touch me as a server or as a

4  bartender because I'm over qualified.  You know, nobody

5  wants -- nobody wants to take, you know, the judge who then is

6  going to be working as a paralegal.  You know, it's that type

7  of thing.  It was the same type of thing.

8         So I would talk to them, and usually the answer was,

9  I've spoken to our attorney, and we're fine.

10  Q.    I want to look -- just for a little bit, we're going to

11  talk about our damage calculations.  This is a document that

12  was actually produced by defendants that shows the breakdown of

13  your hours that were worked.  It's three pages long, which

14  covers your tenure there.

15         THE COURT:  What's the exhibit number and the Bates

16  number?

17         MS. CATLETT:  This is --

18         THE WITNESS:  Is there anything in there from 2013?

19         MS. CATLETT:  There is nothing from 2013.

20         This document, it's Tab 2.

21         THE COURT:  Defendants' Exhibit --

22         MS. CATLETT:  Plaintiff's Exhibit 2.

23         THE COURT:  Plaintiff's Exhibit 2.

24  EXAMINATION BY MS. CATLETT:

25  Q.    Can you see this up there?

1   A.   I can see it here on my screen.

2        THE COURT:  Can you all tell what Bates numbers we're

3   looking at?  Because I can't see the -- would it have

4   Mr. Hunt's name at the top?

5        MS. CATLETT:  So Bates-1028, 1029 and 1030.

6   EXAMINATION BY MS. CATLETT:

7   Q.   So on the far left column up here, that has the dates that

8   are on here.  Can you see what date this starts with?

9   A.   Yes, ma'am.  That's January 1 of 2014.  I'm not sure what

10  happened with the previous two months.

11  Q.   Then on the bottom of this first page, what month does

12  that end with?

13  A.   The bottom -- where are you at?

14  Q.   On that first page, just what date does it end with?

15  A.   The -- 4/18.

16  Q.   Then we're on the second page now, which is Bates-1029.

17  Can you tell me what date that pay starts with?

18  A.   The first pay date is 5/7 of 2014.

19  Q.   Can you tell me what date that ends with?

20  A.   The last pay date on that page is 7/30 of 2014.

21  Q.   Then we're on the last page of the documents that were

22  produced in reference to you.  Can you tell me the date range

23  that it says this is for?

24  A.   Yes, ma'am.  From January 1st of 2014 to December 29th of

25  2017.

*OFFICIAL TRANSCRIPT*

1  Q.   Can you tell me how many hours it says you worked during
2  that period?
3  A.   It says 431 regular hours.  431.04.  I'm sorry.
4  Q.   Can you tell me how many dollars it says you were paid for
5  that?
6  A.   Total earnings $13,988.91.
7  Q.   What about the dollars next to the hours worked?
8  A.   Nine hundred -- it's kind of hard to read.  Is it $918.17?
9       THE COURT:  12 cents.
10  EXAMINATION BY MS. CATLETT:
11  Q.   12 cents.
12       Does that look like that's a multiplication of the
13  431.04 by 2.13 an hour?
14  A.   Uh-huh (affirmative response).  Uh-huh (affirmative
15  response).  Yes, ma'am.
16  Q.   To your knowledge, do you agree that these were the weeks
17  that you worked?
18  A.   No.  Because I worked -- I worked the two previous months.
19  I don't know where that paperwork is, but --
20  Q.   How many hours would you say you averaged during the two
21  months that we don't have records for?
22  A.   Well, I was working there usually five, six nights a week.
23  The money was good.
24       Just speaking the business in New Orleans, October,
25  November, December, those are your three really big money

*OFFICIAL TRANSCRIPT*

1    months in fine dining.  So I hired in and I started the

2    beginning of November, and the money was -- we were making the

3    money, certainly.

4    Q.    Were you having mandatory meetings during the time period

5    for which we don't have records --

6    A.    Yes, ma'am.

7    Q.    -- in October?

8    A.    Yes, ma'am.

9    Q.    Would you say that they happened every Monday during that

10   time period?

11   A.    Yes, ma'am.

12   Q.    Did you go to every one of those Monday meetings?

13   A.    Yes, ma'am.

14   Q.    Then, for the time period that is on the sheet that we

15   just went over, would you say that they had mandatory meetings

16   every Monday during that time period?

17   A.    Yes, ma'am.

18   Q.    Did you attend every one of them?

19   A.    Yes, ma'am.

20   Q.    Is it fair to say that your employers were reckless with

21   regard to how they handled your tips?

22          MR. CUPP:  Objection.  Calls for a conclusion.

23          THE COURT:  Sustained.  That's more of a legal

24   question.  He's a fact witness.

25   EXAMINATION BY MS. CATLETT:

*OFFICIAL TRANSCRIPT*

1   Q.    Just to briefly recap, when you were at

2   Doris Metropolitan, managers controlled scheduling?

3   A.    Yes.

4   Q.    When you were at Doris Metropolitan, did managers control

5   conditions of work, like when you could go home at night, how

6   to handle tardiness?

7   A.    Yes.

8   Q.    When you were at Doris Metropolitan, did managers control

9   the opening and closing of the restaurant?

10  A.    Yes.

11  Q.    When you were at Doris Metropolitan, did managers control

12  staff meetings and attendance?

13  A.    Yes.

14  Q.    When you were at Doris Metropolitan, did the managers

15  control the supervision of dishwashers?

16  A.    Yes.

17  Q.    Do you believe that the cash tips were easy to steal

18  because they were unsecured?

19  A.    Yes.

20  Q.    What was your impression of the explanation given to you

21  when you asked about the tip pool?

22  A.    Once again, it goes back to -- the initial question was,

23  "Don't you trust us?"  And, you know, my inclination, having

24  been in this business for a long time, is no, I wouldn't trust

25  my own brother, you know, if we don't have -- if we don't have

*OFFICIAL TRANSCRIPT*

1  systems and procedures in place.  I mean, if you look at the

2  places that are successful, their systems and procedures are

3  top notch.

4  Q.   There is one more thing -- this is our damage calculation.

5  This is actually not going into evidence.  It's just for you to

6  refer to.  I know we've talked about it on the phone and in

7  doing discovery.

8          Because we just went over the document that was

9  produced by defendants that shows the hours that you worked

10 during your tenure with Doris Metropolitan, with the exception,

11 of course, of the missing records for the end of 2013.  Looking

12 at this, it shows each week that you worked.  Would you say

13 that that's accurate for the records that we have?  From

14 January of 2014 through July of 2014?

15 A.   It would be, yes, ma'am.

16 Q.   Then beside that, you'll see that we have got something

17 for a Monday meeting.  Does that look like that would be one

18 Monday meeting every week?

19 A.   Uh-huh (affirmative response).  Yes, ma'am.

20 Q.   Then you'll see the amount of hours worked in all of these

21 weeks.  Of course, missing still is the end of 2013.  Do those

22 look like they accurately reflect the hours that you worked?

23 A.   Yes, ma'am.

24 Q.   You were paid 2.13 an hour for those?

25 A.   Right.  Yes, ma'am.

*OFFICIAL TRANSCRIPT*

1   Q.    I know -- well, you may be a math whiz, I'm not sure --

2   but do your minimum wage calculations look like they are

3   accurate based on your hours worked?

4   A.    Do they look like -- I'm sorry.  Say that again.

5   Q.    Does this look like the damage estimate that we talked

6   about you would be entitled to based upon the number of hours

7   worked?

8   A.    Yes, ma'am.

9   Q.    That are shown in the records we have?

10  A.    That are shown.  Right, right.

11        THE COURT:  What's the highlighted portion represent?

12        MS. CATLETT:  That's the two-year, rather than the

13  three-year determination, lookback period.

14            I have nothing further.

15                      CROSS-EXAMINATION

16  BY MR. CUPP:

17  Q.    Good morning, Mr. Hunt.  My name is Steven Cupp, and I

18  represent Doris and the individual defendants.

19        Let's take a look at this exhibit that was just

20  placed in front of you.  Where it says *Hours Worked* column,

21  that's not a weekly number, is it?

22  A.    No, sir.  That would be -- there were two-week pay

23  periods.

24  Q.    Right.  Okay.  So, show me, in 2014, which week you

25  believe you worked overtime?

                        ***OFFICIAL TRANSCRIPT***

1    A.    No, actually the -- I was speaking to -- I was speaking to

2    2013, which you seemingly haven't been able to produce.  You

3    have been unable to produce.

4    Q.    Mr. Hunt, I'm asking you, show me on 2014 --

5          THE COURT:  Wait a second.  Wait a second.  If we're

6    looking at the -- what's got Black 90 is the Bates number on

7    it.  It's got L. J. Hunt at the beginning.  It starts with

8    1/12/2014.  So he's asking you questions about that time

9    period.

10         THE WITNESS:  That's fine.

11   EXAMINATION BY MR. CUPP:

12   Q.    So show me, in 2014, which weeks you're testifying you

13   worked overtime.

14   A.    Well, actually, you could be in the first week, it could

15   be the first pay period, it could be the second pay period.

16         The reason I say that is when you pay people

17   biweekly, which means you pay every two weeks, you still have

18   to account for their 40-hour workweek.

19         So if I worked 45 hours my first week, I'm entitled

20   to 5 hours of overtime.  Then, if I only worked 10 hours that

21   next week, I get paid 10 hours straight time.

22   Q.    Do you know as you're sitting here today whether you

23   worked in the two-week pay period ending 1/12/14, that you

24   worked any overtime during those two-week periods?

25   A.    I would imagine I probably did.  This is the same time

*OFFICIAL TRANSCRIPT*

1   that I took a full-time job in the daytime because I couldn't

2   afford to work there.

3   Q.   You don't done for sure; you're just speculating?  You're

4   assuming you did, right?

5   A.   As much as you're assuming anything, sir.

6   Q.   So you believe the two-week period ending 1/24/2014, that

7   you had a week in there that you worked overtime?

8   A.   Yes, sir.

9   Q.   What are you basing your testimony on?

10  A.   Because that's the same time that I went and got a day

11  job.

12  Q.   What was your day job?

13  A.   I went and became a landscape supervisor.

14  Q.   I don't understand the connection between that and whether

15  you worked --

16  A.   I could not afford to make my bills off of what I was

17  being paid at Doris Metropolitan.

18  Q.   The question is:  How do you know that you worked overtime

19  in one of the weeks ending 1/24/2014?

20  A.   Because I worked as much as I could until I took my day

21  job.

22  Q.   That's the best answer you have to that question, right,

23  is that you just worked -- you're assuming that one week you

24  worked over 40?

25  A.   Well, sir, I could ask you just to pull my time sheets.

*OFFICIAL TRANSCRIPT*

1    That would be easy enough.  Produce the time sheets.

2    Q.    I'm asking, do you know --

3    A.    I'm asking you, produce the time sheets.

4          THE COURT:  Okay.  Try to just --

5          THE WITNESS:  I'm sorry.  Yeah, no, it's just -- it's a

6    bit ridiculous.  I'm not one with the integrity issue here.

7    The people you are representing are the ones with the integrity

8    issues here.

9          THE COURT:  We need to just --

10         THE WITNESS:  I apologize, Your Honor.  I apologize.

11         THE COURT:  We don't have testimony from about anybody

12   about that.  We're not trying the moral integrity of any of the

13   defendants here.  So if you all will try to answer the

14   questions.

15         THE WITNESS:  Yes, ma'am.

16         THE COURT:  Your attorney, any questions about, well,

17   were the time sheets produced, they are aware of that, and

18   they'll cover that.

19         THE WITNESS:  Very good.  Thank you.

20   EXAMINATION BY MR. CUPP:

21   Q.    So is it fair to say that -- I understand your testimony

22   with respect to the first four weeks of 2014, but is it fair to

23   say that the remainder of 2014, you worked no overtime,

24   correct?

25   A.    Yes, sir.

*OFFICIAL TRANSCRIPT*

1    Q.    Do you recall what you made in 2013 from Doris?

2    A.    No.  I don't.  I would have to actually go back over my

3    tax records.

4    Q.    I want to place in front of you what's been marked as

5    Exhibit 4 that we're producing.  It's your 2013 W-2.

6                THE COURT:  The Plaintiff's Exhibit 4.

7                MR. CUPP:  No, this is Defendants' Exhibit 4.  This is

8    the one you've already introduced, Your Honor -- or it's

9    en globo, the W-2's.

10   EXAMINATION BY MR. CUPP:

11   Q.    So it appears, based on this W-2, that you worked --

12               THE COURT:  Are there Bates numbers?

13               MR. CUPP:  Yes.  It's Bates-15, DMNO-15.

14               THE COURT:  I have his goes from DMNO-14, 15 and 16.

15               MR. CUPP:  Correct.

16               THE COURT:  You're just showing him 13.

17               MR. CUPP:  I'm just showing him 13.

18               THE COURT:  Okay.

19               MR. CUPP:  Judge, the 2014 W-2 that's in the record

20   matches the pay records and what he paid.  So the question

21   would be 2013.

22   EXAMINATION BY MR. CUPP:

23   Q.    Have you had a chance to review this, Mr. Hunt?

24   A.    Yes, sir.

25   Q.    Would you agree that this accurately reflects the amount

**OFFICIAL TRANSCRIPT**

1    of pay you received in 2013 from Doris?

2    A.    No.

3    Q.    So you're saying that Doris didn't report all of your

4    hours in 2013?

5    A.    No.

6    Q.    Then why do you have reason to believe that this W-2 is

7    inaccurate?

8    A.    Because of how the tip -- because of how the tips were

9    disseminated, how they were adjudicated, if you will.   I

10   believe that we actually made considerably more than that, sir.

11   Q.    So when you received this 2013 W-2 from the company, did

12   you go to the company and say, this is not right?

13   A.    No, because I saw them as grifters.

14   Q.    Did you go to the IRS and say, my goodness, this is not

15   right, I actually made more?

16   A.    I'm sitting here, aren't I?

17   Q.    I take that as a no?

18   A.    There you go.

19   Q.    So you don't know whether this 2013 W-2 is in any way

20   accurate; is that what your testimony?

21   A.    I would say it's not accurate.

22   Q.    When you worked at Doris, did you work a second job?

23   A.    I worked a second job once I realized I had to have a

24   second job, and then I went to part-time status.

25   Q.    You went to part-time status with Doris?

*OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    When was that?

3    A.    In January.  Toward the middle of January -- I think I

4    started my new day job January 20th of 2013.  That was my

5    anniversary date.

6    Q.    Let's make sure we got the year rate.  January 20th, what

7    year?

8    A.    Oh, 2014.  I apologize.  Thank you, sir.

9    Q.    So you went to part-time status?

10    A.    Yes.

11    Q.    After you went to part-time status, how many days a week

12    on average were you working?

13    A.    Probably three.

14    Q.    You believe during those three shifts, those three days

15    that you were working at Doris part time, that you were

16    clocking in, you were clocking over 40 hours in a workweek?

17    A.    No.

18    Q.    Go back to my original question when I showed you the 2014

19    numbers.  In 2014, you weren't working any overtime at Doris,

20    were you?

21    A.    The first couple weeks.  I told you I thought I did, yes.

22    Q.    I'm a little confused with your testimony earlier.  Do you

23    know, do you know whether any managers were taking -- or

24    sharing tips before 2014?

25    A.    Yes.

*OFFICIAL TRANSCRIPT*

1   Q.   How do you know that?

2   A.   Well, the presumption -- and we go back to this again --

3   when the cash goes up with no -- nothing is verified as to how

4   much cash is going up, and you see what's coming back, it

5   doesn't take a genius to figure out that some cash has been

6   skimmed off.

7   Q.   So you're basing your knowledge on a presumption?

8   A.   One with decades of experience, sir.

9   Q.   So you're well familiar with how the tip credit works,

10  right?

11  A.   Yes.

12  Q.   You're well familiar with how tip pooling works, right?

13  A.   Yes.

14  Q.   I mean, my goodness, you have all sorts of experience in

15  the restaurant industry, right?

16  A.   Yes, I do.

17  Q.   So would you agree with me that -- let me ask you to back

18  up a little bit.  When you worked at Commander's Palace, did

19  your captains take part in the tip pool?

20  A.   Well, sir, the captains --

21  Q.   Did the captains take part in the tip pool at

22  Commander's Palace when you worked there?

23  A.   For their team, yes.

24  Q.   Now -- because they were performing table service duties,

25  right?

*OFFICIAL TRANSCRIPT*

1   A.   You clearly don't know what a captain does, sir.

2   Q.   They were performing table service duties?

3   A.   Yes.  Of course.  They have to.  They have to, or else

4   they wouldn't be a captain.  They would be a manager.

5   Q.   They were performing table service duties at Commander's

6   Palace, right?

7   A.   Yes, sir.

8   Q.   Thank you.

9        Now, would you agree with me that Doris Metropolitan

10  had a unique -- is a unique restaurant in the way they ran the

11  tip pool, in that it was a pooled house?

12  A.   I would say it was negligence, sir.

13  Q.   But had you ever worked in a restaurant where all the

14  servers shared equally in the tips?

15  A.   Yes.

16  Q.   So you've worked in restaurants where there was a pooled

17  house?

18  A.   Yes, I have.

19  Q.   Which restaurant was that?

20  A.   Actually, it was a bar.  It was a bar that I worked at.

21  It was at Good Friends.

22  Q.   So have you ever worked at a restaurant -- were you

23  bartending, or were you serving --

24  A.   I also worked at a restaurant.  This was years ago in

25  Chicago.  It's called the *Waterford Room*.

**OFFICIAL TRANSCRIPT**

1    Q.   They pooled?

2    A.   Yes, they did.

3    Q.   They pooled the house?

4    A.   Yes, they did.

5    Q.   So that meant that a server could have a bad section one

6 night, correct, and still earn the same amount of money as a

7 server that worked in a high money section?

8    A.   Not too many shifts, sir, and they would be gone.  The

9 weakest link goes.  You develop them, or you move them on.

10   Q.   I really appreciate your opining on your experience and

11 everything, but I'm trying to ask you a question.

12   A.   I'm answering your question, sir.

13   Q.   So at Doris, you understood that if a server and server

14 assistant happened to have -- get stiffed or have a bad shift

15 that night, they are still earning the same as the servers who

16 were working that evening because it's a pooled house, right?

17   A.   When I was hired --

18   Q.   I'm just asking the question.

19   A.   When I was hired, I was told that we were temporarily

20 pooling our tips, and that we would address each team being

21 able to keep their tips once we got to a certain point of

22 service, once we got to a certain point of excellence, if you

23 will.  That gave us something to strive for.  So I was told

24 otherwise when I was hired.

25   Q.   Let's talk about what happened.  So you worked there

**OFFICIAL TRANSCRIPT**

1   through the end of July 2014?

2   A.   Right.  Right.

3   Q.   So it would happen, wouldn't it, where a service team

4   would have a bad night, bad money night, but they would earn

5   equally with the other service teams because the money's all

6   pooled together?

7   A.   Well, sir, you're saying service team, but there was no

8   service team.  There were waiters, individual waiters.

9   Q.   Well, there were server assistants, right?

10  A.   Yeah, but the server assistant was shared by two or these

11  other servers.

12  Q.   Everybody shared equally, correct?

13  A.   No, server assistants got a turn percentage, a lower

14  percentage.

15  Q.   They all shared equally, right?

16  A.   Yes.  Yes.

17  Q.   All the servers shared equally?

18  A.   Yes.

19  Q.   You believe that was an unfair system?

20  A.   I think that it's a poor system.  I think, also, to -- I

21  spoke to the -- you've asked the question, so I'm going to tell

22  you.  I think it also speaks to the optics of it.

23          You have to -- if you're going to run that type of

24  system, you have to be very diligent to make sure that you're

25  developing your people, and that you're not putting the wrong

*OFFICIAL TRANSCRIPT*

1    people in the wrong spots.

2         It's a lot of pressure.  That's why the majority of

3    the houses, especially in this city, don't do it that way.

4    Q.   Right.  So that's my point.  Doris ran a very unique

5    system?

6    A.   Well, when we hired in, that's not how they said it was

7    going to be.

8    Q.   I understand that.

9    A.   So their contractual obligation to us was --

10   Q.   Well, so we've breached a contract to you now?

11   A.   You tell me, sir.  Is that a contract?  If I go to work

12   for you, and you tell me what you want me to do, and then you

13   change the terms?

14   Q.   So you --

15   A.   It's a contract to me.

16   Q.   Okay.  I appreciate that.  So you're saying that it was an

17   unfair system, the way Doris established the tip pool?

18   A.   I think that rather than saying that it's unfair, I think

19   that they went that way because they found that it was a source

20   of income for the restaurant.

21        That's where that quid pro quo comes in.  You had to

22   pay to play.  You had to pay to work there.  We had to suck

23   those things up because we needed our jobs because we had to

24   bills to pay, because kids had college loans due, things like

25   that.  You know, the rubber meets the road.

**OFFICIAL TRANSCRIPT**

1    Q.    Do you know whether Stavros established your wage when you

2    worked there?

3    A.    What, the 2.13 an hour?

4    Q.    I'm asking, do you know whether --

5    A.    No, sir, that's -- the federal government established

6    that.

7    Q.    Well, a manager could certainly pay you higher, right?

8    A.    Oh, they certainly could.

9    Q.    So do you know whether any of the service managers or

10   managers that you worked with established your wages when you

11   went in?

12   A.    We were told we were paid minimum wage.

13   Q.    Do you know whether the service managers or the managers

14   had the unconditional right to hire and fire somebody without

15   going to Itai?

16   A.    Well, I know that people were fired, and then Itai was

17   then told.

18   Q.    Do you know whether the service manager had the unilateral

19   right to hire and fire somebody without going to Itai?

20   A.    Well, you're using the term *service manager*, sir, and I

21   didn't work for anyone that was called a *service manager*.

22        THE COURT:  Well, I'll know what he means.  When you

23   say *service manager*, you call it a *captain*.

24        THE WITNESS:  No, no, no.  We -- at Doris Metropolitan,

25   there were no captains.

**OFFICIAL TRANSCRIPT**

1              THE COURT:  So what did you --

2              THE WITNESS:  They were managers, ma'am.

3              THE COURT:  Okay.  So --

4              THE WITNESS:  There were managers.  Then when Alise was

5       hired, she was called a *floor manager*.

6              THE COURT:  So just so we know, there are three -- two

7       managers and one floor manager.  That's one set of people.

8                    Now, on the other side, there were people who are

9       either -- or who are called --

10             THE WITNESS:  Service captains.

11             THE COURT:  So, is that what you would say, service

12      captain.  You would call that a *service manager*.  If everybody

13      would use those terms, it would keep the transcript straight.

14                   So even if he calls it a *service captain* or you

15      call it the other, that's okay, just so I know who you're

16      talking about.

17             THE WITNESS:  Yeah.  Well, that's why I wanted to

18      clarify that when I said that.  There were none there when I

19      was there.

20      EXAMINATION BY MR. CUPP:

21      Q.   Do you know whether the service managers, while you worked

22      at Doris, had the unilateral right to hire and fire somebody --

23      A.   Yes, sir.  Yes, sir.  Yes, sir, they did.

24      Q.   How do you know that?

25      A.   Because we had a couple people that were let go during

*OFFICIAL TRANSCRIPT*

1    service, sir.  Or before shift began, or at the end of a shift.

2    Q.    Do you know whether the service manager unilaterally made

3    that decision, without running it by Itai or one of the owners?

4    A.    Rephrase that.

5    Q.    Do you know whether the service managers made that

6    decision unilaterally, and without running it by one of the

7    owners?

8    A.    The --

9    Q.    Do you know?  I mean, I'm just asking whether you know?

10   A.    It doesn't -- actually, it doesn't matter.  If someone

11   lets you go, if someone lets you go, you know, regardless of

12   whether you conferred with your boss or not, you're still the

13   person that is releasing that person from employment.  You are

14   the mechanism of the release, sir, or the mechanism of the

15   hiring.

16   Q.    Do you know whether the service managers made the

17   unilateral decision to discharge somebody without running it by

18   Itai or one of the owners?

19   A.    No, I don't know that.

20   Q.    Thank you, sir.  Thank you.

21         You were hired, in fact, by Itai, right?

22   A.    I was hired by Itai.

23   Q.    You were, in fact, interviewed by Itai, weren't you?

24   A.    He was the only manager at the time, sir.

25   Q.    Mr. Cupp, were you interviewed --

*OFFICIAL TRANSCRIPT*

1   A.    Well, you either want to know or not.  I'm just trying to

2   help you out here.

3          THE COURT:  You can answer yes or no, and then explain

4   your answer.  But if he's asking a yes or no question, try to

5   give him yes or no, and then you can explain it.

6          THE WITNESS:  All right.

7   EXAMINATION BY MR. CUPP:

8   Q.    Do you know whether the service managers had the

9   unilateral right to promote someone from, say, a server

10  assistant to a server without running it by one of the owners?

11  A.    No.

12  Q.    Do you know whether any of the service managers had the

13  ability to change benefits that you receive as a server at

14  Doris?

15  A.    No.

16  Q.    Do you know whether --

17         THE COURT:  Are you saying no, you don't know, or no,

18  they didn't have the authority to do that?

19         THE WITNESS:  No, I don't know.

20         THE COURT:  Also, the changing benefits?

21         THE WITNESS:  Yes, ma'am.  No, I don't know.

22  EXAMINATION BY MR. CUPP:

23  Q.    Do you know whether any of the service managers, when you

24  worked at Doris, had the ability to change the employment

25  records that you would sign when you went to work there?

*OFFICIAL TRANSCRIPT*

1   A.   Are you talking about your paperwork, sir?

2   Q.   Yes.

3   A.   What would they change?

4   Q.   I'm just asking you.  Do you know whether they could?

5   A.   Your question doesn't make any sense.  What's your

6   question?

7   Q.   I'm asking, do you know --

8        THE COURT:  No.  Can you rephrase it.  He doesn't

9   understand the question.

10  EXAMINATION BY MR. CUPP:

11  Q.   Do you know whether any of the service managers maintained

12  your employment records?

13  A.   Service managers with new employees would sit down and

14  help them go over their paperwork.

15  Q.   Do you know whether that would be done by the office

16  manager or the --

17  A.   Originally, from what I saw, it was then given to the

18  manager, who then turned it over to the office manager.

19  Q.   You left in the middle of a shift, right?

20  A.   Yes, I did.  First time ever.  Not the middle of a shift.

21  The beginning of a shift.

22  Q.   Now, when you attended meetings, did anybody at Doris tell

23  you not -- I'm talking about the mandatory meetings on Monday,

24  did anybody at Doris tell you not to punch in?

25  A.   Originally, we were told by Stavros not to punch in.  Then

*OFFICIAL TRANSCRIPT*

1    I have started punching in.  Niko, another server, started

2    punching in, and others started following.  They never caught

3    on.

4    Q.   According to your testimony, when did Stavros tell you not

5    to punch in?

6    A.   When I first got there.  When we first started having the

7    pre-shift -- we weren't even punching in for our pre-shift

8    meetings.  We were punching in right before service started.

9    Q.   That obviously changed, right?  You started punching in?

10   A.   Well, because I started doing it.  It wasn't because we

11   were told by any of the managers to do it.

12   Q.   You started punching in for your pre-shift meeting, as

13   well, right?

14   A.   I would.  Many wouldn't.

15   Q.   Do you know whether other people were told not to punch in

16   for pre-shift meetings?

17   A.   I can tell you this, sir.  When a manager says at the end

18   of the pre-shift meeting, "All right, everybody, go punch in,

19   let's get this restaurant open," that tells you something.

20   Q.   When did you start punching in for pre-shift meetings?

21   A.   I think, when I went part time, so in January.

22   Q.   Did you ever run any pre-shift meetings?

23   A.   Occasionally, you would be asked to do a component.  Like

24   maybe you would prepare a little bio information on a wine that

25   we were featuring that day.

*OFFICIAL TRANSCRIPT*

1    Q.    Sure.  So the restaurant encouraged the servers to

2    participate and to offer guidance during pre-shift meetings,

3    right?  That's what you testified, correct?

4    A.    Well, and that's pretty standard everywhere you go, yes,

5    sir.

6    Q.    Does that make you a manager?

7    A.    No, sir.

8    Q.    Earlier you testified that you were put in a, you brought

9    some issue to Doris, and you believe you were punished and put

10   in a bad section; is that correct?

11   A.    Yes, sir.

12   Q.    What difference would that make at Doris if all the

13   servers share equally?

14   A.    Well, there again, this was at the beginning of my

15   employment.  This is also when we were told that we would be

16   moving toward keeping our team -- you know, meaning you and

17   whoever you are tipping out, that would be your tip pool.  So

18   that we would be moving away from the shared tip pool, so.

19   Q.    So, at Doris, if you got put in a bad shift -- or, excuse

20   me, a bad area, or an area that wasn't a money-making shift, it

21   really didn't matter because you're going to share equally with

22   the other servers who are earning tips that night, right?

23   A.    Well, yes, if you're a troglodyte, that would be your

24   attitude, but that was not mine.

25   Q.    I'm asking what actually happened, Mr. Hunt.  If you got

*OFFICIAL TRANSCRIPT*

1   put in a bad section where tips weren't earned, it didn't

2   matter because you're still earning the same --

3   A.   No, no.

4   Q.   Let me finish my question, okay.

5   A.   Go ahead.

6           THE COURT:  Is this relevant?

7           MR. CUPP:  It goes to the overall circumstances of how

8   the tip pool was run.

9           THE WITNESS:  No, sir, because I was one of the top

10  earners.  So if I wasn't in a section that was seated more

11  often and that had good turnover, then that extra money would

12  not be in the pot.  So, consequently, my share of that shared

13  tip pool would be smaller.

14          THE COURT:  I don't see how it's relevant.

15  EXAMINATION BY MR. CUPP:

16  Q.   Okay.  Let's just see if we can get the understanding.  I

17  know at some point the sharing changed while you were there,

18  correct?  The sharing of the tip pool monies.

19  A.   Several times.  Several times, yes.

20  Q.   So if you had -- if you had five service teams there at

21  the restaurant on a busy Saturday night --

22  A.   No, you don't have five service teams, sir.  There is more

23  than that.

24          THE COURT:  But I thought you said there weren't teams?

25          THE WITNESS:  No.  There is individual waiters.  That's

**OFFICIAL TRANSCRIPT**

1  what I'm saying, there is individual waiters.  It's not service

2  teams.

3          He's trying to sell the bill of goods, and that's

4  not what it was.  There were so many individual waiters.

5      THE COURT:  Are we talking about the same thing?  He

6  says there are no service teams, and you're using that as a

7  preface.  So can you clarify what you're calling a *service*

8  *team.*

9  EXAMINATION BY MR. CUPP:

10  Q.   Yes.  So would you agree with me that Doris ran a team

11  concept for waiting on tables?

12  A.   No, they did not, sir.

13  Q.   You didn't think it was a team concept?

14  A.   No, they did not.

15  Q.   So if you had a server and server assistants that helped

16  the server, you're saying those weren't a team?

17  A.   The server assistants' only real job was setting up table.

18  If they had the time, was bringing water to the table, bringing

19  bread to the table, helping clear if they were available.  All

20  service, all the service requirements were on that of the

21  server.

22  Q.   In fact, as a server, you could tell the server assistant

23  what to do?

24  A.   If they were available.  You were sharing them with one or

25  two other servers, sir.

*OFFICIAL TRANSCRIPT*

1  Q.   I understand.  So answer my question.  As a server, you

2  could direct the server assistants what to do during the --

3  A.   No, sir.  No.  They had their jobs to do.

4       You could ask them, hey, I need you to go serve this

5  food.  They could say, no, I'm getting water for table 13.  So,

6  no, you could not direct them, sir.  I'm sorry.

7  Q.   But you could ask them to do things --

8  A.   You could ask them, and if they can, they would.

9  Q.   Does that make you a manager?

10  A.   The same way that you could ask a manager, hey, can you

11  help me out over here.  If they could, they would.

12  Q.   You directing or asking server assistants to do something,

13  did that make you a manager?

14  A.   No, sir.

15  Q.   Thank you.  So, are you testifying here today that the

16  service managers, the managers and service managers, whatever

17  you want to call them, who received 10 percent of the tip pool

18  performed no table service duties?

19  A.   You're correct.

20  Q.   None?  During the entire time you were there, your

21  testimony is they would not perform any table service duties?

22  A.   Sir, if they showed up at someone's table, it certainly

23  wasn't mine.  If they stopped by a table -- like I said, the

24  manager at the Texas Roadhouse isn't privy to the servers' tips

25  when they stop by and ask how everything is, and then go and

*OFFICIAL TRANSCRIPT*

1  bring me back another onion mum.  They are not part of that tip

2  system.  Same way there, too.

3          So if the server wants to go over because -- I mean,

4  a manager wants to go over, because the table is friendly, and

5  pour a little bit more wine and chat with them about how their

6  evening is going, that's entirely on him.  That does not make

7  him, or her, for that matter, part of the tip pool.

8  Q.   You're basing this on just your experience in the

9  restaurant industry?

10 A.   Also, what I understand to be legal, sir.

11 Q.   Well, you're not a lawyer, are you?

12 A.   No, sir.

13 Q.   You're not offering your expert advice on anything today,

14 are you?

15 A.   No, sir.

16 Q.   So, the service manager --

17 A.   I will say this, though, sir.  I am the one person in this

18 room who has run a team wherein which they have won a James

19 Beard award.

20 Q.   I can tell you're --

21 A.   So I think I do have something to add to the mix, sir,

22 yes.

23 Q.   I can tell you're very proud of your experience in the

24 restaurant business.

25 A.   Rightly so.

*OFFICIAL TRANSCRIPT*

1    Q.    I think that's very clear, okay.

2          But you're not testifying as an expert today, are

3    you?

4    A.    No, sir.

5    Q.    In fact, you have money at stake in this litigation, don't

6    you?

7    A.    I think we all do here.

8    Q.    So your testimony here today, during the eight months,

9    nine months that you were there at Doris, the service managers,

10   other than occasionally going to the table, performed no table

11   service duties?

12   A.    Yes, sir.

13   Q.    Now, would you agree with me that the two linchpins of

14   Doris and its success was its impeccable food --

15   A.    Yes.

16   Q.    You admitted, I think, that the food was good?

17   A.    Oh, yeah, the food was great.

18   Q.    -- and the service that they gave to their customers?

19   A.    No.

20   Q.    So what you're saying is --

21   A.    The service -- the service tried.  The service was trying,

22   but they were -- they were trying to, I think -- they were

23   trying to establish -- they were trying to be unique in that

24   sense.  Even when you would go to the bar, you would see them

25   do things that, for a classically trained bartender, that were

*OFFICIAL TRANSCRIPT*

1    egregious.

2              They would shake gin.  You never shake gin.  They

3    would shake bourbon.  They would not muddle old fashioneds.  I

4    mean, these were things that if you're in the trade or if

5    you're a food critic or a food writer or a sommelier or a

6    beverage director, that would make them shudder.

7              So no, the service was not -- the service was not

8    impeccable.  The food was impeccable.  The service was trying

9    at best.

10   Q.    You were trying at best, right?

11   A.    No, sir, I was impeccable.

12   Q.    Everybody else wasn't impeccable --

13   A.    No, no.  There are several here in the galley who are also

14   impeccable.

15   Q.    So you would disagree, then, with the proposition or the

16   statement that one of the linchpins of how Doris ran its

17   restaurant was providing impeccable service to customers who

18   came in?

19   A.    I think that that is what they envisioned, what the

20   ownership envisioned.  But the system that they set up did not

21   allow for everyone to perform at their maximum opportunity

22   because they supported continually -- it was almost like a

23   welfare system, where you were supporting the lower bottom of

24   non-producers.

25   Q.    Well, if a system is supporting everybody equally, isn't

*OFFICIAL TRANSCRIPT*

1   that a system that does lend itself to people helping each

2   other, so that impeccable service can be provided to the

3   customer?

4   A.   Oh, we've seen how well that's worked out in the Soviet

5   Union, right?

6   Q.   Oh, my goodness, Mr. Hunt.

7   A.   I mean, but no -- no, to answer your question, you're

8   talking some Marxist form of management, and it doesn't work.

9   Not in a capitalist -- waiters are capitalists.  They are your

10  best capitalists.  They are there to take that dollar bill off

11  your forehead.  That's what they do.

12        So they charm you, they give you great food, they

13  give you great service, they remember you, and you compensate

14  them thusly.  That's capitalism, sir.

15        So, no, the whole Marxist aspect doesn't work.

16  Q.   So you just didn't agree totally with -- you just did not

17  agree --

18  A.   That was not the agreement that I hired in, sir.

19  Q.   I would appreciate it if you would let me finish my

20  question.

21  A.   Okay.

22  Q.   You just did not agree with how Doris established its

23  tip pool and the way it provided customer service?

24  A.   I took issue with the theft, with the lack of integrity.

25  Q.   Let's talk with cash tips.  So, what percentage of credit

**OFFICIAL TRANSCRIPT**

1   card tips -- while you were working there, what was your

2   percentage, if you could guess?

3   A.    Those things vary night by night.  You'll have some

4   weekends where everyone pays by credit card, literally

5   everybody one.  You have no cash.  There is none.

6         Then you'll have another weekend or another night

7   where almost everybody's paying cash.  So it's really a hard

8   thing to measure.  You can't say.

9   Q.    Would it be fair to say, though, that during your period

10  time that you were there, that mostly --

11  A.    There was cash every night, sir.

12  Q.    -- mostly people paid with credit cards?

13  A.    I would say 80 percent.

14  Q.    Now, credit card tips were processed, and then went onto

15  your payroll?

16  A.    Yes, sir.

17  Q.    They were considered as reported, right?

18  A.    Yes, sir.

19  Q.    Applicable withholdings were taken from that?

20  A.    Yes, sir.

21  Q.    So with cash tips, let's say all the servers made a

22  thousand -- there was a thousand dollars in cash tips that

23  night, and there were five servers.  Would the cash tips be

24  distributed at the end of the night?

25  A.    Yes, sir.

*OFFICIAL TRANSCRIPT*

1    Q.    You could stay there or come -- even if you left early,

2    you could stay there and come back and get your cash tips that

3    evening?

4    A.    You could.

5    Q.    In fact, that was encouraged, wasn't it?

6    A.    It's not smart in the French Quarter, sir.

7    Q.    I'm just asking -- Mr. Hunt, was it encouraged by the

8    company --

9    A.    I don't believe so.  No, I don't believe so.  No.  I've

10   never heard that.  So you're putting something in my mouth that

11   I've never said.

12   Q.    I'm asking --

13   A.    I'm telling you no.

14   Q.    But you certainly could come back and get them, right?

15   A.    Oh, yeah.  Certainly.

16   Q.    If you worked until the very end, you would stay and take

17   your cash tips, right?

18   A.    Yes, sir.

19   Q.    So it would be a very rare circumstance where you wouldn't

20   get your cash tips right there at the end of the shift?

21   A.    Yes, sir.

22   Q.    You wouldn't leave your cash tips there voluntarily, would

23   you?

24   A.    No.

25   Q.    It would have to be an exceptional circumstance where you

*OFFICIAL TRANSCRIPT*

1    wouldn't collect your cash tips at the end of the night, right?

2    A.    Uh-huh (affirmative response).

3    Q.    Is that correct?

4    A.    Yes, sir.

5    Q.    Maybe one of those circumstances is you knocked off way

6    early in the shift?

7    A.    Well, usually, in most restaurants, the first sections

8    seated are the first sections cut.

9    Q.    In Doris' system, when you're cut -- if you're cut, let's

10   say, mid shift, you're still earning tips because the other

11   service teams there are generating tips on the tables they are

12   servicing, correct?

13   A.    For whatever tables are left on the books, yes, sir.

14   Q.    Right.  Even though you're not there, and even though

15   you're not servicing those tables, you're getting a share of

16   those tips as a server, right?

17   A.    $600, and getting $140.  There you go.

18   Q.    I don't think I understand that.  But I will say, if

19   you're not there --

20          THE COURT:  I understand, yes.  I understand what

21   you're saying.  He does, too.  Yes, he would still get some

22   portion of those tips.

23   EXAMINATION BY MR. CUPP:

24   Q.    You would still get some portion of the tips --

25   A.    Yes, sir.

*OFFICIAL TRANSCRIPT*

1    Q.   You didn't like that system, or was that system bad?

2    A.   Well, you keep focusing on what I like or what I don't

3    like.  Where I took issue, I didn't think -- they can run

4    whatever system they want.  That was not the system we agreed

5    to when we first -- the contract that we first had, that was

6    changed.

7            Then, with staying there, with still abiding there,

8    the tip -- the reason -- when you talked about me walking out,

9    the reason I walked out is they had decided that we were going

10   to start tipping out 5 percent to a wine steward.

11           I had just come back from vacation, and I heard this.

12   I just came back from Cape Cod.  I was like, you know what, I'm

13   just not feeling this anymore.  This is even less mean money

14   I'm going to be making here.  It just -- I couldn't do it any

15   more.

16   Q.   The wine steward is giving table service, aren't they?

17   A.   That's my job.

18   Q.   The wine steward is giving table service, aren't they?

19   A.   Yes, but you --

20           THE COURT:  Wait.  Wait.  Wait.  He can explain his

21   answer.

22           THE WITNESS:  Yes.  The wine steward is doing nothing

23   more than pouring your wines.  They were not there for wine

24   selection, sir.  They were not helping you up your check

25   average by helping them pair their wine with their entrees or

**OFFICIAL TRANSCRIPT**

1    whatever course they happened to be doing.

2                   So, no, they were just pouring your wine.  This

3    was just a guy, a young man by the name of Mark.  He was a good

4    SA, and they wanted to bump him up a little bit, and they gave

5    him that opportunity.

6    EXAMINATION BY MR. CUPP:

7    Q.   Are you alleging that the 5 percent to the wine steward

8    was illegal?

9    A.   No.  I'm alleging that tipping the managers was illegal.

10   That's where I say the theft occurred, sir.

11   Q.   Do you know whether any managers at Doris ever took

12   your -- the cash tips that had been allocated to you at the end

13   of a shift?

14   A.   The first two months, we have honestly no idea.  The

15   reason I say that is because of how lack -- how lapse -- I

16   mean, you can see that.  What proof do you have from 2013

17   besides my W2?  You don't have it because they couldn't produce

18   it.  Because they wouldn't produce it, sir.

19   Q.   So you don't know, you don't have any idea whether anybody

20   at Doris -- any manager at Doris took your cash tips, do you?

21   A.   We were funding -- I think the ownership did, sir.  Yes, I

22   do.

23   Q.   What do you base that on other than your assumption?

24   A.   Well, I'm pretty good at math, sir.  When I know -- when

25   I've talk to the four or five people that are out here, that we

*OFFICIAL TRANSCRIPT*

1    worked together, and we all know what we put in, we all have an

2    idea of what our percentage should have been from that, and it

3    was nowhere near that.  Of course, you don't see a lot of these

4    things until you start talking to one another, and people start

5    connecting the pieces.

6              Originally -- and this is the fourth week when I

7    joined them -- they were putting all the cash and all the

8    charge tips, paper-clipped together, into like a bank bag and

9    sending it upstairs.  Then we would get -- a couple days later,

10   we would get our cash tips.

11             It made no sense.  This was how it had gone on for a

12   while.  It was just very, very, very -- boy, it was bad.  I had

13   never seen anything like it, never.

14   Q.   Did you ever have occasion in 2013, after the shift, that

15   you would ask for your cash tips, and Doris would not give them

16   to you?

17   A.   Yes, sir.  We were told that we would get them the next

18   day or two.  That's what we were told by Itai.

19   Q.   You would get them, right?

20   A.   Whatever they gave us.  We don't know.  We don't know.

21             Do I have permission to go into your wallet and fish

22   out whatever I take, and whatever is mine is mine.  I give you

23   back whatever you get, and you are like, oh, I got my wallet

24   back.  Well, yeah, that's true.

25   Q.   So do you believe that that changed in 2014, however?

*OFFICIAL TRANSCRIPT*

1    A.    I think that it became more -- less easy to steal.

2          That's when I spoke to them about the optics.  I

3    said, "Listen, if you are stealing, you need to stop.  If

4    you're not stealing, you know, your optics are horrible because

5    everyone here thinks you are."

6    Q.    They changed it upon your recommendation, right?

7    A.    No.

8    Q.    No, they didn't change it?

9    A.    No.  No, they didn't.  Because if it were upon my

10   recommendation, my original checkout sheet showed how much you

11   rang, how much -- it was divided by food and by liquor.  It

12   showed what your percentage was with your tip.

13         That's how you decide who your true ringers are.

14   It's not just that, like, myself and let's say Sue, I rang

15   $1,800, and she rang $1,500.  If I rang $1,800, and I only

16   made, like, let's say, 15 percent of my money, okay, that would

17   be, what, 270.  She rang $1,500, but she made 30 percent.  Well

18   that would be $300.  So she has actually how out-earned me,

19   right.

20         So you start looking at the percentages.  You look

21   the rings versus the percentages, and that's how you determine

22   who your top ringers are.

23         Also, if you're managing that type of restaurant, you

24   pay attention to the bottom line, to your bottom three ringers.

25   You see who your perennial bad ringers are.  Those are the

*OFFICIAL TRANSCRIPT*

1    people you either develop or get rid of.

2              THE COURT:  Slow down a little.

3              THE WITNESS:  I'm sorry.  I apologize, ma'am.

4    EXAMINATION BY MR. CUPP:

5    Q.   The system you just described, that is not the system that

6    was at Doris.  That's the system you wanted to be at Doris, but

7    that's not the system that's at Doris, right?

8    A.   That would be the system anybody with common sense would

9    implicate, sir.

10   Q.   So now the owners don't have common sense; is that what

11   you're saying?

12             THE COURT:  Don't engage in that.  Stick to the facts.

13   EXAMINATION BY MR. CUPP:

14   Q.   Did any other -- describe for the Court the Feed option,

15   the Feed Me option that was available for larger tables that

16   came in?

17   A.   The Feed Me option?

18   Q.   Yes.  Or the meat building option?  Was that option there

19   when you were working there?

20   A.   I don't believe so, sir, no.  It's not familiar.

21   Q.   But it is true that, occasionally, with large cuts of

22   meat, service managers would go out there and interact with the

23   table and cut the meat, correct?

24   A.   At times.  At times.  But, I mean, I always -- they

25   would -- usually, I would grab it before they could, myself.

**OFFICIAL TRANSCRIPT**

1   Most of our really good servers preferred to do it ourselves,

2   because the fewer faces that you see at the table -- it's about

3   salesmanship -- the fewer faces that you see at the table, the

4   more likely that you are to give me what you want to give me.

5           If you only see me there once or twice, and you've

6   seen two or three other faces at the table, the tip goes down.

7   It's been proven time and time again.

8   Q.   So you would actually complain that the service manager

9   was at the table too much because you wanted to be seen more,

10  correct?

11  A.   No.  They were at the table at the right times, checking

12  on the table -- which is what every manager is supposed to do.

13  You make the rounds.  You check on the table.  You make small

14  talk with people.  That's what they do.

15          The only times that they are supposed to bring out

16  food or drink is if somebody is in need of that additional

17  help.

18          Like, for example, at Doris Metropolitan, they were

19  notorious for not pacing the tables.  So we could fill up -- if

20  you had a table that's seated, it didn't matter that you just

21  got seated with three tables, you know, like in the past

22  5 minutes, there was no pacing that went on.

23          So you had some of the younger servers, who were less

24  experienced, had a very hard time with that.  They would not

25  communicate real well.  So the managers oftentimes found

*OFFICIAL TRANSCRIPT*

1   themselves -- yes, they were doing service at those tables.

2   Q.    Thank you.  Maybe not your table, but they were doing

3   service at the tables?

4   A.    Only at the people who were underperforming, sir, who, if

5   they had set the system up correctly, would have not been there

6   in that position.

7   Q.    That's fine.  The fact of the matter is, those service

8   managers were performing table service duties for those

9   customers; regardless of the reason they were doing it, they

10  were there performing those duties?

11  A.    Then the server would have to suffer the outcome.  The

12  outcome would be that you would then find, your next schedule,

13  that you would have several days less, or you might be

14  suspended, or you might -- if you were in good stations, you

15  would find yourself in the very back room taking care of one

16  private party that night.

17          So there was a punitive aspect to this.  There was

18  punishment that happened to this, sir.  So it wasn't just that

19  they were there out of the goodness of their hearts.

20          THE COURT:  Slow down.

21          THE WITNESS:  I apologize.  It wasn't that they were

22  there out of the goodness of their heart.  That wasn't -- they

23  were there because part of their job is to make certain that

24  the customers are happy.

25          So if you have a server who is underperforming,

*OFFICIAL TRANSCRIPT*

1    because they put somebody in the spot that didn't belong there,

2    that's a management issue, sir.

3            THE COURT:  All right.  Let me say that I've not

4    allocated a month for this trial.  So I want you to try to give

5    short answers, and answer the questions.

6            THE WITNESS:  Yes, ma'am.

7            MR. CUPP:  I don't know even know where we went on

8    that, Judge.

9    EXAMINATION BY MR. CUPP:

10   Q.   Isn't it true, while you were there, the service managers,

11   for whatever reason, would perform table service duties at that

12   table to make sure those customers were taken care of --

13   A.   At every table?

14           THE COURT:  You've already asked this.  I heard the

15   answer.

16           MR. CUPP:  Let me just check and see if I have anything

17   further.

18                    Nothing further, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MS. CATLETT:

21   Q.   L.J., I just want to clarify --

22   A.   Sure.

23   Q.   -- a couple of things you talked about very briefly.

24           You were saying -- when we were talking about

25   overtime, you said that you thought that most of your overtime

*OFFICIAL TRANSCRIPT*

1  would have been worked during the time period for which we have

2  no records; is that correct?

3  A.    Yes.

4  Q.    During that time period, that was the first two months

5  after the restaurant was open?

6  A.    Yes.

7  Q.    How fully staffed was the restaurant at that time?

8  A.    They ended up adding more servers as time went on.  They

9  had a small coterie of us.  I think there were about ten of us,

10  ten or 11.  I think I was the 11th, maybe the 12th person.

11  Q.    Would that play into why you would have probably worked

12  overtime, because there was a skeleton crew?

13  A.    Yes, ma'am.  Also, too, because the business was there.

14  This place, when it opened, it was hot.

15  Q.    With regard to the checkout sheets, which I know were not

16  in place during the first two months, but did managers maintain

17  those?

18  A.    They -- we don't know.  We don't know what they did

19  upstairs in the office.  You know, like I said, it was kind of

20  thrown into a bag and went upstairs.  I've never seen anything

21  quite like it.

22  Q.    What about after the checkout sheets were created, who

23  performed the calculations at the end of the night?

24  A.    That would be the manager.

25       THE COURT:  When we talk about managers, do you mean

*OFFICIAL TRANSCRIPT*

1    the three?

2          MS. CATLETT:  Yes, ma'am.  They were only called

3    *managers* on the checkout sheets, so I'm just referring to what

4    they were called during the time period.

5          THE COURT:  So if anybody says just the word *manager*, I

6    think you're talking about those three people?

7          MS. CATLETT:  Yes, ma'am.

8          THE WITNESS:  Well, you mean the three people meaning

9    Itai, Stavros and Alise.

10         MS. CATLETT:  If I'm referring to owners, I'll say

11   owners --

12         THE WITNESS:  Right.

13         MS. CATLETT:  -- but managers, I would say --

14         THE COURT:  Not everybody there -- Steve and the woman,

15   they were not owners, but they were managers.

16         MS. CATLETT:  They were managers.

17         THE COURT:  I thought the three managers were Itai,

18   Steve and -- what's the lady's name?

19         THE WITNESS:  Alise.

20         THE COURT:  Alise.

21         MS. CATLETT:  That's correct.

22         THE COURT:  So if you say just manager, I think you're

23   talking about one of these three.

24         MS. CATLETT:  That's who I'm referring to; and, later,

25   anyone's name who is next to manager on the checkout sheet.

                          *OFFICIAL TRANSCRIPT*

1  EXAMINATION BY MR. CATLETT:

2  Q.   But for your time period, it would have been Stavros,

3  Alise and Itai.  So who would have -- if it says *Alise* next to

4  *manager* --

5  A.   It was Alise then that would do the checkout.

6  Q.   She would perform the checkout?

7  A.   Yes.

8  Q.   She would maintain that record?

9  A.   Yes.

10  Q.   Who would determine who got what section every night?

11  A.   That would be the manager.

12       THE COURT:  All right.  Again, one of these three?

13       THE WITNESS:  One of the three, yes, ma'am.

14  EXAMINATION BY MS. CATLETT:

15  Q.   That would be the manager that was working that specific

16  shift for which the --

17  A.   Yes, ma'am.  Whoever was running the floor that night.

18  Q.   Who would determine when people were allowed to leave

19  their sections and check out?

20  A.   That would be the floor manager as well.

21  Q.   To your knowledge, did they make that decision themselves,

22  or did they have to call someone and ask?

23  A.   No, they would make it based on how -- you know, the

24  trends of the business.  You can tell, once you get past nine

25  o'clock, unless it's a busy weekend, you know, you start

*OFFICIAL TRANSCRIPT*

1    cutting people.

2    Q.   When you were there in the beginning, I think you

3    testified earlier that Itai actually was there a lot in the

4    very beginning?

5    A.   Oh, very much so.

6    Q.   As time went on, is it fair to say that he was gone, and

7    other managers managed?

8    A.   Yes, ma'am.

9    Q.   So is that why you would presume that they made decisions

10   themselves, because they were the only managers there?

11   A.   Well, that, and even when the ownership was there -- I'm

12   not talking about managers -- Itai is both manager and owner --

13   but, you know, oftentimes they were at the bar entertaining

14   either clients or friends, or -- most of them are smokers --

15   they were outside.

16        The only place you could smoke was on the patio, and

17   we had dining out there.  So oftentimes, they would kind of

18   hold court out on the courtyard.  So, they were not running the

19   shift, for that matter.

20        Managers sometimes would go out there, even, and join

21   them, but the manager would be the one who would come back in

22   and start making cuts.

23   Q.   Were there periods of time when you worked there where

24   neither Itai nor the owners were there for several days?

25   A.   Yes.  Yes.

*OFFICIAL TRANSCRIPT*

1  Q.   During that time, was there someone else that oversaw the

2  operations --

3  A.   It would be Steve or Alise.  Yes, it would be the

4  managers.

5  Q.   You've reviewed the documents that pertain to your time

6  that we received from defendants, right?

7  A.   Right.

8  Q.   Have you ever reviewed a document that reflected your

9  actual punch-in and punch-out times?

10  A.   I mean, that was the interesting thing.  Every other place

11  I've ever worked at -- and, again, I remember at Commander's

12  Palace we had an audit because we had someone that was suing

13  us.  We had to go and do this audit.

14        So we had to go and pull all their time sheets for, I

15  think, the previous three years.  We, sure enough, had to go

16  back into that warehouse and dig through those boxes and, you

17  know, make copies of those -- make copies of those.  But --

18  Q.   Have you seen any of those type of time sheets?

19  A.   No.

20  Q.   Have you reviewed any documents like that?

21  A.   No.

22  Q.   The only documents that you reviewed have been weekly?

23  A.   Right.  Right.

24        MS. CATLETT:  That's all I have, Your Honor.

25        THE COURT:  All right.

*OFFICIAL TRANSCRIPT*

1              Thank you, Mr. Hunt.

2         THE WITNESS:  Thank you, Your Honor.

3         THE COURT:  All right.  Let's take a break.

4              Well, let's see.  We can either take a break now,

5    or we can keep going through until lunchtime.

6              You need a break?  All right.  Let's take a

7    15-minute break.  We'll come back at 11:35.

8         THE DEPUTY CLERK:  All rise.

9         (WHEREUPON, at 11:20 a.m., the Court took a recess.)

10        THE DEPUTY CLERK:  All rise.

11        THE COURT:  Be seated.

12             Plaintiff, call your next witness.

13        MS. VASQUEZ:  We call Itai Eli to the stand.

14        THE DEPUTY CLERK:  Please remain standing, and raise

15   your right hand.  Do you solemnly swear the testimony you are

16   about to give to this Court will be the truth, the whole truth

17   and nothing but the truth?

18        THE WITNESS:  I do.

19                      **ITAI ELIRAN BEN ELI**

20    was called as a witness and, after being first duly sworn by

21    the Clerk, was examined and testified on his oath as follows:

22        THE DEPUTY CLERK:  Please state and spell your name for

23   the record.

24        THE WITNESS:  Itai Eliran Ben Eli, I-T-A-I, second

25   name, E-L-I-R-A-N, last name, B-E-N E-L-I.

                        *OFFICIAL TRANSCRIPT*

<pre>
 1                      DIRECT EXAMINATION

 2   BY MS. VASQUEZ:

 3   Q.    Mr. Eli -- I'm pronouncing it right, Eli; is that right?

 4   A.    That's right.

 5   Q.    -- you were here during the testimony of Mr. Hunt; is that

 6   right?

 7   A.    Correct.

 8   Q.    The business, Doris Metropolitan, opened October 2013; is

 9   that correct?

10   A.    Correct.

11   Q.    You are the front-of-the-house general manager?

12   A.    Correct.

13   Q.    It's your position that you developed a system you thought

14   was fair; is that correct?

15   A.    Yes.

16   Q.    But it was also to give Mr. Stavros, or Steve, a raise; is

17   that correct?

18   A.    No.

19   Q.    Why?

20   A.    Because, obviously, when you start a restaurant, you know,

21   you start with the staff that you have.

22            At a certain point, we needed another level of depth

23   of service.  That's when we added -- I decided that Stavros

24   would be a service manager or service captain for that matter.

25   Q.    That's why he received the 10 percent from the tips?
</pre>

*OFFICIAL TRANSCRIPT*

1    A.   Well, at that time, the tip pool needed to be adjusted.

2    The same thing that we did with the server assistants.  We

3    started with purely just servers, because we didn't know how

4    many -- you know, how many customers would walk through the

5    door.  So we started relatively small.  Then, as time goes by,

6    yeah, we added more positions.

7    Q.   So that would be a yes to that question?

8         THE COURT:  I'm confused now.  Stavros -- Steve or

9    Stavros, same person, was first a service captain, and then

10   became one of the managers?

11        THE WITNESS:  He started as a server, ma'am, and then

12   promoted to a service captain -- well, a service manager.

13   EXAMINATION BY MS. VASQUEZ:

14   Q.   Just to clarify, the term *service captain* wasn't used at

15   your restaurant until 2017; is that correct?

16   A.   Correct.  We used to call them *service managers*.  I

17   understood that that created some confusion, but things never

18   changed.

19   Q.   Well, I'll ask you about that then.  I'll ask you about

20   that then.

21        THE COURT:  Wait.

22   EXAMINATION BY MS. VASQUEZ:

23   Q.   Just to clarify, the term *service captain* wasn't used

24   until 2017, right?

25   A.   When I understood that the term manager was

*OFFICIAL TRANSCRIPT*

1    creating confusion --

2         THE COURT:  You can answer yes or no, and then explain.

3    Is it correct that you didn't use it --

4         THE WITNESS:  It's correct.

5    EXAMINATION BY MS. VASQUEZ:

6    Q.   Before, in 2013, 2014, and 2015, the term was actually

7    *manager*?

8    A.   Yes, service manager.

9    Q.   Okay.  I'm sorry, did you say "service manager"?

10   A.   Yes.

11   Q.   Would that also be the same thing as a floor manager?

12   A.   It would be -- okay, so I found that terms in the

13   restaurant business are so wide.  There so many terms out

14   there.

15        So, you can call *service captain, service manager,*

16   places will call it *floor manager,* all sort of different

17   definitions for the same job, basically.

18   Q.   Okay.  So you -- do you have any control over the

19   purchasing of -- well, let me rephrase that.

20        Take a look at this exhibit that I have up on the

21   screen.

22   A.   Yes.

23   Q.   Do you see that?  That is a Doris Metropolitan --

24        THE COURT:  You need to identify it.

25        MS. VASQUEZ:  I'm sorry.  I'm identifying it as

                    ***OFFICIAL TRANSCRIPT***

1    Bates-Black 1.

2              THE COURT:  No, no, it's your exhibit number.

3              MS. VASQUEZ:  Tab three.

4              THE COURT:  Plaintiff's Exhibit 3.

5              MS. VASQUEZ:  Yes.  Tab three, Bates-Black 1 at the

6    bottom right.

7    EXAMINATION BY MS. VASQUEZ:

8    Q.    This is the business card for Doris Metropolitan; isn't

9    that right?

10   A.    Yes.

11   Q.    In the first card, it says *Melissa Rogers*, and it shows

12   her as a manager?

13   A.    Uh-huh (affirmative response).

14   Q.    Is that yes?

15   A.    It says *manager*, yes.

16   Q.    Then at the bottom, it says *Dontay Kinchen*, and that says

17   a *manager*; is that right?

18   A.    It says *manager*, yes.

19   Q.    I know you said that the terms were confusing, but there

20   is no term on here that says *service captain*; is that right?

21   A.    On that card, no.

22             THE COURT:  This is the question I wanted to ask.  If

23   you would show him Plaintiff's Exhibit 5, that first page.

24                  Over on the left-hand side, where it says -- the

25   first page of that exhibit, where it says *manager*.  This page

*OFFICIAL TRANSCRIPT*

1  has your name, Itai.  If it was a day where Melissa Rogers
2  would have been there, under manager name it would have had
3  Rogers, correct?
4          THE WITNESS:  It would have said Melissa, yes.
5          THE COURT:  Okay.  Or, for example, Dontay?
6          THE WITNESS:  Right.
7          THE COURT:  All right.
8  EXAMINATION BY MS. VASQUEZ:
9  Q.  Or Ryan, for that matter, because Ryan was also a captain;
10  is that right?
11  A.  Service captains, service managers, yes.
12  Q.  But, again, on this form, it doesn't say service captain
13  on there?
14  A.  No.
15  Q.  It says *manager*?
16  A.  It does not.  On this form, it does not.
17  Q.  Currently, as it is today, you have service captains,
18  servers and server assistants?
19  A.  Yes.
20  Q.  Back in 2014, there were managers, servers and server
21  assistants?
22  A.  Well, what you call *manager* is what service captain is
23  doing today.  It's the exact same job.
24  Q.  Okay.  Just for the record, managers back in 2013, 2014,
25  2015, 2016, same job as service captain today?

                    *OFFICIAL TRANSCRIPT*

1    A.    Correct.

2    Q.    Each and every one of those categories have different

3    responsibility?

4    A.    Yes.

5    Q.    The server assistant cleans, clears, and serves -- and

6    serves the table; is that right?

7    A.    Amongst other things.

8    Q.    But it does those things for sure?

9    A.    Yes.

10   Q.    Okay.  A server takes the order and helps the guest?

11   A.    Correct.

12   Q.    The server will explain the menu?

13   A.    Yes.

14   Q.    The server will sometimes pour wine?

15   A.    Yes.

16   Q.    The server -- would you agree that the server has the most

17   face time with the customers?

18   A.    That's fair to say.

19   Q.    Sometimes servers serve meat under the Feed Me program

20   that you have; is that right?

21   A.    Nowadays we have more servers doing that.  Back when we

22   started, that option, it was more service captain who were

23   doing that on a regular basis.

24   Q.    But you didn't have service captains back then; they were

25   called *managers*, right?

*OFFICIAL TRANSCRIPT*

1    A.    Service managers, for that matter.

2    Q.    The primary responsibility of a manager, you would agree,

3    is checking in on each and every guest?

4    A.    Amongst other things, which I can explain.  I mean --

5    Q.    Well, you will have a chance to do that.  But I'm asking

6    you, the primary responsibility, that means the most important

7    responsibility that a manager would have is checking in on each

8    and every guest?

9    A.    Amongst other things.  It's not -- the primary -- that --

10   what you described --

11          THE COURT:  Wait.  Wait.  Wait.  Wait.  Listen.  You

12   answer yes or no, and then if you need to explain your answer

13   you can.  She said, "Is that the primary responsibility," and

14   your answer is?

15          THE WITNESS:  For everyone.

16          THE COURT:  No.  Wait.  She said, "For service captains

17   or service managers, was it the primary responsibility to check

18   in on each guest?"

19          THE WITNESS:  They have to check on each guest --

20          THE COURT:  Wait.  Answer "yes" or "no" or "I don't

21   know."

22          THE WITNESS:  The answer is there is not just one thing

23   that is just the most important thing.

24          THE COURT:  Is there a primary?

25          THE WITNESS:  It is primary, yes.

*OFFICIAL TRANSCRIPT*

1    THE COURT:  So the answer is yes?

2    THE WITNESS:  Yes.

3    THE COURT:  Okay.

4    EXAMINATION BY MS. VASQUEZ:

5    Q.    Is it your position that managers, now called *service*

6    *captains,* are constantly working every single table?

7    A.    Yes.

8    Q.    Okay.  But not L.J.'s table, right?  Mr. Hunt.

9    A.    They were at his table as well.  He actually -- he didn't

10   like other people to speaks to his tables.  He was complaining

11   all the time that, you know, why is the service captain,

12   service manager, manager, slash, slash, slash, why is he

13   talking to my table so much.

14   Q.    Because he was concerned about the tip being given to the

15   manager; isn't that right?

16   A.    Well, he did -- no.

17   Q.    Is that a yes or a no?

18   A.    No, I said no.

19   Q.    There are 30 tables at Doris Metropolitan; is that right?

20   A.    Approximately.

21   Q.    That's about 150 people?

22   A.    No.

23   Q.    How many people?

24   A.    It's about 90.

25   Q.    90?

*OFFICIAL TRANSCRIPT*

1    A.    Including the bar.

2    Q.    You would have one or two managers per shift back in '13,

3    '14, '15 and '16?

4    A.    Yes.

5    Q.    So these two managers would have to be constantly working

6    every table?

7          THE COURT:  Again, when you say there are two managers,

8    are you talking about the three, Itai, Steve and Alise, or are

9    you talking the service --

10         MS. VASQUEZ:  Well, let me go back.

11   EXAMINATION BY MS. VASQUEZ:

12   Q.    There were many people that acted as managers in 2013,

13   '14, '15 and '16, that were not called *service captains*, other

14   than Steve, Alise, and Itai?

15         THE COURT:  That's totally confusing to me, and so I

16   assume it is to him.

17         MS. VASQUEZ:  Let's see if we can get some clarity.

18         THE COURT:  You heard me say, this is how I want to

19   refer to these people.  I'll know.

20               I guess your first question to him is, other than

21   the three, did you call other people -- who were the other

22   people who were in this gray category, and what did you call

23   them?

24   EXAMINATION BY MS. VASQUEZ:

25   Q.    How many other people appeared on this sheet as manager in

                        *OFFICIAL TRANSCRIPT*

1  2013, '14, '15, and '16?

2  A.   I can't say on the top of my head, but every shift would

3  have approximately two plus myself.

4  Q.   That was people -- let me ask you this, was a person named

5  Ryan, was he on this little area of the manager sheet, and was

6  he a manager?

7  A.   Service manager, service captain, yeah.

8  Q.   But at that time, service captain wasn't used until after

9  this litigation, right?

10  A.   Service manager.  I'll stick to that.

11       THE COURT:  No, that's a separate question.  I think

12  you testified to this.  The term *manager* was not used until

13  2017, after this suit was filed?

14       THE WITNESS:  That's the term, *captain*, ma'am.

15       THE COURT:  No.  Do you call it *service manager* now or

16  service captain?

17       THE WITNESS:  *Service managers*, as we used to call

18  them, and now we call them *service captains* because it's

19  created that confusion.

20       THE COURT:  But before 2017 when you started calling

21  them *service captain*, did you really call them *service*

22  *managers*, or you just called them *managers*?

23       THE WITNESS:  Well, their definition was *service*

24  *managers,* but, yes, occasions they were called *managers* and --

25       THE COURT:  I guess the reason that we're asking this

**OFFICIAL TRANSCRIPT**

1    is because we see a business card with manager on it, and we

2    see Plaintiff's Exhibit 5 that says *manager*, so.

3              THE WITNESS:  I can explain that.

4              THE COURT:  So the question to you is did you call them

5    *managers*?

6              THE WITNESS:  The work was -- service managers, and in

7    short, we call them *managers*.

8              THE COURT:  Is it written anywhere that you call them

9    *service managers*?

10             THE WITNESS:  I'll have to look.  From the top of my

11   head --

12             THE COURT:  But nothing that you've produced -- you're

13   not familiar with anything off the top your head?

14             THE WITNESS:  No, because the amount of paperwork that

15   they did is pretty minimal, such as this daily sheet.  Of

16   course, it says on the business cards that we've seen.  I can

17   get into that, if that's the right time.

18             THE COURT:  No, your lawyer will ask you that, I'm

19   sure.

20   EXAMINATION BY MS. VASQUEZ:

21   Q.   Just to go through one other item, I'm going to direct you

22   to look at what is behind tab 3, 4, Bates-1633?

23             THE COURT:  It's not tab, it's Exhibit 3.  Is that

24   right, it's Exhibit --

25             MS. VASQUEZ:  It would be Exhibit 4.

                    ***OFFICIAL TRANSCRIPT***

1          THE COURT:  If this is appealed, the appellate court

2     will not have your tabs.  It will have Exhibit 4.

3          MS. VASQUEZ:  It would be Exhibit 4.

4          THE COURT:  What's Bates number?

5          MS. VASQUEZ:  It is Bates-1633.  It's page 10 of the

6     employee handbook.

7     EXAMINATION BY MS. VASQUEZ:

8     Q.   This is your employee handbook?

9     A.   Correct.

10    Q.   The date on this handbook is March 13, 2018; is that

11    correct?

12    A.   Yes.

13    Q.   Is that when the handbook was created?

14    A.   No.

15    Q.   When was the handbook created?

16    A.   Before we opened.

17    Q.   Before you opened.

18          Look at this line here.  What are you calling the

19    person that a server would have to contact upon being absent

20    from your shift?

21    A.   That would be me.

22    Q.   What does that term say there, where I highlighted?

23    A.   "If you are going to be late or miss work, employees are

24    expected to call and talk to your manager at least two hours

25    before they are scheduled to work."

                         *OFFICIAL TRANSCRIPT*

1   Q.   Are you telling us today that you are the manager that

2   this handbook refers to?

3   A.   I was the one who they needed to contact, yes.

4   Q.   So there were -- no servers could contact -- no servers

5   could contact any other managers to let them know that they

6   would be absent or tardy?

7   A.   Are you asking me what's in the handbook, or what happened

8   on a regular basis?

9   Q.   I'm asking you what happened on a regular basis?

10  A.   So I'll answer to that.  On a regular basis, it would be

11  that they call either a service captain, or sometimes just

12  their fellow server, and they could come to me as well.

13           They would talk -- many times, more than I could

14  count, a server would approach me telling me that another

15  server is probably going to be a few minutes late.  I would

16  accept it or not depending on the circumstances.

17  Q.   Would there be -- would there be a situation where a

18  server would contact Ryan, Alise or Steve and say, I'm going to

19  be absent?

20  A.   I'm assuming it happened.  I can't recall a specific day.

21  Q.   But you do think it happened?

22  A.   Well, if they will call them to say that they will be

23  absent, whoever they called will come to me and ask me, how do

24  I want to handle this.  But especially at the beginning, I was

25  one person, and, you know --

**OFFICIAL TRANSCRIPT**

1    Q.    You were not always there?

2    A.    I was there pretty much every day for a long time, the

3    first couple of years.

4    Q.    But you do travel?

5    A.    I'm sorry.

6    Q.    You do travel?

7    A.    I do travel.  But the first -- the first year, I didn't

8    travel.  I was there full on, a hundred hours a week.

9           Now, if I'm not available, or they can call a service

10   captain as well.  I mean, I didn't have any problem with them

11   calling whoever they found is available to let them know, so

12   they could let me know.  What I didn't want to happen is for

13   them just not to show up or be late, without letting anybody

14   know.

15   Q.    You would never say that is not acceptable?

16   A.    About what?

17   Q.    If someone says, "I can't make it in," or, "I'm running

18   15 minutes late," was there ever a situation that you would

19   say, that's not acceptable?

20   A.    It depends on the circumstances and the situation.

21   Q.    Then would that then be conveyed to the service

22   captain/manager?

23   A.    No.  I would talk to them myself if, you know, that's the

24   situation.

25           Now, if somebody is constantly late every day, 15 or

**OFFICIAL TRANSCRIPT**

1   20 minutes, it won't be acceptable after, I don't know, the
2   tenth time or -- it really depends on the circumstances.  If
3   somebody is just running a little late, it happens in life, so
4   I just let it fly.
5   Q.   So going back to the handbook, you see here that it says,
6   "Talk to your manager at least two hours before they are
7   scheduled to work;" is that right?
8   A.   Uh-huh (affirmative).
9   Q.   This handbook actually mentions you and your position; is
10  that right?
11  A.   I couldn't hear.
12  Q.   This handbook actually mentions you and what your position
13  is at Doris Metropolitan; is that right?
14  A.   At that time, I was the manager, yes.
15  Q.   I'm going to go behind Exhibit -- the same Exhibit 4, but
16  Bates-1626.
17          MR. CUPP:  What page?
18          MS. VASQUEZ:  Page 3, Bates-1626, in the handbook.
19  EXAMINATION BY MS. VASQUEZ:
20  Q.   This handbook identifies you as owner and GM, general
21  manager; is that right?
22  A.   Yes.
23  Q.   Then it qualifies that there is, you know, supervisor,
24  manager or representative of Doris Metropolitan, other than
25  Itai Ben Eli, owner and GM of Doris Metropolitan; is that

*OFFICIAL TRANSCRIPT*

1   right?

2   A.   Yes.

3   Q.   So in reference to the rest of the handbook, you were

4   referred to as the *general manager*, not just the manager?

5   A.   Yes.

6   Q.   The reason that -- and I'm going to put back up -- I'm

7   going to put back up the business card that is Exhibit -- or --

8   yes, Exhibit 3, Bates-Black 1.

9          The reason you had these business cards with the name

10   manager on it is because you wanted to give -- because giving a

11   guest a business card shows personalized service?

12   A.   Yes.  The only reason they had cards is because they were

13   interacting with guests all the time.

14   Q.   You wanted to give them personalized service; is that

15   right?

16   A.   Yes.

17   Q.   Because the word *manager* implies authority, doesn't it?

18   A.   No, not necessarily.  You know, and I've said it before,

19   in the restaurant world, especially from a guest's point of

20   view or perspective, he doesn't know what a service captain do,

21   a service manager or any other terms that are out there, and

22   there are a lot of them.

23          This is a way of simplifying things, but it's for --

24   not changes everything that they actually do.

25   Q.   Well, you just said it, right, because it confuses --

*OFFICIAL TRANSCRIPT*

1    those terms confuse the guest, right?

2    A.    Confuse -- I don't think they confuse.  All I said is that

3    people not necessarily understand what each position means.

4    This simplifies.  It's a difference.

5    Q.    It simplifies it because it implies that they have a

6    managerial capacity?

7    A.    It simplifies things, period.

8    Q.    So you disagree with me, or you agree?

9    A.    I disagree.  I agree it simplifies, but not for the

10   reasons that you say.

11   Q.    So if that's the case and it simplifies -- you want

12   something simple, why not just call her Melissa Rogers, food

13   orderer?

14   A.    Because -- first, you hand this to guests, okay.  They

15   talk to guests, checking in on them, talking to them, doing

16   whatever table service they do, present themselves.  They hand

17   those cards, and for the guest to have.  I wanted to simplify

18   it -- and I'm repeating myself here.

19   Q.    No, sir, didn't you want to you impress them by showing

20   them that someone with authority at your restaurant was going

21   to their table?

22   A.    It's somebody who wanted to give a personalized service.

23   The authority is irrelevant.

24   Q.    The authority is not irrelevant because they think that

25   person can do something for them, like get them porterhouse

*OFFICIAL TRANSCRIPT*

1    meats, special porterhouse meats?

2    A.    Yes, they can.

3    Q.    So it's because that -- the reason that you did these

4    business cards is because you wanted to show the impression

5    that this person, Melissa Rogers and Dontay Kinchen, had a

6    little special something more than just server or food orderer?

7    A.    They were service managers.  Their primary job was to make

8    sure service is on point.

9    Q.    No, sir.

10   A.    Yes.

11   Q.    You just testified that their primary responsibility was

12   to check in on each and every guest?  Isn't that true?

13   A.    Which is basically the same thing.  I said -- first, I

14   said it's among other things, and it's the same thing.  Making

15   sure service is on point is the same as making sure that the

16   guests get the right experience.

17   Q.    Making sure the service is on point for the entire

18   restaurant, not just a section of the table --

19   A.    Why not?

20   Q.    I'm asking you.

21   A.    I'm telling you.  It could be a section, it could be the

22   whole restaurant.  Usually, we like to separate it for sections

23   because it makes more sense.  We can give more personalized

24   service.

25   Q.    So, then, what would happen on the times where you were

*OFFICIAL TRANSCRIPT*

1    the only manager, as we were looking at previously under

2    Exhibit --

3           THE COURT:  5.

4    EXAMINATION BY MS. VASQUEZ:

5    Q.    -- 5, Bates-602?

6    A.    Can I see the date on that, please?

7    Q.    Herein lies another problem, sir, right?

8    A.    Yes.

9    Q.    You see the dates here?

10   A.    I do.  It's October -- 26 of October.  I would explain

11   that, as you could tell, this is very early after we opened.

12   Q.    What's missing on that date?

13   A.    The year.

14   Q.    How am I supposed to know by looking at this server

15   checkout sheet if this was in 2014, 2015 or 2016?

16   A.    So I will testify to this.  I would say that at the

17   beginning, it was hard to get qualified employees.  A lot of

18   times, I would find myself, you know, in every position.  I did

19   what I had to do.  You know, it's my business.  I just opened

20   it.  I would serve tables.  I would run food.  I would be the

21   service captain.  I would be the dishwasher, if needed.  All of

22   that happened at the beginning a lot.

23           Every time my name is on that sheet, I mean, it was

24   for a few reasons.  First, there were not a lot of them, and it

25   was because of the circumstances of the reality.  Somebody

*OFFICIAL TRANSCRIPT*

1    didn't show up to work.  I had to let somebody rest.  Something

2    happened so that I had to be on to do their job or whatever

3    that was.

4    Q.   But you do agree that in the date section there is no

5    year, so there is no telling when this would have happened?

6    A.   There is no year, but seeing who works and the name, it's

7    probably '13.

8    Q.   Probably, but you're not sure?  Is that right?  You're not

9    sure?

10   A.   I'm sure that -- let's say after the first couple of

11   months, first few months, I didn't have to be -- I didn't

12   have -- I didn't make those reports.  The more -- the more the

13   restaurant progressed, the more I had, you know, captains and

14   all the positions.  So I had to, you know, cover for people

15   less.

16   Q.   Okay.  I want to show you something under the same

17   exhibit, but it's Bates-603.  The previous one we were looking

18   at is 602.

19            Look at that same date, sir.

20   A.   Uh-huh (affirmative response).

21   Q.   This is the same date.

22   A.   Yeah.  But the other one was a.m., and this one is p.m.

23   Q.   But there is no years, right?

24   A.   No.

25   Q.   So this could have been a p.m. shift in another year?

                    *OFFICIAL TRANSCRIPT*

1    There is no way to know?

2    A.    Well, I just said.  But if you just read from the date

3    that -- what I said was that the more -- the time -- the more

4    the restaurant worked, the more I had people filled in

5    positions.

6            It happens in the restaurant business, unfortunately,

7    that turnover is high, and people are not always reliable.

8    Employees are not always reliable.  People can not show up.

9    People can get sick.  Things happen, and then somebody has got

10   to cover for it.

11   Q.    So you see where it says *Cash Sales* at the bottom?

12   A.    Yes.

13   Q.    You see where it says, *Ryan, $128.62*?

14   A.    Yes.

15   Q.    Then it says, *Carlos, $236.53*; do you see that?

16   A.    Yes.

17   Q.    You don't dispute that the cash tips were put in an

18   envelope and left in an unlocked drawer; is that right?

19   A.    So it was brought to all of our staff members --

20           THE COURT:  Wait a minute, sir.  First, do you agree

21   that they were put in -- what was the question?

22           MS. VASQUEZ:  Do you agree that cash tips were put in

23   an envelope and left in an unlocked drawer?

24           THE WITNESS:  When they didn't pick them up as they

25   should have done, yes.

*OFFICIAL TRANSCRIPT*

EXAMINATION BY MS. VASQUEZ:

Q.   So that's a yes.  Okay.

     You heard that cash tips would sometimes go missing?

A.   I would -- no official complaint.  I will hear that
around.

Q.   So that's a yes?

A.   I just answered it.

Q.   Well, you didn't say yes, so I need to make sure the
record is clear.  You said "yes" to that question?

A.   No one came to me with an official complaint, but I heard
it, okay?

Q.   You felt it was not your responsibility to secure those
tips?

A.   According to our policy, they -- the servers need to
stay --

Q.   So can you say "yes" or "no," and then explain?  That way,
we can make a clear record.

A.   Repeat the question, please.

Q.   The question is, you felt it was not your responsibility
to secure the tips?

A.   Yes.

     THE COURT:  Yes, it was not your responsibility?

     THE WITNESS:  I didn't think it was my responsibility
because --

     THE COURT:  Y'all, when those kind of questions get

*OFFICIAL TRANSCRIPT*

1    asked later, I don't know what the answer is.

2             But yes, it was not your responsibility; that's

3    what you're saying?

4         THE WITNESS:  About the cash tips?

5         THE COURT:  Yes.

6         THE WITNESS:  So -- yes.

7         THE COURT:  Did I interpret that?  Okay.

8             Did you want to explain your answer?

9         THE WITNESS:  Yes.

10        THE COURT:  All right.

11        THE WITNESS:  May I?

12        THE COURT:  Yes.

13        THE WITNESS:  Unlike credit card tips, cash tips will

14   be delivered to the servers and server assistants and captains,

15   whoever worked that day, that same day.

16            There are not a lot of cash tips.  The vast

17   majority of all the transactions at Doris Metropolitan are

18   credit card.  Because it was given that same day, it was their

19   responsibility to stay until we make the math on that sheet and

20   hand it to them.

21            What would happen is that if one section, now, is

22   closed, okay, and people can get home early, they would rather

23   go home early and keep their cash tips at the restaurant.  But

24   by no means -- this is something I've repeated so many times

25   because I didn't want something like that to happen, for people

*OFFICIAL TRANSCRIPT*

1   to miss their tips -- it's their responsibility to stay until

2   the end of the night, it's their money, to collect it.

3            If they chose not to, we would do the courtesy of

4   at least put in it an envelope inside a drawer, so they could

5   pick it up tomorrow.  But their responsibility was to pick it

6   up the same day.

7            It was not the restaurant policy to take all the

8   cash tips and put it in an unsafe drawer, no.  It was a

9   courtesy.  They needed to stay until the end of the night.  If

10  they chose not to, then they chose not to.

11       THE COURT:  Mr. Eli, if you cut someone at eight

12  o'clock, and you didn't do this until ten o'clock, it's the

13  employee's responsibility to stay two hours to wait to get the

14  cash tip?  Or there is no assurance that they will get it when

15  they come back the next day?

16            I mean, really, that's what you expected is the

17  employee had to wait two hours to get the cash?

18       THE WITNESS:  For the most part, ma'am, it was not two

19  hours.

20       THE COURT:  But I'm not asking for the most part.  I'm

21  asking in that situation where somebody leaves -- you cut --

22  I'm hearing this word for the first time -- you cut them, so

23  they have to leave.  You're not going to continue paying them

24  by the hour, but you expected them to stay two more hours, to

25  wait to get the cash tip?

*OFFICIAL TRANSCRIPT*

1        THE WITNESS:  I don't cut them.

2        THE COURT:  Somebody does?

3        THE WITNESS:  No, they ask to leave.  They said, "My

4   section is done, may I leave?"  Then we say, "Well, you know,

5   what about the cash tips?"  "Just leave it at the" --

6            We don't cut them.  They come to you way in

7   advance, say, "Hey, can I leave?  Can I leave?"  So we don't --

8   I don't cut them and then expect them to stay on their own time

9   to collect the cash tips at any point.  They may stay as well

10  on the o'clock, and wait for their -- and help their friends,

11  and take their cash tips.

12       THE COURT:  Okay.

13  EXAMINATION BY MS. VASQUEZ:

14  Q.   So just to clarify, was there anyone that waited to

15  collect their tips for the -- on the clock -- or off the clock

16  after their shift was over?

17  A.   Yes.  Of course.

18  Q.   You would agree that it is important to maintain employee

19  records; is that right?

20  A.   Yes.

21  Q.   The timecard report that you produced to us is missing

22  2013 and from April 2015 through 2016; is that right?

23  A.   I'm not aware of this.

24  Q.   You're not aware of that?

25  A.   No.

*OFFICIAL TRANSCRIPT*

Q.    Now, you stated that you were the only -- you were there a
hundred hours in 2013; is that right?

A.    A hundred hours a week.

Q.    A hundred hours a week?

A.    At least.

Q.    Maybe in 2014, as well?

A.    Probably for the start of 2014.

Q.    I'm going to flip to Exhibit 4.  Let me just check.

       So this is going to be Exhibit 2, I'm sorry,
Bates-1676.  That document is your payroll for April 5th, 2014
to April 18th, 2014; is that right?

       THE COURT:  Tell me where you are now.  Exhibit 2.  Of
course, I can't see the Bates numbers.

       MS. VASQUEZ:  It is Bates-1676, the top right.

       THE COURT:  I can't see the Bates numbers.

       What employee -- you know, what y'all need to do
at a break is let me copy something that has the Bates numbers
for this exhibit, because they are -- the hole punched?

       MS. VASQUEZ:  Oh, no.  That's not it.  It's middle of
the way.  I will tell you exactly.  This one would have a Bates
number, and it's after that section of documents.  It's the
very first page after the spreadsheet that we're looking at.

       THE COURT:  All right.  I see that one.  Now I see it.

EXAMINATION BY MS. VASQUEZ:

Q.    Okay.  That document that's up on the monitor, that's your

**OFFICIAL TRANSCRIPT**

1  payroll record for April 5th through April 18, 2014; is that

2  correct?

3  A.   It looks like it, yes.

4  Q.   This has the hours by week broken down for

5  Asaria Crittenden and Erin Lawrence; is that right?

6  A.   Yes.

7  Q.   To your knowledge, this is the only document produced by

8  you and your company for the hours for these two individuals?

9  A.   Yes.

10 Q.   This doesn't have when they clocked in, the time they

11 clocked in, or the time they clocked out?

12 A.   Well, every time they clock in and clock out, they get a

13 slip.  Not only that, it also gives you like a weekly, like,

14 detailed.

15 Q.   So where is that for these folks on this day?

16 A.   When they clock in and out, they collect those slips, not

17 me.

18 Q.   But didn't you say it's important to maintain employee

19 records?

20 A.   Of course.

21 Q.   So where are those records and time slips that you would

22 have kept for these two individuals for this payroll period?

23 A.   First, we have the timecards.  We do have -- we print

24 them, and we go through them, and we make sure they are

25 correct.

*OFFICIAL TRANSCRIPT*

1           But, as I said, when they clock in and out, they get

2    a fully detailed --

3    Q.   But you're saying you have -- there are timecards, right?

4    You just said that.  So where are those timecards for these two

5    folks?

6    A.   Well, as of right now, I don't know.  What do you mean,

7    like --

8    Q.   All you sent us for this pay period was this document.

9    I'm asking you, because you just said that there are timecards,

10   where are the timecards for these two individuals on that

11   date -- for that date range?

12   A.   At this moment, I don't know.  But what I do know is that

13   we have thousands and thousands of timecards that we did

14   provide you.  So, you know...

15           You're asking me about the specific period of time.

16   On the top of my head, I can't answer that.

17   Q.   Well, when you're saying thousands and thousands, I'll

18   represent to you that I have received Bates-1676, which is up

19   on the monitor, all the way to 1708.  That's not even a

20   thousand, right?

21   A.   Okay.  It was an estimate.

22   Q.   Everyone gets paid biweekly; is that right?

23   A.   Yes.

24   Q.   You believe that Doris Metropolitan paid overtime to

25   employees?

                    *OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    So by overtime, you mean they just were paid 2.13 an hour,

3    correct?

4    A.    Again.

5    Q.    By overtime, you mean that they were only paid 2.13 an

6    hour for every hour after 40 hours?

7    A.    No.  We calculate it differently.

8    Q.    How do you calculate it, sir?

9    A.    So, it's the 7.25 time and a half minus the credit.  So in

10   the server case, it would be around $5.44.  Server assistants

11   make a higher hourly wage, so that would bring them to around

12   $10 and, I think, 20-something cents.

13   Q.    Okay.  Well, let's look at that.  In the same Exhibit 2,

14   Bates-1048 and 1049.  I'm going to look right now at 1049,

15   which is the second page.

16           Actually, I'm going to start with 1048.  This is the

17   check history for -- so I'm starting with 1048.  This is the

18   check history detail for Zachary Adams; do you see that?

19   A.    Yes.

20   Q.    Okay.  So I want you to take a look at that because on

21   this second page you're going to see -- as long as I have this

22   number right here -- hold on.  I've got to figure out the right

23   sheets.  I'm going to come back to that.

24           You don't know sitting here today if the person you

25   consulted with at the Louisiana Restaurant Association

*OFFICIAL TRANSCRIPT*

1    regarding the tip pool distribution was, in fact, an attorney?

2    A.    I don't remember -- I don't remember, but I don't think it

3    was an attorney.

4    Q.    Okay.  That would have been the only person that you

5    consulted regarding the tip pool; is that right?

6    A.    That's right.

7    Q.    You would agree that taking care of other people's money

8    is a big responsibility?

9    A.    Absolutely.

10   Q.    I'm sorry?

11   A.    Yes, I do.

12   Q.    So if you didn't know if that person was an attorney, why

13   did you make such big decisions regarding your tip pool?

14   A.    Well, first, I have many years of experience doing this.

15   It's not like I'm new to the restaurant world or industry by

16   any means.  I carried experience and also ideology and -- of

17   how service should be.  I consulted with the Louisiana

18   Restaurant Association, and it seemed enough and made sense,

19   again.

20   Q.    But your experience was not in the U.S.?

21   A.    The experience was --

22   Q.    Your experience was not in the United States?

23   A.    No.

24   Q.    In fact, you talked a little bit about words that you've

25   used for service captain in Hebrew, correct?

*OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    The word that you used in Hebrew regarding these managers

3    was what, again?

4    A.    *Achmash*, if I'm correct.

5          COURT REPORTER:  Could you spell that, please?

6          THE WITNESS:  Yes.  A-C-H-M-A-S-H.

7          COURT REPORTER:  Thank you.

8    EXAMINATION BY MS. VASQUEZ:

9    Q.    That actually means someone responsible for the shift; is

10   that right?

11   A.    Shift service, yes.

12         MS. VASQUEZ:  Okay.  Could I have just a few minutes to

13   consult with --

14         THE COURT:  Yes.

15   EXAMINATION BY MS. VASQUEZ:

16   Q.    Just one more follow-up real quick.

17         Okay.  So we were looking behind Exhibit 2,

18   Bates-1049.  This document, and I'm going to point out here.  I

19   don't know why it looks so fuzzy.  There.

20         This is a paycheck, a regular paycheck that would

21   have gotten to Zachary Adams for 72 and a half hours; is that

22   right?

23   A.    I don't see the name.

24   Q.    The name was on the first sheet that we saw him.  I can

25   get that back up.

*OFFICIAL TRANSCRIPT*

1              So this is the first sheet here.

2    A.    Uh-huh (affirmative).

3    Q.    It says *Zach Adams* at the top, right?

4    A.    Okay.

5    Q.    Then at the bottom -- this is the second page to that

6    document -- you see where it says *72 and a half hours* right

7    there?

8    A.    Yes.

9    Q.    Would you agree with me that 72.5 times the rate of 2.13

10   matches 154.42, which is the amount of that check right here?

11   A.    Yes.

12   Q.    Okay.  Now I'm going to be looking under that same tab,

13   that same exhibit, but it's Bates-1695 at the bottom right.

14              Now, this is for that same pay period that we looked

15   at.  In this case, you did produce a timecard report for Zach

16   Adams; is that right?

17   A.    It looks like it, yes.

18   Q.    If you see here, this shows his time and total hours

19   worked.  Do you see that, on the right-hand side?

20   A.    The total was 72 hours.  Here it only goes until 65.95.

21   Q.    I'm sorry.  You're right.  It was the paycheck underneath

22   that.  I got to get new glasses.

23              I'm going to flip back to that same page that we

24   looked at before.  65.95, do you see that right here?

25   A.    Yes.

*OFFICIAL TRANSCRIPT*

1    Q.    You see the 140.47 next to it?

2    A.    Yes.

3    Q.    Would you agree with me that 65.95 times 2.13 is 140.47,

4    which is the amount of the paycheck?

5    A.    Yes.

6    Q.    Now, I'm going back again to 1695, to show his hours for

7    that day.  Do you see that?

8    A.    Yes, I do.

9    Q.    Do you see here that he worked from Saturday,

10   December 27th, through Saturday, January 3, 2015?  Do you see

11   that?

12   A.    Yes.

13   Q.    At this point, his total hours were 42.23, correct?

14   A.    Ma'am, our pay period --

15   Q.    Is that a yes?

16   A.    Yes.

17   Q.    So if we look at that check, you can be certain that this

18   gentleman did not get paid overtime for that pay rate; is that

19   right?

20   A.    Because our week pay ends at Friday.  So his week ended at

21   34.08.

22   Q.    But it's supposed to go from -- every seven days; is that

23   correct?

24   A.    Saturday being the first day.

25   Q.    Saturday --

*OFFICIAL TRANSCRIPT*

1   A.   Saturday till Friday, yes.

2   Q.   So you're saying that your week ends on Friday, but you

3   start on a Saturday?

4   A.   Start on a Saturday, includes, and it finishes up on

5   Friday after -- including Friday.

6   Q.   Up to and including Friday, but not including Saturday at

7   all?

8   A.   No, that's our pay period.  That's up to --

9   Q.   Your pay period is six days, not seven?

10  A.   No, we pay from Saturday --

11  Q.   Actually, you don't pay weekly, you pay biweekly?

12  A.   I pay biweekly, I know.  If you'll look at it, the math

13  add up.  Week starts on a Saturday and ends on a Saturday

14  before the shift, not after the shift.

15  Q.   So it doesn't go to Saturday at all, because it ends on

16  Friday, which is six days; isn't that right?

17  A.   Well, Friday, Saturday -- I'm sorry, Saturday, Sunday,

18  Monday, Tuesday, Wednesday, Thursday, Friday.  That's seven.

19  Q.   Saturday to Saturday is not your pay period?  You're

20  saying you're going Saturday to Friday?

21  A.   Includes.

22       THE COURT:  Let me ask you a question.  If you pay

23  every two weeks --

24       THE WITNESS:  Yes.

25       THE COURT:  -- that could be a Wednesday to Wednesday

*OFFICIAL TRANSCRIPT*

1    to Wednesday or -- you know, so --

2              THE WITNESS:  Correct.

3              THE COURT:  So I guess an issue for the lawyers is, if

4    you pay it that way, does that mean the first seven days of

5    that period they are paying, is that the workweek, and that's

6    where you look to see if it's over 40 hours, or is it --

7                   I just don't know the answer to that, so you all

8    have to tell me that later.

9              MS. VASQUEZ:  We'll end up briefing that.

10             THE COURT:  You understand the question?  I'm asking,

11   what do you look at to see if there is more than 40 hours in a

12   week?  Is that a set -- you know, does the law say you look

13   from Monday morning to Sunday night, or does it say it depends

14   on how the employer pays?  I just don't know.

15             MR. CUPP:  Your Honor, I don't want to interrupt, but I

16   know the answer.

17             THE COURT:  You can tell me at a break.

18   EXAMINATION BY MS. VASQUEZ:

19   Q.   So just to finish up here, you would agree that this

20   gentleman was paid 2.13 for the entire two weeks, even when he

21   went above the 40 hours on that particular Saturday?

22   A.   Well, if we counted the way we do, when he crossed that

23   40 hours, he was -- it was after his first week of work.  So he

24   was not entitled to overtime.

25             MS. VASQUEZ:  I have no more questions.

                          *OFFICIAL TRANSCRIPT*

1          MR. CUPP:  Your Honor, I would like to be very limited,

2     because we are going to call Itai back in our case in chief.

3          THE COURT:  I would rather you just take him now.  If

4     you're going to call him later, then you don't get anything

5     now.  Is that your position?

6          MR. CUPP:  Well, I wanted to clear up -- I think the

7     workweek issue is confusing, and I would like to clear that up

8     now so you can understand.

9          THE COURT:  All right.  Why don't you ask him some

10    questions, but that's the only topic.  Then you're going to

11    take the rest of it when you call him on direct.

12               If you want to cross him on that issue, you can,

13    and then on any new topics he brings up in his direct.

14         MR. CUPP:  The other alternative, Judge, is you

15    mentioned us talking with you at the break.  I think this could

16    be a probably stipulated fact about when the workweek runs

17    for --

18         THE COURT:  Well, he's testified about what he thinks

19    it is.  The other issue is whether the law says something else

20    or not, which I don't know what --

21         MR. CUPP:  We'll address that as a matter of a legal

22    point.

23         THE COURT:  Okay.  So you won't take him on direct

24    right now?

25         MS. VASQUEZ:  Your Honor, I apologize.  I have one more

*OFFICIAL TRANSCRIPT*

1   question.

2   THE COURT:  Okay.  I don't want to do this for anybody

3   else.  I usually let people take one person, like their main

4   witness, and call them back in their case on direct; but, the

5   other people, I want you to cross them, you know, whenever they

6   get up.

7   MR. CUPP:  I understand, Your Honor.  I was

8   contemplating whether to put Mr. Ben Eli on for my entire case,

9   but we will reserve that until our case in chief.

10   THE COURT:  Okay.  But you understand, for other

11   witnesses, just go ahead and take them when they're on the

12   stand.  We don't usually call people twice.

13   MR. CUPP:  You're talking about with their witness.

14   THE COURT:  Or if they call one of your witnesses, I

15   want you to take them.

16   What I let people do is pick one person who is

17   your main witness, and then you can call them in your case in

18   chief; but, otherwise, just take them when they are on the

19   stand.

20   MR. CUPP:  I got you, because he will be pretty long in

21   my case in chief, but I don't want to take that time today.

22   EXAMINATION BY MS. VASQUEZ:

23   Q.   I just have one further.  I'm going to show you what's

24   behind Exhibit 2, and it's going to be Bates-1683.

25   MR. CUPP:  Which number?

*OFFICIAL TRANSCRIPT*

1          MS. VASQUEZ:  Exhibit 2, Bates-1683.

2     EXAMINATION BY MS. VASQUEZ:

3     Q.    Now, you would agree with me for Patrice Jones that she

4     worked 42 hours on -- where it says *week 1*, for payroll

5     July 12, 2014; is that correct?

6     A.    Yes.

7     Q.    Beth Kuzmovich, below her, worked 44 and a half hours; is

8     that correct?

9     A.    Correct.

10    Q.    Would you agree that those two people would be entitled to

11    overtime?

12    A.    Yes.

13    Q.    Is it your assertion that they got paid that overtime?

14    A.    They should have -- I mean, our -- we pay overtime, so,

15    yes.

16    Q.    If they didn't -- if you didn't pay overtime, would you

17    agree that that is something that you would have to pay them,

18    if it wasn't paid?

19    A.    Yes.

20          MS. VASQUEZ:  No more questions.

21          THE COURT:  All right.  You're excused for now.  You'll

22    come back later.

23               Plaintiff can call the next witness.

24          MS. CATLETT:  Plaintiffs call Patrice Jones.

25          THE DEPUTY CLERK:  Remain standing and raise your right

*OFFICIAL TRANSCRIPT*

1   hand.  Do you solemnly swear the testimony you are about to

2   give to this Court will be the truth, the whole truth and

3   nothing but the truth?

4           THE WITNESS:  I do.

5                           **PATRICE JONES**

6    was called as a witness and, after being first duly sworn by

7     the Clerk, was examined and testified on her oath as follows:

8           THE DEPUTY CLERK:  Please state and spell your name for

9   the record.

10          THE WITNESS:  My name is Patrice Jones, P-A-T-R-I-C-E,

11  J-O-N-E-S.

12                       DIRECT EXAMINATION

13  BY MS. CATLETT:

14  Q.   Patrice, when did you start working for Doris

15  Metropolitan?

16  A.   It would have to have been the middle of May of 2014.  I

17  want to say around May 14th, 2014.

18  Q.   What was your position there?

19  A.   I was a server.

20  Q.   What were your duties?

21  A.   I had a lot of duties.  We would begin with side work,

22  which was setting up my section, polishing silverware,

23  polishing plates, polishing glasses.

24          Then, in terms of service, it was greeting my tables,

25  taking their orders.  I had a server assistant who would often

                       *OFFICIAL TRANSCRIPT*

1   pour my water.  But I would, you know, take my table through

2   the menu, and then get their order, ring in their order into

3   the Point of Sale system.

4        I would also run their food -- or any food in the

5   restaurant when the bell in the kitchen would ring.  I would

6   bus my tables as well.

7   Q.   Were you supervised by managers?

8   A.   Yes.

9   Q.   Which managers worked when you were there?

10  A.   When I first began in 2014, I was managed by Stavros, or

11  Steve, as we have been calling him.  Alise Warren had just been

12  promoted from server to manager.  She was still picking up a

13  couple serving shifts, but also managing at the same time.

14       Then, shortly after, Stavros left, and they hired

15  Ryan O'Dwyer.  He was my manager for a while.  Alise left

16  shortly after that, and Dontay Kinchen, who was a server, was

17  promoted to the manager position.

18       So for the most part, it was -- for the majority of

19  my time working there, I was managed by Ryan and Dontay.  Then

20  after Ryan left, we had Melissa Rogers come on.

21  Q.   All of the people that you've mentioned were referred to

22  as *managers*?

23  A.   Yes.

24  Q.   Would all of the people that you've mentioned been

25  referred to as *managers* on checkout sheets?

*OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    Who is Itai Ben Eli?

3    A.    When I was hired, I was told that he was the owner.

4    Q.    Did he ever supervise you?

5    A.    There was a brief period when there was no manager yet.

6    Ryan O'Dwyer had not been hired.  So he filled in for a couple

7    of weeks and supervised.

8          But, for the most part, during my tenure at

9    Doris Metropolitan, he was very much more behind the scenes.

10   It was Melissa, Ryan, Dontay, Alise and Stavros who were my

11   supervisors and managers.

12   Q.    Then I'm going to put --

13         THE COURT:  Who was she talking about?  You said he was

14   very much behind the scenes.  Were you talking about Itai?

15         THE WITNESS:  Itai.  Itai was the owner, as far as I

16   was concerned.  I never heard him referred to as a *manager* when

17   I worked there.

18          So he was an owner.  He would pop in.  He would

19   come in for pre-shift and maybe say a few words.  But, for the

20   most part, I saw him at the bar hanging out with the other

21   owners.  Occasionally, if there was a huge issue with

22   management or, you know, a friend, he would maybe go to that

23   table.

24   EXAMINATION BY MS. CATLETT:

25   Q.    Tell me a little bit about how you got hired at

*OFFICIAL TRANSCRIPT*

1   Doris Metropolitan.

2   A.   So it was May of 2014.  I was working at a restaurant

3   called *SoBou*, which was down the street -- a couple of blocks

4   down the street, maybe 200 block of Chartres.  Doris is in the

5   300 block, I believe.

6           I had quit SoBou after a very long, two-year

7   difficult job there.  I had a couple friends who were working

8   at Doris already.  It had just opened.  It was pretty fresh and

9   new.  I had heard great things about it.

10          I had left my job at SoBou that day.  I walked down

11  the street into Doris Metropolitan to see my friend at the bar.

12  His name was Konrad.  He wasn't working at the time, but

13  another friend was there, my friend Graham.

14          I had said that I just had quit SoBou, and I was out

15  of a job.  Graham said, "Well, you should work here."  I said,

16  "Okay."  Then, the next thing I knew, a man named Stavros came

17  out from the courtyard.  He said, "Do you want to sit down and

18  chat with me for a minute?"

19          I was a little distraught at this time because I had

20  just quit my job at SoBou, and it was a kind of on-the-spot

21  quitting.  So I was a little bit teary-eyed.  He said, "You

22  know, take a minute, and come chat with me."

23          So I took a minute.  Graham made me a drink.  I took

24  that drink and sat down with Stavros.  We had a very brief

25  discussion.  He asked me what my history in the service

*OFFICIAL TRANSCRIPT*

1   industry was.  I had told him all of the places I had worked,

2   and that I had been a server for the past eight years.

3           He told me at the spot -- on the spot that I was

4   hired.  I believe it was a Friday night.  So he said, you know,

5   "Do you want to come in tonight and work?"  And I said, "Well,

6   it's a Friday night, and I just -- you know, I probably need a

7   day to kind of just rest."  He said, "Take today and tomorrow

8   to rest," and I think he said, "Come in on Sunday, and we'll

9   begin training you."

10  Q.    About how long do you think you chatted with him before he

11  told you that you were hired?

12  A.    Maybe 20 minutes, 25 minutes.

13  Q.    During that time period did he text anyone?

14  A.    No.

15  Q.    Did he call anyone?

16  A.    No.

17  Q.    Did you speak with anyone else during that time period

18  regarding being hired there?

19  A.    No.  But shortly after I was hired by Stavros, my friend

20  Konrad, who at the time was the bar manager, and that was the

21  person who I had originally went to see and say hi to and have

22  a drink at the bar with, came out from the courtyard.  Again,

23  he had just arrived for his shift.  He said, "Congratulations."

24  That's how I knew I was hired.

25  Q.    Then how long after you started was it before you met

*OFFICIAL TRANSCRIPT*

1    Itai Ben Eli?

2    A.    Probably a week.  Around a week, I would say.  I think he

3    was out of town when I was hired.  So he came -- maybe he was

4    in town, I'm not sure, but it was definitely a week.  It was a

5    few days, for sure.

6    Q.    Based on your interaction with the managers that you've

7    mentioned, do you think they were acting on behalf of

8    Doris Metropolitan, the business?

9    A.    Can you rephrase that question?

10   Q.    The managers that you dealt with -- the manager that hired

11   you, do you believe that Stavros was acting on behalf of the

12   company when he hired you?

13   A.    Yes.

14   Q.    When you were working at Doris Metropolitan, did managers

15   have keys to the restaurant to open and close?

16   A.    Yes.

17   Q.    When you were working at Doris Metropolitan, did they

18   supervise the dishwashers?

19   A.    Yes.

20   Q.    When you worked at Doris Metropolitan, did they perform

21   any side work of any kind --

22   A.    No.

23   Q.    -- the managers?

24   A.    No.

25         THE COURT:  When you ask her about managers, are you

1   referring to Steve, Alise, Dontay, Ryan and Melissa?

2       MS. CATLETT:  Yes, ma'am.  Any of the managers that

3   worked there during her tenure.

4       THE COURT:  Who she calls *managers*.  We need it in

5   group A, group B, group C, something.

6       MS. CATLETT:  They were always referred to as *managers*

7   during this time period.

8       THE COURT:  But for purposes of my keeping the record

9   straight, when you're asking this witness, if you can clarify

10   this stuff, it will be so much easier when we're going back and

11   trying to write the opinion.

12       When you go ask her managers right now, you're

13   asking about all those people she had just --

14       MS. CATLETT:  Ryan, Dontay, Stavros.

15       THE WITNESS:  Yes.

16       MS. CATLETT:  Alise.

17       THE WITNESS:  Alise, yes, ma'am.

18       THE COURT:  So the last thing I heard was managers --

19   EXAMINATION BY MS. CATLETT:

20   Q.   Any of those people, did they perform side work?

21   A.   No.  Alise, Dontay, Stavros, Ryan, Itai did not perform

22   side work, even though Itai was not a manager in my tenure at

23   Doris.

24   Q.   Then this is Plaintiff Exhibit 3.  It's Black 1.  Can you

25   identify what those are?

*OFFICIAL TRANSCRIPT*

1    A.    They are the business cards of Melissa Rogers and

2    Dontay Kinchen.

3    Q.    What position does it say that they hold?

4    A.    Manager.

5    Q.    Is that consistent with the business cards that they used

6    when you were working with them?

7    A.    Yes.

8    Q.    When you worked at Doris Metropolitan, who made the

9    schedules?

10   A.    My manager, so that would be Ryan O'Dwyer, Melissa Rogers,

11   Dontay Kinchen, Stavros, Alise.

12   Q.    What would happen if you ever wanted to change your

13   schedule or swap shifts?

14   A.    When I first started working there, there was -- it was a

15   handwritten schedule.  So, I would have to call Alise or

16   Stavros and ask if I could change a shift, or, you know, talk

17   to them in person with the server I wanted to swap with.

18         Eventually, when Ryan O'Dwyer was hired, he installed

19   Schedulefly, which was a scheduling -- it's not really an app,

20   but it's a website.  From there, he would make the schedule,

21   and we could go check the schedule on this on-line app.

22         This app allows you to put up your shift for grabs,

23   kind of, is what we would call it.  Another server could take

24   that shift.  The manager, so Ryan or Dontay, would have to

25   approve that, and we would get a little note saying, your shift

*OFFICIAL TRANSCRIPT*

1    trade has been approved by Ryan O'Dwyer or Dontay Kinchen.

2    Q.    Just so that everyone else can have an idea of what that

3    looked like, this is from Plaintiff's Exhibit 1, Bates-Black

4    69.

5         Can you see what that is, Patrice?

6    A.    Yes.  This looks like an e-mail, kind of an automated

7    e-mail from the Schedulefly website that is saying that James

8    Black gave up his shift, I picked it up, and it was approved by

9    Ryan O'Dwyer on August 8, 2015.

10   Q.    Then this is also Plaintiff's Exhibit 1, Black 70.

11        Patrice, can you identify what this is for us?

12   A.    It says that I -- this is a Schedulefly.  It's another

13   automated e-mail from Schedulefly.  It looks like I requested

14   some time off from work.  I requested Tuesday, September 29th

15   of 2015 off.  Melissa Rogers approved that, which means that I

16   would get that shift off for the next schedule coming out.

17   Q.    Then we have a few more of these I just want to go over

18   because I want to make sure we understand how these worked.

19        This is Plaintiff's Exhibit 1, Black -- Bates-Black

20   72.  Patrice, can you tell us about this particular Schedulefly

21   e-mail.

22   A.    Yes, this is another shift trade.  It likes it happened on

23   3/27, March 27th.  It was given by Zach Adams.  I picked it up.

24   It was approved by Dontay Kinchen.  This is another automated

25   e-mail from the Schedulefly app.

**OFFICIAL TRANSCRIPT**

1   Q.   Once again, that was approved by --

2   A.   Dontay Kinchen, my manager.

3   Q.   Then it looks like here sometimes this Schedulefly was

4   actually used to convey messages to all of the staff; is that

5   correct?

6   A.   Sometimes, yes.

7   Q.   I'm going to put Plaintiff Exhibit 1, Bates-Black 75 up.

8   Who was this a message from?

9   A.   This is a message from Ryan O'Dwyer, so this must have

10   been when he was managing.

11   Q.   What is he telling the servers?

12   A.   It looks like he says that he's uploaded a document that

13   serves as a manual for all servers.  Apparently, it's relevant

14   for the bar.  This is just a little note to us, I guess, saying

15   that he has uploaded a manual, a general manual.

16   Q.   Just to be clear, Ryan's position at Doris Metropolitan

17   was that of?

18   A.   Manager.

19   Q.   Do you recall -- have you seen here today any of these

20   Schedulefly requests that were approved by Itai?

21   A.   No.

22   Q.   Do you recall Itai ever approving any requests in

23   Schedulefly?

24   A.   No.

25   Q.   When you worked at Doris Metropolitan, did the managers

*OFFICIAL TRANSCRIPT*

1    that you've mentioned before maintain the server checkout

2    sheets for each shift that they worked?

3    A.    Yes.

4    Q.    Did they perform the calculations on the checkout sheets,

5    in addition to managing that shift?

6    A.    Yes, ma'am.

7    Q.    Did the managers that have been mentioned, would you say

8    that they supervised or controlled your conditions of

9    employment?

10   A.    Yes.

11   Q.    This would include Dontay, Melissa, Alise, Stavros, Ryan?

12   A.    Yes, all of those managers.

13          THE COURT:  It would be more helpful to me if, instead

14   of leading, her you asked her the questions, the factual

15   questions that relate to that.

16   EXAMINATION BY MS. CATLETT:

17   Q.    Were you required to go to mandatory Monday meetings?

18   A.    Yes.  I was required every Monday, I believe at three

19   o'clock, to be at a staff meeting.

20   Q.    Were you told that you should clock in for those meetings?

21   A.    I don't believe I was told that I should, but I worked at

22   many restaurants, so I assumed that I was to clock in for these

23   meetings.

24   Q.    Were you required to go to those meetings regardless of

25   whether or not you had a shift that same evening?

*OFFICIAL TRANSCRIPT*

1   A.   Yes.

2   Q.   To your knowledge, did you get paid for those meetings?

3   A.   I did get paid for those meetings.

4   Q.   Do you know how much you got paid for those meetings?

5   A.   My hourly wage, which was 2.13 an hour.

6   Q.   Did you ever receive an employee manual?

7   A.   I believe the only one that I received was the one that

8   Ryan uploaded, and I don't remember ever seeing it.

9   Q.   To your knowledge, is there a policy at

10   Doris Metropolitan -- was there a policy when you worked at

11   Doris Metropolitan that prevented you from working overtime?

12   A.   No.   There was not a policy that prevented me from working

13   overtime.

14   Q.   Do you think that the owners of Doris Metropolitan knew

15   that they were violating the tip pool by including managers?

16        MR. CUPP:   Objection.   Foundation.   Relevance.

17   EXAMINATION BY MS. CATLETT:

18   Q.   Did you ever mention to anyone your displeasure or your

19   discontent with managers being included in your tip pool?

20   A.   I never mentioned it to an owner.

21   Q.   Did you ever mention it to a manager?

22   A.   I believe I mentioned it to a manager, but it was way

23   after the fact.   It was near the end of my tenure at Doris.

24   Q.   Speaking of the end of your tenure at Doris, can you tell

25   me how your tenure at Doris came to an end?

*OFFICIAL TRANSCRIPT*

1    A.    Yes.  I was -- I put in my two weeks.  Before my two weeks

2    was over, I was sent home before a shift began by my manager,

3    Dontay Kinchen.

4    Q.    That was your last day there?

5    A.    Yes, and he told me not to come back.

6    Q.    Do you believe that Dontay -- did Dontay consult with

7    anyone before he told you to go home?

8    A.    No, it happened very quickly.

9    Q.    Was Itai there the day that you were told to go home?

10   A.    No, he was not.

11   Q.    Were any other owners there the day that you were told to

12   go home?

13   A.    I believe Doris may have been there that morning doing

14   some workaround, but, no, not present in the moment, not in the

15   room.

16   Q.    I wanted to walk you through some of these time records

17   that were produced by defendant.

18          So, the first page -- the payroll records are

19   Plaintiff's Exhibit 2.  These particular ones that have to deal

20   with Patrice are Bates-1036 through 1042.

21          This is the first page of your check history detail

22   that was provided by the defendants.  You can see that your

23   name is at the top.

24   A.    Uh-huh (affirmative).

25   Q.    What date does this start with?  It's in this corner.

*OFFICIAL TRANSCRIPT*

1   A.    Yeah.  It looks like May -- May 18th.

2   Q.    So that would be consistent with when you started working

3   there?

4   A.    Yeah.  Yeah.  So this would have been the -- probably one

5   of my first -- yeah, the Sunday.  That Sunday or Monday I came

6   in for the first shift.

7   Q.    Then in the column where it says *Earnings*, I want you to

8   look at that, and tell me if anywhere on there you see anything

9   that would reflect overtime?

10   A.    I do not see anything that reflects --

11   Q.    Would you look at the bottom, and tell me what date this

12   ends with.

13   A.    This ends with August 27, 2014.

14   Q.    Then the next page in sequential order, can you tell me

15   what pay date this starts with at the top?

16   A.    September 5, 2014.

17   Q.    Can you look down the column that shows the hours that you

18   worked, and see if anywhere on there it mentions overtime?

19   A.    It does not mention overtime anywhere.

20         THE COURT:  Where would I see that on here?  How would

21   it reflect overtime?

22         MS. CATLETT:  It doesn't on this sheet.  That's what

23   I'm getting to.  I have other sheets that show overtime.

24         THE COURT:  Other records for employees that have

25   overtime?

*OFFICIAL TRANSCRIPT*

1          MS. CATLETT:  That don't match up to this.

2          THE COURT:  Where is the column?

3          MS. CATLETT:  I'm going to show you.  I'm just going to

4    briefly go through these.

5    EXAMINATION BY MS. CATLETT:

6    Q.   At the bottom, Patrice, could you tell me what date this

7    page would have ended with?

8    A.   It ends with December 17, 2014.

9    Q.   I'm just doing that so we know that this is a full

10   sequence of her work when she was there.

11          Then the next sheet, what date does this start with

12   at the top?

13   A.   December 26, 2014.

14   Q.   What does it end with?

15   A.   It ends with March 8, 2015 -- or April 8, 2015, sorry.

16   Q.   Do you see overtime mentioned anywhere on this sheet?

17   A.   No, I do not.

18   Q.   There are just a couple more of these.

19          The next one in sequence, can you tell me what date

20   this starts with?

21   A.   This begins with April 17, 2015.

22   Q.   What it ends with?

23   A.   July 29, 2015.

24   Q.   Here is the next to last one.  Can you tell me what date

25   it starts with?

*OFFICIAL TRANSCRIPT*

1    A.    August 7, 2015.

2    Q.    What date it ends with?

3    A.    November 18, 2015.

4    Q.    This is actually your last one, although there is also

5    another page that cumes it.  Can you tell me what date this

6    starts with?

7    A.    November 27, 2015.

8    Q.    What date it ends with?

9    A.    February 24, 2016.

10   Q.    Is that consent with when you would have had your last day

11   working there?

12   A.    Yes.

13   Q.    Then I'm going to show you this just because it's a cume

14   of all the hours you worked.  Can you tell me how many regular

15   tipped hours it says you worked?

16   A.    It says I worked 25 -- 2544.52.

17   Q.    Can you tell -- can you read how many dollars you were

18   paid for working those hours?

19   A.    72,438.

20   Q.    No, right across from regular tips, where it says *Dollars*.

21   Let me circle it for you.

22   A.    Oh, okay.  Sorry.  It looks like $529.47 or 5,529.47.

23   Q.    That looks like 2.13 times the number of hours you worked?

24   A.    Yes.

25   Q.    Do you see anywhere on here where it says that you were

*OFFICIAL TRANSCRIPT*

1    paid for overtime hours?

2    A.    No, it does not.

3    Q.    These are also Plaintiff's Exhibit 2.  They are payroll

4    summaries provided by defendants.

5            I am going to first put up DMNO Bates-1683.  Can you

6    read at the top what payroll week that is for, Patrice?

7    A.    Yes, it is May 12, 2014.

8    Q.    Then underneath --

9    A.    I'm sorry, July 12, 2014.  I'm sorry.

10   Q.    Then underneath, do you see where it's divided into W-1

11   and W-2?

12   A.    Yes, week 1 and week 2.

13   Q.    Look under your name, and tell me how many hours you

14   worked week 1.

15   A.    I worked week 1, 42.78.

16   Q.    So that would tend to show that you worked some overtime

17   that week?

18   A.    Yes.

19   Q.    Then next, also, Plaintiff's Exhibit 2, DMNO Bates-1684,

20   another payroll summary.  Patrice, what date is this payroll

21   summary for?

22   A.    This is for July 26th, 2014.

23   Q.    How many hours does it show that you worked for week 1?

24   A.    40 hours and 48 minutes.

25   Q.    Would that indicate that you worked some overtime for

*OFFICIAL TRANSCRIPT*

1   week 1?

2   A.   Yes, just a little bit.

3   Q.   This is Plaintiff's Exhibit 2, Bates-DMNO 1685.  For some

4   reason, there is no date that shows on this.  But, Patrice, can

5   you read beside your name, and let us know how many hours you

6   worked week 2?

7   A.   Yes, week 2, I worked 47.1 hours.

8   Q.   Would you agree that that was 7.1 hours of overtime?

9   A.   That was 7.1 hours of overtime.

10  Q.   Then there are only a couple more of these, because we

11  don't have them for every week.  But this is another payroll

12  summary from Plaintiff's Exhibit 2, DMNO Bates-1688.

13          Patrice, can you tell me what date this is from?

14  A.   This is from September 20, 2014.

15  Q.   How many hours did you work week 2 on here?

16  A.   I worked 42.78 hours.

17  Q.   Would you agree that that would indicate that you should

18  have been paid for 2.78 hours of overtime?

19  A.   Yes.

20  Q.   Then this is the last one of these.  It is Plaintiff's

21  Exhibit 2, DMNO Bates-Number 1694.  Patrice, can you tell me

22  what the payroll period is for this payroll summary?

23  A.   For this payroll, it is December 13, 2014, through

24  December 26, 2014.

25  Q.   Do you see beside your name how many hours you worked on

*OFFICIAL TRANSCRIPT*

1   week 2?

2   A.    Week 2, yes.  I worked 43.82 hours.

3   Q.    So would you agree this tends to indicate that there were

4   3.82 hours of overtime that you should have been paid for?

5   A.    Yes, ma'am.

6   Q.    Then based upon everything that we reviewed earlier, did

7   you ever see yourself getting paid for overtime?

8   A.    I did not.

9   Q.    Then I wanted to just very briefly show you -- this is

10  actually not admitted into evidence, but, for people who are

11  following along, it's Black 97.  These are the spreadsheet

12  summaries that we created to tally what was owed to you.

13          I just want you -- I know you've had a chance to

14  review it.  I just want you to look at it again, and we'll talk

15  about it.

16          What pay period does this start with?

17  A.    This begins with May 18, 2014.

18  Q.    Then, at the end, what pay period does this sheet end

19  with?

20  A.    August 7, 2015.

21  Q.    Then on the second page, what pay period does that start

22  with?

23  A.    August 21, 2015.

24  Q.    What does it end with?

25  A.    February 19, 2016.

*OFFICIAL TRANSCRIPT*

1   Q.   Would you say that these dates are representative of your

2   tenure at Doris Metropolitan?

3   A.   Yes, these dates are.

4   Q.   Then we're going to get back to that first page, which is

5   Black 97.  Do you see in the overtime column where, for

6   7/25/2014, it says *2.78 hours* of OT?

7   A.   Yes, I do.

8   Q.   Do you see other places where it's listed where you worked

9   OT?

10  A.   Yes.  Below it there are about four other places.

11  Q.   Would you say -- would you agree that those match up with

12  at least the payroll summaries that we've already reviewed

13  which we're in possession of?

14  A.   Yes.

15  Q.   Were you paid for that overtime?

16  A.   I was not.

17  Q.   This is Black 98, which is the second page.  We total up

18  your damages.  I know we've talked about that, and talked about

19  how we arrived at the figure based upon what you should have

20  been paid and what you actually were paid.

21           Would you tell me what that figure is in the bottom

22  corner right here?

23  A.   Yes, it's $12,937.09.

24  Q.   Would you agree that that is what your damages are as far

25  as what can be determined based upon the records we have?

*OFFICIAL TRANSCRIPT*

1    A.    Yes.

2         THE COURT:  What does that represent?

3         MS. CATLETT:  That is the minimum wage calculation, the

4    difference between the minimum wage and the 2.13 that she was

5    paid for every hour she worked.

6         THE COURT:  If I look at, for example, on July 25,

7    2014, it has she worked 2.78 hours of overtime.  She should

8    have been paid another $10.06.

9              If I add up those numbers in the unpaid overtime

10   column, that doesn't --

11        MS. CATLETT:  On the second page?

12        THE COURT:  Okay.  61.39 hours.

13        MS. CATLETT:  It should be 61.39.

14        THE COURT:  That's hours.  If you multiply that times

15   what number?

16        MS. CATLETT:  No, that's actually her unpaid

17   overtime --

18        THE COURT:  Hours.

19        MS. CATLETT:  -- the calculation.

20             The hours, her unpaid overtime hours are on the

21   front page.  I think it doesn't show the actual number.  We can

22   figure it out really fast because we have -- one, two, three,

23   four -- five.

24        THE COURT:  So, really, you're talking about $61.79?

25        MS. CATLETT:  In unpaid overtime.

*OFFICIAL TRANSCRIPT*

1          THE COURT:  So then where is the 12,000?

2          MS. CATLETT:  The 12,000 is a summary of all.  That's

3     the minimum wage calculation.

4          THE COURT:  Okay.  All right.  I got you.

5     EXAMINATION BY MS. CATLETT:

6     Q.    Then on this sheet, which I know, you know, we have some

7     contentions about, but, Patrice, if you could, right here we

8     talked about the Monday meetings, and we tallied up, based upon

9     an hour and a half per Monday meeting.  Would you say that's

10    about average for a Monday meeting?

11    A.    They were around an hour, maybe an hour and a half.

12    Q.    So overestimating for an hour and a half for every Monday

13    that you went, would you agree that this figure of $500.25 is

14    fairly accurate?

15    A.    Yes.

16    Q.    Were mandatory meetings held every Monday?

17    A.    Yes.

18    Q.    Did you attend them every Monday while you worked there?

19    A.    Most of the meetings.  I would say 90 percent, maybe,

20    95 percent of the meetings I attended.

21          Obviously, I was a full-time student, so there were

22    times that I could not make it to the Monday meeting.  But I

23    would also let one of my managers know that I wouldn't be

24    making it to the Monday meeting.

25    Q.    By letting one of your managers know, would you be

                    *OFFICIAL TRANSCRIPT*

1  specific about who that was.

2  A.    Either Ryan O'Dwyer or Melissa or Dontay or Stavros or

3  Alise.

4  Q.    Did you ever think that the tip pool was operated

5  wrongfully?

6  A.    Yes.

7  Q.    If so, why didn't you question it with a manager or an

8  owner?

9  A.    When I was first hired, the tip pool was explained to me.

10  It was explained -- and I had never worked in a restaurant

11  where tips were pooled before this restaurant, so I was very

12  unfamiliar with the process.

13        I always tipped out a bar at different restaurants

14  that I had worked at.  So this tip pool was a little different

15  in that we all split tips, and then a percentage came out for

16  server assistants and for management.

17        I didn't know that anything was wrong with that when

18  I was hired because I was new to the whole idea of a tip pool.

19  So I went along with it for about two months, and then I was

20  told that it was illegal to tip out management.

21        By that point, I mean, it's summer in New Orleans,

22  and I have a new job.  Do you think I'm going to go tell my

23  owner that they may be acting illegally?  Probably not.  I

24  really needed my job, and I was pretty intimidated by them, so.

25  Q.    For the rest of the questions I'm going to ask, these

*OFFICIAL TRANSCRIPT*

1    all -- when I say manager, I am referring to Dontay, Melissa,

2    Alise, Stavros, Ryan O'Dwyer interchangeably, they can be used

3    in -- any of those people.

4            Is it fair to say that when you worked at

5    Doris Metropolitan, managers controlled the schedule?

6    A.    Yes.

7    Q.    Is it fair to say when you worked at Doris Metropolitan,

8    they controlled the conditions of work?

9    A.    Yes.

10   Q.    Is it fair to say that managers controlled when you left

11   your shift?

12   A.    Yes.

13   Q.    Is it fair to say that managers controlled the opening and

14   the closing of the restaurant?

15   A.    Absolutely.

16   Q.    Is it fair to say that managers controlled and supervised

17   the dishwasher staff?

18   A.    Yes, that is correct.

19   Q.    Is it fair to say that managers controlled and ran staff

20   meetings?

21   A.    Yes, they would run the staff meetings.

22   Q.    During the time that you work at Doris Metropolitan, did

23   you ever hear the term *service captain*?

24   A.    No, never.

25   Q.    During the time that you worked at Doris Metropolitan, did

*OFFICIAL TRANSCRIPT*

1    the managers perform table service at every table?

2    A.    No.

3    Q.    Did they speak to every table?

4    A.    Not every table, but most tables.  They would at least

5    say -- you know, drop by and say, hi, how was your meal, or,

6    you know, thank you for coming.

7              I mean, obviously, you know, Melissa stood at the

8    door most of the time as a manager.  So she would greet every

9    customer who came in by saying, hi, how are you doing.  Then

10   when they would leave, you know, she would say, thank you very

11   much, come again.

12             So, yes, they interacted, but did they go to the

13   tables and bus them or serve them, no.

14             MS. CATLETT:  That's all I have.

15             THE COURT:  Let me ask a question.  Mr. Eli said that

16   if someone left before the end of their shift, people called it

17   *cut*.  He said, "No, I didn't do that, or a manager didn't do

18   it.  The employee asked to leave early."  Tell me what you know

19   about that.

20             THE WITNESS:  I know that I never asked to leave my

21   shifts early.

22             THE COURT:  Did you ever have a manager say, you need

23   to leave now?

24             THE WITNESS:  They never said I needed to leave, but

25   they would say, "You can leave because your section empty and

**OFFICIAL TRANSCRIPT**

1    you've done your side work; so, if you would like, you can

2    leave now."

3              I typically would not leave because I wanted my

4    cash tips at the end of the night.  I never trusted them being

5    put in a drawer, because I was always afraid that they would be

6    gone the next day.

7              So I was really protective of my money, so I

8    personally would stay there, if I had two hours to kill, and,

9    you know, go to the courtyard and have a glass of wine and wait

10   for my tips.  Or I even left at times and went and got a bite

11   to eat, and came back when the shift was over and picked up my

12   tips.

13        THE COURT:  So it wasn't that you didn't ask and they

14   would say you have to leave, but they would say you can?

15        THE WITNESS:  Right.

16                        CROSS-EXAMINATION

17   BY MR. CUPP:

18   Q.   Ms. Jones, my name is Steven Cupp, representing Doris.

19              When you had that circumstance when they said you

20   could leave if you wanted to, but you didn't leave, you stayed

21   there, would you stay on the clock?

22   A.   No.

23   Q.   You would clock out at that point?

24   A.   Absolutely.

25   Q.   But you would stay there in order to -- but you weren't

                        *OFFICIAL TRANSCRIPT*

1    working either, right?

2    A.   No, I wasn't working.  I was just waiting for my tips.

3    Q.   I'm curious about this.  What incident spurred this issue

4    with Dontay where you were told to go home?  Something

5    apparently happened?

6    A.   It was Mardi Gras day, and he was very combative at me in

7    general.  He was a very aggressive person.  I think that day he

8    had just kind of had enough of any kind of behavior.

9         It was also my last shift, so maybe I wasn't as happy

10   go lucky to work my last shift on Mardi Gras day, but I came

11   in.  My attitude maybe wasn't the cheeriest, and that he didn't

12   want to see me there anymore, so he just said, "Go home."

13   Q.   That's right.  Because if you don't have a good attitude,

14   and you're waiting on customers, that's going to impact not

15   only your tips, but everybody's tips, correct?

16   A.   Yes, but this was before the shift.

17   Q.   You knew you were scheduled for Mardi Gras day, correct?

18   A.   Yes.

19   Q.   In fact, the company really worked with you on scheduling

20   because you were a full-time student; is that right?

21        THE COURT:  If you want to start getting into whether

22   they are good or bad people, I'm going to start letting people

23   talk about them again.  This doesn't have anything to do with

24   it, whether they were nice to her and helped her schedule.

25             Are we rehabilitating them?  Are we talking about

*OFFICIAL TRANSCRIPT*

1   their character?

2          MR. CUPP:  I really wanted to talk -- she testified

3   about the schedules.

4          THE COURT:  Right.  That's a different issue.  I want

5   you to talk about the scheduling.

6   EXAMINATION BY MR. CUPP:

7   Q.   Okay.  I'll put in it the context of Schedulefly.

8          So you were able to go in, right, Ms. Jones, into

9   Schedulefly --

10  A.   Yes, sir.

11  Q.   -- and make any sort of request that you wanted to

12  regarding the shifts that you would prefer, right?

13  A.   Yes.  That is correct.

14  Q.   You would do so because you also had a full-time school

15  schedule, correct?

16  A.   Yes.

17  Q.   Were you ever told by anybody to come into work outside of

18  your preferences that you would put into Schedulefly?

19  A.   Yes, there were a couple of times where I was scheduled

20  when I had other engagements, and I had requested those shifts

21  off.

22  Q.   You said you were asked -- you had to come in and work

23  those shifts?

24  A.   Yes.

25  Q.   Was that Mardi Gras day of your last shift one of those

*OFFICIAL TRANSCRIPT*

1    days?

2    A.    No, that wasn't.

3    Q.    So I have that you were there for a little less than two

4    years, about 20 months, it appears, 21 months.  So you would

5    say that you had to come in and work a shift that you didn't

6    want to work --

7          THE COURT:  What does this have to do with anything?

8    How is it relevant?

9          MR. CUPP:  It goes to the totality of the circumstances

10   of her job, Judge.  I mean, that is what the law --

11         THE COURT:  No.  You're talking about whether they were

12   nice to her or not, about scheduling.  I guess you're trying to

13   rehabilitate their image.  But, really, I'm not listening to

14   that from either side.

15              Unless you want to get into it, and probably the

16   plaintiffs would like to get into that.  I told them they

17   couldn't, so you shouldn't either.  I just don't see how it's

18   relevant.

19   EXAMINATION BY MR. CUPP:

20   Q.    Do you know whether the managers, service managers,

21   Dontay, that category of employee -- I'm not talking about

22   Itai -- could establish wages for people who worked at the

23   restaurant?

24   A.    I mean, the federal government establishes our 2.13 an

25   hour.  So, yes -- I don't really understand the question.

**OFFICIAL TRANSCRIPT**

1   Q.   Do you know whether someone like Dontay could come and

2   say, Ms. Jones, I want to pay you $4 an hour instead of 2.13?

3   A.   I am not sure if he had that ability.

4   Q.   Did you ever hear of anybody such as Dontay, in that

5   category of service manager, doing that for anybody who worked

6   at the restaurant?

7   A.   I heard of them doing that for dishwashers, giving them

8   raises, but never servers.  Servers don't typically get raises

9   because we get paid 2.13 an hour, and that's just standard

10  across the City.  Unless you work at a hotel, sometimes it's a

11  little more.

12  Q.   At SoBou, they ran a tip pool there; is that correct?

13  A.   No, they were not.

14  Q.   So was this the first time that you came in and

15  experienced the tip pool?

16  A.   Yes.

17  Q.   So the tip-out sheets, the reconciliation forms, were

18  available for you to review, correct?

19  A.   Yes, they were.

20  Q.   In fact, you would want to review them every day because

21  you'd want to know how much money you're making, right?

22  A.   That is correct.

23  Q.   Because you could be working in a station or have a shift

24  that's not so good of a money making shift, but you would earn,

25  however, the same amount of money as all the other servers

*OFFICIAL TRANSCRIPT*

```
1    earned on that particular shift, right?
2    A.    Yes.
3    Q.    That was the same for the server assistants as well,
4    correct?
5    A.    What was the same?
6    Q.    They earned all the same amount of money for each shift?
7    There wasn't a differentiation?
8    A.    Yes, that is correct.
9    Q.    That's because you knew that the system that they ran at
10   Doris was based on a team concept of helping -- a team concept
11   of serving the customers in order to increase the sales, which
12   hopefully would increase the tip that you would get, right?
13   A.    Can you please rephrase that question?
14   Q.    That was a bad question.  You knew that going in, when you
15   started working there, that service was based on a team
16   concept, correct?
17   A.    I did.
18   Q.    That team included, of course, the servers.  You all
19   helped yourself, right?
20   A.    The team included the servers and the server assistants.
21   Q.    You would also help with other servers when needed for --
22   A.    (Speaking simultaneously) Yes.
23   Q.    -- actions?
24   A.    Absolutely.
25   Q.    Because you, of course, knew if the other servers -- if
```

*OFFICIAL TRANSCRIPT*

1    you could help the other servers with table service, that could

2    potentially increase the amount of money that you would bring

3    home?

4    A.    Right.  We as servers, we worked as a team, absolutely.

5    Q.    All the server assistants would help out all the servers

6    around the restaurant, correct?

7    A.    They had roles.  So they didn't necessarily help every

8    server in the same way.  Some servers used them more than

9    others.  Servers who were maybe newer at the job would maybe

10    use a server assistant more.  But they had delegated roles.

11          There was one server assistant for room one, one

12    server assistant for room two, a server assistant that poured

13    wines by the glass at a station.  They sat at that station and

14    poured wines by the glass.  There was a server assistant who

15    ran food.

16    Q.    Is it your testimony that at no time during the 21 months

17    that you worked there that a service manager performed table

18    service at a table for a customer?

19    A.    Can you define what you mean by table service?

20    Q.    Well, did -- Melissa, for instance, is a sommelier,

21    correct?

22    A.    Yes.

23    Q.    So she would help with customers with ordering wine,

24    right?

25    A.    Occasionally.

**OFFICIAL TRANSCRIPT**

1  Q.   Okay.  She would help, obviously, pour wine.  There is a
2  presentation that goes into that, correct?
3  A.   I typically poured my own wine.
4  Q.   Did she ever pour wine for your tables?
5  A.   Occasionally.
6  Q.   There was a menu option called -- I refer to as the
7  *Feed Me option*, or the --
8  A.   That did not exist when I worked there.  There was a meat
9  board that we could create when I worked there, but no Feed Me
10 option.
11 Q.   All right.  So the meat board would be an off-menu item,
12 correct?
13 A.   Not necessarily.
14 Q.   It would be -- it wouldn't be -- you could combine
15 different meats on a board --
16 A.   Yes.
17 Q.   -according to the customer's choice, correct?
18 A.   Or my choice.
19 Q.   Or the service captain or service manager would explain
20 that to them as well, correct?
21 A.   Occasionally, but typically it was something I did.
22 Q.   So you're not testifying -- earlier, I thought you
23 testified that they didn't perform any table service
24 whatsoever?
25 A.   I didn't say that.  I said define what you mean by *table*

***OFFICIAL TRANSCRIPT***

1    *service*.

2    Q.   Do you know whether any of the service managers could

3    change the benefits that you were entitled to while working at

4    Doris?

5    A.   What do you mean by benefits?

6    Q.   Well, anything?  Well, first of all, the first thing that

7    comes to mind is the wages.  Your wage was established,

8    correct?

9    A.   By the federal government, yes.

10   Q.   How about paperwork?  Was the only thing, to your

11   knowledge, that the service managers were engaged in was tip

12   reconciliation sheets at the end of the night?

13   A.   They were engaged in the tip reconciliation -- or the

14   *tip-out sheets*, as we called them.  There were times where we

15   had these meetings, and they would quiz us on menu items, so

16   maybe that kind of paperwork.  I'm really not sure what their

17   role was past, you know, the tip-out sheet.

18   Q.   You just don't know one way or the other, do you?

19   A.   I mean, I believe they did the tip-out sheet every night,

20   and they did those calculations.  They went to the office and

21   maybe did more calculations.

22   Q.   Did you punch in for every Monday meeting that you were

23   asked to attend?

24   A.   As many as I could remember to.  There were times that I

25   would come on a Monday, and I didn't work on a Monday, and I

*OFFICIAL TRANSCRIPT*

1   would forget; but, I would always tell a manager, I forgot to

2   clock in, can you clock me in manually.

3   Q.   Did anybody ever tell you not to clock in?

4   A.   No.

5   Q.   Who told you that the tip pool that Doris was running was

6   illegal?

7   A.   I do not remember who exactly told me, but it was another

8   employee, another server.

9   Q.   So just --

10  A.   Or maybe it could have been at a bar after work, and a

11  server that worked in a restaurant down the street said,

12  "That's illegal."

13  Q.   I just want to clear that up.  It wasn't a service manager

14  who told you that, was it?

15  A.   No.

16  Q.   In fact, did you ever go to -- such as -- Dontay or

17  Melissa and say, I believe that what you're doing here is

18  improper?

19  A.   I did near the end.  I said, "I've been told that this is

20  illegal," and they shrugged it off.

21  Q.   Who?

22  A.   Well, Dontay for sure.  Melissa as well.

23  Q.   Because you know that Dontay had worked as a server,

24  right?

25  A.   Yes.

*OFFICIAL TRANSCRIPT*

1   Q.    Then he had worked as a service manager, correct?

2   A.    He worked as a manager.

3   Q.    Then did you -- were you there during the time when he

4   went back to working as a server, or had you already gone?

5   A.    I believe I was gone at that point.

6         THE COURT:  Wait.  When you said to them, "This is

7   illegal," did you tell them specifically what you were talking

8   about?

9         THE WITNESS:  Well, it was common knowledge by that

10  point when I -- you know, I'm talking that January, you know,

11  before I left in February.  It was pretty common knowledge that

12  tipping out management is not legal, and that's why no other

13  restaurants do it.

14        THE COURT:  So that's what you're specifically talking

15  about?

16        THE WITNESS:  Yes.  Yes, ma'am.

17  EXAMINATION BY MR. CUPP:

18  Q.    You weren't talking about not getting cash tips, were you?

19  A.    No.

20  Q.    Because you got your cash tips?

21  A.    I made sure I got my cash tips.  Yes.

22  Q.    Because you were told, weren't you, that it was your

23  responsibility to take those cash tips home with you each

24  night?

25  A.    I was never told it was my responsibility.

*OFFICIAL TRANSCRIPT*

1   Q.   Well, did you ever have circumstances where you left cash

2   tips there over a couple days?

3   A.   There were rare circumstances where I did.  It was because

4   I had to leave for some reason, or there was an emergency, or

5   whatever it may be.

6   Q.   When you got your cash tips, did you ever question whether

7   those cash tips were short in any way?

8   A.   Yes.

9   Q.   Who did you question that to?

10  A.   Myself.  Other servers.  How much did you make in cash,

11  because mine looked a little off?  Or I don't know what the

12  numbers are that night or -- then I would check the checkout

13  sheet and kind of doing my own calculation based on cash sales.

14  Q.   Well, that's right.  It was very transparent to check it.

15  You could always go back to the checkout sheet and see what the

16  cash tips should have been, right?

17  A.   Not the cash tips, but I knew what the cash sales were.

18          If there's an amount of cash sales, you can say,

19  okay, these people probably tipped in cash if they paid in

20  cash.  But that doesn't count for the people who pay -- or who

21  swiped a credit card and then paid a cash tip and credit cards.

22  Q.   Did you say you -- during the 21 months you were there,

23  were you ever -- when you made a request through Schedulefly to

24  change a shift or had someone else pick up your shift, was that

25  ever denied to you?

*OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    Was that -- how many times did that occur?

3    A.    I cannot tell you how many times it occurred.  But, I

4    mean, definitely a handful, at least five times it occurred,

5    where I either requested a shift trade and it was denied for

6    various reasons, or I requested a shift off and it was denied

7    and I was scheduled.

8    Q.    Is it fair to say that the managers, the service managers

9    that are there building the schedules need to know who is

10   coming in, in order to have enough coverage for the restaurant,

11   correct?

12   A.    Rephrase that question.  Was who coming in?

13   Q.    The service managers need to know who is going to show up

14   for work, right?

15   A.    The managers should know who shows up to their place that

16   they are managing, yes.

17   Q.    Right.  So if the schedule had been built, and there is a

18   change in the schedule, is it your testimony that it's

19   unreasonable for them to want to know if shifts were changed?

20   A.    No.  It's not unreasonable.

21   Q.    Did you understand -- at SoBou, were you paid 2.13 an hour

22   there?

23   A.    No.

24   Q.    What were you paid there?

25   A.    I believe, 4.50.  $4 or --

**OFFICIAL TRANSCRIPT**

1    Q.   It was below 7.25, right?

2    A.   Yes.

3    Q.   Did you know, going in and looking at the check, what the

4    tip credit was or what it's referred to?

5    A.   What do you mean by --

6    Q.   Did you know, going into the restaurant at Doris, that it

7    was lawful for the restaurant to pay you below 7.25 in cash

8    wage?

9    A.   Yes.  I know, I mean that it's 2.13 an hour is the minimum

10    wage for tipped employees.  I did know that.

11          MR. CUPP:  One second, Your Honor, I'll be done.

12            Your Honor, just to clarify one point.

13    EXAMINATION BY MR. CUPP:

14    Q.   Ms. Jones, when you said -- you talked about getting sent

15    home on Mardi Gras day --

16    A.   Uh-huh (affirmative).

17    Q.   -- that was your last shift, right?

18    A.   It was my last shift, yes.

19    Q.   So two weeks previously, you had given your two weeks'

20    notice, right?

21    A.   Yes.  That is correct.

22    Q.   So you did work the two weeks --

23    A.   Yes, I did.

24    Q.   -- leading up to that last shift on Mardi Gras day?

25    A.   Yes, I did.

*OFFICIAL TRANSCRIPT*

1        MR. CUPP:  Nothing further, Your Honor.

2        THE COURT:  Hold on just a second.

3                     REDIRECT EXAMINATION

4   BY MS. CATLETT:

5   Q.    Just because we were talking about it so that we can show

6   what this looks like, I've got a -- one of the server checkout

7   sheets.  I'm just going to use one as an example.  They are

8   Plaintiff's Exhibit 5.  The specific one that I'm about to show

9   you is DMNO Bates-603.

10        Do you see the date at the top of the checkout sheet?

11  A.    Yes, October 26th.

12  Q.    First of all, does this look like the checkout sheets that

13  were used at the end of every shift?

14  A.    Yes, this does.

15  Q.    Do you see your name on the checkout sheet?

16  A.    I do.

17  Q.    What is the number beside your name?  What does that

18  illustrate?

19  A.    That illustrates how many charged tips I brought in, so

20  $169.40.

21  Q.    Then underneath that, who does it say the manager's name

22  was that day?

23  A.    It says *Itai*.

24  Q.    What does it say the gross total was that day?

25  A.    $929.

**OFFICIAL TRANSCRIPT**

1    Q.    What is that the gross total of?

2    A.    That looks like it is the gross total of tips.

3    Q.    Of charged tips?

4    A.    Charged tips, yes; not cash tips, charge.

5    Q.    Then we'll see where -- this sheet looks like it was

6    actually corrected after it was turned in; is that fair to say?

7    A.    Yes, that is fair to say.

8    Q.    It shows on here what the cut was that went to the server

9    assistants.  Can you tell me what that corrected amount is?

10   A.    It looks like server assistants received 232.

11   Q.    Then it also goes through and shows the server total, the

12   server average and the SA average.

13              Then underneath this, in the bottom right-hand

14   corner, can you tell me what that section of this checkout form

15   is for?

16   A.    So this is where cash sales were put into the system.

17   Q.    What does that amount represent?  The gross sales that

18   were paid for with cash?

19   A.    Yes.  So, that would be what was paid in cash that night.

20   Q.    So how would you ever determine how much people were

21   tipped in cash?  Where is that on this form?

22   A.    It is nowhere.

23              THE COURT:  Let me ask you a question.  Why, if there

24   are cash sales for Ryan, why at the top of the page is there

25   nothing under cash tips for Ryan?  If you knew what the amount

*OFFICIAL TRANSCRIPT*

1    was, that's where it would be?  If you knew what cash tip --

2    well, there were cash sales, so shouldn't there be something in

3    the column for cash tips?

4    EXAMINATION BY MS. CATLETT:

5    Q.   Were cash tips ever recorded on these forms?

6    A.   Not that I can remember.

7    Q.   So regardless of whether or not you stayed until the

8    end -- until closing to get your envelope, was there any way of

9    you knowing how -- whether or not that was correct --

10   A.   Not --

11   Q.   -- the amount?

12   A.   No.  No.

13   Q.   The only way that you could possibly even judge it would

14   be to talk to other servers?

15   A.   Right.  I could talk to other servers.  And then, also, I

16   could look at the cash sales and, based on that, approximate

17   20 percent divided by how many people.  Maybe there were some

18   charged tips, so if there is a little extra.  Yeah, definitely

19   confusing.

20        MS. CATLETT:  That's all I have.

21        THE COURT:  Do you want, Mr. Cupp, to ask her anything

22   about that tip sheet that we just went over, Exhibit 5,

23   Bates-603?  I think that was not gone over in direct, so if you

24   want to ask anything, I'll allow you to do that.

25        MR. CUPP:  No, I have nothing.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  All right.  Thank you.

2          THE WITNESS:  Thank you.

3          THE COURT:  So we will take a break now.  Would you all

4     be okay with a 45-minute break?  We could come back at 2:15.

5               All right.  Okay.  Well, I'll see you all then.

6          THE DEPUTY CLERK:  All rise.

7          (WHEREUPON, at 1:31 p.m., the court was in luncheon

8     recess.)

9                              *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

1              **P-R-O-C-E-E-D-I-N-G-S**

2           A F T E R N O O N   S E S S I O N

3              MONDAY, JUNE 4, 2018

4              (COURT CALLED TO ORDER)

5

6

7          THE COURT:  Have a seat.

8               Plaintiffs, please call your next witness.

9          MS. VASQUEZ:  We call Melissa Rogers.

10         THE DEPUTY CLERK:  Would you please raise your right

11    hand.  Do you solemnly swear that the testimony which you are

12    about to give will be the truth, the whole truth and nothing

13    but the truth, so help you God?

14         THE WITNESS:  Yes.

15                    **MELISSA ROGERS**

16     was called as a witness and, after being first duly sworn by

17      the Clerk, was examined and testified on her oath as follows:

18         THE DEPUTY CLERK:  Please state and spell your name for

19    the record.

20         THE WITNESS:  Melissa Rogers, M-E-L-I-S-S-A,

21    R-O-G-E-R-S.

22                    DIRECT EXAMINATION

23    BY MS. VASQUEZ:

24    Q.   Ms. Rogers, you worked at Doris Metropolitan for the last

25    three years; is that right?

                  *OFFICIAL TRANSCRIPT*

1   A.     Right.

2          THE COURT:  You need to speak up a little.

3          THE WITNESS:  Yes.

4          MS. VASQUEZ:  Me?

5          THE COURT:  You.  You.  Thank you, both.  If you talk

6   louder, you can move a little to the side.

7   EXAMINATION BY MS. VASQUEZ:

8   Q.     Well, I'm going to show you an exhibit.  This will be

9   Exhibit 3, Bates stamped Black 1.

10          Ms. Rogers, is that your business card?

11  A.     Yes, that was my business card.

12  Q.     Okay.  It says *manager* on your business card; is that

13  correct?

14  A.     Yes, that's correct.

15  Q.     You were hired as a manager with Doris Metropolitan; is

16  that right?

17  A.     That's correct.

18  Q.     Not a floor manager, but an actual manager?

19  A.     Manager, yes.

20  Q.     You were never referred to as a *service captain*?

21  A.     No, I was not.

22  Q.     That was for all three years that you were there, that you

23  were never referred to as a *service captain*?

24  A.     Yes, I was never...

25  Q.     As a manager, you got paid hourly plus 10 percent of the

***OFFICIAL TRANSCRIPT***

1   tips?

2   A.    When I first started, yes.

3   Q.    That changed at some point?

4   A.    Yes.

5   Q.    Is that when you received a promotion?

6   A.    Yes.  I was promoted and was salaried.

7   Q.    What is your title now?

8   A.    My title now is general manager.

9   Q.    Going back to the 10 percent of tips that you received as

10  manager, if there were two managers on that shift, how was that

11  handled?

12  A.    It was divided equally amongst the managers.

13  Q.    Managers are always supposed to be there during that

14  shift; is that right?

15  A.    Yes.  You don't receive the tip unless you were actually

16  working.

17  Q.    As a manager you're never supposed to leave the kitchen

18  empty-handed?

19  A.    The kitchen?  I don't understand the question.  I'm sorry.

20  Q.    So as a manager, if you have to -- if you happen to go in

21  the kitchen and there is something there, you would be required

22  to take it out to table service, perhaps?

23  A.    Oh, like food, like running food?

24  Q.    Yes.

25  A.    Sure, yes.

*OFFICIAL TRANSCRIPT*

1    Q.    So I'm sorry, you would be -- occasionally as the manager,

2    you would pretty much, you know, kind of fill in basically?

3    A.    We worked service wherever we were needed.  I was also the

4    sommelier, so I did wine service as well as running food,

5    talking tables through menus when servers are busy, helping bus

6    tables, helping reset tables, pouring water.

7    Q.    And also a person by name of Buck, are you familiar with

8    them?

9    A.    Yes.

10   Q.    What did they do?

11   A.    So Buck Williams was also for the start while I was there

12   somm'ing on the floor with me weekend nights a little bit, and

13   he kind of runs their wine program in more of a wine director

14   role.  He has a contract with them.

15   Q.    To your knowledge, he did not participate in the tip pool;

16   is that correct?

17   A.    That's correct.

18   Q.    So your function as a somm -- is that what you just

19   said -- as a somm was not a part of -- you did not receive the

20   10 percent tips because you acted as a sommelier?  I know I'm

21   mispronouncing that.

22   A.    I was hired to be a floor service manager and sommelier.

23   Q.    But specifically you were hired under the title of

24   manager; is that right?

25   A.    Yes.

*OFFICIAL TRANSCRIPT*

1   Q.   To your knowledge, don't most restaurants with managers

2   work in the sense that if there is something that needs to be

3   bussed from the kitchen or someone that needed to be attended,

4   they fill in for servers that need help?

5          MR. CUPP:  I would object, Your Honor, to *most* of the

6   restaurants, I believe she said.  I'm having a little bit

7   trouble hearing Ms. Vasquez, but she's talking about --

8          THE COURT:  I think you need to rephrase it so it's not

9   leading also.

10  EXAMINATION BY MS. VASQUEZ:

11  Q.   Have you worked at other restaurants?

12  A.   Yes.

13  Q.   In your experience in other restaurants, have you dealt

14  with managers?

15  A.   Yes.

16  Q.   And in your dealings with those managers, do those

17  managers chip in and help servers that perhaps need assistance

18  because of too many tables?

19  A.   Some do; some don't.

20  Q.   The ones that do, what kind -- would they bus food?

21  A.   I've had managers that have helped on the floor before

22  bussing food and doing things.  I have also had managers that

23  have just stood there.

24  Q.   Your duties were to oversee the entire floor in general;

25  is that right?

*OFFICIAL TRANSCRIPT*

1    A.    To oversee the floor service, yes.

2    Q.    I'm sorry, I didn't catch the last --

3    A.    So oversee the floor, yes.

4    Q.    There are about 30 tables, around 90 people?

5    A.    Inside, yeah.

6    Q.    You did not have your own particular section that you were

7    overseeing, it was the entire restaurant?

8    A.    All of the tables, yes.

9    Q.    You also did hiring?

10   A.    When I first came on, someone else was doing hiring.  I

11   have hired, I did hire while I was in that position a little

12   bit, but it wasn't really a main function of my position.

13   Q.    Who did you hire?

14   A.    Quite frankly, I honestly couldn't tell you exactly who

15   I've hired between when I was doing that and -- as the GM I

16   completely took over hiring, but it was never really one of my

17   responsibilities.  It generally fell to one of the other people

18   that were there.

19   Q.    So before you were a GM, while you were hiring, what gave

20   you the authority -- or who gave you the authority to hire

21   people as needed?

22   A.    Itai.

23   Q.    What about firing employees, did there come a time when

24   you fired employees?

25   A.    Never through just my decision.  I could make

*OFFICIAL TRANSCRIPT*

1    recommendations, but I couldn't just fire someone on the spot

2    if I wanted to.

3    Q.    Did you ever fire Marcus Gandy?

4    A.    Did I perform the firing?

5    Q.    Yes.

6    A.    Yes.  I was in the room and I performed the firing, but

7    the decision ultimately came down through Itai.

8    Q.    So Itai told you to fire Marcus Gandy?

9    A.    Yes.

10   Q.    And you went through with those -- with that direction

11   from Mr. Itai; is that right?

12   A.    Yes.

13   Q.    You also set up the map on a day-to-day basis when you

14   were a manager; is that correct?

15   A.    Yes.

16   Q.    Can you tell me what the -- what a map is?

17   A.    Sure.  It tells the servers when they come in what

18   sections in the restaurant they'll be in.

19   Q.    So you instruct the servers where they need to be or what

20   section of the restaurant they are going to be in?

21   A.    Yes.

22   Q.    Do you also set up a host stand?

23   A.    What do you mean "set up a host stand"?

24   Q.    Is there a host stand that needs to be prepared for every

25   shift?

*OFFICIAL TRANSCRIPT*

1   A.   Yes, there is.  But me personally?  No, the hosts were in
2   charge of the host stand, like the setup for it.
3   Q.   Would you do anything in relation to that host stand?
4   A.   I planned large parties for us once Ryan left and, of
5   course I looked at reservations to see how things were coming
6   in and I would help them if they needed anything.
7   Q.   You had the keys to the restaurant?
8   A.   Yes.
9   Q.   You oversaw the dishwashers during your shift there?
10  A.   I wasn't really in charge of the dishwashers, no.
11  Q.   Who oversaw the dishwashers during the shift?
12  A.   It was kind of a dual role since they are in the kitchen
13  and then Dontay mainly was responsible for more like hiring.
14  And part of the actual management during the shift usually fell
15  to the kitchen since they were in the kitchen.
16  Q.   You were talking about Dontay.  What would he do with
17  respect to the dishwashers?
18  A.   Like he was hiring dishwashers, but...
19  Q.   Did he supervise them on any level other than hiring them?
20  A.   We made sure that they were kind of like there and were
21  doing their tasks.  We would check on them.  But really the
22  supervision of it came from the kitchen who could actually see
23  them.  They would tell us if they needed something from us,
24  but...
25  Q.   And when you say *they*, does that also -- or *we*, does that

**OFFICIAL TRANSCRIPT**

1    also include you just making sure they were there and doing

2    their daily tasks?

3    A.    Yes.  Making sure all the staff was there, sure.

4    Q.    And staff, that would include the servers and dishwashers?

5    A.    Yes.

6    Q.    And SA's?

7    A.    Yes.

8    Q.    Now, were these business cards generally something that

9    you would give to the guests?

10   A.    Yeah.  They really were only to give to guests.

11   Q.    And was that -- in what instances would you give them to

12   guests?

13   A.    It would depend.  Sometimes if, you know, you had a lot of

14   interaction with them, you wanted them to know that if they

15   were coming in, they could reach out to you or if there was

16   some sort of issue that arose on the night; if you had maybe

17   given your card so that they would have a face-to-face with

18   someone the next time they come in.

19   Q.    By giving them these business cards, did you want to

20   convey to the guest that you had some authority as a manager of

21   Doris Metropolitan?

22   A.    I wanted to convey to them that I was here to help them in

23   whatever they needed.

24   Q.    And that you had the authority to help them because you

25   were the manager?

**OFFICIAL TRANSCRIPT**

1    A.    Sure.

2    Q.    Was that a yes?  I'm sorry.

3    A.    Yes.

4    Q.    I'm going to reference Exhibit 1, Bates stamp Black 70.

5    Could you take a look at that e-mail?

6    A.    Yes.

7    Q.    And you see that that is an e-mail using a Schedulefly

8    application; is that right?

9    A.    That's correct.

10   Q.    And your name appears at the bottom where it says *approved*

11   *by*; is that correct?

12   A.    Yes, it is.

13   Q.    And this is an e-mail that's going to Patrice Jones; is

14   that right?

15   A.    That's correct.

16   Q.    Okay.  In this situation, you are approving a time off

17   request; is that correct?

18   A.    Yes.

19   Q.    Was that generally part of your duties to approve or deny

20   time off requests?

21   A.    Yes.  I did our scheduling.

22   Q.    I'm sorry?

23   A.    Yes, I did the request off for scheduling.

24   Q.    You did the scheduling; is that what you said?

25   A.    I said I did the request off for scheduling, yes.  Yes.

*OFFICIAL TRANSCRIPT*

1   To answer your question, yes.

2   Q.   Did you generally do the scheduling for servers coming in?

3   A.   Yes, I did.

4   Q.   Now I'm going to flip to the same exhibit, but it is Bates

5   stamped Black 073.  That's another e-mail from Schedulefly; is

6   that correct?

7   A.   Yes.

8   Q.   It looks like this was an internal e-mail that you sent to

9   Patrice Jones; is that correct?

10   A.   Yes.  I believe it was an e-mail I sent out to everyone.

11   Q.   Okay.  This e-mail is talking about a Monday wine class at

12   3:00 p.m.

13   A.   Yes.

14   Q.   And it is -- you're stating on here that it's mandatory

15   for all servers and optional for SA's; is that correct?

16   A.   Yes.

17   Q.   It's dated June 22, 2015?

18   A.   Yes.

19   Q.   Is there anything in that e-mail that requires them to

20   clock in?

21   A.   Not in the e-mail, no.

22   Q.   There was nothing in the e-mail that says that they would

23   be paid for their mandatory attendance; is that correct?

24   A.   Not in the e-mail, no.

25   Q.   I'm going to show you another one from that same

*OFFICIAL TRANSCRIPT*

1    Exhibit 1, Bates stamped Black 074.  This is another

2    Schedulefly e-mail that you sent to Patrice Jones on

3    November 6, 2015; is that correct?

4    A.    Yes.

5    Q.    This is also a Monday wine class; is that right?

6    A.    Yes.

7    Q.    It begins at 3:00; is that right?

8    A.    Yes.

9    Q.    Okay.  This class is mandatory for servers and bartenders;

10   is that correct?

11   A.    Yes.

12   Q.    If they can't attend, they needed to let you know; is that

13   right?

14   A.    Yes.

15   Q.    Is that how generally it was at Doris Metropolitan, if

16   they couldn't attend a mandatory meeting, they would have to

17   let you know?

18   A.    Myself or the other manager, yes.

19   Q.    What other managers were there during that time?

20   A.    During this time, I believe it was me and Ryan.

21   Q.    What about Dontay, was he there?

22   A.    I don't know the exact date that Dontay switched over.

23   Q.    When you say *switched over*, he switched over back to being

24   a server from being a manager; is that right?

25   A.    No.  When I first got there Dontay, wasn't a part of the

*OFFICIAL TRANSCRIPT*

1    management team.

2    Q.   So it was at some point in the future he became a manager

3    after this date?

4    A.   I don't know the exact date for him.

5    Q.   Okay.  Now, I'm going to have you look at what's been

6    entered into evidence as Exhibit 5, and this is Bates

7    stamped 601.

8             Do you recognize this?

9    A.   As one of our tip sheets, yes.

10   Q.   Okay.  These checkout sheets were completed every night

11   for every shift; is that right?

12   A.   Yes.

13   Q.   Where it says *Manager's Name*, those are the folks who

14   managed the shifts; is that right?

15   A.   That is correct.

16   Q.   So it's not just someone who calculated the amounts on

17   this particular form?

18   A.   It's the person who did the closeout as well as the people

19   who were managing on that shift.

20   Q.   So the person who did the closeout, would that be the same

21   person that managed the shift?

22   A.   Yes.  They would have been there during the shift.

23   Q.   Then the cash that was received that night was distributed

24   in the same percentages as the charged tips, is that to your

25   knowledge what happened?

                         *OFFICIAL TRANSCRIPT*

1   A.   Yes.

2   Q.   And the cash tips were put in an envelope with the

3   individual's name on it; is that right?

4   A.   If they weren't there at the end of the shift, yes.

5   Q.   Did that happen frequently?

6   A.   Yes.  Servers weren't required to stay until the entire

7   service was over, if their section was done.

8   Q.   Then they could leave?

9   A.   Then they could leave.

10  Q.   And where -- and the envelopes were put in a -- where

11  exactly?

12  A.   Underneath the till.

13  Q.   That was an unlocked location; is that right?

14  A.   The till, the till is locked.  We switched it over.  When

15  I first started, it was in a folder.

16  Q.   When you first started, it was in a folder.  So where was

17  that folder kept?

18  A.   Downstairs in the center drawer.  Under the POS's.

19  Q.   When you say *POS*, you mean point of system?

20  A.   Yes.

21  Q.   Some of the envelopes didn't have money; is that right?

22  A.   There were times where a name wasn't crossed out and the

23  money wasn't in there, which we would make up from the house.

24  Q.   How -- or what proof do you have that it was made up from

25  the house?

*OFFICIAL TRANSCRIPT*

1   A.    I have no physical proof other than that's what we did.

2   That's what I did on my shift if things were missing.

3   Q.    Do you know how the other managers handled missing cash

4   tips?

5   A.    That was the policy we were all supposed to follow.

6   Q.    And that policy was what?

7   A.    That was making sure that they got their cash.  It was

8   either out of petty cash, that I had a key to, or out of like

9   our drawer for the night, and we would let Tiffanie know that

10   we were short.  But can I speak to what other managers did

11   while I wasn't there?  No, I cannot.

12   Q.    So look at the bottom where it says *Cash Sales*.  Do you

13   see that?

14   A.    Yes.

15   Q.    As you're looking at the bottom, you see that Zack had a

16   cash sale of 293.21; is that correct?

17   A.    That's correct.

18   Q.    And Ryan had a cash sale of, it looks like, perhaps

19   206.37?

20   A.    Yes.

21   Q.    When you look at the top where it says *Cash Tips*, there's

22   nothing in there to represent what were the cash tips from

23   those cash sales; is that correct?

24   A.    Yes.

25   Q.    So would it be fair to say that servers just looking at

*OFFICIAL TRANSCRIPT*

1    this would not be able to determine what exactly were the cash

2    tips for this particular shift?

3    A.    Looking at this sheet, no.

4    Q.    This was available for the server to look at, but no other

5    documentation was available for the servers to review to

6    determine what the cash tips were for that particular shift; is

7    that correct?

8    A.    Yes.

9    Q.    Now, on tables of six or more, occasionally there would be

10   a mandatory service charge; is that right?

11   A.    We added a service charge for a table of six or more, yes.

12   Q.    Was that discretionary or was it every single table of six

13   or more?

14   A.    In general, most tables we did.  If a server felt like

15   they had a good connection with a table and didn't want to put

16   the service charge on, we didn't force them to.

17   Q.    If a server was going to be tardy that day, would they --

18   would you be the person that they advised to let someone know

19   that they were going to be late that day?

20   A.    Whoever the person was managing the floor that night, yes.

21   Q.    If you were managing that night, would that be you?

22   A.    Yes.

23   Q.    If someone was going to be absent that day, would you be

24   the person that someone to advise, you know, that they were

25   going to be absent that day?

*OFFICIAL TRANSCRIPT*

1    A.    If I was scheduled, yes.

2    Q.    Did you need to ask someone else first before, you know,

3    you saying, "Okay, I realize you're going to be late," or were

4    you just conveying that information to other -- to the general

5    manager or was that something you could handle as a manager?

6    A.    Could I handle if someone told me they were going to be

7    late and saying, "Okay, you're late"?

8    Q.    Yes.

9    A.    Yes.

10   Q.    Now, were you the one that coordinated the mandatory staff

11   meetings for the wine class and things like that?

12   A.    I was in charge of wine class.

13   Q.    Did you ever work overtime?

14   A.    Yes, probably.

15   Q.    Were you paid time and a half?

16   A.    I might have to relook at my pay stubs.

17   Q.    Do you know sitting here today if you were paid time and a

18   half?

19   A.    No.

20         MS. VASQUEZ:  Okay.  I have no more questions.

21         THE COURT:  I want to ask a question.  The people who

22   we've heard talked about Stavros, Alise, Dontay, Ryan, and

23   then -- those four people, did they also -- they participated

24   in the tip pool?

25         THE WITNESS:  I only worked with Ryan and Dontay, so I

*OFFICIAL TRANSCRIPT*

1   can say yes for the two of them.  I wasn't there at the other

2   times, so I don't know.

3             THE COURT:  Okay.  Thank you.

4             MR. CUPP:  Your Honor, in accordance with your

5   preference instructions that you articulated earlier, I'm going

6   to go ahead and -- we had Ms. Rogers obviously scheduled for

7   our case in chief.

8             THE COURT:  Right.  So you'll take her on direct.

9             MR. CUPP:  I'm going to take her on direct, Your Honor.

10             THE COURT:  All right.

11                      DIRECT EXAMINATION

12   BY MR. CUPP:

13   Q.   Ms. Rogers, what position do you hold now?

14   A.   General manager.

15   Q.   Before the general manager, you were the service manager?

16   A.   Right.

17   Q.   I want you to describe to the judge how those two

18   positions differ.

19   A.   So when I was first there as a service manager, I -- from

20   setup, which really starts about like four o'clock when the

21   servers get there until -- whether you're first out or last

22   out, until service ends, I was on the floor helping with tables

23   in sections, selling wine, opening wine bottles, helping

24   servers complete whatever tasks were needed.

25   Q.   Slow down a little bit, okay?

*OFFICIAL TRANSCRIPT*

1    A.    Sorry.

2    Q.    That's okay.

3    A.    I'm from New Jersey.  I speak quickly.

4          Helping in whatever way was necessary.  The

5    service -- the service standards we have from ownership can't

6    really be hit with just a single server on a table.  Not really

7    possible.  They need a team of people helping them to make sure

8    everything happens for a guest.

9          We want guests to have face time with as many people

10   as possible, so anywhere from like if they have a question

11   about the menu, a question about wine, cocktails, dropping

12   anything off that they needed at the table, just helping

13   complete service in every way.

14         Since I've stepped away as general manager, I am not

15   on the floor as much.  I do a lot more delegating to -- for

16   tasks or whatever we need.  It's not necessarily me going up to

17   bus a table or drop food.  It's me making sure that everyone

18   there is doing the tasks they are supposed to do.

19         And there are times when service as started that I'm

20   not on the floor.  And I don't generally stay through service

21   anymore.  Sometimes I'll be upstairs doing back-of-the-house

22   admin work until 6:00 or 6:30, which wasn't something that ever

23   happened while I was service manager.

24   Q.    When you were a service manager, what time would you show

25   up at work?

**OFFICIAL TRANSCRIPT**

1    A.    Two o'clock or 3:30, depending on if I was first in or

2    second in.

3    Q.    So they were staggered?

4    A.    Uh-huh (affirmative response).

5    Q.    So one got off earlier and one stayed later?

6    A.    Right.  One really got off once service was finished for

7    the night the other stayed to close everything down.

8    Q.    As a general manager, what time do you get into work?

9    A.    10:00 a.m., 11:00 a.m.

10    Q.    As a service manager were you engaged in arms-folded

11    supervision?

12    A.    No.

13    Q.    Were you strictly someone who delegated and told others

14    what to do?

15    A.    No.  I was involved in service on every level you can

16    imagine.

17    Q.    Does that include running food to the tables?

18    A.    Yes.

19    Q.    Can you describe for the Court what the meat board option

20    or what some people refer to as the *Feed Me option*?

21    A.    Sure.  We do a family-style option that is designed for

22    larger parties, and they all come out on a meat board, on like

23    a carving board, and we carve everything tableside for the, the

24    selection of cuts for that night.

25    Q.    Would you do that?

*OFFICIAL TRANSCRIPT*

```
1   A.   Yes.

2   Q.   Could a server do that?

3   A.   Yes.

4   Q.   Could a server assistant do that?

5   A.   We have a few server assistants that were trained to do

6   it.

7   Q.   What was the training process that you would have to go

8   through in order for you to be able to perform that task?

9   A.   We do a carving class.

10  Q.   Who would put on that carving class?

11  A.   Dontay.

12  Q.   How about -- was a chef --

13  A.   Or Ryan.

14  Q.   Does it take a particular --

15       MS. VASQUEZ:  I'm sorry, Your Honor, I hate to

16  interrupt, but I would like to invoke the rule because I think

17  the next witness is here.

18       MR. CUPP:  We haven't invoked it all day.

19       THE COURT:  I've been assuming that there were

20  witnesses in the courtroom.

21       MS. VASQUEZ:  Those are all parties except for the

22  gentleman to the left.  He's the next witness.

23       THE COURT:  Who is that?  What's his name?

24       MS. VASQUEZ:  Dontay Kinchen.

25       MR. CUPP:  I didn't see him.
```

*OFFICIAL TRANSCRIPT*

1       THE COURT:  All right.  The plaintiffs have asked that

2   witnesses who are not parties be sequestered.

3           So, Mr. Kinchen, if you would please wait out in

4   the hall until you're called to testify, and please don't

5   discuss your testimony with anyone while you're out there.

6   Thank you.

7           MR. CUPP:  I forgot where I was now.

8   EXAMINATION BY MR. CUPP:

9   Q.    What would be the purpose of carving meat at the table?

10  A.    It was a way for there to be interaction at the table and

11  a way for us to make it a little bit easier on the kitchen,

12  rather than getting a large portion of entrees to be plated

13  separately, it gave the servers more face time with the table

14  to be kind of able to interact a little bit more and drive tips

15  up.

16  Q.    And that would be the goal, correct?

17  A.    Yes.

18  Q.    I want to talk -- who scheduled the dishwashers to come in

19  to work?

20  A.    The kitchen.  The chef.

21  Q.    Did you handle the scheduling of the dishwashers?

22  A.    No.

23  Q.    Are the dishwashers engaged in table service?

24  A.    No.

25  Q.    If there is a cash sale at the restaurant and the customer

*OFFICIAL TRANSCRIPT*

1    plops down 200 bucks for the meal, including a cash tip, whose

2    responsibility is it to report that?

3    A.    The servers.  They hold on to all their cash until --

4    well, I guess, to us, the servers, they hold on to all their

5    cash until the end of the night until they hand in their

6    paperwork.

7    Q.    Has it been your experience that the servers don't always

8    report cash tips?

9    A.    No, not to my knowledge.

10   Q.    But would the -- if a cash sale was made and a $20 cash

11   tip was provided, would they report it to you at that point?

12   A.    No.  Not until the end of the night when we have their

13   paperwork.

14   Q.    I want to talk about Marcus Gandy for a second.  I think

15   you testified that you conveyed to him, you informed him that

16   he was going to be discharged, correct?

17   A.    Yes.

18   Q.    Will you explain to the Court the circumstances that led

19   to that?

20   A.    Sure.  We had a table in.  I believe it was -- a couple of

21   them were friends of the restaurant.  One was named Fluffy.

22   They left a tip and there was some confusion about whether they

23   realized that we hadn't added the auto grat, I believe, and

24   Marcus was asking one of them about it and it upset them.  And

25   afterwards they called the owners and expressed their

*OFFICIAL TRANSCRIPT*

1    displeasure with the situation.

2    Q.    So Marcus Gandy confronted a customer, a regular customer

3    over a tip; is that what happened?

4    A.    Yes.

5    Q.    How did you find out about that?

6    A.    Marcus came to me during that time and told me that there

7    had been some confusion with the tip and they seemed upset at

8    him about it as they were walking out the door.

9    Q.    What, if anything, was Marcus asking you to do?

10   A.    To maybe go and speak to them.  I don't know if it was

11   about their tip or about them being upset.

12   Q.    Did you?

13   A.    No, I did not.  They were already out the door by that

14   time.

15   Q.    Did Marcus convey that he was upset at the customers for

16   leaving a poor tip?

17   A.    No, not at that time.

18   Q.    Did he at some point convey that to you?

19   A.    I don't know if it was the poor tip or just the way they

20   got upset with him.

21   Q.    Did you report that incident to Itai or any other owner of

22   the restaurant?

23   A.    By the next morning the guest had already called so then

24   we all sat down and talked about it.

25   Q.    Who all sat down and talked about it?

*OFFICIAL TRANSCRIPT*

1  A.    Myself, Itai and Dontay.

2  Q.    What was conveyed to you about that incident by Itai?

3  A.    That he was unhappy with the situation that happened and

4  that he felt that Marcus should no longer be working here.

5  Q.    Was that the same day that you then informed Marcus that

6  he was discharged?

7  A.    I believe so.

8  Q.    Were you -- and what was his response to you at that

9  point?

10  A.    He was very upset.  Thought that we hadn't done enough to

11  stop it in the moment, that I hadn't spoken to them.  She

12  actually happened to be sitting at the bar and --

13  Q.    Who is "she"?

14  A.    Fluffy, who was the guest who called.  And as he walked

15  out, he called her a cunt and told her that she had cost him

16  his job.

17  Q.    That's what Marcus told the customer, correct?

18  A.    Yes.

19  Q.    As the service manager, you would be in charge of the

20  service?

21  A.    Yes.

22  Q.    Is it important for you to know who's going to show up for

23  any shift on any given night?

24  A.    Yes, so that we can plan service accordingly.

25  Q.    How is service planned?  What are you looking at in order

*OFFICIAL TRANSCRIPT*

1    to structure service and plan service?

2    A.   We're looking at the number of covers we have coming in

3    total at given time periods, what the party size is for all

4    those tables to determine how many servers we would need and

5    where to best place people.

6    Q.   Can you explain to the judge what a cover is?

7    A.   Sure.  A cover is an individual guest.

8    Q.   So at a four-top table, then you would potentially have

9    four covers?

10   A.   Right.

11   Q.   How important was providing a -- is providing exceptional

12   service to a customer at Doris?

13   A.   That's the entire reason we're there.

14   Q.   In your experience, had you worked as a manager in

15   restaurants prior to going to Doris?

16   A.   Yes, at the Windsor Court Hotel.

17   Q.   What was your position at the Windsor Court?

18   A.   I was a food and beverage outlet manager, so I managed

19   three to four different outlets -- well, three at a time

20   because two are in the same place.

21   Q.   At that position were you engaged in customer interaction

22   and customer service?

23   A.   I was engaged in customer interaction and service, not to

24   the degree of what I did at Doris Metropolitan.

25   Q.   Were there times that you experienced when the servers did

**OFFICIAL TRANSCRIPT**

1    not want you to interact with their tables?

2    A.    I definitely have had servers tell me they could sell

3    their own wine and they would pour their own wine.

4    Q.    They would actually prevent you from --

5    A.    Said they would prefer to do it.  They would prefer to

6    have the face time with their table.

7    Q.    Was that the rule or the exception to the rule?

8    A.    It was the exception to the rule.

9    Q.    While you were working as the service manager, did you

10   have the unilateral right to discharge an employee from

11   employment?

12   A.    No, I did not.

13   Q.    If you -- if you felt that someone wasn't performing up to

14   the standards and needed to be discharged or shouldn't be

15   there, what, if anything, would you do?

16   A.    I would talk to Itai and make a recommendation.

17   Q.    And then what would happen?

18   A.    Itai would decide whether or not we were going to fire

19   that person.

20   Q.    Could you change anybody's rate of pay?

21   A.    No.

22   Q.    Did you ever tell anybody when they attended a meeting on

23   a Monday that they should not clock in?

24   A.    No.

25   Q.    What was the rule?

*OFFICIAL TRANSCRIPT*

1    A.    That they should clock in for the time.

2    Q.    Did anybody ever complain to you that they were instructed

3    not to clock in?

4    A.    No.

5    Q.    Did anybody ever complain to you that they weren't being

6    paid properly for the mandatory meeting?

7    A.    No.

8    Q.    Were there -- was there a meeting every Monday or were

9    there some Mondays when there weren't meetings?

10   A.    There were some Mondays where something might come up and

11   there wouldn't be a meeting, but in general there was.

12   Q.    Do you know the method that was used to inform the servers

13   that there would be meetings on Monday?

14   A.    We would send an e-mail through Schedulefly.

15   Q.    And would that also be on the schedule for -- let me step

16   back for a second.  Can you describe for the Court how

17   Schedulefly works?

18   A.    Sure.  It's an online system where we -- whoever is

19   scheduling can put in all their employees, what positions they

20   work, you decide what shifts are working for whatever

21   particular restaurant, mainly geared towards restaurants are

22   doing, and then you assign people to different shifts.

23         You post the schedule.  Everyone gets it through

24   either their e-mail or a text message depending on whatever

25   they've decided, and they have access at any point in time to

**OFFICIAL TRANSCRIPT**

1   their schedule and the entire schedule as a whole to see

2   everyone who is working.

3   Q.   Could a server request not to be scheduled for certain

4   shifts?

5   A.   Yes.  They can do a one-off request or a permanent

6   request.

7   Q.   And did that occur?

8   A.   Yes.

9   Q.   So give the Court an example of a -- someone -- why would

10  someone, based on your experience, make a permanent request?

11  A.   Mainly for school.  We have servers who are still

12  attending school or if they had a second job, that they would

13  have a -- need those days off for.

14  Q.   Is that a transparent system?

15  A.   Yes.

16  Q.   So just so I'm clear on this, if Marcus Gandy went in and

17  looked at his schedule, he could see everybody else's schedule.

18  A.   Yes.

19  Q.   Had you ever had people come in and say, "Well, why is

20  Marcus getting scheduled more than me?"

21  A.   No.

22  Q.   Or anybody?  Did anybody ever complain to you about how

23  that scheduling system worked?

24  A.   No.

25  Q.   After the tip -- I use the term *tip reconciliation form*.

**OFFICIAL TRANSCRIPT**

1   I think we've used tip-out form.  We're referring to the same
2   thing?
3   A.    Right.
4   Q.    How is that completed at the end of the night?
5   A.    At the end of the night the service manager would have
6   everyone's paperwork where they had all entered in their own
7   tips and given us a printout of their cash sales for the day,
8   their credit card tips for the day, and we would fill in
9   everyone's name, the associated tips with each person, and then
10  do the math for the tip breakdown.
11  Q.    Would that be solely your responsibility?
12  A.    Whoever the closing service manager was, it was solely
13  their responsibility.
14  Q.    So if a $200 bill is presented to a customer and it's not
15  an automatic service charge on that, and the customer hands the
16  credit card to the server to run, what does the server then do?
17  A.    They would run the credit card and hand the receipt to the
18  guest to fill out, and they'll pick the check up at the end of
19  the meal and they keep all of their checks until they hand it
20  in with the paperwork at the end of the night.
21  Q.    So when the customer gets the receipt back and it's for
22  $200 worth of food, you're hoping, I assume, that the customer
23  is going to add a gratuity to that, right?
24  A.    Yes.
25  Q.    So let's say the customer adds a $40 gratuity, which would

*OFFICIAL TRANSCRIPT*

1   be 20 percent of the $200 bill of fare, how is that number

2   entered into the point-of-sale system?

3   A.    The server, under the user function screen that we have,

4   they would hit "enter charge tip," they would enter the check

5   number and the tip, and it would show them like this was the

6   sale, this is the tip, here is your total.

7   Q.    Now, would the servers do that or would the service

8   managers enter the tips?

9   A.    The servers do that.

10  Q.    At the conclusion, if people are around, they are able to

11  see, based on that tip reconciliation sheet, what they each

12  earned that evening; is that correct?

13  A.    Yes.

14  Q.    Now, what happens to that form after the service is done

15  and after the reconciliation sheet is done?

16  A.    It's dropped off in the office and our office

17  administrator would go through and make sure that the tips we

18  reported matched up with the tips that were entered in and

19  verified that the tip sheets were correct, and then they went

20  back downstairs in binder so that the servers could see what

21  they made.

22  Q.    So they would go upstairs to the office, is that sort of

23  the term?

24  A.    Yes.

25  Q.    Are mistakes occasionally made on these forms?

*OFFICIAL TRANSCRIPT*

1   A.    Sure.  There is human error doing math.

2   Q.    And that would be the purpose of the check, I would

3   assume?

4   A.    Right.  That's why the office would verify it.

5   Q.    But they would eventually find -- the sheets would

6   eventually be put back in a binder at the service station,

7   right?

8   A.    Yes.

9   Q.    Was anybody restricted from reviewing those tip-out

10  sheets?

11  A.    No.

12  Q.    Did anybody ever complain to you, Ms. Rogers, and I'm

13  talking about any servers, that they felt like you did not

14  deserve to be participating in the tip pool?

15  A.    I heard complaints about service managers being in the

16  tip pool, but no one said, "I don't think you deserve to be a

17  part of this."  Not directed to me.

18  Q.    Had you ever worked in a system where the tips for the

19  house are pooled and everybody shares equally prior to working

20  for Doris?

21  A.    Yes.  The Windsor Court, the Grill Room is a pooled house.

22  Q.    Is that the term that's used, a *pooled house*?

23  A.    Yes.

24  Q.    Can you -- I think we probably understand, but can you

25  just explain to the Court what you mean by a "pooled house"?

*OFFICIAL TRANSCRIPT*

1    A.    Sure.  The servers would all have their own sections or

2    tables.  At the end of the night everyone's tips were added

3    together and divided amongst the servers, back waiters, whoever

4    was a part of that particular tip pool, depending on the

5    restaurant.

6    Q.    If a server was -- left early and the restaurant was still

7    open, would that server still participate in the tips that were

8    earned?

9    A.    Yes, as long as -- if they were there for the majority of

10   the evening.  But every restaurant has their own policy on it.

11   Q.    I think there has been some testimony that maybe someone,

12   a server, would be sent home during the -- during the service

13   on the evening or during the shift.  Can you explain to the

14   Court under what circumstances that could possibly happen?

15   A.    Sure.  The only circumstances that would happen is if

16   we -- the service managers felt there was a server who was a

17   detriment to service.  That usually happened if the server was

18   visibly intoxicated during the shift.

19   Q.    Has that happened?

20   A.    Yes.  That has happened twice while I've been there.

21   Q.    Okay.  And on those two occasions when you were there and

22   acting as a service manager, did you send that person home?

23   A.    Yes.

24   Q.    Had you been told by -- did you feel like you had that --

25   at least that authority to do that?

                        *OFFICIAL TRANSCRIPT*

1    A.    Yes.

2    Q.    What would potentially happen if that server didn't get

3    sent home if he or she was intoxicated?

4    A.    In both instances, they were directly affecting guest

5    service and it would have interfered with us being able to

6    proceed with service and give our guest the experience that we

7    want them to have.

8              MR. CUPP:  One second, Your Honor.  Let me check and

9    see if I'm -- I may be done.

10             Your Honor, I have nothing further.

11             THE COURT:  I had a couple of questions I wanted to

12   ask.  If you could tell me, when you were a service manager,

13   not a general manager, but as a service manager, if you could

14   give me kind of a run-down list of the things you are

15   responsible for, I guess, starting from when you got there

16   through the end of the -- end of the night.

17             THE WITNESS:  Okay.  So we were responsible for, when

18   we got there, making sure the close from the last night had

19   been done properly.

20             THE COURT:  The what?

21             THE WITNESS:  The close from the last night had been

22   done properly; that we set up the map so that the servers, when

23   they came in, would know where they were going to be.

24             THE COURT:  What does that mean when you say you made

25   sure that closings for the last night was done properly?

*OFFICIAL TRANSCRIPT*

1          THE WITNESS:  That the tables were clean, chairs were

2     clean, that the restaurant was shut down in the proper way.

3          THE COURT:  Does it have anything to do with the

4     recordkeeping, the money or --

5          THE WITNESS:  No, we didn't --

6          THE COURT:  The physical part.

7          THE WITNESS:  The physical property.  No, the

8     verification for money was done by our office.

9          THE COURT:  Okay.

10         THE WITNESS:  While we were setting up for service, we

11    were there to make sure that everything was being set up

12    properly; that we had all of the tools we needed for service,

13    whether it be silverware, glassware, anything like that; making

14    sure the reservations were all assigned; making sure tables

15    were being set up properly once shift started.

16         THE COURT:  Where in that process was making sure that

17    you had enough servers and server assistants?

18         THE WITNESS:  When we set the map up for the night.

19         THE COURT:  So we're talking about setup.  You said be

20    sure all the tools are there, the reservations are assigned at

21    the specific tables, the tables set up.

22         THE WITNESS:  Making sure the staff who are supposed to

23    be there are there.

24              Then during service we -- our job was to make

25    sure that tables were being taken care of and that our guests

*OFFICIAL TRANSCRIPT*

1    were leaving happy with whatever they needed.  Selling any of

2    our specials, selling wine, everything that encompassed

3    service.

4            THE COURT:  What was the difference between the service

5    manager and the server then?  What was the difference?

6            THE WITNESS:  The service manager didn't have

7    particular tables they were responsible for.  We oversaw all of

8    the tables and had interactions with all of the tables.  We

9    didn't have specific tables that were ours to take care of.

10           THE COURT:  This part about looking at Schedulefly and

11   changing schedules, when did all that happen?

12           THE WITNESS:  The schedules would get posted on Fridays

13   when I was first there for the rest of the week, I believe.

14   Sorry, we've changed the time that we do scheduling now.  So

15   those would be posted at any point in time up until service.

16   They could put in if somebody was going to pick their shift up,

17   they could make shift trades on that.

18           THE COURT:  For the following week?

19           THE WITNESS:  For the following day if they wanted to.

20           THE COURT:  You posted the schedule for the --

21           THE WITNESS:  Schedule for the following week.

22           THE COURT:  Okay.  That's what I wanted to ask.  Did

23   you have any?

24           MS. VASQUEZ:  Just a little bit.

25                           REDIRECT EXAMINATION

                         *OFFICIAL TRANSCRIPT*

BY MS. VASQUEZ:

Q.    Did any of the servers ever get hourly pay raises?

A.    I don't know.

Q.    Even if none of the meat boards were sold, you still got the 10 percent, right?

A.    Yes.  That wasn't my only responsibility.

Q.    You also handled absences and tardies as well as the schedule?

A.    Yes.

Q.    Let's see.  When you were the manager on shift, you were the one to complete the server checkout forms and the gather all of the credit card slips and cash from the servers?

A.    Yes.

THE COURT:  I guess I forgot to go to the end of the evening, all of the things that you would do at the end.

THE WITNESS:  Sure.  The servers would hand in their server reports with all their credit card receipts.  They would hand in their cash to us, and we would complete the cash drawer paperwork for the office and we would also complete their tip report for the office.  Then we would are drop everything upstairs in the office.

EXAMINATION BY MS. VASQUEZ:

Q.    Then after that would you then close the restaurant?

A.    Yes.  We would lock the restaurant.

MS. VASQUEZ:  Okay.  I have no more questions.

*OFFICIAL TRANSCRIPT*

```
 1              MR. CUPP:  Your Honor, I have one point that I needed
 2    to make, if I may.  It may not be directly within --
 3              THE COURT:  That's fine.
 4                           REDIRECT EXAMINATION
 5    BY MR. CUPP:
 6    Q.    You're a sommelier?
 7    A.    Yes.
 8    Q.    A wine expert; is that fair?
 9    A.    Yes.
10    Q.    And that's a certification for you to get, correct?
11    A.    Yes.
12    Q.    Now, when you sold bottles of wine to the table, did you
13    get any commissions on those wines?
14    A.    I did not.
15              MR. CUPP:  I don't have anything further, Your Honor.
16              MS. VASQUEZ:  Your Honor, I forgot one question to ask.
17    I'm sorry.
18              THE COURT:  All right.
19                        FURTHER REDIRECT EXAMINATION
20    BY MS. VASQUEZ:
21    Q.    When a server was sent home, due to intoxication or for
22    whatever reason early, would their tip share be reduced due to
23    the length of time on the floor?
24    A.    They would receive their portion of the tip share.  They
25    wouldn't be a full portion in the pool since they were not
```

*OFFICIAL TRANSCRIPT*

1    there for the evening.

2            The two instance that I know were both server

3    assistants, so they received their money from the pool.  It

4    would depend on when they got sent home.

5    Q.   So there was some control over the rate of pay in those

6    types of situations?

7    A.   Sure.  Yes.

8            MS. VASQUEZ:  No more questions.

9            THE COURT:  So we're talking about when people were

10   sent home because they were intoxicated --

11           MS. VASQUEZ:  Intoxicated.

12           THE COURT:  -- or not busy.

13           MS. VASQUEZ:  Or not busy.  Or not busy as well, does

14   that apply?

15           THE COURT:  Okay.  So, yeah, I thought if someone was

16   allowed to go home early because they weren't busy, that they

17   still participated fully in the tip pool?

18           THE WITNESS:  They participate in the tip pool.  So how

19   we've -- the policy at Doris Metropolitan is --

20           THE COURT REPORTER:  I can't understand what you are

21   saying.

22           THE WITNESS:  So how the policy was at Doris

23   Metropolitan --

24           THE COURT:  Wait.  The policy was at Metropolitan --

25   you got to give us a little space between the words.

*OFFICIAL TRANSCRIPT*

1          THE WITNESS:  Sorry.

2                -- if you were there until 9:30 or if you were

3    within $50 of the tip pool, you received a full share.

4                If you were sent home early because of business,

5    you were never sent home.  We never said, "We're not busy.  You

6    have to go home now."

7                If you -- if we were -- ended up not being busy

8    enough to need the number of servers on a shift, we would ask

9    for a volunteer to be cut, and they were aware that if they

10   were cut they would keep their portion of the tip-out, which

11   they would then also not have to tip anyone else out on.  There

12   was no SA or service captain tip taken from the server that

13   left early voluntarily based on business because they were not

14   a part of the larger tip pool.

15        THE COURT:  All right.  So this is something I hadn't

16   heard before.

17                Had you all heard that, plaintiffs' counsel?

18        MS. VASQUEZ:  We hadn't heard that before.

19        THE COURT:  Mr. Cupp, was that your understanding, that

20   what she's saying now is correct?  I don't know if it makes any

21   difference or not.  I just had never heard you all say that.

22        MR. CUPP:  Well, no, we wanted to elicit testimony

23   about what happens when somebody, a server, is -- does leave

24   and how that operates.  That was part of what we wanted to make

25   sure got on the record.  I don't think I heard it through any

**OFFICIAL TRANSCRIPT**

1    of the witnesses that plaintiffs put on so far.

2         THE COURT:  But, in fact, in your cross-examination of

3    Mr. Hunt, you implied that if he stayed -- even if he left

4    early, that he continued to make money because he was still

5    participating in the tip pool.

6         MR. CUPP:  Well, he did, I think, clarify that's true

7    up to a certain point.

8         THE COURT:  So is that discretionary with the service

9    manager about whether the person who leaves early will

10   participate fully in the tip pool or not?

11        THE WITNESS:  No.  That's why we put in the rule of the

12   time they left and also the money brought in.

13        THE COURT:  When did that rule go into effect?

14        THE WITNESS:  That rule went into effect when Dontay

15   and I were service captains.

16        THE COURT:  Give me what time frame.  Are we talking

17   about 2015 or --

18        THE WITNESS:  I --

19        THE COURT:  When were you a service captain?

20        THE WITNESS:  When I got on in 2015 through now to

21   2018.

22        THE COURT:  How long were you a service captain?

23        THE WITNESS:  For, I think, maybe the first year that I

24   was there, year and a half.

25                    FURTHER REDIRECT EXAMINATION

*OFFICIAL TRANSCRIPT*

1  BY MR. CUPP:

2  Q.   Ms. Rogers, can you -- do you know when you became the --

3  can you put on the record when you became the general manager

4  of the restaurant?

5  A.   General manager was September of 2017 when I was given the

6  official title.

7  Q.   September of 2017?

8  A.   Yes.

9       THE COURT:  Anything else from the plaintiffs?

10              All right.  Thank you.

11              Plaintiff, please call your next witness.

12       MR. CUPP:  Your Honor, just a point, we would like to

13  have Ms. Rogers excused as a witness except to the extent, I

14  believe, that they put on any more of their witnesses who I

15  would need Ms. Rogers back for.  I think I would have the right

16  to call her back in that case.  I'm not saying that there will

17  be.

18       THE COURT:  It would be unusual that I would let you

19  call her back.  If there is something you want to ask her, you

20  should ask her now.

21       MR. CUPP:  I don't know -- I can't predict what I may

22  have to ask her if they haven't finished putting on their

23  witnesses.

24       THE COURT:  Well, we'll see.  I'm just telling you,

25  don't count on calling her back.  If there's something you have

*OFFICIAL TRANSCRIPT*

1    any idea about that is part of this case, you should ask her

2    about it now.  You know what -- you had a lot of discovery.

3    You know what the evidence is and who the witnesses are going

4    to be.

5            MR. CUPP:  I guess I'll just cross the bridge if, in

6    fact --

7            THE COURT:  If we come to it.

8            MS. CATLETT:  Your Honor, we're going to call plaintiff

9    Marcus Gandy to the stand.

10           THE DEPUTY CLERK:  Would you please raise your right

11   hand.  Do you solemnly swear that the testimony which you are

12   about to give will be the truth, the whole truth and nothing

13   but the truth, so help you God?

14           THE WITNESS:  I do.

15                            **MARK GANDY**

16    was called as a witness and, after being first duly sworn by

17    the Clerk, was examined and testified on his oath as follows:

18           THE DEPUTY CLERK:  Please state and spell your name for

19   the record.

20           THE WITNESS:  My name is Mark Gandy, M-A-R-K,

21   G-A-N-D-Y.

22                        DIRECT EXAMINATION

23   BY MS. CATLETT:

24   Q.   Can you tell us what dates you worked for

25   Doris Metropolitan?

                        *OFFICIAL TRANSCRIPT*

1    A.    I started at Doris, it would have been about February,

2    March of 2014, and then I think I finally left for good, it

3    would have been October of 2015.

4    Q.    What was your position when you worked at

5    Doris Metropolitan?

6    A.    When I first started I was a server, and then I left for a

7    while.  I also had a job touring with a circus, and so -- and I

8    came back from that.  I took a job working at the host stand

9    and then went back to waiting tables again.

10   Q.    When you worked as a server, how much were you paid?

11   A.    2.13 an hour.  That was the standard rate that they gave

12   everyone when they started as a server.

13   Q.    To your knowledge, was that rate ever raised for any

14   servers?

15   A.    I don't think that was ever a discussion ever for anyone.

16   Q.    Tell me how you got hired at Doris Metropolitan.

17   A.    I had decided to leave another restaurant and I scheduled

18   a meeting with Stavros.  I walked in and he hired me on the

19   spot.

20   Q.    How long did he speak with you before he hired you?

21   A.    Five, ten minutes.

22   Q.    During that time, did he text or phone anyone for

23   approval?

24   A.    No.  It was just us chatting.

25   Q.    How soon after the interview with Stavros did you start

*OFFICIAL TRANSCRIPT*

1    working?

2    A.    It was a couple weeks.  It wasn't an immediate start date,

3    but, yeah, he gave me confirmation that day that I was starting

4    and then I started training a little bit after that.

5    Q.    Once you actually started work there -- and by working, I

6    do mean started training -- how long did you work before you

7    met Itai or any of the other owners?

8    A.    I met Itai when I was doing my training.

9    Q.    But after you had already started?

10   A.    Yeah, yeah, yeah.  I didn't know who any of the owners

11   were until after I started.

12   Q.    What were your duties as a server?

13   A.    General go in, you do the pre-shift setup and then we

14   would have a pre-shift meeting.  In those meetings sometimes we

15   would have little things where we had to prepare something to

16   demonstrate that we actually did know stuff about wine.  We

17   would go through at that.  And then we would start the shift.

18         And the responsibilities include just making sure

19   that everything was present at the table when it needed to be

20   and also it -- also coordinating our server assistants as we

21   needed to make sure that things got to the table correctly.

22         Also, we were in charge of collecting payment at the

23   end and making sure we kept track of all that payment, and then

24   from there, closing down the restaurant, which was cleaning,

25   sweeping floors, making sure that tables were cleaned off,

*OFFICIAL TRANSCRIPT*

1    everything was polished at the end of the night.

2    Q.   Were you supervised by managers?

3    A.   Yes.  When I first started, Stavros was there as was Itai.

4    Itai was a little more present in the beginning.  But then

5    Stavros become more of the person who was on the floor.  I feel

6    like Itai and Dori were more like figureheads at that point.

7         Then when I left and came back, that was when an

8    Alise Warren was there as a manager.  Also, I believe -- I

9    think it was -- I believe -- I think it was just Alise and Itai

10   at that point, but Itai was out of town for a really long time

11   at that point.

12        And then -- yeah, then Ryan started right after I got

13   there.  And then Dontay became a manager.  And Melissa started

14   on.  All those people as managers.

15   Q.   So just for purposes of clarification, when we are talking

16   during your testimony about managers, we're using that

17   interchangeably to reflect Dontay, Alise, Ryan O'Dwyer, Melissa

18   and/or Itai if he was there?

19   A.   Right.  Exactly.  Those people were the managers.

20        MR. CUPP:  Your Honor, may I -- I hate to do this.  Can

21   I talk to Ms. Catlett for a second?

22        THE COURT:  Yes.

23        MR. CUPP:  It's having to do with a witness that we

24   were supposed to have here.

25        THE COURT:  Okay.

*OFFICIAL TRANSCRIPT*

1          MR. CUPP:  We apologize.  One of the witnesses that we

2     were supposed to have here had a personal issue come up.  I

3     think the agreement is that he can come tomorrow.

4          MS. CATLETT:  We can do him tomorrow.  Thank you for

5     telling us.

6     EXAMINATION BY MS. CATLETT:

7     Q.    Did you receive a paycheck for your hourly work?

8     A.    Yes, yes.  We received biweekly paychecks.

9     Q.    Did those biweekly paychecks also include your credit card

10    tips?

11    A.    Yes, yes.  It was all inclusive.  It had our hourly and

12    our tips on it.

13    Q.    Do you remember if you ever worked overtime?

14    A.    It would have been really incidental.

15    Q.    Do you know if you were paid correctly for it?

16    A.    Again, it would have been incidental and I probably

17    wouldn't have noticed.

18    Q.    Was there any policy in place that forbid you from working

19    overtime?

20    A.    If there was, I didn't know about it.

21    Q.    Did you ever receive a copy of a handbook when you worked

22    there?

23    A.    We had things that talked about the menu that I was given,

24    for sure.  As far as like company protocol, I don't remember

25    getting one of those.

**OFFICIAL TRANSCRIPT**

1  Q.   When you worked at Doris Metropolitan, both times that you

2  were there, did you ever hear the term *service captain*?

3  A.   I really wasn't even familiar with that term until today,

4  no.  We had managers who supervised the servers and the floor.

5  Q.   Did the managers, during your tenure at

6  Doris Metropolitan, have the authority to hire and fire?

7  A.   Well, I mean, Stavros hired me, like I said, on the spot.

8  Then when I was let go, it was Dontay and Melissa who sat me

9  down, they reviewed everything that had happened, and then at

10 that point they told me that I was no longer employed.

11 Q.   Did they have a lengthy discussion with you when they sat

12 you down to talk about what happened?

13 A.   Yes.  They had questions about everything, and I explained

14 how everything I had done was exactly by the book.  And then

15 they told me, "Well, you know, we are going to be letting you

16 go today."

17 Q.   When you left that meeting knowing that you were

18 terminated, who did you think had made that decision?

19 A.   From the experience that I had, they both made that

20 decision then.  I don't know why they would have sat there and

21 questioned me about the experience and then get delivered that

22 news if they had already made a decision.

23 Q.   During the time that you worked at Doris Metropolitan, did

24 the managers have keys to the restaurant?

25 A.   Yeah, absolutely.

1  Q.    Did you believe that all of the managers were acting on

2  behalf of Doris Metropolitan, the company?

3  A.    Yeah, absolutely.

4  Q.    During the time that you worked there, did the managers

5  supervise the dishwashers?

6  A.    I know Ryan and Dontay had a lot to do with that.  I don't

7  think Melissa really bothered with that.  I don't know that

8  Alise ever really bothered with that.

9        I know Stavros, he was pretty-- he was pretty

10 involved with all that, I believe.

11 Q.    During the time you were at Doris Metropolitan, who made

12 your schedules?

13 A.    I don't know who did the schedule in the beginning, but

14 then when I came back, I remember Ryan was in charge of that

15 for a bit and then it was Melissa.  And it was definitely

16 Melissa who was handling it.

17 Q.    Would that time period have been pre- or post-Schedulefly?

18 Did you use that system?

19 A.    Yeah, yeah.  I used the Schedulefly.  That was when Ryan

20 and Melissa were both managers.  Yeah.

21 Q.    So during at that time, if you wanted to change your

22 schedules, who would approve it?

23 A.    When it was Stavros there, that's who I would text.  We

24 would text or call them.  I never really had an experience

25 where we were to contact Itai, but I did have experiences, you

*OFFICIAL TRANSCRIPT*

1  know, with Ryan and Melissa and incidentally Dontay.

2  Q.   We've talked a lot about these server checkout sheets.

3  And we don't need to go through all of them again.  We've seen

4  them already.  But did managers perform the calculations on the

5  server checkout sheets at the end of every shift that you

6  worked?

7  A.   Yeah, at the end of the shifts, like at the very end of

8  the shift when everybody had turned everything in, they would

9  do the server checkouts, yeah.

10 Q.   Do you think that the managers during the time you worked

11 at Doris Metropolitan controlled the conditions of your

12 employment?

13 A.   Absolutely.  Yeah.

14 Q.   During the time that you worked at Doris Metropolitan, did

15 managers perform customer table service at every table?

16 A.   Not at every table, no.  Incidentally they were at tables.

17 And, of course, they were going and greeting people.  They

18 were, you know, creating the ambiance.  But I wouldn't say they

19 were doing service at every table, by any means.

20 Q.   Have you worked at other restaurants?

21 A.   Yes.

22 Q.   Would you say the table service at Doris Metropolitan was

23 more or less than the table service that managers perform at

24 other restaurants?

25 A.   I would say they say perform the same management duties at

*OFFICIAL TRANSCRIPT*

1    any other restaurant that I've worked in.  There is going to be

2    incidental table service, yeah.  Other than that, they weren't

3    going above and beyond with table service, by any means.  They

4    weren't doing a server's portion of it.

5    Q.   If there was ever a particularly slow night, would there

6    be times when managers didn't perform any table service?

7    A.   Yeah.  I know when Itai would manage, absolutely.  Like he

8    would be more of a figurehead.  If we had a problem, I guess we

9    could have gone and found him but, no.

10   Q.   So are you saying sometimes when Itai would manage, he

11   wouldn't necessarily be on the floor?

12   A.   Yeah.

13   Q.   With regard to the managers participating in the tip pool,

14   did you ever question that?

15   A.   I'm sorry, what was that?

16   Q.   Did you ever question the managers being included in the

17   tip pool?

18   A.   Absolutely.  Yeah, I brought it up to Stavros when I

19   started, because that seemed a little strange.  I had never

20   seen that.  And I've worked in plenty of restaurants.  Even

21   other restaurants where I worked where, you know, a manager

22   would take care of the to-go orders or something, they still

23   didn't participate in the tip pool, by any means.

24   Q.   Did Stavros attempt to address your concerns about it?

25   A.   I kind of got brushed off with that one.  Then I brought

*OFFICIAL TRANSCRIPT*

1  it up again to Ryan O'Dwyer.  And his general opinion was, "You

2  guys are already making so much money.  Why are you concerned

3  about that?  You're getting paid."

4  Q.   Were you required to attend Monday meetings?

5  A.   Yes.  Yes.  We were all required to attend the Monday

6  meetings.

7  Q.   Were you told to clock in for the Monday meetings?

8  A.   We weren't told to clock in, but yeah, I clocked in.  I

9  don't work for free.  I clocked in and I clocked in at the

10 server's rate of 2.13, even those there was no opportunity for

11 us to make tips during those meetings.

12 Q.   Did you attend every Monday meeting you were supposed to

13 attend, or that was held?

14 A.   Incidentally I would have something going on and I'd not

15 be able to make one here or there, but for the most part, yeah,

16 I was always at them.

17 Q.   How long did the Monday meeting typically last?

18 A.   Like an hour, hour and a half.  Never too much longer than

19 that.

20 Q.   Before we go over your damages very briefly, is it fair to

21 say that managers controlled the schedule?

22 A.   Yeah.  Absolutely.

23 Q.   Is it fair to say that they controlled the opening and

24 closing of the restaurant?

25 A.   Yeah.  Yeah.

**OFFICIAL TRANSCRIPT**

1    Q.    Is it fair to say that they supervised and controlled the

2    dishwasher staff?

3    A.    I would say they had a huge hand in it.

4    Q.    Is it fair to say that they controlled -- managers

5    controlled staff meeting attendance and content?

6    A.    Yes.

7    Q.    Just real briefly, have you had an opportunity to go over,

8    with your attorneys, your damages calculation?

9    A.    Oh, yeah.

10   Q.    So I'm going to put up here, this is the demonstrative

11   evidence, Black 95 and 96.  This is Marcus Gandy's hours.

12          And I'll put this here.  And, Marcus, if you would,

13   just tell me what the first date you see on there is?

14   A.    That would be February 7, 2014.

15   Q.    Then tell me what the last date on this page is.

16   A.    September 4, 2015.

17   Q.    Then I'll switch to Black 96 just for purpose of

18   determining his tenure at Doris Metropolitan.

19          Can you tell me what those two dates are on there?

20   A.    September 18th of 2015 and October 2nd of 2015.

21   Q.    So would you agree that this is representative of your

22   tenure overall at Doris Metropolitan?

23   A.    Yes, ma'am.

24   Q.    Based upon this, there is a figure that was determined for

25   your minimum wage obligation that needs to be met for you and

*OFFICIAL TRANSCRIPT*

1    your damages.  Can you tell us what those are?

2    A.    That number right there.  It's $4,891.15.

3    Q.    Do you agree with that calculation based upon the time

4    that you worked there and the number of hours that you worked?

5    A.    I would say that seems accurate.

6    Q.    Then this other figure that is right here -- I'm going to

7    put the top page down just for a second so you can see it --

8    that's underneath the Monday meeting hours.  And what we

9    determined was that Monday meetings, if they were held every

10   week and you were paid an hour and a half at 7.25, then this is

11   what would be owed for every Monday meeting.

12          And would you agree that this would be a fair figure

13   if that was what was taken into consideration, an every-week

14   Monday meeting?

15   A.    Yeah, yeah.  It would.

16   Q.    I do see on the first page of this one that you admitted

17   that you didn't work very much overtime.

18   A.    Yeah.

19   Q.    And it looks like on here we determined that you only

20   worked about 8.8 hours of overtime.  Does that seem correct?

21   A.    Yes, that would be correct.

22   Q.    So you would agree that your unpaid overtime was maybe

23   32.04?

24   A.    Probably, yeah.

25          MS. CATLETT:  I have nothing further.

*OFFICIAL TRANSCRIPT*

1      MS. VASQUEZ:  Your Honor, just based on the

2  representation we got about the witness, if we could just have

3  five minutes to figure out who our next person is.

4      THE COURT:  Well, he hasn't been crossed yet.

5      MS. VASQUEZ:  I'm sorry.

6      MR. CUPP:  I'll be very short with this witness.

7                    CROSS-EXAMINATION

8  BY MR. CUPP:

9  Q.   Mr. Gandy, I didn't hear when you left and came back.  Do

10 you recall the specific date?

11 A.   No.  It would have been like April to September.

12 Q.   Of what year?

13 A.   Of -- I want to say 2014.

14 Q.   So you left in April of 2014?

15 A.   Uh-huh (affirmative response).

16 Q.   And you came back in September 2014?

17 A.   Yes.

18 Q.   So --

19 A.   Roughly.  I don't have those dates in front of me.

20 Q.   I have, according to my notes that, that you started there

21 late January 2014; is that correct?

22 A.   Yeah.

23 Q.   So you were aware of the tip pool system for the first

24 three months you were working there, right?

25 A.   I was familiar with it, yes.

                        *OFFICIAL TRANSCRIPT*

1   Q.    Then you decided that you wanted to come back into that
2   system and --
3   A.    When I came back from the tour, I wanted to walk back into
4   the same job I had, right.
5   Q.    Thank you.
6           I was curious, I was looking at some dates and I want
7   to put in front of you a document you just looked at, which is
8   Black 95.  Is it your testimony that all the dates that are
9   listed here were Monday meetings, in the second column?
10  A.    I really don't remember how many meetings there were and
11  specific dates of them.
12  Q.    The reason I ask, and I could be looking at this wrong,
13  because it appears to me --
14          THE COURT:  I thought the part that was shaded was the
15  Monday meetings; is that right?
16          MR. CUPP:  No, ma'am.
17          MS. VASQUEZ:  Shaded is -- the black area that's shaded
18  is two years versus three years.
19  EXAMINATION BY MR. CUPP:
20  Q.    Because I just happened to pick up and look at some
21  Schedulefly schedules, and, for instance, it looks like
22  5/1/2015 is actually a Friday.  You wouldn't know that as you
23  sit here today, would you?
24  A.    No, I don't know if -- I don't know if May 1, 2015, was a
25  Friday or not.

*OFFICIAL TRANSCRIPT*

1    Q.   All right.

2         THE COURT:  Is something of this exhibit related to

3    their minimum wage claim?

4         MS. CATLETT:  It is.  It's by pay period.

5         MR. CUPP:  As I understand it, Judge, excuse me, I --

6    I'm sorry.  I see now.

7              I think Laura clarified it for me.  I was looking

8    at the date itself and not the pay period.

9         THE COURT:  So a pay period ending on May 1, these are

10   hours worked during that previous pay period where he was paid

11   2.13 and he said the tip pool was --

12        MR. CUPP:  I read it in error.

13        THE COURT:  I just want to be sure I was right.

14        MR. CUPP:  That was my error, because I was looking at

15   a date and thinking that was the date they were attributing

16   that to a Monday meeting.  That wasn't adding up for me.

17   EXAMINATION BY MR. CUPP:

18   Q.   Maybe you can clarify this for us, Mr. Gandy, was the pay

19   period at the restaurant while you were there from a Saturday

20   through a Friday, encompass those seven days?

21   A.   I don't know that.

22   Q.   Would you agree with me that providing exceptional service

23   to the customers was of paramount importance for the operation

24   of the Doris Metropolitan?

25   A.   I would say all the people on the floor tried to do their

*OFFICIAL TRANSCRIPT*

1    best job to provide the best service and make it the best

2    experience, yeah.

3    Q.    That included the service managers, right?

4    A.    It included the managers.

5            MR. CUPP:  Thank you.  Nothing further.

6            THE COURT:  Any redirect?

7            MS. CATLETT:  No, Your Honor.

8            THE COURT:  Thank you.  You're excused.

9                So do the plaintiffs need five minutes before the

10   next witness?

11           MS. VASQUEZ:  Yes, please.

12           THE COURT:  Why don't we take a ten-minute break.

13   We'll resume at 3:45.

14           THE DEPUTY CLERK:  All rise.

15           (WHEREUPON, at 3:36 p.m. the Court took a recess.)

16           THE DEPUTY CLERK:  All rise.

17           THE COURT:  All right.  Be seated.

18                Please call your next witness.

19           MS. VASQUEZ:  Plaintiff will call Itamar Levy to the

20   stand.

21           THE DEPUTY CLERK:  Would you please raise your right

22   hand.  Do you solemnly swear that the testimony which you are

23   about to give will be the truth, the whole truth and nothing

24   but the truth, so help you God?

25           THE WITNESS:  I do.

                              *OFFICIAL TRANSCRIPT*

1                                **ITAMAR LEVY**

2      was called as a witness and, after being first duly sworn by

3      the Clerk, was examined and testified on his oath as follows:

4              THE DEPUTY CLERK:  Please state and spell your name for

5      the record.

6              THE WITNESS:  Itamar Levy.  I-T-A-M-A-R, last name

7      Levy, L-E-V-Y.

8                               DIRECT EXAMINATION

9      BY MS. VASQUEZ:

10     Q.    Mr. Itamar, what is your position at Doris Metropolitan?

11     A.    Administrator, administrative.

12     Q.    When you say administrate, what exactly are you

13     administrating?

14     A.    The back of the house.  The back of the office.  I mean,

15     yeah, the back of the house.

16     Q.    That would include money coming in from guests in tips?

17     A.    I don't collect money from guests.  I mean, I don't really

18     collect anything.  I will look at the documents.  But I don't

19     actually personally collect anything from anybody.

20     Q.    You said you don't collect them, but you receive at some

21     point the server checkout sheets that are completed by the

22     managers --

23     A.    Yes.

24     Q.    -- at the restaurant?

25     A.    Yes.

                            *OFFICIAL TRANSCRIPT*

1    Q.    And then after you receive the server checkout sheets, you
2    input the information into some spreadsheets, I would assume?
3    A.    Well, I don't do it personally, but I have helped create
4    that system and I occasionally check it out, especially at
5    times of payroll.  I'm familiar with it.  Whether I do it every
6    day personally myself or not, I am familiar with it.
7    Q.    Okay.  It would be correct to say that any monies that
8    were collected while Itai appeared on the server checkout
9    sheets were deposited into the Doris Metropolitan operating
10   account?
11   A.    Let me clear this up.  Every money --
12   Q.    Is that a yes or a no?
13   A.    Yes.
14   Q.    Okay.
15   A.    Now can I explain?
16   Q.    Yes.
17   A.    Every money that's being collected, processed, a credit
18   card that has been processed, it all goes into our general
19   account.
20   Q.    Okay.  That general account is used for whatever the
21   restaurant might need?
22   A.    Yes.
23   Q.    Okay.  It was your impression that the overtime worked by
24   servers would be covered under the tip pool?
25   A.    That's correct.

**OFFICIAL TRANSCRIPT**

1    Q.    How was that your impression -- or why is it your

2    impression?

3    A.    When I first, I come from -- I come from California.  I've

4    never heard of tip credit until I came here.  So when I inquire

5    about it, we have been told that -- or my impression, that was

6    my understanding, that we pay, like, 2.13 an hour, and as long

7    as the tips cover the wage, then that's included in the tip.

8    That was my impression.  I was most definitely wrong about it,

9    but that's how I got to it.

10   Q.    When did you find out you were wrong about it?

11   A.    Not until this whole thing started.

12   Q.    Now, you heard earlier today Larry or L.J. Hunt testify?

13   A.    Uh-huh (affirmative response).

14   Q.    And he talked about how he spoke to you and how you stated

15   to him that you had checked it out with an attorney.

16   A.    Would you please remind me?  I remember he mentioned

17   something that he spoke to me about a couple issues.  One was

18   legality of -- of people at the bar.  And he did mention

19   talking to me -- whether it was about the spreadsheet or -- I'm

20   not really sure.  If you could please -- I don't remember

21   exactly his words so I don't want to assume.

22        THE COURT:  Can you remind him of what the testimony

23   was?

24        MS. VASQUEZ:  Yes.

25   EXAMINATION BY MS. VASQUEZ:

*OFFICIAL TRANSCRIPT*

1    Q.   Actually, let me go in this direction.  You just mentioned

2    now about the kids at the bar.

3    A.   Yes.

4    Q.   You just said you remember his testimony regarding whether

5    a child should be at the bar and he asked you about it, and you

6    said that you had talked to the attorney and that it was okay.

7    A.   Yes.  I have, yes.

8    Q.   That is true, that you did, in fact, consult with an

9    attorney?

10   A.   Yes.

11   Q.   They said it was fine --

12   A.   Absolutely.

13   Q.   -- for a child to be at the bar?

14   A.   Again, I come from California.  In California you could

15   not put a kid at the bar.

16   Q.   You cannot or you can?

17   A.   You cannot.  You cannot serve -- it's illegal to drink

18   under the age of 18, this is at the time that I still lived in

19   California, even if the alcohol is given to you by your parent.

20   So it was a concern to me.  I have received from the servers at

21   the time conflicting information.

22        Larry -- I didn't remember it was Larry.  Now that he

23   mentioned, yeah, I assume it was him, and probably other

24   servers, felt that it's illegal.  And others, I was told, were

25   no, it's by the restaurant, it's the restauranteur's decision.

**OFFICIAL TRANSCRIPT**

1    So I did check it.  I did check it with my attorney.

2    Q.    Was this a New Orleans-based attorney?

3    A.    Yes.

4    Q.    So when you consulted -- after you consulted with the

5    attorney, you felt like it was okay to keep kids at the bar and

6    to allow a 10 percent tip to the managers?

7    A.    I have not consulted with my attorney about the

8    10 percent.  I have discussed with my attorney about the kids

9    at the bar.

10         THE COURT:  The 10 percent to the service managers is

11   what you're talking about?

12         MS. VASQUEZ:  Yes.

13         THE WITNESS:  So let's not mix the two.  Because I

14   don't see -- it's not a decision that is made at the same time.

15   The question did not come out at the same time.  And they are

16   not related.

17   EXAMINATION BY MS. VASQUEZ:

18   Q.    Okay.  So there was one time you consulted with an

19   attorney about the kids at the bar?

20   A.    Yes.

21   Q.    Okay.  Then there was a separate time that you consulted

22   with an attorney regarding the 10 percent?

23   A.    No.  I have never consulted, and I don't remember Larry or

24   anybody else bringing it up with me.

25   Q.    So you don't remember any time Larry coming up to you and

*OFFICIAL TRANSCRIPT*

1    saying, "I don't think it's legal to tip out the service

2    managers, managers"?

3    A.    Absolutely not.

4    Q.    Okay.  Is it because you don't remember or is it because

5    it didn't happen?

6    A.    If I don't remember -- of course there is always a chance

7    that something might have happened and I don't remember, and I

8    can always say -- or anybody can always say I don't remember

9    and for that, it didn't happen.  Of course there is the

10   possibility that that I don't remember.  But I think I would

11   remember something or like a conversation with him about it.

12   Even if it was not specifically noted about 10 percent or

13   5 percent or whatever, it's probably -- there has to be some

14   conversation related to it and I don't remember that as well,

15   so -- you know.

16   Q.    Do you remember a conversation about the meetings on

17   Monday, the mandatory meetings on Monday?

18   A.    Remember what?  What are you asking?  What should I

19   remember?  There were meetings on Monday.  I remember that.

20   Q.    Earlier today Larry Hunt testified that he talked to you

21   about the minimum wage issue for the mandatory Monday meetings.

22   He thought he should be paid --

23   A.    I never discussed Monday meetings with Larry.

24   Q.    Okay.

25   A.    Most of the times Larry worked at the restaurant, as he

*OFFICIAL TRANSCRIPT*

1    did mention today, I was going back and forth.  It was early

2    years of -- early time of the restaurant, so I was traveling a

3    lot between -- I lived in California at the time, so I was

4    going back and forth.  I really didn't have many conversations

5    with Larry.

6    Q.    Okay.  So I am not sure I really understood what you said.

7    I know that you said that you were traveling back and forth in

8    the -- early on.  And then you said something towards the end

9    and I couldn't hear you.  Could you repeat that?

10   A.    I don't remember having any conversations with Larry -- or

11   many conversations with Larry.  Actually, I didn't even

12   remember him when I walked in the door, so...

13   Q.    I'm going to take you back to 2013, the beginnings of your

14   restaurant.  Where are -- where are the time records and

15   clock-in sheets for the folks that worked during that time,

16   from October to December of 2013?

17   A.    Probably not existent at this point.

18   Q.    Why would that be?

19   A.    Or system records three years' worth of documentation, and

20   if after three years, it's getting erased.  Automatically.

21   There is nothing that we do.  It only records three years back.

22   Q.    So when you received this lawsuit in 2016, why didn't you

23   stop at that point and preserve those records before they were

24   destroyed?

25   A.    My understanding, that it was not about the time.  I was

*OFFICIAL TRANSCRIPT*

1    not asked to.  And this thing has been going on for two years.

2    Why didn't you ask for them two years ago?

3    Q.    We did ask for them.

4    A.    Not two years ago.

5    Q.    When you read the lawsuit, did you notice that there was a

6    claim for overtime?

7    A.    Bartenders?  One person?  Shannon McSwain, if I remember

8    correctly.

9    Q.    Well, even knowing that, why was that not enough for you

10   to preserve the records that you had before they were deleted?

11   A.    I am not an attorney.  I look at these things, some of the

12   things I understand; some of things I don't understand.  I have

13   other records and by the time -- bottom line, by the time we

14   were asked for it, it was past the three years.  It's just not

15   in the records.  There is nothing.

16   Q.    Well, your records end in April of 2015 even though they

17   had some plaintiffs still working there in 2016.  So my

18   question to you is, what about the records from April to

19   December and a little bit of 2016, what happened to those time

20   records?

21   A.    April, December of what year?

22   Q.    2015.

23   A.    At the time that we were asked for those timecards, that

24   was six months ago, I could only pull whatever three years

25   back, plus if -- we were always trying to save all the records.

**OFFICIAL TRANSCRIPT**

1    I mean, scan everything and keep it in binders.  Some of that
2    stuff has disappeared over the time.  I mean, I can't give you
3    an exact explanation to why or -- if we want to pull it out
4    from our POS system, I can only go three years back.  That's
5    all I can say.  I can only pull it back three years from any
6    given date.
7    Q.   Okay.  I'm going to go refer to Exhibit 2, Bates
8    stamped 1677.
9         MR. CUPP:  What exhibit?
10        MS. VASQUEZ:  It's Exhibit 2.  Exhibit 2, Bates
11   stamped 1677.
12   EXAMINATION BY MS. VASQUEZ:
13   Q.   Do you see that on your screen?
14   A.   Yes.
15   Q.   Okay.  So you said you could only go three years back and
16   that's why we don't have 2015.  But here I am showing you a
17   record from 2014.
18   A.   Uh-huh (affirmative response).
19   Q.   How is it that you have record but you don't have 2015 or
20   2016 records?
21   A.   We do have records for 2015 or 2016.  You have some of the
22   records.
23   Q.   I have some.
24   A.   Yes.
25   Q.   I don't have from April 2015 to December of 2015 and I

*OFFICIAL TRANSCRIPT*

1   don't have any from 2016.  Why is that?

2   A.    They are lost.

3   Q.    Now, these look different.  This particular record here

4   that breaks it down from week one to week two, looks different

5   from your timecard sheets that you produced in 2015; is that

6   right?

7   A.    That's correct.  That's correct.

8   Q.    Why does it look different?

9   A.    Because timecards -- this is not our POS timecard.  This

10   is not what the guys clock in.  When the guys clock in or

11   clock out, there is a certain form -- I wish I could show it to

12   you, then I could show you how that looks like.

13        When that comes back to the office at the end of the

14   two-week period, there are a lot of documents to put together

15   for payroll.  There is timecards.  There are tips.  Those

16   things change daily.  When you put -- when you put a tip

17   employee on payroll, every day is different.  It's not just

18   multiplying hours by -- an hourly rate by number of hours.  So

19   bottom line, that takes a long time.

20        What we created is a certain place, Excel sheets,

21   where we can consolidate all of this and then it's transferred

22   to a certain sheet, and when it's entered into the payroll, it

23   is all on one or two pages.

24   Q.    Is this what you're referring to?

25   A.    This is one of them.  This is -- this will -- what you see

*OFFICIAL TRANSCRIPT*

1    here is just -- the paperwork relates to the plaintiffs.

2    Q.    Okay.  So it looks like -- is this something you copied

3    from an Excel spreadsheet and then printed out?

4    A.    It is an Excel spreadsheet.

5    Q.    So does it come from a bigger Excel sheet with times or

6    anything that you were just describing a few minutes ago?

7    A.    Yes.

8    Q.    And let me show you in that same exhibit but Bates

9    stamped 1676.  Would you agree with me that Erin Lawrence in

10   week two worked 3.9 --

11   A.    I agree with the documents.

12         THE COURT:  Wait.  Let her finish the question.

13   EXAMINATION BY MS. VASQUEZ:

14   Q.    Would you agree with me that Erin Lawrence worked

15   3.92 hours of overtime on --

16   A.    I agree with this document.  Whatever it says is correct.

17         THE COURT:  Please let her finish the question.

18         THE WITNESS:  I thought she did.

19         THE COURT:  No, she was going to give the date, I

20   believe.

21              Were you?

22         MS. VASQUEZ:  Yes.

23   EXAMINATION BY MS. VASQUEZ:

24   Q.    -- on the date range that it says there, April 5, 2014,

25   through April 18, 2014; is that correct?

*OFFICIAL TRANSCRIPT*

1    A.    Sorry about earlier.  Yes, I do.

2    Q.    Okay.  Is it your understanding that Ms. Lawrence was paid

3    straight time of 2.13, $2.13, for these 43 hours and 92?

4    A.    Yes.

5    Q.    Was that based upon your impression that the tip pool

6    covered the overtime?

7    A.    Absolutely.

8    Q.    Like you had testified earlier, you had not talked to an

9    attorney -- or did you talk to an attorney about that --

10   A.    No.

11   Q.    -- particular issue?

12   A.    No.  No.  No.  If I would have, we wouldn't have been here

13   regarding this issue.

14   Q.    Did you talk to anyone from the Louisiana Restaurant

15   Association about that issue?

16   A.    No, I did not.

17   Q.    Did you talk to anyone in any state regarding how you were

18   going to do -- how you were calculating and paying overtime in

19   this restaurant?

20   A.    No, I did not.

21   Q.    Why not?

22   A.    I thought I knew.

23   Q.    Now, you also -- I don't know if you heard this, so let me

24   refresh your recollection.  Do you recall Mr. Hunt saying that

25   you also employed some people that were here under a tourist

*OFFICIAL TRANSCRIPT*

1    visa?

2    A.    Yes.

3         MR. CUPP:  I object to the relevance, Judge, of this

4    line of questioning.

5         MS. VASQUEZ:  I'm just trying to make it go to

6    willfulness or bad faith overall in their payment structure.

7         THE COURT:  Overruled.

8    EXAMINATION BY MS. VASQUEZ:

9    Q.    Do you recall Mr. Hunt testifying that you --

10        THE COURT:  But I will say, if you want to talk to your

11   client about his testimony and whether he has any

12   Fifth Amendment rights, then I'll allow you to have an

13   opportunity to do that.

14        MR. CUPP:  I will say, today was the first day I had

15   ever heard of any sort of Costa Rican issue and some sort of

16   visa issue.

17        THE COURT:  Why don't you tell me more about how it's

18   related, why it's relevant --

19        MS. VASQUEZ:  Because it goes to the method and

20   administration of their payment structure in general of the

21   restaurant.  If they did other acts, similar acts that were not

22   particularly legal, then I think that under the totality it

23   would go to whether this person is in good faith or whether

24   this person acted recklessly, which is one of the elements that

25   we're trying to prove.

*OFFICIAL TRANSCRIPT*

1          THE COURT:  But it's not -- it doesn't have anything to

2     do with -- directly with these people's overtime pay or minimum

3     wage claim?

4          MS. VASQUEZ:  No, it doesn't.  It's just to the other

5     acts that -- it's not character evidence.  It would be other

6     acts under -- so it would be 404(b), admissible for other

7     purposes, such as proof of motive, opportunity, intent,

8     preparation, plan, knowledge, is why I'm asking it, identity,

9     absence of mistake.

10          THE COURT:  Mr. Cupp, do you want to respond?

11          MR. CUPP:  Yes.  Your Honor, this particular

12     evidentiary section deals with notice in criminal case.

13     Certainly we're not dealing with a criminal case here.  And not

14     only that, but the foundation for the question comes from a lay

15     witness who wants to testify that there is some -- that there

16     was something sketchy in some regard with respect to bringing

17     somebody over from Costa Rica where they had a restaurant and

18     they were trying to open a restaurant in New Orleans.  It's

19     completely irrelevant to the issues in this case.  And we would

20     submit that line of questioning is improper.

21          MS. VASQUEZ:  We have not -- my first question was, did

22     you hear it and is it true?  And if it's true, I would like to

23     know -- you know, that would go to the whole exclusion for

24     character evidence section.

25          THE COURT:  I think that that's kind of far afield from

1   our inquiry today, so I'm going to sustain the objection.

2          MS. VASQUEZ:  Okay.

3   EXAMINATION BY MS. VASQUEZ:

4   Q.   Could you, for the record, list your Social Security

5   number.

6   A.   Mine?

7   Q.   Yes, please.

8   A.   ███████  --

9          MR. CUPP:  Objection, Your Honor.

10          THE COURT:  I don't know why that -- why is that

11   relevant?

12          MS. VASQUEZ:  It's relevant just in the event --

13   well --

14          THE COURT:  We'll deal with that later.

15          MS. VASQUEZ:  Okay.  That's fine.

16          THE COURT:  I just don't put people's Social Security

17   numbers.  And to the extent that it got in there, we'll strike

18   it.

19          MS. VASQUEZ:  Okay.  That's fine.

20          THE COURT:  (Addressing the court reporter.)  How do I

21   get it off the record?

22          THE COURT REPORTER:  I can redact it.

23          THE COURT:  All right.  It's redacted.

24          MS. VASQUEZ:  Can I have a minute to consult with

25   Ms. Catlett just to make sure I asked all the questions?

*OFFICIAL TRANSCRIPT*

1            THE COURT:  Yes.

2            MS. VASQUEZ:  I have no more questions.

3            MR. CUPP:  Your Honor, I would like to reserve

4    Mr. Itamar for my case in chief tomorrow -- Mr. Levy, in this

5    case.

6                 One of the issues we have is that we believe

7    there were additional documents -- there are additional

8    documents produced that we had Bates stamped that go to this

9    issue, and I would like to have the time, the preparation to be

10   able to confirm that before I put Mr. -- well, he won't be

11   long, in any event, tomorrow, but I think I have a right to ask

12   to put him on in my case in chief rather than to question him

13   now.

14           THE COURT:  Well, I'm going to let you do that, but --

15   because we didn't specifically discuss this, to my

16   recollection, at the pretrial conference.  But if you have

17   other cases with me, don't expect it.  I usually let people do

18   one.  But under the circumstances, since I didn't warn you

19   ahead of time, I'm going to let you call him in your case in

20   chief.

21                So I'm interested in the -- I don't really

22   understand yet what was produced and what wasn't and whether

23   these -- because -- you know, whether there were gaps.  You

24   know, the plaintiffs' counsel has said they produced for these

25   time periods with these gaps.  2016, that's the year suit was

*OFFICIAL TRANSCRIPT*

1    filed.

2          MR. CUPP:  May we have sidebar on this?

3          THE COURT:  Yes.

4          (WHEREUPON, at this point in the proceedings, there was

5    a conference held at the bench.)

6          THE COURT:  Who don't you want to hear this?  We don't

7    have a jury.  I'm not sure why we're up here.

8          MR. CUPP:  I didn't want Itamar to hear.

9          THE COURT:  Okay.

10         MR. CUPP:  Okay.  But we have documents that we already

11   produced, the 1709 Bates stamped here through 1760, that do

12   contain the time punches for your workers during that time

13   period.

14         THE COURT:  Which time?  The entire three years?

15         MR. CUPP:  This was 3/27/15 -- this document here is

16   3/27/15 through 3/12/16.

17         MS. VASQUEZ:  Can I just look at the Bates numbers on

18   that real quick?

19         THE COURT:  1709 through 1760.

20         MR. CUPP:  1709 through 1760.  It was 52 pages.

21         MS. WRIGLEY:  Judge, I also want to add that the reason

22   that the records end in early '16 is because that is the last

23   date that any of the plaintiffs worked for Doris, and so they

24   didn't work, you know, all through 2016, such as there are all

25   these records that existed, but I believe that the records were

**OFFICIAL TRANSCRIPT**

1    produced to that point.

2            THE COURT:  What did I certify the class as, through --

3    I can't remember, through --

4            MS. WRIGLEY:  It was bartenders with overtime.

5            THE COURT:  I excluded them.  But then I certified the

6    class for the --

7            MS. WRIGLEY:  For the minimum wage?

8            THE COURT:  Yes.

9            MS. WRIGLEY:  It's servers and server assistants who

10   worked --

11           THE COURT:  From what to what?

12           MS. WRIGLEY:  Oh, gosh.  I could have told you if you

13   had not asked me.  I'm not sure.

14           THE COURT:  Do you recall when we did the order

15   certifying the class, what time period it was?  I just did it

16   over the weekend.

17               I didn't give a time period.  I can't remember,

18   is it three years back usually from the date suit is the filed,

19   is it the three years?  And then it stops --

20           MR. CUPP:  It would have been October 25, 2013, is when

21   the restaurant opened -- excuse me, 2013 is when the restaurant

22   opened.

23           THE COURT:  Suit was filed --

24           MS. CATLETT:  March of 2016.

25           MR. CUPP:  March 31st.

                          ***OFFICIAL TRANSCRIPT***

1          MS. CATLETT:  The whole time they were open.

2          THE COURT:  Until the date they filed suit.

3          MS. VASQUEZ:  Those may have 2015 information, which

4    I'm going to double-check.  That's still not 2013 information.

5          THE COURT:  And the beginning of 2016.

6          MS. VASQUEZ:  2013, in the beginning.

7          THE COURT:  He didn't file suit until April?

8          MS. CATLETT:  March.

9          THE COURT:  March 31, 2016.

10          MR. CUPP:  The issue, Judge, when you certified the

11    class --

12          THE COURT:  I conditionally certified it a long time

13    ago, and then I recently said --

14          MR. CUPP:  You conditionally certified it, because that

15    was part of our objections to the evidence that you overruled

16    us on, but when you -- they put overtime claims in their

17    lawsuit and asked for you, at the very beginning, to certify an

18    overtime claim, you rejected that.

19          MS. CATLETT:  For every hourly employee.

20          THE COURT:  When they first asked for the class, they

21    said we want a class for all hourly employees and who were paid

22    as an hourly employee in the past three years and were not paid

23    overtime.  First they asked for that, for all.  Then I

24    certified it only for bartenders.

25          MR. CUPP:  Only bartenders.

*OFFICIAL TRANSCRIPT*

1      THE COURT:  Right.  But then -- and then you settled

2  that, so that was the only named plaintiff and that went away.

3           But when I looked back at the complaint, they

4  still had -- the other hourly workers were included, you know,

5  their overtime, so that's why I said I'm not certifying the

6  class for them, but I don't want to hold two trials on this

7  either, so I'll let them make their overtime claims.

8      MR. CUPP:  As far as the individual claims were

9  concerned.

10      THE COURT:  Yeah.

11      MR. CUPP:  I understand that.

12           But when we got around -- you know, keep in mind,

13  discovery wasn't served on us in this case -- first of all,

14  everybody waived initial disclosures.  Discovery wasn't served

15  on us until two and a half weeks to three weeks before the

16  initial discovery deadline in this case, 16 months after the

17  case started.

18      THE COURT:  He should have gotten from you or previous

19  the counsel an instruction that he needed to preserve --

20      MR. CUPP:  He did for the bartenders.

21      THE COURT:  Well, he should have read the complaint

22  more carefully.

23      MR. CUPP:  We did, because we had all the information

24  for the bartenders.

25      THE COURT:  Why would you let any of that information

*OFFICIAL TRANSCRIPT*

1   go?

2          MR. CUPP:  I didn't know it at the time.  When

3   discovery was served upon us and we went back and tried to pull

4   it, that's when he informed us that the system no longer had

5   it.  We did inform opposing counsel of that, and we produced

6   what we had.

7          THE COURT:  But my point is, they should have just

8   saved it for all of them for that time period because of the

9   overtime.  And their complaint said overtime for all hourly

10  workers, so it should have been preserved.

11               Are you saying, we produced it all or we didn't

12  produce it all?

13         MR. CUPP:  I'm saying we produced what we had.

14         THE COURT:  Well, I guess they admit that.

15         MR. CUPP:  No, they're not, because they are saying

16  that we didn't produce anything up to March or something of

17  2016.

18         MS. VASQUEZ:  (Speaking simultaneously.)  You didn't

19  have anything --

20         MR. CUPP:  And we did produce that.  It's right here.

21  It's Bates stamped.

22         MS. VASQUEZ:  (Speaking simultaneously.)  2013 is a

23  definite no.  I can tell you that.  I just need to double-check

24  that.  I'm not doubting that they produced it, but there must

25  have been a -- we need to double-check it.

**OFFICIAL TRANSCRIPT**

1    MR. CUPP:  We don't dispute, Judge, the two months in

2  2013.

3    THE COURT:  That you didn't have it.

4    MR. CUPP:  Yeah, we didn't have that at the time that

5  we went back.  We couldn't get that any longer.

6    MS. VASQUEZ:  There was one further question that I

7  need to ask him because the server checkout sheets look the

8  same way.  They are missing several checkout sheets.  There is

9  already testimony that came in on that, but I was going to ask

10  him about it as well.  What happens to it after it gets to the

11  office?  Does it get destroyed?  What happens?

12    THE COURT:  All right.  So in the morning when you all

13  come back, why don't you tell me what was asked for and what

14  was produced and what's missing.  Make sure you all have

15  communicated about it.  All right?

16    MS. VASQUEZ:  Yes, ma'am.

17    MR. CUPP:  So at this point you're going to -- what are

18  you going to allow as far as the further testimony from -- oh,

19  you're done with Itamar, right?

20    MS. VASQUEZ:  I have that one further questions about

21  the server checkout sheets and then I'll be done.

22    MR. CUPP:  Then I will reserve until tomorrow because

23  we need to track this down first.  I need to go back and look

24  and see what happened historically in this case.

25    THE COURT:  Right.  So you'll have an opportunity to do

*OFFICIAL TRANSCRIPT*

1   that tonight, and you'll have time to call another witness.

2             MS. VASQUEZ:  Okay.  Thank you, Judge.

3             (WHEREUPON, at this point in the proceedings, the bench

4   conference concluded.)

5             MS. VASQUEZ:  May I proceed, Your Honor?

6             THE COURT:  Yes.

7   EXAMINATION BY MS. VASQUEZ:

8   Q.    What happened to those server checkout sheets after they

9   went up to the office?

10  A.    They were being reviewed against the sales.  And --

11  Q.    Are those maintained for a period of time?

12  A.    You know, we maintained them -- my understanding, that it

13  needs to be maintained for around three years.  Look, it's

14  different now.  As we move on, as we -- as we stay in business

15  longer, as we practice, we get better.

16            Now -- now we are set more on a cloud.  There is

17  information that stays there longer.  And we don't have to

18  count on pieces of paper being put in a manila envelope.  So a

19  certain date we moved to a slightly different system.  It's

20  similar.  Improved everything that we could.  And now I think

21  records are staying longer.  I hope so.  You don't know,

22  something can crash and then you lose documents.

23  Q.    You would agree with me, though, that not all of the

24  server checkout sheets were produced over to us in this

25  litigation, right?

**OFFICIAL TRANSCRIPT**

1   A.   I take your word for it.  I don't remember everything that

2   was produced, and I definitely don't know what you're missing.

3   Q.   Okay.  Would you agree with me that not all -- some server

4   checkout sheets either get discarded or overtime misplaced?

5   A.   That is logical, yes.  I'm not sure of a specific one, but

6   I would agree that that can happen.

7   Q.   Would you agree that you, as of right now, you do not have

8   all the server checkout sheets from the time that the

9   restaurant opened to March 2016?

10  A.   When you say *server checkout sheets* --

11  Q.   Yes.

12  A.   -- what are you referring to exactly?

13  Q.   I will show you.  I'm going to point to Exhibit 5,

14  Bates stamp 0601, 601.  This is what I'm referring to for

15  *server checkout sheets* or *server reconciliation, tip*

16  *reconciliation forms*.

17  A.   I am not a hundred percent.  Are you missing any of those?

18  Q.   I would represent to you that we are.  And I'm asking you,

19  do you have a complete copy of every single month -- or every

20  single day, a.m. and p.m. shifts, from October 2013 to March of

21  2016?

22  A.   I'm not sure.  I mean, from the top of my head, I can't

23  answer that.  I assume that some are missing.  It's just almost

24  the way of paperwork.  I can't -- if you ask me about anything

25  specific, I definitely cannot answer that at this point.

*OFFICIAL TRANSCRIPT*

1    Q.    And you were mentioning something about the cloud, so do

2    you no longer use this form?

3    A.    No.  We use a different form.

4    Q.    Is that form maintained in the cloud?

5    A.    Yes.

6    Q.    So these forms were not maintained in the cloud from 2013

7    to 2016; is that right?

8    A.    No.  I mean, they are all scanned and we were supposed to

9    have them all.  How come we're missing here and there, I'm not

10   really sure.

11   Q.    Is there anyone that would -- is in charge of keeping them

12   together and recording them or putting them away somewhere in

13   the office?

14   A.    Yes.  But that has changed four times already.

15   Q.    And is that turn over from staff?  Four times, you said?

16   That has changed four times?

17   A.    Yes, we had -- we had --

18   Q.    What do you mean by that?

19   A.    I had three -- there's a fourth person in the office who

20   handles this paperwork now over the past four and a half years.

21          MS. VASQUEZ:  Okay.  I have no more questions.

22          THE COURT:  Thank you, Mr. Levy.  You'll come back to

23   the stand in connection with the plaintiffs' case in chief.

24          THE WITNESS:  Thank you.

25          THE COURT:  Please call your next witness.

**OFFICIAL TRANSCRIPT**

1          Who is your next witness?

2          MS. VASQUEZ:  I'm calling Erin Lawrence.

3          THE DEPUTY CLERK:  Would you please raise your right

4     hand.  Do you solemnly swear that the testimony which you are

5     about to give will be the truth, the whole truth and nothing

6     but the truth, so help you God?

7          THE WITNESS:  I do.

8                          **ERIN LAWRENCE**

9      was called as a witness and, after being first duly sworn by

10     the Clerk, was examined and testified on her oath as follows:

11          THE DEPUTY CLERK:  Please state and spell your name for

12     the record.

13          THE WITNESS:  Erin Lawrence, E-R-I-N, L-A-W-R-E-N-C-E.

14                       DIRECT EXAMINATION

15     BY MS. VASQUEZ:

16     Q.   Okay.  Erin, how long did you work at Doris Metropolitan?

17     A.   Right about two and a half years.

18     Q.   What years are those exactly?

19     A.   I started in about February 2014 until.

20     Q.   Until.  Okay.

21          THE COURT:  Until when?

22          THE WITNESS:  Two and a half years after that, so...

23     EXAMINATION BY MS. VASQUEZ:

24     Q.   Would that have been in 2016?

25     A.   Right around there.

                      *OFFICIAL TRANSCRIPT*

1  Q.    Let's see if I can refresh your recollection real quick.

2  Does your last date of employment -- was it February 10, 2016?

3  A.    That sounds about right.

4  Q.    How did you get hired?

5  A.    I heard about the job through Marcus and I went in to have

6  an interview with Stavros?

7  Q.    And what happened during the interview?

8  A.    We had a very short, casual interview.  He told me that --

9  about the restaurant.  He told me it was a pooled house

10  restaurant and if I was familiar with a pooled house

11  restaurant.  And I told him yes, I was.  I worked in pooled

12  houses before.  And then he hired me on the spot.

13  Q.    He hired you on the spot?

14  A.    On the spot.

15  Q.    Did he consult with anyone before hiring you?

16  A.    No, ma'am.  I only had -- talked with Stavros and nobody

17  else was consulted.

18  Q.    Did he step away from his talk with you and call or text

19  someone?

20  A.    No, ma'am.

21  Q.    What were your duties as a server?

22  A.    I would come in and set up my section that had been

23  assigned as to me by a manager.  I would polish the silverware.

24  I would set the whole thing up.  Once the guests started coming

25  in after our meetings, we would talk to the guest, take the

*OFFICIAL TRANSCRIPT*

1   orders, put the orders in, run the food, normal day-to-day

2   activities.  At the end we would do our side work and then been

3   done with our shift.

4   Q.   Who were the managers while you worked there?

5   A.   It started off, Stavros.  And then we had Alise come in.

6   And then there was Ryan.  Then Dontay was promoted.

7   Q.   What about the person that testified earlier today?

8   A.   Oh, Melissa.  Yeah, Melissa was there as well.

9   Q.   Did they all have the same title when you were working

10  there?

11  A.   They were known as managers.

12  Q.   Were they known as service managers?

13  A.   I've never heard service manager before.

14  Q.   Were they known as floor managers?

15  A.   I've never heard floor manager before.

16  Q.   Were they known as service captains?

17  A.   Never heard service captain before.

18  Q.   Did the managers have keys to the restaurant?

19  A.   Yes, ma'am.

20  Q.   Did they supervise the dishwashers to your knowledge?

21  A.   To my knowledge, they had supervision over the

22  dishwashers.

23  Q.   What exactly does that mean to the extent that you know?

24  A.   That they made sure they were there.  I believe they had

25  some scheduling to take care of as well.

*OFFICIAL TRANSCRIPT*

1    Q.    Did any of the managers perform side work?

2    A.    Not that I've seen.

3    Q.    Is it your understanding that managers made the schedules?

4    A.    Yes, they did make the schedules.  Managers made the

5    schedules.

6    Q.    And as you heard the Melissa testify earlier, were those

7    schedules posted on Friday?

8    A.    I believe they were posted on Friday to the best of my

9    knowledge.

10   Q.    If you wanted to change schedules, you would log into an

11   application?

12   A.    When I first started, we had a paper sheet that was run by

13   the managers, and then once we moved to Schedulefly, yes, we

14   would log on to the app.

15   Q.    On that paper sheet, was there an area that would allow

16   approval or disapproval of any changes in shifts?

17   A.    Yes, ma'am.  It was a handwritten sheet, and so it was all

18   handwritten.

19   Q.    Who would approve or not approve schedule changes?

20   A.    The managers.

21   Q.    Those would have been those people that you listed

22   earlier; is that right?

23   A.    Uh-huh (affirmative response).

24   Q.    Is that a yes?  I'm sorry.

25   A.    Yes, ma'am.

*OFFICIAL TRANSCRIPT*

1   Q.    Did managers maintain the server checkout sheets?

2   A.    Yes, ma'am.

3   Q.    So would you agree with the testimony that you heard

4   earlier from Ms. Rogers that the servers then submitted the

5   credit card tips, the cash over to the manager and the manager

6   would record that in the server checkout sheets?

7   A.    Yes, ma'am.

8   Q.    Do you know who calculated the amounts in the server

9   checkout sheet?

10  A.    The manager of the shift that day or evening.

11  Q.    Were the managers in charge of the air conditioner if it

12  was too cold or too hot?

13  A.    The managers were in charge of pretty much the whole is

14  restaurant, yes.  Air conditioning included.

15  Q.    Okay.  Did there come a time where they controlled whether

16  there was going to be service charges on a table or not?

17  A.    Yes.  If we wanted service charges to be on there, we

18  would have to ask the manager to do that for us.

19  Q.    And was there a situation with a manager named Alise

20  regarding her position?

21  A.    Yes.  Alise was, for a very small period of time, a server

22  and a manager both.  She was doing both jobs.  Then she was

23  told she could not pick up server shifts anymore while she was

24  managing because it was getting confusing.

25          MR. CUPP:  I object to the hearsay.

*OFFICIAL TRANSCRIPT*

1          MS. VASQUEZ:  I'm just going to object and say it's an

2     opponent-party statement as she was a manager of Doris

3     Metropolitan during the time.  It's an exception.

4          THE COURT:  She was told by Alise?  Did we hear who

5     told her?

6          MS. VASQUEZ:  Yes, who was the manager.

7          THE COURT:  Is that's who told you is Alise?

8          THE WITNESS:  Yes.  We had a quick discussion about it.

9     A very brief discussion.

10         THE COURT:  I'm going to overrule the objection.

11         MS. VASQUEZ:  Go ahead.

12         THE WITNESS:  So she was told she couldn't pick up

13    server shifts anymore because it was getting confusing for the

14    customers.  If there was an issue that arose, then you only had

15    a server come face to face with the table and they wanted to

16    see a manager.

17    EXAMINATION BY MS. VASQUEZ:

18    Q.   So there was a distinct -- there was a distinct line drawn

19    between a manager and a server?

20    A.   Absolutely.

21    Q.   That was for -- for one reason, that was in order to let

22    the customer know that there was a person with additional

23    authority above the level of server; would you agree with that?

24    A.   I would agree with that.

25    Q.   Were you told -- tell me a little bit about the Monday

*OFFICIAL TRANSCRIPT*

1   meetings.  Were those mandatory Monday meetings for you?

2   A.    They were mandatory.

3   Q.    Were you told to clock in during the mandatory meetings?

4   A.    I was not told to clock in and I was not told not to clock

5   in.  It was not discussed.

6   Q.    Who handled or maintained the e-mails regarding the

7   mandatory meeting?

8   A.    The managers did.

9   Q.    That was through the -- the Schedulefly application?

10   A.    Schedulefly.

11   Q.    Did you ever get a copy of the employee manual?

12   A.    Not to my knowledge.

13   Q.    Do you know -- are you aware of any policy against

14   overtime?

15   A.    I'm not aware of any policy against overtime.

16   Q.    I'm going to have you look at this real quick.  I'm going

17   to refer to Exhibit 3, and this is going to be Bates -- oh, I'm

18   sorry, Exhibit 2.  Exhibit 2.  And it's -- I'm sorry, hold on.

19   Let me get the Bates number so can be exact on that.

20          It's going to be Bates number 1010 through 1017.  So

21   this is 1010.  1010, Exhibit 2.

22          Do you see where the highlighted yellow portion is on

23   the exhibit?

24   A.    I do.

25   Q.    That is for a pay period of April 18, 2014 to April 23,

*OFFICIAL TRANSCRIPT*

1  2014; is that correct?

2  A.   That's what it looks like, yes.

3  Q.   Would you agree with me, if you multiply that 78.24 times

4  2.13, you would get what your check amount was, which is

5  166.65?

6  A.   That seems about right.

7  Q.   Now I'm going to refer to Bates-1676 of that same exhibit,

8  and as we saw earlier, the -- this is the same pay period

9  4/18/2014.  Do you see there where it says *W-2* for week 2?

10  A.   Yes, ma'am.

11  Q.   You worked 3.92 hours in overtime during that pay period;

12  is that correct?

13  A.   That's what it looks like, yes, ma'am.

14  Q.   If you add the week one and week two, you get 78.24, is

15  that -- to the best of your knowledge, do you think that is

16  correct?

17  A.   I'll take your word for it, yes, ma'am.

18  Q.   So that would match up with the record that we saw earlier

19  of 78.24 hours at the 2.13 rate.  Does that sound right?

20  A.   Yes, ma'am.

21  Q.   There's a few instances where that happens in your check

22  history where you're paid 2.13 for some hours where you may

23  have worked some overtime during week one or week two.  Do you

24  recall that happening to you?

25  A.   I'm sure that happened multiple times.

*OFFICIAL TRANSCRIPT*

1    Q.    I want you to take a look at Exhibit 6, Bates stamped 09

2    and -- 0909.  This is a document that contains -- it's a

3    spreadsheet that we've created in this case that starts on

4    March 7, 2014.  Does that look like around the period where you

5    started working at Doris Metropolitan?

6    A.    That sounds about right.

7    Q.    Okay.  If you go over to the corner where it has -- to the

8    column, second-to-last column, where it says *Unpaid Overtime*,

9    you see numbers put into the unpaid overtime.  Do you see that?

10   A.    I do.

11   Q.    That's the amount of overtime that you were not paid

12   versus the hours of overtime, which is two columns to the

13   left -- to the left of that; is that right?

14   A.    That's what it looks like.

15   Q.    In the column next to Monday meetings is the total hours

16   that you worked for that two-week pay period; is that right?

17   A.    That's what it looks like.

18   Q.    Did you attend every Monday meeting?

19   A.    I attended most Monday meetings unless I had a previous

20   obligation, which I informed the manager that I wouldn't be

21   able to be there.

22   Q.    So for most of these meetings that are listed here, you

23   would have likely attended most of them?

24   A.    Most of them, definitely.

25   Q.    Let's switch over to the second page of this report.  And

*OFFICIAL TRANSCRIPT*

1   do you see the end date where it has February 15th, 2016?  Do

2   see that?

3   A.   Yes, ma'am.

4   Q.   That would have been around the last day that you stopped

5   working there; is that correct?

6   A.   Okay, that looks about right.

7   Q.   So underneath that first column is the amount -- that the

8   Monday meetings would have occurred at about an hour and a

9   half.  Did the Monday meetings last about an hour and a half?

10  A.   An hour to an hour and a half.

11  Q.   Then the column next to last where it says *71.39*, that

12  would be the amount of overtime that you were not paid.  Does

13  that look like it's about right?

14  A.   Yes.  Yes.  Uh-huh (affirmative response).

15  Q.   As we -- under the law, you would be entitled to minimum

16  wage calculation.  And we probably -- we previously discussed

17  it, but we calculate that to be this number, correct?

18  A.   Correct.

19  Q.   What is that number for the record?

20  A.   15,117.62.

21  Q.   $15,117.62; is that correct?

22  A.   Yes, ma'am.

23        MS. VASQUEZ:  Okay.  I have no more questions.

24                        CROSS-EXAMINATION

25  BY MR. CUPP:

*OFFICIAL TRANSCRIPT*

1  Q.   Ms. Lawrence, I'm Steve Cupp.

2  A.   Hi.

3  Q.   You've been here all day, right, listening to the

4  testimony?

5  A.   I've been here, yes, sir.

6  Q.   You've listened to all of the testimony today, correct?

7  A.   Yes, sir.

8  Q.   When you say that you attended most of the meetings, give

9  me -- 70 percent?

10  A.   I would say 75 to 90 percent.

11  Q.   You don't know?

12  A.   No.  I'm guessing.  I was there as many times as I could

13  be.

14  Q.   But admittedly you're guessing?

15  A.   Yes.

16  Q.   You worked mostly -- you worked all the time as a server

17  or did you have another position?

18  A.   I only worked as a server there.

19  Q.   Going back to the Monday meetings, I keep hearing it from

20  the witnesses' testimony, "Oh, it may be an hour.  It could be

21  an hour and a half."  You just don't remember?

22  A.   It depended on the week.  Sometimes the meetings, we had

23  more to cover.

24  Q.   Did you punch in?

25  A.   I did not at first and then I started to punch in.

*OFFICIAL TRANSCRIPT*

1    Q.    Did anybody tell you not to?

2    A.    Nobody told me not to; nobody told me to.

3    Q.    Did you understand that you were supposed to get paid for

4    those meetings?

5    A.    I would assume if you're at work, you get paid.

6    Q.    And did anybody at the restaurant tell you that?

7    A.    No.

8    Q.    Did anybody at the restaurant tell you that you weren't

9    supposed to get paid for those meetings?

10   A.    None of this has been discussed.

11   Q.    None of it was discussed with anybody at the restaurant,

12   correct?

13   A.    With me.

14   Q.    That's what I'm saying, with you?

15   A.    Right.

16   Q.    Which service manager did you work mostly with?

17   A.    There is no way to say that.  I worked with all of them.

18   They would go in and out.  Some would be servers sometimes,

19   some would be managers sometimes, so.

20   Q.    What time -- to the best of your recollection, what time

21   would the service managers show up at the restaurant for

22   service?

23   A.    The service managers would get there on lunches, right

24   about the time the servers showed up, sometimes before.  And

25   then on dinnertime, I believe they showed up before the

*OFFICIAL TRANSCRIPT*

1    servers, and we would get there about four o'clock.

2    Q.    Do you know how much before the servers?

3    A.    I don't know.  I wasn't there.

4    Q.    The restaurant would be open well before 3:30, correct?

5    A.    For dinnertime.

6    Q.    In fact, let's take a day that wasn't a lunch day.

7          Let me ask a better question.  During your work

8    history with Doris, was it open for lunch?

9    A.    We were open for lunch for some of the time that I worked

10   there.

11   Q.    Was it all week for lunch?

12   A.    I don't think so.

13   Q.    Was it just Fridays for lunch?

14   A.    To the best of my knowledge, we did weekend lunches while

15   I was there.  To the best of my knowledge.

16   Q.    Did you work lunch or did you work dinner?

17   A.    I would sometimes work both.

18   Q.    That would be on the same day?

19   A.    Yes.  I've worked doubles before.

20   Q.    Now, on a non-lunch day, when the restaurant wasn't open

21   for lunch, do you know what time the restaurant opened in order

22   to prep for the evening shift?

23   A.    I had to be there at four o'clock, so I just showed up at

24   4:00.

25   Q.    At that point the restaurant was already open, correct?

*OFFICIAL TRANSCRIPT*

1    A.    I walked into an open restaurant, yes.

2    Q.    The kitchen is preparing for dinner, right?

3    A.    Yes.

4    Q.    Do you know what time anybody else had to show up?

5    A.    No.

6    Q.    Would you agree that the service to the customer is of

7    paramount importance at Doris?

8    A.    I would agree with that.

9    Q.    That's one of the lynchpins -- that's what makes it a

10    successful restaurant, one of the things, right?

11    A.    It's what insured me to keep my job.

12    Q.    You made good money at your job, right?

13    A.    I did.

14    Q.    Of course, that's combined, you have to have good food in

15    order to get the customers in, right?

16    A.    Yes.  They provided great food.

17    Q.    Okay.  So great food and great service, correct?

18    A.    Yes.

19    Q.    Now, when you worked for another pooled house, I think you

20    indicated earlier, which pooled house was that?

21    A.    This was back in Texas.

22    Q.    Did you ever work at any other pooled house in the

23    New Orleans area or French Quarter?

24    A.    Not before Doris, no.

25    Q.    So when you came in, the pooled house concept was

*OFFICIAL TRANSCRIPT*

1    explained to you, correct?

2    A.    It didn't have to be explained to me.  We discussed what

3    it was.  I mean, he said that, "We all pool our tips."  And I

4    was like, "Yes.  That's what pooled houses do."

5    Q.    Because that allows you -- everybody shares equally?

6    A.    Right.

7    Q.    Now -- at least the servers, correct, and the server

8    assistants shared equally?

9    A.    Exactly.

10   Q.    Now, is it your testimony today that the service managers

11   performed no table service at the tables?

12   A.    They provided very little, very little table service --

13   Q.    Okay.

14   A.    -- the managers provided.

15   Q.    So I think you -- they didn't sell wine?

16   A.    Melissa would talk to VIP tables and larger parties about

17   wine sales.

18   Q.    So they were engaged in table service?

19   A.    In some tables, yes.

20   Q.    Just not necessarily yours?

21   A.    Not necessarily all the tables, no.

22   Q.    Right, because you have maybe two service managers in

23   there trying to service all the tables, right, so they can't

24   get to all of them all the time?

25   A.    The managers -- will you rephrase that, please?

**OFFICIAL TRANSCRIPT**

1   Q.   So how many service managers would you have in there?

2   A.   Depending on the night, usually two.

3   Q.   How many servers would be there?

4   A.   Depending on the night -- what did we have -- maybe seven.

5   I'm guessing.  I'm thinking back.

6   Q.   So I understand what you're saying is the servers would

7   provide the primary duty at the table and the server

8   assistants, correct?

9   A.   Yes.  Definitely.

10   Q.   But certainly the service managers would get to the table

11   and engage in customer interaction at the table in order to

12   make the dining experience the best that it can be for that

13   customer; is that correct?

14   A.   They did just as much as any managers at any other

15   restaurant would do.

16   Q.   Well, you're basing your experience on the one in Texas?

17   A.   On the many restaurants that I've worked at in the past.

18   Q.   What other restaurants have you worked at in New Orleans?

19   A.   I started at Luke.  And then I went to SoBou.  I worked at

20   a restaurant out in Metairie for a period of time.

21   Doris Metropolitan, Cavin.

22   Q.   Were any of those restaurants pooled houses?

23   A.   Doris was.  Cavin was.  Yes.

24   Q.   Would it be fair to say that the dining experience that

25   was provided at Doris Metropolitan is unique in the level of

*OFFICIAL TRANSCRIPT*

1  customer service that's given to the patrons when they walk in

2  the door?

3  A.    I think that we all strived for excellence more at Doris.

4  Everybody strived for excellence at Doris.

5  Q.    So you would agree that it was unique in the sense that

6  there was significant emphasis placed on the service that was

7  given to the customers who walked into the restaurant?

8  A.    Yes.

9        MR. CUPP:  Nothing further, Your Honor.

10                      REDIRECT EXAMINATION

11 BY MS. VASQUEZ:

12 Q.    Was it unique because it was the only restaurant that

13 actually allowed managers to participate in the tip pool?

14 A.    Will you rephrase that, please?

15 Q.    Was it unique -- was the Doris Metropolitan approach

16 unique because it was one of the only restaurants that you had

17 worked at that actually tipped the manager?

18 A.    Yeah, I've never worked in a restaurant that tipped a

19 manager before except for Doris.

20        MS. VASQUEZ:  Thank you.

21        THE COURT:  All right.  Thank you.

22             So we will break for the night.  We'll start

23 again tomorrow at 9:00 a.m.  And we'll begin with you all

24 explaining to me what was produced and what wasn't.

25             Remind me, on the overtime claim, am I correct

                    *OFFICIAL TRANSCRIPT*

1    that the defendants -- it sounded like Mr. Levy, that they

2    admit that they didn't -- that they should have paid overtime

3    for the Monday meetings.  I thought I heard Mr. Levy say that

4    that was correct.

5         MR. CUPP:  No, not -- not for the Monday meetings.  The

6    overtime is based on a workweek basis.

7         THE COURT:  Well, that's one of the things we were

8    talking about, that how do you decide what the seven-day work

9    period is?  So what was your thought about that?

10        MR. CUPP:  Well, the seven day -- as I understand it,

11   the seven day work period was from Saturday -- it began on a

12   Saturday and ended on a Friday, seven days.

13             Under the Fair Labor Standards Act law, there is

14   no -- really -- well, there is no Louisiana state law dealing

15   with this issue, so under the federal FLSA an employer is

16   allowed to have the workweek for whatever seven-day period they

17   want it.  It could be Wednesday to Wednesday, Thursday to

18   Thursday.  However, it cannot be manipulated in such a way as

19   to try to change it every week to try to avoid an overtime

20   liability in that seven-day period.

21             So at Doris the workweek was from Saturday to

22   Friday.  It began anew on the next Saturday, and so it would

23   be -- yeah, there would be -- it would be the 40-hour standard.

24             The hours on the -- on the Monday meetings should

25   be counted within that, you know, to determine how many hours

*OFFICIAL TRANSCRIPT*

1    in that week, but there is no allegation in the complaint that

2    the Monday meetings were automatically overtime hours.  The

3    allegation in the complaint is that the Monday meetings, to the

4    extent they were paid at 2.13, should be paid at 7.25.

5         THE COURT:  All right.  So there is -- first, it's just

6    a minimum wage for those, and then for some of them, there is

7    also overtime?

8         MS. VASQUEZ:  That's correct.  So we don't -- we don't

9    disagree with that, what he just represented.

10            I just want to clarify that the issue with the

11   Monday meetings are the ones that did clock in, clocked in at

12   2.13 and should have been 7.25, so that's not an overtime

13   issue.  And then some --

14        THE COURT:  Wait.

15        MS. VASQUEZ:  So some of the employees that attended

16   the Monday meetings did clock in at the 2.13 rate, not the

17   7.25.  So that's the issue.  And then there is some that didn't

18   clock in at all that attended the meeting and should have been

19   paid for that meeting.

20            Apart from that, we have the overtime claim.  And

21   I'm going to make sure I clean it up this evening, but our

22   numbers we stipulated to, so to the extent that that might

23   speed things up, on the demonstrative exhibit, there is an

24   amount for overtime claims.  And that number has not -- to my

25   knowledge, it's been stipulated to.  So we're going through the

*OFFICIAL TRANSCRIPT*

1    elements right now.

2            THE COURT:  So is that still stipulated to, the amount?

3            MR. CUPP:  I'm going to have to check with Jackson on

4    that.  I know we had talked about that.  I kind of tired right

5    now and I can't really remember whether we did that, but we'll

6    clear that up this evening.

7            THE COURT:  Okay.

8            MR. CUPP:  I do want to make one distinction, though,

9    Judge, because there is no claim -- you had the Monday meeting

10   and then you also have the pre-shift meeting.  It's my

11   understanding that there is no claim being made that people

12   were improperly compensated at the pre-shift meeting.

13           THE COURT:  Is that correct?

14           MS. VASQUEZ:  We were unaware of the pre-shift meeting.

15   We counted that all as a Monday meeting.  But after hearing

16   testimony, we realize that people may have come in a little

17   earlier for a meeting and then started their shift.  So we're

18   not going to -- we don't intend to bring in evidence on that.

19           MS. CATLETT:  Your Honor, I was aware of the pre-shift

20   meetings in dealing with clients when I first signed them up

21   for this lawsuit, and it is my understanding, from speaking

22   with them and from my experience in the service industry, that

23   that's akin to side work, the pre-shift meeting, so that's not

24   something we're seeking compensation for.

25           MR. CUPP:  It's close enough related to the tip duty

*OFFICIAL TRANSCRIPT*

1    that they were engaged in to be allowed to be paid at the tip

2    rate.

3           THE COURT:  Apparently they are agreeing with you on

4    that.

5           MR. CUPP:  I just want to make sure we're clear on that

6    so I can consolidate down my testimony for tomorrow.

7           THE COURT:  All right.  Well, I'll see you all in the

8    morning.

9           MS. VASQUEZ:  Thank you.

10          THE DEPUTY CLERK:  All rise.

11          (WHEREUPON, at 4:54 p.m., the proceedings were

12   concluded.)

13                        *    *    *

14

15                 REPORTER'S CERTIFICATE

16

17          I, Cathy Pepper, Certified Realtime Reporter, Registered
     Merit Reporter, Certified Court Reporter in and for the State
     of Louisiana, Official Court Reporter for the United States
18   District Court, Eastern District of Louisiana, do hereby
     certify that the foregoing is a true and correct transcript to
19   the best of my ability and understanding from the record of the
     proceedings in the above-entitled and numbered matter.

20

21                           s/Cathy Pepper
                             Cathy Pepper, CRR, RMR, CCR
                             Certified Realtime Reporter
22                           Registered Merit Reporter
                             Official Court Reporter
23                           United States District Court
                             Cathy_Pepper@laed.uscourts.gov

24

25

                    *OFFICIAL  TRANSCRIPT*

1

## $

**$1,200** [1] - 9:13
**$1,500** [1] - 81:15, 81:17
**$1,800** [2] - 81:15
**$10** [1] - 120:12
**$10.06** [1] - 150:8
**$100** [2] - 9:14, 16:25
**$12,937.09** [1] - 149:23
**$128.62** [1] - 112:13
**$13,988.91** [1] - 45:6
**$130** [1] - 10:8
**$140** [1] - 77:17
**$15,117.62** [1] - 265:21
**$169.40** [1] - 169:20
**$2.13** [1] - 242:3
**$20** [1] - 195:10
**$200** [4] - 16:25, 202:14, 202:22, 203:1
**$236.53** [1] - 112:15
**$300** [1] - 81:18
**$4,891.15** [1] - 226:2
**$40** [1] - 202:25
**$5.44** [1] - 120:10
**$50** [1] - 212:3
**$500.25** [1] - 151:13
**$529.47** [1] - 145:22
**$600** [4] - 10:3, 10:5, 10:7, 77:17
**$61.79** [1] - 150:24
**$918.17** [1] - 45:8
**$929** [1] - 169:25

## '

**'13** [2] - 100:2, 111:7
**'14** [3] - 100:3, 100:13, 101:1
**'15** [3] - 100:3, 100:13, 101:1
**'16** [4] - 100:3, 100:13, 101:1, 247:22

## 0

**0601** [1] - 254:14
**073** [1] - 183:5
**074** [1] - 184:1
**09** [1] - 264:1
**0909** [1] - 264:2

## 1

**1** [24] - 1:10, 4:13, 5:15, 5:16, 44:9, 95:1, 95:5, 107:8, 129:4, 136:24, 138:3, 138:10, 138:19, 139:7, 146:12, 146:14, 146:15, 146:23, 147:1, 174:9, 182:4, 184:1, 228:24, 229:9
**1/12/14** [1] - 50:23
**1/12/2014** [1] - 50:8
**1/24/2014** [2] - 51:6, 51:19
**10** [18] - 6:6, 9:16, 11:10, 50:20, 50:21, 70:17, 92:25, 103:5, 174:25, 175:9, 176:20, 209:5, 235:6, 235:8, 235:10, 235:22, 236:12, 257:2
**1010** [3] - 262:20, 262:21
**1017** [1] - 262:20
**1029** [1] - 44:5
**1030** [1] - 44:5
**1042** [1] - 142:20
**1048** [2] - 120:16, 120:17
**1049** [2] - 120:14
**10:00** [1] - 192:9
**11** [1] - 86:10
**11:00** [1] - 192:9
**11:20** [1] - 91:9
**11:35** [1] - 91:7
**11th** [1] - 86:10
**12** [8] - 9:13, 19:3, 19:4, 45:9, 45:11, 129:5, 146:7, 146:9
**12,000** [2] - 151:1, 151:2
**12th** [1] - 86:10
**13** [5] - 53:16, 53:17, 70:5, 103:10, 147:23
**130** [2] - 3:11, 3:12
**14** [1] - 19:5
**140.47** [2] - 124:1, 124:3
**1414** [1] - 1:20
**14th** [1] - 130:17
**14TH** [1] - 1:24
**15** [5] - 41:19, 53:14, 81:16, 105:18, 105:25
**15,117.62** [1] - 265:20
**15-minute** [1] - 91:7

**150** [1] - 99:21
**154.42** [1] - 123:10
**155** [1] - 3:13
**15th** [1] - 265:1
**16** [2] - 53:14, 250:16
**166.65** [1] - 263:5
**1676** [1] - 241:9
**1677** [2] - 239:8, 239:11
**1685** [1] - 147:3
**169** [1] - 3:14
**1694** [1] - 147:21
**1695** [1] - 124:6
**17** [2] - 144:8, 144:21
**1708** [1] - 119:19
**1709** [3] - 247:11, 247:19, 247:20
**172** [1] - 3:15
**173** [2] - 3:16, 3:17
**1760** [3] - 247:11, 247:19, 247:20
**18** [6] - 118:1, 145:3, 148:17, 234:18, 241:25, 262:25
**18th** [3] - 117:11, 143:1, 225:20
**19** [1] - 148:25
**190** [1] - 3:18
**1:31** [1] - 172:7
**1st** [2] - 7:13, 44:24

## 2

**2** [28] - 43:20, 43:22, 43:23, 117:9, 117:12, 120:13, 122:17, 128:24, 129:1, 142:19, 146:3, 146:12, 146:19, 147:3, 147:6, 147:7, 147:12, 147:15, 147:21, 148:1, 148:2, 239:7, 239:10, 262:18, 262:23, 263:9
**2.13** [38] - 7:21, 11:14, 38:16, 38:17, 39:18, 39:20, 40:3, 40:16, 41:6, 41:8, 42:6, 45:13, 48:24, 61:3, 120:2, 120:5, 123:9, 124:3, 126:20, 141:5, 145:23, 150:4, 158:24, 159:2, 159:9, 167:21, 168:9, 216:11, 224:10, 229:11, 233:6,

242:3, 263:4, 263:19, 263:22, 274:4, 274:12, 274:16
**2.78** [3] - 147:18, 149:6, 150:7
**20** [11] - 12:14, 12:16, 20:8, 41:19, 41:20, 106:1, 134:12, 147:14, 158:4, 171:17, 203:1
**20-something** [1] - 120:12
**200** [2] - 133:4, 195:1
**2013** [34] - 7:13, 30:21, 43:18, 43:19, 48:11, 48:21, 50:2, 53:1, 53:5, 53:21, 54:1, 54:4, 54:11, 54:19, 55:4, 79:16, 80:14, 92:8, 94:6, 96:24, 100:12, 101:1, 116:22, 117:2, 237:13, 237:16, 248:20, 248:21, 249:4, 249:6, 251:22, 252:2, 254:20, 255:6
**2014** [62] - 7:15, 27:24, 28:1, 30:17, 30:18, 44:9, 44:18, 44:20, 44:24, 48:14, 49:24, 50:4, 50:12, 52:22, 52:23, 53:19, 55:8, 55:18, 55:19, 55:24, 59:1, 80:25, 94:6, 96:20, 96:24, 110:15, 117:6, 117:7, 117:10, 117:11, 118:1, 129:5, 130:16, 130:17, 131:10, 133:2, 143:13, 143:16, 144:8, 144:13, 146:7, 146:9, 146:22, 147:14, 147:23, 147:24, 148:17, 150:7, 216:2, 225:14, 227:13, 227:14, 227:16, 227:21, 239:17, 241:24, 241:25, 256:19, 262:25, 263:1, 264:4
**2015** [34] - 94:6, 96:25, 110:15, 116:22, 124:10, 138:9, 138:15, 144:15, 144:21,

144:23, 145:1, 145:3, 145:7, 148:20, 148:23, 183:17, 184:3, 213:17, 213:20, 216:3, 225:16, 225:20, 228:24, 238:16, 238:22, 239:16, 239:19, 239:21, 239:25, 240:5, 249:3
**2016** [23] - 96:25, 110:15, 116:22, 145:9, 148:25, 237:22, 238:17, 238:19, 239:20, 239:21, 240:1, 246:25, 247:24, 248:24, 249:5, 249:9, 251:17, 254:9, 254:21, 255:7, 256:24, 257:2, 265:1
**2017** [7] - 44:25, 93:15, 93:24, 101:13, 101:20, 214:5, 214:7
**2018** [5] - 1:6, 5:3, 103:10, 173:3, 213:21
**206.37** [1] - 187:19
**208** [1] - 3:19
**20th** [2] - 55:4, 55:6
**21** [4] - 148:23, 158:4, 161:16, 166:22
**210** [2] - 3:20, 3:21
**213** [1] - 3:22
**215** [2] - 3:23, 3:24
**22** [1] - 183:17
**227** [1] - 3:25
**23** [1] - 262:25
**230** [1] - 4:1
**231** [1] - 4:2
**232** [1] - 170:10
**24** [1] - 145:9
**25** [10] - 9:17, 11:11, 11:16, 29:20, 30:3, 30:6, 134:12, 145:16, 150:6, 248:20
**25,000** [1] - 30:7
**2505** [1] - 1:24
**2544.52** [1] - 145:16
**256** [2] - 4:3, 4:4
**26** [3] - 110:10, 144:13, 147:24
**265** [1] - 4:5
**26th** [2] - 146:22, 169:11
**27** [2] - 143:13, 145:7

**270** [1] - 81:17
**272** [1] - 4:6
**27th** [2] - 124:10, 138:23
**29** [1] - 144:23
**293.21** [1] - 187:16
**29th** [2] - 44:24, 138:14
**2:15** [1] - 172:4
**2nd** [1] - 225:20

## 3

**3** [9] - 95:4, 102:22, 102:23, 106:18, 107:8, 124:10, 136:24, 174:9, 262:17
**3.21** [1] - 41:10
**3.82** [1] - 148:4
**3.9** [1] - 241:10
**3.92** [2] - 241:15, 263:11
**3/12/16** [1] - 247:16
**3/27** [1] - 138:23
**3/27/15** [2] - 247:15, 247:16
**30** [4] - 12:18, 81:17, 99:19, 178:4
**300** [2] - 1:24, 133:5
**31** [2] - 19:23, 249:9
**31st** [1] - 248:25
**32.04** [1] - 226:23
**34.08** [1] - 124:21
**35** [1] - 11:16
**39501** [1] - 1:25
**3:00** [2] - 183:12, 184:7
**3:30** [3] - 41:1, 192:1, 268:4
**3:36** [1] - 230:15
**3:45** [1] - 230:13

## 4

**4** [17] - 1:6, 5:3, 5:23, 5:24, 53:5, 53:6, 53:7, 102:22, 102:25, 103:2, 103:3, 106:15, 117:8, 159:2, 167:25, 173:3, 225:16
**4.............................** [1] - 4:14
**4.50** [1] - 167:25
**4/18** [1] - 44:15
**4/18/2014** [1] - 263:9

**40** [8] - 51:24, 55:16, 120:6, 126:6, 126:11, 126:21, 126:23, 146:24
**40-hour** [2] - 50:18, 273:23
**400** [1] - 1:16
**404(b** [1] - 244:6
**40th** [1] - 8:1
**42** [1] - 129:4
**42.23** [1] - 124:13
**42.78** [2] - 146:15, 147:16
**43** [1] - 242:3
**43.82** [1] - 148:2
**431** [1] - 45:3
**431.04** [2] - 45:3, 45:13
**44** [1] - 129:7
**45** [4] - 11:20, 36:5, 41:21, 50:19
**45-minute** [1] - 172:4
**47.1** [1] - 147:7
**48** [1] - 146:24
**49** [1] - 3:7
**4:00** [1] - 268:24
**4:54** [1] - 276:11

## 5

**5** [19] - 4:13, 4:14, 5:15, 5:16, 50:20, 78:10, 79:7, 83:22, 95:23, 102:2, 110:3, 110:5, 143:16, 169:8, 171:22, 185:6, 236:13, 241:24, 254:13
**5,529.47** [1] - 145:22
**5....................** [1] - 4:13
**5/1/2015** [1] - 228:22
**5/7** [1] - 44:18
**500** [1] - 2:4
**504** [1] - 2:5
**52** [1] - 247:20
**55** [1] - 11:21
**589-7779** [1] - 2:5
**5th** [2] - 117:10, 118:1

## 6

**6** [4] - 3:5, 5:18, 184:3, 264:1
**601** [2] - 185:7, 254:14
**602** [1] - 111:18
**61.39** [2] - 150:12, 150:13

**65** [4] - 9:20, 9:21, 11:20
**65.95** [3] - 123:20, 123:24, 124:3
**650** [1] - 1:20
**69** [1] - 138:4
**6:00** [1] - 191:22
**6:30** [1] - 191:22

## 7

**7** [5] - 3:6, 145:1, 148:20, 225:14, 264:4
**7.1** [2] - 147:8, 147:9
**7.25** [13] - 39:23, 39:24, 39:25, 40:1, 40:5, 40:10, 120:9, 168:1, 168:7, 226:10, 274:4, 274:12, 274:17
**7/25/2014** [1] - 149:6
**7/30** [1] - 44:20
**70** [3] - 138:10, 182:4, 266:9
**70130** [3] - 1:17, 1:21, 2:5
**71.39** [1] - 265:11
**72** [4] - 122:21, 123:6, 123:20, 138:20
**72,438** [1] - 145:19
**72.5** [1] - 123:9
**75** [2] - 139:7, 266:10
**78.24** [3] - 263:3, 263:14, 263:19

## 8

**8** [3] - 138:9, 144:15
**8.8** [1] - 226:20
**80** [1] - 75:13
**85** [1] - 3:8

## 9

**90** [6] - 50:6, 99:24, 99:25, 151:19, 178:4, 266:10
**900** [1] - 1:16
**91** [1] - 3:9
**92** [2] - 3:10, 242:3
**95** [3] - 151:20, 225:11, 228:8
**96** [2] - 225:11, 225:17
**97** [2] - 148:11, 149:5
**98** [1] - 149:17
**9:00** [2] - 1:6, 272:23
**9:30** [1] - 212:2

## A

**A-C-H-M-A-S-H** [1] - 122:6
**a.m** [6] - 91:9, 111:22, 192:9, 254:20, 272:23
**A.M** [1] - 1:6
**abiding** [1] - 78:7
**ability** [4] - 64:13, 64:24, 159:3, 276:19
**able** [13] - 30:1, 50:2, 58:21, 157:8, 188:1, 193:8, 194:14, 203:10, 206:5, 224:15, 246:10, 264:21
**above-entitled** [1] - 276:19
**absence** [1] - 244:9
**absences** [1] - 209:7
**absent** [6] - 103:19, 104:6, 104:19, 104:23, 188:23, 188:25
**absolutely** [15] - 121:9, 153:15, 155:24, 160:24, 161:4, 220:25, 221:3, 222:13, 223:7, 223:18, 224:22, 234:12, 236:3, 242:7, 261:20
**accept** [1] - 104:16
**acceptable** [3] - 105:15, 105:19, 106:1
**access** [1] - 200:25
**accomplished** [1] - 28:6
**accordance** [1] - 190:4
**according** [4] - 66:4, 113:14, 162:17, 227:20
**accordingly** [1] - 197:24
**account** [5] - 6:7, 50:18, 232:10, 232:19, 232:20
**accurate** [6] - 48:13, 49:3, 54:20, 54:21, 151:14, 226:5
**accurately** [2] - 48:22, 53:25
**Achmash** [1] - 122:4
**Act** [1] - 273:13
**acted** [3] - 100:12, 176:20, 243:24

**acting** [6] - 35:1, 135:7, 135:11, 152:23, 205:22, 221:1
**ACTION** [1] - 1:5
**actions** [1] - 160:23
**activities** [1] - 258:2
**acts** [4] - 243:21, 244:5, 244:6
**actual** [4] - 90:9, 150:21, 174:18, 180:14
**Adams** [5] - 120:18, 122:21, 123:3, 123:16, 138:23
**add** [6] - 71:21, 125:13, 150:9, 202:23, 247:21, 263:14
**added** [6] - 10:25, 92:23, 93:6, 188:11, 195:23, 205:2
**adding** [3] - 31:2, 86:8, 229:16
**addition** [1] - 140:5
**additional** [6] - 10:21, 10:23, 83:16, 246:7, 261:22
**address** [6] - 18:10, 18:13, 18:16, 58:20, 127:21, 223:24
**addressed** [2] - 38:11, 38:18
**Addressing** [1] - 245:20
**adds** [1] - 202:25
**adjudicated** [1] - 54:9
**adjusted** [1] - 93:1
**admin** [1] - 191:22
**administrate** [1] - 231:12
**administrating** [1] - 231:13
**administration** [1] - 243:20
**administrative** [1] - 231:11
**administrator** [2] - 203:17, 231:11
**admissible** [1] - 244:6
**admit** [3] - 5:12, 251:14, 273:2
**admitted** [6] - 5:17, 5:21, 5:24, 72:16, 148:10, 226:16
**admittedly** [1] - 266:14
**admitting** [2] - 5:14, 5:22
**adopting** [1] - 20:1

advance [1] - 116:7
advice [2] - 32:11,
71:13
advise [1] - 188:24
advised [1] - 188:18
affecting [1] - 206:4
affects [1] - 21:11
affirmative) [5] - 37:2,
106:8, 123:2,
142:24, 168:16
afford [2] - 51:2, 51:16
afield [1] - 244:25
afraid [1] - 155:5
afterwards [1] -
195:25
age [3] - 19:5, 29:24,
234:18
aggressive [1] - 156:7
ago [6] - 57:24, 238:2,
238:4, 238:24,
241:6, 249:13
agree [50] - 45:16,
53:25, 56:17, 57:9,
69:10, 72:13, 74:16,
74:17, 74:22, 97:16,
98:2, 108:8, 108:9,
111:4, 112:20,
112:22, 116:18,
121:7, 123:9, 124:3,
126:19, 129:3,
129:10, 129:17,
147:8, 147:17,
148:3, 149:11,
149:24, 151:13,
225:21, 226:3,
226:12, 226:22,
229:22, 241:9,
241:11, 241:14,
241:16, 253:23,
254:3, 254:6, 254:7,
260:3, 261:23,
261:24, 263:3,
269:6, 269:8, 272:5
agreed [2] - 5:25, 78:4
agreeing [1] - 276:3
agreement [3] - 5:12,
74:18, 219:3
ahead [5] - 68:5,
128:11, 190:6,
246:19, 261:11
AIDED [1] - 2:8
air [2] - 260:11, 260:14
akin [1] - 275:23
AL [2] - 1:4, 1:7
alcohol [1] - 234:19
Alise [40] - 14:16,
26:3, 26:4, 32:14,
34:13, 34:17, 34:24,
62:4, 87:9, 87:19,
87:20, 88:3, 88:5,

90:3, 100:8, 100:14,
104:18, 131:11,
131:15, 132:10,
136:1, 136:16,
136:17, 136:21,
137:11, 137:15,
140:11, 152:3,
153:2, 189:22,
218:8, 218:9,
218:17, 221:8,
258:5, 260:19,
260:21, 261:4, 261:7
allegation [2] - 274:1,
274:3
alleging [2] - 79:7,
79:9
allocated [2] - 79:12,
85:4
allow [6] - 73:21,
171:24, 235:6,
243:12, 252:18,
259:15
allowed [6] - 38:23,
88:18, 211:16,
272:13, 273:16,
276:1
allows [2] - 137:22,
270:5
almost [3] - 73:22,
75:7, 254:23
alone [1] - 23:24
alternative [1] -
127:14
ambiance [1] - 222:18
Amendment [1] -
243:12
America [1] - 29:9
American [1] - 14:22
amount [21] - 13:9,
48:20, 53:25, 58:6,
102:14, 123:10,
124:4, 159:25,
160:6, 161:2,
166:18, 170:9,
170:17, 170:25,
171:11, 263:4,
264:11, 265:7,
265:12, 274:24,
275:2
amounts [2] - 185:16,
260:8
anew [1] - 273:22
Angeles [1] - 14:1
anniversary [1] - 55:5
announced [1] - 30:13
answer [26] - 43:8,
51:22, 52:13, 64:3,
64:4, 70:1, 74:7,
78:21, 85:5, 85:15,
94:2, 98:12, 98:14,

98:20, 98:22, 99:1,
104:10, 114:1,
114:8, 119:16,
126:7, 126:16,
183:1, 254:23,
254:25
answered [1] - 113:7
answering [1] - 58:12
answers [1] - 85:5
apart [1] - 274:20
apartment [1] - 29:21
apologize [9] - 28:8,
32:7, 52:10, 55:8,
82:3, 84:21, 127:25,
219:1
app [5] - 137:19,
137:21, 137:22,
138:25, 259:14
appealed [1] - 103:1
APPEARANCES [2] -
1:13, 2:1
appeared [1] - 100:25,
232:8
appellate [1] - 103:1
appetizers [1] - 24:14
applicable [1] - 75:19
application [3] -
182:8, 259:11, 262:9
apply [1] - 211:14
appreciate [3] - 58:10,
60:16, 74:19
approach [2] - 104:14,
272:15
approached [1] - 8:11
appropriate [1] -
34:15
approval [3] - 5:12,
216:23, 259:16
approve [5] - 137:25,
182:19, 221:22,
259:19
approved [10] - 26:10,
34:20, 34:21, 138:1,
138:8, 138:15,
138:24, 139:1,
139:20, 182:10
approving [2] -
139:22, 182:16
approximate [1] -
171:16
April [18] - 116:22,
117:10, 117:11,
118:1, 144:15,
144:21, 227:11,
227:14, 238:16,
238:18, 238:21,
239:25, 241:24,
241:25, 249:7,
262:25
area [6] - 67:20, 101:5,

228:17, 259:15,
269:23
arms [1] - 192:10
arms-folded [1] -
192:10
arose [2] - 181:16,
261:14
arrived [2] - 134:23,
149:19
articulated [1] - 190:5
Asaria [1] - 118:5
aspect [4] - 18:3,
39:17, 74:15, 84:17
aspects [1] - 35:23
assertion [1] - 129:13
assign [1] - 200:22
assigned [3] - 207:14,
207:20, 257:23
assistance [1] -
177:17
assistant [15] - 17:12,
21:16, 23:17, 58:14,
59:10, 64:10, 69:22,
97:5, 130:25,
161:10, 161:11,
161:12, 161:14,
193:4
assistants [26] - 9:17,
23:17, 36:23, 59:9,
59:13, 69:15, 70:2,
70:12, 93:2, 96:18,
96:21, 114:14,
120:10, 152:16,
160:3, 160:20,
161:5, 170:9,
170:10, 193:5,
207:17, 211:3,
217:20, 248:9,
270:8, 271:8
assistants' [1] - 69:17
associated [1] - 202:9
Association [3] -
120:25, 121:18,
242:15
assume [8] - 100:16,
202:22, 204:3,
232:2, 233:21,
234:23, 254:23,
267:5
assumed [1] - 140:22
assuming [5] - 51:4,
51:5, 51:23, 104:20,
193:19
assumption [1] -
79:23
assurance [1] -
115:14
AT [1] - 1:19
attempt [1] - 223:24
attend [10] - 46:18,

151:18, 163:23,
184:12, 184:16,
224:4, 224:5,
224:12, 224:13,
264:18
attendance [3] -
47:12, 183:23, 225:5
attended [9] - 65:22,
151:20, 177:3,
199:22, 264:19,
264:23, 266:8,
274:15, 274:18
attending [1] - 201:12
attention [5] - 15:5,
33:19, 37:17, 37:19,
81:24
attitude [3] - 67:24,
156:11, 156:13
ATTORNEY [1] - 1:19
attorney [21] - 31:19,
32:5, 32:8, 43:9,
52:16, 121:1, 121:3,
121:12, 233:15,
234:6, 234:9, 235:1,
235:2, 235:5, 235:7,
235:8, 235:19,
235:22, 238:11,
242:9
attorneys [2] - 40:18,
225:8
attributing [1] -
229:15
audit [2] - 90:12,
90:13
August [6] - 7:15,
138:9, 143:13,
145:1, 148:20,
148:23
authority [15] - 22:17,
22:18, 27:13, 64:18,
107:17, 108:20,
108:23, 108:24,
178:20, 181:20,
181:24, 205:25,
220:6, 261:23
auto [1] - 195:23
automated [3] - 138:6,
138:13, 138:24
automatic [1] - 202:15
automatically [2] -
237:20, 274:2
available [9] - 23:21,
69:19, 69:24, 82:15,
105:9, 105:11,
159:18, 188:4, 188:5
average [8] - 37:10,
39:25, 40:2, 55:12,
78:25, 151:10,
170:12
averaged [2] - 12:12,

*OFFICIAL TRANSCRIPT*

45:20
**averages** [1] - 10:18
**avoid** [1] - 273:19
**award** [1] - 71:19
**aware** [9] - 41:16,
52:17, 116:23,
116:24, 212:9,
227:23, 262:13,
262:15, 275:19

## B

**B-275** [1] - 2:4
**baby** [1] - 20:8
**back-of-the-house** [1]
- 191:21
**background** [2] -
18:25, 43:2
**backups** [1] - 36:2
**bad** [19] - 9:8, 9:23,
10:2, 10:9, 32:2,
58:5, 58:14, 59:4,
67:10, 67:19, 67:20,
68:1, 78:1, 80:12,
81:25, 156:22,
160:14, 243:6
**bag** [2] - 80:8, 86:20
**bank** [1] - 80:8
**banquet** [1] - 24:17
**bar** [27] - 9:16, 11:10,
17:12, 22:10, 31:22,
31:24, 57:20, 72:24,
89:13, 100:1,
132:20, 133:11,
134:20, 134:22,
139:14, 152:13,
164:10, 197:12,
233:18, 234:2,
234:5, 234:13,
234:15, 235:5,
235:9, 235:19
**bartender** [3] - 20:20,
43:4, 72:25
**bartenders** [7] -
184:9, 238:7, 248:4,
249:24, 249:25,
250:20, 250:24
**bartending** [2] - 19:8,
57:23
**base** [2] - 30:7, 79:23
**based** [26] - 17:22,
34:25, 38:17, 41:8,
49:3, 49:6, 53:11,
88:23, 135:6, 148:6,
149:19, 149:25,
151:8, 160:10,
160:15, 166:13,
171:16, 201:10,
203:11, 212:13,

225:24, 226:3,
227:1, 235:2, 242:5,
273:6
**basing** [4] - 51:9,
56:7, 71:8, 271:16
**basis** [6] - 97:23,
104:8, 104:9,
104:10, 179:13,
273:6
**Bates** [34] - 43:15,
44:2, 50:6, 53:12,
95:1, 95:5, 103:4,
107:8, 117:13,
117:15, 117:17,
117:20, 138:3,
138:19, 139:7,
147:3, 147:21,
174:9, 182:4, 183:4,
184:1, 185:6, 239:7,
239:10, 241:8,
246:8, 247:11,
247:17, 251:21,
254:14, 262:17,
262:19, 262:20,
264:1
**Bates-1028** [1] - 44:5
**Bates-1029** [1] - 44:16
**Bates-1036** [1] -
142:20
**Bates-1048** [1] -
120:14
**Bates-1049** [1] -
122:18
**Bates-15** [1] - 53:13
**Bates-1626** [2] -
106:16, 106:18
**Bates-1633** [2] -
102:22, 103:5
**Bates-1676** [4] -
117:10, 117:14,
119:18, 263:7
**Bates-1683** [3] -
128:24, 129:1, 146:5
**Bates-1684** [1] -
146:19
**Bates-1688** [1] -
147:12
**Bates-1695** [1] -
123:13
**Bates-602** [1] - 110:5
**Bates-603** [3] -
111:17, 169:9,
171:23
**Bates-Black** [6] -
95:1, 95:5, 107:8,
138:3, 138:19, 139:7
**Bates-DMNO** [1] -
147:3
**Bates-Number** [1] -
147:21

bathroom [1] - 36:18
**Beard** [1] - 71:19
became [8] - 24:3,
51:13, 81:1, 93:10,
185:2, 214:2, 214:3,
218:13
**become** [2] - 19:21,
218:5
**BEFORE** [1] - 1:11
**began** [5] - 63:1,
131:10, 142:2,
273:11, 273:22
**begin** [4] - 5:11,
130:21, 134:9,
272:23
**beginning** [21] -
26:19, 27:1, 27:19,
27:24, 28:1, 35:23,
46:2, 50:7, 65:21,
67:14, 89:2, 89:4,
104:24, 110:17,
110:22, 218:4,
221:13, 249:5,
249:6, 249:17
**beginnings** [1] -
237:13
**begins** [3] - 144:21,
148:17, 184:7
**behalf** [5] - 6:14, 35:2,
135:7, 135:11, 221:2
**behavior** [1] - 156:8
**behind** [7] - 34:5,
102:22, 106:15,
122:17, 128:24,
132:9, 132:14
**bell** [1] - 131:5
**belligerent** [1] - 27:7
**belong** [1] - 85:1
**below** [5] - 39:25,
129:7, 149:10,
168:1, 168:7
**BEN** [3] - 3:9, 91:19,
91:25
**Ben** [6] - 6:5, 91:24,
106:25, 128:8,
132:2, 135:1
**BENCH** [1] - 1:10
**bench** [2] - 247:5,
253:3
**benchmark** [1] - 12:15
**benefits** [4] - 64:13,
64:20, 163:3, 163:5
**beside** [4] - 48:16,
147:5, 147:25,
169:17
**best** [20] - 10:22, 28:4,
42:22, 42:23, 51:22,
73:9, 73:10, 74:10,
198:5, 230:1, 259:8,
263:15, 267:20,

268:14, 268:15,
271:12, 276:19
**Beth** [1] - 129:7
**better** [4] - 20:2,
33:24, 253:15, 268:7
**between** [8] - 14:1,
51:14, 150:4,
178:15, 208:4,
211:25, 237:3,
261:19
**beverage** [2] - 73:6,
198:18
**Beverage** [1] - 19:16
**beyond** [1] - 223:3
**big** [8] - 20:5, 22:3,
32:22, 37:5, 45:25,
121:8, 121:13
**bigger** [1] - 241:5
**bill** [4] - 69:3, 74:10,
202:14, 203:1
**bills** [2] - 51:16, 60:24
**binder** [4] - 16:12,
17:6, 203:20, 204:6
**binders** [1] - 239:1
**bio** [1] - 66:24
**bit** [25] - 12:10, 18:25,
21:1, 28:2, 32:13,
43:10, 52:6, 56:18,
71:5, 79:4, 121:24,
132:25, 133:21,
147:2, 176:12,
177:6, 178:12,
190:25, 194:11,
194:14, 208:24,
217:4, 221:15,
238:19, 261:25
**bite** [1] - 155:10
**biweekly** [6] - 50:17,
119:22, 125:11,
125:12, 219:8, 219:9
**BLACK** [1] - 1:4
**black** [1] - 228:17
**Black** [21] - 50:6, 95:1,
95:5, 107:8, 136:24,
138:3, 138:8,
138:10, 138:19,
139:7, 148:11,
149:5, 149:17,
174:9, 182:4, 183:5,
184:1, 225:11,
225:17, 228:8
**blanks** [2] - 16:10,
16:11
**blew** [1] - 30:23
**block** [2] - 133:4,
133:5
**blocks** [1] - 133:3
**blow** [1] - 27:7
**board** [6] - 162:9,
162:11, 162:15,

192:19, 192:22,
192:23
**boards** [1] - 209:4
**Bob** [1] - 19:6
**Bombay** [2] - 20:19,
38:4
**book** [2] - 38:8,
220:14
**bookkeeper** [2] -
14:19, 14:20
**books** [2] - 15:16,
77:13
**boss** [1] - 63:12
**bothered** [2] - 221:7,
221:8
**bottles** [2] - 190:23,
210:12
**bottom** [10] - 44:11,
44:13, 73:23, 81:24,
95:6, 95:16, 112:11,
123:5, 123:13,
143:11, 144:6,
149:21, 170:13,
182:10, 187:12,
187:15, 238:13,
240:19
**bounced** [1] - 19:12
**boundaries** [1] - 8:17
**bourbon** [1] - 73:3
**boutique** [1] - 35:9
**boxes** [1] - 90:16
**boy** [1] - 80:12
**boys** [1] - 20:1
**brainer** [1] - 20:3
**breached** [1] - 60:10
**bread** [2] - 23:18,
69:19
**break** [12] - 12:10,
91:3, 91:4, 91:6,
91:7, 117:17,
126:17, 127:15,
172:3, 172:4,
230:12, 272:22
**breakdown** [2] -
43:12, 202:10
**breaks** [1] - 240:4
**Brennan** [1] - 29:6
**Brennan's** [1] - 29:5
**Brennans** [1] - 29:7
**bridge** [1] - 215:5
**brief** [5] - 18:25,
23:15, 132:5,
133:24, 261:9
**briefing** [1] - 126:9
**briefly** [6] - 47:1,
85:23, 144:4, 148:9,
224:20, 225:7
**bright** [1] - 26:7
**bring** [5] - 71:1, 83:15,
120:11, 161:2,

275:18
**bringing** [4] - 69:18, 235:24, 244:16
**brings** [1] - 127:13
**broken** [1] - 118:4
**brother** [1] - 47:25
**brothers** [1] - 20:1
**brought** [7] - 25:8, 67:8, 112:19, 169:19, 213:12, 223:18, 223:25
**brushed** [1] - 223:25
**Buck** [8] - 35:10, 35:12, 35:16, 35:17, 176:7, 176:11
**bucks** [1] - 195:1
**bugging** [1] - 32:18
**building** [3] - 16:16, 82:18, 167:9
**built** [1] - 167:17
**bulk** [1] - 14:20
**bump** [1] - 79:4
**bumped** [2] - 27:14, 32:4
**bus** [5] - 131:6, 154:13, 176:5, 177:20, 191:17
**busboy** [2] - 9:18, 21:17
**busboys** [1] - 25:21
**business** [32] - 13:19, 15:8, 19:13, 31:10, 42:19, 45:24, 47:24, 71:24, 86:13, 88:24, 92:8, 94:13, 95:8, 102:1, 102:16, 107:7, 107:9, 107:11, 109:4, 110:19, 112:6, 135:8, 137:1, 137:5, 174:10, 174:11, 174:12, 181:8, 181:19, 212:4, 212:13, 253:14
**bussed** [1] - 177:3
**bussing** [1] - 177:22
**busy** [9] - 68:21, 88:25, 176:5, 211:12, 211:13, 211:16, 212:5, 212:7
**but..** [2] - 180:18, 180:24
**buzz** [2] - 8:24
**BY** [119] - 1:15, 1:23, 2:7, 2:8, 3:6, 3:7, 3:8, 3:10, 3:12, 3:13, 3:14, 3:17, 3:18, 3:19, 3:20, 3:21, 3:22, 3:24, 3:25, 4:2, 4:4, 4:5, 4:6, 7:5,

222:4
**California** [5] - 233:3, 234:14, 234:19, 237:3
**CALLED** [2] - 5:4, 173:4
**Campbell** [1] - 6:2
**cannot** [7] - 167:3, 187:11, 234:16, 234:17, 254:25, 273:18
**capable** [1] - 14:12
**capacity** [2] - 22:20, 108:6
**Cape** [1] - 78:12
**capitalism** [1] - 74:14
**capitalist** [1] - 74:9
**capitalists** [2] - 74:9, 74:10
**captain** [55] - 21:13, 21:14, 21:21, 21:24, 22:8, 22:9, 22:10, 22:13, 22:16, 22:17, 23:1, 23:7, 25:19, 25:22, 25:24, 57:1, 57:4, 61:23, 62:12, 62:14, 92:24, 93:9, 93:12, 93:14, 93:23, 94:15, 95:20, 96:9, 96:12, 96:22, 96:25, 97:22, 99:11, 101:7, 101:8, 101:14, 101:16, 101:21, 104:11, 105:10, 107:20, 110:21, 121:25, 153:23, 162:19, 174:20, 174:23, 212:12, 213:19, 213:22, 220:2, 258:17
**captain/manager** [1] - 105:22
**captains** [19] - 21:6, 22:7, 24:20, 56:19, 56:20, 56:21, 61:25, 62:10, 96:11, 96:17, 97:24, 98:16, 99:6, 100:13, 101:18, 111:13, 114:14, 213:15, 258:16
**car** [1] - 29:22
**card** [25] - 9:12, 75:1, 75:4, 75:14, 95:8, 95:11, 95:21, 102:1, 107:7, 107:11, 114:13, 114:18, 166:21, 174:10, 174:11, 174:12, 181:17, 202:8, 202:16, 202:17,

209:12, 209:17, 219:9, 232:18, 260:5
**cards** [11] - 75:12, 102:16, 107:9, 107:12, 108:17, 109:4, 137:1, 137:5, 166:21, 181:8, 181:19
**care** [9] - 12:21, 22:2, 84:15, 85:12, 121:7, 207:25, 208:9, 223:22, 258:25
**carefully** [1] - 250:22
**Carlos** [1] - 112:15
**Carlton** [3] - 10:15, 20:2, 20:4
**carried** [1] - 121:16
**carting** [1] - 37:5
**carve** [2] - 37:15, 192:23
**carved** [3] - 36:25, 37:13, 37:16
**carving** [4] - 192:23, 193:9, 193:10, 194:9
**case** [29] - 21:9, 25:5, 27:18, 34:8, 108:11, 120:10, 123:15, 127:2, 128:4, 128:8, 128:9, 128:17, 128:21, 190:7, 214:16, 215:1, 244:12, 244:13, 244:19, 246:4, 246:5, 246:12, 246:19, 250:13, 250:16, 250:17, 252:24, 255:23, 264:3
**cases** [1] - 246:17
**cash** [99] - 8:6, 9:12, 16:20, 17:2, 17:6, 17:8, 17:10, 17:21, 18:18, 18:21, 20:15, 47:17, 56:3, 56:4, 56:5, 74:25, 75:5, 75:7, 75:11, 75:21, 75:22, 75:23, 76:2, 76:17, 76:20, 76:22, 77:1, 79:12, 79:20, 80:7, 80:10, 80:15, 112:17, 112:22, 113:3, 114:4, 114:13, 114:16, 114:23, 115:8, 115:14, 115:17, 115:25, 116:5, 116:9, 116:11, 155:4, 165:18, 165:20, 165:21, 165:23, 166:1,

166:6, 166:7, 166:10, 166:13, 166:16, 166:17, 166:18, 166:19, 166:20, 166:21, 168:7, 170:4, 170:16, 170:18, 170:19, 170:21, 170:24, 170:25, 171:1, 171:2, 171:3, 171:5, 171:16, 185:23, 186:2, 187:3, 187:7, 187:8, 187:16, 187:18, 187:22, 187:23, 188:1, 188:6, 194:25, 195:1, 195:3, 195:5, 195:8, 195:10, 202:7, 209:12, 209:18, 260:5
**Cash** [3] - 112:11, 187:12, 187:21
**casual** [1] - 257:8
**catch** [1] - 178:2
**categories** [1] - 97:2
**category** [3] - 100:22, 158:21, 159:5
**CATHY** [1] - 2:3
**Cathy** [2] - 276:16, 276:21
**cathy_Pepper@laed. uscourts.gov** [1] - 2:6
**Cathy_Pepper@laed .uscourts.gov** [1] - 276:23
**Catlett** [3] - 6:13, 218:21, 245:25
**CATLETT** [72] - 1:19, 6:9, 6:13, 7:5, 11:6, 13:17, 14:11, 14:17, 21:6, 22:15, 30:5, 32:12, 33:12, 43:19, 43:22, 43:24, 44:5, 44:6, 45:10, 46:25, 49:12, 85:20, 87:2, 87:7, 87:10, 87:13, 87:16, 87:21, 87:24, 88:1, 88:14, 90:24, 129:24, 130:13, 132:24, 136:2, 136:6, 136:14, 136:16, 136:19, 140:16, 141:17, 143:22, 144:1, 144:3, 144:5, 150:3, 150:11, 150:13, 150:16, 150:19,

11:6, 13:17, 14:17, 22:15, 30:5, 32:12, 33:12, 40:23, 43:24, 44:6, 45:10, 46:25, 49:16, 50:11, 52:20, 53:10, 53:22, 62:20, 64:7, 64:22, 65:10, 68:15, 69:9, 77:23, 79:6, 82:4, 82:13, 85:9, 85:20, 88:1, 88:14, 92:2, 93:13, 93:22, 94:5, 95:7, 96:8, 99:4, 100:11, 100:24, 102:20, 103:7, 106:19, 110:4, 113:1, 116:13, 117:24, 122:8, 122:15, 126:18, 128:22, 129:2, 130:13, 132:24, 136:19, 140:16, 141:17, 144:5, 151:5, 155:17, 157:6, 158:19, 165:17, 168:13, 169:4, 171:4, 173:23, 174:7, 177:10, 190:12, 194:8, 209:1, 209:22, 210:5, 210:20, 214:1, 215:23, 219:6, 227:8, 228:19, 229:17, 231:9, 233:25, 235:17, 239:12, 241:13, 241:23, 243:8, 245:3, 253:7, 256:15, 256:23, 261:17, 265:25, 272:11

## C

**cabinet** [1] - 16:10
**calculate** [3] - 120:7, 120:8, 265:17
**calculated** [2] - 185:16, 260:8
**calculating** [1] - 242:18
**calculation** [11] - 40:2, 41:7, 41:9, 48:4, 150:3, 150:19, 151:3, 166:13, 225:8, 226:3, 265:16
**calculations** [8] - 42:7, 43:11, 49:2, 86:23, 140:4, 163:20, 163:21,

150:25, 151:2,
151:5, 154:14,
169:4, 171:4,
171:20, 215:8,
215:23, 219:4,
219:6, 226:25,
229:4, 230:7,
248:24, 249:1,
249:8, 249:19,
275:19
**CATLETT.................**
[2] - 3:8, 3:14
**CATLETT...................**
[3] - 3:6, 3:12, 3:24
**caught** [1] - 66:2
**Cavin** [1] - 271:21,
271:23
**CCR** [2] - 2:3, 276:21
**center** [1] - 186:18
**cents** [3] - 45:9, 45:11,
120:12
**certain** [12] - 8:16,
58:21, 58:22, 84:23,
92:22, 124:17,
201:3, 213:7,
240:11, 240:20,
240:22, 253:19
**certainly** [9] - 8:18,
46:3, 61:7, 61:8,
70:22, 76:14, 76:15,
244:13, 271:10
**CERTIFICATE** [1] -
276:15
**certification** [1] -
210:10
**Certified** [3] - 276:16,
276:17, 276:21
**certified** [5] - 248:5,
249:10, 249:12,
249:14, 249:24
**CERTIFIED** [1] - 2:3
**certify** [3] - 248:2,
249:17, 276:18
**certifying** [2] - 248:15,
250:5
**chain** [1] - 29:5
**chairs** [1] - 207:1
**chance** [4] - 53:23,
98:5, 148:13, 236:6
**change** [17] - 11:12,
21:20, 60:13, 64:13,
64:24, 65:3, 81:8,
137:12, 137:16,
163:3, 166:24,
167:18, 199:20,
221:21, 240:16,
259:10, 273:19
**changed** [12] - 11:13,
66:9, 68:17, 78:6,
80:25, 81:6, 93:18,

167:19, 175:3,
208:14, 255:14,
255:16
**changes** [3] - 107:24,
259:16, 259:19
**changing** [2] - 64:20,
208:11
**character** [3] - 157:1,
244:5, 244:24
**charge** [17] - 8:6, 80:8,
170:4, 180:2,
180:10, 188:10,
188:11, 188:16,
189:12, 197:19,
202:15, 203:4,
217:22, 221:14,
255:11, 260:11,
260:13
**charged** [5] - 169:19,
170:3, 170:4,
171:18, 185:24
**charges** [2] - 260:16,
260:17
**charm** [1] - 74:12
**Chartres** [1] - 133:4
**chat** [3] - 71:5, 133:18,
133:22
**chateaubriand** [1] -
37:9
**chatted** [1] - 134:10
**chatting** [1] - 216:24
**check** [45] - 8:3,
10:18, 11:22, 11:23,
15:2, 15:3, 18:24,
23:1, 24:2, 28:22,
32:25, 34:3, 34:6,
37:10, 78:24, 83:13,
85:16, 88:19, 98:17,
98:19, 109:12,
117:8, 120:17,
120:18, 123:10,
124:17, 137:21,
142:21, 166:12,
166:14, 168:3,
180:21, 202:18,
203:4, 204:2, 206:8,
232:4, 235:1, 249:4,
251:23, 251:25,
263:4, 263:21, 275:3
**checked** [1] - 233:15
**checking** [5] - 11:22,
83:11, 98:3, 98:7,
108:15
**checkout** [47] - 8:3,
9:3, 11:24, 16:2,
16:11, 16:16, 17:13,
17:22, 23:2, 30:19,
81:10, 86:15, 86:22,
87:3, 87:25, 88:5,
88:6, 110:15,

131:25, 140:1,
140:4, 166:12,
166:15, 169:6,
169:10, 169:12,
169:15, 170:14,
185:10, 209:11,
222:2, 222:5,
231:21, 232:1,
232:8, 252:7, 252:8,
252:21, 253:8,
253:24, 254:4,
254:8, 254:10,
254:15, 260:1,
260:6, 260:9
**checkouts** [2] - 9:4,
222:9
**checks** [2] - 18:22,
202:19
**cheeriest** [1] - 156:11
**chef** [6] - 15:17, 25:8,
25:13, 25:16,
193:12, 194:20
**chef's** [1] - 14:21
**chefs** [1] - 25:10
**Chicago** [1] - 57:25
**chief** [13] - 13:22,
127:2, 128:9,
128:18, 128:21,
190:7, 246:4,
246:12, 246:20,
255:23
**child** [2] - 234:5,
234:13
**children** [2] - 31:21,
31:23
**chip** [1] - 177:17
**choice** [2] - 162:17,
162:18
**chose** [3] - 115:3,
115:10
**circle** [1] - 145:21
**circumstance** [3] -
76:19, 76:25, 155:19
**circumstances** [14] -
23:7, 68:7, 77:5,
104:16, 105:20,
106:2, 110:25,
158:9, 166:1, 166:3,
195:18, 205:14,
205:15, 246:18
**circus** [1] - 216:7
**City** [1] - 159:10
**city** [3] - 8:24, 9:7,
60:3
**CIVIL** [1] - 1:5
**claim** [8] - 229:3,
238:6, 244:3,
249:18, 272:25,
274:20, 275:9,
275:11

**claims** [4] - 249:16,
250:7, 250:8, 274:24
**clarification** [1] -
218:15
**clarified** [1] - 229:7
**clarify** [12] - 41:5,
62:18, 69:7, 85:21,
93:14, 93:23,
116:14, 136:9,
168:12, 213:6,
229:18, 274:10
**clarity** [1] - 100:17
**class** [14] - 183:11,
184:5, 184:9,
189:11, 189:12,
193:9, 193:10,
248:2, 248:6,
248:15, 249:11,
249:20, 249:21,
250:6
**classically** [1] - 72:25
**clean** [6] - 13:3, 25:14,
35:25, 207:1, 207:2,
274:21
**cleaned** [1] - 217:25
**cleaning** [3] - 21:17,
36:17, 217:24
**cleans** [1] - 97:5
**clear** [12] - 69:19,
72:1, 113:9, 113:17,
127:6, 127:7,
139:16, 164:13,
201:16, 232:11,
275:6, 276:5
**clearly** [2] - 27:13,
57:1
**clears** [1] - 97:5
**Clerk** [7] - 6:24, 91:21,
130:7, 173:17,
215:17, 231:3,
256:10
**CLERK** [21] - 5:7,
6:17, 6:25, 91:8,
91:10, 91:14, 91:22,
129:25, 130:8,
172:6, 173:10,
173:18, 215:10,
215:18, 230:14,
230:16, 230:21,
231:4, 256:3,
256:11, 276:10
**client** [1] - 243:11
**clients** [2] - 89:14,
275:20
**clipped** [1] - 80:8
**clock** [30] - 39:13,
116:15, 118:12,
118:16, 119:1,
140:20, 140:22,
155:21, 155:23,

164:2, 164:3,
183:20, 199:23,
200:1, 200:3, 224:7,
224:8, 237:15,
240:10, 240:11,
262:3, 262:4,
274:11, 274:16,
274:18
**clock-in** [1] - 237:15
**clocked** [7] - 118:10,
118:11, 224:8,
224:9, 274:11
**clocking** [2] - 55:16
**close** [9] - 23:25,
32:19, 41:21,
135:15, 192:7,
206:18, 206:21,
209:23, 275:25
**closed** [1] - 114:22
**closeout** [2] - 185:18,
185:20
**closing** [6] - 47:9,
153:14, 171:8,
202:12, 217:24,
224:24
**closings** [1] - 206:25
**cloud** [4] - 253:16,
255:1, 255:4, 255:6
**Club** [2] - 20:19, 38:4
**coat** [1] - 25:11
**cocktails** [2] - 22:12,
191:11
**Cod** [1] - 78:12
**cold** [1] - 260:12
**collect** [9] - 77:1,
115:2, 116:9,
116:15, 118:16,
231:17, 231:18,
231:19, 231:20
**collected** [2] - 232:8,
232:17
**collecting** [1] - 217:22
**college** [2] - 19:8,
60:24
**column** [14] - 44:7,
49:20, 143:7,
143:17, 144:2,
149:5, 150:10,
171:3, 228:9, 264:8,
264:15, 265:7,
265:11
**columns** [1] - 264:12
**combative** [1] - 156:6
**combine** [1] - 162:14
**combined** [1] - 269:14
**coming** [15] - 8:9,
25:16, 41:23, 56:4,
138:16, 154:6,
167:10, 167:12,
180:5, 181:15,

183:2, 198:2,
231:16, 235:25,
257:24
**Commander's** [10] -
10:14, 19:22, 20:25,
21:2, 21:7, 22:17,
56:18, 56:22, 57:5,
90:11
**comment** [1] - 18:4
**commissions** [1] -
210:13
**common** [4] - 82:8,
82:10, 165:9, 165:11
**communicate** [1] -
83:25
**communicated** [1] -
252:15
**company** [8] - 54:11,
54:12, 76:8, 118:8,
135:12, 156:19,
219:24, 221:2
**comparable** [1] - 26:6
**compared** [1] - 12:8
**compensate** [1] -
74:13
**compensated** [1] -
275:12
**compensation** [1] -
275:24
**comping** [1] - 34:6
**complain** [6] - 42:9,
83:8, 200:2, 200:5,
201:22, 204:12
**complained** [1] -
29:15
**complaining** [1] -
99:10
**complaint** [7] - 113:4,
113:10, 250:3,
250:21, 251:9,
274:1, 274:3
**complaints** [1] -
204:15
**complete** [6] - 190:24,
191:13, 209:11,
209:18, 209:19,
254:19
**completed** [3] -
185:10, 202:4,
231:21
**completely** [4] -
31:19, 33:3, 178:16,
244:19
**component** [1] - 66:23
**COMPUTER** [1] - 2:8
**COMPUTER-AIDED**
[1] - 2:8
**computers** [1] - 16:17
**concept** [6] - 69:11,
69:13, 160:10,

160:16, 269:25
**concern** [1] - 234:20
**concerned** [4] - 99:14,
132:16, 224:2, 250:9
**concerns** [1] - 223:24
**concluded** [2] - 253:4,
276:12
**conclusion** [2] -
46:22, 203:10
**condiments** [2] - 36:4,
36:20
**conditionally** [2] -
249:12, 249:14
**conditioner** [1] -
260:11
**conditioning** [1] -
260:14
**conditions** [4] - 47:5,
140:8, 153:8, 222:11
**conference** [3] -
246:16, 247:5, 253:4
**conferred** [1] - 63:12
**confirm** [1] - 246:10
**confirmation** [1] -
217:3
**conflicting** [1] -
234:21
**confronted** [1] - 196:2
**confuse** [3] - 108:1,
108:2
**confused** [2] - 55:22,
93:8
**confuses** [1] - 107:25
**confusing** [6] - 95:19,
100:15, 127:7,
171:19, 260:24,
261:13
**confusion** [5] - 93:17,
94:1, 101:19,
195:22, 196:7
**Congratulations** [1] -
134:23
**conjecture** [1] - 27:16
**connecting** [1] - 80:5
**connection** [4] - 21:9,
51:14, 188:15,
255:23
**consent** [1] - 145:10
**consequently** [1] -
68:12
**consider** [1] - 24:14
**considerably** [1] -
54:10
**consideration** [1] -
226:13
**considered** [2] -
41:14, 75:17
**consistent** [2] - 137:5,
143:2
**consolidate** [2] -

240:21, 276:6
**constant** [1] - 22:2
**constantly** [3] - 99:6,
100:5, 105:25
**consult** [6] - 26:16,
122:13, 142:6,
234:8, 245:24,
257:15
**consulted** [10] -
120:25, 121:5,
121:17, 235:4,
235:7, 235:18,
235:21, 235:23,
257:17
**consulting** [1] - 15:10
**contact** [6] - 103:19,
104:3, 104:4, 104:5,
104:18, 221:25
**contain** [1] - 247:12
**contains** [1] - 264:2
**contemplating** [1] -
128:8
**content** [1] - 225:5
**contentions** [1] -
151:7
**context** [1] - 157:7
**continually** [1] - 73:22
**continue** [1] - 115:23
**continued** [1] - 213:4
**CONTINUED** [1] - 2:1
**continuity** [1] - 22:1
**contract** [5] - 60:10,
60:11, 60:15, 78:5,
176:14
**contractual** [2] -
42:20, 60:9
**control** [6] - 47:4,
47:8, 47:11, 47:15,
94:18, 211:5
**controlled** [15] - 47:2,
140:8, 153:5, 153:8,
153:10, 153:13,
153:16, 153:19,
222:11, 224:21,
224:23, 225:1,
225:4, 225:5, 260:15
**conversation** [3] -
236:11, 236:14,
236:16
**conversations** [6] -
24:4, 237:4, 237:10,
237:11
**convey** [5] - 139:4,
181:20, 181:22,
196:15, 196:18
**conveyed** [3] - 105:21,
195:15, 197:2
**conveying** [1] - 189:4
**cook** [1] - 19:6
**cooks** [1] - 18:23

**coordinated** [1] -
189:10
**coordinating** [1] -
217:20
**copied** [1] - 241:2
**copies** [2] - 90:17
**copy** [4] - 117:17,
219:21, 254:19,
262:11
**corner** [4] - 142:25,
149:22, 170:14,
264:7
**correct** [122] - 6:8,
52:24, 53:15, 58:6,
59:12, 67:3, 67:10,
68:18, 70:19, 77:3,
77:12, 82:23, 83:10,
86:2, 87:21, 92:7,
92:9, 92:10, 92:12,
92:14, 92:17, 93:15,
93:16, 94:3, 94:4,
96:3, 97:1, 97:11,
103:9, 103:11,
118:2, 118:25,
120:3, 121:25,
122:4, 124:13,
124:23, 126:2,
129:5, 129:8, 129:9,
139:5, 153:18,
156:15, 156:17,
157:13, 157:15,
159:12, 159:18,
159:22, 160:4,
160:8, 160:16,
161:6, 161:21,
162:2, 162:12,
162:17, 162:20,
163:8, 165:1,
167:11, 168:21,
171:9, 174:13,
174:14, 174:17,
176:16, 176:17,
179:14, 182:9,
182:11, 182:15,
182:17, 183:6,
183:9, 183:15,
183:23, 184:3,
184:10, 185:15,
187:16, 187:17,
187:23, 188:7,
194:16, 195:16,
197:17, 203:12,
203:19, 210:10,
212:20, 226:20,
226:21, 227:21,
232:7, 232:25,
240:7, 241:16,
241:25, 263:1,
263:12, 263:16,
265:5, 265:17,

265:18, 265:21,
266:6, 267:12,
268:4, 268:25,
269:17, 270:1,
270:7, 271:8,
271:13, 272:25,
273:4, 274:8,
275:13, 276:18
**corrected** [2] - 170:6,
170:9
**correctly** [4] - 84:5,
217:21, 219:15,
238:8
**cost** [1] - 197:15
**Costa** [4] - 15:14,
15:18, 243:15,
244:17
**coterie** [2] - 40:18,
86:9
**counsel** [5] - 32:10,
212:17, 246:24,
250:19, 251:5
**count** [5] - 23:4,
104:14, 166:20,
214:25, 253:18
**counted** [3] - 126:22,
273:25, 275:15
**couple** [21] - 12:3,
30:12, 36:18, 55:21,
62:25, 80:9, 85:23,
105:3, 111:10,
131:13, 132:6,
133:3, 133:7,
144:18, 147:10,
157:19, 166:2,
195:20, 206:11,
217:2, 233:17
**course** [19] - 22:19,
24:10, 24:22, 48:11,
48:21, 57:3, 79:1,
80:3, 102:16,
116:17, 117:13,
118:20, 160:18,
160:25, 180:5,
222:17, 236:6,
236:9, 269:14
**court** [4] - 89:18,
103:1, 172:7, 245:20
**COURT** [276] - 1:1,
2:3, 5:4, 5:8, 5:11,
5:18, 5:25, 6:10,
9:25, 10:10, 11:4,
13:12, 13:16, 14:12,
21:5, 21:8, 29:14,
32:6, 33:5, 40:10,
43:15, 43:21, 43:23,
44:2, 45:9, 46:23,
49:11, 50:5, 52:4,
52:9, 52:11, 52:16,
53:6, 53:12, 53:14,

53:16, 53:18, 61:22,
62:1, 62:3, 62:6,
62:11, 64:3, 64:17,
64:20, 65:8, 68:6,
68:14, 68:24, 69:5,
77:20, 78:20, 82:2,
82:12, 84:20, 85:3,
85:14, 86:25, 87:5,
87:14, 87:17, 87:20,
87:22, 88:12, 90:25,
91:3, 91:11, 93:8,
93:21, 94:2, 94:24,
95:2, 95:4, 95:22,
96:5, 96:7, 98:11,
98:16, 98:20, 98:24,
99:1, 99:3, 100:7,
100:15, 100:18,
101:11, 101:15,
101:20, 101:25,
102:4, 102:8,
102:12, 102:18,
102:23, 103:1,
103:4, 110:3,
112:20, 113:22,
113:25, 114:5,
114:7, 114:10,
114:12, 115:11,
115:20, 116:2,
116:12, 117:12,
117:15, 117:23,
122:5, 122:7,
122:14, 125:22,
125:25, 126:3,
126:10, 126:17,
127:3, 127:9,
127:18, 127:23,
128:2, 128:10,
128:14, 129:21,
132:13, 135:25,
136:4, 136:8,
136:18, 140:13,
143:20, 143:24,
144:2, 150:2, 150:6,
150:12, 150:14,
150:18, 150:24,
151:1, 151:4,
154:15, 154:22,
155:13, 156:21,
157:4, 158:7,
158:11, 165:6,
165:14, 169:2,
170:23, 171:21,
172:1, 172:3, 173:4,
173:7, 174:2, 174:5,
177:8, 189:21,
190:3, 190:8,
190:10, 193:19,
193:23, 194:1,
206:11, 206:20,
206:24, 207:3,
207:6, 207:9,

207:16, 207:19,
208:4, 208:10,
208:18, 208:20,
208:22, 209:14,
210:3, 210:18,
211:9, 211:12,
211:15, 211:20,
211:24, 212:15,
212:19, 213:2,
213:8, 213:13,
213:16, 213:19,
213:22, 214:9,
214:18, 214:24,
215:7, 218:22,
218:25, 227:4,
228:14, 229:2,
229:9, 229:13,
230:6, 230:8,
230:12, 230:17,
233:22, 235:10,
241:12, 241:17,
241:19, 243:7,
243:10, 243:17,
244:1, 244:10,
244:25, 245:10,
245:14, 245:16,
245:20, 245:22,
245:23, 246:1,
246:14, 247:3,
247:6, 247:9,
247:14, 247:19,
248:2, 248:5, 248:8,
248:11, 248:14,
248:23, 249:2,
249:5, 249:7, 249:9,
249:12, 249:20,
250:1, 250:10,
250:18, 250:21,
250:25, 251:7,
251:14, 252:3,
252:12, 252:25,
253:6, 255:22,
255:25, 256:21,
261:4, 261:7,
261:10, 272:21,
273:7, 274:5,
274:14, 275:2,
275:7, 275:13,
276:3, 276:7
**Court** [20] - 6:19,
82:14, 91:9, 91:16,
130:2, 192:19,
195:18, 198:16,
198:17, 200:16,
201:9, 204:21,
204:25, 205:14,
230:15, 276:17,
276:17, 276:18,
276:22, 276:23
**courtesy** [2] - 115:3,
115:9

**courtroom** [1] -
193:20
**courtyard** [4] - 89:18,
133:17, 134:22,
155:9
**cover** [8] - 6:11,
52:18, 111:14,
112:10, 198:6,
198:7, 233:7, 266:23
**coverage** [1] - 167:10
**covered** [2] - 232:24,
242:6
**covers** [3] - 43:14,
198:2, 198:9
**coworkers** [2] - 14:6,
31:1
**crash** [1] - 253:22
**create** [3] - 16:4,
162:9, 232:3
**created** [12] - 11:25,
12:4, 13:13, 16:2,
86:22, 93:17,
101:19, 103:13,
103:15, 148:12,
240:20, 264:3
**creating** [2] - 94:1,
222:18
**creator** [1] - 19:16
**credit** [24] - 9:12, 22:4,
25:15, 27:12, 56:9,
74:25, 75:4, 75:12,
75:14, 114:13,
114:18, 120:9,
166:21, 168:4,
202:8, 202:16,
202:17, 209:12,
209:17, 219:9,
232:17, 233:4, 260:5
**crew** [2] - 40:20, 86:12
**criminal** [2] - 244:12,
244:13
**critic** [1] - 73:5
**Crittenden** [1] - 118:5
**cross** [4] - 127:12,
128:5, 213:2, 215:5
**CROSS** [8] - 3:7, 3:13,
3:25, 4:5, 49:15,
155:16, 227:7,
265:24
**cross-examination**
[1] - 213:2
**CROSS-
EXAMINATION**[8] -
3:7, 3:13, 3:25, 4:5,
49:15, 155:16,
227:7, 265:24
**crossed** [3] - 126:22,
186:22, 227:4
**CRR** [2] - 2:3, 276:21
**culturally** [1] - 31:25

**cume** [1] - 145:13
**cumes** [1] - 145:5
**cunt** [1] - 197:15
**Cupp** [7] - 49:17,
63:25, 155:18,
171:21, 212:19,
244:10, 266:1
**CUPP** [117] - 1:23,
14:9, 21:4, 33:3,
46:22, 49:16, 50:11,
52:20, 53:7, 53:10,
53:13, 53:15, 53:17,
53:19, 53:22, 62:20,
64:7, 64:22, 65:10,
68:7, 68:15, 69:9,
77:23, 79:6, 82:4,
82:13, 85:7, 85:9,
85:16, 106:17,
126:15, 127:1,
127:6, 127:14,
127:21, 128:7,
128:13, 128:20,
128:25, 141:16,
155:17, 157:2,
157:6, 158:9,
158:19, 165:17,
168:11, 168:13,
169:1, 171:25,
177:5, 190:4, 190:9,
190:12, 193:18,
193:25, 194:7,
194:8, 206:8, 210:1,
210:5, 210:15,
212:22, 213:6,
214:1, 214:12,
214:21, 215:5,
218:20, 218:23,
219:1, 227:6, 227:8,
228:16, 228:19,
229:5, 229:12,
229:14, 229:17,
230:5, 239:9, 243:3,
243:14, 244:11,
245:9, 246:3, 247:2,
247:8, 247:10,
247:15, 247:20,
248:20, 248:25,
249:10, 249:14,
249:25, 250:8,
250:11, 250:20,
250:23, 251:2,
251:13, 251:15,
251:20, 252:1,
252:4, 252:17,
252:22, 260:25,
265:25, 272:9,
273:5, 273:10,
275:3, 275:8,
275:25, 276:5
**CUPP** ............ [1] -

3:22
**CUPP**.................... [1]
- 3:20
**CUPP**....................
[1] - 3:18
**CUPP**....................
[4] - 3:7, 3:13, 3:25,
4:5
**curious** [2] - 156:3,
228:6
**customer** [26] - 12:20,
22:4, 22:5, 74:3,
74:23, 154:9,
161:18, 194:25,
196:2, 197:17,
198:12, 198:21,
198:22, 198:23,
202:14, 202:15,
202:21, 202:22,
202:25, 222:15,
261:22, 269:6,
271:11, 271:13,
272:1
**customer's** [1] -
162:17
**customers** [16] -
22:10, 72:18, 73:17,
84:9, 84:24, 85:12,
93:4, 97:17, 156:14,
160:11, 161:23,
196:15, 229:23,
261:14, 269:15,
272:7
**cut** [19] - 16:20, 17:9,
36:12, 37:9, 77:8,
77:9, 82:23, 115:11,
115:21, 115:22,
116:1, 116:6, 116:8,
154:17, 170:8,
212:9, 212:10
**cuts** [3] - 82:21, 89:22,
192:24
**cutting** [3] - 25:3,
33:20, 89:1

**D**

**d'** [4] - 10:14, 10:15,
19:21, 19:23
**daily** [4] - 41:18,
102:15, 181:2,
240:16
**damage** [3] - 43:11,
48:4, 49:5
**damages** [5] - 149:18,
149:24, 224:20,
225:8, 226:1
**date** [50] - 44:8, 44:14,
44:17, 44:18, 44:19,
44:20, 44:22, 55:5,

103:10, 110:6, 110:12, 111:4, 111:19, 111:21, 112:2, 119:11, 142:25, 143:11, 143:15, 144:6, 144:11, 144:19, 144:24, 145:2, 145:5, 145:8, 146:20, 147:4, 147:13, 169:10, 184:22, 185:3, 185:4, 217:2, 225:13, 225:15, 227:10, 229:8, 229:15, 239:6, 241:19, 241:24, 247:23, 248:18, 249:2, 253:19, 257:2, 265:1
**dated** [1] - 183:17
**dates** [10] - 44:7, 110:9, 149:1, 149:3, 215:24, 225:19, 227:19, 228:6, 228:8, 228:11
**DAY** [1] - 1:10
**day-to-day** [2] - 179:13, 258:1
**days** [18] - 15:19, 16:14, 30:12, 55:11, 55:14, 80:9, 84:13, 89:24, 124:22, 125:9, 125:16, 126:4, 135:5, 158:1, 166:2, 201:13, 229:20, 273:12
**daytime** [1] - 51:1
**deadline** [1] - 250:16
**deal** [2] - 142:19, 245:14
**dealing** [4] - 14:12, 244:13, 273:14, 275:20
**dealings** [1] - 177:16
**deals** [1] - 244:12
**dealt** [2] - 135:10, 177:13
**dear** [1] - 20:21
**decades** [1] - 56:8
**December** [11] - 44:24, 45:25, 124:10, 144:8, 144:13, 147:23, 147:24, 237:16, 238:19, 238:21, 239:25
**decide** [4] - 81:13, 199:18, 200:20, 273:8

**decided** [5] - 78:9, 92:23, 200:25, 216:17, 228:1
**decision** [11] - 63:3, 63:6, 63:17, 88:21, 178:25, 179:7, 220:18, 220:20, 220:22, 234:25, 235:14
**decisions** [3] - 27:14, 89:9, 121:13
**defendant** [2] - 6:7, 142:17
**DEFENDANT** [1] - 1:22
**DEFENDANT'S** [1] - 4:14
**Defendant's** [1] - 5:24
**defendants** [10] - 5:22, 7:23, 43:12, 48:9, 49:18, 52:13, 90:6, 142:22, 146:4, 273:1
**Defendants'** [2] - 43:21, 53:7
**define** [2] - 161:19, 162:25
**definite** [1] - 251:23
**definitely** [12] - 12:20, 27:5, 135:4, 167:4, 171:18, 199:2, 221:15, 233:8, 254:2, 254:25, 264:24, 271:9
**definition** [1] - 101:23
**definitions** [1] - 94:17
**degree** [1] - 198:24
**delegated** [2] - 161:10, 192:13
**delegating** [1] - 191:15
**deleted** [1] - 238:10
**delivered** [3] - 33:16, 114:14, 220:21
**demonstrate** [1] - 217:16
**demonstrative** [4] - 5:19, 5:20, 225:10, 274:23
**demote** [1] - 10:25
**denied** [3] - 166:25, 167:5, 167:6
**deny** [1] - 182:19
**depended** [1] - 266:22
**deposited** [2] - 6:6, 232:9
**deposition** [1] - 6:1
**depth** [1] - 92:22
**DEPUTY** [21] - 5:7, 6:17, 6:25, 91:8,

91:10, 91:14, 91:22, 129:25, 130:8, 172:6, 173:10, 173:18, 215:10, 215:18, 230:14, 230:16, 230:21, 231:4, 256:3, 256:11, 276:10
**describe** [5] - 42:15, 82:14, 190:17, 192:19, 200:16
**described** [2] - 82:5, 98:10
**describing** [1] - 241:6
**DESCRIPTION** [1] - 4:11
**deserve** [2] - 204:14, 204:16
**designations** [1] - 6:1
**designed** [1] - 192:21
**designer** [1] - 20:10
**dessert** [1] - 24:16
**destroyed** [2] - 237:24, 252:11
**detail** [2] - 120:18, 142:21
**detailed** [2] - 118:14, 119:2
**determination** [1] - 49:13
**determine** [8] - 81:21, 88:10, 88:18, 170:20, 188:1, 188:6, 198:4, 273:25
**determined** [4] - 149:25, 225:24, 226:9, 226:19
**determining** [1] - 225:18
**detriment** [1] - 205:17
**develop** [2] - 58:9, 82:1
**developed** [1] - 92:13
**developing** [1] - 59:25
**dialogue** [1] - 24:6
**differ** [1] - 190:18
**difference** [6] - 67:12, 108:4, 150:4, 208:4, 208:5, 212:21
**differences** [1] - 26:5
**different** [17] - 24:3, 24:4, 94:16, 97:2, 152:13, 152:14, 157:4, 162:15, 198:19, 200:22, 240:3, 240:4, 240:8, 240:17, 253:14, 253:19, 255:3
**differentiation** [1] - 160:7

**differently** [1] - 120:7
**difficult** [1] - 133:7
**dig** [1] - 90:16
**diligent** [1] - 59:24
**diners** [1] - 37:21
**dining** [14] - 12:13, 15:11, 19:9, 21:3, 22:2, 24:9, 27:3, 33:18, 38:6, 46:1, 89:17, 271:12, 271:24
**dinner** [3] - 22:19, 268:16, 269:2
**dinnertime** [2] - 267:25, 268:5
**DIRECT** [16] - 3:6, 3:10, 3:12, 3:17, 3:18, 3:24, 4:2, 4:4, 7:4, 92:1, 130:12, 173:22, 190:11, 215:22, 231:8, 256:14
**direct** [10] - 70:2, 70:6, 102:21, 127:11, 127:13, 127:23, 128:4, 171:23, 190:8, 190:9
**directed** [1] - 204:17
**directing** [1] - 70:12
**direction** [2] - 179:10, 234:1
**directly** [3] - 206:4, 210:2, 244:2
**director** [2] - 73:6, 176:13
**dirty** [1] - 25:10
**disagree** [4] - 73:15, 108:8, 108:9, 274:9
**disappeared** [1] - 239:2
**disapproval** [1] - 259:16
**disaster** [1] - 23:11
**discarded** [1] - 254:4
**discharge** [2] - 63:17, 199:10
**discharged** [3] - 195:16, 197:6, 199:14
**disclosures** [1] - 250:14
**discontent** [1] - 141:19
**discouraged** [2] - 38:25, 39:1
**discovery** [6] - 48:7, 215:2, 250:13, 250:14, 250:16, 251:3
**discretionary** [2] -

188:12, 213:8
**discuss** [2] - 194:5, 246:15
**discussed** [7] - 235:8, 236:23, 262:5, 265:16, 267:10, 267:11, 270:2
**discussion** [6] - 14:10, 133:25, 216:15, 220:11, 261:8, 261:9
**dishwasher** [3] - 110:21, 153:17, 225:2
**dishwashers** [16] - 34:10, 47:15, 135:18, 159:7, 180:9, 180:10, 180:11, 180:17, 180:18, 181:4, 194:18, 194:21, 194:23, 221:5, 258:20, 258:22
**dismaying** [1] - 8:10
**displeasure** [3] - 27:11, 141:18, 196:1
**dispute** [2] - 112:17, 252:1
**disseminated** [1] - 54:9
**distinct** [2] - 261:18
**distinction** [1] - 275:8
**distraught** [1] - 133:19
**distributed** [2] - 75:24, 185:23
**distribution** [7] - 11:8, 11:12, 16:4, 16:5, 26:19, 121:1
**District** [3] - 276:18, 276:23
**DISTRICT** [3] - 1:1, 1:1, 1:11
**disturbed** [1] - 15:13
**divided** [5] - 81:11, 146:10, 171:17, 175:12, 205:3
**DMNO** [7] - 1:7, 146:5, 146:19, 147:3, 147:12, 147:21, 169:9
**DMNO-14** [1] - 53:14
**DMNO-15** [1] - 53:13
**document** [15] - 43:11, 43:20, 48:8, 90:8, 117:10, 117:25, 118:7, 119:8, 122:18, 123:6, 139:12, 228:7, 241:16,

247:15, 264:2
**documentation** [2] -
188:5, 237:19
**documents** [12] -
44:21, 90:5, 90:20,
90:22, 117:21,
231:18, 240:14,
241:11, 246:7,
246:8, 247:10,
253:22
**dollar** [2] - 41:13,
74:10
**Dollars** [1] - 145:20
**dollars** [5] - 12:12,
45:4, 45:7, 75:22,
145:17
**done** [31] - 9:4, 12:5,
12:15, 24:10, 27:8,
31:25, 33:21, 36:10,
36:14, 38:1, 38:2,
38:3, 51:3, 65:15,
112:25, 116:4,
155:1, 168:11,
186:7, 197:10,
203:14, 203:15,
206:9, 206:19,
206:22, 206:25,
207:8, 220:14,
252:19, 252:21,
258:3
**Dontay** [45] - 95:16,
96:5, 109:5, 131:16,
131:19, 132:10,
136:1, 136:14,
136:21, 137:2,
137:11, 137:24,
138:1, 138:24,
139:2, 140:11,
142:3, 142:6, 152:2,
153:1, 156:4,
158:21, 159:1,
159:4, 164:16,
164:22, 164:23,
180:13, 180:16,
184:21, 184:22,
184:25, 189:22,
189:25, 193:11,
193:24, 197:1,
213:14, 218:13,
218:17, 220:8,
221:6, 222:1, 258:6
**door** [6] - 93:5, 154:8,
196:8, 196:13,
237:12, 272:2
**Dori** [5] - 13:22, 26:24,
26:25, 42:17, 218:6
**Doris** [144] - 7:10,
7:16, 9:11, 13:19,
14:18, 15:23, 20:24,
21:11, 22:3, 22:6,

23:14, 25:14, 25:23,
28:3, 33:14, 35:1,
35:2, 35:20, 36:22,
37:23, 42:11, 47:2,
47:4, 47:8, 47:11,
47:14, 48:10, 49:18,
51:17, 53:1, 54:1,
54:3, 54:22, 54:25,
55:15, 55:19, 57:9,
58:13, 60:4, 60:17,
61:24, 62:22, 64:14,
64:24, 65:22, 65:24,
67:9, 67:12, 67:19,
69:10, 72:9, 72:14,
73:16, 74:22, 79:11,
79:20, 80:15, 82:6,
82:7, 83:18, 92:8,
94:23, 95:8, 99:19,
106:13, 106:24,
106:25, 114:17,
119:24, 130:14,
132:9, 133:1, 133:4,
133:8, 133:11,
135:8, 135:14,
135:17, 135:20,
136:23, 137:8,
139:16, 139:25,
141:10, 141:11,
141:14, 141:23,
141:24, 141:25,
142:13, 149:2,
153:5, 153:7,
153:22, 153:25,
155:18, 160:10,
163:4, 164:5, 168:6,
173:24, 174:15,
181:21, 184:15,
198:12, 198:15,
198:24, 204:20,
211:19, 211:22,
215:25, 216:1,
216:5, 216:16,
220:1, 220:6,
220:23, 221:2,
221:11, 222:11,
222:14, 222:22,
225:18, 225:22,
229:24, 231:10,
232:9, 247:23,
256:16, 261:2,
264:5, 268:8, 269:7,
269:24, 271:21,
271:23, 271:25,
272:3, 272:4,
272:15, 272:19,
273:21
**Doris'** [1] - 77:9
**double** [3] - 249:4,
251:23, 251:25
**double-check** [3] -
249:4, 251:23,

251:25
**doubles** [1] - 268:19
**doubting** [1] - 251:24
**down** [33] - 11:21,
12:10, 24:24, 25:1,
25:6, 36:15, 65:13,
82:2, 83:6, 84:20,
118:4, 133:3, 133:4,
133:10, 133:17,
133:24, 143:17,
164:11, 179:7,
190:25, 192:7,
195:1, 196:24,
196:25, 206:14,
207:2, 217:24,
220:9, 220:12,
226:7, 240:4,
252:23, 276:6
**downstairs** [2] -
186:18, 203:20
**drawer** [9] - 16:10,
112:18, 112:23,
115:4, 115:8, 155:5,
186:18, 187:9,
209:18
**drawn** [1] - 261:18
**drink** [6] - 22:10,
83:16, 133:23,
133:24, 134:22,
234:17
**drinks** [1] - 33:22
**drive** [1] - 194:14
**drop** [3] - 154:5,
191:17, 209:20
**dropped** [2] - 18:6,
203:16
**dropping** [1] - 191:11
**drops** [1] - 39:25
**dual** [1] - 180:12
**due** [4] - 18:8, 60:24,
210:21, 210:22
**duly** [7] - 6:23, 91:20,
130:6, 173:16,
215:16, 231:2, 256:9
**during** [70] - 12:2,
13:18, 14:5, 14:18,
22:18, 22:19, 41:2,
45:1, 45:20, 46:4,
46:9, 46:16, 48:10,
50:24, 55:14, 62:25,
67:2, 70:2, 70:20,
72:8, 75:9, 86:1,
86:4, 86:16, 87:4,
90:1, 92:5, 132:8,
134:13, 134:17,
136:3, 136:7,
153:22, 153:25,
161:16, 165:3,
166:22, 175:13,
180:9, 180:11,

251:25
180:14, 184:19,
184:20, 185:22,
196:6, 205:12,
205:13, 205:18,
207:24, 216:22,
218:16, 220:5,
220:23, 221:4,
221:11, 221:21,
222:10, 222:14,
224:11, 229:10,
237:15, 247:12,
257:7, 261:3, 262:3,
263:11, 263:23,
268:7
**duties** [18] - 23:15,
32:13, 56:24, 57:2,
57:5, 70:18, 70:21,
72:11, 84:8, 84:10,
85:11, 130:20,
130:21, 177:24,
182:19, 217:12,
222:25, 257:21
**duty** [2] - 271:7,
275:25

# E

**E-L-I** [1] - 91:25
**e-mail** [19] - 138:6,
138:7, 138:13,
138:21, 138:25,
182:5, 182:7,
182:13, 183:5,
183:8, 183:10,
183:11, 183:19,
183:21, 183:22,
183:24, 184:2,
200:14, 200:24
**e-mails** [1] - 262:6
**early** [19] - 16:21,
76:1, 77:6, 110:11,
114:22, 114:23,
154:18, 154:21,
205:6, 210:22,
211:16, 212:4,
212:13, 213:4,
213:9, 237:1, 237:2,
237:8, 247:22
**earn** [5] - 10:5, 41:2,
58:6, 59:4, 159:24
**earned** [6] - 68:1,
81:18, 160:1, 160:6,
203:12, 205:8
**earners** [2] - 9:11,
68:10
**earning** [4] - 58:15,
67:22, 68:2, 77:10
**earnings** [1] - 45:6
**Earnings** [1] - 143:7
**easier** [2] - 136:10,

194:11
**EASTERN** [1] - 1:1
**Eastern** [1] - 276:18
**easy** [4] - 13:4, 47:17,
52:1, 81:1
**eat** [2] - 37:18, 155:11
**effect** [2] - 213:13,
213:14
**egregious** [1] - 73:1
**eight** [3] - 72:8,
115:11, 134:2
**either** [20] - 10:25,
23:1, 26:13, 34:17,
36:11, 62:9, 64:1,
82:1, 89:14, 91:4,
104:11, 152:2,
156:1, 158:14,
158:17, 167:5,
187:8, 200:24,
250:7, 254:4
**elated** [1] - 28:5
**elegant** [1] - 24:8
**elements** [2] - 243:24,
275:1
**ELI** [1] - 91:19
**Eli** [11] - 6:5, 91:13,
91:24, 92:3, 106:25,
115:11, 128:8,
132:2, 135:1, 154:15
**ELI.............................
...** [1] - 3:9
**elicit** [1] - 212:22
**Eliran** [1] - 91:24
**ELIRAN** [3] - 3:9,
91:19, 91:25
**elsewhere** [1] - 15:15
**elucidate** [1] - 15:25
**emergency** [1] - 166:4
**emphasis** [1] - 272:6
**employed** [2] -
220:10, 242:25
**employee** [18] - 11:19,
34:18, 37:24, 103:6,
103:8, 115:17,
116:18, 117:16,
118:18, 141:6,
154:18, 158:21,
164:8, 199:10,
240:17, 249:19,
249:22, 262:11
**employee's** [1] -
115:13
**employees** [16] - 7:22,
15:14, 34:8, 41:12,
65:13, 103:23,
110:17, 112:8,
119:25, 143:24,
168:10, 178:23,
178:24, 200:19,
249:21, 274:15

employer [4] - 13:12,
42:15, 126:14,
273:15
employers [1] - 46:20
employment [9] -
42:11, 63:13, 64:24,
65:12, 67:15, 140:9,
199:11, 222:12,
257:2
empty [2] - 154:25,
175:18
empty-handed [1] -
175:18
en [1] - 53:9
encompass [1] -
229:20
encompassed [1] -
208:2
encouraged [3] - 67:1,
76:5, 76:7
end [61] - 17:9, 17:10,
22:25, 27:21, 28:10,
36:7, 36:11, 36:14,
40:13, 44:12, 44:14,
48:11, 48:21, 59:1,
63:1, 66:17, 75:24,
76:16, 76:20, 77:1,
79:12, 86:23, 115:2,
115:9, 126:9,
141:23, 141:24,
141:25, 144:14,
148:18, 148:24,
154:16, 155:4,
163:12, 164:19,
169:13, 171:8,
186:4, 195:5,
195:12, 202:4,
202:5, 202:18,
202:20, 205:2,
206:16, 209:14,
209:15, 217:23,
218:1, 222:5, 222:7,
237:8, 238:16,
240:13, 247:22,
258:2, 265:1
ended [8] - 19:19,
20:24, 26:7, 86:8,
124:20, 144:7,
212:7, 273:12
ending [5] - 27:18,
50:23, 51:6, 51:19,
229:9
ends [13] - 44:19,
124:20, 125:2,
125:13, 125:15,
143:12, 143:13,
144:8, 144:15,
144:22, 145:2,
145:8, 190:22
engage [2] - 82:12,

271:11
engaged [8] - 163:11,
163:13, 192:10,
194:23, 198:21,
198:23, 270:18,
276:1
engagements [1] -
157:20
engaging [1] - 13:1
enjoyed [1] - 19:23
enjoying [1] - 35:15
enter [3] - 203:4,
203:8
entered [6] - 42:20,
185:6, 202:6, 203:2,
203:18, 240:22
entertaining [1] -
89:13
entire [10] - 70:20,
109:17, 126:20,
128:8, 177:24,
178:7, 186:6,
198:13, 201:1,
247:14
entirely [1] - 71:6
entitled [10] - 9:21,
25:6, 33:10, 49:6,
50:19, 126:24,
129:10, 163:3,
265:15, 276:19
entre [1] - 25:4
entree [1] - 24:15
entrees [2] - 78:25,
194:12
envelope [7] - 17:22,
112:18, 112:23,
115:4, 171:8, 186:2,
253:18
envelopes [5] - 16:19,
16:20, 18:21,
186:10, 186:21
envisioned [2] -
73:19, 73:20
equal [2] - 28:15,
28:16
equally [12] - 57:14,
59:5, 59:12, 59:15,
59:17, 67:13, 67:21,
73:25, 175:12,
204:19, 270:5, 270:8
erased [1] - 237:20
Erin [6] - 118:5, 241:9,
241:14, 256:2,
256:13, 256:16
ERIN [3] - 4:3, 256:8,
256:13
error [3] - 204:1,
229:12, 229:14
especially [6] - 35:13,
37:5, 60:3, 104:24,

107:19, 232:4
ESQUIRE [3] - 1:15,
1:23, 1:23
establish [2] - 72:23,
158:22
established [6] -
60:17, 61:1, 61:5,
61:10, 74:22, 163:7
establishes [1] -
158:24
estimate [2] - 49:5,
119:21
ET [2] - 1:4, 1:7
Evans [1] - 19:6
evening [17] - 24:7,
32:18, 36:3, 37:20,
58:16, 71:6, 76:3,
140:25, 203:12,
205:10, 205:13,
209:15, 211:1,
260:10, 268:22,
274:21, 275:6
evenings [1] - 20:22
event [2] - 245:12,
246:11
eventually [4] - 16:12,
137:18, 204:5, 204:6
every-week [1] -
226:13
everywhere [1] - 67:4
evidence [11] - 5:13,
5:21, 48:5, 148:10,
185:6, 215:3,
225:11, 244:5,
244:24, 249:15,
275:18
evidentiary [1] -
244:12
exact [5] - 96:23,
184:22, 185:4,
239:3, 262:19
exactly [15] - 8:9,
40:4, 117:20, 164:7,
178:14, 186:11,
188:1, 218:19,
220:14, 231:12,
233:21, 254:12,
256:18, 258:23,
270:9
examination [1] -
213:2
EXAMINATION [115] -
3:6, 3:7, 3:8, 3:10,
3:12, 3:13, 3:14,
3:17, 3:18, 3:19,
3:20, 3:21, 3:22,
3:24, 3:25, 4:2, 4:4,
4:5, 4:6, 7:4, 11:6,
13:17, 14:17, 22:15,
30:5, 32:12, 33:12,

40:23, 43:24, 44:6,
45:10, 46:25, 49:15,
50:11, 52:20, 53:10,
53:22, 62:20, 64:7,
64:22, 65:10, 68:15,
69:9, 77:23, 79:6,
82:4, 82:13, 85:9,
85:19, 88:1, 88:14,
92:1, 93:13, 93:22,
94:5, 95:7, 96:8,
99:4, 100:11,
100:24, 102:20,
103:7, 106:19,
110:4, 113:1,
116:13, 117:24,
122:8, 122:15,
126:18, 128:22,
129:2, 130:12,
132:24, 136:19,
140:16, 141:17,
144:5, 151:5,
155:16, 157:6,
158:19, 165:17,
168:13, 169:3,
171:4, 173:22,
174:7, 177:10,
190:11, 194:8,
208:25, 209:22,
210:4, 210:19,
213:25, 215:22,
219:6, 227:7,
228:19, 229:17,
231:8, 233:25,
235:17, 239:12,
241:13, 241:23,
243:8, 245:3, 253:7,
256:14, 256:23,
261:17, 265:24,
272:10
examined [7] - 6:24,
91:21, 130:7,
173:17, 215:17,
231:3, 256:10
example [7] - 20:25,
33:1, 83:18, 96:5,
150:6, 169:7, 201:9
Excel [4] - 240:20,
241:3, 241:4, 241:5
excellence [3] - 58:22,
272:3, 272:4
except [3] - 193:21,
214:13, 272:19
exception [4] - 48:10,
199:7, 199:8, 261:3
exceptional [3] -
76:25, 198:11,
229:22
exciting [1] - 28:5
excluded [1] - 248:5
exclusion [1] - 244:23

excuse [3] - 67:19,
229:5, 248:21
excused [3] - 129:21,
214:13, 230:8
EXHIBIT [1] - 4:14
exhibit [19] - 5:19,
5:20, 43:15, 49:19,
94:20, 95:2, 95:25,
111:17, 117:18,
123:13, 174:8,
183:4, 229:2, 239:9,
241:8, 262:23,
263:7, 274:23
Exhibit [55] - 5:18,
5:23, 5:24, 43:21,
43:22, 43:23, 53:5,
53:6, 53:7, 95:4,
95:23, 102:2,
102:23, 102:24,
102:25, 103:2,
103:3, 106:15,
107:7, 107:8, 110:2,
117:8, 117:9,
117:12, 120:13,
122:17, 128:24,
129:1, 136:24,
138:3, 138:10,
138:19, 139:7,
142:19, 146:3,
146:19, 147:3,
147:12, 147:21,
169:8, 171:22,
174:9, 182:4, 184:1,
185:6, 239:7,
239:10, 254:13,
262:17, 262:18,
262:21, 264:1
EXHIBITS [1] - 4:13
exhibits [1] - 5:13
Exhibits [2] - 5:15,
5:16
exist [1] - 162:8
existed [1] - 247:25
existent [1] - 237:17
expect [2] - 116:8,
246:17
expected [3] - 103:24,
115:16, 115:24
experience [28] -
12:24, 13:9, 15:11,
31:20, 56:8, 56:14,
58:10, 71:8, 71:23,
109:16, 121:14,
121:16, 121:20,
121:21, 121:22,
177:13, 195:7,
198:14, 201:10,
206:6, 220:19,
220:21, 221:24,
230:2, 271:12,

271:16, 271:24,
275:22
**experienced** [3] -
83:24, 159:15,
198:25
**experiences** [1] -
221:25
**experiencing** [1] -
15:6
**expert** [3] - 71:13,
72:2, 210:8
**explain** [19] - 9:9,
33:1, 64:3, 64:5,
78:20, 94:2, 97:12,
98:4, 98:12, 102:3,
110:10, 113:16,
114:8, 162:19,
195:18, 198:6,
204:25, 205:13,
232:15
**explained** [5] - 152:9,
152:10, 220:13,
270:1, 270:2
**explaining** [1] -
272:24
**explanation** [2] -
47:20, 239:3
**expressed** [1] -
195:25
**extend** [1] - 22:20
**extent** [5] - 214:13,
245:17, 258:23,
274:4, 274:22
**extra** [4] - 33:17,
37:17, 68:11, 171:18
**eyed** [1] - 133:21

## F

**face** [8] - 97:17,
181:17, 191:9,
194:13, 199:6,
261:15
**face-to-face** [1] -
181:17
**faces** [3] - 83:2, 83:3,
83:6
**fact** [19] - 8:14, 46:24,
63:21, 63:23, 69:22,
72:5, 76:5, 84:7,
121:1, 121:24,
127:16, 141:23,
156:19, 159:20,
164:16, 213:2,
215:6, 234:8, 268:6
**facts** [1] - 82:12
**factual** [1] - 140:14
**fair** [24] - 46:20, 52:21,
52:22, 75:9, 89:6,

92:14, 97:18, 153:4,
153:7, 153:10,
153:13, 153:16,
153:19, 167:8,
170:6, 170:7,
187:25, 210:8,
224:20, 224:23,
225:1, 225:4,
226:12, 271:24
**Fair** [1] - 273:13
**fairly** [2] - 30:25,
151:14
**faith** [2] - 243:6,
243:23
**fall** [1] - 36:13
**falling** [1] - 34:5
**familiar** [10] - 56:9,
56:12, 82:20,
102:13, 176:7,
220:3, 227:25,
232:5, 232:6, 257:10
**family** [3] - 8:18, 20:6,
192:21
**family-style** [1] -
192:21
**far** [11] - 8:17, 13:22,
16:4, 44:7, 132:15,
149:24, 213:1,
219:24, 244:25,
250:8, 252:18
**fare** [1] - 203:1
**fashioneds** [1] - 73:3
**fast** [1] - 150:22
**featured** [1] - 20:20
**featuring** [1] - 66:25
**February** [8] - 145:9,
148:25, 165:11,
216:1, 225:14,
256:19, 257:2, 265:1
**fed** [1] - 40:15
**federal** [7] - 7:21,
39:23, 39:24, 61:5,
158:24, 163:9,
273:15
**Feed** [7] - 82:14,
82:15, 82:17, 97:19,
162:7, 162:9, 192:20
**fell** [2] - 178:17,
180:14
**fellow** [1] - 104:12
**felt** [9] - 113:12,
113:19, 188:14,
197:4, 199:13,
204:13, 205:16,
234:24, 235:5
**few** [12] - 10:13,
15:18, 104:15,
110:24, 111:11,
122:12, 132:19,
135:5, 138:17,

193:5, 241:6, 263:21
**fewer** [2] - 83:2, 83:3
**Fifth** [1] - 243:12
**figure** [10] - 56:5,
120:22, 149:19,
149:21, 150:22,
151:13, 225:24,
226:6, 226:12, 227:3
**figurehead** [1] - 223:8
**figureheads** [1] -
218:6
**file** [1] - 249:7
**filed** [5] - 101:13,
247:1, 248:18,
248:23, 249:2
**filet** [1] - 37:9
**fill** [5] - 83:19, 176:2,
177:4, 202:8, 202:18
**filled** [2] - 112:4, 132:6
**film** [1] - 29:20
**final** [2] - 17:19, 18:11
**finally** [1] - 216:2
**finances** [1] - 8:18
**fine** [16] - 12:13,
18:16, 19:9, 21:3,
24:9, 32:9, 42:18,
43:9, 46:1, 50:10,
84:7, 210:3, 234:11,
245:15, 245:19
**finish** [5] - 68:4,
74:19, 126:19,
241:12, 241:17
**finished** [2] - 192:6,
214:22
**finishes** [1] - 125:4
**fire** [9] - 23:7, 61:14,
61:19, 62:22, 179:1,
179:3, 179:8,
199:18, 220:6
**fired** [3] - 26:14,
61:16, 178:24
**firing** [3] - 178:23,
179:4, 179:6
**first** [103] - 6:12, 6:15,
6:23, 7:12, 7:23,
8:12, 9:16, 11:25,
17:16, 19:23, 26:24,
28:9, 28:12, 29:18,
29:19, 44:11, 44:14,
44:18, 50:14, 50:15,
50:19, 52:22, 55:21,
65:20, 66:6, 77:7,
77:8, 78:5, 79:14,
86:4, 86:16, 91:20,
93:9, 95:11, 95:23,
95:25, 100:20,
105:3, 105:7,
108:14, 109:13,
110:24, 111:10,
111:11, 112:20,

115:22, 117:22,
118:23, 121:14,
122:24, 123:1,
124:24, 126:4,
126:23, 130:6,
131:10, 137:14,
142:18, 142:21,
143:5, 143:6, 146:5,
149:4, 152:9,
159:14, 163:6,
169:12, 173:16,
175:2, 178:10,
184:25, 186:15,
186:16, 189:2,
190:19, 190:21,
192:1, 208:13,
213:23, 215:16,
216:6, 218:3,
225:13, 226:16,
227:23, 231:2,
233:3, 243:14,
244:21, 249:20,
249:23, 250:13,
252:23, 256:9,
259:12, 265:7,
266:25, 274:5,
275:20
**fish** [1] - 80:21
**FISHER** [1] - 1:22
**five** [12] - 21:23,
35:10, 45:22, 68:20,
68:22, 75:23, 79:25,
150:23, 167:4,
216:21, 227:3, 230:9
**flip** [3] - 117:8, 123:23,
183:4
**floor** [25] - 26:4, 62:5,
62:7, 88:17, 88:20,
94:11, 94:16,
174:18, 176:12,
176:22, 177:21,
177:24, 178:1,
178:3, 188:20,
190:22, 191:15,
191:20, 210:23,
218:5, 220:4,
223:11, 229:25,
258:14, 258:15
**floors** [2] - 36:16,
217:25
**FLSA** [1] - 273:15
**Fluffy** [2] - 195:21,
197:14
**fly** [1] - 106:4
**focus** [2] - 10:17, 22:5
**focused** [1] - 22:4
**focusing** [1] - 78:2
**fold** [1] - 36:19
**folded** [2] - 36:3,
192:10

**folder** [3] - 186:15,
186:16, 186:17
**folks** [6] - 13:10,
23:25, 118:15,
119:5, 185:13,
237:15
**follow** [2] - 122:16,
187:5
**follow-up** [1] - 122:16
**following** [6] - 18:6,
66:2, 148:11,
208:18, 208:19,
208:21
**follows** [7] - 6:24,
91:21, 130:7,
173:17, 215:17,
231:3, 256:10
**food** [40] - 8:23, 12:13,
19:18, 21:18, 24:2,
24:21, 24:24, 25:1,
25:6, 29:5, 33:23,
70:5, 72:14, 72:16,
72:17, 73:5, 73:8,
74:12, 81:11, 83:16,
108:12, 109:6,
110:20, 131:4,
161:15, 175:23,
176:4, 177:20,
177:22, 191:17,
192:17, 198:18,
202:22, 258:1,
269:14, 269:16,
269:17
**FOR** [2] - 1:15, 1:22
**forbid** [1] - 219:18
**force** [1] - 188:16
**foregoing** [1] - 276:18
**forehead** [1] - 74:11
**forget** [1] - 164:1
**forgot** [4] - 164:1,
194:7, 209:14,
210:16
**form** [17] - 9:6, 13:12,
34:21, 74:8, 96:12,
96:16, 170:14,
170:21, 185:17,
201:25, 202:1,
203:14, 240:11,
255:2, 255:3, 255:4
**former** [2] - 10:14,
10:15
**forms** [6] - 159:17,
171:5, 203:25,
209:11, 254:16,
255:6
**forth** [3] - 237:1,
237:4, 237:7
**foundation** [2] -
141:16, 244:14
**four** [20] - 18:11,

20:21, 21:22, 24:25, 52:22, 79:25, 149:10, 150:23, 189:23, 190:20, 198:8, 198:9, 198:19, 255:14, 255:15, 255:16, 255:20, 268:1, 268:23

**four-top** [1] - 198:8

**fourth** [2] - 80:6, 255:19

**frame** [1] - 213:16

**frankly** [1] - 178:14

**fraudulent** [1] - 31:4

**free** [2] - 34:6, 224:9

**French** [6] - 20:12, 20:13, 24:11, 24:12, 76:6, 269:23

**frequently** [1] - 186:5

**fresh** [2] - 33:9, 133:8

**Friday** [20] - 10:5, 124:20, 125:1, 125:2, 125:5, 125:6, 125:16, 125:17, 125:18, 125:20, 134:4, 134:6, 228:22, 228:25, 229:20, 259:7, 259:8, 273:12, 273:22

**Fridays** [2] - 208:12, 268:13

**friend** [6] - 20:22, 132:22, 133:11, 133:13, 134:19

**friendly** [1] - 71:4

**Friends** [1] - 57:21

**friends** [6] - 22:12, 29:23, 89:14, 116:10, 133:7, 195:21

**front** [7] - 27:3, 49:20, 53:4, 92:11, 150:21, 227:19, 228:7

**front-of-the-house** [1] - 92:11

**frustrating** [1] - 42:14

**full** [10] - 30:9, 36:2, 51:1, 105:8, 144:9, 151:21, 156:20, 157:14, 210:25, 212:3

**full-time** [4] - 51:1, 151:21, 156:20, 157:14

**fully** [4] - 86:7, 119:2, 211:17, 213:10

**function** [3] - 176:18, 178:12, 203:3

**funding** [1] - 79:21

**FURTHER** [4] - 3:21, 3:22, 210:19, 213:25

**future** [1] - 185:2

**fuzzy** [1] - 122:19

## G

**G-A-N-D-Y** [1] - 215:21

**gallery** [3] - 9:10, 10:5, 13:11

**galley** [1] - 73:13

**GANDY** [1] - 215:15

**Gandy** [9] - 179:3, 179:8, 195:14, 196:2, 201:16, 215:9, 215:20, 227:9, 229:18

**Gandy's** [1] - 225:11

**GANDY.....................
.................** [1] - 3:23

**gaps** [2] - 246:23, 246:25

**gather** [1] - 209:11

**geared** [1] - 200:21

**general** [24] - 6:7, 26:11, 92:11, 106:20, 107:4, 139:15, 156:7, 175:8, 177:24, 188:14, 189:4, 190:14, 190:15, 191:14, 192:8, 200:11, 206:13, 214:3, 214:5, 217:13, 224:1, 232:18, 232:20, 243:20

**generally** [6] - 178:17, 181:8, 182:19, 183:2, 184:15, 191:20

**generating** [1] - 77:11

**genius** [1] - 56:5

**gentleman** [4] - 35:7, 124:18, 126:20, 193:22

**George** [1] - 19:22

**gin** [2] - 73:2

**given** [16] - 47:20, 65:17, 99:14, 114:18, 138:23, 168:19, 181:17, 197:23, 198:3, 202:7, 214:5, 219:23, 234:19, 239:6, 272:1, 272:7

**glass** [4] - 25:2, 155:9, 161:13, 161:14

**glasses** [2] - 123:22, 130:23

**glassware** [2] - 36:1, 207:13

**Glazer's** [3] - 19:14, 19:16, 19:20

**globo** [1] - 53:9

**GM** [4] - 106:20, 106:25, 178:15, 178:19

**goal** [1] - 194:16

**God** [4] - 173:13, 215:13, 230:24, 256:6

**goodies** [1] - 34:6

**goodness** [5] - 54:14, 56:14, 74:6, 84:19, 84:22

**goods** [1] - 69:3

**gosh** [1] - 248:12

**government** [3] - 61:5, 158:24, 163:9

**grab** [1] - 82:25

**grabs** [1] - 137:22

**graduated** [1] - 29:20

**Graham** [3] - 133:13, 133:15, 133:23

**grandma's** [1] - 24:17

**Gras** [6] - 156:6, 156:10, 156:17, 157:25, 168:15, 168:24

**grat** [1] - 195:23

**gratuity** [2] - 202:23, 202:25

**gray** [1] - 100:22

**great** [11] - 10:6, 12:21, 37:6, 37:9, 72:17, 74:12, 74:13, 133:9, 269:16, 269:17

**greatly** [1] - 34:5

**greet** [3] - 23:16, 23:19, 154:8

**greeting** [2] - 130:24, 222:17

**grifters** [1] - 54:13

**grill** [1] - 19:6

**Grill** [1] - 204:21

**gross** [5] - 12:12, 169:24, 170:1, 170:2, 170:17

**group** [3] - 136:5

**Guatemala** [1] - 20:1

**guess** [14] - 6:7, 11:15, 75:2, 100:20, 101:25, 126:3, 139:14, 158:12,

195:4, 206:15, 209:14, 215:5, 223:8, 251:14

**guessing** [3] - 266:12, 266:14, 271:5

**guest** [18] - 97:10, 98:3, 98:8, 98:18, 98:19, 107:11, 108:1, 108:17, 109:12, 181:20, 191:8, 196:23, 197:14, 198:7, 202:18, 206:4, 206:6, 257:25

**guest's** [1] - 107:19

**guests** [12] - 107:13, 108:14, 108:15, 109:16, 181:9, 181:10, 181:12, 191:9, 207:25, 231:16, 231:17, 257:24

**guidance** [1] - 67:2

**GULFPORT** [1] - 1:25

**guy** [4] - 13:22, 37:5, 39:19, 79:3

**guys** [3] - 224:2, 240:10

## H

**half** [23] - 17:19, 40:21, 41:14, 120:9, 122:21, 123:6, 129:7, 151:9, 151:11, 151:12, 189:15, 189:18, 213:24, 224:18, 226:10, 250:15, 255:20, 256:17, 256:22, 265:9, 265:10, 266:21

**hall** [1] - 194:4

**hand** [23] - 6:18, 8:5, 8:6, 23:2, 42:16, 91:15, 95:24, 108:14, 108:16, 114:20, 123:19, 130:1, 170:13, 173:11, 195:5, 202:17, 202:19, 209:16, 209:18, 215:11, 225:3, 230:22, 256:4

**handbook** [15] - 37:24, 103:6, 103:8, 103:10, 103:13, 103:15, 104:2, 104:7, 106:5, 106:9, 106:12, 106:18,

106:20, 107:3, 219:21

**handed** [2] - 8:4, 175:18

**handful** [1] - 167:4

**handle** [7] - 22:23, 22:25, 47:6, 104:24, 189:5, 189:6, 194:21

**handled** [5] - 46:21, 175:11, 187:3, 209:7, 262:6

**handles** [1] - 255:20

**handling** [1] - 221:16

**hands** [1] - 202:15

**handwritten** [3] - 137:15, 259:17, 259:18

**hanging** [2] - 25:12, 132:20

**haphazard** [1] - 42:24

**happy** [4] - 15:12, 84:24, 156:9, 208:1

**hard** [7] - 11:2, 12:24, 20:5, 45:8, 75:7, 83:24, 110:17

**harsh** [1] - 10:11

**hate** [2] - 193:15, 218:20

**head** [7] - 14:10, 42:13, 101:2, 102:11, 102:13, 119:16, 254:22

**hear** [12] - 25:24, 106:11, 113:4, 153:23, 159:4, 220:2, 227:9, 237:9, 244:22, 247:6, 247:8, 261:4

**heard** [29] - 8:13, 76:10, 78:11, 85:14, 100:18, 113:3, 113:10, 132:16, 133:9, 136:18, 159:7, 189:22, 204:15, 212:16, 212:17, 212:18, 212:21, 212:25, 233:4, 233:12, 242:23, 243:15, 257:5, 258:13, 258:15, 258:17, 259:6, 260:3, 273:3

**HEARD** [1] - 1:11

**hearing** [4] - 115:22, 177:7, 266:19, 275:15

**hearsay** [1] - 260:25

**heart** [2] - 20:23, 84:22

**hearts** [1] - 84:19

**Hebrew** [2] - 121:25, 122:2
**held** [4] - 151:16, 224:13, 226:9, 247:5
**help** [23] - 25:20, 25:21, 64:2, 65:14, 70:11, 83:17, 116:10, 160:21, 161:1, 161:5, 161:7, 161:23, 162:1, 173:13, 177:4, 177:17, 180:6, 181:22, 181:24, 215:13, 230:24, 256:6
**helped** [5] - 69:15, 156:24, 160:19, 177:21, 232:3
**helpful** [1] - 140:13
**helping** [14] - 33:22, 33:23, 69:19, 74:1, 78:24, 78:25, 160:10, 176:5, 176:6, 190:22, 190:23, 191:4, 191:7, 191:12
**helps** [1] - 97:10
**hereby** [1] - 276:18
**herein** [1] - 110:7
**hi** [4] - 134:21, 154:5, 154:9, 266:2
**high** [6] - 19:5, 19:7, 20:5, 29:5, 58:7, 112:7
**high-profile** [1] - 20:5
**higher** [5] - 12:19, 30:4, 30:8, 61:7, 120:11
**highlighted** [3] - 49:11, 103:22, 262:22
**hire** [8] - 23:7, 61:14, 61:19, 62:22, 178:11, 178:13, 178:20, 220:6
**hired** [41] - 7:17, 9:16, 15:10, 26:3, 26:14, 46:1, 58:17, 58:19, 58:24, 60:6, 62:5, 63:21, 63:22, 74:18, 131:14, 132:3, 132:6, 132:25, 134:4, 134:11, 134:18, 134:19, 134:24, 135:3, 135:10, 135:12, 137:18, 152:9, 152:18, 174:15, 176:22, 176:23, 178:11, 178:15,

216:16, 216:18, 216:20, 220:7, 257:4, 257:12, 257:13
**hiring** [9] - 63:15, 178:9, 178:10, 178:16, 178:19, 180:13, 180:18, 180:19, 257:15
**historically** [1] - 252:24
**history** [6] - 120:17, 120:18, 133:25, 142:21, 263:22, 268:8
**hit** [2] - 191:6, 203:4
**hits** [3] - 11:22, 11:23, 13:5
**hitting** [2] - 29:21, 29:23
**hold** [9] - 89:18, 120:22, 137:3, 169:2, 190:13, 195:3, 195:4, 250:6, 262:18
**hole** [1] - 117:18
**holidays** [1] - 28:11
**home** [26] - 20:8, 20:11, 20:12, 20:15, 47:5, 114:22, 114:23, 142:2, 142:7, 142:9, 142:12, 156:4, 156:12, 161:3, 165:23, 168:15, 205:12, 205:22, 206:3, 210:21, 211:4, 211:10, 211:16, 212:4, 212:5, 212:6
**honestly** [6] - 18:4, 25:11, 26:6, 30:2, 79:14, 178:14
**Honor** [37] - 6:13, 14:9, 21:4, 29:17, 33:3, 52:10, 53:8, 85:18, 90:24, 91:2, 126:15, 127:1, 127:25, 128:7, 168:11, 168:12, 169:1, 177:5, 190:4, 190:9, 193:15, 206:8, 206:10, 210:1, 210:15, 210:16, 214:12, 215:8, 218:20, 227:1, 230:7, 244:11, 245:9, 246:3, 253:5, 272:9, 275:19

**HONORABLE** [1] - 1:11
**hope** [1] - 253:21
**hopefully** [1] - 160:12
**hoping** [1] - 202:22
**horrible** [2] - 27:2, 81:4
**host** [6] - 179:22, 179:23, 179:24, 180:2, 180:3, 216:8
**hosts** [1] - 180:1
**hot** [3] - 8:23, 86:14, 260:12
**hotel** [1] - 159:10
**Hotel** [1] - 198:16
**hour** [45] - 7:21, 11:15, 38:16, 39:18, 39:20, 39:23, 39:24, 39:25, 40:1, 40:5, 40:9, 40:21, 40:22, 41:10, 41:13, 42:6, 45:13, 48:24, 61:3, 115:24, 120:2, 120:6, 141:5, 150:5, 151:9, 151:11, 151:12, 158:25, 159:2, 159:9, 167:21, 168:9, 216:11, 224:18, 226:10, 233:6, 265:8, 265:9, 265:10, 266:20, 266:21
**houses** [5] - 10:22, 60:3, 257:12, 270:4, 271:22
**huge** [2] - 132:21, 225:3
**human** [1] - 204:1
**hundred** [6] - 45:8, 105:8, 117:2, 117:3, 117:4, 254:17
**Hunt** [18] - 6:16, 7:2, 7:3, 49:17, 50:4, 50:7, 53:23, 67:25, 74:6, 76:7, 91:1, 92:5, 99:8, 213:3, 233:12, 236:20, 242:24, 243:9
**HUNT** [3] - 3:5, 6:22, 7:3
**Hunt's** [1] - 44:4
**hurt** [1] - 41:12

## I

**idea** [7] - 8:8, 79:14, 79:19, 80:2, 138:2, 152:18, 215:1
**identifies** [1] - 106:20
**identify** [3] - 94:24, 136:25, 138:11
**identifying** [1] - 94:25
**identity** [1] - 244:8

145:23, 146:1, 146:13, 146:23, 146:24, 147:5, 147:7, 147:8, 147:9, 147:15, 147:16, 147:18, 147:25, 148:2, 148:4, 149:6, 150:7, 150:12, 150:14, 150:18, 150:20, 155:8, 225:11, 226:4, 226:8, 226:20, 229:10, 240:18, 241:15, 242:3, 263:11, 263:19, 263:22, 264:12, 264:15, 273:24, 273:25, 274:2
**house** [21] - 35:9, 57:11, 57:17, 58:3, 58:16, 92:11, 186:23, 186:25, 191:21, 204:19, 204:21, 204:22, 204:25, 231:14, 231:15, 257:9, 257:10, 269:19, 269:20, 269:22, 269:25

**ideology** [1] - 121:16
**illegal** [9] - 79:8, 79:9, 152:20, 164:6, 164:12, 164:20, 165:7, 234:17, 234:24
**illegally** [1] - 152:23
**illustrate** [1] - 169:18
**illustrates** [1] - 169:19
**image** [1] - 158:13
**imagine** [2] - 50:25, 192:16
**immediate** [1] - 217:2
**impact** [1] - 156:14
**impeccable** [8] - 72:14, 73:8, 73:11, 73:12, 73:14, 73:17, 74:2
**implicate** [1] - 82:9
**implied** [1] - 213:3
**implies** [2] - 107:17, 108:5
**importance** [2] - 229:23, 269:7
**important** [6] - 98:6, 98:23, 116:18, 118:18, 197:22, 198:11
**impress** [1] - 108:19
**impression** [8] - 47:20, 109:4, 232:23, 233:1, 233:2, 233:5, 233:8, 242:5
**improper** [2] - 164:18, 244:20
**improperly** [1] - 275:12
**improved** [1] - 253:20
**inability** [1] - 42:13
**inaccurate** [1] - 54:7
**incident** [3] - 156:3, 196:21, 197:2
**incidental** [3] - 219:14, 219:16, 223:2
**incidentally** [2] - 222:1, 222:16
**Incidentally** [1] - 224:14
**inclination** [1] - 47:23
**include** [8] - 25:8, 140:11, 181:1, 181:4, 192:17, 217:18, 219:9, 231:16
**included** [10] - 5:18, 141:19, 160:18, 160:20, 223:16, 230:3, 230:4, 233:7,

250:4, 260:14
**includes** [2] - 125:4, 125:21
**including** [6] - 100:1, 125:5, 125:6, 141:15, 195:1
**inclusive** [1] - 219:11
**income** [2] - 11:23, 60:20
**increase** [3] - 160:11, 160:12, 161:2
**increased** [2] - 11:16, 25:1
**incredible** [1] - 8:23
**indicate** [3] - 146:25, 147:17, 148:3
**indicated** [1] - 269:20
**indicative** [1] - 25:22
**individual** [8] - 9:22, 49:18, 59:8, 68:25, 69:1, 69:4, 198:7, 250:8
**individual's** [1] - 186:3
**individuals** [3] - 118:8, 118:22, 119:10
**industry** [8] - 8:1, 19:1, 20:17, 56:15, 71:9, 121:15, 134:1, 275:22
**inequity** [1] - 42:12
**inform** [2] - 200:12, 251:5
**information** [9] - 66:24, 189:4, 232:2, 234:21, 249:3, 249:4, 250:23, 250:25, 253:17
**informed** [5] - 5:19, 195:15, 197:5, 251:4, 264:20
**initial** [4] - 7:3, 47:22, 250:14, 250:16
**input** [1] - 232:2
**inquire** [1] - 233:4
**inquiry** [1] - 245:1
**inside** [3] - 16:16, 115:4, 178:5
**installed** [1] - 137:18
**instance** [3] - 161:20, 211:2, 228:21
**instances** [3] - 181:11, 206:4, 263:21
**instead** [2] - 140:13, 159:2
**Institute** [1] - 19:16
**instruct** [1] - 179:19
**instructed** [1] - 200:2

**instruction** [2] - 16:3, 250:19
**instructions** [1] - 190:5
**insured** [1] - 269:11
**integrity** [8] - 15:6, 18:12, 31:12, 42:20, 52:6, 52:7, 52:12, 74:24
**intend** [1] - 275:18
**intent** [1] - 244:7
**interact** [3] - 82:22, 194:14, 199:1
**interacted** [2] - 13:20, 154:12
**interacting** [1] - 107:13
**interaction** [7] - 34:25, 135:6, 181:14, 194:10, 198:21, 198:23, 271:11
**interactions** [1] - 208:8
**interchangeably** [2] - 153:2, 218:17
**interested** [1] - 246:21
**interesting** [4] - 15:4, 26:22, 38:10, 90:10
**interfered** [1] - 206:5
**internal** [1] - 183:8
**interpret** [1] - 114:7
**interrupt** [2] - 126:15, 193:16
**interview** [4] - 216:25, 257:6, 257:7, 257:8
**interviewed** [2] - 63:23, 63:25
**intimidated** [1] - 152:24
**intoxicated** [4] - 205:18, 206:3, 211:10, 211:11
**intoxication** [1] - 210:21
**introduce** [1] - 35:16
**introduced** [1] - 53:8
**invoke** [1] - 193:16
**invoked** [1] - 193:18
**involved** [3] - 26:9, 192:15, 221:10
**irrelevant** [4] - 33:4, 108:23, 108:24, 244:19
**IRS** [1] - 54:14
**Israeli** [1] - 14:21
**issue** [28] - 33:23, 52:6, 67:9, 74:24, 78:3, 85:2, 126:3, 127:7, 127:12, 127:19, 132:21,

156:3, 157:4, 181:16, 219:2, 236:21, 242:11, 242:13, 242:15, 243:15, 243:16, 246:9, 249:10, 261:14, 273:15, 274:10, 274:13, 274:17
**issued** [1] - 16:22
**issues** [4] - 52:8, 233:17, 244:19, 246:6
**ITAI** [3] - 3:9, 91:19, 91:24
**Itai** [75] - 6:5, 8:11, 9:2, 13:23, 14:3, 16:8, 26:11, 26:16, 27:8, 27:9, 27:12, 28:10, 31:16, 32:3, 32:14, 34:24, 37:25, 42:16, 61:15, 61:16, 61:19, 63:3, 63:18, 63:21, 63:22, 63:23, 80:18, 87:9, 87:17, 88:3, 89:3, 89:12, 89:24, 91:13, 91:24, 96:1, 100:8, 100:14, 106:25, 127:2, 132:2, 132:14, 132:15, 135:1, 136:21, 136:22, 139:20, 139:22, 142:9, 158:22, 169:23, 178:22, 179:7, 179:8, 179:11, 196:21, 197:1, 197:2, 199:16, 199:18, 217:7, 217:8, 218:3, 218:4, 218:6, 218:9, 218:10, 218:18, 221:25, 223:7, 223:10, 232:8
**Itamar** [17] - 13:24, 31:17, 31:20, 32:3, 32:4, 38:22, 39:18, 42:16, 230:19, 231:6, 231:10, 246:4, 247:8, 252:19
**ITAMAR** [3] - 4:1, 231:1, 231:6
**item** [2] - 102:21, 162:11
**items** [1] - 163:15
**itself** [2] - 74:1, 229:8

## J

**J-O-N-E-S** [1] - 130:11

**Jackson** [1] - 275:3
**JAKLYN** [1] - 1:23
**James** [2] - 71:18, 138:7
**JAMES** [1] - 1:4
**January** [17] - 27:21, 28:10, 29:18, 30:16, 30:17, 30:18, 44:9, 44:24, 48:14, 55:3, 55:4, 55:6, 66:21, 124:10, 165:10, 227:21
**Jersey** [1] - 191:3
**JESSICA** [1] - 1:15
**job** [40] - 12:5, 12:15, 15:7, 20:2, 31:6, 32:22, 51:1, 51:11, 51:12, 51:21, 54:22, 54:23, 54:24, 55:4, 69:17, 78:17, 84:23, 94:17, 96:23, 96:25, 109:7, 111:2, 133:7, 133:10, 133:15, 133:20, 152:22, 152:24, 158:10, 161:9, 197:16, 201:12, 207:24, 216:7, 216:8, 228:4, 230:1, 257:5, 269:11, 269:12
**jobs** [5] - 20:5, 60:23, 70:3, 260:22
**join** [1] - 89:20
**joined** [1] - 80:7
**joint** [1] - 19:5
**Jones** [10] - 129:3, 129:24, 130:10, 155:18, 157:8, 159:2, 168:14, 182:13, 183:9, 184:2
**JONES** [1] - 130:5
**JONES.......................
.................** [1] - 3:11
**JR** [1] - 6:22
**Jr** [2] - 7:2, 7:3
**JR.............................
....** [1] - 3:5
**judge** [5] - 43:5, 53:19, 171:13, 190:17, 198:6
**JUDGE** [1] - 1:11
**Judge** [10] - 85:8, 127:14, 158:10, 229:5, 243:3, 247:21, 249:10, 252:1, 253:2, 275:9
**July** [7] - 48:14, 59:1, 129:5, 144:23, 146:9, 146:22, 150:6
**June** [1] - 183:17

**JUNE** [3] - 1:6, 5:3, 173:3
**jury** [1] - 247:7

## K

**keep** [14] - 8:16, 9:19, 58:21, 62:13, 78:2, 91:5, 114:23, 202:19, 212:10, 235:5, 239:1, 250:12, 266:19, 269:11
**keeping** [3] - 67:16, 136:8, 255:11
**kept** [10] - 16:9, 16:11, 16:13, 17:3, 17:6, 17:7, 30:19, 118:22, 186:17, 217:23
**key** [2] - 24:8, 187:8
**keys** [6] - 23:10, 32:16, 135:15, 180:7, 220:24, 258:18
**kid** [1] - 234:15
**kids** [8] - 20:7, 29:23, 31:23, 60:24, 234:2, 235:5, 235:8, 235:19
**kill** [1] - 155:8
**Kinchen** [11] - 95:16, 109:5, 131:16, 137:2, 137:11, 138:1, 138:24, 139:2, 142:3, 193:24, 194:3
**kind** [34] - 8:4, 13:22, 13:25, 19:12, 26:7, 29:23, 30:23, 33:1, 33:8, 33:17, 37:24, 45:8, 86:19, 89:17, 113:25, 133:20, 134:7, 135:21, 137:23, 138:6, 156:8, 163:16, 166:13, 176:2, 176:13, 177:20, 180:12, 180:20, 194:14, 206:14, 223:25, 244:25, 275:4
**kinds** [1] - 34:6
**Kingopolous** [1] - 14:14
**kitchen** [14] - 18:20, 25:14, 131:5, 175:17, 175:19, 175:21, 177:3, 180:12, 180:15, 180:22, 194:11, 194:20, 269:2

**knocked** [1] - 77:5
**know..** [1] - 119:14
**knowing** [3] - 171:9, 220:17, 238:9
**knowledge** [25] - 18:17, 41:15, 45:16, 56:7, 88:21, 118:7, 141:2, 141:9, 163:11, 165:9, 165:11, 176:15, 177:1, 185:25, 195:9, 216:13, 244:8, 258:20, 258:21, 259:9, 262:12, 263:15, 268:14, 268:15, 274:25
**known** [4] - 258:11, 258:12, 258:14, 258:16
**Konrad** [2] - 133:12, 134:20
**Kuzmovich** [1] - 129:7

## L

**L-A-W-R-E-N-C-E** [1] - 256:13
**L-E-V-Y** [1] - 231:7
**L.J** [5] - 7:7, 7:10, 18:25, 85:21, 233:12
**L.J.'s** [1] - 99:8
**L.L.C** [1] - 6:7
**LA** [4] - 1:17, 1:21, 2:5, 13:25
**Labor** [1] - 273:13
**lack** [5] - 13:8, 31:11, 42:24, 74:24, 79:15
**lacked** [1] - 42:19
**lackluster** [1] - 10:23
**lady's** [1] - 87:18
**lagniappe** [1] - 12:16
**laid** [4] - 24:12, 24:14, 24:15
**landscape** [2] - 20:10, 51:13
**language** [1] - 20:7
**lap** [1] - 37:19
**lapse** [1] - 79:15
**large** [3] - 82:21, 180:4, 194:12
**larger** [4] - 82:15, 192:22, 212:14, 270:16
**Larry** [14] - 6:16, 7:2, 7:6, 233:12, 234:22, 235:23, 235:25, 236:20, 236:23, 236:25, 237:5,

237:10, 237:11
**LARRY** [3] - 3:5, 6:22, 7:2
**last** [36] - 17:16, 36:15, 36:17, 36:18, 40:8, 41:18, 44:20, 44:21, 91:25, 136:18, 142:4, 144:24, 145:4, 145:10, 147:20, 156:9, 156:10, 157:25, 168:17, 168:18, 168:24, 173:24, 178:2, 190:21, 206:18, 206:21, 206:25, 224:17, 225:15, 231:6, 247:22, 257:2, 264:8, 265:4, 265:9, 265:11
**late** [11] - 103:23, 104:15, 105:13, 105:18, 105:25, 106:3, 188:19, 189:3, 189:7, 227:21
**laughable** [1] - 32:24
**LAURA** [1] - 1:19
**Laura** [2] - 6:13, 229:7
**law** [7] - 29:12, 126:12, 127:19, 158:10, 265:15, 273:13, 273:14
**LAW** [2] - 1:15, 1:19
**lawful** [1] - 168:7
**LAWRENCE** [2] - 4:3, 256:8
**Lawrence** [7] - 118:5, 241:9, 241:14, 242:2, 256:2, 256:13, 266:1
**lawsuit** [4] - 237:22, 238:5, 249:17, 275:21
**lawyer** [2] - 71:11, 102:18
**lawyers** [1] - 126:3
**lay** [1] - 244:14
**leading** [3] - 140:14, 168:24, 177:9
**least** [9] - 103:24, 106:6, 115:4, 117:5, 149:12, 154:4, 167:4, 205:25, 270:7
**leave** [28] - 20:22, 22:24, 36:13, 76:22, 88:18, 115:23, 116:3, 116:4, 116:5, 116:7, 154:10, 154:18, 154:20, 154:23, 154:24,

154:25, 155:2, 155:3, 155:14, 155:20, 166:4, 175:17, 186:8, 186:9, 212:23, 216:17
**leaves** [2] - 115:21, 213:9
**leaving** [2] - 196:16, 208:1
**led** [1] - 195:18
**left** [39] - 16:19, 16:20, 18:10, 19:21, 19:25, 33:11, 40:15, 42:11, 44:7, 65:19, 76:1, 77:13, 95:24, 112:18, 112:23, 131:14, 131:15, 131:20, 133:10, 153:10, 154:16, 155:10, 165:11, 166:1, 180:4, 193:22, 195:22, 205:6, 212:13, 213:3, 213:12, 216:2, 216:6, 218:7, 220:17, 227:9, 227:14, 264:13
**left-hand** [1] - 95:24
**legal** [10] - 29:13, 31:19, 31:25, 32:10, 46:23, 71:10, 127:21, 165:12, 236:1, 243:22
**legality** [3] - 31:14, 32:1, 233:18
**legally** [1] - 29:8
**lend** [1] - 74:1
**length** [1] - 210:23
**lengthy** [1] - 220:11
**less** [9] - 13:1, 40:1, 78:13, 81:1, 83:23, 84:13, 111:15, 158:3, 222:23
**letting** [4] - 105:13, 151:25, 156:22, 220:15
**level** [5] - 92:22, 180:19, 192:15, 261:23, 271:25
**Levy** [7] - 230:19, 231:6, 231:7, 246:4, 255:22, 273:1, 273:3
**LEVY** [1] - 231:1
**LEVY...........................
...............** [1] - 4:1
**liability** [1] - 273:20
**lies** [1] - 110:7
**life** [2] - 20:6, 106:3
**likely** [2] - 83:4,

264:23
**limitation** [1] - 15:12
**limited** [1] - 127:1
**linchpins** [2] - 72:13, 73:16
**line** [10] - 11:2, 25:17, 81:24, 103:18, 137:21, 238:13, 240:19, 243:4, 244:20, 261:18
**lines** [1] - 26:10
**link** [1] - 58:9
**lion's** [1] - 35:8
**liquor** [3] - 19:14, 19:18, 81:11
**list** [2] - 206:14, 245:4
**listed** [4] - 149:8, 228:9, 259:21, 264:22
**Listen** [3] - 29:4, 31:22, 81:3
**listen** [4] - 23:25, 27:13, 31:7, 98:11
**listened** [1] - 266:6
**listening** [2] - 158:13, 266:3
**literally** [2] - 41:20, 75:4
**litigation** [3] - 72:5, 101:9, 253:25
**lived** [2] - 234:18, 237:3
**lives** [1] - 8:17
**living** [1] - 30:8
**LLC** [1] - 1:7
**loans** [3] - 29:21, 29:22, 60:24
**location** [1] - 186:13
**lock** [3] - 32:17, 209:24
**locked** [1] - 186:14
**log** [2] - 259:10, 259:14
**logical** [1] - 254:5
**look** [52] - 12:14, 17:18, 43:10, 45:12, 48:1, 48:17, 48:22, 49:2, 49:4, 49:5, 49:19, 81:20, 94:20, 102:10, 102:22, 103:18, 111:19, 120:13, 120:14, 120:20, 124:17, 125:12, 126:6, 126:11, 126:12, 143:8, 143:11, 143:17, 146:13, 148:14, 150:6, 169:12, 171:16, 182:5, 185:5,

187:12, 187:21, 188:4, 228:20, 231:18, 238:11, 240:3, 240:8, 247:17, 252:7, 252:23, 253:13, 262:16, 264:1, 264:4, 265:13
**lookback** [1] - 49:13
**looked** [8] - 123:14, 123:24, 138:3, 166:11, 180:5, 201:17, 228:7, 250:3
**looking** [22] - 12:23, 44:3, 48:11, 50:6, 81:20, 110:1, 110:14, 111:17, 117:22, 122:17, 123:12, 168:3, 187:15, 187:25, 188:3, 197:25, 198:2, 208:10, 228:6, 228:12, 229:7, 229:14
**looks** [28] - 10:2, 118:3, 122:19, 123:17, 138:6, 138:13, 139:3, 139:12, 143:1, 145:22, 145:23, 169:6, 170:2, 170:5, 170:10, 183:8, 187:18, 226:19, 228:21, 240:4, 240:12, 241:2, 263:2, 263:13, 264:14, 264:17, 265:6
**Los** [1] - 14:1
**lose** [1] - 253:22
**lost** [1] - 240:2
**louder** [1] - 174:6
**LOUISIANA** [2] - 1:1, 1:5
**Louisiana** [7] - 31:23, 120:25, 121:17, 242:14, 273:14, 276:17, 276:18
**love** [3] - 12:17, 24:4, 37:6
**loving** [1] - 12:19
**low** [2] - 24:8, 28:19
**lower** [2] - 59:13, 73:23
**lowest** [3] - 10:17, 10:18, 10:19
**lucky** [2] - 37:12, 156:10
**Luke** [1] - 271:19
**lunch** [9] - 22:19,

268:6, 268:8, 268:9, 268:11, 268:13, 268:16, 268:20, 268:21
**luncheon** [1] - 172:7
**LUNCHEON** [1] - 3:15
**lunches** [2] - 267:23, 268:14
**lunchtime** [1] - 91:5
**lynchpins** [1] - 269:9

**M**

**ma'am** [72] - 7:12, 7:19, 10:2, 11:10, 13:15, 14:4, 14:6, 14:20, 17:4, 18:15, 19:2, 23:13, 27:12, 27:25, 30:17, 32:20, 35:3, 36:24, 37:16, 41:17, 44:9, 44:24, 45:15, 46:6, 46:8, 46:11, 46:13, 46:17, 46:19, 48:15, 48:19, 48:23, 48:25, 49:8, 52:15, 62:2, 64:21, 82:3, 85:6, 86:13, 87:2, 87:7, 88:13, 88:17, 89:8, 93:11, 101:14, 115:18, 124:14, 136:2, 136:17, 140:6, 148:5, 165:16, 225:23, 228:16, 252:16, 257:16, 257:20, 258:19, 259:17, 259:25, 260:2, 260:7, 263:10, 263:13, 263:17, 263:20, 265:3, 265:22
**mail** [20] - 18:13, 138:6, 138:7, 138:13, 138:21, 138:25, 182:5, 182:7, 182:13, 183:5, 183:8, 183:10, 183:11, 183:19, 183:21, 183:22, 183:24, 184:2, 200:14, 200:24
**mails** [1] - 262:6
**main** [3] - 128:3, 128:17, 178:12
**maintain** [6] - 86:16, 88:8, 116:18, 118:18, 140:1, 260:1
**maintained** [7] - 65:11, 253:11,

253:12, 253:13, 255:4, 255:6, 262:6
**maintaining** [1] - 21:15
**majority** [4] - 60:2, 114:17, 131:18, 205:9
**man** [4] - 14:8, 29:25, 79:3, 133:16
**manage** [2] - 223:7, 223:10
**managed** [8] - 20:20, 32:14, 89:7, 131:10, 131:19, 185:14, 185:21, 198:18
**management** [14] - 14:3, 16:5, 16:6, 16:7, 19:15, 74:8, 85:2, 132:22, 152:16, 152:20, 165:12, 180:14, 185:1, 222:25
**manager** [197] - 10:14, 14:4, 14:7, 14:16, 17:12, 20:19, 22:8, 22:14, 23:2, 23:9, 25:20, 26:4, 26:11, 29:19, 30:14, 30:15, 33:7, 33:15, 33:19, 33:22, 34:21, 34:23, 37:13, 57:4, 61:7, 61:18, 61:20, 61:21, 61:23, 62:5, 62:7, 62:12, 63:2, 63:24, 65:16, 65:18, 66:17, 67:6, 70:9, 70:10, 70:13, 70:24, 71:4, 71:16, 79:20, 83:8, 83:12, 86:24, 87:5, 87:22, 87:25, 88:4, 88:11, 88:15, 88:20, 89:12, 89:21, 92:11, 92:24, 93:12, 93:25, 94:7, 94:8, 94:9, 94:11, 94:15, 94:16, 95:12, 95:15, 95:17, 95:18, 95:25, 96:2, 96:15, 96:22, 98:2, 98:7, 99:12, 99:15, 100:25, 101:5, 101:6, 101:7, 101:10, 101:12, 101:15, 102:1, 102:2, 103:24, 104:1, 106:6, 106:14, 106:21, 106:24, 107:4, 107:10, 107:17, 107:21, 110:1, 131:12, 131:15,

131:17, 132:5, 132:16, 134:20, 135:10, 136:22, 137:4, 137:10, 137:24, 139:2, 139:18, 141:21, 141:22, 142:2, 152:7, 153:1, 154:8, 154:17, 154:22, 159:5, 161:17, 162:19, 164:1, 164:13, 165:1, 165:2, 174:12, 174:15, 174:18, 174:19, 174:25, 175:8, 175:10, 175:17, 175:20, 176:1, 176:22, 176:24, 179:14, 181:20, 181:25, 184:18, 184:24, 185:2, 189:5, 190:14, 190:15, 190:19, 191:14, 191:23, 191:24, 192:8, 192:10, 197:19, 198:14, 198:18, 199:9, 202:5, 202:12, 205:22, 206:12, 206:13, 208:5, 208:6, 209:10, 213:9, 214:3, 214:5, 218:8, 218:13, 223:21, 257:23, 258:13, 258:15, 260:5, 260:10, 260:18, 260:19, 260:22, 261:2, 261:6, 261:16, 261:19, 264:20, 267:16, 272:17, 272:19
**manager's** [1] - 169:21
**Manager's** [1] - 185:13
**managerial** [1] - 108:6
**managers** [197] - 14:5, 14:11, 22:13, 26:1, 26:2, 26:13, 28:23, 29:2, 29:15, 30:20, 31:14, 32:14, 32:21, 32:23, 33:14, 34:2, 34:12, 34:17, 34:25, 35:4, 37:1, 39:2, 39:13, 40:20, 47:2, 47:4, 47:8, 47:11, 47:14, 55:23, 61:9, 61:10, 61:13, 62:2, 62:4, 62:7, 62:21,

63:5, 63:16, 64:8, 64:12, 64:23, 65:11, 65:13, 66:11, 70:16, 72:9, 79:9, 79:11, 82:22, 83:25, 84:8, 85:10, 86:16, 86:25, 87:3, 87:13, 87:15, 87:16, 87:17, 89:7, 89:10, 89:12, 89:20, 90:4, 93:10, 93:16, 96:11, 96:20, 96:24, 97:25, 98:1, 98:17, 99:5, 100:2, 100:5, 100:7, 100:12, 101:17, 101:22, 101:24, 102:5, 102:6, 102:7, 102:9, 104:5, 109:7, 122:2, 131:7, 131:9, 131:22, 131:25, 132:11, 135:6, 135:10, 135:14, 135:23, 135:25, 136:2, 136:4, 136:6, 136:12, 136:18, 139:25, 140:7, 140:12, 141:15, 141:19, 151:23, 151:25, 153:5, 153:10, 153:13, 153:16, 153:19, 154:1, 158:20, 163:2, 163:11, 167:8, 167:13, 167:15, 175:10, 175:12, 175:13, 177:1, 177:14, 177:16, 177:17, 177:21, 177:22, 184:19, 187:3, 187:10, 203:8, 204:15, 205:16, 218:2, 218:14, 218:16, 218:19, 220:4, 220:5, 220:24, 221:1, 221:4, 221:20, 222:4, 222:10, 222:15, 222:23, 223:6, 223:13, 223:16, 224:21, 225:4, 230:3, 230:4, 231:22, 235:6, 235:10, 236:2, 258:4, 258:11, 258:12, 258:14, 258:18, 259:1, 259:3, 259:4, 259:13, 259:20, 260:1, 260:11, 260:13, 262:8,

267:19, 267:21, 267:23, 270:10, 270:14, 270:22, 270:25, 271:1, 271:10, 271:14, 272:13
**managers'** [1] - 32:13
**managing** [12] - 13:23, 28:17, 81:23, 131:13, 139:10, 140:5, 167:16, 185:19, 188:20, 188:21, 260:24
**mandatory** [22] - 39:4, 39:9, 40:5, 41:3, 46:4, 46:15, 65:23, 140:17, 151:16, 183:14, 183:23, 184:9, 184:16, 188:10, 189:10, 200:6, 236:17, 236:21, 262:1, 262:2, 262:3, 262:7
**manicuring** [1] - 13:2
**manila** [1] - 253:18
**manipulated** [1] - 273:18
**manual** [6] - 37:24, 139:13, 139:15, 141:6, 262:11
**manually** [1] - 164:2
**map** [4] - 179:13, 179:16, 206:22, 207:18
**March** [12] - 103:10, 138:23, 144:15, 216:2, 248:24, 248:25, 249:8, 249:9, 251:16, 254:9, 254:20, 264:4
**Marcus** [17] - 179:3, 179:8, 195:14, 195:24, 196:2, 196:6, 196:9, 196:15, 197:4, 197:5, 197:17, 201:16, 201:20, 215:9, 225:11, 225:12, 257:5
**Mardi** [6] - 156:6, 156:10, 156:17, 157:25, 168:15, 168:24
**Mark** [2] - 79:3, 215:20
**MARK** [3] - 3:23, 215:15, 215:20
**marked** [1] - 53:4
**Marxist** [2] - 74:8, 74:15
**match** [3] - 144:1,

149:11, 263:18
**matched** [1] - 203:18
**matches** [2] - 53:20, 123:10
**math** [9] - 31:1, 42:7, 49:1, 79:24, 114:19, 125:12, 202:10, 204:1
**matter** [13] - 16:14, 63:10, 67:21, 68:2, 71:7, 83:20, 84:7, 89:19, 92:24, 96:9, 98:1, 127:21, 276:19
**matters** [1] - 6:10
**maximum** [1] - 73:21
**maître** [4] - 10:14, 10:15, 19:21, 19:23
**McDonald's** [2] - 40:18
**McSwain** [1] - 238:7
**meal** [3] - 154:5, 195:1, 202:19
**mean** [66] - 9:9, 9:14, 9:20, 9:25, 10:1, 12:4, 12:7, 12:17, 12:25, 17:24, 24:22, 25:11, 30:6, 32:14, 32:15, 39:9, 40:2, 40:12, 48:1, 56:14, 63:9, 71:3, 73:4, 74:7, 78:13, 79:16, 82:24, 86:25, 87:8, 90:10, 98:4, 105:10, 110:23, 115:16, 119:6, 120:2, 120:5, 126:4, 129:14, 152:21, 154:7, 158:10, 158:24, 161:19, 162:25, 163:5, 163:19, 167:4, 168:5, 168:9, 179:23, 186:19, 204:25, 206:24, 217:6, 220:7, 231:14, 231:17, 239:1, 239:2, 254:22, 255:8, 255:18, 258:23, 270:3
**meaning** [2] - 67:16, 87:8
**means** [13] - 13:3, 24:10, 50:17, 61:22, 98:6, 108:3, 114:24, 121:16, 122:9, 138:15, 222:19, 223:3, 223:23
**meant** [2] - 9:19, 58:5
**measure** [1] - 75:8
**meat** [10] - 82:18,

82:22, 82:23, 97:19, 162:8, 162:11, 192:19, 192:22, 194:9, 209:4
**meats** [3] - 109:1, 162:15
**MECHANICAL** [1] - 2:7
**mechanism** [2] - 63:14
**meeting** [45] - 39:5, 39:6, 39:13, 40:6, 40:19, 40:24, 41:1, 41:3, 41:25, 48:17, 48:18, 66:12, 66:18, 140:19, 151:9, 151:10, 151:22, 151:24, 163:22, 184:16, 199:22, 200:6, 200:8, 200:11, 216:18, 217:14, 220:17, 224:12, 224:17, 225:5, 226:8, 226:11, 226:14, 229:16, 262:7, 264:18, 274:18, 274:19, 275:9, 275:10, 275:12, 275:14, 275:15, 275:17, 275:23
**meetings** [70] - 38:19, 38:22, 39:3, 39:4, 40:8, 41:18, 46:4, 46:12, 46:15, 47:12, 65:22, 65:23, 66:8, 66:16, 66:20, 66:22, 67:2, 140:17, 140:20, 140:23, 140:24, 141:2, 141:3, 141:4, 151:8, 151:16, 151:19, 151:20, 153:20, 153:21, 163:15, 189:11, 200:9, 200:13, 217:14, 224:4, 224:6, 224:7, 224:11, 226:9, 228:9, 228:10, 228:15, 236:16, 236:17, 236:19, 236:21, 236:23, 257:25, 262:1, 262:3, 264:15, 264:19, 264:22, 265:8, 265:9, 266:8, 266:19, 266:22, 267:4, 267:9, 273:3, 273:5, 273:24, 274:2, 274:3,

274:11, 274:16, 275:20
**meets** [1] - 60:25
**MELISSA** [3] - 3:16, 173:15, 173:20
**Melissa** [32] - 95:11, 96:1, 96:4, 108:12, 109:5, 131:20, 132:10, 136:1, 137:1, 137:10, 138:15, 140:11, 152:2, 153:1, 154:7, 161:20, 164:17, 164:22, 173:9, 173:20, 218:13, 218:17, 220:8, 221:7, 221:15, 221:16, 221:20, 222:1, 258:8, 259:6, 270:16
**members** [2] - 8:18, 112:19
**mention** [6] - 26:20, 141:18, 141:21, 143:19, 233:18, 237:1
**mentioned** [14] - 36:25, 39:3, 127:15, 131:21, 131:24, 135:7, 140:1, 140:7, 141:20, 141:22, 144:16, 233:16, 234:1, 234:23
**mentioning** [1] - 255:1
**mentions** [3] - 106:9, 106:12, 143:18
**menu** [7] - 97:12, 131:2, 162:6, 162:11, 163:15, 191:11, 219:23
**menus** [2] - 23:25, 176:5
**Merit** [2] - 276:17, 276:22
**MERIT** [1] - 2:4
**message** [3] - 139:8, 139:9, 200:24
**messages** [1] - 139:4
**met** [5] - 13:24, 134:25, 217:7, 217:8, 225:25
**Metairie** [1] - 271:20
**method** [2] - 200:12, 243:19
**Metropolitan** [89] - 7:11, 7:16, 9:11, 13:19, 14:18, 15:23, 20:24, 21:11, 22:3, 22:6, 23:14, 25:14, 25:23, 28:3, 33:14,

35:1, 35:2, 35:20, 36:22, 37:23, 42:11, 47:2, 47:4, 47:8, 47:11, 47:14, 48:10, 51:17, 57:9, 61:24, 83:18, 92:8, 94:23, 95:8, 99:19, 106:13, 106:24, 106:25, 114:17, 119:24, 130:15, 132:9, 133:1, 133:11, 135:8, 135:14, 135:17, 135:20, 137:8, 139:16, 139:25, 141:10, 141:11, 141:14, 149:2, 153:5, 153:7, 153:22, 153:25, 173:24, 174:15, 181:21, 184:15, 198:24, 211:19, 211:23, 211:24, 215:25, 216:5, 216:16, 220:1, 220:6, 220:23, 221:2, 221:11, 222:11, 222:14, 222:22, 225:18, 225:22, 229:24, 231:10, 232:9, 256:16, 261:3, 264:5, 271:21, 271:25, 272:15
**mid** [1] - 77:10
**middle** [6] - 7:3, 55:3, 65:19, 65:20, 117:19, 130:16
**might** [11] - 21:22, 24:7, 24:16, 37:12, 84:13, 84:14, 189:16, 200:10, 232:21, 236:7, 274:22
**mind** [3] - 7:8, 163:7, 250:12
**mine** [7] - 20:22, 67:24, 70:23, 80:22, 166:11, 245:6
**minimal** [1] - 102:15
**minimum** [16] - 7:21, 39:23, 39:24, 49:2, 61:12, 150:3, 150:4, 151:3, 168:9, 225:25, 229:3, 236:21, 244:2, 248:7, 265:15, 274:6
**minus** [1] - 120:9
**minute** [8] - 6:2, 25:18, 112:20, 133:18, 133:22,

133:23, 230:12, 245:24
**minutes** [16] - 36:5, 41:19, 41:20, 41:21, 83:22, 104:15, 105:18, 106:1, 122:12, 134:12, 146:24, 216:21, 227:3, 230:9, 241:6
**misplaced** [1] - 254:4
**mispronouncing** [1] - 176:21
**miss** [1] - 103:23, 115:1
**missing** [15] - 17:14, 17:21, 48:11, 48:21, 110:12, 113:3, 116:21, 187:2, 187:3, 252:8, 252:14, 254:2, 254:17, 254:23, 255:9
**missteps** [1] - 13:8
**mistake** [1] - 244:9
**mistakes** [1] - 203:25
**mix** [2] - 71:21, 235:13
**moment** [3] - 119:12, 142:14, 197:11
**Monday** [65] - 39:5, 39:7, 40:24, 41:3, 46:9, 46:12, 46:16, 48:17, 48:18, 65:23, 125:18, 126:13, 140:17, 140:18, 143:5, 151:8, 151:9, 151:10, 151:12, 151:16, 151:18, 151:22, 151:24, 163:22, 163:25, 183:11, 184:5, 199:23, 200:8, 200:13, 224:4, 224:5, 224:7, 224:12, 224:17, 226:8, 226:9, 226:11, 226:14, 228:9, 228:15, 229:16, 236:17, 236:19, 236:21, 236:23, 261:25, 262:1, 264:15, 264:18, 264:19, 265:8, 265:9, 266:19, 273:3, 273:5, 273:24, 274:2, 274:3, 274:11, 274:16, 275:9, 275:15
**MONDAY** [3] - 1:6, 5:3, 173:3

**Mondays** [2] - 200:9, 200:10
**money** [46] - 8:22, 8:23, 13:1, 13:10, 15:11, 16:22, 18:1, 20:3, 20:15, 22:23, 22:25, 30:24, 39:19, 45:23, 45:25, 46:2, 46:3, 58:6, 58:7, 59:4, 67:20, 68:11, 72:5, 78:13, 81:16, 115:2, 121:7, 155:7, 159:21, 159:24, 159:25, 160:6, 161:2, 186:21, 186:23, 207:4, 207:8, 211:3, 213:4, 213:12, 224:2, 231:16, 231:17, 232:11, 232:17, 269:12
**money's** [1] - 59:5
**money-making** [1] - 67:20
**monies** [2] - 68:18, 232:7
**monitor** [2] - 117:25, 119:19
**month** [4] - 7:25, 44:11, 85:4, 254:19
**months** [23] - 14:15, 16:14, 20:8, 44:10, 45:18, 45:21, 46:1, 72:8, 72:9, 79:14, 86:4, 86:16, 111:11, 152:19, 158:4, 161:16, 166:22, 227:24, 238:24, 250:16, 252:1
**moon** [1] - 12:18
**moral** [1] - 52:12
**MORGAN** [1] - 1:11
**morning** [9] - 5:9, 5:10, 6:13, 49:17, 126:13, 142:13, 196:23, 252:12, 276:8
**mortgage** [1] - 20:14
**most** [29] - 9:7, 21:19, 27:5, 77:7, 83:1, 85:25, 89:14, 97:16, 98:6, 98:23, 115:18, 115:20, 131:18, 132:8, 132:20, 151:19, 154:4, 154:8, 177:1, 177:5, 188:14, 224:15, 233:8, 236:25, 264:19, 264:22, 264:23, 264:24,

266:8
**mostly** [4] - 75:10, 75:12, 266:16, 267:16
**motive** [1] - 244:7
**mouth** [1] - 76:10
**move** [3] - 58:9, 174:6, 253:14
**moved** [5] - 19:11, 19:14, 253:19, 259:13
**moving** [2] - 67:16, 67:18
**MR** [124] - 3:7, 3:13, 3:18, 3:20, 3:22, 3:25, 4:5, 14:9, 21:4, 33:3, 46:22, 49:16, 50:11, 52:20, 53:7, 53:10, 53:13, 53:15, 53:17, 53:19, 53:22, 62:20, 64:7, 64:22, 65:10, 68:7, 68:15, 69:9, 77:23, 79:6, 82:4, 82:13, 85:7, 85:9, 85:16, 88:1, 106:17, 126:15, 127:1, 127:6, 127:14, 127:21, 128:7, 128:13, 128:20, 128:25, 141:16, 155:17, 157:2, 157:6, 158:9, 158:19, 165:17, 168:11, 168:13, 169:1, 171:25, 177:5, 190:4, 190:9, 190:12, 193:18, 193:25, 194:7, 194:8, 206:8, 210:1, 210:5, 210:15, 212:22, 213:6, 214:1, 214:12, 214:21, 215:5, 218:20, 218:23, 219:1, 227:6, 227:8, 228:16, 228:19, 229:5, 229:12, 229:14, 229:17, 230:5, 239:9, 243:3, 243:14, 244:11, 245:9, 246:3, 247:2, 247:8, 247:10, 247:15, 247:20, 248:20, 248:25, 249:10, 249:14, 249:25, 250:8, 250:11, 250:20, 250:23, 251:2, 251:13, 251:15, 251:20, 252:1,

252:4, 252:17, 252:22, 260:25, 265:25, 272:9, 273:5, 273:10, 275:3, 275:8, 275:25, 276:5
**MS** [200] - 1:25, 3:6, 3:8, 3:10, 3:12, 3:14, 3:17, 3:19, 3:21, 3:24, 4:2, 4:4, 4:6, 6:9, 6:13, 7:5, 11:6, 13:17, 14:11, 14:17, 21:6, 22:15, 30:5, 32:12, 33:12, 40:23, 43:17, 43:19, 43:22, 43:24, 44:5, 44:6, 45:10, 46:25, 49:12, 85:20, 87:2, 87:7, 87:10, 87:13, 87:16, 87:21, 87:24, 88:14, 90:24, 91:13, 92:2, 93:13, 93:22, 94:5, 94:25, 95:3, 95:5, 95:7, 96:8, 99:4, 100:10, 100:11, 100:17, 100:24, 102:20, 102:25, 103:3, 103:5, 103:7, 106:18, 106:19, 110:4, 112:22, 113:1, 116:13, 117:14, 117:19, 117:24, 122:8, 122:12, 122:15, 126:9, 126:18, 126:25, 127:25, 128:22, 129:1, 129:2, 129:20, 129:24, 130:13, 132:24, 136:2, 136:6, 136:14, 136:16, 136:19, 140:16, 141:17, 143:22, 144:1, 144:3, 144:5, 150:3, 150:11, 150:13, 150:16, 150:19, 150:25, 151:2, 151:5, 154:14, 169:4, 171:4, 171:20, 173:9, 173:23, 174:4, 174:7, 177:10, 189:20, 193:15, 193:21, 193:24, 208:24, 209:1, 209:22, 209:25, 210:16, 210:20, 211:8, 211:11, 211:13, 212:18, 215:8, 215:23,

219:4, 219:6, 226:25, 227:1, 227:5, 228:17, 229:4, 230:7, 230:11, 230:19, 231:9, 233:24, 233:25, 235:12, 235:17, 239:10, 239:12, 241:13, 241:22, 241:23, 243:5, 243:8, 243:19, 244:4, 244:21, 245:2, 245:3, 245:12, 245:15, 245:19, 245:24, 246:2, 247:17, 247:21, 248:4, 248:7, 248:9, 248:12, 248:24, 249:1, 249:3, 249:6, 249:8, 249:19, 251:18, 251:22, 252:6, 252:16, 252:20, 253:2, 253:5, 253:7, 255:21, 256:2, 256:15, 256:23, 261:1, 261:6, 261:11, 261:17, 265:23, 272:11, 272:20, 274:8, 274:15, 275:14, 275:19, 276:9
**muddle** [1] - 73:3
**multiple** [1] - 263:25
**multiplication** [1] - 45:12
**multiply** [2] - 150:14, 263:3
**multiplying** [1] - 240:18
**mum** [2] - 33:8, 71:1
**must** [2] - 139:9, 251:24

## N

**Name** [1] - 185:13
**name** [45] - 7:1, 7:2, 7:6, 14:11, 16:23, 16:24, 35:9, 44:4, 49:17, 79:3, 87:18, 87:25, 91:22, 91:25, 96:1, 96:2, 107:9, 110:23, 111:6, 122:23, 122:24, 130:8, 130:10, 133:12, 142:23, 146:13, 147:5, 147:25, 155:18,

169:15, 169:17, 169:21, 173:18, 176:7, 182:10, 186:3, 186:22, 193:23, 202:9, 215:18, 215:20, 231:4, 231:6, 256:11
**named** [5] - 101:4, 133:16, 195:21, 250:2, 260:19
**napkins** [2] - 36:3, 36:19
**navigate** [1] - 42:13
**near** [3] - 80:3, 141:23, 164:19
**necessarily** [11] - 18:2, 27:15, 37:14, 107:18, 108:3, 161:7, 162:13, 191:16, 223:11, 270:20, 270:21
**necessary** [1] - 191:4
**necessitated** [1] - 41:23
**need** [40] - 6:10, 23:22, 30:10, 32:6, 32:9, 52:9, 70:4, 81:3, 83:16, 91:6, 94:24, 98:12, 113:8, 113:14, 117:16, 134:6, 136:4, 154:22, 167:9, 167:13, 174:2, 177:4, 177:8, 177:17, 179:19, 189:2, 191:7, 191:16, 198:4, 201:13, 212:8, 214:15, 222:3, 230:9, 232:21, 251:23, 251:25, 252:7, 252:23
**needed** [32] - 8:25, 17:11, 20:15, 31:6, 34:14, 34:18, 36:21, 60:23, 92:22, 93:1, 104:3, 110:21, 115:9, 152:24, 154:24, 160:21, 176:3, 177:3, 178:21, 180:6, 180:23, 181:23, 184:12, 190:24, 191:12, 199:14, 207:12, 208:1, 210:1, 217:19, 217:21, 250:19
**needs** [4] - 177:2, 179:24, 225:25, 253:13

**negligence** [1] - 57:12
**negligent** [2] - 42:25, 43:1
**never** [41] - 18:10, 18:11, 18:23, 41:24, 42:7, 66:2, 73:2, 76:10, 76:11, 80:13, 86:20, 93:17, 105:15, 132:16, 141:20, 152:10, 153:24, 154:20, 154:24, 155:4, 159:8, 165:25, 174:20, 174:23, 175:17, 178:16, 178:25, 212:5, 212:21, 221:24, 223:19, 224:18, 233:4, 235:23, 236:23, 258:13, 258:15, 258:17, 272:18
**never..** [1] - 174:24
**New** [13] - 12:17, 14:2, 19:11, 19:12, 31:23, 37:8, 45:24, 152:21, 191:3, 235:2, 244:18, 269:23, 271:18
**NEW** [4] - 1:5, 1:17, 1:21, 2:5
**new** [15] - 8:23, 19:23, 28:4, 31:9, 31:10, 32:21, 55:4, 65:13, 121:15, 123:22, 127:13, 133:9, 152:18, 152:22
**newer** [1] - 161:9
**newly** [1] - 8:2
**news** [1] - 220:22
**next** [33] - 39:3, 45:7, 50:21, 80:17, 84:12, 87:25, 88:3, 91:12, 115:15, 124:1, 129:23, 133:16, 138:16, 143:14, 144:11, 144:19, 144:24, 146:19, 155:6, 173:8, 181:18, 193:17, 193:22, 196:23, 214:11, 227:3, 230:10, 230:18, 255:25, 256:1, 264:15, 265:11, 273:22
**nice** [2] - 156:24, 158:12
**night** [64] - 9:1, 10:5, 17:9, 17:11, 17:19,

22:25, 33:2, 33:7, 36:11, 37:12, 47:5, 58:6, 58:15, 59:4, 67:22, 68:21, 75:3, 75:6, 75:11, 75:23, 75:24, 77:1, 84:16, 86:23, 88:10, 88:17, 115:2, 115:9, 126:13, 134:4, 134:6, 155:4, 163:12, 163:19, 165:24, 166:12, 170:19, 181:16, 185:10, 185:23, 187:9, 188:20, 188:21, 192:7, 192:24, 195:5, 195:12, 197:23, 202:4, 202:5, 202:20, 205:2, 206:16, 206:18, 206:21, 206:25, 207:18, 218:1, 223:5, 271:2, 271:4, 272:22
**nightly** [1] - 18:21
**nights** [5] - 12:3, 20:21, 35:11, 45:22, 176:12
**Niko** [1] - 66:1
**nine** [3] - 45:8, 72:9, 88:24
**no-brainer** [1] - 20:3
**NO.16-2708** [1] - 1:5
**nobody** [6] - 18:9, 43:4, 43:5, 257:16, 267:2
**non** [3] - 34:25, 73:24, 268:20
**non-lunch** [1] - 268:20
**non-owner** [1] - 34:25
**non-producers** [1] - 73:24
**none** [6] - 62:18, 70:20, 75:5, 209:4, 267:10, 267:11
**normal** [3] - 22:16, 23:7, 258:1
**normally** [2] - 25:15, 27:3
**nosh** [1] - 22:12
**notch** [1] - 48:3
**note** [2] - 137:25, 139:14
**noted** [1] - 236:12
**notes** [1] - 227:20
**nothing** [25] - 6:20, 31:7, 43:19, 49:14, 56:3, 78:22, 85:18, 91:17, 102:12,

130:3, 169:1, 170:25, 171:25, 173:12, 183:22, 187:22, 206:10, 215:12, 226:25, 230:5, 230:23, 237:21, 238:15, 256:5, 272:9
**notice** [3] - 168:20, 238:5, 244:12
**noticed** [1] - 219:17
**notorious** [1] - 83:19
**November** [7] - 7:13, 12:1, 45:25, 46:2, 145:3, 145:7, 184:3
**nowadays** [1] - 97:21
**nowhere** [3] - 29:2, 80:3, 170:22
**Number** [1] - 147:21
**number** [30] - 20:10, 42:10, 43:15, 43:16, 49:6, 49:21, 50:6, 95:2, 103:4, 117:21, 120:22, 128:25, 145:23, 150:15, 150:21, 169:17, 198:2, 203:1, 203:5, 212:8, 226:2, 226:4, 240:18, 245:5, 262:19, 262:20, 265:17, 265:19, 274:24
**numbered** [1] - 276:19
**numbers** [13] - 25:1, 44:2, 53:12, 55:19, 117:13, 117:15, 117:17, 150:9, 166:12, 245:17, 247:17, 264:9, 274:22

## O

**o'clock** [11] - 39:11, 39:15, 88:25, 115:12, 116:10, 140:19, 190:20, 192:1, 268:1, 268:23
**O'Dwyer** [11] - 131:15, 132:6, 137:10, 137:18, 138:1, 138:9, 139:9, 152:2, 153:2, 218:17, 224:1
**oath** [7] - 6:24, 91:21, 130:7, 173:17, 215:17, 231:3, 256:10
**object** [5] - 14:9, 177:5, 243:3, 260:25, 261:1

**objection** [7] - 21:4, 33:3, 46:22, 141:16, 245:1, 245:9, 261:10
**objections** [1] - 249:15
**obligation** [3] - 60:9, 225:25, 264:20
**obviously** [6] - 66:9, 92:20, 151:21, 154:7, 162:1, 190:6
**occasion** [1] - 80:14
**occasionally** [12] - 31:22, 66:23, 72:10, 82:21, 132:21, 161:25, 162:5, 162:21, 176:1, 188:9, 203:25, 232:4
**occasions** [2] - 101:24, 205:21
**occur** [2] - 167:2, 201:7
**occurred** [4] - 79:10, 167:3, 167:4, 265:8
**October** [11] - 45:24, 46:7, 92:8, 110:10, 169:11, 216:3, 225:20, 237:16, 248:20, 254:20
**OF** [2] - 1:1, 1:10
**off-menu** [1] - 162:11
**offer** [2] - 42:21, 67:2
**offered** [3] - 20:2, 23:22, 38:1
**offering** [1] - 71:13
**OFFICE** [1] - 1:15
**office** [19] - 12:3, 65:15, 65:18, 86:19, 163:20, 203:16, 203:22, 204:4, 207:8, 209:19, 209:20, 209:21, 231:14, 240:13, 252:11, 253:9, 255:13, 255:19
**Official** [2] - 276:17, 276:22
**official** [3] - 113:4, 113:10, 214:6
**OFFICIAL** [1] - 2:3
**often** [4] - 14:23, 37:3, 68:11, 130:25
**oftentimes** [11] - 13:8, 16:19, 27:16, 33:16, 33:17, 35:12, 36:19, 37:12, 83:25, 89:13, 89:17
**old** [3] - 19:3, 29:20, 73:3
**on-line** [1] - 137:21
**on-the-spot** [1] -

133:20
**once** [22] - 20:23, 24:3, 24:8, 28:13, 29:11, 30:22, 32:2, 32:24, 39:18, 47:22, 54:23, 58:21, 58:22, 83:5, 88:24, 139:1, 180:4, 192:6, 207:15, 217:5, 257:24, 259:13
**one** [138] - 7:25, 9:1, 14:6, 15:13, 15:17, 16:11, 20:7, 21:12, 21:14, 21:25, 24:13, 25:11, 31:8, 32:18, 33:9, 34:12, 34:22, 35:13, 36:15, 36:17, 37:8, 37:12, 37:13, 38:12, 42:10, 42:16, 42:21, 46:12, 46:18, 48:4, 48:17, 51:19, 51:23, 52:6, 53:8, 56:8, 58:5, 62:7, 63:3, 63:6, 63:18, 64:10, 68:9, 69:24, 71:17, 73:16, 75:5, 77:5, 80:4, 84:15, 87:23, 88:12, 88:13, 89:21, 93:10, 97:2, 98:22, 100:2, 102:21, 104:3, 104:25, 111:17, 111:22, 113:10, 114:21, 117:20, 117:23, 122:16, 127:25, 128:3, 128:14, 128:16, 128:23, 141:7, 143:4, 144:19, 144:24, 145:4, 147:20, 150:22, 151:23, 151:25, 157:25, 161:11, 163:18, 168:11, 168:12, 169:6, 169:7, 169:8, 178:16, 178:17, 183:25, 185:9, 189:10, 192:5, 192:6, 195:21, 195:24, 201:5, 204:16, 206:8, 209:11, 210:1, 210:16, 219:1, 219:25, 223:25, 224:15, 226:16, 233:17, 235:18, 238:7, 240:4, 240:23, 240:25, 243:24, 246:6, 246:18, 252:6,

252:20, 254:5,
261:21, 263:14,
263:23, 269:9,
269:10, 271:16,
272:16, 273:7, 275:8
**one-off** [1] - 201:5
**ones** [5] - 11:24, 52:7,
142:19, 177:20,
274:11
**onion** [2] - 33:8, 71:1
**online** [1] - 200:18
**open** [13] - 32:19,
66:19, 86:5, 135:15,
205:7, 244:18,
249:1, 268:4, 268:8,
268:9, 268:20,
268:25, 269:1
**opened** [13] - 7:12,
8:2, 86:14, 92:8,
103:16, 103:17,
110:11, 110:19,
133:8, 248:21,
248:22, 254:9,
268:21
**opening** [6] - 36:6,
41:22, 47:9, 153:13,
190:23, 224:23
**operated** [1] - 152:4
**operates** [1] - 212:24
**operating** [3] - 22:19,
38:7, 232:9
**operation** [1] - 229:23
**operations** [1] - 90:2
**opining** [1] - 58:10
**opinion** [3] - 8:25,
136:11, 224:1
**opponent** [1] - 261:2
**opponent-party** [1] -
261:2
**opportunity** [8] - 41:2,
73:21, 79:5, 224:10,
225:7, 243:13,
244:7, 252:25
**opposed** [1] - 28:22
**opposing** [1] - 251:5
**optics** [15] - 9:7, 9:8,
9:23, 9:25, 10:1,
10:8, 11:17, 11:18,
13:14, 29:1, 30:22,
32:2, 59:22, 81:2,
81:4
**option** [12] - 82:14,
82:15, 82:17, 82:18,
97:22, 162:6, 162:7,
162:10, 192:19,
192:20, 192:21
**optional** [1] - 183:15
**ORDER** [2] - 5:4,
173:4
**order** [15] - 24:1,

97:10, 131:2,
143:14, 155:25,
160:11, 167:10,
193:8, 197:25,
248:14, 261:21,
268:21, 269:15,
271:11
**orderer** [2] - 108:13,
109:6
**ordering** [1] - 161:23
**orders** [4] - 130:25,
223:22, 258:1
**original** [2] - 55:18,
81:10
**originally** [5] - 34:11,
65:17, 65:25, 80:6,
134:21
**Orleans** [11] - 12:17,
14:2, 19:11, 19:12,
31:23, 45:24,
152:21, 235:2,
244:18, 269:23,
271:18
**ORLEANS** [4] - 1:5,
1:17, 1:21, 2:5
**Orleans-based** [1] -
235:2
**OT** [2] - 149:6, 149:9
**otherwise** [2] - 58:24,
128:18
**ourselves** [1] - 83:1
**out-earned** [1] - 81:18
**outcome** [2] - 84:11,
84:12
**outlet** [1] - 198:18
**outlets** [1] - 198:19
**outside** [2] - 89:15,
157:17
**overall** [3] - 68:7,
225:22, 243:6
**overestimating** [1] -
151:12
**overrule** [1] - 261:10
**overruled** [3] - 33:5,
243:7, 249:15
**oversaw** [4] - 90:1,
180:9, 180:11, 208:7
**oversee** [3] - 177:24,
178:1, 178:3
**overseeing** [1] - 178:7
**overstep** [1] - 15:12
**overtime** [94] - 38:9,
38:10, 38:14, 38:16,
38:24, 41:5, 41:7,
41:11, 41:12, 42:2,
42:5, 42:9, 49:25,
50:13, 50:20, 50:24,
51:7, 51:18, 52:23,
55:19, 85:25, 86:12,
119:24, 120:2,

120:5, 124:18,
126:24, 129:11,
129:13, 129:14,
129:16, 141:11,
141:13, 143:9,
143:18, 143:19,
143:21, 143:23,
143:25, 144:16,
146:1, 146:16,
146:25, 147:8,
147:9, 147:18,
148:4, 148:7, 149:5,
149:15, 150:7,
150:9, 150:17,
150:20, 150:25,
189:13, 219:13,
219:19, 226:17,
226:20, 226:22,
232:23, 238:6,
241:15, 242:6,
242:18, 244:2,
248:4, 249:16,
249:18, 249:23,
250:5, 250:7, 251:9,
254:4, 262:14,
262:15, 263:11,
263:23, 264:9,
264:11, 264:12,
265:12, 272:25,
273:2, 273:6,
273:19, 274:2,
274:7, 274:12,
274:20, 274:24
**Overtime** [1] - 264:8
**owed** [2] - 148:12,
226:11
**own** [12] - 12:4, 35:6,
47:25, 116:8, 162:3,
166:13, 178:6,
199:3, 202:6, 205:1,
205:10
**owner** [13] - 13:23,
20:21, 34:25, 89:12,
106:20, 106:25,
132:3, 132:15,
132:18, 141:20,
152:8, 152:23,
196:21
**owners** [23] - 13:19,
22:3, 26:23, 28:6,
30:20, 32:18, 41:15,
63:3, 63:7, 63:18,
64:10, 82:10, 87:10,
87:11, 87:15, 89:24,
132:21, 141:14,
142:11, 195:25,
217:7, 217:10
**ownership** [4] - 73:20,
79:21, 89:11, 191:5

**P**

**p.m** [7] - 111:22,
111:25, 172:7,
183:12, 230:15,
254:20, 276:11
**pacing** [2] - 83:19,
83:22
**package** [1] - 18:23
**PAGE** [2] - 3:3, 4:11
**page** [31] - 44:11,
44:14, 44:16, 44:20,
44:21, 95:23, 95:25,
103:5, 106:17,
106:18, 117:22,
120:15, 120:21,
123:5, 123:23,
142:18, 142:21,
143:14, 144:7,
145:5, 148:21,
149:4, 149:17,
150:11, 150:21,
170:24, 225:15,
226:7, 226:16,
264:25
**pages** [3] - 43:13,
240:23, 247:20
**paid** [85] - 7:20, 7:21,
11:14, 14:23, 15:1,
15:15, 15:16, 17:12,
18:18, 35:17, 38:16,
38:18, 38:21, 38:22,
39:17, 40:5, 40:10,
40:11, 41:6, 41:10,
42:5, 42:13, 45:4,
48:24, 50:21, 51:17,
53:20, 61:12, 75:12,
119:22, 119:24,
120:2, 120:5,
124:18, 126:20,
129:13, 129:18,
141:2, 141:3, 141:4,
145:18, 146:1,
147:18, 148:4,
148:7, 149:15,
149:20, 150:5,
150:8, 159:9,
166:19, 166:21,
167:21, 167:24,
170:18, 170:19,
174:25, 183:23,
189:15, 189:17,
200:6, 216:10,
219:15, 224:3,
226:10, 229:10,
236:22, 242:2,
249:21, 249:22,
263:22, 264:11,
265:12, 267:3,
267:5, 267:9, 273:2,

274:4, 274:19, 276:1
**pair** [1] - 78:25
**pairings** [1] - 19:18
**pal** [1] - 24:5
**Palace** [8] - 10:15,
19:22, 21:2, 21:7,
56:18, 56:22, 57:6,
90:12
**panache** [1] - 33:17
**paper** [4] - 80:8,
253:18, 259:12,
259:15
**paper-clipped** [1] -
80:8
**papers** [1] - 17:20
**paperwork** [14] -
45:19, 65:1, 65:14,
102:14, 163:10,
163:16, 195:6,
195:13, 202:6,
202:20, 209:19,
241:1, 254:24,
255:20
**paralegal** [1] - 43:6
**paramount** [2] -
229:23, 269:11
**pardon** [1] - 19:11
**parent** [1] - 234:19
**part** [35] - 27:16, 28:5,
29:8, 32:22, 38:21,
54:24, 54:25, 55:9,
55:11, 55:15, 56:19,
56:21, 66:21, 71:1,
71:7, 84:23, 115:18,
115:20, 131:18,
132:8, 132:20,
176:19, 180:14,
182:19, 184:25,
204:17, 205:4,
207:6, 208:10,
212:14, 212:24,
215:1, 224:15,
228:14, 249:15
**part-time** [4] - 54:24,
54:25, 55:9, 55:11
**participate** [7] - 67:2,
176:15, 205:7,
211:18, 213:10,
223:23, 272:13
**participated** [2] -
189:23, 211:17
**participating** [4] -
30:20, 204:14,
213:5, 223:13
**particular** [15] -
126:21, 138:20,
142:19, 160:1,
178:6, 185:17,
188:2, 188:6,
193:14, 200:21,

---

205:4, 208:7, 240:3, 242:11, 244:11

**particularly** [2] - 223:5, 243:22

**parties** [9] - 5:12, 5:13, 5:25, 6:4, 180:4, 192:22, 193:21, 194:2, 270:16

**partner** [2] - 13:23, 19:25

**party** [3] - 84:16, 198:3, 261:2

**passed** [2] - 19:22, 20:23

**past** [9] - 38:3, 83:21, 88:24, 134:2, 163:17, 238:14, 249:22, 255:20, 271:17

**patio** [2] - 22:11, 89:16

**Patrice** [18] - 129:3, 129:24, 130:10, 130:14, 138:5, 138:11, 138:20, 142:20, 144:6, 146:6, 146:20, 147:4, 147:13, 147:21, 151:7, 182:13, 183:9, 184:2

**PATRICE** [3] - 3:11, 130:5, 130:10

**patrons** [1] - 272:1

**pay** [64] - 15:25, 17:11, 18:23, 29:22, 39:21, 39:22, 39:24, 40:16, 40:20, 44:17, 44:18, 44:20, 49:22, 50:15, 50:16, 50:17, 50:23, 53:20, 54:1, 60:22, 60:24, 61:7, 81:24, 119:8, 123:14, 124:14, 124:18, 124:20, 125:8, 125:9, 125:10, 125:11, 125:12, 125:19, 125:22, 126:4, 129:14, 129:16, 129:17, 143:15, 148:16, 148:18, 148:21, 159:2, 166:20, 168:7, 189:16, 199:20, 209:2, 211:5, 229:4, 229:8, 229:9, 229:10, 229:18, 233:6, 244:2, 262:25, 263:8,

263:11, 264:16

**paycheck** [7] - 18:7, 18:12, 122:20, 123:21, 124:4, 219:7

**paychecks** [2] - 219:8, 219:9

**payday** [1] - 18:21

**paying** [6] - 15:5, 20:15, 75:7, 115:23, 126:5, 242:18

**payment** [5] - 29:22, 217:22, 217:23, 243:6, 243:20

**payroll** [20] - 15:15, 75:15, 117:10, 118:1, 118:22, 129:4, 142:18, 146:3, 146:6, 146:20, 147:11, 147:22, 147:23, 149:12, 232:5, 240:15, 240:17, 240:22

**pays** [2] - 75:4, 126:14

**people** [108] - 8:19, 8:21, 10:4, 10:18, 10:19, 12:10, 12:23, 15:11, 16:21, 17:8, 18:19, 19:18, 23:5, 24:23, 24:24, 24:25, 28:17, 28:18, 28:21, 36:16, 36:17, 36:18, 36:19, 40:19, 40:20, 42:11, 50:16, 52:7, 59:25, 60:1, 61:16, 62:7, 62:8, 62:25, 66:15, 74:1, 75:12, 79:25, 80:4, 82:1, 83:14, 84:4, 87:6, 87:8, 88:18, 89:1, 99:10, 99:21, 99:23, 100:12, 100:19, 100:21, 100:22, 100:25, 101:4, 108:3, 111:14, 112:4, 112:7, 112:8, 112:9, 114:22, 114:25, 128:3, 128:5, 128:12, 128:16, 129:10, 131:21, 131:24, 136:13, 136:20, 148:10, 153:3, 154:16, 156:22, 158:22, 166:19, 166:20, 170:20, 171:17, 178:4, 178:17, 178:21, 185:18, 189:21, 189:23, 191:7,

191:9, 192:20, 198:5, 200:22, 201:19, 203:10, 211:9, 218:14, 218:19, 222:17, 229:25, 233:18, 242:25, 246:17, 259:21, 275:11, 275:16

**people's** [4] - 12:5, 121:7, 244:2, 245:16

**pepper** [1] - 36:1

**PEPPER** [1] - 2:3

**Pepper** [3] - 276:16, 276:20, 276:21

**per** [3] - 24:22, 100:2, 151:9

**percent** [40] - 6:6, 9:16, 9:17, 9:20, 9:21, 11:10, 11:11, 11:16, 11:20, 11:21, 12:14, 12:16, 12:18, 70:17, 75:13, 78:10, 79:7, 81:16, 81:17, 92:25, 151:19, 151:20, 171:17, 174:25, 175:9, 176:20, 203:1, 209:5, 235:6, 235:8, 235:10, 235:22, 236:12, 236:13, 254:17, 266:9, 266:10

**percentage** [10] - 12:7, 12:22, 30:14, 59:13, 59:14, 74:25, 75:2, 80:2, 81:12, 152:15

**percentages** [5] - 10:19, 12:6, 81:20, 81:21, 185:24

**perennial** [1] - 81:25

**perform** [21] - 32:23, 33:14, 35:4, 70:21, 73:21, 85:11, 88:6, 135:20, 136:20, 136:21, 140:4, 154:1, 162:23, 179:4, 193:8, 222:4, 222:15, 222:23, 222:25, 223:6, 259:1

**performed** [7] - 36:23, 70:18, 72:10, 86:23, 161:17, 179:6, 270:11

**performers** [1] - 28:19

**performing** [6] - 56:24, 57:2, 57:5, 84:8, 84:10, 199:13

**perhaps** [3] - 175:22,

177:17, 187:18

**period** [58] - 13:25, 45:2, 46:4, 46:10, 46:14, 46:16, 49:13, 50:9, 50:15, 50:23, 51:6, 75:9, 86:1, 86:4, 87:4, 88:2, 108:7, 118:22, 119:8, 119:15, 123:14, 124:14, 125:8, 125:9, 125:19, 126:5, 132:5, 134:13, 134:17, 136:7, 147:22, 148:16, 148:18, 148:21, 221:17, 229:4, 229:8, 229:9, 229:10, 229:19, 240:14, 247:13, 248:15, 248:17, 251:8, 253:11, 260:21, 262:25, 263:8, 263:11, 264:16, 271:20, 273:9, 273:11, 273:16, 273:20

**periodically** [1] - 38:13

**periods** [5] - 49:23, 50:24, 89:23, 198:3, 246:25

**permanent** [2] - 201:5, 201:10

**permission** [1] - 80:21

**permit** [1] - 19:3

**person** [41] - 13:7, 21:13, 21:22, 25:5, 63:13, 71:17, 86:10, 93:9, 101:4, 103:19, 104:25, 108:25, 109:5, 120:24, 121:4, 121:12, 128:3, 128:16, 134:21, 137:17, 156:7, 176:7, 185:18, 185:20, 185:21, 188:18, 188:20, 188:24, 199:19, 202:9, 205:22, 213:9, 218:5, 227:3, 238:7, 243:23, 243:24, 255:19, 258:7, 261:22

**personal** [2] - 8:17, 219:2

**personalized** [4] - 107:11, 107:14,

108:22, 109:23

**personally** [6] - 6:5, 155:8, 180:1, 231:19, 232:3, 232:6

**perspective** [1] - 107:20

**pertain** [1] - 90:5

**petty** [1] - 187:8

**PHILLIPS** [1] - 1:22

**phone** [2] - 48:6, 216:22

**phonetically** [1] - 14:15

**physical** [3] - 187:1, 207:6, 207:7

**pick** [10] - 112:24, 115:5, 128:16, 166:24, 202:18, 208:16, 228:20, 260:23, 261:12

**picked** [4] - 19:19, 138:8, 138:23, 155:11

**picking** [1] - 131:12

**pieces** [2] - 80:5, 253:18

**pittance** [1] - 30:25

**pizza** [1] - 19:4

**place** [16] - 20:20, 22:11, 36:16, 36:17, 38:2, 48:1, 53:4, 86:14, 86:16, 89:16, 90:10, 167:15, 198:5, 198:20, 219:18, 240:20

**placed** [2] - 49:20, 272:6

**places** [8] - 9:7, 10:13, 48:2, 94:16, 134:1, 149:8, 149:10

**Plaintiff** [2] - 136:24, 139:7

**plaintiff** [7] - 6:14, 91:12, 129:23, 214:11, 215:8, 230:19, 250:2

**PLAINTIFF'S** [1] - 4:13

**Plaintiff's** [17] - 5:16, 43:22, 43:23, 53:6, 95:4, 95:23, 102:2, 138:3, 138:10, 138:19, 142:19, 146:3, 146:19, 147:3, 147:12, 147:20, 169:8

**PLAINTIFFS** [1] - 1:15

**plaintiffs** [13] - 5:14, 5:18, 6:12, 129:24, 158:16, 173:8, 194:1, 213:1, 214:9,

230:9, 238:17,
241:1, 247:23
**plaintiffs'** [1] - 212:17,
246:24, 255:23
**plan** [3] - 197:24,
198:1, 244:8
**planned** [2] - 180:4,
197:25
**plate** [1] - 25:9
**plated** [1] - 194:12
**plates** [1] - 130:23
**play** [3] - 15:25, 60:22,
86:11
**plenty** [1] - 223:20
**plops** [1] - 195:1
**plus** [4] - 40:3, 101:3,
174:25, 238:25
**point** [48] - 21:12,
26:12, 32:9, 58:21,
58:22, 60:4, 68:17,
92:22, 107:19,
109:8, 109:15,
109:17, 116:9,
122:18, 124:13,
127:22, 152:21,
155:23, 165:5,
165:10, 168:12,
175:3, 185:2,
186:19, 195:11,
196:18, 197:9,
200:25, 203:2,
208:15, 210:1,
213:7, 214:12,
218:6, 218:10,
218:11, 220:10,
231:21, 237:17,
237:23, 247:4,
248:1, 251:7,
252:17, 253:3,
254:13, 254:25,
268:25
**Point** [1] - 131:3
**point-of-sale** [1] -
203:2
**policy** [16] - 38:9,
38:23, 113:14,
115:7, 141:9,
141:10, 141:12,
187:5, 187:6,
205:10, 211:19,
211:22, 211:24,
219:18, 262:13,
262:15
**polish** [2] - 13:9,
257:23
**polished** [3] - 35:25,
36:1, 218:1
**polishing** [3] - 130:22,
130:23
**pompous** [1] - 42:17

**pool** [66] - 8:8, 9:7,
9:8, 9:9, 9:10, 9:13,
9:20, 9:22, 10:17,
11:3, 17:10, 27:17,
27:18, 28:24, 29:15,
30:21, 31:15, 47:21,
56:19, 56:21, 57:11,
60:17, 67:17, 67:18,
68:8, 68:13, 68:18,
70:17, 71:7, 74:23,
93:1, 121:1, 121:5,
121:13, 141:15,
141:19, 152:4,
152:9, 152:14,
152:18, 159:12,
159:15, 164:5,
176:15, 189:24,
204:14, 204:16,
205:4, 210:25,
211:3, 211:17,
211:18, 212:3,
212:14, 213:5,
213:10, 223:13,
223:17, 223:23,
227:23, 229:11,
232:24, 242:5,
270:3, 272:13
**pooled** [20] - 57:11,
57:16, 58:1, 58:3,
58:16, 59:6, 152:11,
204:19, 204:21,
204:22, 204:25,
257:9, 257:10,
257:11, 269:19,
269:20, 269:22,
269:25, 270:4,
271:22
**pooling** [2] - 56:12,
58:20
**poor** [3] - 59:20,
196:16, 196:19
**pop** [1] - 132:18
**porterhouse** [7] -
25:3, 33:16, 33:20,
37:5, 37:7, 108:25,
109:1
**porterhouses** [1] -
36:25
**portion** [10] - 11:19,
49:11, 77:22, 77:24,
194:12, 210:24,
210:25, 212:10,
223:4, 262:22
**POS** [3] - 186:19,
239:4, 240:9
**POS's** [1] - 186:18
**posed** [1] - 8:12
**position** [24] - 7:16,
11:1, 15:10, 84:6,
92:13, 99:5, 106:9,

106:12, 108:3,
110:18, 127:5,
130:18, 131:17,
137:3, 139:16,
178:11, 178:12,
190:13, 198:17,
198:21, 216:4,
231:10, 260:20,
266:17
**positions** [6] - 7:18,
93:6, 111:14, 112:5,
190:18, 200:19
**possession** [1] -
149:13
**possibility** [1] -
236:10
**possible** [2] - 191:7,
191:10
**possibly** [2] - 171:13,
205:14
**post** [2] - 200:23,
221:17
**post-Schedulefly** [1] -
221:17
**posted** [6] - 38:8,
208:12, 208:15,
208:20, 259:7, 259:8
**pot** [1] - 68:12
**potentially** [3] - 161:2,
198:8, 206:2
**pour** [7] - 35:6, 71:5,
97:14, 131:1, 162:1,
162:4, 199:3
**poured** [3] - 161:12,
161:14, 162:3
**pouring** [4] - 25:2,
78:23, 79:2, 176:6
**powers** [1] - 27:15
**POYDRAS** [3] - 1:16,
1:20, 2:4
**practice** [1] - 253:15
**practices** [1] - 42:19
**pre** [19] - 40:25, 41:18,
66:7, 66:12, 66:16,
66:18, 66:20, 66:22,
67:2, 132:19,
217:13, 217:14,
221:17, 275:10,
275:12, 275:14,
275:19, 275:23
**pre-shift** [18] - 40:25,
41:18, 66:7, 66:12,
66:16, 66:18, 66:20,
66:22, 67:2, 132:19,
217:13, 217:14,
275:10, 275:12,
275:14, 275:19,
275:23
**precludes** [1] - 25:4
**predict** [1] - 214:21

**preface** [1] - 69:7
**prefer** [3] - 157:12,
199:5
**preferably** [1] - 24:24
**preference** [1] - 190:5
**preferences** [1] -
157:18
**preferred** [1] - 83:1
**preliminary** [1] - 6:10
**prep** [1] - 268:22
**preparation** [2] -
244:8, 246:9
**prepare** [2] - 66:24,
217:15
**prepared** [1] - 179:24
**preparing** [1] - 269:2
**prerogative** [2] -
22:14, 23:8
**presence** [1] - 22:2
**present** [4] - 108:16,
142:14, 217:19,
218:4
**presentable** [1] - 13:3
**presentation** [1] -
162:2
**presented** [1] - 202:14
**preserve** [3] - 237:23,
238:10, 250:19
**preserved** [1] - 251:10
**pressure** [1] - 60:2
**presume** [1] - 89:9
**presumption** [4] -
29:12, 42:21, 56:2,
56:7
**pretrial** [1] - 246:16
**pretty** [14] - 21:19,
31:20, 67:4, 79:24,
102:15, 105:2,
128:20, 133:8,
152:24, 165:11,
176:2, 221:9, 260:13
**prevent** [1] - 199:4
**prevented** [2] -
141:11, 141:12
**previous** [9] - 16:14,
38:4, 44:10, 45:18,
90:15, 111:17,
229:10, 250:18,
264:19
**previously** [3] - 110:1,
168:19, 265:16
**primary** [10] - 98:2,
98:6, 98:9, 98:13,
98:17, 98:24, 98:25,
109:7, 109:11, 271:7
**print** [1] - 118:23
**printed** [1] - 241:3
**printout** [1] - 202:7
**private** [1] - 84:16
**privy** [1] - 70:24

**pro** [3] - 15:24, 29:1,
60:21
**proactive** [2] - 10:20,
34:1
**problem** [4] - 26:18,
105:10, 110:7, 223:8
**procedure** [5] - 7:24,
9:3, 11:5, 11:7, 17:2
**procedures** [4] - 8:3,
38:7, 48:1, 48:2
**proceed** [2] - 206:6,
253:5
**proceeded** [1] - 30:11
**proceedings** [4] -
247:4, 253:3,
276:11, 276:19
**PROCEEDINGS** [4] -
1:10, 2:7, 5:1, 173:1
**process** [3] - 152:12,
193:7, 207:16
**processed** [3] - 75:14,
232:17, 232:18
**produce** [10] - 50:2,
50:3, 52:1, 52:3,
79:17, 79:18,
123:15, 251:12,
251:16, 251:20
**produced** [22] - 43:12,
44:22, 48:9, 52:17,
102:12, 116:21,
118:7, 142:17,
240:5, 246:8,
246:22, 246:24,
247:11, 248:1,
251:5, 251:11,
251:13, 251:24,
252:14, 253:24,
254:2, 272:24
**PRODUCED** [1] - 2:8
**producers** [1] - 73:24
**producing** [1] - 53:5
**professional** [1] - 8:17
**profile** [1] - 20:5
**profiting** [1] - 12:23
**program** [3] - 19:17,
97:19, 176:13
**progressed** [1] -
111:13
**prohibitions** [1] -
29:11
**promote** [1] - 64:9
**promoted** [6] - 14:15,
93:12, 131:12,
131:17, 175:6, 258:6
**promotion** [1] - 175:5
**pronouncing** [1] -
92:3
**proof** [4] - 79:16,
186:24, 187:1, 244:7
**proper** [1] - 207:2

**properly** [6] - 200:6, 206:19, 206:22, 206:25, 207:12, 207:15
**property** [1] - 207:7
**proposition** [1] - 73:15
**protective** [1] - 155:7
**protocol** [2] - 42:24, 219:24
**proud** [2] - 28:6, 71:23
**prove** [1] - 243:25
**proven** [1] - 83:7
**provide** [4] - 6:2, 119:14, 230:1, 271:7
**provided** [9] - 74:2, 74:23, 142:22, 146:4, 195:11, 269:16, 270:12, 270:14, 271:25
**providing** [5] - 15:11, 73:17, 198:11, 229:22
**pull** [7] - 14:3, 51:25, 90:14, 238:24, 239:3, 239:5, 251:3
**punch** [10] - 65:24, 65:25, 66:5, 66:15, 66:18, 90:9, 163:22, 266:24, 266:25
**punch-in** [1] - 90:9
**punch-out** [1] - 90:9
**punched** [2] - 41:23, 117:18
**punches** [1] - 247:12
**punching** [9] - 40:13, 40:14, 66:1, 66:2, 66:7, 66:8, 66:9, 66:12, 66:20
**punished** [1] - 67:9
**punishment** [1] - 84:18
**punitive** [3] - 27:4, 27:5, 84:17
**purchasing** [1] - 94:19
**purely** [1] - 93:3
**purpose** [3] - 194:9, 204:2, 225:17
**purposes** [3] - 136:8, 218:15, 244:7
**purveyor** [1] - 35:8
**push** [1] - 41:22
**put** [56] - 10:3, 10:7, 25:6, 28:12, 29:4, 33:17, 38:8, 67:8, 67:9, 67:19, 68:1, 80:1, 85:1, 107:6, 107:7, 112:17, 112:21, 112:22, 115:4, 115:8, 128:8,

132:12, 137:22, 139:7, 142:1, 146:5, 155:5, 157:7, 157:18, 170:16, 186:2, 186:10, 188:15, 193:10, 200:19, 204:6, 208:16, 213:1, 213:11, 214:3, 214:14, 225:10, 225:12, 226:7, 228:7, 234:15, 240:14, 240:16, 245:16, 246:10, 246:12, 249:16, 253:18, 258:1, 264:9
**puts** [1] - 9:12
**putting** [9] - 24:24, 24:25, 28:21, 30:24, 59:25, 76:10, 80:7, 214:22, 255:12

**Q**

**qualified** [2] - 43:4, 110:17
**qualifies** [1] - 106:23
**quality** [1] - 20:6
**Quarter** [4] - 20:12, 20:13, 76:6, 269:23
**questioned** [2] - 31:14, 220:21
**questioning** [2] - 243:4, 244:20
**questions** [21] - 50:8, 52:14, 52:16, 85:5, 113:25, 126:25, 127:10, 129:20, 140:14, 140:15, 152:25, 189:20, 206:11, 209:25, 211:8, 220:13, 245:25, 246:2, 252:20, 255:21, 265:23
**quick** [5] - 122:16, 247:18, 257:1, 261:8, 262:16
**quickly** [3] - 27:23, 142:8, 191:3
**quid** [3] - 15:24, 29:1, 60:21
**quiet** [4] - 13:4, 24:6, 24:8, 37:21
**quit** [4] - 18:3, 133:6, 133:14, 133:20
**quite** [2] - 86:21, 178:14
**quitting** [2] - 8:21, 133:21

**quiz** [1] - 163:15
**quo** [3] - 15:24, 29:1, 60:21

**R**

**R-O-G-E-R-S** [1] - 173:21
**raise** [8] - 6:17, 91:14, 92:16, 129:25, 173:10, 215:10, 230:21, 256:3
**raised** [1] - 216:13
**raises** [3] - 159:8, 209:2
**ran** [8] - 57:10, 60:4, 69:10, 73:16, 153:19, 159:12, 160:9, 161:15
**rang** [6] - 12:9, 81:11, 81:14, 81:15, 81:17
**range** [3] - 44:22, 119:11, 241:24
**rare** [2] - 76:19, 166:3
**rate** [13] - 42:4, 55:6, 123:9, 124:18, 199:20, 211:5, 216:11, 216:13, 224:10, 240:18, 263:19, 274:16, 276:2
**rather** [6] - 49:12, 60:18, 114:22, 127:3, 194:12, 246:12
**ratio** [1] - 12:8
**reach** [1] - 181:15
**reached** [1] - 6:4
**reaching** [1] - 8:20
**read** [8] - 45:8, 112:2, 145:17, 146:6, 147:5, 229:12, 238:5, 250:21
**ready** [2] - 36:4, 36:6
**real** [8] - 27:23, 69:17, 83:25, 122:16, 225:7, 247:18, 257:1, 262:16
**reality** [5] - 10:10, 10:11, 13:7, 18:1, 110:25
**realize** [2] - 189:3, 275:16
**realized** [3] - 39:19, 54:23, 195:23
**really** [59] - 8:20, 9:23, 9:24, 10:2, 15:5, 15:6, 15:7, 18:23, 30:23, 31:3, 31:12,

35:14, 38:14, 41:22, 41:24, 42:16, 45:25, 58:10, 67:21, 75:7, 83:1, 101:21, 106:2, 115:16, 137:19, 150:22, 150:24, 152:24, 155:7, 156:19, 157:2, 158:13, 158:25, 163:16, 178:12, 178:16, 180:10, 180:21, 181:10, 190:20, 191:6, 192:6, 218:10, 219:14, 220:3, 221:7, 221:8, 221:24, 228:10, 231:17, 233:20, 237:4, 237:6, 246:21, 255:10, 273:14, 275:5
**Realtime** [2] - 276:16, 276:21
**REALTIME** [1] - 2:3
**reason** [28] - 8:16, 9:23, 11:13, 19:25, 22:1, 34:19, 42:11, 42:25, 50:16, 54:6, 78:8, 78:9, 79:15, 84:9, 85:11, 101:25, 107:6, 107:9, 107:12, 109:3, 147:4, 166:4, 198:13, 210:22, 228:12, 247:21, 261:21
**reasonable** [1] - 8:16
**reasons** [3] - 108:10, 110:24, 167:6
**recap** [1] - 47:1
**receipt** [2] - 202:17, 202:21
**receipts** [1] - 209:17
**receive** [14] - 6:5, 15:3, 18:13, 18:21, 41:7, 64:13, 141:6, 175:15, 176:19, 210:24, 219:7, 219:21, 231:20, 232:1
**received** [18] - 18:10, 18:11, 54:1, 54:11, 70:17, 90:6, 92:25, 119:18, 141:7, 170:10, 175:5, 175:9, 185:23, 211:3, 212:3, 219:8, 234:20, 237:22
**recently** [1] - 249:13
**recess** [3] - 91:9,

172:8, 230:15
**RECESS**....................
................. [1] - 3:15
**recipe** [1] - 23:11
**reckless** [1] - 46:20
**recklessly** [1] - 243:24
**recognize** [1] - 185:8
**recollection** [4] - 242:24, 246:16, 257:1, 267:20
**recommendation** [3] - 81:6, 81:10, 199:16
**recommendations** [1] - 179:1
**reconciliation** [8] - 159:17, 163:12, 163:13, 201:25, 203:11, 203:15, 254:15, 254:16
**record** [26] - 7:1, 35:20, 53:19, 88:8, 91:23, 96:24, 113:9, 113:17, 118:1, 130:9, 136:8, 173:19, 212:25, 214:3, 215:19, 231:5, 239:17, 239:19, 240:3, 245:4, 245:21, 256:12, 260:6, 263:18, 265:19, 276:19
**RECORDED** [1] - 2:7
**recorded** [1] - 171:5
**recording** [2] - 11:7, 255:12
**recordkeeping** [1] - 207:4
**records** [35] - 45:21, 46:5, 48:11, 48:13, 49:9, 53:3, 53:20, 64:25, 65:12, 86:2, 116:19, 118:19, 118:21, 142:16, 142:18, 143:24, 149:25, 237:14, 237:19, 237:21, 237:23, 238:10, 238:13, 238:15, 238:16, 238:18, 238:20, 238:25, 239:20, 239:21, 239:22, 247:22, 247:25, 253:21
**redact** [1] - 245:22
**redacted** [1] - 245:23
**redirect** [1] - 230:6
**REDIRECT** [14] - 3:8, 3:14, 3:19, 3:20, 3:21, 3:22, 4:6,

85:19, 169:3, 208:25, 210:4, 210:19, 213:25, 272:10
**reduced** [1] - 210:22
**refer** [7] - 48:6, 100:19, 162:6, 192:20, 239:7, 262:17, 263:7
**reference** [4] - 40:17, 44:22, 107:3, 182:4
**referred** [8] - 107:4, 131:21, 131:25, 132:16, 136:6, 168:4, 174:20, 174:23
**referring** [11] - 16:7, 29:16, 87:3, 87:10, 87:24, 136:1, 153:1, 202:1, 240:24, 254:12, 254:14
**refers** [1] - 104:2
**reflect** [4] - 48:22, 143:9, 143:21, 218:17
**reflected** [1] - 90:8
**reflects** [2] - 53:25, 143:10
**refresh** [2] - 242:24, 257:1
**regard** [6] - 38:9, 42:15, 46:21, 86:15, 223:13, 244:16
**regarding** [12] - 121:1, 121:5, 121:13, 122:2, 134:18, 157:12, 234:4, 235:22, 242:13, 242:17, 260:20, 262:6
**regardless** [7] - 39:5, 39:8, 40:21, 63:11, 84:9, 140:24, 171:7
**REGISTERED** [1] - 2:4
**Registered** [1] - 276:16
**registered** [1] - 276:22
**regressed** [1] - 28:8
**regular** [9] - 45:3, 97:23, 104:8, 104:9, 104:10, 122:20, 145:14, 145:20, 196:2
**rehabilitate** [1] - 158:13
**rehabilitating** [1] - 156:25
**reimbursed** [1] - 17:23
**reissued** [1] - 15:21

**rejected** [1] - 249:18
**relate** [1] - 140:15
**related** [6] - 8:19, 229:2, 235:16, 236:14, 243:18, 275:25
**relates** [2] - 22:6, 241:1
**relation** [1] - 180:3
**relationship** [1] - 42:20
**relatively** [1] - 93:5
**release** [1] - 63:14
**releasing** [1] - 63:13
**relevance** [3] - 21:4, 141:16, 243:3
**relevant** [9] - 21:5, 68:6, 68:14, 139:13, 158:8, 158:18, 243:18, 245:11, 245:12
**reliable** [2] - 112:7, 112:8
**relook** [1] - 189:16
**remain** [3] - 6:17, 91:14, 129:25
**remainder** [1] - 52:23
**remember** [45] - 11:8, 12:20, 26:13, 26:22, 29:1, 30:22, 38:11, 42:4, 74:13, 90:11, 121:2, 141:8, 163:24, 164:7, 171:6, 219:13, 219:24, 221:14, 228:10, 233:16, 233:20, 234:4, 234:22, 235:23, 235:25, 236:4, 236:6, 236:7, 236:8, 236:10, 236:11, 236:14, 236:16, 236:18, 236:19, 237:10, 237:12, 238:7, 248:3, 248:17, 254:1, 266:21, 275:5
**remind** [1] - 233:16, 233:22, 272:25
**renovating** [1] - 20:12
**renovations** [1] - 20:16
**repeat** [2] - 113:18, 237:9
**repeated** [1] - 114:24
**repeating** [1] - 108:18
**rephrase** [9] - 63:4, 65:8, 94:19, 135:9, 160:13, 167:12, 177:8, 270:25,

272:14
**replicated** [1] - 19:19
**report** [9] - 54:3, 116:21, 123:15, 195:2, 195:8, 195:11, 196:21, 209:20, 264:25
**reported** [2] - 75:17, 203:18
**reporter** [1] - 245:20
**Reporter** [7] - 276:16, 276:17, 276:17, 276:21, 276:22, 276:22
**REPORTER** [8] - 2:3, 2:3, 2:4, 32:6, 122:5, 122:7, 211:20, 245:22
**REPORTER'S** [1] - 276:15
**reports** [2] - 111:12, 209:17
**reprehensible** [1] - 31:3
**represent** [7] - 49:11, 49:18, 119:18, 150:2, 170:17, 187:22, 254:18
**representation** [1] - 227:2
**representative** [3] - 106:24, 149:1, 225:21
**represented** [2] - 35:9, 274:9
**representing** [2] - 52:7, 155:18
**represents** [1] - 35:16
**request** [9] - 157:11, 166:23, 182:17, 182:23, 182:25, 201:3, 201:5, 201:6, 201:10
**requested** [6] - 18:14, 138:13, 138:14, 157:20, 167:5, 167:6
**requests** [3] - 139:20, 139:22, 182:20
**required** [9] - 39:4, 42:22, 140:17, 140:18, 140:24, 175:21, 186:6, 224:4, 224:5
**requirements** [1] - 69:20
**requires** [1] - 183:19
**reservations** [3] - 180:5, 207:14, 207:20
**reserve** [3] - 128:9,

246:3, 252:22
**reset** [1] - 176:6
**respect** [5] - 5:14, 5:22, 52:22, 180:17, 244:16
**respectfully** [1] - 31:5
**respective** [1] - 28:20
**respond** [1] - 244:10
**response** [1] - 197:8
**response)** [12] - 45:14, 45:15, 48:19, 77:2, 95:13, 111:20, 192:4, 227:15, 233:13, 239:18, 259:23, 265:14
**responsibilities** [2] - 178:17, 217:18
**responsibility** [23] - 97:3, 98:2, 98:6, 98:7, 98:13, 98:17, 109:11, 113:12, 113:19, 113:22, 113:23, 114:2, 114:19, 115:1, 115:5, 115:13, 121:8, 165:23, 165:25, 195:2, 202:11, 202:13, 209:6
**responsible** [8] - 21:14, 21:15, 21:17, 122:9, 180:13, 206:15, 206:17, 208:7
**rest** [8] - 33:18, 107:3, 111:1, 127:11, 134:7, 134:8, 152:25, 208:13
**restaurant** [108] - 15:8, 18:17, 21:23, 22:16, 23:10, 25:16, 28:4, 31:10, 32:16, 35:10, 35:18, 47:9, 56:15, 57:10, 57:13, 57:19, 57:22, 57:24, 60:20, 66:19, 67:1, 68:21, 71:9, 71:24, 73:17, 81:23, 86:5, 86:7, 92:20, 93:15, 94:13, 107:19, 108:20, 109:18, 109:22, 111:13, 112:4, 112:6, 114:23, 115:7, 121:15, 131:5, 133:2, 135:15, 152:10, 152:11, 153:14, 158:23, 159:6, 161:6, 164:11, 167:10,

168:6, 168:7, 178:7, 179:18, 179:20, 180:7, 194:25, 195:21, 196:22, 200:21, 205:5, 205:6, 205:10, 207:2, 209:23, 209:24, 214:4, 216:17, 217:24, 220:24, 223:1, 224:24, 229:19, 231:24, 232:21, 234:25, 236:25, 237:2, 237:14, 242:19, 243:21, 244:17, 244:18, 248:21, 254:9, 257:9, 257:10, 257:11, 258:18, 260:14, 267:6, 267:8, 267:11, 267:21, 268:4, 268:20, 268:21, 268:25, 269:1, 269:10, 271:15, 271:20, 272:7, 272:12, 272:18
**Restaurant** [3] - 120:25, 121:18, 242:14
**restauranteur's** [1] - 234:25
**restauranteurs** [1] - 29:9
**restaurants** [21] - 21:19, 43:3, 57:16, 77:7, 140:22, 152:13, 165:13, 177:1, 177:6, 177:11, 177:13, 198:15, 200:21, 222:20, 222:24, 223:20, 223:21, 271:17, 271:18, 271:22, 272:16
**Restaurants** [1] - 19:6
**restock** [2] - 36:20
**restocked** [1] - 36:21
**restricted** [1] - 204:9
**resume** [1] - 230:13
**returned** [2] - 15:18, 42:23
**review** [5] - 53:23, 148:14, 159:18, 159:20, 188:5
**reviewed** [8] - 90:5, 90:8, 90:20, 90:22, 148:6, 149:12, 220:9, 253:10
**reviewing** [1] - 204:9

**rewards** [1] - 28:21
**Rica** [3] - 15:14, 15:18, 244:17
**Rican** [1] - 243:15
**Richard** [2] - 20:21, 20:23
**Rico** [1] - 19:22
**rid** [3] - 11:2, 28:18, 82:1
**ridiculous** [1] - 52:6
**rife** [1] - 31:12
**right-hand** [2] - 123:19, 170:13
**rightly** [1] - 71:25
**rights** [1] - 243:12
**ring** [2] - 131:2, 131:5
**ringers** [5] - 10:18, 81:13, 81:22, 81:24, 81:25
**ringing** [1] - 13:1
**rings** [1] - 81:21
**rise** [7] - 5:7, 91:8, 91:10, 172:6, 230:14, 230:16, 276:10
**Ritz** [3] - 10:15, 20:2, 20:4
**Ritz-Carlton** [3] - 10:15, 20:2, 20:4
**RMR** [2] - 2:3, 276:21
**road** [1] - 60:25
**Roadhouse** [3] - 33:2, 33:6, 70:24
**ROGERS** [1] - 173:15
**Rogers** [20] - 95:11, 96:1, 96:3, 108:12, 109:5, 131:20, 137:1, 137:10, 138:15, 173:9, 173:20, 173:24, 174:10, 190:6, 190:13, 204:12, 214:2, 214:13, 214:15, 260:4
**ROGERS**.................
...............[1] - 3:16
**role** [3] - 163:17, 176:14, 180:12
**roles** [2] - 161:7, 161:10
**romantic** [2] - 24:7, 37:20
**Room** [2] - 57:25, 204:21
**room** [9] - 22:2, 27:3, 33:18, 71:18, 84:15, 142:15, 161:11, 161:12, 179:6
**ROOM** [1] - 2:4
**roughly** [1] - 227:19

**rounds** [1] - 83:13
**rubber** [1] - 60:25
**rule** [9] - 41:16, 193:16, 199:7, 199:8, 199:25, 213:11, 213:13, 213:14
**run** [18] - 8:4, 8:5, 33:22, 33:23, 42:1, 59:23, 66:22, 68:8, 71:18, 78:3, 110:20, 131:4, 153:21, 202:16, 202:17, 206:14, 258:1, 259:12
**run-down** [1] - 206:14
**running** [14] - 21:18, 36:6, 63:3, 63:6, 63:17, 64:10, 88:17, 89:18, 105:17, 106:3, 164:5, 175:23, 176:4, 192:17
**runs** [2] - 127:16, 176:13
**Russian** [4] - 24:10, 24:11, 24:18, 24:21
**Ryan** [39] - 96:9, 101:5, 104:18, 112:13, 131:15, 131:19, 131:20, 132:6, 132:10, 136:1, 136:14, 136:21, 137:10, 137:18, 137:24, 138:1, 138:9, 139:9, 140:11, 141:8, 152:2, 153:2, 170:24, 170:25, 180:4, 184:20, 187:18, 189:22, 189:25, 193:13, 218:12, 218:17, 221:6, 221:14, 221:19, 222:1, 224:1, 258:6
**Ryan's** [1] - 139:16

## S

**s/Cathy** [1] - 276:20
**SA** [3] - 79:4, 170:12, 212:12
**SA's** [2] - 181:6, 183:15
**salaried** [1] - 175:6
**Sale** [1] - 131:3
**sale** [6] - 187:16, 187:18, 194:25, 195:10, 203:2, 203:6

**sales** [14] - 12:13, 160:11, 166:13, 166:17, 166:18, 170:16, 170:17, 170:24, 171:2, 171:16, 187:23, 202:7, 253:10, 270:17
**Sales** [2] - 112:11, 187:12
**salesmanship** [1] - 83:3
**salt** [1] - 36:1
**SAs** [3] - 11:11, 11:14, 38:15
**sat** [7] - 133:24, 161:13, 196:24, 196:25, 220:8, 220:11, 220:20
**satisfaction** [1] - 33:8
**Saturday** [27] - 10:5, 17:16, 17:19, 68:21, 124:9, 124:10, 124:24, 124:25, 125:1, 125:3, 125:4, 125:6, 125:10, 125:13, 125:15, 125:17, 125:19, 125:20, 126:21, 229:19, 273:11, 273:12, 273:21, 273:22
**save** [1] - 238:25
**saved** [1] - 251:8
**saw** [9] - 18:23, 26:18, 30:12, 54:13, 65:17, 122:24, 132:20, 263:8, 263:18
**scan** [1] - 239:1
**scanned** [1] - 255:8
**scenes** [2] - 132:9, 132:14
**schedule** [26] - 26:9, 39:6, 39:9, 84:12, 137:13, 137:15, 137:20, 137:21, 138:16, 153:5, 156:24, 157:15, 167:17, 167:18, 200:15, 200:23, 201:1, 201:17, 208:20, 208:21, 209:8, 221:13, 224:21, 259:19
**scheduled** [11] - 103:25, 106:7, 156:17, 157:19, 167:7, 189:1, 190:6, 194:18, 201:3, 201:20, 216:17

**Schedulefly** [25] - 137:19, 138:7, 138:12, 138:13, 138:20, 138:25, 139:3, 139:20, 139:23, 157:7, 157:9, 157:18, 166:23, 182:7, 183:5, 184:2, 200:14, 200:17, 208:10, 221:17, 221:19, 228:21, 259:13, 262:9, 262:10
**schedules** [14] - 23:12, 137:9, 157:3, 167:9, 208:11, 208:12, 221:12, 221:22, 228:21, 259:3, 259:4, 259:5, 259:7, 259:10
**scheduling** [15] - 47:2, 137:19, 156:19, 157:5, 158:12, 182:21, 182:23, 182:24, 182:25, 183:2, 194:21, 200:19, 201:23, 208:14, 258:25
**school** [6] - 19:5, 19:7, 29:20, 157:14, 201:11, 201:12
**screen** [4] - 44:1, 94:21, 203:3, 239:13
**seat** [2] - 6:25, 173:7
**seated** [7] - 5:8, 68:10, 77:8, 83:20, 83:21, 91:11, 230:17
**second** [31] - 12:1, 20:11, 20:12, 20:14, 44:16, 50:5, 50:15, 54:22, 54:23, 54:24, 91:24, 120:15, 120:21, 123:5, 148:21, 149:17, 150:11, 168:11, 169:2, 192:2, 195:14, 200:16, 201:12, 206:8, 218:21, 226:7, 228:9, 264:8, 264:25
**second-to-last** [1] - 264:8
**section** [23] - 21:22, 21:25, 58:5, 58:7, 67:10, 68:1, 68:10, 88:10, 109:18, 109:21, 111:4, 114:21, 116:4, 117:21, 130:22,

154:25, 170:14, 178:6, 179:20, 186:7, 244:12, 244:24, 257:22
**sections** [8] - 21:24, 77:7, 77:8, 88:19, 109:22, 179:18, 190:23, 205:1
**secure** [2] - 113:12, 113:20
**Security** [2] - 245:4, 245:16
**see** [101] - 17:18, 24:5, 30:12, 33:15, 43:25, 44:1, 44:3, 44:8, 48:16, 48:20, 56:4, 68:14, 68:16, 72:24, 79:16, 80:3, 81:25, 83:2, 83:3, 83:5, 85:16, 91:4, 94:23, 100:17, 102:1, 102:2, 106:5, 110:6, 110:9, 112:11, 112:13, 112:15, 117:13, 117:15, 117:23, 120:18, 120:21, 122:23, 123:6, 123:18, 123:19, 123:24, 124:1, 124:7, 124:9, 124:10, 126:6, 126:11, 133:11, 134:21, 138:5, 142:22, 143:8, 143:10, 143:18, 143:20, 144:16, 145:25, 146:10, 147:25, 148:7, 149:5, 149:8, 156:12, 158:17, 166:15, 169:10, 169:15, 170:5, 172:5, 180:5, 180:22, 182:7, 187:13, 187:15, 193:25, 201:1, 201:17, 203:11, 203:20, 206:9, 209:10, 214:24, 225:13, 226:7, 226:16, 229:6, 235:14, 239:13, 240:25, 252:24, 257:1, 261:16, 262:22, 263:9, 264:9, 265:1, 265:2, 276:7
**seeing** [2] - 111:6, 141:8
**seek** [1] - 32:10

**seeking** [1] - 275:24
**seem** [1] - 226:20
**seemingly** [1] - 50:2
**selection** [2] - 78:24, 192:24
**selections** [1] - 23:21
**sell** [7] - 37:4, 37:10, 37:11, 37:12, 69:3, 199:2, 270:15
**selling** [4] - 13:2, 190:23, 208:1, 208:2
**send** [2] - 200:14, 205:22
**sending** [2] - 34:6, 80:9
**sense** [11] - 42:7, 42:23, 65:5, 72:24, 80:11, 82:8, 82:10, 109:23, 121:18, 177:2, 272:5
**sent** [13] - 119:8, 142:2, 168:14, 183:8, 183:10, 184:2, 205:12, 206:3, 210:21, 211:4, 211:10, 212:4, 212:5
**separate** [3] - 101:11, 109:22, 235:21
**separately** [1] - 194:13
**September** [9] - 138:14, 143:16, 147:14, 214:5, 214:7, 225:16, 225:20, 227:11, 227:16
**sequence** [2] - 144:10, 144:19
**sequential** [1] - 143:14
**sequestered** [1] - 194:2
**serious** [1] - 26:24
**serve** [6] - 24:1, 70:4, 97:19, 110:20, 154:13, 234:17
**served** [3] - 250:13, 250:14, 251:3
**server** [155] - 7:17, 7:20, 9:14, 9:17, 11:18, 11:24, 14:16, 15:7, 15:10, 16:2, 16:17, 17:12, 21:15, 21:16, 23:15, 23:16, 23:17, 33:11, 36:23, 43:3, 58:5, 58:7, 58:13, 59:9, 59:10, 59:13, 64:9, 64:10, 64:13, 66:1, 69:15,

69:16, 69:17, 69:21, 69:22, 70:1, 70:2, 70:12, 71:3, 77:16, 84:11, 84:25, 93:2, 93:11, 96:18, 96:20, 97:5, 97:10, 97:12, 97:14, 97:16, 103:19, 104:12, 104:14, 104:15, 104:18, 109:6, 110:14, 114:14, 120:10, 130:19, 130:25, 131:12, 131:16, 134:2, 137:17, 137:23, 140:1, 152:16, 160:3, 160:20, 161:5, 161:8, 161:10, 161:11, 161:12, 161:14, 164:8, 164:11, 164:23, 165:4, 169:6, 170:8, 170:10, 170:11, 170:12, 184:24, 188:4, 188:14, 188:17, 191:6, 193:2, 193:4, 193:5, 201:3, 202:16, 203:3, 205:6, 205:7, 205:12, 205:16, 205:17, 206:2, 207:17, 208:5, 209:11, 209:17, 210:21, 211:2, 212:12, 212:23, 216:6, 216:10, 216:12, 217:12, 217:20, 222:2, 222:5, 222:9, 231:21, 232:1, 232:8, 248:9, 252:7, 252:21, 253:8, 253:24, 254:3, 254:8, 254:10, 254:15, 257:21, 260:1, 260:6, 260:8, 260:21, 260:23, 261:13, 261:15, 261:19, 261:23, 266:16, 266:18, 270:7, 271:7
**server's** [2] - 223:4, 224:10
**servers** [98] - 7:21, 9:14, 11:15, 17:23, 17:24, 24:5, 25:20, 36:23, 37:15, 38:15, 57:14, 58:15, 59:11, 59:17, 67:1, 67:13, 67:22, 69:25, 75:21,

75:23, 83:1, 83:23, 86:8, 93:3, 96:18, 96:20, 97:19, 97:21, 104:4, 113:14, 114:14, 139:11, 139:13, 159:8, 159:25, 160:18, 160:20, 160:21, 160:25, 161:1, 161:4, 161:5, 161:8, 161:9, 166:10, 171:14, 171:15, 176:5, 177:4, 177:17, 179:17, 179:19, 181:4, 183:2, 183:15, 184:9, 186:6, 187:25, 188:5, 190:21, 190:24, 194:13, 195:3, 195:4, 195:7, 198:4, 198:25, 199:2, 200:12, 201:11, 203:7, 203:9, 203:20, 204:13, 205:1, 205:3, 206:22, 207:17, 209:2, 209:12, 209:16, 212:8, 216:14, 220:4, 232:24, 234:20, 234:24, 248:9, 260:4, 267:18, 267:24, 268:1, 268:2, 270:7, 271:3, 271:6
**servers'** [2] - 29:8, 70:24
**serves** [3] - 97:5, 97:6, 139:13
**service** [263] - 8:1, 13:4, 19:1, 20:17, 21:1, 21:13, 23:22, 24:9, 24:10, 24:11, 24:12, 24:19, 24:21, 25:22, 25:24, 32:23, 33:13, 33:14, 56:24, 57:2, 57:5, 58:22, 59:3, 59:5, 59:7, 59:8, 61:9, 61:13, 61:18, 61:20, 61:21, 61:23, 62:10, 62:11, 62:12, 62:14, 62:21, 63:1, 63:2, 63:5, 63:16, 64:8, 64:12, 64:23, 65:11, 65:13, 66:8, 68:20, 68:22, 69:1, 69:6, 69:7, 69:20, 70:16, 70:18, 70:21, 71:16, 72:9, 72:11, 72:18, 72:21,

73:7, 73:8, 73:17, 74:2, 74:13, 74:23, 77:11, 78:16, 78:18, 82:22, 83:8, 84:1, 84:3, 84:7, 84:8, 85:10, 85:11, 92:23, 92:24, 93:9, 93:12, 93:14, 93:16, 93:23, 94:8, 94:9, 94:15, 95:20, 96:11, 96:12, 96:17, 96:22, 96:25, 97:22, 97:24, 98:1, 98:16, 98:17, 99:5, 99:11, 99:12, 100:9, 100:13, 101:7, 101:8, 101:10, 101:15, 101:16, 101:17, 101:18, 101:21, 101:23, 102:6, 102:9, 104:11, 105:9, 105:21, 107:11, 107:14, 107:20, 107:21, 108:16, 108:22, 109:7, 109:8, 109:15, 109:17, 109:24, 110:21, 121:17, 121:25, 122:11, 130:24, 133:25, 153:23, 154:1, 158:20, 159:5, 160:15, 161:1, 161:17, 161:18, 161:19, 162:19, 162:23, 163:1, 163:2, 163:11, 164:13, 165:1, 167:8, 167:13, 174:20, 174:23, 175:22, 176:3, 176:4, 176:22, 178:1, 186:7, 188:10, 188:11, 188:16, 190:15, 190:19, 190:22, 191:5, 191:13, 191:19, 191:20, 191:23, 191:24, 192:6, 192:10, 192:15, 194:23, 197:19, 197:20, 197:24, 197:25, 198:1, 198:12, 198:22, 198:23, 199:9, 202:5, 202:12, 202:15, 203:7, 203:14, 204:6, 204:15, 205:12, 205:16, 205:17, 205:22,

206:5, 206:6, 206:12, 206:13, 207:10, 207:12, 207:24, 208:3, 208:4, 208:6, 208:15, 212:12, 213:8, 213:15, 213:19, 213:22, 220:2, 222:15, 222:19, 222:22, 222:23, 223:2, 223:3, 223:6, 229:22, 230:1, 230:3, 235:10, 236:1, 258:12, 258:13, 258:16, 258:17, 260:16, 260:17, 267:16, 267:21, 267:22, 267:23, 269:6, 269:17, 270:10, 270:11, 270:12, 270:18, 270:22, 270:23, 271:1, 271:10, 272:1, 272:6, 275:22
**servicing** [2] - 77:12, 77:15
**serving** [4] - 12:25, 57:23, 131:13, 160:11
**set** [19] - 11:2, 11:7, 16:5, 16:6, 62:7, 73:20, 84:5, 126:12, 179:13, 179:22, 179:23, 206:22, 207:11, 207:15, 207:18, 207:21, 253:16, 257:22, 257:24
**setting** [4] - 11:4, 69:17, 130:22, 207:10
**settled** [1] - 250:1
**setup** [8] - 35:23, 36:5, 36:8, 41:24, 180:2, 190:20, 207:19, 217:13
**seven** [12] - 124:22, 125:9, 125:18, 126:4, 229:20, 271:4, 273:8, 273:10, 273:11, 273:12, 273:16, 273:20
**seven-day** [3] - 273:8, 273:16, 273:20
**several** [17] - 8:10, 8:13, 9:11, 10:4, 14:15, 15:14, 15:21,

16:21, 19:10, 20:19,
21:24, 68:19, 73:13,
84:13, 89:24, 252:8
**shaded** [3] - 228:14,
228:17
**shake** [3] - 73:2, 73:3
**shakers** [1] - 36:1
**Shannon** [1] - 238:7
**share** [15] - 9:21, 9:22,
10:8, 10:13, 25:6,
28:15, 33:10, 35:8,
67:13, 67:21, 68:12,
77:15, 210:22,
210:24, 212:3
**shared** [8] - 57:14,
59:10, 59:12, 59:15,
59:17, 67:18, 68:12,
270:8
**shares** [2] - 204:19,
270:5
**sharing** [5] - 9:24,
55:24, 68:17, 68:18,
69:24
**sheet** [36] - 12:4, 16:2,
17:22, 46:14, 81:10,
87:25, 100:25,
101:5, 102:15,
110:15, 110:23,
114:19, 122:24,
123:1, 143:22,
144:11, 144:16,
148:18, 151:6,
163:17, 163:19,
166:13, 166:15,
169:10, 169:15,
170:5, 171:22,
188:3, 203:11,
203:15, 240:22,
241:5, 259:12,
259:15, 259:17,
260:9
**sheets** [47] - 11:24,
16:9, 17:13, 30:20,
51:25, 52:1, 52:3,
52:17, 86:15, 86:22,
87:3, 90:14, 90:18,
120:23, 131:25,
140:2, 140:4,
143:23, 159:17,
163:12, 163:14,
169:7, 169:12,
185:9, 185:10,
203:19, 204:5,
204:10, 222:2,
222:5, 231:21,
232:1, 232:9,
237:15, 240:5,
240:20, 252:7,
252:8, 252:21,
253:8, 253:24,

254:4, 254:8,
254:10, 254:15,
260:1, 260:6
**shift** [111] - 14:3, 27:2,
35:24, 36:8, 36:10,
40:25, 41:18, 41:25,
58:14, 63:1, 65:19,
65:20, 65:21, 66:7,
66:12, 66:16, 66:18,
66:20, 66:22, 67:2,
67:19, 67:20, 76:20,
77:6, 77:10, 79:13,
80:14, 88:16, 89:19,
100:2, 101:2,
103:20, 111:25,
116:16, 122:9,
122:11, 125:14,
132:19, 134:23,
137:16, 137:22,
137:24, 137:25,
138:8, 138:16,
138:22, 140:2,
140:5, 140:25,
142:2, 143:6,
153:11, 154:16,
155:11, 156:9,
156:10, 156:16,
157:25, 158:5,
159:23, 159:24,
160:1, 160:6,
166:24, 167:5,
167:6, 168:17,
168:18, 168:24,
169:13, 175:10,
175:14, 179:25,
180:9, 180:11,
180:14, 185:11,
185:19, 185:21,
185:22, 186:4,
187:2, 188:2, 188:6,
197:23, 205:13,
205:18, 207:15,
208:16, 208:17,
209:10, 212:8,
217:13, 217:14,
217:17, 222:5,
222:8, 258:3,
260:10, 268:22,
275:10, 275:12,
275:14, 275:17,
275:19, 275:23
**shifts** [20] - 16:14,
34:18, 55:14, 58:8,
131:13, 137:13,
154:21, 157:12,
157:20, 157:23,
167:19, 185:14,
200:20, 200:22,
201:4, 222:7,
254:20, 259:16,
260:23, 261:13

**short** [8] - 17:22,
41:20, 85:5, 102:7,
166:7, 187:10,
227:6, 257:8
**shortly** [4] - 7:12,
131:14, 131:16,
134:19
**show** [34] - 12:5,
16:13, 49:24, 50:4,
50:12, 95:23,
105:13, 109:4,
111:1, 111:16,
112:8, 124:6,
128:23, 143:23,
144:3, 145:13,
146:16, 146:23,
148:9, 150:21,
167:13, 169:5,
169:8, 174:8,
183:25, 191:24,
197:22, 203:5,
240:11, 240:12,
241:8, 254:13,
267:21, 269:4
**showed** [9] - 33:18,
42:6, 55:18, 70:22,
81:10, 81:12,
267:24, 267:25,
268:23
**showing** [5] - 28:22,
53:16, 53:17,
108:19, 239:16
**shown** [3] - 16:13,
49:9, 49:10
**shows** [11] - 43:12,
48:9, 48:12, 95:11,
107:11, 123:18,
143:17, 147:4,
167:15, 170:8,
170:11
**shrugged** [1] - 164:20
**shudder** [1] - 73:6
**shut** [1] - 207:2
**sick** [1] - 112:9
**side** [26] - 35:4, 35:19,
35:20, 35:22, 36:7,
36:9, 36:10, 36:12,
36:14, 36:22, 37:8,
41:24, 62:8, 95:24,
123:19, 130:21,
135:21, 136:20,
136:22, 155:1,
158:14, 174:6,
258:2, 259:1, 275:23
**sidebar** [1] - 247:2
**sides** [1] - 24:15
**sign** [2] - 17:3, 64:25
**signed** [1] - 275:20
**significant** [1] - 272:6
**silverware** [4] - 35:25,

130:22, 207:13,
257:23
**similar** [3] - 29:24,
243:21, 253:20
**similarly** [1] - 31:21
**simple** [1] - 108:12
**simplifies** [5] - 108:4,
108:5, 108:7, 108:9,
108:11
**simplify** [1] - 108:17
**simplifying** [1] -
107:23
**simplistic** [1] - 12:4
**simultaneously** [3] -
160:22, 251:18,
251:22
**single** [5] - 99:6,
188:12, 191:6,
254:19, 254:20
**sit** [7] - 22:9, 31:22,
31:23, 42:4, 65:13,
133:17, 228:23
**sitting** [6] - 24:23,
50:22, 54:16,
120:24, 189:17,
197:12
**situation** [9] - 104:17,
105:18, 105:20,
105:24, 115:21,
182:16, 196:1,
197:3, 260:19
**situations** [1] - 211:6
**six** [9] - 21:23, 35:10,
45:22, 125:9,
125:16, 188:9,
188:11, 188:12,
238:24
**size** [1] - 198:3
**skeleton** [1] - 86:12
**sketchy** [1] - 244:16
**skill** [1] - 11:1
**skills** [1] - 26:6
**skimmed** [1] - 56:6
**slash** [3] - 99:12
**slightly** [1] - 253:19
**slip** [1] - 118:13
**slips** [4] - 8:6, 118:16,
118:21, 209:12
**sloppy** [1] - 17:5
**slow** [4] - 82:2, 84:20,
190:25, 223:5
**slowly** [1] - 32:6
**small** [5] - 35:9, 83:13,
86:9, 93:5, 260:21
**smaller** [1] - 68:13
**smart** [1] - 76:6
**smoke** [3] - 22:11,
89:16
**smokers** [1] - 89:14
**snuff** [1] - 10:24

**so..** [3] - 40:22,
237:12, 256:22
**SoBou** [8] - 133:3,
133:6, 133:10,
133:14, 133:20,
159:12, 167:21,
271:19
**Social** [2] - 245:4,
245:16
**soggy** [1] - 33:9
**sold** [4] - 37:3, 37:13,
209:4, 210:12
**solely** [2] - 202:11,
202:12
**solemnly** [7] - 6:18,
91:15, 130:1,
173:11, 215:11,
230:22, 256:4
**soliloquy** [1] - 14:10
**someone** [33] - 16:3,
25:3, 25:4, 63:10,
63:11, 64:9, 88:22,
90:1, 90:12, 105:17,
108:20, 115:11,
122:9, 154:16,
159:1, 166:24,
177:3, 178:10,
179:1, 181:18,
185:16, 188:18,
188:23, 188:24,
189:2, 189:6,
192:13, 199:13,
201:9, 201:10,
205:11, 211:15,
257:19
**sometime** [1] - 27:19
**sometimes** [26] -
10:21, 10:22, 21:19,
25:8, 32:19, 36:25,
37:1, 37:15, 41:20,
89:20, 97:14, 97:19,
104:11, 113:3,
139:3, 139:6,
159:10, 181:13,
191:21, 217:14,
223:10, 266:22,
267:18, 267:19,
267:24, 268:17
**somewhat** [1] - 20:3
**somewhere** [2] -
25:12, 255:12
**somm** [2] - 176:18,
176:19
**somm'ing** [1] - 176:12
**sommelier** [6] - 73:5,
161:20, 176:4,
176:20, 176:22,
210:6
**soon** [1] - 216:25
**sorry** [37] - 11:21,

13:5, 28:7, 32:7, 45:3, 49:4, 52:5, 70:6, 82:3, 94:9, 94:25, 105:5, 117:9, 121:10, 123:21, 125:17, 144:15, 145:22, 146:9, 175:19, 176:1, 178:2, 182:2, 182:22, 191:1, 193:15, 208:14, 210:17, 212:1, 223:15, 227:5, 229:6, 242:1, 259:24, 262:18

**sort** [10] - 7:24, 14:10, 33:13, 42:24, 94:16, 157:11, 181:16, 203:22, 243:15

**sorts** [1] - 56:14

**sound** [1] - 263:19

**sounded** [1] - 273:1

**sounds** [2] - 257:3, 264:6

**source** [1] - 60:19

**sous** [1] - 15:17

**Soviet** [1] - 74:4

**space** [1] - 211:25

**speaking** [10] - 21:10, 25:19, 45:24, 50:1, 141:24, 160:22, 251:18, 251:22, 275:21

**speaks** [2] - 59:22, 99:10

**special** [4] - 25:16, 40:19, 109:1, 109:6

**specials** [2] - 23:20, 208:2

**specific** [11] - 88:15, 104:20, 119:15, 152:1, 169:8, 207:21, 208:9, 227:10, 228:11, 254:5, 254:25

**specifically** [5] - 165:7, 165:14, 176:23, 236:12, 246:15

**speculating** [1] - 51:3

**speed** [1] - 274:23

**spell** [8] - 6:25, 91:22, 122:5, 130:8, 173:18, 215:18, 231:4, 256:11

**spelled** [1] - 14:14

**spirits** [1] - 19:18

**split** [1] - 152:15

**spoken** [3] - 37:25, 43:9, 197:11

**spoon** [1] - 37:18

**spot** [11] - 8:23, 85:1, 133:20, 134:3, 179:1, 216:19, 220:7, 257:12, 257:13, 257:14

**spots** [2] - 29:24, 60:1

**spread's** [1] - 24:18

**spreadsheet** [6] - 117:22, 148:11, 233:19, 241:3, 241:4, 264:3

**spreadsheets** [1] - 232:2

**spurred** [1] - 156:3

**staff** [17] - 32:21, 42:12, 47:12, 92:21, 112:19, 139:4, 140:19, 153:17, 153:19, 153:21, 181:3, 181:4, 189:10, 207:22, 225:2, 225:5, 255:15

**staffed** [1] - 86:7

**staggered** [1] - 192:3

**stake** [1] - 72:5

**stamp** [2] - 182:4, 254:14

**stamped** [11] - 174:9, 183:5, 184:1, 185:7, 239:8, 239:11, 241:9, 246:8, 247:11, 251:21, 264:1

**stand** [12] - 91:13, 128:12, 128:19, 179:22, 179:23, 179:24, 180:2, 180:3, 215:9, 216:8, 230:20, 255:23

**standard** [7] - 12:14, 38:7, 40:22, 67:4, 159:9, 216:11, 273:23

**standards** [2] - 191:5, 199:14

**Standards** [1] - 273:13

**standing** [3] - 6:17, 91:14, 129:25

**standpoint** [1] - 11:18

**start** [26] - 11:25, 66:20, 78:10, 80:4, 81:20, 88:25, 89:22, 92:20, 92:21, 117:7, 120:16, 125:3, 125:4, 130:14, 142:25, 144:11, 148:16, 148:21, 156:21, 156:22,

176:11, 216:25, 217:2, 217:17, 272:22

**started** [62] - 7:10, 7:23, 13:21, 15:5, 19:2, 19:4, 19:5, 19:8, 20:11, 20:12, 20:16, 23:18, 40:13, 46:1, 55:4, 66:1, 66:2, 66:6, 66:8, 66:9, 66:10, 66:12, 93:3, 93:5, 93:11, 97:22, 101:20, 134:25, 137:14, 143:2, 160:15, 175:2, 186:15, 186:16, 191:19, 207:15, 216:1, 216:6, 216:12, 217:4, 217:5, 217:6, 217:9, 217:11, 218:3, 218:12, 218:13, 223:19, 227:20, 233:11, 250:17, 256:19, 257:24, 258:5, 259:12, 264:5, 266:25, 271:19, 275:17

**starting** [4] - 11:4, 120:17, 206:15, 217:3

**starts** [10] - 44:8, 44:17, 50:7, 125:13, 143:15, 144:20, 144:25, 145:6, 190:20, 264:3

**state** [9] - 6:25, 91:22, 130:8, 173:18, 215:18, 231:4, 242:17, 256:11, 273:14

**State** [1] - 276:17

**statement** [2] - 73:16, 261:2

**States** [3] - 121:22, 276:17, 276:23

**STATES** [2] - 1:1, 1:11

**states** [3] - 15:20, 19:20, 24:13

**stating** [1] - 183:14

**station** [8] - 16:11, 16:16, 16:17, 27:2, 159:23, 161:13, 204:6

**stations** [1] - 84:14

**status** [4] - 54:24, 54:25, 55:9, 55:11

**Stavros** [45] - 14:6, 14:7, 14:14, 29:18,

32:15, 34:11, 34:13, 34:17, 34:24, 61:1, 65:25, 66:4, 87:9, 88:2, 92:16, 92:23, 93:8, 93:9, 131:10, 131:14, 132:10, 133:16, 133:24, 134:19, 135:11, 136:14, 136:21, 137:11, 137:16, 140:11, 152:2, 153:2, 189:22, 216:18, 216:25, 218:3, 218:5, 220:7, 221:9, 221:23, 223:18, 223:24, 257:6, 257:16, 258:5

**stay** [20] - 20:24, 28:14, 30:1, 76:1, 76:2, 76:16, 113:15, 114:19, 115:1, 115:9, 115:13, 115:24, 116:8, 116:9, 155:8, 155:21, 155:25, 186:6, 191:20, 253:14

**stayed** [7] - 19:9, 20:8, 155:20, 171:7, 192:5, 192:7, 213:3

**staying** [3] - 18:1, 78:7, 253:21

**stays** [1] - 253:17

**steak** [1] - 37:6

**steal** [2] - 47:17, 81:1

**stealing** [2] - 81:3, 81:4

**STENOGRAPHY** [1] - 2:7

**step** [3] - 25:18, 200:15, 257:18

**stepped** [1] - 191:14

**Steve** [16] - 14:7, 26:3, 26:9, 29:18, 32:15, 87:14, 87:18, 90:3, 92:16, 93:8, 100:8, 100:14, 104:18, 131:11, 136:1, 266:1

**Steven** [3] - 30:8, 49:17, 155:18

**STEVEN** [1] - 1:23

**steward** [5] - 78:10, 78:16, 78:18, 78:22, 79:7

**stick** [2] - 82:12, 101:10

**stiffed** [1] - 58:14

**still** [25] - 9:15, 9:25, 48:21, 50:17, 58:6, 58:15, 63:12, 68:2,

77:10, 77:21, 77:24, 78:7, 131:12, 201:11, 205:6, 205:7, 209:4, 211:17, 213:4, 223:22, 234:18, 238:17, 249:4, 250:4, 275:2

**stipulated** [4] - 127:16, 274:22, 274:25, 275:2

**stipulation** [1] - 6:4

**stood** [2] - 154:7, 177:23

**stop** [5] - 27:23, 70:25, 81:3, 197:11, 237:23

**stopped** [3] - 33:7, 70:23, 265:4

**stops** [1] - 248:19

**straight** [5] - 41:7, 50:21, 62:13, 136:9, 242:3

**strange** [1] - 223:19

**STREET** [4] - 1:16, 1:20, 1:24, 2:4

**street** [4] - 133:3, 133:4, 133:11, 164:11

**strictly** [1] - 192:13

**strike** [1] - 245:17

**strip** [1] - 37:8

**strive** [1] - 58:23

**strived** [2] - 272:3, 272:4

**structure** [3] - 198:1, 243:6, 243:20

**stubs** [1] - 189:16

**student** [4] - 29:21, 29:22, 151:21, 156:20

**stuff** [3] - 136:10, 217:16, 239:2

**style** [3] - 21:1, 24:12, 192:21

**styles** [1] - 24:11

**submit** [1] - 244:20

**submitted** [2] - 6:1, 260:4

**substantial** [2] - 11:22, 11:23

**subterfuge** [1] - 31:11

**success** [1] - 72:14

**successful** [2] - 48:2, 269:10

**suck** [1] - 60:22

**Sue** [1] - 81:14

**suffer** [1] - 84:11

**suffering** [2] - 20:6, 20:7

**suggested** [1] - 21:12
**suing** [1] - 90:12
**suit** [6] - 101:13,
246:25, 248:18,
248:23, 249:2, 249:7
**SUITE** [3] - 1:16, 1:20,
1:24
**summaries** [3] -
146:4, 148:12,
149:12
**summary** [5] - 146:20,
146:21, 147:12,
147:22, 151:2
**summer** [1] - 152:21
**summertime** [1] -
40:14
**Sunday** [5] - 125:17,
126:13, 134:8, 143:5
**supervise** [5] - 132:4,
135:18, 180:19,
221:5, 258:20
**supervised** [8] -
34:10, 131:7, 132:7,
140:8, 153:16,
218:2, 220:4, 225:1
**supervision** [4] -
47:15, 180:22,
192:11, 258:21
**supervisor** [2] - 51:13,
106:23
**supervisors** [1] -
132:11
**supervisory** [3] -
22:17, 22:18, 22:20
**supplies** [1] - 36:20
**supported** [1] - 73:22
**supporting** [2] -
73:23, 73:25
**supposed** [20] - 9:19,
15:20, 24:21, 39:21,
41:19, 83:12, 83:15,
110:14, 124:22,
175:13, 175:17,
187:5, 191:18,
207:22, 218:24,
219:2, 224:12,
255:8, 267:3, 267:9
**SUSIE** [1] - 1:11
**suspended** [1] - 84:14
**sustain** [1] - 245:1
**sustained** [1] - 46:23
**swap** [2] - 137:13,
137:17
**swear** [7] - 6:18,
91:15, 130:1,
173:11, 215:11,
230:22, 256:4
**sweeping** [2] - 36:16,
217:25
**swiped** [1] - 166:21

**switch** [3] - 34:18,
225:17, 264:25
**switched** [4] - 184:22,
184:23, 186:14
**sworn** [7] - 6:23,
91:20, 130:6,
173:16, 215:16,
231:2, 256:9
**synopsis** [1] - 23:15
**system** [40] - 31:12,
59:19, 59:20, 59:24,
60:5, 60:17, 71:2,
73:20, 73:23, 73:25,
74:1, 77:9, 78:1,
78:4, 82:5, 82:6,
82:7, 82:8, 84:5,
92:13, 131:3, 160:9,
170:16, 186:19,
200:18, 201:14,
201:23, 203:2,
204:18, 221:18,
227:23, 228:2,
232:4, 237:19,
239:4, 251:4, 253:19
**systems** [2] - 48:1,
48:2

# T

**Tab** [1] - 43:20
**tab** [6] - 38:6, 95:3,
95:5, 102:22,
102:23, 123:12
**table** [103] - 18:20,
21:16, 23:16, 23:18,
23:19, 24:13, 24:16,
25:2, 25:3, 25:6,
32:23, 32:25, 33:7,
33:13, 33:15, 33:19,
34:7, 56:24, 57:2,
57:5, 69:17, 69:18,
69:19, 70:5, 70:18,
70:21, 70:22, 70:23,
71:4, 72:10, 78:16,
78:18, 82:23, 83:2,
83:6, 83:9, 83:9,
83:11, 83:12, 83:13,
83:20, 84:2, 84:8,
85:11, 85:12, 85:13,
97:6, 99:6, 99:8,
99:9, 99:13, 100:6,
108:16, 108:21,
109:18, 131:1,
132:23, 154:1,
154:3, 154:4, 161:1,
161:17, 161:18,
161:19, 162:23,
162:25, 175:22,
188:11, 188:12,
188:15, 191:6,

191:12, 191:17,
194:9, 194:10,
194:13, 194:23,
195:20, 198:8,
199:6, 210:12,
217:19, 217:21,
222:15, 222:16,
222:19, 222:22,
222:23, 223:2,
223:3, 223:6,
260:16, 261:15,
270:11, 270:12,
270:18, 271:7,
271:10, 271:11
**tables** [58] - 12:25,
13:1, 13:2, 21:23,
24:3, 24:4, 33:14,
34:3, 35:25, 37:16,
37:18, 69:11, 77:11,
77:13, 77:15, 82:15,
83:19, 83:21, 84:1,
84:3, 99:10, 99:19,
110:20, 130:24,
131:6, 154:4,
154:13, 162:4,
176:5, 176:6,
177:18, 178:4,
178:8, 188:9,
188:14, 190:22,
192:17, 198:4,
199:1, 205:2, 207:1,
207:14, 207:21,
207:25, 208:7,
208:8, 208:9, 216:9,
217:25, 222:16,
270:11, 270:16,
270:19, 270:21,
270:23
**tableside** [1] - 192:23
**tabs** [1] - 103:2
**tails** [1] - 42:14
**tallied** [1] - 151:8
**tally** [1] - 148:12
**tape** [2] - 8:4, 8:5
**tardies** [1] - 209:7
**tardiness** [1] - 47:6
**tardy** [2] - 104:6,
188:17
**task** [1] - 193:8
**tasks** [5] - 180:21,
181:2, 190:24,
191:16, 191:18
**tax** [1] - 53:3
**team** [28] - 21:13,
21:14, 21:21, 21:22,
22:21, 22:22, 23:4,
23:6, 28:5, 56:23,
58:20, 59:3, 59:7,
59:8, 67:16, 69:8,
69:10, 69:13, 69:16,

71:18, 160:10,
160:15, 160:18,
160:20, 161:4,
185:1, 191:7
**teams** [7] - 59:5,
68:20, 68:22, 68:24,
69:2, 69:6, 77:11
**teary** [1] - 133:21
**teary-eyed** [1] -
133:21
**temporarily** [1] -
58:19
**ten** [5] - 86:9, 86:10,
115:12, 216:21,
230:12
**ten-minute** [1] -
230:12
**tend** [1] - 146:16
**tends** [1] - 148:3
**tenth** [1] - 106:2
**tenure** [16] - 13:18,
14:5, 14:18, 19:23,
43:14, 48:10, 132:8,
136:3, 136:22,
141:23, 141:24,
141:25, 149:2,
220:5, 225:18,
225:22
**term** [17] - 22:7, 25:24,
61:20, 93:14, 93:23,
93:25, 94:6, 95:20,
101:12, 101:14,
103:22, 153:23,
201:25, 203:23,
204:22, 220:2, 220:3
**terminated** [1] -
220:18
**terms** [9] - 21:20,
60:13, 62:13, 94:12,
94:13, 95:19,
107:21, 108:1,
130:24
**testified** [20] - 6:24,
30:18, 67:3, 67:8,
89:3, 91:21, 101:12,
109:11, 127:18,
130:7, 157:2,
162:23, 173:17,
195:15, 215:17,
231:3, 236:20,
242:8, 256:10, 258:7
**testify** [5] - 110:16,
194:4, 233:12,
244:15, 259:6
**testifying** [5] - 50:12,
70:15, 72:2, 162:22,
243:9
**testimony** [36] - 5:11,
6:18, 51:9, 52:11,
52:21, 54:20, 55:22,

66:4, 70:21, 72:8,
91:15, 92:5, 130:1,
161:16, 167:18,
173:11, 194:5,
205:11, 212:22,
215:11, 218:16,
228:8, 230:22,
233:22, 234:4,
243:11, 252:9,
252:18, 256:4,
260:3, 266:4, 266:6,
266:20, 270:10,
275:16, 276:6
**Texas** [5] - 33:2, 33:6,
70:24, 269:21,
271:16
**text** [6] - 134:13,
200:24, 216:22,
221:23, 221:24,
257:18
**Thanksgiving** [1] -
24:17
**THE** [408] - 1:11, 1:15,
1:22, 5:7, 5:8, 5:11,
5:18, 5:25, 6:10,
6:17, 6:21, 6:25, 7:2,
9:25, 10:2, 10:10,
10:11, 11:4, 13:12,
13:14, 13:16, 14:12,
14:14, 21:5, 21:8,
21:10, 29:14, 29:17,
32:7, 33:5, 33:6,
40:10, 40:12, 43:15,
43:18, 43:21, 43:23,
44:2, 45:9, 46:23,
49:11, 50:5, 50:10,
52:4, 52:5, 52:9,
52:10, 52:11, 52:15,
52:16, 52:19, 53:6,
53:12, 53:14, 53:16,
53:18, 61:22, 61:24,
62:1, 62:2, 62:3,
62:4, 62:6, 62:10,
62:11, 62:17, 64:3,
64:6, 64:17, 64:19,
64:20, 64:21, 65:8,
68:6, 68:9, 68:14,
68:24, 68:25, 69:5,
77:20, 78:20, 78:22,
82:2, 82:3, 82:12,
84:20, 84:21, 85:3,
85:6, 85:14, 86:25,
87:5, 87:8, 87:12,
87:14, 87:17, 87:19,
87:20, 87:22, 88:12,
88:13, 90:25, 91:2,
91:3, 91:8, 91:10,
91:11, 91:14, 91:18,
91:22, 91:24, 93:8,
93:11, 93:21, 94:2,
94:4, 94:24, 95:2,

95:4, 95:22, 96:4,
96:5, 96:6, 96:7,
98:11, 98:15, 98:16,
98:19, 98:20, 98:22,
98:24, 98:25, 99:1,
99:2, 99:3, 100:7,
100:15, 100:18,
101:11, 101:14,
101:15, 101:17,
101:20, 101:23,
101:25, 102:3,
102:4, 102:6, 102:8,
102:10, 102:12,
102:14, 102:18,
102:23, 103:1,
103:4, 110:3,
112:20, 112:24,
113:22, 113:23,
113:25, 114:4,
114:5, 114:6, 114:7,
114:9, 114:10,
114:11, 114:12,
114:13, 115:11,
115:18, 115:20,
116:1, 116:2, 116:3,
116:12, 117:12,
117:15, 117:23,
122:6, 122:14,
125:22, 125:24,
125:25, 126:2,
126:3, 126:10,
126:17, 127:3,
127:9, 127:18,
127:23, 128:2,
128:10, 128:14,
129:21, 129:25,
130:4, 130:8,
130:10, 132:13,
132:15, 135:25,
136:4, 136:8,
136:15, 136:17,
136:18, 140:13,
143:20, 143:24,
144:2, 150:2, 150:6,
150:12, 150:14,
150:18, 150:24,
151:1, 151:4,
154:15, 154:20,
154:22, 154:24,
155:13, 155:15,
156:21, 157:4,
158:7, 158:11,
165:6, 165:9,
165:14, 165:16,
169:2, 170:23,
171:21, 172:1,
172:2, 172:3, 172:6,
173:7, 173:10,
173:14, 173:18,
173:20, 174:2,
174:3, 174:5, 177:8,

189:21, 189:25,
190:3, 190:8,
190:10, 193:19,
193:23, 194:1,
206:11, 206:17,
206:20, 206:21,
206:24, 207:1,
207:3, 207:5, 207:6,
207:7, 207:9,
207:10, 207:16,
207:18, 207:19,
207:22, 208:4,
208:6, 208:10,
208:12, 208:18,
208:19, 208:20,
208:21, 208:22,
209:14, 209:16,
210:3, 210:18,
211:9, 211:12,
211:15, 211:18,
211:20, 211:22,
211:24, 212:1,
212:15, 212:19,
213:2, 213:8,
213:11, 213:13,
213:14, 213:16,
213:18, 213:19,
213:20, 213:22,
213:23, 214:9,
214:18, 214:24,
215:7, 215:10,
215:14, 215:18,
215:20, 218:22,
218:25, 227:4,
228:14, 229:2,
229:9, 229:13,
230:6, 230:8,
230:12, 230:14,
230:16, 230:17,
230:21, 230:25,
231:4, 231:6,
233:22, 235:10,
235:13, 241:12,
241:17, 241:18,
241:19, 243:7,
243:10, 243:17,
244:1, 244:10,
244:25, 245:10,
245:14, 245:16,
245:20, 245:22,
245:23, 246:1,
246:14, 247:3,
247:6, 247:9,
247:14, 247:19,
248:2, 248:5, 248:8,
248:11, 248:14,
248:23, 249:2,
249:5, 249:7, 249:9,
249:12, 249:20,
250:1, 250:10,
250:18, 250:21,

250:25, 251:7,
251:14, 252:3,
252:12, 252:25,
253:6, 255:22,
255:24, 255:25,
256:3, 256:7,
256:11, 256:13,
256:21, 256:22,
261:4, 261:7, 261:8,
261:10, 261:12,
272:21, 273:7,
274:5, 274:14,
275:2, 275:7,
275:13, 276:3,
276:7, 276:10

theft [2] - 74:24, 79:10
themselves [4] - 84:1,
88:21, 89:10, 108:16
they've [1] - 200:25
thinking [4] - 15:18,
16:22, 229:15, 271:5
thinks [2] - 81:5,
127:18
thousand [4] - 12:12,
75:22, 119:20
thousands [4] -
119:13, 119:17
three [52] - 18:11,
21:13, 21:22, 26:23,
34:24, 39:11, 41:10,
43:13, 45:25, 49:13,
55:13, 55:14, 62:6,
81:24, 83:6, 83:21,
87:1, 87:6, 87:8,
87:17, 87:23, 88:12,
88:13, 90:15, 95:3,
95:5, 100:8, 100:21,
140:18, 150:22,
173:25, 174:22,
198:19, 227:24,
228:18, 237:19,
237:20, 237:21,
238:14, 238:24,
239:4, 239:5,
239:15, 247:14,
248:18, 248:19,
249:22, 250:15,
253:13, 255:19
three-person [2] -
21:13, 21:22
three-year [1] - 49:13
THROUGH [1] - 4:13
throughout [1] - 31:12
thrown [1] - 86:20
Thursday [3] - 125:18,
273:17, 273:18
thusly [1] - 74:14
Tiffanie [2] - 6:1,
187:9
timecard [4] - 116:21,

123:15, 240:5, 240:9
timecards [9] -
118:23, 119:3,
119:4, 119:9,
119:10, 119:13,
238:23, 240:9,
240:15
tip [129] - 8:8, 9:7, 9:8,
9:9, 9:10, 9:15, 9:20,
9:24, 10:13, 10:17,
10:19, 11:3, 12:8,
12:14, 12:18, 12:22,
26:19, 27:17, 27:18,
28:15, 28:24, 29:15,
30:21, 31:15, 33:10,
41:16, 47:21, 54:8,
56:9, 56:12, 56:19,
56:21, 57:11, 60:17,
67:17, 67:18, 68:8,
68:13, 68:18, 70:17,
71:1, 71:7, 74:23,
78:8, 81:12, 83:6,
93:1, 99:14, 115:14,
115:25, 121:1,
121:5, 121:13,
141:15, 141:19,
152:4, 152:9,
152:14, 152:18,
152:20, 159:12,
159:15, 159:17,
160:12, 163:11,
163:13, 163:14,
163:17, 163:19,
164:5, 166:21,
168:4, 171:1,
171:22, 175:15,
176:15, 185:9,
189:24, 195:1,
195:11, 195:22,
196:3, 196:7,
196:11, 196:16,
196:19, 201:25,
202:1, 202:10,
203:4, 203:5, 203:6,
203:11, 203:19,
204:9, 204:14,
204:16, 205:4,
209:19, 210:22,
210:24, 211:17,
211:18, 212:3,
212:10, 212:11,
212:12, 212:14,
213:5, 213:10,
223:13, 223:17,
223:23, 227:23,
229:11, 232:24,
233:4, 233:7, 235:6,
236:1, 240:16,
242:5, 254:15,
272:13, 275:25,
276:1

tip-out [8] - 9:15,
159:17, 163:14,
163:17, 163:19,
202:1, 204:9, 212:10
tipped [11] - 7:22,
29:3, 35:17, 41:12,
145:15, 152:13,
166:19, 168:10,
170:21, 272:17,
272:18
tipping [5] - 30:13,
67:17, 78:10, 79:9,
165:12
Tips [1] - 187:21
tips [127] - 6:5, 6:6,
7:24, 9:12, 9:20,
11:8, 13:6, 16:4,
16:6, 16:19, 16:20,
17:2, 17:6, 17:8,
17:10, 17:21, 25:4,
25:5, 25:7, 29:8,
40:3, 41:2, 46:21,
47:17, 54:8, 55:24,
57:14, 58:20, 58:21,
67:22, 68:1, 70:24,
74:25, 75:1, 75:14,
75:21, 75:22, 75:23,
76:2, 76:17, 76:20,
76:22, 77:1, 77:10,
77:11, 77:16, 77:22,
77:24, 79:12, 79:20,
80:8, 80:10, 80:15,
92:25, 112:17,
112:22, 113:3,
113:13, 113:20,
114:4, 114:13,
114:16, 114:23,
115:1, 115:8, 116:5,
116:9, 116:11,
116:15, 145:20,
152:11, 152:15,
155:4, 155:10,
155:12, 156:2,
156:15, 165:18,
165:20, 165:21,
165:23, 166:2,
166:6, 166:7,
166:16, 166:17,
169:19, 170:2,
170:3, 170:4,
170:25, 171:3,
171:5, 171:18,
175:1, 175:9,
176:20, 185:24,
186:2, 187:4,
187:22, 188:2,
188:6, 194:14,
195:8, 202:7, 202:8,
202:9, 203:8,
203:17, 203:18,

204:18, 205:2,
205:7, 219:10,
219:12, 224:11,
231:16, 233:7,
240:15, 260:5, 270:3
**tired** [1] - 275:4
**title** [5] - 175:7, 175:8,
176:23, 214:6, 258:9
**TO** [2] - 5:4, 173:4
**to-go** [1] - 223:22
**today** [28] - 7:8, 13:11,
42:4, 50:22, 70:15,
71:13, 72:2, 72:8,
96:17, 96:23, 96:25,
104:1, 120:24,
128:21, 134:7,
139:19, 189:17,
220:3, 220:16,
228:23, 233:12,
236:20, 237:1,
243:14, 245:1,
258:7, 266:6, 270:10
**together** [8] - 17:10,
24:22, 59:6, 80:1,
80:8, 205:3, 240:14,
255:12
**tomorrow** [9] - 115:5,
134:7, 219:3, 219:4,
246:4, 246:11,
252:22, 272:23,
276:6
**tonight** [2] - 134:5,
253:1
**took** [13] - 12:21, 51:1,
51:20, 74:24, 78:3,
79:11, 79:20, 91:9,
133:23, 178:16,
216:8, 230:15
**tools** [2] - 207:12,
207:20
**top** [24] - 9:11, 14:10,
34:8, 40:18, 44:4,
48:3, 68:9, 81:22,
101:2, 102:10,
102:13, 117:14,
119:16, 123:3,
142:23, 143:15,
144:12, 146:6,
169:10, 170:24,
187:21, 198:8,
226:7, 254:22
**topic** [2] - 39:3,
127:10
**topics** [1] - 127:13
**total** [12] - 45:6,
123:18, 123:20,
124:13, 149:17,
169:24, 170:1,
170:2, 170:11,
198:3, 203:6, 264:15

**totality** [2] - 158:9,
243:22
**totally** [2] - 74:16,
100:15
**totals** [1] - 16:15
**touch** [1] - 43:3
**tour** [1] - 228:3
**touring** [1] - 216:7
**tourist** [1] - 242:25
**toward** [3] - 40:13,
55:3, 67:16
**towards** [3] - 18:8,
200:21, 237:8
**town** [5] - 29:6, 31:17,
135:3, 135:4, 218:10
**track** [2] - 217:23,
252:23
**tracking** [1] - 7:24
**trade** [7] - 38:1, 38:5,
73:4, 138:1, 138:22,
167:5
**trades** [1] - 208:17
**traditional** [1] - 21:19
**traditionally** [1] - 36:7
**train** [2] - 10:20, 32:21
**trained** [2] - 72:25,
193:5
**training** [11] - 10:21,
10:22, 10:23, 13:9,
19:17, 28:18, 134:9,
193:7, 217:4, 217:6,
217:8
**transactions** [1] -
114:17
**transcript** [2] - 62:13,
276:18
**TRANSCRIPT** [2] -
1:10, 2:7
**TRANSCRIPTION** [1] -
2:8
**transferred** [1] -
240:21
**transparent** [3] -
13:13, 166:14,
201:14
**travel** [4] - 105:4,
105:6, 105:7, 105:8
**traveling** [2] - 237:2,
237:7
**trends** [1] - 88:24
**trial** [2] - 5:11, 85:4
**TRIAL** [1] - 1:10
**trials** [1] - 250:6
**tried** [5] - 23:23,
26:25, 72:21,
229:25, 251:3
**troglodyte** [1] - 67:23
**trouble** [1] - 177:7
**true** [10] - 80:24,
81:13, 82:21, 85:10,

109:12, 213:6,
234:8, 244:22,
276:18
**trust** [5] - 8:13, 38:12,
38:13, 47:23, 47:24
**trusted** [1] - 155:4
**trusting** [1] - 8:14
**truth** [21] - 6:19, 6:20,
91:16, 91:17, 130:2,
130:3, 173:12,
173:13, 215:12,
215:13, 230:23,
230:24, 256:5, 256:6
**try** [8] - 30:7, 37:11,
52:4, 52:13, 64:4,
85:4, 273:19
**trying** [25] - 10:20,
15:8, 15:9, 15:12,
22:7, 26:23, 30:4,
37:4, 52:12, 58:11,
64:1, 69:3, 72:21,
72:22, 72:23, 73:8,
73:10, 136:11,
158:12, 238:25,
243:5, 243:25,
244:18, 270:23
**Tuesday** [2] - 125:18,
128:14
**turn** [4] - 9:2, 34:7,
59:13, 255:15
**turned** [3] - 65:18,
170:6, 222:8
**turnover** [2] - 68:11,
112:7
**turns** [1] - 15:19
**twice** [3] - 83:5,
128:12, 205:20
**two** [89] - 14:25,
16:17, 18:22, 18:23,
20:1, 24:11, 24:23,
24:24, 25:18, 32:5,
35:23, 36:15, 36:17,
39:21, 40:20, 44:10,
45:18, 45:20, 49:12,
49:22, 50:17, 50:23,
50:24, 51:6, 59:10,
62:6, 69:25, 72:13,
79:14, 80:18, 83:6,
86:4, 86:16, 100:2,
100:5, 100:7, 101:3,
103:24, 106:6,
115:13, 115:17,
115:18, 115:24,
118:8, 118:22,
119:4, 119:10,
125:23, 126:20,
129:10, 133:6,
142:1, 150:22,
152:19, 155:8,
158:3, 161:12,

168:19, 168:22,
175:10, 190:1,
190:17, 192:1,
198:20, 205:21,
211:2, 225:19,
228:18, 235:13,
238:1, 238:2, 238:4,
240:4, 240:14,
240:23, 241:10,
250:6, 250:15,
252:1, 256:17,
256:22, 263:14,
263:23, 264:12,
264:16, 270:22,
271:2
**two-week** [6] - 49:22,
50:23, 50:24, 51:6,
240:14, 264:16
**two-year** [2] - 49:12,
133:6
**type** [12] - 9:3, 15:19,
21:13, 24:9, 33:9,
35:4, 38:6, 43:6,
43:7, 59:23, 81:23,
90:18
**types** [4] - 15:9, 15:21,
26:8, 211:6
**typically** [6] - 40:8,
155:3, 159:8, 162:3,
162:21, 224:17

---

## U

**U.S** [2] - 31:9, 121:20
**ultimately** [2] - 16:3,
179:7
**unable** [1] - 50:3
**unaware** [1] - 275:14
**unconditional** [1] -
61:14
**under** [22] - 18:20,
23:7, 96:2, 97:19,
110:1, 111:16,
123:12, 146:13,
170:25, 176:23,
186:18, 203:3,
205:14, 232:24,
234:18, 242:25,
243:22, 244:6,
246:18, 265:15,
273:13, 273:15
**underlying** [1] - 31:11
**underneath** [9] -
16:11, 123:21,
146:8, 146:10,
169:21, 170:13,
186:12, 226:8, 265:7
**underperforming** [2] -
84:4, 84:25
**understood** [4] -

58:13, 93:17, 93:25,
237:6
**undoubtedly** [1] - 35:3
**unfair** [3] - 59:19,
60:17, 60:18
**unfamiliar** [1] - 152:12
**unfortunately** [1] -
112:6
**unhappy** [1] - 197:3
**uniform** [1] - 18:7
**unilateral** [5] - 61:18,
62:22, 63:17, 64:9,
199:10
**unilaterally** [2] - 63:2,
63:6
**Union** [1] - 74:5
**unique** [9] - 57:10,
60:4, 72:23, 271:25,
272:5, 272:12,
272:15, 272:16
**United** [3] - 121:22,
276:17, 276:23
**UNITED** [2] - 1:1, 1:11
**unless** [6] - 32:18,
88:25, 158:15,
159:10, 175:15,
264:19
**unlike** [2] - 42:8,
114:13
**unlocked** [3] - 112:18,
112:23, 186:13
**unpaid** [6] - 150:9,
150:16, 150:20,
150:25, 226:22,
264:9
**Unpaid** [1] - 264:8
**unreasonable** [2] -
167:19, 167:20
**unsafe** [1] - 115:8
**unsecured** [2] - 16:21,
47:18
**unusual** [1] - 214:18
**up** [136] - 9:6, 10:24,
11:5, 11:7, 19:14,
19:19, 20:24, 23:25,
25:12, 26:7, 27:14,
28:22, 29:5, 30:19,
30:23, 31:2, 32:17,
33:20, 34:20, 36:6,
37:18, 37:19, 38:13,
38:14, 38:15, 40:15,
41:22, 43:25, 44:7,
56:3, 56:4, 56:18,
60:23, 69:17, 70:22,
73:20, 78:24, 79:4,
83:19, 84:5, 86:8,
94:20, 105:13,
107:6, 107:7, 111:1,
112:8, 112:24,
115:5, 115:6,

117:25, 119:18,
122:16, 122:25,
125:4, 125:6, 125:8,
125:13, 126:9,
126:19, 127:6,
127:7, 127:13,
128:6, 130:22,
131:12, 137:22,
138:8, 138:23,
139:7, 144:1, 146:5,
149:11, 149:17,
150:9, 151:8,
155:11, 164:13,
166:24, 167:13,
167:15, 168:24,
174:2, 179:13,
179:22, 179:23,
186:23, 186:24,
191:16, 191:25,
194:15, 197:22,
199:13, 200:10,
202:18, 203:18,
206:22, 207:10,
207:11, 207:15,
207:18, 207:21,
208:15, 208:16,
212:7, 213:7, 219:2,
223:18, 224:1,
225:10, 228:20,
229:16, 232:11,
235:24, 235:25,
247:7, 251:16,
253:9, 257:22,
257:24, 260:23,
261:12, 263:18,
267:21, 267:24,
267:25, 268:23,
269:4, 274:21,
274:23, 275:6,
275:20

**uploaded** [3] - 139:12,
139:15, 141:8
**ups** [1] - 37:10
**upset** [6] - 195:24,
196:7, 196:11,
196:15, 196:20,
197:10
**upstairs** [7] - 18:8,
80:9, 86:19, 86:20,
191:21, 203:22,
209:21
**user** [1] - 203:3
**utilities** [1] - 29:22

## V

**vacation** [1] - 78:11
**value** [1] - 10:25
**various** [1] - 167:6
**vary** [1] - 75:3

**VASQUEZ** [114] - 1:15,
1:15, 91:13, 92:2,
93:13, 93:22, 94:5,
94:25, 95:3, 95:5,
95:7, 96:8, 99:4,
100:10, 100:11,
100:17, 100:24,
102:20, 102:25,
103:3, 103:5, 103:7,
106:18, 106:19,
110:4, 112:22,
113:1, 116:13,
117:14, 117:19,
117:24, 122:8,
122:12, 122:15,
126:9, 126:18,
126:25, 127:25,
128:22, 129:1,
129:2, 129:20,
173:9, 173:23,
174:4, 174:7,
177:10, 189:20,
193:15, 193:21,
193:24, 208:24,
209:1, 209:22,
209:25, 210:16,
210:20, 211:8,
211:11, 211:13,
212:18, 227:1,
227:5, 228:17,
230:11, 230:19,
231:9, 233:24,
233:25, 235:12,
235:17, 239:10,
239:12, 241:13,
241:22, 241:23,
243:5, 243:8,
243:19, 244:4,
244:21, 245:2,
245:3, 245:12,
245:15, 245:19,
245:24, 246:2,
247:17, 249:3,
249:6, 251:18,
251:22, 252:6,
252:16, 252:20,
253:2, 253:5, 253:7,
255:21, 256:2,
256:15, 256:23,
261:1, 261:6,
261:11, 261:17,
265:23, 272:11,
272:20, 274:8,
274:15, 275:14,
276:9
**Vasquez** [1] - 177:7
**VASQUEZ........** [1] -
3:21
**VASQUEZ.................**
[2] - 3:19, 4:6

**VASQUEZ.................**
**.** [4] - 3:10, 3:17, 4:2,
4:4
**vast** [1] - 114:16
**verification** [1] - 207:8
**verified** [2] - 56:3,
203:19
**verify** [1] - 204:4
**VERSUS** [1] - 1:5
**versus** [3] - 81:21,
228:18, 264:12
**view** [1] - 107:20
**violating** [2] - 41:16,
141:15
**VIP** [1] - 270:16
**visa** [4] - 15:19, 243:1,
243:16
**visibly** [1] - 205:18
**voice** [1] - 31:5
**VOICES** [1] - 5:10
**voluntarily** [2] - 76:22,
212:13
**volunteer** [1] - 212:9

## W

**W-1** [1] - 146:10
**W-2** [9] - 18:16, 53:5,
53:11, 53:19, 54:6,
54:11, 54:19,
146:11, 263:9
**W-2's** [1] - 53:9
**W2** [1] - 79:17
**wage** [23] - 7:22, 30:8,
39:23, 39:24, 49:2,
61:1, 61:12, 120:11,
141:5, 150:3, 150:4,
151:3, 163:7, 168:8,
168:10, 225:25,
229:3, 233:7,
236:21, 244:3,
248:7, 265:16, 274:6
**wages** [3] - 61:10,
158:22, 163:7
**wait** [23] - 50:5, 78:20,
93:21, 98:11, 98:16,
98:20, 112:20,
115:13, 115:17,
115:25, 116:10,
155:9, 165:6, 194:3,
211:24, 241:12,
274:14
**waited** [1] - 116:14
**waiters** [7] - 59:8,
68:25, 69:1, 69:4,
74:9, 205:3
**waiting** [4] - 69:11,
156:2, 156:14, 216:9
**waived** [1] - 250:14

**walk** [4] - 93:4,
142:16, 228:3, 272:1
**walked** [7] - 78:9,
133:10, 197:14,
216:18, 237:12,
269:1, 272:7
**walking** [2] - 78:8,
196:8
**wallet** [2] - 80:21,
80:23
**wants** [5] - 43:5, 71:3,
71:4, 244:15
**warehouse** [1] - 90:16
**warn** [1] - 246:18
**Warren** [3] - 14:16,
131:11, 218:8
**water** [5] - 23:18,
69:18, 70:5, 131:1,
176:6
**Waterford** [1] - 57:25
**watering** [1] - 21:18
**weakest** [1] - 58:9
**website** [2] - 137:20,
138:7
**Wednesday** [7] -
17:17, 125:18,
125:25, 126:1,
273:17
**weeds** [1] - 34:4
**week** [66] - 12:1, 18:6,
20:21, 35:11, 45:22,
48:12, 48:18, 49:22,
49:24, 50:14, 50:19,
50:21, 50:23, 50:24,
51:6, 51:7, 51:23,
55:11, 80:6, 105:8,
117:3, 117:4, 118:4,
124:20, 125:2,
125:13, 126:12,
126:23, 129:4,
135:2, 135:4, 146:6,
146:12, 146:14,
146:15, 146:17,
146:23, 147:1,
147:6, 147:7,
147:11, 147:15,
148:1, 148:2,
208:13, 208:18,
208:21, 226:10,
226:13, 240:4,
240:14, 241:10,
263:9, 263:14,
263:23, 264:16,
266:22, 268:11,
273:19, 274:1
**weekend** [5] - 75:6,
88:25, 176:12,
248:16, 268:14
**weekends** [2] - 19:4,
75:4

**weekly** [4] - 49:21,
90:22, 118:13,
125:11
**weeks** [19] - 8:10,
14:25, 45:16, 48:21,
50:12, 50:17, 51:19,
52:22, 55:21,
125:23, 126:20,
132:7, 142:1,
168:19, 168:22,
217:2, 250:15
**weeks'** [1] - 168:19
**welfare** [1] - 73:23
**whatnot** [1] - 36:15
**whatsoever** [1] -
162:24
**whereby** [1] - 17:2
**wherein** [1] - 71:18
**WHEREUPON** [6] -
91:9, 172:7, 230:15,
247:4, 253:3, 276:11
**white** [1] - 25:11
**whiz** [1] - 49:1
**whole** [18] - 6:19,
31:12, 31:20, 74:15,
91:16, 109:22,
130:2, 152:18,
173:12, 201:1,
215:12, 230:23,
233:11, 244:23,
249:1, 256:5,
257:24, 260:13
**wholesale** [1] - 19:14
**wholesaler** [1] - 19:13
**wide** [1] - 94:13
**wife** [1] - 14:21
**willfulness** [1] - 243:6
**Williams** [1] - 176:11
**Windsor** [3] - 198:16,
198:17, 204:21
**wine** [42] - 12:13,
13:2, 19:13, 19:18,
23:22, 25:2, 35:6,
35:8, 66:24, 71:5,
78:10, 78:16, 78:18,
78:22, 78:23, 78:25,
79:2, 79:7, 97:14,
155:9, 161:23,
162:1, 162:3, 162:4,
176:4, 176:13,
183:11, 184:5,
189:11, 189:12,
190:23, 191:11,
199:3, 208:2, 210:8,
210:12, 217:16,
270:15, 270:17
**wines** [8] - 35:8,
35:13, 35:14, 35:16,
78:23, 161:13,
161:14, 210:13

*OFFICIAL TRANSCRIPT*

**wiping** [1] - 36:15
**wish** [1] - 240:11
**withholdings** [1] - 75:19
**witness** [30] - 6:12, 6:15, 6:23, 46:24, 91:12, 91:20, 128:4, 128:13, 128:17, 129:23, 130:6, 136:9, 173:8, 173:16, 193:17, 193:22, 214:11, 214:13, 215:16, 218:23, 227:2, 227:6, 230:10, 230:18, 231:2, 244:15, 253:1, 255:25, 256:1, 256:9
**WITNESS** [115] - 6:21, 7:2, 10:2, 10:11, 13:14, 14:14, 21:10, 29:17, 32:7, 33:6, 40:12, 43:18, 50:10, 52:5, 52:10, 52:15, 52:19, 61:24, 62:2, 62:4, 62:10, 62:17, 64:6, 64:19, 64:21, 68:9, 68:25, 78:22, 82:3, 84:21, 85:6, 87:8, 87:12, 87:19, 88:13, 91:2, 91:18, 91:24, 93:11, 94:4, 96:4, 96:6, 98:15, 98:19, 98:22, 98:25, 99:2, 101:14, 101:17, 101:23, 102:3, 102:6, 102:10, 102:14, 112:24, 113:23, 114:4, 114:6, 114:9, 114:11, 114:13, 115:18, 116:1, 116:3, 122:6, 125:24, 126:2, 130:4, 130:10, 132:15, 136:15, 136:17, 154:20, 154:24, 155:15, 165:9, 165:16, 172:2, 173:14, 173:20, 174:3, 189:25, 206:17, 206:21, 207:1, 207:5, 207:7, 207:10, 207:18, 207:22, 208:6, 208:12, 208:19, 208:21, 209:16, 211:18, 211:22, 212:1, 213:11,

213:14, 213:18, 213:20, 213:23, 215:14, 215:20, 230:25, 231:6, 235:13, 241:18, 255:24, 256:7, 256:13, 256:22, 261:8, 261:12
**witnesses** [9] - 128:11, 128:14, 193:20, 194:2, 213:1, 214:14, 214:23, 215:3, 219:1
**witnesses'** [1] - 266:20
**woman** [1] - 87:14
**won** [2] - 28:4, 71:18
**wonderful** [2] - 10:6, 14:7
**word** [6] - 87:5, 107:17, 115:22, 122:2, 254:1, 263:17
**words** [4] - 121:24, 132:19, 211:25, 233:21
**workaround** [1] - 142:14
**workers** [3] - 247:12, 250:4, 251:10
**works** [4] - 56:9, 56:12, 111:6, 200:17
**workweek** [8] - 50:18, 55:16, 126:5, 127:7, 127:16, 273:6, 273:16, 273:21
**world** [2] - 107:19, 121:15
**worry** [1] - 14:12
**worth** [2] - 202:22, 237:19
**wow** [1] - 10:6
**WRIGLEY** [6] - 1:23, 247:21, 248:4, 248:7, 248:9, 248:12
**write** [1] - 136:11
**writer** [1] - 73:5
**written** [1] - 102:8
**wrongfully** [1] - 152:5

### Y

**y'all** [2] - 113:25, 117:16
**year** [23] - 7:25, 8:1, 16:14, 27:20, 28:3, 28:9, 28:12, 38:4, 49:12, 49:13, 55:6, 55:7, 105:7, 110:13, 111:5, 111:6,

111:25, 133:6, 213:23, 213:24, 227:12, 238:21, 246:25
**years** [38] - 19:3, 19:10, 19:23, 20:11, 20:19, 29:20, 38:3, 57:24, 90:15, 105:3, 111:23, 121:14, 134:2, 158:4, 173:25, 174:22, 228:18, 237:2, 237:20, 237:21, 238:1, 238:2, 238:4, 238:14, 238:24, 239:4, 239:5, 239:15, 247:14, 248:18, 248:19, 249:22, 253:13, 255:20, 256:17, 256:18, 256:22
**years'** [1] - 237:19
**yellow** [1] - 262:22
**Yoda** [1] - 15:8
**York** [1] - 37:8
**young** [2] - 14:8, 79:3
**younger** [1] - 83:23
**yourself** [4] - 23:21, 84:15, 148:7, 160:19

### Z

**Zach** [3] - 123:3, 123:15, 138:23
**Zachary** [2] - 120:18, 122:21
**Zack** [1] - 187:15
**zenith** [1] - 8:21

*OFFICIAL TRANSCRIPT*