UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

****************************************************************

JAMES BLACK, ET AL.

CIVIL ACTION NO.16-2708 "E"

VERSUS

NEW ORLEANS, LOUISIANA
TUESDAY, JUNE 5, 2018, 9:00 A.M.

DMNO, LLC, ET AL.

****************************************************************

**DAY 2**

TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE SUSIE MORGAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

VASQUEZ LAW OFFICE
BY: JESSICA M. VASQUEZ, ESQUIRE
400 POYDRAS STREET
SUITE 900
NEW ORLEANS, LA 70130

LAURA L. CATLETT
ATTORNEY AT LAW
650 POYDRAS STREET
SUITE 1414
NEW ORLEANS, LA 70130

FOR THE DEFENDANT:

FISHER & PHILLIPS
BY: STEVEN R. CUPP, ESQUIRE
JAKLYN L. WRIGLEY, ESQUIRE
2505 14TH STREET
SUITE 300
GULFPORT, MS 39501

APPEARANCES CONTINUED:

OFFICIAL COURT REPORTER: CATHY PEPPER, CRR, RMR, CCR
CERTIFIED REALTIME REPORTER
REGISTERED MERIT REPORTER
500 POYDRAS STREET, ROOM B-275
NEW ORLEANS, LA 70130
(504) 589-7779
Cathy_Pepper@laed.uscourts.gov

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

**I N D E X**

PAGE

**DONTAY KINCHEN**.................................... 281
DIRECT EXAMINATION BY MS. VASQUEZ.................... 281
CROSS-EXAMINATION BY MR. CUPP........................ 325
REDIRECT EXAMINATION BY MS. VASQUEZ.................. 342
**ZACHARY ADAMS**..................................... 358
DIRECT EXAMINATION BY MS. CATLETT.................... 358
CROSS-EXAMINATION BY MR. CUPP........................ 375
**DAVID PIERCE-FEITH**................................ 382
DIRECT EXAMINATION BY MS. CATLETT.................... 382
CROSS-EXAMINATION BY MR. CUPP........................ 391
LUNCHEON RECESS...................................... 393
**ITAI ELIRAN BEN ELI**............................... 398
CROSS-EXAMINATION BY MS. VASQUEZ..................... 454
REDIRECT EXAMINATION BY MR. CUPP..................... 481

**P-R-O-C-E-E-D-I-N-G-S**

TUESDAY, JUNE 5, 2018

M O R N I N G S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK: All rise.

THE COURT: Be seated.

Good morning, everyone.

Let's see, counsel were going to talk yesterday and then report back to me about some issue, but I don't remember right now what it was.

MS. VASQUEZ: We were going to discuss about the missing documents that we discussed during the trial yesterday. However, I know that there is a witness that has a time issue. So I would like to start off with that, and then maybe we can take the time to do the administrative stuff.

THE COURT: That's fine.

All right. So, is the Plaintiff ready to call its first witness?

MS. VASQUEZ: Yes, we would like to call Dontay Kinchen.

THE DEPUTY CLERK: Sir, if you can remain standing and raise your right hand. Do you solemnly swear the testimony you are about to give to this Court will be the truth, the whole

truth and nothing but the truth?

THE WITNESS: I do.

**DONTAY KINCHEN**

was called as a witness and, after being first duly sworn by the Clerk, was examined and testified on his oath as follows:

THE DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: Dontay Kinchen, D-O-N-T-A-Y, last name K-I-N-C-H-E-N.

DIRECT EXAMINATION

BY MS. VASQUEZ:

Q. Good morning, Mr. Kinchen. My name is Jessica Vasquez, and I represent the plaintiffs in this matter.

MS. VASQUEZ: Is there any way we can turn on the Elmo? Thank you.

EXAMINATION BY MS. VASQUEZ:

Q. You own your own catering company right now, don't you?

A. Yes, ma'am.

Q. Prior to that, you worked at Doris Metropolitan for three years as a server; is that correct?

A. No. I served there for about a year, and service captain there for two years, two and a half years. Now I'm serving again.

Q. Let's talk about the dates exactly. When were you there as a server?

A. I started with the company Easter of 2016, I think -- 2015, sorry.

Q. Easter 2015?

A. Yeah.

Q. That's when you were a server?

A. That's when I started off as a server.

Q. Okay. Then when did you become a manager?

A. I became a service captain about -- I don't know, about seven months, eight months after I started working there.

Q. So it would have been still 2015, or was that now 2016?

A. No, it was more than -- it was 2016 when I started.

Q. Okay. In 2016, was your title manager, and then later changed to service captain in 2017?

A. Yes.

Q. So from -- just to make sure, Easter 2015 to about seven months later, sometime in 2016, you were a server?

A. Yes.

Q. Then after those seven months, you moved up as a manager in 2016?

A. Yes.

Q. Then your title changed in 2017 to service captain?

A. Yes.

Q. After service captain -- how long were you a service captain?

A. I mean, I went in and out because I moved away. So, it

was a nice while, about a year and a half, almost two years.

Q. You said you moved away during the time that you were a service captain?

A. About a month. Then I came back.

Q. Okay. Why did you move way?

A. To take another job opportunity somewhere else.

Q. Then you were rehired?

A. Yes.

Q. So I assume you left on good terms?

A. Yeah, absolutely.

Q. Did they give you a bump in salary upon your return?

A. No.

Q. So you were making the same thing as you did before you left?

A. Yes.

Q. So it just didn't work out --

A. When I came back, I was actually serving again, until I had a position available. So I served for another three or four months before I actually had a position to even move into.

Q. So there was a lot of bouncing around between server and --

A. Yeah. I mean, I pretty much -- all around.

THE COURT: When is the last time you worked there? I'm not sure -- do you still work there?

THE WITNESS: I'm still working there now.

THE COURT: As a server?

THE WITNESS: As a server.

THE COURT: When did you go back to being a server?

THE WITNESS: About February of last year.

THE COURT: Of 2017?

THE WITNESS: 2017.

EXAMINATION BY MS. VASQUEZ:

Q. When you moved away for that month, it was for another -- a higher paying job; is that --

A. Yes.

Q. So why did you come back to a lower paying job?

A. Personal reasons. I went out and then didn't like Chicago. Chicago was a lot different than I expected. We had a chance on our lease to have only one month, without it being a year thing.

We decided we didn't want to stay, me and my wife -- well, it was my girlfriend at the time. We moved back. When I moved back, I called, and they hired me without a question, and I came back.

Q. At some point you started your own catering business?

A. Yes, ma'am.

Q. When was that?

A. December of 2016.

Q. So while you were working at Doris Metropolitan as a service manager, because it was 2016, you opened another

business?

A. Uh-huh (affirmative response).

Q. Is that a yes?

A. Yes, I'm sorry.

Q. That's okay.

You went back to being a server because you could not both manage Doris and focus on what you wanted to do for yourself; is that right?

A. Right.

Q. That refers -- the part of what you wanted to do for yourself refers to the catering business?

A. Yes.

Q. So what I'm trying to understand is, this last time, why you became a server. Was it related to your catering business, or was it because there was no managerial position available at Doris?

A. No, I was already doing service captain. Then I decided to step down because I didn't really have the time to focus on both. My business had gotten a lot business than I expected a lot quicker.

So they worked with me with my schedule, with being a server; but, being a service captain, I wouldn't be able to have that flexible schedule.

Q. Can you tell me more about that flexible schedule as a service captain/manager?

A. Well, there was no flexibility to my schedule as a service captain. I had to work my five or six days, and there was no way out of that.

But as a server, I have a chance to get cut or only work three days a week, if it comes down to it.

Q. So it would be fair to say that you went down to being a server because of the issue with scheduling, the flexibility of scheduling that you just described?

A. Yes.

Q. When you were a manager in 2016, who else was a manager with you?

A. I did it with Ryan O'Dwyer for a little while.

Then once I came back -- after I left, I came back, Ryan and Melissa were managing, so I will served, as I said. Then once Ryan decided to leave the company, then I moved up to a service captain.

Q. While you were a service captain, were there any other service captains there with you?

A. While I was there service captaining?

Q. Yes.

A. Yes. Everybody? You want everybody's name?

Q. Yes.

A. Oh, Gilford, Zachary --

THE COURT: Are these servers or service captains?

THE WITNESS: These are service captains. Not this

Zachary, another Zachary. I don't know his last name.

EXAMINATION BY MS. VASQUEZ:

Q. So you're not referring to the Plaintiff?

A. No. No. I was referring to someone else.

Q. This time frame would be 2017?

A. Yeah.

Q. So you named off two. Were there more than two?

A. No, I'm pretty sure that's it, just Gilford and Zachary.

Q. So it was around three of you?

A. Yeah, but they were two different times. They kind of replaced each other. Me and Melissa have been there, and they've been, like, cycling through a third person for a while.

Q. So in 2016 when you were a manager, you were -- you managed with Melissa; is that correct?

A. Yes.

Q. Was there anyone else that was a manager in that 2016 time frame?

A. I mean, Ryan for --

Q. Ryan O'Dwyer?

A. Yeah.

Q. Was he 2016, or was he earlier, in 2015?

A. I mean, he might have been both. I can't recall off the top of my head. I've been working there a while, and the timeline is kind of all mashed into each other.

Q. Now, as a manager, you would be paid a salary; is that

right?

A. Yes.

Q. Was that around -- well, was that 750 a week?

A. No.

Q. How much did you get paid a week?

A. Mine was 6 -- I started off as 550 a week. Then, by the time I was done, it was 650 a week.

Q. 650 a week.

You said you started off at 550 a week. Would that have been in -- what year would that have been?

A. That would have been when I -- when I first started doing the managing -- whenever I started doing managing at the Doris Metropolitan.

So when I started managing, I was --

Q. I'm sorry, when you started managing, you made what?

A. 13.

Q. 13?

A. Hundred.

Q. 1300?

A. Well, because it was two weeks. You get paid every two weeks.

Q. Oh, two weeks. Okay. I see. So --

A. So it was 1100 when stared, and it was 1300 by the time I ended.

Q. So you had received a raise at some point during that

time?
A. Yes.
Q. Do you know when you received that raise?
A. Probably about six months in, but I asked.
Q. You asked?
A. Yes.
Q. They agreed to bump you up?
A. Yes.
Q. Then on top of the 1300, by the time you got it, you also received 10 percent of the tips from the tip pool; is that right?
A. No, I received 5.
Q. You received 5 percent?
A. Yes.
Q. Would that be because you were sharing it with another manager at the time?
A. Because we were sharing it with other managers at the time. At one point in time, we didn't know we were supposed to take 10, so we were only taking 5, no matter what happened, until we knew we were supposed to take 10. So we were taking 5 at first.
Q. So let's look at that. I'm going to refer to Exhibit 5, Bates-602. I'm going to ask you a couple of questions. I'll be looking this way, so I'm going to try to be loud, so you can hear me.

This is the server check-out forms that were at Doris Metropolitan; is that right?

A. Yes.

Q. Do you see where it says *Manager's Name* over here?

A. Yes.

Q. Sometimes there were two managers' names on that portion; is that right?

A. Yes.

Q. It would be, let's say, your name, and then like a slash, and then Melissa?

A. So then we would split it.

Q. I'm going to push this a little up. Let me try to clear it. Okay.

Where it says the *Gross Total* in the middle column -- do you see that?

A. Yes.

Q. -- that would be the total amount of tips collected?

A. Yes.

Q. Then where it says *Shift Manager*, it would be fair to say that that term *shift manager* also referred to *manager*, and then, later in 2017, *service captain*?

A. Yes.

Q. Okay. So, they would deduct -- there would be a deduction of 10 percent on the forms that you saw when there were two managers listed on the left-hand side; would that be fair to

say?

A. Yes.

Q. So in this case, we see 18. That would be the amount that was conducted from the gross total; is that right?

A. Yes.

Q. So in instances where you and Melissa managed, let's say it was $100 of the gross totals, there would be $10; in that box where it says *Shift Manager*, it would be appear to be like 10?

A. Yes.

Q. Then out of those 10, you would take 5 percent?

A. Yes.

Q. Then Melissa would take the other 5 percent?

A. Yes, ma'am.

Q. Okay. That would total the $10 in this little column here under shift manager?

A. Yes, ma'am.

Q. Then underneath that column, that's where the server assistants took their portion of the tips, correct?

A. Yes, ma'am.

Q. Do you recall what percentage that was that went to the server assistants?

A. While I've been working there, it's been 25 percent.

Q. Has it changed over time, to your knowledge?

A. When they first started, I don't think it was 25 percent,

but I think they changed very quickly.

Q. Then underneath that box, underneath the left SA box would be the server totals; is that right? Do you see that?

A. Yes.

Q. Okay. Then what would happen in that column is that they would take -- they would deduct then what the SA, the server assistants, received, and the servers would get then like a net total; is that right?

A. Yes.

Q. Then underneath that box, it says *Server Average*. Do you see that?

A. Yes, ma'am.

Q. How was that calculated?

A. The server average, it was divided by the amount of servers that were working that night.

Q. So on this sheet, we can see the servers towards the top left; is that right?

A. Yes, ma'am.

Q. So in that case, they would divide that amount by three people?

A. Three servers, yes.

Q. Once the server average is calculated -- that is per person, that number there would be per person; is that right?

A. Yes, ma'am.

Q. Then what is the box underneath servers' average?

A. That's the SA average, the server assistant average.

Q. How is that calculated?

A. It's divided -- it's 25 percent of the total tip divided by the amount of server assistants that are there for the night.

Q. How do we know how many server assistants are there for the night?

A. The SAs names are on the side. So this one has one. His name was Eric Kingslake (spelled phonetically).

Q. So Eric would be the one receiving the $92?

A. Yes.

Q. Now, when you were managing in 2016, did you complete these forms?

A. Yes, ma'am.

Q. Was it the job of the person that was managing on that shift to complete the forms and fill in the numbers and do the math?

A. Yes, ma'am.

Q. But they didn't just do that, right? They didn't just complete the form; they also functioned as a manager for that night?

A. I mean, yes, but...

Q. So what I'm trying to get at is, you would never be on a shift -- or you would never be a manager listed on a form who just completed the math on this and didn't work the shift?

A. Well, you're not going to complete this form if you're not --

Q. Unless you work the shift?

A. Unless you work the shift.

Q. Now, there are no separate classifications for servers, right?

A. No, ma'am.

Q. So there is just the title of server?

A. Yes, ma'am.

Q. Then there are server assistants?

A. (Witness nods head affirmatively.)

Q. Is that yes? You have to say yes.

A. Yes, ma'am.

Q. Now, for server assistants, they don't have a designated zone themselves; they have to pretty much bring water and bread to all of the tables. Would you agree with that?

A. They have a designated zone. It's just not as small -- I mean, yeah, small as the servers is.

Q. As the servers are?

A. Yes.

Q. So how many tables would a server be assigned to during the night?

A. Three to four a night.

Q. How many tables would a server assistant be assigned to at night?

A. I mean, they would have the room, so sometimes it could be eight tables in that room.

Q. So they would go around serving water to every -- or to multiple servers' tables?

A. Yes.

Q. There is usually either one manager or two managers on a particular shift; is that right?

A. Yes, ma'am.

Q. They were overlooking all of the sections, not just a section?

A. Yes, ma'am.

Q. You had keys to the restaurant to open and close; is that right?

A. Yes, ma'am.

Q. You also supervised the dishwashers?

A. Yes, ma'am.

Q. By supervising, did you mean you wanted to make sure they were there?

A. I mean, I had to make sure they were there. I had to be the one to make sure they were using the right, you know, stuff -- but, I mean, it wasn't all me. I just only did, really, the -- made sure they were there, making sure -- but I didn't make the schedule. I didn't do any of those things. I didn't hire or fire dishwashers, could not.

Q. So what did you do with the dishwashers then?

A. I literally helped hold the meetings, and I made sure that they were there.

That wasn't even a long process. That kind of fell into the -- into our hands for a short period of time, but -- I mean, I guess it's now back in their hands again, but --

Q. Now, when you said hold meetings, what did you mean?

A. Like we would be there with Itai while we had the meeting with everyone. Itai had to be there because most of the time when I was there they spoke Spanish.

So, I mean, sometimes there were issues that we had with polishing and with dishes being dirty. Through this conversation, it's not something that we could just have by ourselves because I don't speak fluent Spanish. So Itai was there to have these meetings.

Q. Okay. So let me ask you this: Going back to this form in front of you, would it be fair to say that if you took out what the shift manager made, the servers and the server assistants would have obviously made more money; is that right?

A. Yes, ma'am.

Q. So, for example, you know, if there was no 18, and it was zero, that would be 18 more dollars that this particular server or server assistant would have in their pocket?

A. Well, both, because it would be split between everyone on the shift.

Q. They would both have more money, is what you're saying?

A. Yes.
Q. Now, what kind of meetings were you describing -- you said something about polishing --
A. Yes.
Q. -- or issues regarding silverware?
A. Polishing the dishes, polishing silverware.
Q. Were those meetings exclusively with dishwashers, or were servers required to be at those meetings?
A. No, that was just dishwashers.
Q. Was there anything else that you participated in with respect to the dishwashers?
A. No.
Q. So meetings and making sure that they were there were primarily what you needed to participate in with respect to the dishwashers?
A. Yes, ma'am.
Q. Do you remember having a business card while you worked as a manager for Doris Metropolitan?
A. Yes, ma'am.
Q. We're going to be looking at Exhibit 3. Is this your business card for the time that you worked at Doris Metropolitan?
A. Yes, ma'am.
Q. These identify you as a manager; is that correct?
A. It does.

Q. You requested -- in 2017, when your title changed to service captain --

A. Yes.

Q. -- you requested more of the business cards that designated you as a manager; is that right?

A. I did.

Q. You did that because you couldn't explain the differences to your guests; is that right?

A. Right.

Q. By that, did you mean that your guests would be confused as to what a service captain is, so it would be more clear if they understood you to be the manager of the restaurant versus a service captain?

A. No, what I mean by that is I wanted the respect of a manager still in the classification of a service captain. Because if you work in the service industry, people feel like they can get over or get certain things from certain people.

So if I go to the table as a service captain, then that's my authority, which means somebody is always going to want to speak over me and speak to someone over me. But if I go to a table and I'm still classified and you think that I'm a manager, then you won't want anyone over me because you know what I'm telling you is going to be what the situation -- I mean --

Q. Because it gives you a sense of authority in that

restaurant; is that right?

A. In certain situations, you need it. I mean, in certain situations, there is no way out of it.

Q. So when the customer -- so let me just back up. Even in 2017, when you were a service captain in 2017, did you still use these cards that designated you manager, because of what you just stated?

A. Yes.

Q. So would it be fair to say that the customers, when they saw you and you gave them this business card, knew at that point that you were someone that had authority over just a regular server or someone titled *service captain*?

A. Well, I mean, there was no one titled *service captain* in the beginning, so there would be no authority over someone called *service captain*.

Q. But even now in 2017, you still use the cards, right?

A. No, I don't use them.

Q. Well, when you were a service captain in 2017, you still used the cards?

A. Yes.

Q. Now, would it be fair to say that it would be difficult for a manager/service captain to go to every single table for the entire night, to service all 90 people?

A. You said do I think so?

Q. Yes.

A. You never met me. Absolutely, I think it's possible.
Q. You're a hard worker, correct?
A. I am a hard worker.
Q. That's why you were promoted -- that's why they took you back --
A. Absolutely.
Q. -- as a manager so quickly after leaving, right?
A. Yes, ma'am.
Q. Now, did you have -- did you make schedule changes?
A. Did I make schedule changes?
Q. Yes.
A. I wasn't allowed to.
Q. I want to show you something. I'm going to show you what is behind Exhibit 1 -- I'm sorry, Exhibit 1, Bates-Black 69 at the bottom.
Can you take a look at that?
A. Yes, ma'am.
Q. That is Schedulefly e-mail to Patrice Jones; is that right?
A. Yes, ma'am, it is.
Q. The Schedulefly is an application that allows scheduling changes to be made; is that correct?
A. Yes, ma'am.
Q. Oh, I'm so sorry. Sorry. I have to switch over. I'm going to Bates-72.

This is a Schedulefly e-mail to Patrice Jones. Do you see her name at the bottom of it, where it says *Approved By*?

A. Yes.

Q. This application allows different shifts to be tweaked or changed after the schedule comes out on a Friday; is that right?

A. It does.

Q. Here, you see that Patrice is picking up a shift given up by Zachary Adams; do you see that?

A. Yes. It does have my name, approved.

Q. It does have your name, approved, as the person approving it, right?

A. Right, but I can only do that if I ask. They have to come to me, and then I have to either ask Melissa or Itai if that's a possibility. I can't just physically make that approval myself. I couldn't just physically say, right there, on the spot, yes, make that change.

Q. How did you have access to the Schedulefly?

A. I had a login.

Q. You had a login?

A. Yes.

Q. So you would in, and you would then approve them based on conversations that you had with other people; is that what you did?

A. Yes.
Q. This would have been in March 24th, 2015; do you see that?
A. Yes.
Q. So what was your position at that time?
A. I had to be either a -- I don't know, service captain or manager, whatever you want to call me at the time.
Q. Well, let's think through what you said. You said that back in Easter 2015, you were hired; isn't that right?
A. Yes. So it must have been earlier than that then. I just also told you I don't remember dates because I've been working there for a long time, so.
Q. Well, that's why I'm trying to refresh your recollection with this, sir.
A. Well, at this point, I can't really tell you. I've been working there for a long time. Four and a half years, I'm pretty sure. So maybe 2014.
Q. When did you get access to the Schedulefly?
A. When I got promoted.
Q. When you got promoted to a manager?
A. Yes.
Also, we didn't have Schedulefly the whole time I was manager. This was something that was brought in. I mean, Ryan eventually brought in Schedulefly. There was no Schedulefly at first.
Q. What happened at first then?

A. Itai would make the schedule.
Q. Itai would make the schedule on Fridays?
A. Well, I don't remember what day it was, but he would make the schedule for us, and that's how we knew the schedule --
Q. If there were changes -- I'm sorry, finish your thought.
A. No, that was it.
Q. If you needed to do make a change to the schedule, who would handle that?
A. Ryan, back then.
Q. Ryan would handle it back then?
A. Yeah. Before then, I mean, Stavros and Alise.
Q. Was there anyone else other than Itai that put out the schedule?
A. Not -- I mean, now, are you asking?
Q. No, between 2015 and 2016.
A. I mean, maybe Ryan.
Q. Did Melissa put out the schedule?
A. If she worked there in 2016, then I'll pretty sure she did also.
Q. Now, what about when Itai was out of the country? Who put out the schedule when Itai was out of the country?
A. Ryan or Melissa.
Q. You, yourself, never put out the schedule?
A. No.
Q. But you did approve schedule changes?

A. Yeah, as long as I spoke -- so I could not make a schedule change without speaking to someone else. If I didn't speak to someone else, either Melissa or Itai had to, or Ryan or Itai, whoever it was that I was working with at the time.

Q. Just so we can break it down and clarify, although you, yourself, did not put out the schedule or make the decision on the schedule changes, you would consult with Melissa or Ryan or another manager that was not Itai to discuss schedule changes?

A. Well, not -- I mean, that was the only two people that I worked with that handled the schedule was Melissa and Ryan.

Q. So Melissa and Ryan handled -- had the authority to make schedule changes?

A. Yes.

Q. Then you would discuss those schedule changes with them. Then, if they were okay with it, you would then come into the Schedulefly app, and then put your name on it as approved by?

A. Yes.

Q. Now, as far as the authority to fire someone --

A. Yes.

Q. -- you told James Black, "Look, you're going to be fired, so if you want to come in and get fired, you can."?

A. That is not what I told him, not in that context. But me and James were friends, so this is where a lot of that confusion comes in.

So me and James had a conversation over the phone. I

told him. I told him he was losing his job. I said, "But you can come in," I said, "but, I mean, I'm just letting you know. You decide -- you know, whatever you decide you want to do."

He told me, "Well, I'm not going to come back in to get fired."

I said, "Well, then don't come back in and get fired." It doesn't mean I was going to fire him.

Q. So you took a deposition in this case; do you remember that?

A. Yes.

Q. You swore to tell the truth at that deposition; is that right?

A. Yes.

Q. You told the truth in that deposition, right?

A. (Witness nods head affirmatively.) Yes.

Q. So you're telling me that you told Dontay, "Look, if you want to come in" --

THE COURT: Wait. Dontay?

THE WITNESS: No, I'm Dontay.

EXAMINATION BY MS. VASQUEZ:

Q. I'm sorry. So you James Black, look, if you want to come in -- what exactly are you telling us now that you said to him?

A. Well, I'm telling you what I said to James was, I said, "James," I said, "you're probably not going to have a job when you come in." I said, "It's up to you." I said, "You can come

in" -- this is me. I'm speaking as friends, not as manager to -- this is James calling me from out in California to talk to me as a friend, and we had this conversation -- or before he left for California, and we had this conversation.

Q. So when you said that you are probably not going to have a job, what made you think he was probably not going to have a job?

A. Well, because we had -- I had a conversation with Itai, and they had already come to the conclusion that he probably wasn't going to be a good fit for the company. So Itai had already made the conclusion that he wasn't going to work there.

Q. Tell me about that meeting.

A. We had a meeting about some issues that they had with James and some issues that had been brought up. So the conclusion of that meeting was that James was not going to work for the company anymore.

Q. That meeting was before or after that phone call?

A. That meeting was before the phone call.

Q. You knew what was going to happen as a result of the phone call?

A. I did.

Q. That's why you told him, "You're probably not going to have a job."?

A. Yes.

Q. He responded what, exactly?

A. To me?

Q. Yes.

A. That he wasn't going to come in and get fired.

Q. Okay. Because he knew he was probably not going to have a job?

A. Right.

Q. Why didn't you just tell him what Itai's decision was at that point, since you knew about it?

A. Well, because I wasn't talking to him as a manager. I was talking about to as a friend. So if I'm talking to you as a friend, it's not my job to tell you what Itai told me.

What I'm telling you as a friend is what I'm telling you as a friend. That's different. The explanation should come if I was sitting down with him at Doris Metropolitan and telling him, saying, look, this is the decision that Itai came up to.

Q. If he had come in, would that be what happened; you would have then sat him down and said, "Look, Itai fired you."?

A. Well, no, I wouldn't have talked to him. It would have been either -- it would have probably been Itai himself, the circumstances that James got hired. I mean, James got hired because he was a regular customer there, and he liked the place. So I don't think any of us would have had that talk with him. I don't think it would have been.

Q. Have you ever hired anyone for Doris Metropolitan?

A. Yes.
Q. Who did you hire?
A. I don't know, but it wasn't -- it was never on the spot. I had to have the résumé. I had to talk to them. Then we had to -- I had to talk with Itai and the ownership before anyone was physically said to be hired.
Q. But that wasn't the case with the other managers that worked with you as well; is that right?
A. Well, not -- I mean, not Ryan and Melissa.
Q. They both could hire people?
A. Well, Melissa, later on. In the beginning, me and her both were kind of in the same boat of not being able to just hire anybody on the spot, without at least talking to Itai about it.
Q. What about Ryan? Ryan could hire people; is that right?
A. Yes.
Q. Stavros, were you there when Stavros was?
A. Yes.
Q. Stavros could hire people?
A. Yes.
Q. Stavros could fire people; is that right?
A. Yes.
I mean, the word for *firing* I'm pretty sure came from Itai also, because, even when I was there as a server in the beginning, I watched two people get fired, and I know the word

came from above.

Q. So when there would be servers that came in intoxicated, you would agree that Melissa could fire them without talking to management?

A. No, she had to send them home without talking to management. I mean, there was no such thing as just firing somebody on the spot, at least since I've been there. I don't know -- I mean, I can't speak of what has happened before me, but you got to be sent home first because the conversation needs to be had.

Q. But you would agree with me that hiring did happen on the spot?

A. Yes.

Q. With different other managers, even if not you?

A. Yes.

Q. But did it happen with you as well, where you could hire on the spot without having to consult owners?

A. There had to be some -- there had to be some consulting before I said yes -- before I could physically hand you that paperwork, and you fill out your paperwork.

Even if I said, "You know what, yeah, it looks good, I'm pretty sure you got it." But if Itai tells me no, then I had to tell you no. It happened more than one time where I told someone that I think he had it, and I was turned down, so.

Q. So that was in your particular case, but you did see

different situations with the other people that were managers during time that you were there, such as Melissa being able to hire without consulting with the owners?

A. Well, I mean, I'm not -- also, in -- I don't always talk with Melissa about what she can and cannot do. I mean, when we were there together, when we managed together or whatever you want to say, we both had to do the same thing. We both had to talk to the ownership.

Now, I mean, these are all changes that have happened since I came back the second time, that, you know, Melissa has been able to do any hiring, I feel like -- I mean, but who knows. I don't know everything that Melissa says. I don't know everything Melissa does. So I'm speaking of me and what I can do.

Q. Now, what do you remember about Ryan O'Dwyer? He was able to hire people; is that right?

A. Yes.

Q. Without consulting management?

A. Well, I mean, I didn't know that either because I didn't really work -- I mean, when I did work with him, yes, he would hire without consulting, but....

Q. Okay. I just want to be clear, he hired without consulting owners? Is that a yes?

A. Yes.

Q. Now, the Doris Metropolitan had mandatory meetings for

servers on Monday; isn't that right?

A. Yes.

Q. Everyone was supposed to attend those meetings; is that correct?

A. Yes, ma'am. Unless you had some excuse.

Q. Unless you had some excuse?

A. Yes.

Q. To your knowledge, those folks that did clock in were paid at the 2.13 rate, not minimum wage rate of 7.25?

A. I'm not a hundred percent sure, but, I mean, a lot of times, people didn't clock in -- say again.

Q. Go ahead. Finish your thought.

A. There was a lot of times people just didn't clock in. There's a lot of times people -- so, I mean --

Q. Did you remind those people to clock in?

A. No.

Q. Did you ever e-mail those people, hey, we have a mandatory meeting, don't forget to clock in for the meeting?

A. No.

Q. Why not?

A. Why didn't I do what?

Q. Why didn't you remind them to make sure to clock in, as you were a manager at that time?

A. I mean -- (witness shakes head negatively) -- you're asking a question I cannot answer. I mean, if you ask me -- if

you're asking me why should I ask somebody, do they want their own money? I went to these meetings and didn't clock in also. I mean --

Q. Why?

A. Because the money doesn't matter. It doesn't --

Q. Because it was 2.13 an hour?

A. Even 7.50 an hour is just an hour. That's a waste of money to me. It doesn't help me or defeat me to have 7.50 an hour.

So, to me, you're asking a man who clocks in -- no, that doesn't bother me to clock in for a meeting that I'm not going to be there that long for. My money comes from the service that I give at night. That's the most apparent part of my money.

Q. But don't you have to go almost every Monday, to the Monday mandatory meeting?

A. Yes.

Q. So over how many years did you work there?

A. About four and a half years, almost five, whatever, right now.

Q. That 7.25 times very many, many months?

A. I know. It's also --

Q. Is that significant to you?

A. They also have given me things that would equal up to that. So that's what I'm saying, you're talking to someone

that --

Q. What did they give you that equals up to that?

A. I mean, they have been there for me through everything. I mean, you're asking about my employers. They have been there for me through things that I've been being through.

They've been there through good times. I got married. They took care of my venue for me. I mean, so I'm standing on the stand right now hearing about people that are, you know, doing nothing but taking, but that they also give. So, I mean, they're both ways. I mean, it could be both ways, how do you feel about it.

Q. Wouldn't it be fair, too, that the defendants didn't pay for the plaintiff's venue when they got married --

A. It's not. But, guess what, this is also the plaintiffs. This is these people that feel this way. Guess what, I feel like everyone is entitled to feel like they want.

These people that are sitting down here, I still love to this day, and still love working with. We all feel differently about our time there and how we do things.

THE COURT: I said yesterday, this is not what this case is about.

EXAMINATION MS. VASQUEZ:

Q. Would it be fair to say THAT you also worked overtime there?

A. Yes.

Q. More than 40 hours a week?
A. Yes.
Q. Because you're a hard worker?
A. Yes.
Q. You don't know if you got time and a half during the time that you worked there were overtime, over the 40 hours?
A. Do I know if I did? I know I didn't, but I opted for that.
Q. You opted not to receive overtime?
A. Yes.
Q. What do you mean by that?
A. I did not want to have overtime. I needed a second job, and they offered me a second job, so I worked it.
Q. What do you mean, they offered you a second job?
A. I was also a cook there.
Q. Oh, a cook?
A. Yes.
Q. Oh, okay. So you worked not only as the server for the night, you were also a cook?
A. In the morning.
Q. Oh, in the morning you would come in and cook?
A. Yes.
Q. What did you get paid for cooking?
A. 13 -- 15, I think.
Q. $15 an hour?

A. Uh-huh (affirmative response).

Q. Now, talking a little bit about the mandatory service charges, not every table of six or more had mandatory service charges; is that correct?

A. Right.

Q. That was the discretion of the server?

A. Yes.

Q. So sometimes they could opt to put it on, and sometimes they would not; is that right?

A. Absolutely.

Q. If an employee -- or if a server was coming in late, would they notify you?

A. Yes.

Q. And why -- were they supposed to notify you per policy of the company?

A. Well, because we were the ones running the service. So if we're missing someone for that service, we should know. Because if we didn't know, then, I mean, it's going to affect the service.

Q. So when you say you're running service, that means you're making the map, which is basically a plan of which servers are going to be assigned to which tables; is that right?

A. Yes.

Q. Is that what running service means?

A. Well, no. I mean --

Q. It means more than that?

A. Oh, absolutely. It means, the set up. It means actually the service. If I'm missing a server -- I mean, there is times where I've missed a server, and I've had to be the one to get in there and serve the tables. I mean, this is -- let me be finished. That's all I have to say.

Q. So this map, that y'all call a *map in the industry*, is that like a paper --

A. It's a floor plan. It's a piece of paper that we write everyone's name on.

I mean, back then I don't even think we were writing names down. I think we was just telling everybody where they were back then. But now, we write it down on a piece of paper, so that everyone can see exactly where they are working and which tables they would have. Because they get to decide in the room which tables they want. We would only put them in a room. So then, from that point, you would decide which section, because each room breaks down into sections.

Q. So if a server is coming in tardy, you would then make an adjustment to the map, which would indicate what tables they were going to take; is that right?

If a server came in 15 minutes late --

A. Yes.

Q. -- you would then make a change to your map?

A. No, you don't have to.

Q. So what do you do then?
A. I mean, if they're setting up, 15 minutes later is not --
Q. Well, let's say an hour late.
A. Then, yes, we have to adjust the map to, I guess, put them in a section where there would be no table, if you really needed them; but, if not, then you would send them home, so that you could have a discussion with everyone else about what we're going to do about them being late.
Q. So would it be fair to say you had the authority to send them home?
A. Yes.
Q. That basically would mean that if they were an hour late, they would not be a part of the tip pool; is that right, because they were going to be sent home?
A. But, I mean, I worked there for a long time, and that rule's not -- I mean, people came in late all the time. They still come in late all the time, and they are never sent home. I mean, I know that this rule is supposed to be in place, but that's not always something that happens.
Q. But it does happen sometimes?
A. Yes, but I can probably count on my hand the amount of people that have been sent home for being late since I've been there.
Q. If they were absent, what would you do if a person didn't show up for a shift?

A. Figure out why, first of all. I mean, it's not always a negative thing. Sometimes people can be hurt. So we try to figure out why.

Once we figure out why, then that conclusion is now discussed with the managers and the owners about what -- I mean, if it was an accident and something that they couldn't stop, then, of course, they come in the next day, and we go on about our business.

But if it was something that they just were not there for, then the conclusion is figuring out what do we do from that point? I mean, are they going to be suspended from that point, or will they not work for us from that point. I mean, do they get a vertebral or written.

Q. Now, what about the mandatory meetings? If they don't show up for the mandatory meetings, what happens?

A. You'll be getting written up. After you get written up a certain amount of times, you would get fired.

Q. Do you handle the write-ups?

A. I have written up.

Q. How many times have you written up?

A. I can't even count them.

Q. A lot?

A. Yes.

Q. Did you need to -- every single time that you wrote someone up, did you have to consult and tell the owners before

you decided to do write someone up, or is that something that you had the authority to do without consulting them?
A. I was able to write up without consulting, but the write-up had to go through them before I talked -- so I would essentially be able to write up the write-up, and the owners had to see it or know about it before I could talk to the person about it, in case they wanted to add anything. Because they also like to add or take back -- you know, add or tell me a better way. Because I was also new at being a manager, so this was kind of new for me also. So, I mean, I tried to take --
Q. Would it be fair to say that other managers may have had more authority than you because you were new at being a manager and still kind of in training?
A. Yeah.
Q. So what other people such as Ryan O'Dwyer or Stavros may have had the authority to do, you may have been a little bit more limited in your capacity because of your experience?
A. I'm not going to say that because, I mean, I never seen Ryan write up anyone. I never seen Stavros write up anyone. Their managing style was a lot different. I really feel like I was one of the only people that was really writing up anyone.
Q. Their management styles, by that you mean they may have taken a more hands-on approach or discussed it with that person, rather than writing up?

A. Yes.

Q. When you were a manager and then stepped in to serve as needed -- hold on one second. I just need one --

When you were a manager and stepped in to serve, did you take the full cut in the tip pool, or just the 10 percent allocated to managers?

A. I didn't take the -- it was one or the other. I can't recall. I either took a 5 or the -- it was not both. I could not have both, though.

Q. So there were times where they were short staffed and used you as a server?

A. Yes.

Q. So in those cases, were you ever --

A. Like, that only happened -- I'm sorry.

Q. In those cases where you would have to step in and stop being a manager to be a server --

A. Yes.

Q. -- what would your take be from the tip pool?

A. I would get -- I would get the service role of it, and not the service captain or manager role of it.

THE COURT: How often does that happen?

THE WITNESS: I mean, it didn't happen often. It would just -- I mean, since I've been working there, maybe six or seven times. It's usually when someone calls in. It's a busy night, and there is just no one else -- because, I mean, we

don't do, like, on call. So when we don't have someone, we just don't have someone, so we've kind of got to step in there.

EXAMINATION BY MS. VASQUEZ:

Q. Did you -- so would the other manager -- let's say you stepped in to be a server that night and took from the server portion, would there be another manager, or would it just be you that night?

A. No, no. There would still be -- if I'm -- I could not step out of that role and not have someone else there. I mean, there had to be somebody. So I stepped into that role.

The only time I can think about it happening, Melissa was there. Because it only usually happened if it was Melissa's time.

Q. So if Melissa was there as the manager then, and you stepped into the server role, would she take 10 percent or just 5 percent, to your knowledge?

A. To be honest with you, I cannot recall. I don't know if she just took 5 or if she took 10.

Q. So you recall that at some point each manager would take -- well, you testified earlier that the total that went to the managers was 10 percent, but that you took 5 percent?

A. Well, because in the beginning we didn't know that we were supposed to take 10 percent, some of us, so we weren't taking that.

When I was filling out paperwork, I basically didn't

know, if I was alone, that I was supposed to take the full 10 percent. I thought I was, you know, supposed to take 5.

So for a long time, I still only took, until we had a meeting about it. Then we found out that we were still supposed to be taking our 10.

Q. Tell me about that meeting.

A. Well, it wasn't really a meeting. It was Itamar telling me that we were supposed to taking 10. We just didn't know.

Q. Did you complain about, hey, why am I getting 5 percent, and shouldn't I be getting 10? Or how did the meeting come up in the first place?

A. In the mornings, I was not taking any percentage. So Itamar asked me why I wasn't taking any percentage in the morning because it was just not -- he just thought I wasn't doing it.

I just felt like in the mornings, on Friday mornings, because it wasn't -- we weren't making that much money, even service-wise, so I just didn't feel like taking seven bucks would do anything to me or them, so I wasn't taking it at all.

So that's when we started discussing the percentages of how much we were supposed to take, and then found out that I wasn't taking what I was supposed to take a long time I was working there.

THE COURT: Let me ask you a question. When you're the only service captain, and you took 5 percent, what happens to

the other 5 percent?

THE WITNESS: It would just -- we wouldn't take it at all because -- what happens is we do all the math. So the math that we do then goes upstairs, and she rechecks all the math. But still, she was only taking 5 percent because I was only taking 5 percent.

THE COURT: So the other 5 --

THE WITNESS: That was going back to the servers and the server assistants.

THE COURT: Do you know that, or you're assuming that?

THE WITNESS: I'm assuming that. I mean, I don't know for sure.

THE COURT: Okay. I just wondered if you knew.

EXAMINATION BY MS. VASQUEZ:

Q. That meeting with Itamar where he told you you had to take the 10 percent, can you tell me a little bit more about what you all said? Did he say, "Look, I noticed you are not taking tips for the morning."?

A. Well, literally, it was he called me just to say -- he was like, "What's going on in the morning? Your name wasn't on the sheet?" I told him that usually, if it's not anything serious, I don't take any of the money because I don't think it's worth it. He said, "All right."

I said, "It's only 5 percent." When I said it was only 5 percent, he was like, "Well, you're supposed to be

taking 10 percent." I was like, "Oh, I didn't know."

So from that point forward, just I started taking the right thing. It wasn't like sit down and us have a full meeting. I told you, I'm a really like go-with-it person. It didn't matter to me. To me, I just thought it --

Q. It didn't matter to you because they were being kind in other areas of your life, right?

A. Well, this was all after. I mean, I got married about a year ago. This is -- it doesn't matter to me because I've worked in places where you don't make the type of money you make here. You make a lot of money at Doris Metropolitan.

I'm just different. Like I told you, we all think different. Me personally, this is different.

Q. Is that why you didn't question why managers were participating in the tip pool?

A. No, it's not that. I never told you I never questioned. I did question it before, but I feel differently about the outcome.

Q. I understand that. My question is, when you did question it, did you ask Itamar or Itai about it?

A. No. No one did.

Q. Who did you question then?

A. We questioned each other. That's what it is.

Q. The servers?

A. We just had our server talk, and we'd question each other,

and we'd bring it up to each other. This is how it happens.
Q. None of that was ever reported to ownership?
A. No.
Q. Did you send Patrice home on her last day?
A. Yes.
Q. That was after her -- she had put in her two weeks' notice, right?
A. Yes, I did.
Q. That was before her shift started?
A. Yes.
Q. So there were no -- she had not gotten any tables assigned to her yet -- or had not started service on her tables yet?
A. No, ma'am.
Q. Now, did the defendants also help you start your catering business?
A. No.
Q. Let me just check to make sure I don't have anything else.
MS. VASQUEZ: I have no more questions.

CROSS-EXAMINATION

BY MR. CUPP:
Q. Good morning, Dontay. How are you?
A. Good morning. How are you?
Q. When you worked as a server the first time --
A. Yes, ma'am -- yes, sir.
Q. -- with Doris, did you contribute to the tip pool that was

shared by the service managers?

A. Yes.

Q. Did you, as a server during that period of time, think that was the right thing to do based on what the service managers did for service at the restaurant?

A. In the beginning, I didn't think it was the right thing because I came from working other places where that just wasn't a thing. I had never worked anywhere else where service captains or managers, whatever, getting tips was a thing.

I mean, like I said, everyone feels differently. I felt like they do just as much work, I feel like.

Q. Let's talk about the work that they do. I think that was missing from the -- obviously, the testimony.

So let's -- when you went from a server to a service captain, service manager, describe for me -- or describe for the Court the type of table interaction that you engage in on a daily or nightly basis when you're occupying that position?

A. I mean, I still did as much as I was doing as a server. I bussed tables. I still poured wine. I mean, I've got one of the biggest local followings because I decided to get into that promotion and speak to every table. My goal every night was to speak to every table, to interact, to be there for what they need.

So, we talk about the service captains, and I feel like it just depends on the person. I work hard. I made sure

that if they were sweating, I was sweating. If they were talking to guests, I was talking to guests. This is how I -- this is how it works, how it's supposed to be done.

Q. Would you bus tables if needed?

A. Absolutely.

Q. Would you take orders?

A. Take orders, bus tables, pour wine. Whatever that guest needs, that guest is going to get, if I've got to get it myself.

Q. Prior to going to work for Doris, were you a manager at another restaurant?

A. Yes.

Q. Which restaurant was that?

A. Palace Cafe and Tableau.

Q. What positions did you occupy at those restaurants?

A. I served and managed the Palace Cafe. I was back-of-the-house manager and banquet coordinator at Tableau.

Q. Now, when you were service manager at Doris, did you engage in strictly delegation duties?

A. No. No. Like I told you, I worked at Palace, where, actually, I did -- just did delegation. But, I mean, that place was three times, four times as big, and your job is to point, and telling people to do this, that and the other.

But, I mean, I'm at Doris, and I'm the person moving equipment. I'm the person -- I mean, like I said, there is a

lot of things that I do outside of just -- you're talking about getting ready for the shift. You know, we're there helping put things up. We're helping put things up. I'm not saying servers are not also, but we should be doing the same amount of work. I feel like it happens.

Q. Describe for the Court what would be the meat board option, or the Feed Me option. Do you have that at Doris?

A. It's just a family style, where people come in, and they have the option to get a board of meat that we bring out the table, carve tableside for them, and they get to all kind of pick off and enjoy it together.

Q. As a service manager, would you engage the table with selling that product?

A. Oh, yeah. I mean, they would call me over all the time to sell the product. I was the one that carved, but it's just because of my personality. People like to hear the spiel that I would give. But, I mean, there is also people that are sitting in front of me that gave good spiels and did it just as good as I did.

Q. Did anybody other servers ever tell you, Dontay, you're engaging my table too much?

A. No. Oh, what, like my tables like me too much?

Q. Yes.

A. No.

Q. Or that they don't want you to be at their table?

A. No, the more I'm with their table, they know that's the more money we're going to make.
Q. Because you're up there selling the restaurant, selling --
A. Well, not just selling. It's also about a good time. I mean, everyone isn't going to Doris to spend a million dollars; but, guess what, that person will tip you a good amount just because you've had a chance to talk to them, get to know them, the experience.
Q. Is the service style at Doris, is it more unique than what you experienced than other restaurants?
A. Yes.
Q. How so?
A. I mean, in a lot ways. The first thing is I've never worked in a place where you can take so much control of a dining experience or a person or a group of people, you know.
I walk to a table, I tell them what I want them to have, and they have it. That's kind of a technique of mine.
I use that in every aspect of where I work. If I was serving, if I was managing, it didn't matter. I still work the tables, and I will tell it.
I told you, I also know a lot of people. So there is no such thing as not being to relax and just working all the time.
Q. When you handed out the business card that we saw earlier, would that be in conjunction with providing table service

duties to the table?

A. Well, yeah, I didn't -- I just felt like this was my title at one point. Then, now, we're going to change the title, which was totally fine, but I could not physically have my guests feel like -- I mean, they are going to think that it was a demotion, or it was not level, and then I have to explain. I just didn't want to feel uncomfortable about everything.

Q. Would you hand them the card while they were sitting at the table?

A. Yes, absolutely.

Q. Would that be a part of the customer interaction that you would be engaged with?

A. Oh, yeah, I handed out my card to everyone.

Q. I want to put a little bit better in context of what happened with Mr. Black. You and Mr. Black were friends, correct?

A. Yes.

Q. Mr. Black, as I understand it, his full-time job is an actor?

A. Yes, it is.

Q. Because he was an actor and got called away on movie shoots, what did that mean as far as the restaurant?

A. Just, I mean, sometimes it put us in bad places, with trying to, you know, schedule around. Because when we have more time, then it's a little bit different for them to

schedule, I guess, but...

So sometimes he would need off, and it was a harder thing to give him. But, I mean, to me, they still gave it to him, I feel like. I didn't really see any times that he didn't get it.

Q. When Mr. Black called you and asked you about his status within the restaurant -- did you call him, or did he call you?

A. He called me, just to talk, is what the original conversation was about. It was not supposed to be about Doris at all. He just wanted to call. Then the conversation went to a Doris conversation.

Q. Had he been away on a movie shoot somewhere?

A. I believe he was getting ready to go out, or he was out. He was out of the town at the time, and he was coming back in. I just can't recall. It was a while back. It was either one.

Q. Do you know whether he came back in and spoke with Itai about getting back on with the restaurant?

A. I don't know if he did.

Q. Let's talk a little bit about Patrice Jones. Do you recall the specific circumstance of when you sent her home on the last shift?

A. Yes, I do.

Q. Will you describe for the Court what happened in that context.

A. Yes. I'm pretty sure it was her last day. It was

Mardi Gras day.

First of all, Mardi Gras day is a day that is already hard enough to keep every server positive because it's an aggressive day.

The whole morning, she complained about being there. I know she just didn't want to be there. It was her last day. She didn't want to work there anymore. Like, it was just all in conjunction with each other. I felt like it would just be easier for everyone else to get through it if I sent her home for the day.

So I told Patrice that, you know, if you're not going to work -- if this is going to be the rest of the day, then, you know, you can just go ahead and go home. So she was like, all right, I'm gone. So she left.

I mean, we had a Mardi Gras shift that day. I wasn't going to keep someone there that was going to bring down the staff. She didn't want to be there.

Q. That's what I wanted to ask you. If you have a server that's working there that, for whatever reason, has a negative personality, a negative -- not a personality, but in a bad mood, not wanting to be there, how does that impact the service at the restaurant?

A. I mean, it can bring everybody down. One negative person can make everybody negative. But not just that, it can make people's dining experience negative. You can lose a lot of

things from one person being angry.

Q. That was very important at Doris is to make sure that the customer had an impeccable dining experience; is that correct?

A. Absolutely.

Q. Would that include the food?

A. Yeah.

Q. So how would you describe the approach that Doris took to service at the restaurant, customer service?

A. I mean, they were always serious about it. I mean, like I said, it's just different management styles. Some people were picky about this certain thing, some people were picky -- but it's always been about the guest experience overall at Doris.

Q. So when you were looking -- what time -- working as a service manager, what time would you get to the restaurant?

A. Two.

Q. Would the restaurant already been open?

A. No.

Q. You're talking about for the evening shift?

A. Yes.

Q. I don't know if the record is clear on this, but when you first started working there, was the restaurant open for lunch?

A. Yes. But it was opening Friday, Saturday, Sunday.

Q. Did that change at some point?

A. Yes. Mardi Gras this year, we decided to go down to just Friday lunches.

Q. So there was a Friday, Saturday and Sunday lunch shift. About how long did those shifts last?
A. They were from 10:30 in the morning to -- I mean, it just depends on when your last table leaves. Sometimes it could be 2:30, sometimes it could be four o'clock.
Q. So when you were working Friday, Saturday or Sunday night shift -- or evening shift, would you got there would the restaurant be open?
A. No, I would still be there before the shift, to help for the night shift. Because we were closed in between. From 2:30 to 5:30, we weren't even open.
Q. So what time was the lunch shift from?
A. From two -- I'm sorry, from 10:30 to 2:30.
Q. So there would be some downtime between the lunch shift and the evening shift?
A. Yes.
Q. Now, when you made the transition from service manager back to server -- and I think you said that was in February of 2017 --
A. Yes.
Q. -- thereabouts?
A. Yes.
Q. So you've been working as a server at Doris, this stint, for 18 months? 17 months?
A. Server-wise, probably so.

Q. Whatever the math is?
A. Yeah.
Q. As a server now, are you contributing money to the tip pool that is shared by the service captains and service managers?
A. Yes.
Q. Based on your experience in the restaurant, and seeing what the service managers do, are they deserving of that tip based on their table interaction?
A. Yes, I think so.
Q. Are they doing the same table interaction that you were doing when you were a service captain?
A. Yes. But that's the difference, though, is that I'm going to hold you to that. I feel like if I'm going to if pay you to do that, then I'm going to make sure you're touching my tables. I'm going to make sure -- even if it's something that you are not going to do, I'm going to make sure of it.
Q. Did the service managers just sit at the front door and just keep an eye on things?
A. No.
Q. Do they just have their arms folded pointing at people for what to do?
A. No.
Q. Do the servers have any authority over the server assistants while the shift is going on?

A. I mean, very, very small, not like -- I wouldn't even really call it *authority*. But, I mean, it's both of your money. If I need something, then I really need you to help me get this done, and the server assistant knows.

Q. So you would ask the server assistant to perform the duty?

A. Yeah.

Q. On the meetings, did you ever tell someone that they shouldn't clock in on a mandatory meeting?

A. No.

Q. Did that instruction ever come from Itai or anybody in ownership saying they are not supposed to punch in?

A. No.

Q. Do you know whether people, in fact, did punch in?

A. I don't know for sure. It's not something I ever really paid much attention to.

Q. Describe for the Court what would happen at the end of the shift with the tip-out form, or the tip reconciliation sheet. Would you and the servers both be engaged in getting that figured out?

A. No. But, I mean, they would sit there. They wouldn't do it, but I would do it. Some of them would wait to figure out what they made and to figure out what their cash is for the night. But some people leave and wait for the next day.

Q. You're talking about for cash tips?

A. Yes.

Q. Because the credit card tips are put on --
A. Yeah, they are put on the check. Then the cash tip is --
Q. Those tip reconciliation sheets are there for everybody to view, right?
A. Yes.
Q. Is it a transparent system in that regard?
A. Yes.
Q. Is it still like that?
A. Yes.
Q. Do you have you the ability to set anybody's wages, to establish their wages of what they would earn at the restaurant?
A. No.
Q. Were you asked by someone to join this class in this litigation?
A. Yes.
Q. Who were you asked by?
A. One of the young ladies on this side. I don't remember her name.
Q. One of the attorneys?
A. Questioned me about it. Asked me about it.
Q. What was your response?
A. I told her, I said no. I just told them that -- we didn't have any more conversations after that, really. We just talked about it. I didn't say no. I just didn't -- like, just didn't

conversate with them anymore.

Q. Was it because you did not believe that they were correct in asserting that the service captains shouldn't be included in the tip pool?

A. I felt like I, as a person, didn't -- I think that everything is fine, the way I feel. This is just how I feel, though. I mean, I don't --

MR. CUPP: One second, Your Honor. Let me check my notes.

EXAMINATION BY MR. CUPP:

Q. What was the general rule in the restaurant about service charges on the check?

A. That we had the option as the server to -- if we felt like we should put it on or not. Most of the time, we did. But there's some people -- me, I really don't put it on most of the time.

Q. Put the microphone a little bit closer to you.

A. I'm sorry. I don't really put it on most of the time. But usually, I know the people that I'm taking care of, you know.

Q. What type of tables --

A. Larger tables. It has to be six or more people to put a service charge on it.

Q. So if you were waiting on a six-top table as a server, would the server be then vested with the discretion whether

they wanted to put that service charge on there or not?

A. Yes. But most of them go with the -- with yes, all the time. I mean, they don't really not put the money. Because, I mean, that's guaranteed, so people usually take the service charge.

Q. It would be 20 percent --

A. Yes.

Q. -- of the bill of fare?

A. Yes.

Q. Why would you, as a server, make the decision not to put it on?

A. Well, like I told, I have a bigger clientele. I just have more confidence in the fact that they are going to tip me more than what 20 percent is.

Q. Do you get tipped -- as working, if you're working as a service manager, and working with a table, and they tip more than 20 percent, who else shares in that?

A. The servers and me.

Q. It would be all the servers in the restaurant, right?

A. Yes.

Q. It would be all the server assistants in the restaurant?

A. Yes.

Q. In your position as the service manager, are you managing the service to the customers?

A. Am I managing the service?

Q. Yes.

A. Yeah, I mean, I'm more the service when I'm the service captain or manager than my colleague, yes.

Q. You're making sure that table has the experience they deserve when they come in the doors at Doris?

A. Yes.

MR. CUPP: I don't have anything further, Your Honor.

THE COURT: I have a couple questions I want to ask.

You're aware that Melissa became the general manager in September of 2017?

THE WITNESS: Yes.

THE COURT: You're aware of that? Remember to speak into the --

THE WITNESS: Yes.

THE COURT: -- microphone, if you can.

MR. CUPP: You can move that.

THE COURT: You can move it.

Before she became the general manager, if Itai was not there --

THE WITNESS: Then she --

THE COURT: -- who acted as the manager?

THE WITNESS: She did.

THE COURT: Melissa?

THE WITNESS: Yeah. But I mean, still, Itamar would be in town, so she still had to make decisions through Itamar,

that I know of. This is what I also had to do if I had anything I had to take care of.

THE COURT: So the times when Melissa was a service captain, if Itai was not there, she performed the duties that he ordinarily would perform?

THE WITNESS: Uh-huh (affirmative response). Yes, ma'am.

THE COURT: Is there anybody else who did that, like you mentioned --

THE WITNESS: Ryan O'Dwyer. It would have been the same.

THE COURT: If Ryan was there, and Itai was not there and Melissa was not there, then Ryan would do it?

THE WITNESS: Yes.

THE COURT: What are some of the things that they would have to do if they were performing in the absence of Itai?

THE WITNESS: Well, I mean, really -- I mean, the restaurant pretty much ran the same. They held the meetings if Itai wasn't there to hold the meetings. I mean, if we had any small decisions that had to be made, then they were usually in more contact with Itai, so that's who we had to talk to is one of them. They would -- whatever issue or problem we were having would have to go through them.

Usually, any firing that would have to happen while Itai wasn't there, we would just not have the person work

until either he comes back, or if he felt like they wanted them out of there now, then he made the decision just over the phone.

THE COURT: He, you're talking about Itai?

THE WITNESS: Yeah.

THE COURT: That's all I wanted to know.

REDIRECT EXAMINATION

BY MS. VASQUEZ:

Q. Would it be fair to say that you were different than the other managers because you worked a little bit harder?

A. Yes.

Q. In fact, you said that if they were sweating, you were sweating?

A. Absolutely.

Q. Melissa had a different management style; is that right?

A. She does.

Q. How would you describe her management style?

A. She's more strictly fine dining, I feel like. She's slower at a lot of things, I guess, and not as aggressive.

So when I say that, I mean, she still did things. She still opened wine, and she still went to tables and did these things, but when I say me, I'm looking for it, like --

Q. So you have a following of people that -- you said you have a following or a clientele?

A. Yes.

Q. That means people come to seek you out; is that what that means?

A. Yes.

Q. Whereas, Melissa, Melissa, would you agree, she did not have the same level of interactions with people because she did not seek it like you did?

A. She didn't have the same -- she doesn't have the same level of clientele like I do. I'm not saying she doesn't -- because, I mean, you have to interact. But, of course, not as much as I am, with interaction with people, because that's what I do, and that's who I am.

Q. Going back to Patrice, you had the authority to send her home that day, correct?

A. Yes.

Q. You didn't need to consult anyone in order to send her home that day?

A. Not to send her home.

Q. Okay. You said that you made it your duty as a manager to keep all servers positive, like on Mardi Gras day; isn't that right?

A. Yes.

Q. That was a duty that you'd just impose on yourself. That's not something that you were told you had to do; that's just part of you developing your following or clientele?

A. No. That's absolutely wrong. The reason I sent her home

on Mardi Gras day was because she was already in a bad place and didn't want to be there.

So if you're already in a bad place, it's your last day, and you don't want to be there, now I'm setting the restaurant up for anything to happen. Not saying that she was going to do anything, but anything could happen. What if she would have gotten angry with a guest? What if she would have just walked out. What if she would have -- I didn't have time on Mardi Gras to figure out if that was going to be the best way to handle her, how she was acting that day.

So the best way to do it was to have her out of the building, handle the shift, and then figure it out from there. It was her last day, anyway.

Q. You had that authority because you were the manager at that time, and you didn't need to consult with anyone to make that executive decision; is that right?

A. To send her home?

Q. Yes.

A. Yes.

Q. When you were working as a manager/service captain, you had the ability, if you wanted to, to forego that 10 percent that you would have received in the tip pool; is that right?

A. In the morning. I mean, they would never not allow me to take it at night. But I also -- they wouldn't know, because I just would not take it.

It was not something that I discussed with him if I could do or if I did not do. It's just morally how I felt about it. Because I knew how it felt to wake up at 10:30 in the morning, probably work a double, and them make very little money. I know how that feels.

So then, when there is not much to do in the morning when I would be there, and I was not having to bus tables and was not having to do all those things, sometimes I didn't feel like I should take any money because I was not doing anything. So if I'm not doing anything, I felt like I shouldn't take it.

Q. The contrary is the true, as well. So if you did do things -- if you did put a little extra work in things, like you have in order to develop your following, you would then feel justified to take into the tip pool?

A. But it wouldn't be -- I mean, you keep trying to bring it back to my following. To me, it's about how busy the restaurant is. It's about -- I'm way more about how much those servers make than anybody in that building. That's what I care about. Because if were servers are happy, then the people will be happy.

Q. You'll be happy?

A. Well, not me. The people will be happy.

You've got to understand, sweetheart, I work in that building --

Q. I'd appreciate it if you didn't call me *sweetheart*.

A. I'm so sorry. Ma'am. I'm sorry. Ma'am, I work in that building because I like that company. I don't have to work for them. I have my own, and I do my own. I work for them because I love that company. And if we're going to sit here and talk about it, that's just who we are.

THE COURT: We're not. We're not.

THE WITNESS: All right. So, I mean, these are the same questions that I'm getting asked over and over again.

EXAMINATION BY MS. VASQUEZ:

Q. Well, the reason you love that company -- I mean, they love you and you love them so much that you got your venue for your wedding paid for?

A. Oh. I mean, I know, but I still had to pay for everything else. I to work my butt off to get that. Guess what, if anybody else in this building wanted to work as hard as me, they can do those things, and there are probably people in this world that would do things for them.

THE COURT: Let's move on.

EXAMINATION BY MS. VASQUEZ:

Q. Would it be fair to say that the other managers did not work as hard as you did?

A. I'm speaking of myself, ma'am.

Q. I'm asking you, did the other managers work as hard as you did?

A. I think everybody in the building works hard. Everyone

has a job, everyone has a title, and they are supposed to do what they are supposed to do.

Q. How many of them cooked in the morning like you did?

A. None. That was my decision. I wanted -- I wanted that.

THE COURT: Wait. Wait. Wait. One at a time.

EXAMINATION BY MS. VASQUEZ:

Q. I realize it's your decision, but what I'm saying is none of the other managers/service captains cooked in the morning like you did; is that right?

A. No.

Q. None of the other managers had following or clientele like you did; is that right?

A. I mean, Ryan had a good following and clientele, but he's just a popular person in general.

Q. Did you ever work as a captain anywhere else?

A. As a service captain anywhere else?

Q. Or as a captain, yes.

A. Or as a manager?

Q. As a service captain or as a captain anywhere else?

A. Yeah, I worked as a captain also at Palace Cafe.

Q. Did you ever work anywhere else that included managers in the tip pool?

A. No, ma'am.

Q. Is it fair to say that it was unique in that sense because you had to share -- the managers got to share in the tip pool?

A. Do I say what was unique?

Q. Yes. Would you say that the managers sharing in the tip pool was unique for Doris Metropolitan?

A. It was. I've never seen that before.

MS. VASQUEZ: No more questions.

THE COURT: All right. Do you have any other questions, Mr. Cupp?

MR. CUPP: No, ma'am.

THE COURT: Thank you. You are excused from the stand.

Let's take our morning break.

The case that I was going to have oral argument in today settled, so we'll just do our regular lunch break, unless that causes anybody any problem with planning.

Okay. All right, so we'll come back in at 10:40.

THE DEPUTY CLERK: All rise.

(WHEREUPON, at 10:23 a.m., the Court took a recess.)

THE DEPUTY CLERK: All rise.

THE COURT: Have a seat.

You all were going to let me know what you had figured out about those document productions.

MS. VASQUEZ: So as far as the document production from the plaintiff's point of view, we have reviewed our records; although, we have some employee timecard reports that we discussed with Mr. Itamar yesterday, we never got complete employee timecard reports.

We did get what the defendants showed us yesterday, which is called an *Activity Report*, which contains some data, but not all of the data that would be in the employee timecard report, which is basically the two-week time period that indicates date, the time they logged in -- the time they clocked in, the date that they worked, and how many hours they worked.

The activity report contained only the time clock punches in and punches out for the plaintiffs. So it does not contain hours. You would have to sit there and calculate several, several, several pages of hours in order just to, like, reverse engineer the data that would be readily available under the employee timecard report, which was not produced.

So, to that extent, we agree that they produced to us an activity report, which was Bates-1709 to 1760, but we do not agree that they completed -- that they produced complete employee timecard reports. We are missing all of 2014, 2013, of the employee timecard reports. So that is what we're asking for an adverse inference on.

THE COURT: So let me be sure I understand. It's the -- for what you got, if it's called an *Employee Timecard* --

MS. VASQUEZ: There isn't -- yeah.

THE COURT: -- it's for a two-week period, and includes each date, the time they clocked in and out, and the number of hours?

MS. VASQUEZ: Correct. That is an incomplete.

THE COURT: Then if you just got the activity report, that only has --

MS. VASQUEZ: Timestamps.

THE COURT: -- timestamps. So you would have to go in each day and figure out the number of hours?

MS. VASQUEZ: Correct.

THE COURT: For the employee timecards that you did get, what period did they cover?

MS. VASQUEZ: I received basically six months. It would have been December 2017 --

THE COURT: Wait.

MS. VASQUEZ: -- I'm sorry, December 27, 2014, to April 4, 2015. I am still missing 2013, January 2014 through December 27, 2014.

THE COURT: Wait. You got nothing in 2013. Then in 2014, you got --

MS. VASQUEZ: Basically the entire year.

THE COURT: Because it starts December 27th? You got three days of 2014?

MS. VASQUEZ: That's it.

THE COURT: Then in April of 2015, you got January 1 through April 4, 2015, and the suit wasn't filed until 2016?

MS. VASQUEZ: Correct. March.

THE COURT: So you're also missing --

MS. VASQUEZ: Yes.

THE COURT: -- the rest.

MS. VASQUEZ: Yes.

So just for the record, we're asking for an adverse inference under FRCP 34(b)(1)(C). The documents that were produced were not reasonably usable and were in a different format than the ones previously produced, so we could not reasonably reverse engineer all the hours coming in and out using the documents that they showed us yesterday, which we do agree they produced.

THE COURT: Did the activity report cover the entire period?

MS. VASQUEZ: It covered -- let's see, it covered the entire period, but -- I don't think it was '16. It was just '15, I think.

THE COURT: Maybe Mr. Cupp can tell me that.

MR. CUPP: I'm looking at the --

THE COURT: Come on up.

MR. CUPP: Judge, one of the concerns I had yesterday when we had the sidebar with you was that I thought a representation was being made that we had not produced a document that's Bates-1709 through 1760, at least that -- and that is what was called the *Activity Report*, with punch-in and punch-outs, from 3/27/15 through 3/12/16. Okay.

Clearly, they were produced. Plaintiff included

them in their pretrial order for exhibits.

THE COURT: They agree it was produced. But it still sounds like, even if you take the employee timecards and the activity reports, it still doesn't cover the entire period.

MR. CUPP: But they also produced payroll records from January 1st, 2014, through the time period. Right? We actually produced those --

THE COURT: For the record, what was that? 1/1/15?

MR. CUPP: Yes, 1/1/14.

THE COURT: Through when?

MS. WRIGLEY: Your Honor, the report was run through December 27, 2017, I believe. So it went from January 1, 2014, through far beyond what the statutory period would be in this case.

THE COURT: The payroll records, what did they give the -- did they have a day-by-day --

MR. CUPP: No, they're just --

THE COURT: -- how many hours, or a week by week, number of hours worked.

MR. CUPP: No, they show the -- it's the biweekly payroll.

THE COURT: Just an amount?

MR. CUPP: Well, you've seen it. It's like a ledger. You've seen it a few times through the trial.

MS. WRIGLEY: Your Honor, this is Plaintiff's Exhibit 2

that Mr. Cupp is referencing. I think it would help to pick it up from the demonstrative. One second.

THE COURT: Okay. All right. What inferences are the plaintiffs asking for? An inference that what?

MS. CATLETT: There is one other thing that we need to discuss that's missing. There were -- yesterday --

THE COURT: Come up to the podium when you get your materials together.

MS. CATLETT: Yesterday, we had testimony about these are payroll summaries. These are --

THE COURT: Payroll what?

MS. CATLETT: They are *payroll summaries* is what we've called them. They sort of look like a little miniature spreadsheet.

THE COURT: That is Exhibit --

MS. CATLETT: This is Plaintiff's Exhibit 2. They are DMNO Bates-1676 through 1694. Those only span -- those are the only things that purportedly accurately reflect overtime. Those are -- the only ones we have are from April 5, 2014, through 12/26/2014.

THE COURT: All right. So, I guess you would have to put all those things to see where they overlap and then what's missing. But so what is the inference that you're asking for?

MS. VASQUEZ: The inference that -- the inference that we're asking for is that the plaintiffs worked overtime on the

dates in which they testified they worked overtime.

The reason it's a concern for us is because we thought we had a stipulation as to the overtime amount and to the minimum wage damage calculation. I don't know if that's still the case. This was what our stipulation was from pretrial order.

So, if that is not, in fact, the stipulation still, we would like -- we would like the presumption to be that, in our demonstrative evidence, the days that they said that they worked overtime, which we have calculated, is, in fact, true.

THE COURT: So you're not saying assume every employee worked overtime every week; you're saying go to Exhibit 6 --

MS. VASQUEZ: -- and determine that those are actual days that they worked overtime based on the best evidence that we have thus far.

THE COURT: What you did was go through and find weeks that it looked like that you have some evidence that the plaintiffs worked -- each individual plaintiff worked more than 40 hours?

MS. VASQUEZ: Correct.

The additional argument is that the lack of records also go to the bad faith and the reckless disregard damages.

As you recall, bad faith determines whether or

not plaintiffs get liquidated damages, and reckless disregard determines whether or not we expand from a two-year to a three-year lookback for the filing of the suit. So it goes to the weight.

Also, the lack of records is one of the factors that case law basically says you can consider when reviewing for a bad faith and reckless disregard argument.

THE COURT: Okay. Mr. Cupp, tell us where do we have a disagreement. At this point, when we look at Exhibit 6, their demonstrative exhibit, what do you see?

MR. CUPP: Right. The ones so far through the trial that we have seen where it shows that someone maybe worked 43 hours in a week, 42 hours in a week, 40.7, I think was one, we're going to stipulate to that. That's not an issue for us.

We did produce data, Judge. We produced 76 documents --

THE COURT: But the only thing they are asking for is the ones that are shown in Exhibit 6?

MR. CUPP: I didn't understand that to be the argument prior to just now.

THE COURT: So, it sounds like we do have an agreement about -- that the individuals shown on Exhibit 6 who have hours over 40 hours a week, that they are entitled to overtime?

MR. CUPP: Yeah, we're not going to dispute that.

THE COURT: But is there still an issue about whether

it's 2.13 or whatever -- 7.50, whatever overtime is?

MR. CUPP: Well, we could look at those -- we could look at those numbers and figure it out, because it's just a mathematical formula.

Overtime for a tipped employee is 7.25 times 1.5, and then you back out the tip credit that they take. I don't know -- these numbers always get me. It's 5.36 an hour. Yes. I always forget the numbers.

THE COURT: So the amount they are owed for each hour of overtime is $5.36?

MS. VASQUEZ: I'll represent that that is the math that we did, and that is correct, the way he just described the calculation.

MR. CUPP: But, no, Judge -- that's right. The calculation is right. But we didn't -- they did get paid 2.13. So you have got to back out the 2.13, because they did get paid that.

MS. CATLETT: We believe we backed out the 2.13 in the calculation, which is why I thought we stipulated to it. But that's why I'm trying to figure out, do we have a stipulation or don't we on six, on Exhibit 6?

MR. CUPP: I haven't dug down that deep to see if they did or not.

THE COURT: Would you all talk about that during the next break over lunch, and show him how you did your

calculation, so we can reach resolution of this.

MR. CUPP: In looking at the documents, with the overtime that's been shown, it's a very limited amount.

Our concern was -- has been addressed with the issue of the, you know, adverse inference, which I thought they were trying to argue that it would be applied to everybody.

THE COURT: All right. Then we still have the issue of whether the lack of records has any bearing on whether it's bad faith or reckless disregard, but we don't --

MR. CUPP: I'm personally not aware of any cases that would say that. I would like the opportunity to brief that.

I understand the issue of bad faith and recklessness and whatnot, but I've always seen it come up in different contexts, and particularly when no documents are produced. You know, we produced a significant amount of data to you that we had at the time it was asked for.

THE COURT: Okay. Well, thank you.

But you all talk about the calculations before the day is over, and let me know.

All right. So, the plaintiff can call their next witness.

MS. CATLETT: We're going to call Zachary Adams.

THE DEPUTY CLERK: Sir, do you solemnly swear the testimony you are about to give to this Court will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

**ZACHARY ADAMS**

was called as a witness and, after being first duly sworn by the Clerk, was examined and testified on his oath as follows:

THE DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: My name is Zachary Adams, Z-A-C-H-A-R-Y, A-D-A-M-S.

DIRECT EXAMINATION

BY MS. CATLETT:

Q. Zach, when did you work at Doris Metropolitan?

A. I started in August 2014 until February 2016.

Q. For what position were you hired at Doris Metropolitan?

A. For server.

Q. Can you tell me a little bit about your prior experience --

A. Yeah.

Q. -- in the service industry?

A. Sure. In total, now, I've probably worked about 15 years in the service industry. Started in college working in, you know, chain restaurants, Jason's Deli and Joe's Crab Shack just to make a little extra money.

Then, subsequently worked in -- well, I worked in some fine dining restaurants. In New York City, I worked at Jean-Georges, which is a restaurant with Michelin stars. At

that point in time, there is only five restaurants in that category in the whole country, so it was -- it was one of the top restaurants in the world. I was a captain there for two years.

I worked at Qua in San Francisco. When I worked there, we were ranked the number 49 restaurant in the world. We were only one of five restaurants in the country that made the top 50.

Then, after that -- and in between those time periods, I've worked, you know, in several different restaurants, in between those top tier and the bottom tier, Doris Metropolitan being included in that kind of middle category.

So I've worked, you know, in New York, San Francisco, Houston, New Orleans, in the best restaurants in the world and some of the worst, and kind of everything in between, over the last, you know, 15 or so years.

Q. You testified just now that you were a captain at Jean-Georges. What was your position in San Francisco at Qua?

A. At Qua, I was also a captain.

Q. Were those two captain positions similar?

A. They were similar in some respects, you know, and different in others. I mean, obviously, each restaurant will have its own nuances.

The thing that's kind of universal about the captain

position throughout the restaurant industry is you have a section. On average, it's going to be four or five tables. You will have people beneath you. There could be one server beneath you, or there could be sometimes two, sometimes even three servers beneath you, depending upon the level of service that you have to give the guest.

So you'll typically be the one that does most of the talking with the table. You'll take the order. You'll do the wine. You're typically like the most knowledgeable, so that's why you get that position. So you know more about, like, the spirits, you know more about the food, you know more about wine. So you're the one who is doing most of the talking.

Then you're delegating to the people beneath you more of the menial tasks, like I need you to clean that table for the next course, I need you to go pour water for them.

Then, typically, you'll also be the one who takes the order, and then also processes payment for that table.

Usually in a restaurant -- I mean, it depends on the size -- you'll have three to five servers, I would say is average -- I mean, captains. The captain -- of all tipped employees, the captain is the highest position. So they'll --

Q. So the captain would get the most of the tip?

A. Yes. The captain would get the most -- the greatest share of the tip pool would go to the captain. Then, to a lesser extent, you would have, you know, the front waiter, the back

waiter, the food runner, depending upon, you know, how the restaurant breaks that down, but that's pretty standard.

Q. When you were a captain at any of the restaurants you've been a captain at, did you hire and fire?

A. No. You don't have that ability. No.

Q. Did you make schedules?

A. No. We didn't do anything like that.

Q. Did you approve schedule changes as a captain?

A. No.

Q. As a captain in the restaurants you worked at, did you have keys to the restaurant to open and close?

A. No.

Q. As a captain at the restaurant you worked at, did you perform tip reconciliation with regard to any other servers besides the ones that were on your team?

A. No, not even for the ones that are on my team. The managers did that.

Q. When you worked as a captain at other restaurants, would you count cash of other servers that were not on your team?

A. No.

Q. When you were worked as captain, did you have side work?

A. Yes.

Q. Tell me a little bit about the side work you would do as a captain.

A. It would vary, but, I mean, pretty standard stuff. You

know, polish your glasses, polish your silverware in your section, make sure that it looks proper and that everything is lined up appropriately, that there's no, you know, problem --

COURT REPORTER: Could you speak a little slower.

THE WITNESS: Yes, sorry.

Polish your glassware, polish your silverware, make sure that your section is set up appropriately. Make sure there is no crumbs, dirt, you know, that the tablecloths are clean, they don't have any stains on them.

Make sure that, you know, some of the behind-the-scenes stuff is set up. The coffee station is set up. The section with -- in the industry, we call it *mise en place*, which is a French term that means everything in its place. So you would have like a little plate with your silverware you're going to use for the night. You would have some of these things, just to make sure that you're set up for success and that you're not scrambling, you know, once the actual dinner service begins.

So it would be things along those lines and, you know, some other things that, you know, just for the sake of brevity, I won't get into. You know, filling up of ice buckets, so that way, if somebody orders champagne, you have that ready, you know, things of that nature.

EXAMINATION BY MS. CATLETT:

Q. Would you ever decide when you were a captain when other

servers went home?

A. No, you don't have that ability as captain.

Q. Is it safe to say that in your significant restaurant experience, you've worked with several different types of managers?

A. Yeah. I mean, typically, the word *manager* is kind of ubiquitous, but within that category there will be different classifications. So, like, for example, when I got hired at Doris Metropolitan, I was hired by somebody with the title of service director. That means they were manager, but their primary focus was service. So they would be greatly involved in servicing the tables and making sure --

Q. That was at what restaurant?

A. This was at Jean-Georges.

So their role would be more service oriented. You might have another manager who -- there was a manager there named John, who was also a manager. Unlike the service director, he was more involved in making the schedule and -- you know, dealing with scheduling and payroll. There would be another manager who would do something else.

So, depending on the restaurant, the size, the needs, you know, there would be different titles. There would be different positions. Different managers would focus on different aspects of the restaurant. One might be more service oriented. One might be more clerical. It depends.

Breaking it up in that way makes it more efficient than having, you know, one or two people trying to do everything.

Q. Were any of those managers ever included in a tip pool?

A. No, they were never included.

Q. Who were the managers at Doris Metropolitan during your tenure there?

A. There was Stavros. I started, like, a few days before Stavros left. Then Alise. Then it was Ryan O'Dwyer. Then it was Dontay Kinchen, and then Melissa Rogers.

Q. I think you pretty much worked with everybody, it sounds like?

A. Yeah, I guess so.

Q. Were they included in the tip pool?

A. They were all included in the tip pool, yeah.

Q. Did they hire and fire?

A. Yes.

Q. Did they control the schedule?

A. Yes.

Q. Approve schedule changes?

A. Yes.

Q. Did they control meetings, the content, attendance?

A. Yeah. The Monday meetings, they were conducted by a manager, or Buck, or sometimes even some of the servers would participate.

Then the pre-shift meetings were always led by the manager. Whoever the manager was for that shift would lead the pre-shift meeting, which would be going over, you know, specials, if we had key guests coming in, if there were some things that had been lacking in service that they wanted to discuss with us, that we can improve upon, anything of that nature.

They would do periodic evaluations of the servers and service assistants. So there is a period of time when, like, Melissa Rogers and Ryan O'Dwyer would sit down with the servers and server assistants individually and go over with us, you know, how we had been doing, what we could improve upon. You know, just kind of like a standard evaluation that a manager does of their employees on a yearly basis, I guess.

Q. There have been some questions that have been asked with regard to whether or not managers changed your hourly rate of pay. What was your hourly rate of pay at Doris Metropolitan?

A. The hourly rate was the 2.13.

Q. Have you ever worked in a restaurant where people were given a raise on 2.13 an hour as a server?

A. No, not that I can recall. I mean, in different cities, the minimal wage laws are different. So, you know, that wasn't an arbitrary decision that was made, though. That was based upon the government in that locale, so.

Q. Is it safe to say that if someone is becoming more

proficient in the service industry, that the way to give them a raise would be to give them a different position, for example, from server assistant to server?

A. Yeah. That's pretty standard.

Q. At Doris Metropolitan, did the managers make decisions about moving people from server assistant to server?

A. Yes. It appeared as though they did.

Q. Did the managers at Doris Metropolitan decide who was assigned to what section?

A. Yes, as far as I know.

Q. Were the managers ever assigned to a section at Doris Metropolitan?

A. No, the managers didn't have sections, the servers did.

Q. Did the managers provide table service to every single table at Doris Metropolitan?

A. Not every table. That would also vary, depending upon who the manager was, to what extent the table interaction would be.

So, you know, Dontay testified to being highly involved in tables, and that was true. Dontay -- I'm not -- Dontay was very involved in the guests and the guest experience. You know, in a different restaurant, he would probably have the title of, you know, service director or something like that, like I mentioned at Jean-Georges, where your role is to be very involved in the service.

Did he touch every table? No, that's not possible.

There would be occasions -- you know, Dontay said that he was highly requested and had a lot of friends. So, if one of his friends came in, and they had a big party, and he was, you know, pouring wine for them and, you know, spieling with them and doing his thing, then, you know, obviously, he wasn't able to attend to the guests in the other dining room because he was occupied with some people who he was giving, you know, the experience to.

Melissa was not particularly involved in the tables. You know, you kind of had to -- she's a little bit more, you know, passive. Her personality wasn't as gregarious as Dontay's, so you had to kind of coax her to go talk to the guests.

Ryan O'Dwyer was a bit more personable. You know, so it kind of was a case-by-case basis. Some were involved more than others, but they didn't obviously talk to every single table in the restaurant.

Q. So regardless of the level of table service or the number of tables that they interacted with in any given night, each of the people that you just mentioned that were managers at Doris Metropolitan, Melissa, Ryan and Dontay all still participated in the tip pool?

A. Yeah, they were all in the tip pool regardless.

Q. Did you ever hear the term *service captain* while you were working at Doris Metropolitan?

A. The first time I heard that word in my entire life was yesterday morning. So, obviously, no, I've never heard it at Doris Metropolitan. I've never heard it in any restaurant I've ever worked in or heard of.

Q. Can you tell me a little bit about Itai's role?

A. Itai. His role would change. When I first started, he was more involved. The managers weren't as strong as they became later, so he was more present and more involved in things.

As time went on, you know, he would leave for periods of time. He might go to Costa Rica for a few weeks. He might go to Israel. There was a period of time that he was going to different cities around the country scouting for new restaurant locations. You know, during those times he wasn't there at all.

Then once, you know, Ryan -- really, once Ryan O'Dwyer took over and then Melissa, there was more continuity in the managerial position. So, I mean, they would pretty much run the show. He would -- you know, he would come and go, and then he would have his meetings with the managers to talk about things.

But it was kind of like a macro capacity, you know, like the big picture overview. Not real involved in, like, talking to a guest that had an overcooked steak, for example, no. I mean, like Dontay or Melissa or one of the managers

would do that. Itai was more, you know, walk around in a suit, you know, spiel, shake some hands, you know, kind of like. What he was doing behind the scenes, I don't know, but as far as, like, my perspective, that was kind of what he -- you know, once the managers became better, that's kind of what he was doing.

Q. Was the service style at Doris Metropolitan unique?

A. I wouldn't say it was unique in any way. I mean, it's a well-run steakhouse.

Q. Was the level of service unique?

A. No. I mean, it's all relative, you know. I mean, I can't speak for everyone. If you've had certain restaurant experience, then for you Doris might be the best service that you've seen.

I've worked in two of the best restaurants in the world. For me -- I mean, Doris is obviously not comparable to that. I mean, the expectation level of the guest is completely different. The ambiance is totally different. The amount that people are spending is a fraction of what they would be spending in one of those other restaurants. So, for me, no, it's nothing -- there is nothing exemplary about it.

For what it was, for a steakhouse in the French Quarter, I think it was great. Compared to some of the best restaurants in the world or, you know, even locally, someplace like Restaurant R'evolution or something like that,

no, I mean, it's not on that level, but, you know, it is what it is. I mean --

Q. What was unique about Doris Metropolitan?

A. Well, managers being paid with tips was unique. I've never seen that anywhere before.

Q. Did you ever raise concerns about managers being included in the tip pool at Doris Metropolitan?

A. I mean, I spoke to most of the managers about it. I spoke to Ryan O'Dwyer, I remember. He kind of brushed it off. You know, he said that -- and this is hearsay, I don't know if it's true or not -- he said he spoke to them, and they kind of --

MR. CUPP: Objection. Objection.

THE COURT: All right. So, you were about to say what Ryan O'Dwyer told you?

THE WITNESS: Yeah, correct.

THE COURT: In his position as either a manager or a service captain?

THE WITNESS: He was a manager, yeah.

THE COURT: Okay. The objection is overruled.

THE WITNESS: He said that he spoke with them, and that it was just kind of brushed off, like it wasn't an issue.

Then the only time I brought it up with Itai or Itamar directly was we were talking at one time about -- they were considering opening a restaurant up in New York, and we were kind of brainstorming about it. I said, "You know, if you

go to New York, you won't be able to have the managers in the tip pool because people won't go for it up there."

The reason that I said that was because in New York and others -- Chicago, Los Angeles, you know, the servers are a lot more aware of their rights. They are a lot more educated about what the laws are. There's also a lot more attorneys who are familiar with the law who are ready to litigate. It's just a different culture than it is down here, unfortunately.

So I knew, having worked in New York, like, if a servers sees a manager in the tip pool, automatically they are going to be like, no.

Quite frankly, I knew you couldn't do it down here, but, you know, people down here don't really know what their rights are as much. There is not as much of a system in place to deal with those things as they arise. So I didn't know if anything would come of it. I guess that's just being kind of jaded.

But when I brought it up to them with regards to the New York place, they just kind of, you know, brushed me off, like, you know -- changed the subject quickly. You know, like we're not going to go there.

EXAMINATION BY MS. CATLETT:

Q. But either time after you brought it up, did anything change about manager inclusion in the tip pool?

A. No. Nothing changed.

Q. Did managers' duties change after you brought that up?

A. No, the managers always acted in a managerial capacity from the duration of my tenure there.

Q. Then I want to take some time to go over some of the payroll records that were submitted to us.

Have you had an opportunity to review all of the payroll records that were submitted?

A. The ones that you showed me, I reviewed.

Q. The first one is under Exhibit 2, the payroll records. Plaintiff's Exhibit two. This is DMNO 1048.

MS. CATLETT: He's going to stipulate to that.

MR. CUPP: There are some hours that are over 40 in a week for Mr. Adams.

THE WITNESS: My name is Adams.

MR. CUPP: I knew your first name was Zach.

So we won't have to go through this exercise.

THE COURT: So you're stipulating that he also has some hours --

MS. CATLETT: Some overtime hours.

MR. CUPP: Based on the records that we have.

THE COURT: Is that based on your Exhibit 6 demonstrative --

MS. CATLETT: It is in Exhibit 6, yes, ma'am.

THE COURT: So you've stipulated to that, the

defendants have.

EXAMINATION BY MS. CATLETT:

Q. Since we're going to stipulate to this, this is from our Demonstrative Exhibit 6. It's Black 100 and 101. This is the spreadsheet of damage calculations for Zachary Adams.

So, Zach, can you see this and see what week this started?

A. August 22, 2014.

Q. Is it safe to say that that was the beginning of your tenure at Doris Metropolitan?

A. That was the cessation of my first pay period, yes.

Q. Then do you see the overtime columns?

A. Yes, I do.

Q. You see where one week you had 2.5 of overtime?

A. Yes.

Q. Another week you had 1.52?

A. Yes.

Q. Do you feel like that's an accurate representation of overtime that you worked at Doris Metropolitan?

A. As far as I can determine sitting here right now, I mean, sure.

Q. We based your damage calculation -- and this is on that second page, this is Black 101 -- we based it on the overtime that was due to you. It does have -- this particular thing has the Monday meetings added in.

A. Okay.

Q. Would you agree that the amount, $12,270.43, is an accurate representation of your damages?

A. Yes, the best of my knowledge.

Q. The $6.41 that's on here, that's in the overtime column. Would you say that that's correct for the amount owed to you for -- I think it was 1.7 hours overtime?

A. As far as I know, yes.

Q. 1.77 hours.

Then, just for the record, did you -- did Doris Metropolitan hold mandatory meetings on Monday?

A. Yes.

Q. By mandatory, did that mean that you were supposed to show up for the meetings, regardless of whether or not you were scheduled to actually serve that night?

A. Yes.

Q. Were those held every Monday?

A. 95 percent of the time.

Q. Did you go to every one that you were supposed to go to?

A. I went to probably 95 percent. I may have missed one here or there, you know, doctor's appointment, something like that.

Q. How long would those typically last?

A. An hour to hour and a half.

Q. Did you clock in for those?

A. I remember clocking in -- typically, I would say yes. Not

a hundred percent of the time, but usually I would try to.

Q. Do you know if you were ever paid 7.25 an hour for those?

A. I never checked.

Q. Was there any opportunity to earn tips --

A. No.

Q. -- during those mandatory meetings?

A. No.

MS. CATLETT: That's it for me, Your Honor.

CROSS-EXAMINATION

BY MR. CUPP:

Q. Good morning, Mr. Adams. My name is Steve Cupp.

You've been sitting in the audience through yesterday's testimony and today's testimony, correct?

A. Correct.

Q. You've heard everybody testify in this?

A. Yes.

Q. A minute ago -- well, you testified about working in New York and Chicago, correct?

A. I never worked in Chicago.

Q. I'm sorry, San Francisco?

A. Correct.

Q. Do you know what the laws are in New York dealing with tip pooling?

A. Off the top of my head, I'm not going to recite what the law is. I know, from the Department of Labor nationwide, there

are certain regulations that determine who can and cannot be in a tip pool. That applies, you know, nationwide, so.

Q. There are also state laws, right? You've been in the restaurant business long enough to know that state laws come into play, right?

A. Sure.

Q. You don't know what the state law is in New York, do you?

A. I don't know them off the top of my head.

Q. You don't know the state law in California, do you?

A. I don't know it.

Q. How big were the restaurants that you worked in, compared to Doris, in New York and San Francisco?

A. Insofar as like square feet or number of guests that we --

Q. Let's say number of -- number of tables.

A. Well, those two restaurants specifically, the one in San Francisco was smaller. I don't know, maybe half the size. The restaurant in New York was the same size or slightly larger.

Q. Than what?

A. Doris Metropolitan.

Q. You said that in the restaurants that you worked in you would have servers beneath you, correct, working as a captain?

A. Yeah. As part of your team, you would typically have a captain, then a front server, and then a back server. That's how it was at Jean-Georges.

There was also food runners that ran the food to all the different tables, and there was a sommelier, so, yeah.

Q. As a captain, you would direct the servers and server assistants as to what to do in order to provide the table service that you think your customers deserve, right?

A. Yeah, you were kind of like the leader. Everyone knew what their roles were, and they performed their roles; but, also, if you were a good captain, then you were able to delegate efficiently. If you were a bad captain, then they didn't respect you, then they might not really necessarily listen to you as much.

Q. All right. But as a captain, that was your responsibility is to direct that team to maximize the service and to maximize the tip, right?

A. I think that's pretty accurate.

Q. I think you used the term a minute ago that in your experience in the restaurant industry, that the term *manager* is -- you said ubiquitous? Is that the term you used?

A. I believe so. Yeah.

Q. So to you, what does that mean?

A. What that means is that you can call a manager a service director, or you can say floor manager, or you can say, you know, different things; but, there is a common knowledge of what a manager is and what they do.

A manager is somebody who -- you know, if you want me

to elaborate on it, a manager is somebody who has an authority. They have the ability to discipline people. They have the ability to have meetings with people about their service. They have the pre-shift meetings. They set schedules. They hire. They fire. They him have keys to the restaurant. They perform managerial tasks.

Q. Sort of the things that you've heard through the testimony in the last couple days?

A. The sort of things that I've experienced in my 15 years in the service industry.

Q. Have you ever worked as a manager?

A. No.

Q. At Doris Metropolitan, server assistants, SAs, were they paid 2.13 an hour?

A. I don't know.

Q. In fact, they were paid 5.50 an hour, weren't they?

A. I don't know.

Q. Would it surprise you to know that that's a stipulated fact in this, that they were actually paid --

THE COURT: He just said he doesn't know anything about it.

EXAMINATION BY MR. CUPP:

Q. During the Monday meetings -- you actually engaged in putting on some of those Monday meetings, didn't you?

A. Yes, I assisted.

Q. You were acting in a server capacity, correct?
A. As a server, yeah.
Q. Can you explain for the record what you would do, what your function would be in those Monday meetings?
A. In what Monday meetings specifically?
Q. Well, the mandatory Monday meetings that you led?
A. That I led. So, typically, the Monday meetings were led by either Buck or Melissa. They were based on wine.

I led -- I took the lead on one meeting, I can remember, talking about cocktails, and just going over some of the basics of cocktails and spirits.

I also led a meeting that I can remember about service, just like some of the finer points of service, based upon my experience, just as a way to, you know, just educate my colleagues and try to raise the level of what we were doing.
Q. You would train others?
A. No, I wouldn't train anybody.
Q. You didn't have any functions as to servers or other servers or other server assistants in training, how they did their job?
A. No.
Q. Did you speak in pre-shift meetings?
A. Yeah, everybody did.
Q. Servers spoke and server assistants spoke, if they wanted to?

A. Servers spoke, server assistants spoke.

I mean, we would typically assign, like, a bottle of wine or a region to a server. They would research it. Then, as part of the larger pre-shift meeting -- which, you know, the pre-shift meetings had certain things that were always there. Always there was the manager telling us how busy we were going to be that night, what sections we were going to be in, going over any points of service that we needed to do discuss, telling us about any specials or anything that we're out of.

Then, a subset of that larger meeting would be sometimes a server would present, you know, I researched this bottle of wine, and this is something to know about. So then we could gain that knowledge and pass that knowledge along to the customer.

Q. So the meetings were meant to enhance the service that the customer is going to have when they come into the restaurant?

A. That was one part of the meeting, correct.

Q. Better service, happy customer, hopefully higher gratuities?

A. That's how restaurants work.

Q. Of course, the focus on customer service at Doris was what you would expect from a restaurant where you're going to go in and spend a high-end dollar for a steak, right?

A. Yeah. I mean, I think it's one of the most expensive restaurants in the city, and people expect to get good service

when they go there.
Q. They expect service from everybody in the restaurant that's working, including the service managers, correct?
A. I don't know when the expectation of each guest is, but...
Q. Well, you would certainly expect it, wouldn't you, from the service managers to engage in the table, to make sure that customer is having the best experience they can have?
A. I would expect the service manager to make sure the guest was having a good experience in any restaurant I worked in, of course.
Q. Just to clarify this point. I was a little confused about it. Did you actually work with Stavros?
A. So when I got hired, I was sat down with Stavros and Itai both. Then I think I worked maybe one shift with him, maybe one or two shifts.
Q. Earlier I think you had mentioned that you -- I was under the impression, anyway, you worked a considerable amount of time with Stavros?
A. No, that's not true.
Q. Maybe one shift?
A. One, two shifts. It wasn't long.
Q. That was back in which year?
A. 2014.
Q. That's right. You had began around, I think, August 9th?
A. In the very beginning of August, yeah.

MR. CUPP: I don't have anything further, Your Honor.

THE COURT: Any redirect?

MS. CATLETT: I don't have anything, Your Honor.

THE COURT: All right. Thank you. You're excused.

All right. Plaintiff, please call your next witness.

MS. CATLETT: David Pierce-Feith.

THE DEPUTY CLERK: Sir, do you solemnly swear the testimony you are about to give to this Court will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

**DAVID PIERCE-FEITH**

was called as a witness and, after being first duly sworn by the Clerk, was examined and testified on his oath as follows:

THE DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: My name is David Pierce-Feith, D-A-V-I-D, P-I-E-R-C-E, hyphen, F-E-I-T-H.

DIRECT EXAMINATION

BY MS. CATLETT:

Q. David, when did you work at Doris Metropolitan?

A. I started in November of 2014, and left, I believe, in the beginning of March 2016.

Q. For what position were you hired?

A. Server.

Q. Who hired you?

A. Ryan O'Dwyer hired me. He actually hired me before we even sat down. I walked into the restaurant. I saw Konrad Kantor, who was the bar manager at the time, and whom I had known briefly. He greeted me joyfully. I handed him my resumé and said, "I'm looking for a job."

He said, "Well, let me introduce you to Ryan." He gave Ryan my resumé, had a quick word with him. Ryan walked me into the private dining room, and, before we sat down, he said, "Well, you're hired. We're just going to have a conversation."

Q. How long after that conversation did you start working there?

A. The next day. Maybe two, three days.

Q. How long was it after you started working before you met Itai?

A. It wasn't the first couple of days. Within the first week.

Q. During your conversation with Ryan O'Dwyer, did he let you know what his position was at Doris Metropolitan?

A. He was the manager.

Q. During your conversation with Ryan O'Dwyer, did he stop to text or call anyone for approval to hire you?

A. No.

Q. Tell me a little bit about your prior service industry experience.

A. I've been working in the restaurant industry for 30 years. I started -- I started as a four-year-old in my mother's restaurant cleaning spinach. But, as far as professionally, in my late teens. I started working in a little deli. Then I started at TGI Fridays after that. Then, just continued to work in restaurants around the nation.

In New York City, I worked for Jean-Georges' V Steakhouse, Michael's, Del Frisco's, Capital Grille. I worked in San Diego. I worked here in New Orleans at a bunch of restaurants, the Windsor Court, Doris, K-Paul's.

Q. In your significant experience, have you ever had the opportunity to work in the capacity of a captain?

A. Yeah, in New York. I was a captain at both Michael's and at Jean-George's V Steakhouse.

Q. When you worked as a captain, who worked on your team with you?

A. You had a series of back waiters, SAs. Runners were part of the extended team. At some places, there were polishers or a tea person or coffee person.

Q. Do you remember what your hourly pay was when you were a captain?

A. I don't. It was in New York. The pay rate was higher. But it was whatever the federal minimum was -- or the state minimum.

Q. When you worked as a captain, what were your duties?

A. Your primary duty was to manage your section. It meant greeting every table, delivering the specials, discussing wine, taking the order, inputting the order into the computer system, maintaining the table, cleanliness, maintaining the level of wine in each glass, assuring that food arrived promptly and as it should, clearing the table or managing the clearing of the table, delivering the check.

Q. When you worked as a captain, did you have the authority to hire and fire other employees?

A. No.

Q. When you worked as a captain, did you make schedules or approve schedule changes?

A. No.

Q. When you worked as a captain, did you ever have keys to the restaurant in which you were a captain?

A. No.

Q. When you worked as a captain, did you ever perform tip reconciliation for other servers?

A. No.

Q. As a captain, did you ever count cash of other servers?

A. No.

Q. When you worked as a captain, did you have side work that you had to perform?

A. Yes.

Q. What type of side work would you do?

A. You would polish your station. At those places, the glassware was extraordinarily expensive, so you had to make sure it was pristine. That took a lot of time.

Maintaining your section, making sure that the section and the restaurant were set up for the next shift, if it was the end of the shifts; side work at the beginning, make sure you had everything you needed to get through the night.

Q. When you worked at Doris Metropolitan, who were the managers that you worked with?

A. I worked with Ryan O'Dwyer and Melissa Rogers and Dontay Kinchen. Then, briefly, Gilford, I guess, was there, as I was leaving.

Q. That would have been March of 2016?

A. Yeah, I think so.

Q. Were the managers that you just mentioned, Ryan, Melissa and Dontay, included in the tip pool when you worked at Doris Metropolitan?

A. They were.

Q. When you worked at Doris Metropolitan, did the managers you just mentioned hire and fire?

A. Yes.

Q. When you worked at Doris Metropolitan, did the managers you just mentioned control the schedule?

A. Yes.

Q. Did they approve schedule changes?

A. Yes.
Q. When you worked at Doris Metropolitan, did these managers handle cash of other servers?
A. Yes.
Q. Did they have keys to the restaurant to open and close?
A. Yes.
Q. Did they decide who was assigned to what section?
A. Yes.
Q. Did they provide table service at every single table?
A. By table service, I'm assuming you mean an extended period of care, not just stopping at a table and checking up on a guest?
Q. I would agree with that.
A. Then, no.
Q. Did the managers at Doris Metropolitan perform more table service than other managers you've worked with?
A. No.
Q. Did you ever receive an evaluation, performance evaluation at Doris Metropolitan?
A. Yes.
Q. Who performed that?
A. It would have been Ryan O'Dwyer or Melissa Rogers.
Q. Did you ever hear the term *service captain* while working at Doris Metropolitan?
A. Never.

Q. Do you think that -- was the service style at Doris Metropolitan unique?
A. No. It went standard, front waiter, server assistants.
Q. Was the level of service unique?
A. The level of service was standard good service.
Q. Would it be more than any other restaurant you worked at?
A. It would be different. Each restaurant has its own specifics and needs. But it isn't higher or lower of that strata of restaurant care of a steakhouse level.
Q. Was there anything particularly unique about Doris Metropolitan?
A. The fact that the managers took our money for a tip-out was absolutely, if not unprecedented, rare and illegal.
Q. Did you raise concern over that ever?
A. When I was hired, Ryan O'Dwyer and I sat down, as I described. He described the tip-out procedure: 25 percent to the SAs, 10 percent to the managers. I said, "Well, that's a savings account I won't be touching for five to ten years." He said, "I know."
Q. Just briefly, I want to talk a little bit about the handling of cash tips. We're not going to go through every single server check-out sheet. But describe for me how cash tips were handled at the end of the night.
A. Cash tips were calculated as per the check-out sheet you saw. There was the number of servers there, the number of

server assistants, the managers. It would be distributed in that same formula as the charged tips, but it wasn't listed anywhere. It was just done by the manager on duty.

Q. Where were cash tips kept?

A. They were kept in a drawer, folded bundles with not even people's names on it. It was just names on an envelope with every time that someone took their money their name would be scratched off.

Q. When someone would come back to get their cash tips, if they decided not to wait the night before to get them on the night that they worked, would they have to find a manager to come and unlock the drawer to get the tips?

A. The drawer didn't have a lock. It certainly was never locked, as far as I recall. My recollection is that they would ask the manager for their tips from the night before or two nights before or what have you, and then the manager would hand it to them.

Q. Could anyone who knew where that drawer was open the drawer and get the tips out?

A. They absolutely could.

Q. Then, just briefly, because we have stipulated to overtime -- you did have little -- I'm going to just go over this.

This is from our Demonstrative Exhibit 6. It is Black 88 and Black 89. These are the damage calculations for

David Pierce-Feith.

David, do you recall reviewing this with us?

A. I do.

Q. Would you just let us know what -- does the top date, 11/14/2014, correspond with your beginning work at Doris Metropolitan?

A. It does.

Q. Do you see in the overtime column where on May 1st, 2015, you had -- that pay period, that week, you would have had 2.85 hours of overtime?

A. I do.

Q. Would you agree that that calculation, based upon the way we discussed earlier that it was supposed to be calculated, your unpaid overtime would be 10.32?

A. Yes.

Q. Then later, towards the bottom, on September 18, 2015, would you agree that you had 1.18 hours of overtime?

A. I do.

Q. Would you agree that the calculation for that amount of overtime would be 4.27?

A. Yes.

Q. Then this is on Black 89, the second page. There is no additional overtime.

Would you agree that your damage calculation is $10,266.91?

A. Yes.

MS. CATLETT: That's it for me, Your Honor.

CROSS-EXAMINATION

BY MR. CUPP:

Q. Mr. Pierce-Feith -- that's the correct pronunciation?

A. That's correct.

Q. -- have you ever worked in a pooled house before?

A. I have.

Q. Where was that?

A. At Michael's, at V Steakhouse, Jean-Georges' V Steakhouse, at K-Paul's. We worked team tip pool at Bayona. We worked tip pool at the Windsor Court.

Q. I'm talking about a pooled house, though, where all the servers shared equally in whatever was generated --

A. With the exception of Bayona, the other ones I mentioned, yes.

Q. So they ran the same way as Doris Metropolitan?

A. Not the same way.

Q. But all the servers shared equally in the tips that came in?

A. Yes.

Q. I'm not going to spend a whole lot of time on this, but just to make sure that I understood you correctly, if there is five servers working in a restaurant, the five servers at Doris, they are going to share 65 percent of the tips, and

everybody gets the same thing?

A. That's how it worked at Doris, yes.

Q. Had you worked at a restaurant that had that type of tip pooling?

A. That has had tip pooling, yes. Different percentages, perhaps. Certainly different people that were part of the tip-out portion of the pool.

Q. When you worked as a captain, you said you were in New York?

A. Correct.

Q. You were directing the -- the people underneath you --

A. Was I directing them; is that what you're asking me?

Q. I think that was my question.

A. I'm just looking for clarity.

Q. Yes.

A. They all had their responsibilities as parts of the team. I was the lead of that team. I might have requested a server assistant or a back waiter to focus on this table or that table, but I never had much control over what they did. They were good members of the team. They knew what to do.

Q. But it is your responsibility to make sure that the team --

A. I was responsible for the team being successful, yes.

MR. CUPP: No further questions, Your Honor.

THE COURT: Any redirect?

MS. CATLETT: No, Your Honor.

THE COURT: All right. Thank you. You're excused.

All right. Plaintiffs, please call your next witness.

MS. VASQUEZ: We have no more witnesses, but we need a few minutes to decide if we're ready to close. We don't have any witnesses yet, but I need at least five minutes to consult with Laura to make sure we've got it covered.

THE COURT: Why don't we take our lunch break now. You all are going to talk about the calculation and if you can agree on that and get organized.

The defendants can get ready to present their case this afternoon.

So we will come back at 12:40.

THE DEPUTY CLERK: All rise.

(WHEREUPON, at 11:36 a.m., the Court was in luncheon recess.)

* * *

**P-R-O-C-E-E-D-I-N-G-S**

TUESDAY, JUNE 5, 2018

A F T E R N O O N   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK: All rise.

THE COURT: Be seated. Does the plaintiff have any additional evidence?

MS. VASQUEZ: We would like to submit the excerpts for Tiffanie Campbell at this point.

THE COURT: All right. Give them to my courtroom deputy.

MS. VASQUEZ: We have a stipulation for Exhibit 6.

THE COURT: All right.

MS. VASQUEZ: For Exhibit 6 the parties will stipulate that the Monday meeting damages are $1,124.44.

THE COURT: That's for all named plaintiffs?

MS. VASQUEZ: All named plaintiffs.

THE COURT: Is that correct, Mr. Cupp?

MR. CUPP: That is.

We've also discussed that we're, obviously, not stipulating to the liquidated damages factor or anything to that. It's just a number that we were able to, after the testimony, able to compromise on.

THE COURT: All right. So the defendants are not making a claim that there should be a setoff against that of any of the compulsory tips or anything?

MR. CUPP: No, ma'am. Not on this.

THE COURT: Okay. All right.

MS. VASQUEZ: Just for the record, I want to make sure, before we close, that there is this stipulation to the calculated amount for the minimum wage and the overtime, which I think we do have stipulations on, but I just want to make the record clear --

THE COURT: We just stipulated to that overtime, right?

MS. VASQUEZ: I'm just making sure.

THE COURT: Don't ask about that again.

MS. VASQUEZ: The minimum wage as well. That's the bigger number, $87,765.98.

THE COURT: $87,765, 98.

Okay. Mr. Cupp, what's your position?

MR. CUPP: Our position, Judge, that's a stipulation as to the number itself. What's different between the stipulation and the number itself and the stipulation that we made on the overtime is that we are agreeing that we owe this -- I'm sorry, excuse me, the Monday meetings -- but we're not, obviously, agreeing --

THE COURT: You do not agree as to liability. Just if you are liable, that's the amount?

MR. CUPP: (Nods head affirmatively.) Correct.

THE COURT: What I see that's left is for me to decide whether the managers/service captains were enough managers to violate the tip rule and then whether there was the recklessness of FLSA.

MR. CUPP: I think that boils down to the issues, Judge. Of course, we would ask that we would be allowed to brief that. I think you indicated that we would.

THE COURT: All right.

MS. VASQUEZ: Just to clarify the record, you said if there were enough managers, but if there were enough servers to participate in the tip pool, not managers. You said if there were enough managers.

THE COURT: Oh, I meant if they had enough manager responsibilities.

MR. CUPP: Functionality.

MS. VASQUEZ: Yes, as whether they should have been in the pool.

THE COURT: Such that they should not have been in the tip pool. That's the issue.

MR. CUPP: I think that's where the rubber hits the road.

THE COURT: Okay. All right.

MR. CUPP: Judge, one thing I would like to mention about the flow chart that we were working on today, I was able

to, of course, have Itai and Itamar look it over. One thing we would like to put on here is below Melissa -- Melissa was made a general manager in September 2017.

Shortly thereafter, they hired an assistant general manager. His name is Travis Sauvain S-A-U-V-A-I-N. He -- we think it's October/November 2017. We don't have a precise date on that, but that would make, as it stands today, that would make this flow chart at least more accurate.

THE COURT: For the record, what Mr. Cupp is referring to is a diagram that I put together to help me understand the testimony with respect to who the managers were, who the service captains were, who the servers were and the time period, which is just for my use, but thank you for looking at it to tell me.

MR. CUPP: I wanted to make sure it was accurate.

THE COURT: Thank you, but otherwise it looked in the ballpark.

MR. CUPP: Yes, in the ballpark for sure.

THE COURT: Okay. I'm saying that because sometimes the testimony was a little -- people's memories were not exactly clear about exactly what day they started or stopped, or maybe there were people on this chart that didn't testify so I don't know the exact dates. I think that you all reflect I've pretty much got the time frame correct.

MS. VASQUEZ: At this time, the plaintiffs will close.

THE COURT: All right. Thank you.

All right. Now, Mr. Cupp, the defense can call its witnesses.

MR. CUPP: Your Honor, we are going to have one witness, and it's going to be Mr. Ben Eli.

I know in most cases we would move for a directed verdict on various issues in the case. We understand that you're, in all likelihood, going to take this matter under advisement and let the parties brief the issues, but I just want -- if that's the way you want to go, that's fine.

Obviously with us, we could make an argument on the record to preserve it, at least with respect to the liquidated damages and the two- or three-year willful violation, but as long as I would have the record protected, then we would --

THE COURT: Why don't we, if the plaintiffs are in agreement's, that we consider it as your having made a motion with respect to liquidated damages and bad faith and that what I'm doing, I'm going to defer it and allow you to do posttrial briefing on that issue.

Any objection?

MS. VASQUEZ: No objection.

MR. CUPP: Then we call Mr. Ben Eli to the stand.

**ITAI ELIRAN BEN ELI**

was called as a witness and, after being previously duly sworn

by the Clerk, was examined and testified on his oath as follows:

THE COURT: Mr. Eli, you continue to be under oath.

THE WITNESS: Yes, ma'am.

MR. CUPP: May I proceed, Your Honor?

THE COURT: Yes.

EXAMINATION BY MR. CUPP:

Q. Itai, I want you to explain to the Judge where you began your restaurant career and how it began.

A. My restaurant experience started right after I finished my mandatory military service back in Israel. The end of 2005 I started bartending at a local restaurant as a side job, just to, you know, save some money maybe for a trip or something like that.

I immediately fell in love with the work environment of a restaurant, and my supervisors at the time thought also that I'm very good at it. So I got slowly promoted to be -- first I was shifted to be a server and then sort of like a supervisor, and then I was managing a restaurant.

Q. Where was this?

A. That was in the northern part of Israel where I'm from.

Q. What city are you from?

A. I'm sorry.

Q. What city?

A. It's called *Hatzor HaGlilit*. It's H-A-T-Z-O-R, second

word, H-A-G-L-I-L-I-T.

Q. How did it come to where you were operating your own restaurant?

A. I'm sorry?

Q. How did you get to the point where you were running or owning your own restaurant?

A. Well, at that time I was promoted to be the restaurant manager, and that company, who is now my business partner, Dori, was the owner, and they promoted me to, actually, run two restaurants at that point of time. Then the restaurant was sold -- was sold to the competition, but at that time I was managing two restaurants.

Q. What was name of the restaurant?

A. Doris, D-O-R-I-S, Katzavim, K-A-T-Z-A-V-I-M, which means Doris Butchers.

Q. That's the translation?

A. The translation.

Q. What year was that?

A. That was -- we were in 2008.

Q. When the restaurant was sold?

A. That's where the restaurant was sold, correct.

Q. So what was your next restaurant venture?

A. My next restaurant venture was opening my own restaurant together with Dori and Itamar, both of my business partner, a restaurant in Costa Rica.

Q. When did that restaurant open?
A. 2009.
Q. What was the name of that restaurant or what is the name of that restaurant?
A. It's still there, yeah. Doris Metropolitan, the same name that we have here in New Orleans.
Q. Okay. What is the style of restaurant?
A. Well, in both restaurants the style is providing high-end experience overall of service and food to our guests, something that would be extraordinary.
Q. Is that how it started in Costa Rica?
A. Yes.
Q. I think just as background information, it's an Israeli -- is it fair to say it's an Israeli-inspired steak house?
A. Definitely. Our dishes are nontraditional than you would see in a regular steak house.
Q. How did it come that you found New Orleans as a home for another in restaurant?
A. We were looking for expansion. Three years after the restaurant in Costa Rica started, it was very successful. We wanted to reach another restaurant and started to look. Our customers encouraged us, our customers in Costa Rica encouraged us to open one in Miami where they had summer homes, saying they will support us, and we were looking for a venue in Miami.
At that time Dori, our partner, took a car from

Itamar's place in Los Angeles and drove to Miami. On his way he stopped in New Orleans for a few days. You know, he heard about the city. He really fell in love with the city and called all of us to come check it out, and he thought, and so did we, that it would be a much better fit for us than Miami, so we liked the city and decided to go for it.

Q. So in Costa Rica -- I understand Costa Rica is not the same laws as the United States, there is no dispute about that, but how is service structured at your Costa Rican restaurant?

A. Well, throughout my whole experience I was -- I was working in restaurants where the effort of service is being done as a team, all the way back in Israel. I implemented it also in Costa Rica, and also in New Orleans. One big effort of everybody on different layers to meet excellence of service.

Q. So did you bring that concept to Doris in New Orleans?

A. Correct.

Q. When did you -- explain to the Court, will you please, how it came that you found your place that you're currently located in the French Quarter?

A. The actual location?

Q. Yes.

A. Well, we were looking around and tried to find the right spot for the restaurant. When we took over, that restaurant was 20 years called *The Alpine*, I think. It was like a dive bar.

It was hard to envision a high-end restaurant at that place, but we made it happen after about a year of construction.

Q. That's what I was going to -- how long did it take? I'm assuming you signed a lease on the building?

A. Correct. We signed the lease, and about a year after, we opened the doors.

Q. When did you open the doors in New Orleans?

A. It was the last weekend of October, 2013.

Q. So describe for the Court when you opened how you structured the service experience or the service teams at the restaurant in the French Quarter.

A. Well, I obviously carried with me the same idea or ideology of strong teamwork, tip pooling, for that matter. I'm not saying it wasn't a struggle, especially at the beginning.

I hired -- basically we started with just a few servers, which I gave training to, and then we kind of grew from there.

Q. When you opened in October, late October of 2013, was the manager or service manager included in the tip pool?

A. Well, at the very beginning, I didn't have anybody, so it was just servers, I want to say for the first few weeks, maybe even a couple of months.

After a certain point I promoted Stavros, or Stephen -- he was referred in both names -- to be a service

manager.

Q. Okay. At that point, do you recall how many servers you had in the early days?

A. Probably four to five max.

Q. You have seen some of the tip reconciliation reports that have been shown to various witnesses in this litigation. Did those reports exist at the time y'all opened the restaurant in late October?

A. At the very beginning, it wasn't. It was more of doing it manually. Again, we opened. I didn't really know what to expect as far as volume goes, how many people are going to walk through the door. I'm not from the city; I really had no idea.

From my experiences in Costa Rica, you know, that's where we opened and could count the customers, at least in the first few months, on one hand, so I didn't really know what's going to happen.

Q. When you opened the restaurant in New Orleans, did you consult with anybody, to the best of your recollection, about how you were setting up the service teams and the proper payments?

A. Well, we registered with the LRA, the Louisiana Restaurant Association, and I used them for many things -- Workers' Comp, kind of asked everything that I had in mind regarding to how things are being run in Louisiana, and so I did with the tip.

Q. With the tip pool?

A. That's correct.

Q. Now, I think this came out yesterday, I can't remember, but do you recall who you spoke with at the Louisiana Restaurant Association?

A. I honestly don't remember the name. I've spoke with several people over different subjects, but I don't remember specifically who I talk with about the tip pool.

Q. In setting up your tip pool that you operated at Doris in the French Quarter, what was your intent? What were you trying to accomplish?

A. Well, I believe that in order to do -- to give as detail-oriented service as we give in Doris, you need to work as a team. As a patron I can say that, you know, when I dine out at restaurants, obviously my first reaction is to see how everybody operates because that's where I come from. It's my world. I always try to take that experience and kind of perfect it and fix it, so to speak, in my place.

I found that the best way of doing that is work as a team. In a lot of places you work in sections, and if a guest will raise his hand for some help and the server from his section -- from another section would see that customer, he wouldn't necessarily go and help him because it does not affect his tip, but when you work as a team, everybody is motivated to work and to give an excellent service because everybody benefits from it.

Q. You're aware, of course, that this lawsuit was filed on March 31st, 2016, correct?
A. Yes, sir.
Q. Now, when you opened the restaurant, up until the time that this lawsuit was filed, had you been put on any notice that what you may have been doing could be a problem under the law?
A. No, never.
Q. Had you ever had the Department of Labor, federal government, ever come to you and say this is something that you should not be doing?
A. No. Never.
Q. Did any of the servers ever come to you and sit down with you and say, "Itai, this is not something you can do here."?
A. No, never.
Q. Did any of the service managers or service captains ever come to you and say, "We need to change this structure."?
A. No.
Q. Do you have an open door with your service team? Can they come to you with any concerns that they have?
A. I would like to think so. I'm a very hands-on owner/manager or however you call it. I believe that we do things a little different, and for me it's very important to work with my staff, lead by example, say with my own words what do I mean, how do I think things needs to happen.

That's why, especially at the beginning, at the opening of a restaurant, I'm there basically all the time to make sure that happens.

Q. I think you testified yesterday it could have been up to a hundred hours a week that you were there in the beginning?

A. If not many more.

Q. Okay. Let me clear this point up. Do you currently live in New Orleans?

A. I currently don't.

Q. Okay. Where do you live?

A. In Houston, Texas.

Q. When did you move to Houston?

A. September 2017.

Q. For what reason did you move to Houston?

A. Well, we opened a restaurant there in late November of 2017.

Q. What's the name of that restaurant?

A. Same name, Doris Metropolitan.

Q. Is it the same concept --

A. Yes, sir.

Q. -- as the French Quarter location?

A. Correct.

Q. I'm assuming that's the same concept as the Costa Rican location?

A. Yes.

Q. Which was based off the concept that you had in Israel?
A. Well, yeah, in Costa Rica, I think we took it up a little from what it was in Israel.
Q. Do you recall when the tip-out sheets were formatted and started being used?
A. Early 2014. Maybe a month or two after we opened.
Q. What was the purpose of establishing or formulating or putting together that tip-out sheet?
A. Well, first of all, order and transparency. We came up with this form so everybody would see how much money was collected and how we divided it.
Every form goes into a binder that is kept by the service station so they could all go back and see and check how much money did they make, and it's basically an open book. Everybody can look at it and ask any questions they might have.
Q. You heard the term used over the last couple days of trial as a *pooled house*. Have you heard that term used?
A. Yes.
Q. Okay. To you what does that mean when that term is used?
A. Well, for me a pooled house or a tip pool is basically a tip pool of everybody who works at the restaurant and gives service to the table. Those are the people who are in the tip pool.
Q. Do the service teams earn their own tips? Excuse me. Did the service teams earn and keep their own tips or is it shared

equally?

A. It's shared. I find that, again, in order to give the level of service we wanted to give or we want to give every day at Doris Metropolitan, you must have a few layers of service, including a strong sense of teamwork.

We all come in at the same time. Everybody is doing the same tasks. Of course, server assistants will do a certain group of tasks, servers a certain group of tasks, and service captains or service managers a certain group of tasks.

Everything is related to the service itself, and once the service started, everybody thrives to give the best service we can.

Q. You've heard testimony throughout the trial that at some point you changed the nomenclature from service -- or manager, service manager, to a service captain on tip-out sheets. Did you do that?

A. Yes, sir, I have.

Q. Explain to the Court why you made the decision to do that.

A. Well, of course I understood, once I received the lawsuit, that there was a confusion about the terms that we're using on those tip-out sheets or tip reconciliation sheets. It basically, you know, create that whole, big thing that I never thought was, but, again, at any point -- in order to make order, I change it because I realize it was creating this confusion.

Q. Did the -- you changed the name to eliminate the possible confusion, but has the duties, the table-service duties, of the service captain changed from what it was before?
A. No, they are the same.
Q. Okay. I would like to take you through what I'm going to refer to as a *night in the life of a Saturday night at Doris Metropolitan*.
A. Okay.
Q. Okay. So I'm going to use the example and preface it by we're going to use the example of a busy Saturday night during the season. Okay. You have a patio at the restaurant, correct?
A. We do.
Q. Is the patio service always used?
A. No. It depends on the weather.
Q. So we're going to use the example, at least for my purposes in asking you to testify, no patio service.
A. Okay.
Q. All right. So how many tables on a Saturday night -- oh, excuse me. How many tables, without patio service, does the restaurant have approximately?
A. It's approximately 30 tables. But, again, it really changes on the form that the reservations are built. So if we have a six-top, for instance, six guests, we'll have to put together two tables in order to accommodate that.

Q. How many servers would be working on that particular shift?
A. I would say between six to seven.
Q. How many server assistants would you have?
A. Five to six.
Q. How many service managers would be there to run the service?
A. Two.
Q. Would there be an occasion where there would only be one service manager there?
A. It has -- if it happened, it's because something -- an emergency happened, and, you know, something extraordinary happened.
Q. What are you expecting that the service manager is doing during the night when you're serving guests in the restaurant?
A. Well, first, they are in charge to see that service meets its standards. By that I mean, from the fact that the tables are clean or lined up or set up, to, you know, the customers having water, having wine, getting service.
I'll give you an example. There is a term that's called *double sit* -- *double seating*. Okay. So when a server has a section, that section might have three or four tables, and he had two tables sitting at the same time, there is no way that server could attend those two tables and give them service or at least the same service at the same time. There is only

one person; he can talk to one table at the same time.

So that's where service captain will come in and do whatever it takes, take the order, make sure they get water, make sure menus are in place, whatever is needed in that area.

Q. What time on this Saturday night, what time would be -- what time would the restaurant open for service?

A. 5:30.

Q. What time would the kitchen close down?

A. 10:30.

Q. If a customer came in, if a group comes in at 10:25, would you still serve them?

A. Absolutely.

Q. But after 10:30, at least the kitchen is closed?

A. Most likely we won't.

Q. So what time would the employees who are serving, who are performing this service to the customers, get there in order to start preparing for the evening?

A. Oh, it depends on the position, but most of the staff will be there around three o'clock. That's where we serve family meal so everybody can come in and eat.

Service captain, one of them will come a little earlier, 2:30, and another service captain would come more around pre-shift, which is about four o'clock, 4:30.

Q. So just so the record is clear, when you say *family meal*, what are you referring to?

A. We cook food for our staff every day, and everybody is welcome to come and eat so they could, you know --
Q. They're not required to come to eat, are they?
A. No, they are not required. It's optional. Basically they can arrive at four o'clock and just punch in without eating.
Q. Is this menu service or is it a different type of food?
A. It's usually a buffet. We prepare a few things, protein, a carb and salad, something like that.
Q. Okay. You used the term a second ago, *pre-shift*. What does pre-shift mean?
A. Well, pre-shift is when you gather everybody who's going to serve that night, tell them about what are we expecting, how many reservations do we have, if we have any specials, point of service, what is important to focus on, what is not, if we have somebody important coming in tonight, something like that.
Q. Who would attend the pre-shifts?
A. Everybody that is related to service -- server assistants, servers, service captains, and bartenders.
Q. Would you attend if you were there?
A. Yes, I try to.
Q. Would you run it if you were there?
A. I've ran more than I can count.
Q. How long does the pre-shift routine last?
A. Approximately 30 minutes.
Q. When the servers -- when they arrive at the restaurant for

the pre-shift, are they punching in?
A. Yes.
Q. Okay. So you mentioned that you would have about 30 tables. How many sections would you have?
A. Our restaurant is divided in a way that we have three main dining rooms. We call them *Dining Room Number 1, Number 2*, and the *Private Room,* which Dining Room Number 2 is the larger one.
Q. Would only one server be assigned to the larger dining room?
A. No, it's usually three people.
Q. How about Dining Room Number 1?
A. Two.
Q. How about the Private Room?
A. Mostly one.
Q. Is the Private Room always in use?
A. We try to, yes.
Q. You hope it is, right?
A. Yeah.
Q. Okay. During the 5:30 to 10:30 service that you're open, from an industry perspective and standpoint, how often are you hoping these tables turn?
A. We try to turn them at least once so every table had two seating in them. So twice, for that matter.
Q. Yes, two different --
A. Two turns.

Q. So at a minimum you would want two different sets of customers sitting at that same table during this period?
A. Potentially, yes.
Q. Sometimes does it happen that you get three? You turn it twice?
A. On very busy seasons, yes.
Q. Is it better for the restaurant the more times a table turns?
A. Absolutely.
Q. Why is that?
A. More revenue, more people that dined with us and can tell their friends about their dining experience.
Q. So during this Saturday night, other than who you just described, who else is in the restaurant running the restaurant?
A. Well, you'll have myself, you'll have service captains, you'll have servers and server assistants.
Q. How about behind the bar?
A. Behind the bar you'll have bartenders. On a busy night it's two bartenders and bar manager or three bartenders at least.
Q. How about the kitchen?
A. The kitchen, we'll have two people in each station. That would make it approximately seven, eight people in the kitchen.
Q. Do you have stations in the kitchen?

A. Yes.
Q. What time does the kitchen personnel arrive at the restaurant to prep for the evening shift?
A. 6:00 a.m.
Q. 6:00 a.m.?
A. Yes, sir.
Q. You have heard some testimony about the service managers having keys to the restaurant. Do you remember that testimony?
A. Yes, I do.
Q. Were they the only ones that has keys to the restaurant?
A. No. I mean, many, many different position have keys to the restaurant. Our butcher has keys to the restaurant. We have maintenance guy who has keys to the restaurant. We have prep kitchen members that have keys to the restaurant.
Q. When you first opened, who was the chef?
A. His name is Shachar Kurgan, S-H-A-C-H-A-R, last name, K-U-R-G-A-N.
Q. Describe for the Court the level of authority that the chef would have when the chef is at the restaurant.
A. Shachar is pretty involved with everything that's happening at the restaurant. He is, you know, a very hands-on chef inside his kitchen and outside.
Q. If you're not at the restaurant, and you -- and there is an issue that comes to your attention, how would that be handled typically?

A. If I'm not there -- first of all, I'm always trying to be available, but, again, I'm there 90 percent of the time, if not more than that.

If I'm not there and something happens, the first reaction will be to call me. If I'm in a different country and not available, they will go and consult with Shachar, with the chef or if Itamar is around or Dori or any other owner is there to deal with the situation, but if absolutely nobody is there, they will go to the chef, which rarely happens. We try always for one of us to be there at any time.

Q. Describe Itamar's function at the restaurant.

A. Itamar deals with all the administrative stuff, as far as I see it. All the reports that we -- the POS.

Q. What does POS stand for?

A. Point of Sale. So that system where we punch in all the orders, all the reports that he generates basically, he's the one arranging them, you know, all the payroll, everything that has to do with administrative.

Q. Do you have a payroll service that you use?

A. Yes.

Q. Let me ask you a better question. Do you do the payroll in-house?

A. We haven't. We have outsource company.

Q. During the relevant time period, if you know, do you recall who that outsource company was?

A. I think it was Hartland.

Q. H-E-A-R-T-L-A-N-D?

A. I think it's H-A-R-T-L-A-N-D.

Q. I did a heart like that (indicating). Hartland.

A. Hartland.

Q. Okay. Do you recall whether there was any other payroll service that you were using?

A. I don't think -- we recently changed to a different one called *ADP*, but that's something we've did -- we've done maybe a couple of months ago, maybe a little more.

Q. So, when the -- how do you know on -- prior to this Friday night what type of crowd you're going to have in the restaurant that evening?

A. We use a seating system. For many years we used Open Table when people go on-line and make a reservation or call the restaurant or go on our website.

We, again, recently changed to a different one called *Resy*.

Q. How do you spell Resy?

A. R-E-S-Y.

So most nights you already know what to expect, but in the French Quarter, in New Orleans, we do get a good amount of walk-ins, so by this time we know how to estimate how many walk-ins also we're going to have, so that's that.

Q. Is that based on, like, a historical trend?

A. Correct.

Q. So if you have an idea about what this busy Saturday night is going to look at, what goes into the scheduling to make sure we have enough people in the restaurant in order to be able to service these customers?

A. Well, you know how many seatings you're going to have and how many tables; and, therefore, I know how many people to schedule for that night.

Q. Who makes the decision on how many to schedule for that night?

A. Me. Myself.

Q. So, do you actually then go make the schedules yourself?

A. No. So, servers and server assistants -- for most of them, not all of them -- it's is not their primary occupation. They do something else. They study. They have another job, so a lot of them have schedule preferences, which is fine. It's one of the benefits that working in this industry gives you.

You know, as general or as an idea always -- my goal is always to accommodate that. I don't get into whose occasion is more important than the other, but what I care for is having the right amount of servers, service captains, server assistants at each and every shift.

Q. So when the customer arrives at the restaurant, who is the first person that the customer sees?

A. The host.

Q. Okay. What's the host's duty?

A. The host's duty is getting -- arranging the reservations, taking the phone calls, walk -- greet the guests and walk them to their table, hand them menus for the most part.

Q. Just to make sure the record is clear, are the -- have the hosts ever been included in the tip pool?

A. No, sir.

Q. So after the host seats the customers, what happens next?

A. Well, then they get greeted usually by the server assistants, ask for their preference of water, what kind of water do they like.

Then the server arrives and asks for, you know, to take a drinker order, if it's a cocktail or a wine. If it's a wine and he can accommodate their request, he will do so. If not, he will call the sommelier.

Q. Who are the sommeliers in the restaurant?

A. We have two. We have Melissa. She's there most of the time so she's always a go-to. On Friday and Saturday we have Buck Williams, who is now more of our wine director.

Again, it changed since. Now we have two sommeliers on the floor, but back then it was primarily Melissa during the week and on the weekend Buck will help.

Q. What's the purpose of a sommelier?

A. When you have a big wine menu, wine selection, a lot of people walk in, and it's basically to help them choose the wine

together with their food, to pair their wine with their food and that's about it.

Q. Does that involve customer interaction?

A. Absolutely.

Q. Is wine sales a big part of the --

A. They are a huge part, especially for our concept. Wine is -- could be more than 30 percent of our revenue.

Q. So after the server introduces him or herself and gets the drink orders, what happens next?

A. Well, then the server is asking for -- explaining -- he explains about -- he or she explains about our menu, then take the appetizers or take their food order, appetizers and entrees, punch it into the Point of Sale.

Then basically, you know, the wine is being opened or cocktails are being served to the table. Once the appetizers are in, he checks if there is anything else they need, if they like the dish.

Q. Who checks?

A. Well, the server or the service captain, it depends. If the server is busy with another table, the service captain will take over and go, and a lot of times it would be the same server who would ask it.

Q. How long, if you know, how long is the average sit time for an average party at the restaurant?

A. Well, it's pretty much set. We -- it's -- it's

approximate two hours for a party of two. Two to two and a half for a party of four and two and a half to three hours for parties of six or more.

Q. Now, during that -- the time period of that service, what do the service captains/service managers doing?

A. Well, they do all sort of things. Above helping with that turn, they do everything. Again, so, we have those dining rooms, service managers will basically do everything that is necessary to perfect the service. That's what they are.

They come to make sure the flow of the service is being run and being flawless, that the pace is good with all other servers, that communication between servers is correct. Any help with the Point of Sale, they will help. Meet and greet every table. Help with wine service. Help with clearing, with resetting. Whatever is needed at the moment, they are there.

So, communication is a huge part of running a restaurant service in general. You have so many bodies on the floor doing all sort of different things. You have to have order, and service captain is there to also be part of that order. He knows what's going on in each and every table and, therefore, can help and execute, basically, service well.

Q. Under the concept that Doris Metropolitan has in the Quarter, do those service managers sit back and just point and tell people what to do?

A. No way. They have to be physically on the floor, walking, checking in on tables, seeing what's missing, do it themselves if there is no one there to actually do it.

Q. You mentioned the term *cleaning*. Would that be the same thing as bussing?

A. Yes.

Q. If necessary, would the service managers engage in that duty?

A. Absolutely. Whatever it takes. Run food, carve the food, serve the wine. Whatever is needed.

Q. You mentioned the term *set up*. What do you mean by the term *set up*?

A. Set the restaurant, *set up the table* means making sure the silverware, the glassware, the plateware is ready for a guest.

Q. So I understand that you would have the set-up before you opened --

A. Correct.

Q. -- for the first sitting, and then customers come, stay for a couple, hours and they leave?

A. It's an ongoing thing. So we have it before service, during service, and after service.

Q. If you have people waiting in line to get a seat, how important is the setup process?

A. It's crucial. I've said it's approximate because you have people who have fun and will have more drinks and will stay

longer that will cause another party to wait. So, being efficient on that side is very important.

Q. Would the service managers be involved in that process then?

A. Of course. In every process.

Q. We've heard some testimony on the -- what I've referred to -- I've heard is the *Feed Me option* or --

A. Meat boards.

Q. Meat boards. I don't know why it's stuck in my head about the Feed Me. *Little House of Horrors* reference there? Would you explain what that is to the Court.

A. Yes. In order to provide, especially for larger parties -- parties of four or more -- we would offer this option where they can taste different things, have a big, actual meat board on the table with different cuts that we carve tableside, and they can enjoy an entertainment value and also try different cuts that we offer at the restaurant.

Q. Is there a technique to making sure that meats are cut properly?

A. Well, every -- especially the bigger cuts that has the bone, you got to know how to cut them. You have to cut meat against the grain and each cut is different, so we have sort of like a training in order to do that.

Q. Would that be -- could a server do that?

A. If -- if he went through that training, yes. When we

started with that concept, only service managers would do that at the beginning, but then it became popular, and we certified a few servers to do so as well.

Q. Who would certify?

A. Usually it was the chef.

Q. When the meat board is involved, what is the focus? What are you trying to convey to the patron at that point?

A. Well, first it's a show. It looks really good. It's a big board. You usually put it on flame, so everybody is looking and see that there is a huge meat board walking around the dining room. Then it comes, it sits on the table, and you carve everything, carve each and every cut on that table, so it's definitely an entertaining experience.

Q. So there is some presentation?

A. Absolutely, yeah.

Q. During the service at the table on this Saturday night, who is directing the server assistants?

A. Mainly the servers.

Q. What type of things would they be directing them to do?

A. All kinds of things. From clearing the table from their plates to reset the table with new silverware, filling up water, moving chairs. Whatever is needed to maintain a table.

Q. So we come to the conclusion of the night. The kitchen is closed down. If the kitchen closed down at 10:30, what happens after the sections are closed?

A. Well, the kitchen closes at 10:30, but customers may stay for as much as they want after without ordering anything from the kitchen. They can, you know, enjoy their wine or whatever it is that they are enjoying.

If the section is completely cleared, there are no other guests in that section, it's past 10:30 and we know we won't be seating anymore tables there, the servers of that section may start -- and server assistants, both -- may start what we call *start to close*, which means cleaning the chairs, bringing the broom and sweep, and just do -- reset the table and things of this sort.

Q. Is that the process to get ready for the next day?

A. Correct.

Q. Now, you've heard some testimony in here from various plaintiffs that the service managers would not engage in any of that, I think what was referred to as *side duty*?

A. Uh-huh (affirmative response).

Q. In that circumstance, would the service manager be engaged in the closing-type duties?

A. Well, the service managers don't really, you know, take the broom and clean. While there are still customers in the building, they will be there to watch and make sure that they're getting the proper service, and, you know, they're still getting service.

Q. So is it fair to say that after a section -- a service

manager may have had a responsibility for a certain section. If that section closed, then that service manager's attention is shifted to where the customers are?

A. Correct.

Q. Let's talk about the closing process and the tip reconciliation process at the end of the evening. Describe for the Court what that process is. The section is closed or maybe two sections are closed, and -- let me back up. I missed a part. I want to make sure I covered this.

Who presents the bill of fare? Who presents the check to the table?

A. The servers.

Q. If the servers are busy with a double seat or somewhere else, is it something that they have to do or can someone else --

A. No, the service captain can easily take the check from a table and charge it. Again, it's right about everything in that section. Everything that is needed, he's there to cover for. He's there to -- the service captain is there to help with whatever is needed on the service during the service.

Q. So you present a check and let's say the check is, just to make the numbers easy, I think -- the check is $200. I think you testified -- someone testified yesterday; it may have been Itamar-- but what is the percentage of credit card tips, excuse me, credit card sales compared to cash sales at Doris?

A. About 95 percent of all of our transactions are credit card.
Q. That could be, of course, a debit card as well?
A. Correct.
Q. Okay. So if the customer hands a credit card to pay the bill, what happens at that point?
A. Well, once we persist, we process the payment, he gets back his bill, and he can add a tip, which normally happens.
Q. You've heard some testimony about mandatory service charges?
A. Correct.
Q. When would those be put on the --
A. Parties of six and more.
Q. Who, if anyone, would have the discretion not to put that on there?
A. Well, usually the server. If they feel they have a good connection -- 20 percent is sort of like the guarantee once you have a table of six or more. But some servers would feel that they had a very good connection, or service captains or whatever, they all feel that table had such a great time there is no need to auto grat, to add those service charges to the bill and just won't do it.
Q. I'm assuming the hope is that someone tips over --
A. Correct.
Q. -- 20 percent?

So after the customer fills in, let's say it's a 20 percent gratuity, a 20 percent tip on a bill of $200, that would be $40, how is that $40 then processed?

A. The server needs to -- well, they will have a bunch of those slips with tips on them. They would go back to the POS station and punch in each and every tip that they got from each table.

Q. Who does that?

A. The servers.

Q. Is that how then the tip is processed through the credit card?

A. Correct.

Q. Are there mistakes made occasionally?

A. A lot, yes.

Q. Describe for the Court some circumstances that you've experienced when mistakes would be made in this regard?

A. It could be many types of mistakes. Sometimes it's just human error. Instead of 50, you punch 60, or sometimes it could be just a math error.

It could be that you read the slip wrong and what looked like, you know, 90 was just, I don't know, 10, whatever. It's just people had a few the glasses of wine, they write down a number, it's not all the time understandable or easy to read. So, mistakes happen all the time, and we fix them.

Q. Okay. So after the servers punch in the tips received

through the Point of Sale system, how is that tip reconciliation sheet then completed?

A. Well, you match the service captain -- look at the report that came out from the POS, and he matches it with the actual slips to make sure it's correct.

Then he adds up all the tips from all the servers that day and then divide it by the formula that we've seen before, which is 65 percent of that goes to the servers among themselves -- it's shared equally -- 25 percent would go to the server assistants that will be divided equally between them, and 10 percent will to go the service captains or service managers, and that would be equally divided in between them.

Q. So we've heard some testimony earlier today, and we'll see if maybe you can clear it up. Maybe there was some confusion about 5 percent or 10 percent. Do you recall that testimony?

A. I do.

Q. Okay. Was it -- at one point was that percentage, 5 percent, raised to 10 percent or how --

A. Well, when there was only one service manager, they would take 5 percent, but when there was two he would take 10 percent.

Q. That's generally how it's supposed to be?

A. That's correct.

Q. But on this busy Saturday night we're talking about, you're going to have two on the floor?

A. Correct.
Q. Do the servers -- can the servers make any recommendations to the service managers regarding giving something free to customers?
A. Sure.
Q. Explain to the Court the circumstances where that may happen.
A. Well, let's say, we have a couple that are celebrating an anniversary. The server will make that comment to the service manager and ask if we can send them something, a dessert or after dinner drink or something of this order.
Q. Okay. Just to clarify, does that have to go through you in order for that to approve?
A. No.
Q. That would be a part of the service you're providing to the table?
A. Correct.
Q. Do the service managers do the same thing for every table every time while they are on duty?
A. I can't say that, no. It varies of the necessity of the service. There is certain things they will do no matter what, such as, you know, greeting the table, make sure their experience is correct and they are having fun, engage with them, talk with them, see if they need anything and things of this sort.

Q. You've heard the testimony that came up during the trial about the business cards that were made for Melissa and Dontay. Can you describe to the Court how that came about and the reason why those were made.

A. Sure. Because they are the one talking to our customers, you know, that they do a lot of talking, a lot of engaging, and they want to hand out -- you know, we thrive for personalized service.

I think this is one of the advantages we at Doris on other similar restaurants or similar concept or bigger restaurants where service can be very technical. I think we try to personalize it more, and by doing so, is giving -- handing a card from somebody that, you know, is in that section. I think it's an added value when you personalize the service.

Q. Are they just handing out cards to people that are walking in the door or leaving?

A. No.

Q. When does the card exchange take place?

A. Mostly at the table. It happens at the table.

Q. Mr. Eli, if your service structure did not have the service managers, would the servers and server assistants be able to provide the type of service that you want to give the customer?

A. Not with the attention to detail that I'm looking for.

There is a reason why you need to work as a team and why you need several people at a certain section in order to execute high-end service. A server on his own won't be able to do it.

Q. How about the server assistants and the server?

A. No. You need just a few -- a few people that would do different things.

Q. So during the service of the restaurant in the evening, are there any other service managers sitting in the office performing paperwork?

A. No way.

Q. So you, of course, heard -- you know what the issue is in this case, so we would like you to explain to the Court with respect to your restaurant how is a service manager different than what would be a manager who is doing other things and actually running the restaurant?

A. Well, I've been managing restaurants for most of my adult life. There is no way you could come at four o'clock and manage a restaurant. It doesn't work that way.

Melissa testified, for instance, that she arrives 10:00 a.m. every day at the restaurant, and I get to the restaurant every day in the a.m. There is so much work that needs to be done prior to service, things that obviously are related to service in some shape or form. They are much more administrative -- e-mails, ordering, making sure everything is in place.

There is so much work to be done prior to service that you just got to have someone doing those things. Our service managers is for that sort. They come for service. They come right before service, making sure things are ready for that service. Once service started, that's all their job is basically, to serve and help.

Do they have a low-level authority in certain occasions? Yes, they do. I mean, it happens. In circumstances it's something that happens, but everything is related to that service itself. They are not there during the day managing the restaurant.

Q. Let me make sure just to clear up one point. When you mentioned Melissa's testimony that you were in here for --

A. Yes.

Q. -- that she comes at 10:00, were you referring to her working as a service manager or as a general manager?

A. As a general manager.

Q. I think we have it pretty well established, you don't have the precise date, but we believe Melissa was made the general manager at the restaurant around September of 2017?

A. Correct.

Q. Prior to Melissa being put into that position, you were occupying that position, correct?

A. Correct.

Q. So for what purpose did you then bring Melissa and put her

into that position?

A. Well, first I promoted her to be an assistant GM about more than a year ago -- a year prior to that because as a service captain she showed abilities. You know, you have all kind of different people in different positions. Some people always like to think ahead and be proactive. This is something I've seen in her, so I figured she would be the right -- the right person to be in an assistant GM.

Then after being an assistant GM, we're looking at opening in Houston, and she was obviously my natural choice to replace me, and then she hired who she thinks -- she promoted who she thinks or she thought was the right person to assist her in as an assistant GM.

Q. Who was that?

A. Travis Sauvain.

Q. Is Travis still with the restaurant?

A. Yes. He actually recently moved to Houston to work with us over there, but yes.

Q. Let me talk a little bit about the level of authority that the service manager may have to send a server home from a shift for whatever reason. Can you explain to the Judge, the Court the circumstances under which that may happen.

A. Yes. Of course. I will start by saying that it happened maybe a handful of time during four and a half years that we've been operating. This is not something that is very common.

But if a situation occurs at the restaurant that is extraordinary, such as having an intoxicated server or a server assistant, if I'm not there at the moment or available by phone, they can send that person home for everybody's sake.

I will get report on it immediately if it's a text at the moment, and by the end of the night I will get an e-mail probably, if I'm not available, and then I will deal with the situation depending on the circumstances.

Q. Why would it be important for that particular person to exit the restaurant at that point?

A. Well, it's a danger for everybody. So it happened, I think, two or three times that we had just people intoxicated. They were just drunk, so they couldn't perform the most minimal requirement so -- of the job.

Q. So let's switch then from sending -- from closing -- from sending someone home because of some sort of malfeasance or because they are intoxicated to cutting a server, having them an early out from the restaurant because you're slow. Does that happen?

A. Yes. I mean, if we see that reservations don't pick up and we already have all the staff members at the restaurant, we will ask for a volunteer, somebody who would rather go home and not stay for the whole shift.

Q. When you say *ask for volunteers,* what are you asking them?

A. "Who want to go home?" Obviously it will affect

everybody's tip share if you have less people to share it.

Q. So is there a -- I heard reference from somebody of a time -- sort of a time cut off. Is that a policy? If someone closes down, like, at 9:00, would they share in the remainder of the tip for the night or how would that work?

A. This is a policy that we started after there was a confusion of when -- what was the time that the person is being cut. So let's say that we're very slow and somebody was sent home at seven o'clock, and he already served one table.

So the agreement is between everybody, which is the most fair one, that he will keep that specific tip of that table, and the rest of the team will divide the tip pool -- the entire tip pool from the entire restaurant. He will go home and will earn the specific tip from that table.

Q. Would any tip pool amount be taken from that tip that --

A. No, sir.

Q. Let's say it's 9:30 and you have more servers than you need, is that a different circumstance?

A. It is. It is. Because once that server has served more than one table, three or four tables, the amount of tip is significantly higher, then everybody is going to share that tip.

Q. Including the person that goes home?

A. Correct.

Q. If you've not in the restaurant, Itai, and during the

relevant time period of this case from when you opened until March 31, 2016, who is the ultimate authority in the restaurant when you weren't there?

A. Really, I was there most of the time. If I had to be away, you know, chef is always there. He's definitely an authority.

We would let -- as far as the service -- I would let things just be. If something extraordinary happens, the instruction is to call me immediately. If it -- or -- and like I mentioned before, if I'm not there I try one of my partners to be there at least as a presence, so they would have somebody to refer to.

In a very extreme case when nobody is there, they would, you know, take decision for that specific period of time and will let me deal with it later.

Q. You're talking about the service manager?

A. Yes.

Q. You mentioned Itamar as one of your partners. Was there another partner that was in town that would be at the restaurant?

A. Dori.

Q. What is Dori's position? What does he do on a daily basis?

A. Dori does all sort of things as on a daily basis. He definitely takes care of the actual maintenance of the

restaurants, that the kitchen has everything. Everything is working properly.

If there is a specific renovation we need to do, he will be in charge of that. He will be the one looking for maybe other opportunities as well, as far as business comes, let's say another concept or whatever.

Q. Scouting other locations?

A. Correct.

Q. Did he take the lead on finding the Houston restaurant, for instance?

A. He was definitely a big part of it, yes.

Q. How about when you moved, when you opened in the French Quarter, was that his --

A. Yes, he was the visioner. He saw it happening there.

Q. He saw it in The Alpine?

A. Yes.

Q. You've heard the testimony throughout the trial of the service managers hiring people or telling them that they were hired. Can you explain to the Court the level of authority that you authorized for that, and then take us through from the beginning of when the restaurant was opened until March 31, 2016.

A. Of course. I felt like from those testimonies, you really have to understand the context. When we opened this restaurant here in 2013, no one knew who we were, who Doris Metropolitan

is or what we do, what kind of food we serve and how is it going to be.

Our necessity for employees was really, really high. I can say that I was desperate to get people at Doris. I knew that at certain point it won't be a problem anymore because I believe in what we do, but definitely our first year was a rough one.

I can tell you that it didn't take much to get hired at the first year at Doris Metropolitan for any position. If you had some kind of an experience, you were hired. No interviews, no nothing.

I literally remember servers coming to me, telling me I have a friend who works there, and he's thinking about coming here. I would ask him, "Can he work tomorrow?" Can he start? We really need people."

We were gaining popularity and really struggled with getting qualified people. I had servers with no experience at all doing all sort of things. I heard the testimonies of a few guys here came from SoBou, most of them.

Our bar managers at the time, his name is Konrad Kantor. He came from SoBou. I was very pleased with Konrad. As a matter of fact, he works with us to the day. When he told me there might be people coming from SoBou to work at Doris, I didn't even think twice. I was like, "Please. I mean, if we can get anybody, that would be great." Those

people, I mean, I've hired I don't know how many people without interviewing them. It was more of whoever comes.

Q. Would you take recommendations from the servers?

A. Absolutely.

Q. Has that happened before, when a server came to you who said, "I have a friend. We need to get him over here."?

A. Many times.

Q. Would you agree that would you tell the server, "Well, tell your friend to come on in. We need him."?

A. Yes. I remember a specific case when, you know, a server told me, "I think my friend want to work here. She used to work at Stella," which was a high-end restaurant in the French Quarter at the time. I was like, "Whatever she needs. Whenever she can start." There wasn't a formal interview.

When time went by, it became a way that I could be more selective. As servers were making very good money and servers -- just everybody was making very good money on the service team, so more and more qualified people came in. The word on the street was, I think, around May we earned *The Best New Restaurant*.

Q. What year?

A. 2014. I'm sorry. We earned *Best New Restaurant in New Orleans*, and that definitely draw more people in our direction, and then, too, we can actually be more selective about who is qualified and who is not, and that's where, you

know, I conducted more interviews and could actually select who is qualified and who is not.

Q. So the necessity of sort of hiring on the fly went by the wayside as more people started applying for that job?

A. Correct.

Q. Can a service manager make the decision on his or her own to discharge an employee?

A. No.

Q. Explain why not.

A. Well, firing is not the same as hiring, as far as I'm seeing it. When you need people, you just hire them. Letting somebody go, it's a serious decision. They can recommend the same way I get recommendations also from, you know, all other staff members about other staff members, but firing is a serious decision that I was taking when needed.

Q. You made the statement just now that some staff members would maybe blow the whistle on some other staff member about what was wrong. Was there a specific instance that you can recall when that happened?

A. There were many incidents. In many incidents we had to let go of whatever, server assistants, dishwashers. People saw them smoking weed or doing like that. It didn't have to come from a service manager to come to me and tell me this is my recommendation. I would be there. People will come to me and tell me, you know, he shouldn't be here.

Q. Have you ever had an incident where the servers actually told you something bad about a service manager?

A. Yes, of course. I think it was in 2016, we had -- late 2016 we had a service manager, his name was Zachary. Not this Zachary. Apparently after I was gone, late at night he would go to the office and drink, and servers will see him drinking.

So a couple of servers came to me and told me, you know, about the incident, recommend -- told me how unhappy they were with the situation. Based on that, I decided to let him go.

Q. Who made that decision?

A. Myself.

Q. Okay. You heard some testimony about Mark Gandy being discharged and being informed of his discharge. Can you give the Judge the context of how that occurred.

A. Well, once he confronted the customer about tips and made that regular feel so uncomfortable -- I was very uncomfortable, first of all, with the situation itself, but then the thought that, you know, she was a regular, especially on Friday lunch, I was afraid that there would be another interaction between thems two.

For me, he crossed the line once he confronted a guest about the amount of tip that she left him and made them feel very uncomfortable. She called me and told me about the situation. She loved the restaurant but she never experienced

something like that before, and quite honestly, I thought that was crossing the line. At this point it was not the first or second complaint I had about him, so it was what really crossed the line.

I was not there that Friday lunch, and I know that, you know, when they said Dontay wanted to talk to me anyway about it to get what happened there because she was so upset, then I called them and told them, you know, "Guys, I want to fire Marcus. It's not a regular talk. I won't be able to make it, but would you please let him know this was my decision."

Q. I think the customer name was Fluffy or is Fluffy, a nickname.

A. I think she goes by *Fluffy*, yeah.

Q. She had been a regular at the restaurant?

A. Yes.

Q. She actually called you?

A. She actually called me.

Q. Was it the Friday -- the following day, the Friday, is when you spoke to this service manager that was there and said "Convey the message to Mark that he was discharged."?

A. Yes.

Q. Let's talk about issuing of discipline, some sort of discipline. We've already talked -- I don't want to talk about sending somebody home based on the rare occurrence or circumstance that you have talked about, but the issuing of any

other sort of discipline.

What type of authority do you give the service managers to engage in that type of discipline, particularly as it relates to service of customers?

A. Well, when it's related to service, they do have authority, I mean, when a table is not clean, they can go and tell a server or server assistant that table is not cleaned, has not been cleaned. That is something they can do. It's all related and controlled during service, and things of this sort.

They can also have POS, Point of Sale, authority such like making a discount, void something that a customer didn't like, things of this sort.

Q. Do you review the discipline that is issued to a server or server assistant?

A. Most of the time.

Q. Have you ever had an occasion when someone wanted to discipline somebody and you did not think it was appropriate to do so?

A. Yes. That happened as well. It really depend on the situation.

Q. Okay. If you did not think it was appropriate to do so, what, if anything, would you do?

A. I would just continue, like, I mean, nothing happened. They didn't discipline him, which is -- just move on.

Q. I want you to describe for the Court the Schedulefly

system, but I want to, if you can, pinpoint more accurately when that Schedulefly system came into existence.

A. Well, it came into existence after one of the service managers thought it would be a good idea and make more order to have an on-line system where everybody can submit their requests.

Once we did that --

Q. What do you mean by *submit their requests*?

A. Like I explain previously, we have different servers and servers that have different requests because they are going out of town, they have other obligations, so they can decide -- they, you know, they can send a request not to work, for an instance, Wednesday and Thursday this week because I have an exam and I need to study. So we'll try to honor that request.

Once the schedule is done, I -- you know, once we implemented Schedulefly, everybody would submit their request. We'll try to accommodate it. When it's done, it gets showed to me. I look at it. I mostly look at the amount of servers and server assistants that I have because that's what really matters to me. I approve it and then it goes.

Then, servers and server assistants can switch or cover for a shift. Let's say that a server, you know, realized that it's his friends birthday tonight and he would like to get the night off, so he would go on-line and post that he's -- he wants to get off that shift; does somebody want to pick it up?

Everybody gets that notification. If a server that doesn't work that day want to pick it up, he submit it. Once he submit it, we get a notification of that request, and then we approve it. Now, it's more of a formality for us to know who is coming when, that we know that who is really going to show up for that shift.

When we used to schedule manually, we would have one name of a server, and then a different name would come in. We didn't know they switched because of lack of communication. This really helped keep everybody in the same loop and that's it. Once we saw that change it's approved and moves up.

Q. If you saw some e-mails that showed that Dontay or Melissa or Ryan had approved that, would that be unusual in your system?

A. No, it's very frequently -- I mean, we will see people will switch. They will switch shifts all the time, and for 99 percent of the time I want to say as long as it's covered we will approve that. As I said, for me the main issue is to have enough people.

Q. So you have given the guidelines about how many people you need there for the service for that shift?

A. Correct.

Q. Do you know of any circumstance or instance, since you've been using Schedulefly, where either Dontay or Melissa or you have denied somebody a shift?

A. I never denied any switch and I don't think they have as well. It might have happened once, but every time they wanted to switch shifts, it would have been approved.

It was more of a formality for everybody to know what's going on rather than say "yes" or "no" because, no, I don't know if it ever happened. Maybe it did but it's very rare.

Q. To the best of your recollection, did anyone ever complain to you that their request for a scheduled change had been denied in any way?

A. No.

Q. Let's talk a little bit about the tip reconciliation process where cash sales were involved. You mentioned that it's about 5 percent of the time?

A. An average, yes.

Q. So if -- how does the service manager or the restaurant, for that matter, know if someone received a cash tip?

A. Well, they would have to report it. By the end of the night, they bring all the slips from the credit card, and if they had any cash tips they need to bring it to the service captain, who will then do the same math of the same formula of 65 percent, 25, and 10, and he will need to do that on the sheet. This is what the instruction is.

I know that many times servers don't want to report cash tips because they will have to pay taxes on them, so they

just split it between themselves. Then even if it wasn't that formal, I just do that, but, again, this is something that I know and not necessarily practice or seen. It's just a common thing in the industry.

Q. But just to be clear, your policy is that they are supposed to report tips?

A. Of course.

Q. But policing it is another matter?

A. Exactly.

Q. Okay. So do servers or -- server or servers don't report the cash tip what are you supposed to do?

A. All I can do is tell them, basically, you know. You can't force them to do anything.

Q. So if the server does not stay for the end of the shift, leaves before the reconciliation is done, I think you testified yesterday -- I don't want to go back over it all -- but I think you mentioned that those would be apportioned and put aside, correct?

A. Uh-huh (affirmative response). Correct.

Q. So, did the handling of cash tips change over time from the beginning of the restaurant, well, until now how you handled them?

A. No. The only change was that, you know, at the beginning, at a certain point people who didn't collect those tips felt like some things were missing, and we decided to just lock it

in the cash drawer.

Q. So you did hear at some point over the years that someone felt like they were shorted on their cash tips?

A. It was never brought up to me directly, but, yes, I've heard it. Then I said, "So why don't you just keep in it the cash drawer?" They said, "Oh, we can do that," something like that.

Q. That's a more secure drawer?

A. Yes.

Q. Okay. If someone felt like they were shorted on cash tips, had an amount in, would the restaurant make that up?

A. Yes. A few times people felt like they were short, so it was -- it wasn't a lot of money, and I would just tell whoever is there just I will take it from the petty cash and pay it back for, you know, make things easier.

Q. Was it your experience in running the restaurant that the servers were very interested in what's in that reconciliation form because they want to know what money they made that evening?

A. Of course. I would too.

MR. CUPP: Let's talk about -- I had Monday meetings here, Judge, but I think I may be able to skip that.

EXAMINATION BY MR. CUPP:

Q. Mr. Eli, did you personally ever take any tips from the tip pool?

A. No, sir.

Q. Do you know whether any other owner of DMNO, Doris, ever took any tips from the tip pool?

A. No, sir.

Q. Do you have an estimation of how many servers and server assistants that have worked at Doris Metropolitan since the opening through middle of 2016?

A. I can say a rough number of 150, maybe 200 people.

MR. CUPP: Bear with me, Your Honor. I'm sorry.

EXAMINATION BY MR. CUPP:

Q. We know that server assistants were paid a rate of 5.50?

A. Correct.

Q. All right. Can you tell the Court why the decision was made to pay the server assistants 5.50?

A. Of course. We needed server assistants -- for the system to work and be fair, everybody has got to -- has got to make decent money.

When we first brought on server assistants to the tip pool, or we created that position for that instance, they started at 2.13, and then we saw that, you know, the amount of work that they do at the table and the amount of money that they earned relative to that is not fair.

So I, instead of just giving them more percentage from that tip pool, I decided that the restaurant will help and I would pay server assistants $5.5 an hour, not 2.13, to kind

of balance it out because, you know, it's essential when you work an eight-hour shift.

They were happy with it, and I was happy with it and the servers, too, because they basically get the same amount of help without affecting their tip pool, and this is -- I found was fair.

Q. You've heard some testimony about the service managers having some authority over the dishwashers.

A. Uh-huh (affirmative response).

Q. Do you recall that testimony over the last few days?

A. I do.

Q. Can you give the Judge some context of what type of authority they have over dishwashers.

A. Of course. Well, first, the scheduling was done by the kitchen, by the kitchen staff, the sous-chef or chef. They are the ones working with the dishwashers on a regular basis during service. The dish palace, or the dish pit -- depends how you call it -- is in the kitchen.

Then, again, during service there is a communication between the dish palace and the floor because we need more glassware, we need more silverware, we need more -- we need to prioritize what they are cleaning first.

So definitely, you know, a representative from the floor, service captain, for that matter, would be in touch with them and make sure that we are getting the right -- you know,

the prioritizing things that we need because we might be good on wine glasses, but we currently need more steak knives.

Q. All related to the service that you're providing on the floor?

A. Correct.

Q. Did you ever have an occasion, Mr. Eli, where the servers complained to you that the service managers were spending too much time at the tables?

A. Yes.

Q. Explain to the Judge the context of those complaints.

A. Well, a lot of times we'll have service managers getting into a table after a server greeted them, and he will say hi and create a conversation, take an order, take a wine order.

A lot of servers felt service managers are too involved with their table service and would constantly complain about it. I even remember specifically complaints from plaintiffs on this lawsuit that told me, "They are talking to my table too much. They are taking all the order. They do everything that I need to do," and things of this sort.

Q. Then what was your response to them?

A. Well, that was part of the service manager's job as well.

Q. Mr. Hunt testified that he spoke to you about the -- well, did Mr. Hunt ever speak to you about anything having to do with the tip pool, to your recollection?

A. If he had questions -- general question about the

tip pool, I don't recall. I mean he might about general stuff.

Q. Mr. Eli, from the time you started the restaurant in Costa Rica and starting it in New Orleans in the French Quarter, did you believe that what you were doing was proper under the law?

A. Yes, absolutely.

Q. Did you have any reason to believe that how you were running the tip pool was in any way improper under the law?

A. No, the contrary. It was very transparent. All these exhibits that's presented here, I think they were available to our staff all the time. We run a very transparent process and very transparent management. They have access to all of this at every moment because I truly believe there is nothing to hide.

MR. CUPP: Your Honor, let me take a second to check with counsel. I may be done.

EXAMINATION BY MR. CUPP:

Q. Ms. Wrigley pointed out I probably asked an unclear question that I would like to clear up.

Did any server at Doris ever come to you and complain to you that they believe that the tip pool was being run unlawfully?

A. No, sir.

MR. CUPP: Your Honor, I pass the witness, please.

THE COURT: All right.

CROSS-EXAMINATION

BY MS. VASQUEZ:

Q. You did not consult with an attorney regarding the tip pool?

A. I have not.

Q. I'm sorry?

A. No, I have not.

Q. You did not consult -- did you consult with an accountant when you were setting up the restaurant in 2013?

A. When I talked to the LRA, I -- you know, it's the restaurant association -- I didn't ask for what their certification is. I assumed they represent most of the restaurants in Louisiana, and once I talked to them, they know what they were talking about.

Q. So you based your information regarding the tip pool and other issues with setting up your restaurant with an association that you thought encompassed all the restaurants in Louisiana?

MR. CUPP: Your Honor --

THE WITNESS: Not all. Most.

MR. CUPP: -- I would like to state the objection that this was precisely the ground that Ms. Vasquez covered yesterday in her --

THE COURT: Overruled. I'm going to let her go and talk about that.

First, she asked you did you talk to a CPA, and you didn't answer that. You started talking about the restaurant association, so what is the answer to the talk to the CPA question?

THE WITNESS: I have not talked to a CPA.

THE COURT: Maybe you ought to start the restaurant question again, and it seemed long and confusing.

MS. VASQUEZ: Okay. I'll break it up.

EXAMINATION BY MS. VASQUEZ:

Q. Prior to opening your business or as you were in the process of opening your business, did you consult with any professionals in this state regarding opening a restaurant?

A. I considered the LRA professionals.

Q. What is your understanding of what the LRA is?

A. Well, they give all sort of services to the restaurants, from legal counsel -- they recommend legal counseling, they give a Workers' Comp, and basically are there to help restaurants.

Q. Would it be fair to say it's more of a referral service to get you professionals that you can be connected with?

A. They have inhouse counseling, and they have -- and I'm sure they can refer too, also.

Q. What do you mean by *in-house counseling*?

A. I mean they have lawyers or -- and professional people working in that association.

Q. You don't recall that the person that you did speak to at the LRA, whether or not they were even an attorney?
A. No, I don't.
Q. Even now, knowing that, that you weren't sure if they were an attorney, you still base your concept for the tip pool on the information you got from the LRA?
A. Yes.
Q. Now, you stated that the documents, you believe, are transparent?
A. Yes.
Q. Okay. I'm going to refer, what is it, Exhibit 3, Bates-603, but as we saw yesterday, there are no cash tips reported on here, correct?
A. Correct.
Q. On the bottom, the cash sales are reported but the tips are not reported?
A. Yes.
Q. Didn't you just state that --
THE COURT: That's not Exhibit 3. What exhibit is it?
MS. VASQUEZ: Five. I'm sorry, Exhibit 5, Bates-603.
MR. CUPP: I'm sorry, 603.
EXAMINATION BY MS. VASQUEZ:
Q. So in this form you see here, although there is a form that's been created for it, the cash tips were not recorded, correct?

A. Correct.
Q. So that's not very transparent, is it?
A. Why would you assume that there were cash tips?
Q. Because there are cash sales at the bottom.
A. Well, do you know how many tables split their payment and some pay in cash, some pay in credit card, and the tip is left only on the credit card? That is something that happens on a regular basis.
Q. Then wouldn't it be more transparent if there was some indication on this form of tip splitting?
A. What do you mean?
Q. If there was another box to indicate that that's what happened, what you just explained happened?
A. That there were no cash tips?
Q. Or that it was split between credit card and cash?
A. I don't understand the question.
Q. Wouldn't it be more transparent if there was an indication under *Cash Sales* that said *Tip Left on Credit Card*?
A. I'm sure it would have been helpful, yes.
Q. Okay. This is not the only instance that this has happened, correct, where there is no cash tips recorded?
A. No, it could be many times.
Q. For example, we see that it happened again in the same exhibit under Bates-604; do you see that?
A. Yes.

Q. Okay. Then in the bottom there is cash sales as well; do you see that?

A. Yes.

Q. Okay. There is no indication that there was a -- the tip was left on the credit card, is there?

A. No.

Q. Now, let me show you one more. Do you see this one? The same thing happened here. There is no cash tips?

A. No. I don't see any.

Q. There is some cash sales at the bottom; do you see that?

A. Yes, I do.

Q. You don't dispute Mr. Hunt's testimony that he created the server check-out sheets, do you?

A. Yes.

Q. You dispute that Mr. Hunt created the first version of the server checkout sheets?

A. Yes. I don't remember him creating anything as far as forms.

Q. Okay. You don't dispute that in the beginning, in 2013, it was done by collecting everything and distributing it manually somewhere up in the office?

A. It was written manually. It wasn't a well-established form.

Q. I'm sorry, what was that last part?

A. That it was written manually, and it wasn't a written,

printed form. We would do it just manually. Again, we're talking about the first few weeks of opening the restaurant.
Q. So when you were doing it manually, where would you do the calculations that would be transparent to the servers?
A. On just a sheet. It will look pretty much the same, okay? It will have a column for credit card tips and a column for cash tips, and I would just do the calculation manually.
Q. So where are those forms, sir?
A. I can't tell. I don't know.
Q. But you do think that they exist from 2013?
A. I can't say that. I know that we produced everything that we have.
Q. Okay. You do agree you didn't produce anything from 2013?
A. Could be. Again, everything was going up to the office. It wasn't as -- you know, as you go by, you get better at organization, ordering. All of those forms are being created. You print them. You get better at them. Yeah, we were not -- I mean, we were not -- I mean, when we started it was manually.
Q. If your concern is transparency, there would be some way of reporting those 2013 tips, correct?
A. They were recorded at the time and everybody who had any question about it would come to me and ask me and I would show him exactly.
Q. The manager is in charge of collecting, completing that

server checkout form and reporting those numbers; is that correct?
A. Yes.
Q. Okay. So if you -- if you purchased a meal for cash, that goes into a locked cash drawer; is that correct?
A. Can you rephrase that.
Q. If a guest pays in cash, that money goes into a cash drawer?
A. Correct.
Q. That cash drawer is locked?
A. Correct.
Q. But in the time frame that we discussed here, from 2013 to 2016, the tips were not kept in the locked cash drawer?
A. Well, at a certain point -- at '16 we switched to the locked drawer. Either '15 or '16. I can't remember the exact date. I remember when it was brought to me. My concept about this is always: This is your tip; stay to get it. Okay?
Q. Because you thought it was their liability, not your liability; isn't that what you said?
A. It's because they want to take the cash tips every day home. Every server does. So in order to do so, in order to give it to them daily, they have to stay there to get them.
Q. They would have to stay there until the end of their shift or leave and come back and get it at some point?
A. Well, everybody -- everybody get it the same time and goes

at the same times, as far as I'm concerned. Now, if somebody finish their job and their section early and want to go home, they can ask for it, the service captain can offer it as well, but it's on them to make sure they get their tips.

Q. What do you mean that the service manager or the service manager could offer it swell as well?

A. All right. Let's say that -- well, usually they are pretty good about it, the servers, about telling you, "Okay. My section is done. Can I go?" So that's how it usually happens, but I don't know, maybe a service manager can tell them your section is go -- "Your section is done, if you want to go."

Q. So you would agree that they have the authority to tell them to go at the end of their --

A. Only if they want to.

Q. Only if the managers want to?

A. No, only if the server wants to. If is server want to stay all the way to the end on the clock and wait for his tips, that's totally fine.

Q. Okay. Then I'm misunderstanding you. You said something about the service manager dealing with the tips. What did you mean by that?

A. I don't know. Rephrase that.

Q. Okay. You stated that, I don't know, maybe the server captain can, and I don't understand what you meant by that.

Can you explain what that meant.

A. Yes, I meant that, okay, most of the time the server would finish his section and he doesn't have more tables but there is another table on another section and he would ask to leave. Okay? In that case the service captain would say, "Yes, you can go," and that's about it.

Q. So they have nothing to do with what we were just talking about then, right? We were just discussing how cash tips were handled at the end of the night, and you mentioned service manager, and I wasn't sure why you mentioned service manager, so I don't understand why you said that, but we're going to go on.

So, the cash tips, they would have to either wait for them or they could come back the next day, but it would kept in an unlocked drawer all the way up until sometime in 2016; you're not sure?

A. Yes.

Q. You were talking a little bit earlier about if a table is dirty, when we were talking about discipline, if a table is dirty, the manager could admonish the server and say something like, "Go clean that table," or something like that?

A. The same way the server will tell the server assistant, "This table don't have water. Go pour water in their glasses."

Q. So if it was really a teamwork concept, why didn't the service manager or the manager clean up that table themselves?

A. Many times he would.

Q. So then why would they have the need to admonish the server regarding that?

A. If they are doing something else and need help doing that they will do so. The same way a server is going to take an order from a table, and he would realize that the other table is dirty, he will tell the server assistant, "Please clear that table."

Q. So, again, if it was really a teamwork concept, why did the servers complain about the managers helping to you?

A. Because sometimes they felt they took too much table time, I guess.

Q. What does that mean?

A. That they took -- actually stayed there and took the order or carved the meat or served the wine. Many servers or some servers, more correct to say, would like to have as much solo time as they can with a customer. So they don't like anybody else coming to the table and sort of interfere with their flow. They are solo actors. They like to sell their own wine, pour their own wine, and do everything that way.

Q. Is that how L. J. Hunt or Larry Hunt operated? He was a solo actor? He poured his own wine, cut his own meat?

A. He would want to. That's where it clashed with Larry, that he say, "Yeah, well, I do all of this," and, you know, we present him all the help that he get, but he say, "I don't want

that help." Well, our concept is based on everybody doing a lot of things in your section. Many times he got help as well. I mean, even if he didn't want it, he needed it.

Q. Your concept is based on managers helping service; isn't that right?

A. Managing and being part of service.

Q. Okay. By being part of service, you used a lot the word *helping* do this or *helping* do that, so they are helping the servers; is that right?

A. Everybody is helping everybody.

Q. Have you ever been in a restaurant where managers didn't help servers at all?

A. Absolutely.

Q. Let me ask you this: Are the managers tipped out at the Houston restaurant?

A. Service managers or service captains, yes, they are.

Q. When Melissa was made assistant GM, did she still receive the 10 percent tip-out?

A. No, ma'am.

Q. Isn't it true that a manager would always have to be on the floor regardless of what their -- well, wouldn't it be true that the manager would always have to be on the floor anyway?

A. No, I mean, Melissa, as now a general manager, there are days that she's not on the floor at all and some days that she will be there for an hour or two or more. She's not -- her

whole roll on the floor is not as nearly as a service manager.

Q. What about, you said *server manager*. I thought she was a general manager now?

A. I said that as a general manager, her presence on the floor is not as near as a service manager.

Q. Okay. So my question was: As a manager, who you call a *service manager*, don't service managers or managers have to be on the floor always anyway?

A. Well, that's part of their job, to be of service.

Q. Because they are supervising service?

A. Yeah, managing the service. I said that. They had, you know, low authority on things but everything that's related to the service. It was not more than that.

Their job is to make sure that the service meets its standards by doing whatever it takes, by giving personalized service, by talking to every table, by pouring wine and carving meat.

Q. And by supervising the servers that are doing that?

A. The same way servers are supervising the server assistants. I mean --

Q. But the server assistants are in more sections than the servers themselves are; isn't that right?

A. Explain that.

Q. The server assistants cover more tables than the servers do?

A. Well, we need more servers. Yeah, there is more servers than service captains and more servers than server assistants, if that's what you're asking.

Q. No, what I'm asking is: The server assistants, they perform service at more tables because there is fewer of them; is that right?

A. There are a little fewer of them, that's right.

Q. Okay. Then there is only usually one or two managers overseeing the servers; is that right?

A. Correct.

Q. Okay. You testified that you gave Stavros, or Steve, the authority to hire; is that right?

A. Yes. As I explained, it's -- it was pretty much an open -- we just needed everybody to come, and some of these guys mentioned that they got hired without even an interview. When you need people, you just need people.

Q. So they didn't need to go through you because they have the authority to hire on the spot?

A. It depends. I mean, if -- if what they hear from me is we need everybody, we need people, we're desperate, we're urgent, we don't have people to put on the schedule, we have, I don't know, 60 people coming in tonight, and we only have two servers, so everybody who would come to apply for a job would basically get hired on the spot regardless of who is there.

Q. Okay. By whatever -- by either Steve or Ryan O'Dwyer?

A. That happened, yes.

Q. Okay. Where they were hired on the spot.

You kept the language or the nomenclature of *manager* on Dontay's business card; isn't that right?

A. Well, he has the business card saying *manager*, yes.

Q. Okay. That was even after you changed to this new title of service captain?

A. He had -- we changed service captain and then Dontay asked for permission to, you know, he expressed to me, you know, this delicacy of the name on the card is important to him, if he can still use his old cards. I didn't object to it.

Q. That's because he wanted, and you agreed, that the customers needed to think that he had authority?

A. At this point it was because I felt he was used to something, and it meant something for him, so I didn't see any point in taking that away from him. But for the rest, I said that, you know, we got to change it because, obviously, it creates confusion. I realize it creates confusion.

Q. But you would not disagree that Dontay and managers in his position like Dontay, Ryan, Melissa during her time period as a manager, could apply discounts to meals; isn't that what you just testified to?

A. They could comp items, not specifically discounts. They wouldn't do 10 percent or 15 percent on a meal, but if they want to take a dessert off for somebody who has a birthday,

they can do that.

Q. If your teamwork concept -- if you intend to have a teamwork concept, why does everyone who performs the same level of service not get all paid the same percentages?

A. Because there are a different levels of interacting and affecting that tip pool. Server assistants who has tableside duties doesn't talk as much to the table as the server does. Therefore -- and he has probably less knowledge about our menu and about our wine list and about all the things that we do; therefore, he's not eligible to get the same portion as a server does. Service managers would get 10 percent, but the rest would be paid by the company so they could meet the amounts that servers are making.

Q. So did you base that percentage on what you thought the amount of interaction with customers are?

A. It's part of it. It's not all of it. I take pride of I want everybody that work on the floor to make very good money, so I felt like the company would pay -- so this is how it goes: Okay, the more servers are making the happier they are, and the more qualified people will want to work for you.

So, making sure that the servers are making money was top priority for me, so when it meant that I will pay the server assistants more hourly or when I would pay the service captain more outside of the tip would increase the share that the servers are making; and, therefore, they will be making

money, they will like their job, they would want to keep it, and qualified people would want to apply to the job.

Q. So do you agree with Mr. Hunt's testimony that the reason the 10 percent was added to the server checkout is because Stavros, or Steve, needed a bonus, and he wasn't getting paid very much for everything that he was doing, so the company decided to go and cut him in on the 10 percent?

A. I do not agree at all. When Stavros worked, he was hands on each and every customer. He would be so involved with the service. He had his own spiel on certain desserts that we had, and he would love to sell those things to the table. He would have full table interaction.

But the most people we have on the floor are servers; therefore, they have to have the largest portion of the tip. It just makes sense. I can take care -- the company can pay more for service managers, who are two at the time, okay, in order to make sure that those servers are making enough money. That was the whole logic behind it.

The same with server assistants. I could pay them 2.13 an hour, but I chose not to. I chose to pay them more because I didn't want to take a larger portion off the servers' share.

Q. Just going back to the ability to hire that you had given both Steve and Ryan O'Dwyer the ability to hire on the spot, do you remember when we just talked about that a few minutes ago?

A. I said it happened. It wasn't -- everybody, like I said, in, some instances, even servers would come to me without even going to anybody saying that they have somebody, and I would hire them without even meeting them, and that was the attitude at that time.

Q. So my question was: Did they have your permission to do that, Steve and Ryan O'Dwyer?

A. I think they did. They did it in a few times. I didn't tell them not to. They came to me and tell me, "Hey, look, somebody very qualified was here. I told him they could come." I was like, "Okay." We needed it.

Q. I'm sorry?

A. We needed the qualified people at the restaurant.

Q. So your answer is yes, essentially, that they did have --

A. (Speaking simultaneously) That it happened.

Q. -- supervision? That it happened and that they had your permission?

A. Yes.

Q. Okay. Do you remember when you took a deposition in this case on October 13, 2017, at 10:00 a.m.?

A. Yes, ma'am.

Q. Okay. Do you remember when you were asked -- and I'm going to refer to the deposition, page 14 of your deposition, line 12 through 14 -- when Ms. Catlett asked you, "Who at Doris Metropolitan have hiring and firing authority," you

answered, "Myself."?

A. Correct.

Q. But that's not really true, is it?

A. Well, you're talking about specific instances of people that we knew were coming referenced, then it happened that they were hired -- they were hired and only then talked to me.

But the general rule of how things work at the restaurant, and especially after the first few months when we were struggling, that's where I was the one, I conducted more interviews and could be more selective about who is working and who was not.

Q. Does that mean that that's not really true, sir? I don't understand your answer.

A. No, that it is true but there were a few instances that --

Q. There were many instances. Many people were hired by Steve and Ryan O'Dwyer?

A. Name them.

Q. Some of the plaintiffs that testified yesterday.

A. Name them. I can explain to you each and every one.

Q. Well, I think you did explain that there was a time that you needed people, correct? And you were --

A. (Speaking simultaneously) Specifically and I explained that those people came from SoBou, where my bar manager came from, and I was happy with them, and he told me they were qualified.

Q. So, your attorney can ask the questions if you would like to explain all that.

Now, you agree that they had at least a low level of authority, these managers; is that right?

A. Related to service, yes.

Q. Related to service and also hiring at times just like we saw with Stavros and Ryan O'Dwyer, correct?

A. On those instance, it happened, yes.

Q. There is no -- prior to 2016 -- from 2013 to 2016, did there exist a certification for this meat board presentation that you explained?

A. It's not -- it's not a diploma that you get. Before you handle those meat boards, you need to know how to cut them and -- and --

Q. Is that a yes or no, sir? I'm just trying to get --

A. (Speaking simultaneously) You need to have sort of a certification, correct.

Q. Okay. Did that certification exist in 2013?

A. At 2013 we wouldn't offer meat boards.

Q. What about 2014?

A. Maybe late '14 we started with it.

Q. Okay. Now, do you recall any of the plaintiffs getting a certification for the meat board?

A. They probably went through a course, yes.

Q. You said that that happened 2014?

A. Some of them, I assume. Not all of them.
Q. Now, you also stated that managers don't sweep; is that right?
A. They -- if they need to, they will during service. By the end of the service, they are watching everyone to the last table. So while other people are starting to close, they won't do that. They would watch the tables.
Q. So they are going to watch and make sure people get proper service; is that right?
A. Yes.
Q. They are there, essentially, just to help if anything is needed during service, but their function is more supervision of the servers that are performing the service; would you agree with that?
A. When are you talking about? When the last table is there or in general.
Q. In general.
A. In general they are involved with service.
Q. When you say they are involved in service, you talked about -- you said -- give me one second to find it in my notes -- they are there to greet tables; is that right?
A. They would greet tables, yes.
Q. Talk to customers?
A. Yes.
Q. Make sure that they experience the correct experience?

A. Yes.
Q. Hand out personalized service?
A. Yes.
Q. Okay. It doesn't say that they have to bus tables or anything. You didn't say that, did you?
A. I didn't but both testified to it.
Q. Is that part of the filling in if a server has two tables for, like, a double-seating situation?
A. For many situations. Again, restaurant dynamic is not very, very structured. A lot of things are happening on the fly, and you have to react to them.
Q. Let's talk a little bit about the double seating. Isn't the issue with the double seating where the manager would have to be involved due to a pacing issue with the restaurant?
A. Obviously we never try to double sit. This is something we will try to avoid, but occasionally it will happen because a reservation is late, and they came at 7:30 instead of at 7:00 and then he already a 7:30 reservation at that specific table right next to them, so it's a double sitting.
Q. If there is a situation where there is pacing problems and you have to have the manager help because the server has too many tables, that's generally -- that would be something that -- would the host control something like that?
A. Yes, but sometimes it's circumstances that you will have no -- no control of.

Q. Have you ever seen Dontay greet a table that perhaps he knows, perhaps, some friends and sit and drink wine at the table?
A. Probably it happened, yes.
Q. Now, is that -- do a couple of managers do that? They'll sit and drink wine with the table and give some personalized attention to a particular table that they may know someone at?
A. Well, it depends. I mean, tables will give also servers a taste of their wine if they talked with wine about them. With the sommelier for sure.
Q. What about other managers then, not just servers --
A. (Speaking simultaneously) It can happen that, say, Dontay recommended a specific wine for them and they love it, and they wanted to share, you know, a taste with him.
Q. Then he'll sit down and have some wine with those folks?
A. I mean, he has job to do. I don't think he will sit down, but even if he sit down out of respect to them, it would happen, then he would get back to work.
Q. Okay. Then the hosts, you testified, they make reservations, they hand out menus; is that right?
A. Yes.
Q. They also greet the customers?
A. As they walk in, yes.
Q. They interact with the customers?
A. As they walk in.

Q. Now, why aren't they part of the tip pool?
A. Because they don't do any table service.
Q. They do have interaction with the customers; isn't that right?
A. Only when they come in and go out.
Q. How is that different from the managers that are meeting and greeting the customers?
A. Because during the time that the customers is sitting at the table, the service manager has a lot of interaction with them. The host, on the other hand, greeted him as he walked in and greeted him as he walked out. There is a huge difference.
Q. Unless there is a reservation that is being made, in which case they are going to talk to the customers, aren't they?
A. Well, they will greet them as they walk in. Of course, they will ask if they have a reservation. If they do, they will take them to their table.
Q. Just to confirm, managers don't have sections, right?
A. They work -- two captains will cover the whole restaurant. It's not a huge restaurant, and sometimes you will have a bigger section all set and another section that is relatively empty, so both of them will come and be at the same section.
Q. So when there is only one manager on staff, how can they logistically interact and meet and greet every single customer?
A. If they were, it should be a very slow -- very, very slow shift.

Q. But what if it's not a slow shift, that you only have --

A. (Speaking simultaneously) It rarely happens. We always schedule two.

Q. But in the instance that there's only one, or even when you have two, and you have 90 customers, how is it logistically possible to service or interact with all 90 customers?

A. Come and see. It's happening every night.

Q. So it might be two or three minutes at a table, or even less than that?

A. It depends.

Q. So, if you're out of town or out of the country, you testified that a manager can go to the chef and get authority from the chef? Is that what you were speaking of?

A. It depends on the issue, but, yes.

Q. Okay. Can you recall an instance where that happened, where one of the managers had a problem and went to the chef?

A. Yes.

Q. Okay. What was that instance like or what was that instance about?

A. We have the service manager who thought one of -- one of the servers -- one of the server assistants has a bottle of alcohol in the bathroom, and he thought he would go there and drink. He didn't know what to do with the situation, so he went to the chef and asked him what would be the right call.

The chef decided that at that moment it would be the

right call to send him home and then deal with it when I know -- when I know more about the situation, after they let me know about the situation.

Q. You said that a lot of people have keys to the restaurant, correct?

A. Yes.

Q. You said that the butcher has keys to the restaurant?

A. Yes.

Q. Do the dishwashers have keys to restaurant?

A. No.

Q. Do the SA's have keys to the restaurant?

A. No.

Q. Do the servers have keys to the restaurant?

A. No.

Q. On the issue with Mr. Gandy and Fluffy, was the issue that she hadn't signed her credit card slip, not so much the tip issue?

A. When she talked to me it was -- he confronted about the amount of tip.

Q. Okay. Was Ms. Fluffy intoxicated when you talked to her?

A. When I talked to her, no. She called me the day after.

Q. When you investigated the issue, did you determine that it was because Mr. Gandy was trying to get the credit card slip to turn into the office?

A. No, it was the amount of tip that was discussed.

 MS. VASQUEZ: Just give me one moment. Let me consult with Ms. Catlett.

EXAMINATION BY MS. VASQUEZ:

Q. Where was the petty cash kept?

A. Petty cash? Usually at the office, I would say.

Q. Was it kept in a locked container?

A. In this little -- little boxes with a small lock on it.

Q. The cash in the bar register, who had access to that?

A. The bartenders.

Q. How did the servers make change?

A. They would do it with the service captain's help.

Q. How did the service captain help or the manager help?

A. We have a cash register. They would open it and do the necessary change.

Q. So why weren't the cash tips kept there or where the petty cash is located?

A. Because they didn't want to mix up.

Q. There was no way to keep a separate section for people's envelopes for the cash tips that were given at the end of the night, either in the register or in the petty cash box?

A. Well, when we started no one was really leaving. Everybody was waiting for their tips, and then gradually it was one server who said, "I'm going to pick it up tomorrow," so they left him an envelope. Then it was another one and another one, and before you know it, it became sort of like a norm.

Then when I kind of heard that some of them think some of it is missing, I decided to just put in it the cash drawer where it's locked.

Q. But that wasn't until much later, correct?

A. It was, but that issue -- I was not even aware of that issue until that later.

Q. But you had heard of that issue. You testified earlier you had heard about it?

A. Right, when I decided to change it.

Q. When did you decide to change that?

A. Like I said, it was probably around -- it's really hard to put my finger on -- on the specific date, but late '15 or early '16.

Q. Was it after the suit was filed?

A. No.

Q. It was before?

A. I'm pretty sure.

MS. VASQUEZ: I have no more questions.

MR. CUPP: Just a few follow up, Your Honor.

REDIRECT EXAMINATION

BY MR. CUPP:

Q. Mr. Eli, when there would be a double seating, would the server and server assistants be expected to step up and help with the double-seating situation?

A. Of course. Everybody.

Q. Everybody. The point was to make sure if you got two new groups -- two new groups of customers seated in the same section, we need take care of them?

A. Correct.

Q. We spent, I think, a lot of time on cash tips. Was the restaurant taking the cash tips of the servers?

A. Never.

Q. With cash tips being so rare, did you believe or did you have some suspicion that they simply just weren't reporting the cash tips and splitting them among themselves?

A. Yes.

MR. CUPP: Nothing further, Your Honor.

THE COURT: All right. Mr. Eli, I had a couple of questions I wanted to ask you.

When you said you called the Louisiana Restaurant Association, what exactly did you ask them when you called them? What was the question?

THE WITNESS: Well, I asked about everything I could possibly ask. Being new to town, I asked them how normally things are being run in Louisiana, what is -- you know, how restaurants operate, from what positions are common, as far as servers, server assistants, and how people get paid, is it weekly, is it biweekly, is it daily, how often do you give tips? All these questions that I have, you know, that I knew how I do it in Costa Rica or in Israel, but I wasn't sure how

to do it here.

THE COURT: Did you ask them a specific question about tip pools and who should participate?

THE WITNESS: I explained exactly how I work in Costa Rica and express that this how I want to do it also here in New Orleans, and that person basically heard it all and said that that sounds perfectly fine.

THE COURT: All right. When you described how you do it in Costa Rica, how is it you said you did it in Costa Rica?

THE WITNESS: Well, it's exactly how we do it here. We have two captains, and we have about six to seven servers. It's a larger dining room rather than the two that we have here. We have three server assistants, and it's basically identical.

THE COURT: Do you have a tip pool in Costa?

THE WITNESS: Correct. I have tip pool.

THE COURT: When you asked about that question in particular, you know, about this is how I'm planning to do my tip pool, was it because you had some concerns about whether that was authorized under U.S. law?

THE WITNESS: No. Honestly, the question came from more of what's the norm rather than the legality because, I mean, I didn't picture a scenario when it's not legal to do a tip pool.

Again, in my mind I have a very specific way of

how I wanted the service to happen or to be given to a table, so I was more interested on what's the norm because I figured, you know, if it will be too different, people wouldn't understand or wouldn't want to work for me, so it would be more difficult to get people.

THE COURT: Is it your testimony that somebody at the LRA told you that tip pools were the norm in Louisiana?

THE WITNESS: No. No, they didn't tell me it was the norm. They tell me that some people do it, but they didn't tell me it's the norm. That's why I just wanted to know.

THE COURT: Did they get into a specific discussion with you about, well, yes, you can have tip pools and you could have service managers to do some managerial responsibilities, but they also have direct contact with the customers, did you get into that kind of specific discussion?

THE WITNESS: No, ma'am. It was more of I explained how the service goes and the levels or layers that there are from server assistants to the service manager and that's it. That's where I kept that.

THE COURT: You were aware that the United States had its own set of labor laws?

THE WITNESS: I'm aware of that, yes.

THE COURT: You knew that when you opened the restaurant?

THE WITNESS: Yes, I figured obviously.

THE COURT: All right. So did you do anything else to try to educate yourself about what your responsibilities were as the owner/manager of this restaurant?

THE WITNESS: I'm sorry. As time went by, of course, I realized, and, you know, looking back in perspective, I probably should have just to make sure I making things right. I'm getting educated about these things as well myself.

Obviously I would have much preferred not to get into this lawsuit, for instance, but I definitely learned, and I definitely consult more with lawyers about everything that I do now because I realize it's the right thing to do.

THE COURT: All right. Thank you.

All right. You're excused from the stand.

Counsel, you all requested an opportunity to do post-trial briefing, and what I would like for you to do is provide those to me by the end of the day on June 15th, so that gives you about 10 days to do it.

MR. CUPP: Yes, ma'am. The question I have, obviously, can we order a transcript so we can cite to it?

THE COURT: Are you going to do a transcript for the case? I guess if you do --

MR. CUPP: If I'm going to do suggested findings of fact or conclusions of law or revise the one we did, we took copious notes, obviously, but I would --

THE COURT: I didn't know you were going to get a

transcript, so I guess you'll have to find out how long it will take and then we'll set a deadline.

MR. CUPP: If you would accept just based upon our copious notes what people said in constructing it, I would be --

THE COURT: It's up to you. You have to decide.

MR. CUPP: Okay. Yeah, I guess we would get with the court reporter and figure out when that would be.

THE COURT: At least it wasn't too long. It was a day and two-thirds of a day.

MS. VASQUEZ: I would say that if it's going to be a long time to get the transcript, because I know sometimes some court reporters are very, very back logged, then I would prefer to just set a sooner date and base it on our notes than wait several months.

THE COURT: We'll decide after we check to see how long it will take to get a transcript, and I will let you know by setting a deadline.

MR. CUPP: I will say I had an experience recently in state court -- one-day trial, bench trial, and they gave us a two-month time period. I'm in agreement with Ms. Vasquez if that's the case.

THE COURT: Okay. Well, we'll visit when we know more about that.

Anything else we need to discuss?

MR. CUPP: Case closed as far as the defense is concerned.

THE COURT: All right. Good. Well, thank you both.

I would like to meet with counsel in my chambers for a minute.

THE DEPUTY CLERK: All rise.

(WHEREUPON, at 3:05 p.m., the proceedings were concluded.)

* * *

REPORTER'S CERTIFICATE

I, Cathy Pepper, Certified Realtime Reporter, Registered Merit Reporter, Certified Court Reporter in and for the State of Louisiana, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript to the best of my ability and understanding from the record of the proceedings in the above-entitled and numbered matter.

*s/Cathy Pepper*

Cathy Pepper, CRR, RMR, CCR
Certified Realtime Reporter
Registered Merit Reporter
Official Court Reporter
United States District Court
Cathy_Pepper@laed.uscourts.gov

## $

**$1,124.44** [1] - 394:17
**$10** [2] - 291:7, 291:15
**$10,266.91** [1] - 390:25
**$100** [1] - 291:7
**$12,270.43** [1] - 374:2
**$15** [1] - 314:25
**$200** [2] - 427:22, 429:2
**$40** [2] - 429:3
**$5.36** [1] - 356:10
**$6.41** [1] - 374:5
**$87,765** [1] - 395:16
**$87,765.98** [1] - 395:15
**$92** [1] - 293:10

## '

**'14** [1] - 473:21
**'15** [3] - 351:15, 461:15, 481:12
**'16** [4] - 351:14, 461:14, 461:15, 481:13

## 1

**1** [6] - 300:14, 350:22, 352:12, 414:6, 414:11
**1.18** [1] - 390:17
**1.5** [1] - 356:5
**1.52** [1] - 373:16
**1.7** [1] - 374:7
**1.77** [1] - 374:9
**1/1/14** [1] - 352:9
**1/1/15** [1] - 352:8
**10** [31] - 289:10, 289:19, 289:20, 290:24, 291:9, 291:11, 320:5, 321:15, 321:18, 321:21, 321:23, 322:2, 322:5, 322:8, 322:10, 323:16, 324:1, 344:21, 388:17, 429:21, 430:11, 430:15, 430:18, 430:20, 448:22, 465:18, 468:24, 469:11, 470:4, 470:7, 485:17
**10.32** [1] - 390:14
**100** [1] - 373:4
**101** [2] - 373:4, 373:23
**1048** [1] - 372:11
**10:00** [3] - 433:20, 434:15, 471:20
**10:23** [1] - 348:16
**10:25** [1] - 412:10
**10:30** [9] - 334:3, 334:13, 345:3, 412:9, 412:13, 414:19, 425:24, 426:1, 426:6
**10:40** [1] - 348:14
**11/14/2014** [1] - 390:5
**1100** [1] - 288:23
**11:36** [1] - 393:16
**12** [1] - 471:24
**12/26/2014** [1] - 353:20
**12:40** [1] - 393:14
**13** [4] - 288:16, 288:17, 314:24, 471:20
**1300** [3] - 288:19, 288:23, 289:9
**14** [2] - 471:23, 471:24
**1414** [1] - 277:20
**14TH** [1] - 277:24
**15** [7] - 314:24, 316:22, 317:2, 358:19, 359:17, 378:9, 468:24
**150** [1] - 451:8
**15th** [1] - 485:16
**1694** [1] - 353:17
**17** [1] - 334:24
**1760** [2] - 349:15, 351:22
**18** [5] - 291:3, 296:20, 296:21, 334:24, 390:16
**1st** [2] - 352:6, 390:8

## 2

**2** [6] - 277:10, 352:25, 353:16, 372:10, 414:6, 414:7
**2.13** [12] - 311:9, 312:6, 356:1, 356:15, 356:16, 356:18, 365:18, 365:20, 378:14, 451:20, 451:25, 470:20
**2.5** [1] - 373:14
**2.85** [1] - 390:10
**20** [8] - 339:6, 339:14, 339:17, 402:24, 428:17, 428:25, 429:2
**200** [1] - 451:8
**2005** [1] - 399:11
**2008** [1] - 400:19
**2009** [1] - 401:2
**2013** [15] - 349:17, 350:14, 350:16, 403:9, 403:19, 439:25, 455:9, 459:19, 460:10, 460:13, 460:21, 461:12, 473:9, 473:18, 473:19
**2014** [18] - 302:16, 349:17, 350:13, 350:14, 350:15, 350:17, 350:20, 352:6, 352:12, 353:19, 358:12, 373:8, 381:23, 382:22, 408:6, 441:22, 473:20, 473:25
**2015** [13] - 282:2, 282:3, 282:10, 282:15, 287:21, 302:2, 302:8, 303:15, 350:14, 350:22, 350:23, 390:8, 390:16
**2016** [29] - 282:1, 282:10, 282:11, 282:12, 282:16, 282:19, 284:23, 284:25, 286:10, 287:13, 287:16, 287:21, 293:12, 303:15, 303:18, 350:23, 358:12, 382:23, 386:13, 406:2, 438:2, 439:22, 443:3, 443:4, 451:7, 461:13, 463:15, 473:9
**2017** [21] - 282:13, 282:21, 284:5, 284:6, 287:5, 290:21, 298:1, 299:5, 299:16, 299:18, 334:19, 340:10, 350:11, 352:12, 397:3, 397:6, 407:13, 407:16, 434:20, 471:20
**2018** [3] - 277:6, 280:2, 394:2
**22** [1] - 373:8
**24th** [1] - 302:2
**25** [6] - 291:23, 291:25, 293:3, 388:16, 430:9, 448:22
**2505** [1] - 277:24
**27** [3] - 350:13, 350:15, 352:12
**27th** [1] - 350:19
**281** [2] - 279:5, 279:6
**2:30** [4] - 334:5, 334:10, 334:13, 412:22

## 3

**3** [3] - 297:20, 457:11, 457:19
**3/12/16** [1] - 351:24
**3/27/15** [1] - 351:24
**30** [5] - 384:1, 410:22, 413:24, 414:3, 421:7
**300** [1] - 277:24
**31** [2] - 438:2, 439:21
**31st** [1] - 406:2
**325** [1] - 279:7
**34(b)(1)(C)** [1] - 351:5
**342** [1] - 279:8
**358** [2] - 279:9, 279:10
**375** [1] - 279:11
**382** [2] - 279:12, 279:13
**391** [1] - 279:14
**393** [1] - 279:15
**39501** [1] - 277:25
**398** [1] - 279:16
**3:05** [1] - 487:7

## 4

**4** [2] - 350:14, 350:23
**4.27** [1] - 390:20
**40** [5] - 314:1, 314:6, 354:20, 355:23, 372:13
**40.7** [1] - 355:13
**400** [1] - 277:16
**42** [1] - 355:13
**43** [1] - 355:13
**454** [1] - 279:17
**481** [1] - 279:18
**49** [1] - 359:6
**4:30** [1] - 412:23

## 5

**5** [29] - 277:6, 280:2, 289:12, 289:13, 289:19, 289:20, 289:22, 291:11, 291:13, 320:8, 321:16, 321:18, 321:21, 322:2, 322:9, 322:25, 323:1, 323:5, 323:6, 323:7, 323:24, 323:25, 353:19, 394:2, 430:15, 430:18, 430:20, 448:14, 457:20
**5.36** [1] - 356:7
**5.5** [1] - 451:25
**5.50** [3] - 378:16, 451:11, 451:14
**50** [2] - 359:8, 429:18
**500** [1] - 278:4
**504** [1] - 278:5
**550** [2] - 288:6, 288:9
**589-7779** [1] - 278:5
**5:30** [3] - 334:11, 412:7, 414:19

## 6

**6** [12] - 288:6, 354:13, 355:9, 355:18, 355:22, 356:21, 372:22, 372:24, 373:4, 389:24, 394:14, 394:16
**60** [2] - 429:18, 467:22
**603** [1] - 457:21
**65** [3] - 391:25, 430:8, 448:22
**650** [3] - 277:20, 288:7, 288:8
**69** [1] - 300:14
**6:00** [2] - 416:4, 416:5

## 7

**7.25** [4] - 311:9, 312:21, 356:5, 375:2
**7.50** [3] - 312:7, 312:8, 356:1
**70130** [3] - 277:17, 277:21, 278:5
**750** [1] - 288:3
**76** [1] - 355:15
**7:00** [1] - 475:17
**7:30** [2] - 475:17, 475:18

## 8

**88** [1] - 389:25
**89** [2] - 389:25, 390:22

## 9

**90** [5] - 299:23, 417:2, 429:21, 478:5, 478:6
**900** [1] - 277:16
**95** [3] - 374:18, 374:20, 428:1
**98** [1] - 395:16
**99** [1] - 447:17
**9:00** [2] - 277:6, 437:4
**9:30** [1] - 437:17
**9th** [1] - 381:24

## A

**A-D-A-M-S** [1] - 358:8
**a.m** [7] - 348:16, 393:16, 416:4, 416:5, 433:20, 433:21, 471:20
**A.M** [1] - 277:6
**abilities** [1] - 435:4
**ability** [9] - 337:10, 344:21, 361:5, 363:2, 378:2, 378:3, 470:23, 470:24, 487:18
**able** [18] - 285:22, 308:12, 310:2, 310:11, 310:15, 319:3, 319:5, 367:5, 371:1, 377:8, 394:24, 394:25, 396:25, 419:4, 432:23, 433:3, 444:9, 450:22
**above-entitled** [1] - 487:19
**absence** [1] - 341:16
**absent** [1] - 317:24
**absolutely** [21] - 283:10, 300:1, 300:6, 315:10, 316:2, 327:5, 330:10, 333:4, 342:14, 343:25, 388:13, 389:20, 412:12, 415:9, 417:8, 421:4, 423:9, 425:15, 441:4, 454:6, 465:13
**accept** [1] - 486:3
**access** [4] - 301:19, 302:17, 454:12, 480:8
**accident** [1] - 318:6
**accommodate** [4] - 410:25, 419:19, 420:14, 446:17
**accomplish** [1] - 405:10
**account** [1] - 388:18
**accountant** [1] - 455:8
**accurate** [5] - 373:18, 374:3, 377:15, 397:8, 397:15
**accurately** [2] - 353:18, 446:1
**acted** [2] - 340:21, 372:3
**acting** [2] - 344:10, 379:1
**ACTION** [1] - 277:5
**Activity** [2] - 349:2, 351:23
**activity** [5] - 349:8, 349:15, 350:2, 351:11, 352:4
**actor** [3] - 330:19, 330:21, 464:22
**actors** [1] - 464:19
**actual** [6] - 354:14, 362:18, 402:20, 424:15, 430:4, 438:25
**Adams** [7] - 301:10, 357:22, 358:7, 372:14, 372:15, 373:5, 375:11
**ADAMS** [1] - 358:2
**ADAMS.....................................** [1] - 279:9
**add** [5] - 319:7, 319:8, 428:8, 428:21
**added** [3] - 373:25, 432:14, 470:4
**additional** [3] - 354:22, 390:23, 394:9
**addressed** [1] - 357:4
**adds** [1] - 430:6
**adjust** [1] - 317:4
**adjustment** [1] - 316:20
**administrative** [4] - 280:17, 417:12, 417:18, 433:24
**admonish** [2] - 463:20, 464:2
**ADP** [1] - 418:9
**adult** [1] - 433:16
**advantages** [1] - 432:9
**adverse** [3] - 349:19, 351:5, 357:5
**advisement** [1] - 398:9
**affect** [3] - 315:18, 405:22, 436:25
**affecting** [2] - 452:5, 469:6
**affirmatively** [3] - 294:11, 305:15, 396:1
**afraid** [1] - 443:20
**afternoon** [1] - 393:13
**aggressive** [2] - 332:4, 342:19
**ago** [7] - 324:9, 375:17, 377:16, 413:9, 418:10, 435:3, 470:25
**agree** [23] - 294:16, 309:3, 309:11, 343:4, 349:14, 349:16, 351:10, 352:2, 374:2, 387:13, 390:12, 390:17, 390:19, 390:24, 393:11, 395:24, 441:8, 460:13, 462:13, 470:3, 470:8, 473:3, 474:13
**agreed** [2] - 289:7, 468:12
**agreeing** [2] - 395:21, 395:23
**agreement** [3] - 355:21, 437:10, 486:21
**agreement's** [1] - 398:17
**ahead** [3] - 311:12, 332:13, 435:6
**AIDED** [1] - 278:8
**AL** [2] - 277:4, 277:7
**alcohol** [1] - 478:22
**Alise** [2] - 303:11, 364:9
**allocated** [1] - 320:6
**allow** [2] - 344:23, 398:19
**allowed** [2] - 300:12, 396:7
**allows** [2] - 300:21, 301:5
**almost** [3] - 283:1, 312:15, 312:19
**alone** [1] - 322:1
**Alpine** [2] - 402:24, 439:15
**ambiance** [1] - 369:18
**amount** [34] - 290:17, 291:3, 292:14, 292:19, 293:4, 317:21, 318:17, 328:4, 329:6, 352:22, 354:3, 356:9, 357:3, 357:15, 369:18, 374:2, 374:6, 381:17, 390:19, 395:8, 395:25, 418:22, 419:21, 437:15, 437:20, 443:23, 446:18, 450:11, 451:20, 451:21, 452:4, 469:15, 479:19, 479:25
**amounts** [1] - 469:13
**Angeles** [2] - 371:4, 402:1
**angry** [2] - 333:1, 344:7
**anniversary** [1] - 431:9
**answer** [5] - 311:25, 456:2, 456:3, 471:14, 472:13
**answered** [1] - 472:1
**anyway** [5] - 344:13, 381:17, 444:6, 465:22, 466:8
**app** [1] - 304:16
**apparent** [1] - 312:13
**appear** [1] - 291:8
**APPEARANCES** [2] - 277:13, 278:1
**appeared** [1] - 366:7
**appetizers** [3] - 421:12, 421:15
**application** [2] - 300:21, 301:5
**applied** [1] - 357:6
**applies** [1] - 376:2
**apply** [3] - 467:23, 468:21, 470:2
**applying** [1] - 442:4
**appointment** [1] - 374:21
**apportioned** [1] - 449:17
**appreciate** [1] - 345:25
**approach** [2] - 319:24, 333:7
**appropriate** [2] - 445:17, 445:21
**appropriately** [2] - 362:3, 362:7
**approval** [2] - 301:16, 383:22
**approve** [10] - 301:23, 303:25, 361:8, 364:20, 385:12, 386:25, 431:13, 446:20, 447:4, 447:18
**Approved** [1] - 301:2
**approved** [6] - 301:11, 301:12, 304:16, 447:11, 447:13, 448:3
**approving** [1] - 301:12
**approximate** [2] - 422:1, 423:24
**April** [4] - 350:14, 350:22, 350:23, 353:19
**arbitrary** [1] - 365:23
**area** [1] - 412:4
**areas** [1] - 324:7
**argue** [1] - 357:6
**argument** [5] - 348:11, 354:22, 355:7, 355:19, 398:11
**arise** [1] - 371:16
**arms** [1] - 335:21
**arranging** [2] - 417:17, 420:2
**arrive** [3] - 413:5, 413:25, 416:2
**arrived** [1] - 385:5
**arrives** [3] - 419:23, 420:12, 433:19
**aside** [1] - 449:17
**aspect** [1] - 329:18
**aspects** [1] - 363:24
**asserting** [1] - 338:3
**assign** [1] - 380:2
**assigned** [8] - 294:21, 294:24, 315:22, 325:11, 366:9, 366:11, 387:7, 414:8
**assist** [1] - 435:12
**assistant** [19] - 293:1, 294:24, 296:22, 336:4, 336:5, 366:3, 366:6, 392:18, 397:4, 435:2, 435:8, 435:9, 435:13, 436:3, 445:7, 445:14, 463:22, 464:7, 465:17
**assistants** [54] - 291:19, 291:22, 292:7, 293:4, 293:6, 294:10, 294:14, 296:17, 323:9, 335:25, 339:21, 365:9, 365:11, 377:4, 378:13, 379:19, 379:24, 380:1, 388:3, 389:1, 409:7, 411:4, 413:17, 415:17, 419:13, 419:22,

420:10, 425:17, 426:8, 430:10, 432:22, 433:4, 442:21, 446:19, 446:21, 451:6, 451:11, 451:14, 451:15, 451:18, 451:25, 466:20, 466:21, 466:24, 467:2, 467:4, 469:6, 469:23, 470:19, 478:21, 481:23, 482:22, 483:13, 484:18
**assisted** [1] - 378:25
**Association** [3] - 404:22, 405:4, 482:16
**association** [4] - 455:11, 455:17, 456:3, 456:25
**assume** [4] - 283:9, 354:12, 458:3, 474:1
**assumed** [1] - 455:12
**assuming** [6] - 323:10, 323:11, 387:10, 403:5, 407:23, 428:23
**assuring** [1] - 385:5
**AT** [1] - 277:19
**attend** [5] - 311:3, 367:6, 411:24, 413:16, 413:19
**attendance** [1] - 364:22
**attention** [5] - 336:15, 416:24, 427:2, 432:25, 476:7
**attitude** [1] - 471:4
**attorney** [4] - 455:3, 457:2, 457:5, 473:1
**ATTORNEY** [1] - 277:19
**attorneys** [2] - 337:20, 371:7
**audience** [1] - 375:12
**August** [4] - 358:12, 373:8, 381:24, 381:25
**authority** [35] - 298:19, 298:25, 299:11, 299:14, 304:11, 304:18, 317:9, 319:2, 319:13, 319:17, 335:24, 336:2, 343:12, 344:14, 378:1, 385:8, 416:18, 434:7, 435:19, 438:2, 438:6, 439:19, 445:2, 445:6, 445:10, 452:8, 452:13, 462:13, 466:12, 467:12, 467:18, 468:13, 471:25, 473:4, 478:12
**authorized** [2] - 439:20, 483:20
**auto** [1] - 428:21
**automatically** [1] - 371:11
**available** [8] - 283:18, 285:15, 349:12, 417:2, 417:6, 436:3, 436:7, 454:10
**Average** [1] - 292:10
**average** [10] - 292:14, 292:22, 292:25, 293:1, 360:2, 360:20, 421:23, 421:24, 448:15
**avoid** [1] - 475:16
**aware** [8] - 340:9, 340:12, 357:10, 371:5, 406:1, 481:5, 484:20, 484:22

## B

**B-275** [1] - 278:4
**back-of-the-house** [1] - 327:17
**backed** [1] - 356:18
**background** [1] - 401:13
**bad** [12] - 330:23, 332:20, 344:1, 344:3, 354:23, 354:25, 355:7, 357:8, 357:12, 377:9, 398:18, 443:2
**balance** [1] - 452:1
**ballpark** [2] - 397:17, 397:18
**banquet** [1] - 327:17
**bar** [8] - 383:4, 402:25, 415:18, 415:19, 415:20, 440:20, 472:23, 480:8
**bartenders** [5] - 413:18, 415:19, 415:20, 480:9
**bartending** [1] - 399:12
**base** [3] - 457:5, 469:14, 486:14
**based** [21] - 301:23, 326:4, 335:7, 335:9, 354:15, 365:23, 372:21, 372:22, 373:22, 373:23, 379:8, 379:13, 390:12, 408:1, 418:25, 443:9, 444:24, 455:15, 465:1, 465:4, 486:3
**basics** [1] - 379:11
**basis** [7] - 326:17, 365:14, 367:15, 438:23, 438:24, 452:16, 458:8
**Bates** [1] - 300:14
**Bates-1676** [1] - 353:17
**Bates-1709** [2] - 349:15, 351:22
**Bates-602** [1] - 289:23
**Bates-603** [2] - 457:12, 457:20
**Bates-604** [1] - 458:24
**Bates-72** [1] - 300:25
**Bates-Black** [1] - 300:14
**bathroom** [1] - 478:22
**Bayona** [2] - 391:11, 391:15
**bear** [1] - 451:9
**bearing** [1] - 357:8
**became** [9] - 282:8, 285:14, 340:9, 340:18, 368:8, 369:5, 425:2, 441:15, 480:25
**become** [1] - 282:7
**becoming** [1] - 365:25
**BEFORE** [1] - 277:11
**began** [3] - 381:24, 399:8, 399:9
**beginning** [20] - 299:14, 308:11, 308:25, 321:22, 326:6, 373:9, 381:25, 382:23, 386:6, 390:5, 403:15, 403:21, 404:9, 407:1, 407:5, 425:2, 439:21, 449:21, 449:23, 459:19
**begins** [1] - 362:18
**behind** [6] - 300:14, 362:11, 369:3, 415:18, 415:19, 470:18
**behind-the-scenes** [1] - 362:11
**below** [1] - 397:2
**Ben** [2] - 398:5, 398:23
**BEN** [2] - 279:16, 398:24
**bench** [1] - 486:20
**BENCH** [1] - 277:10
**beneath** [5] - 360:3, 360:4, 360:5, 360:13, 376:22
**benefits** [2] - 405:25, 419:17
**Best** [2] - 441:19, 441:22
**best** [14] - 344:9, 344:11, 354:15, 359:15, 369:13, 369:15, 369:24, 374:4, 381:7, 404:18, 405:18, 409:11, 448:8, 487:18
**better** [9] - 319:9, 330:14, 369:5, 380:18, 402:5, 415:7, 417:21, 460:15, 460:17
**between** [18] - 283:20, 296:23, 303:15, 334:10, 334:14, 359:9, 359:11, 359:16, 395:19, 411:3, 422:12, 430:10, 430:12, 437:10, 443:20, 449:1, 452:20, 458:15
**beyond** [1] - 352:13
**big** [11] - 327:22, 367:3, 368:23, 376:11, 402:13, 409:22, 420:24, 421:5, 424:14, 425:9, 439:11
**bigger** [5] - 339:12, 395:15, 424:20, 432:10, 477:20
**biggest** [1] - 326:20
**bill** [6] - 339:8, 427:10, 428:6, 428:8, 428:22, 429:2
**binder** [1] - 408:12
**birthday** [2] - 446:23, 468:25
**bit** [19] - 315:2, 319:17, 323:16, 330:14, 330:25, 331:19, 338:17, 342:10, 358:15, 361:23, 367:10, 367:14, 368:5, 383:24, 388:20, 435:19, 448:12, 463:18, 475:12
**biweekly** [2] - 352:20, 482:23
**Black** [12] - 300:14, 304:20, 305:21, 330:15, 330:18, 331:6, 373:4, 373:23, 389:25, 390:22
**BLACK** [1] - 277:4
**blow** [1] - 442:17
**board** [8] - 328:6, 328:9, 424:15, 425:6, 425:9, 425:10, 473:10, 473:23
**boards** [4] - 424:8, 424:9, 473:13, 473:19
**boat** [1] - 308:12
**bodies** [1] - 422:18
**boils** [1] - 396:6
**bone** [1] - 424:21
**bonus** [1] - 470:5
**book** [1] - 408:14
**bother** [1] - 312:11
**bottle** [3] - 380:2, 380:12, 478:21
**bottom** [8] - 300:15, 301:2, 359:11, 390:16, 457:15, 458:4, 459:1, 459:10
**bouncing** [1] - 283:20
**box** [7] - 291:8, 292:2, 292:10, 292:25, 458:12, 480:20
**boxes** [1] - 480:7
**brainstorming** [1] - 370:25
**bread** [1] - 294:15
**break** [6] - 304:5, 348:10, 348:12, 356:25, 393:9, 456:8
**breaking** [1] - 364:1
**breaks** [2] - 316:18, 361:2
**brevity** [1] - 362:21
**brief** [3] - 357:11, 396:8, 398:9
**briefing** [2] - 398:20, 485:15
**briefly** [4] - 383:5, 386:11, 388:20, 389:21
**bring** [10] - 294:15, 325:1, 328:9, 332:16, 332:23,

345:15, 402:15, 434:25, 448:19, 448:20
**bringing** [1] - 426:10
**broom** [2] - 426:10, 426:21
**brought** [10] - 302:22, 302:23, 306:14, 370:22, 371:19, 371:24, 372:2, 450:4, 451:18, 461:16
**brushed** [3] - 370:9, 370:21, 371:20
**Buck** [4] - 364:24, 379:8, 420:19, 420:22
**buckets** [1] - 362:22
**bucks** [1] - 322:18
**buffet** [1] - 413:7
**building** [8] - 344:12, 345:18, 345:24, 346:2, 346:15, 346:25, 403:5, 426:22
**built** [1] - 410:23
**bump** [2] - 283:11, 289:7
**bunch** [2] - 384:9, 429:4
**bundles** [1] - 389:5
**bus** [4] - 327:4, 327:7, 345:7, 475:4
**business** [22] - 284:20, 285:1, 285:11, 285:14, 285:19, 297:17, 297:21, 298:4, 299:10, 318:8, 325:15, 329:24, 376:4, 400:8, 400:24, 432:2, 439:5, 456:10, 456:11, 468:4, 468:5
**bussed** [1] - 326:19
**bussing** [1] - 423:5
**busy** [10] - 320:24, 345:16, 380:6, 410:10, 415:6, 415:19, 419:2, 421:20, 427:13, 430:24
**but..** [3] - 293:22, 331:1, 381:4
**but...** [1] - 310:21
**butcher** [2] - 416:12, 479:7
**Butchers** [1] - 400:15
**butt** [1] - 346:14
**BY** [43] - 277:15, 277:23, 278:7, 278:8, 279:6, 279:7, 279:8, 279:10, 279:11, 279:13, 279:14, 279:17, 279:18, 281:11, 281:16, 284:7, 287:2, 305:20, 321:3, 323:14, 325:20, 338:10, 342:8, 346:9, 346:19, 347:6, 358:10, 362:24, 371:23, 373:2, 375:10, 378:22, 382:20, 391:4, 399:7, 450:23, 451:10, 454:17, 455:2, 456:9, 457:22, 480:3, 481:21

## C

**Cafe** [3] - 327:14, 327:16, 347:20
**calculate** [1] - 349:10
**calculated** [7] - 292:13, 292:22, 293:2, 354:10, 388:24, 390:13, 395:8
**calculation** [11] - 354:4, 356:13, 356:15, 356:19, 357:1, 373:22, 390:12, 390:19, 390:24, 393:10, 460:7
**calculations** [4] - 357:18, 373:5, 389:25, 460:4
**California** [3] - 306:2, 306:4, 376:9
**CALLED** [2] - 280:4, 394:4
**Campbell** [1] - 394:11
**cannot** [4] - 310:5, 311:25, 321:17, 376:1
**capacity** [5] - 319:18, 368:22, 372:3, 379:1, 384:12
**Capital** [1] - 384:8
**captain** [101] - 281:21, 282:8, 282:13, 282:21, 282:23, 282:24, 283:3, 285:17, 285:22, 286:2, 286:16, 286:17, 290:21, 298:2, 298:11, 298:13, 298:15, 298:18, 299:5, 299:12, 299:13, 299:15, 299:18, 299:22, 302:5, 320:20, 322:25, 326:15, 335:12, 340:3, 341:4, 344:20, 347:15, 347:16, 347:17, 347:19, 347:20, 359:3, 359:18, 359:20, 359:21, 359:25, 360:20, 360:21, 360:22, 360:23, 360:24, 361:3, 361:4, 361:8, 361:10, 361:13, 361:18, 361:21, 361:24, 362:25, 363:2, 367:24, 370:17, 376:22, 376:24, 377:3, 377:8, 377:9, 377:12, 384:12, 384:13, 384:15, 384:21, 384:25, 385:8, 385:11, 385:14, 385:15, 385:17, 385:20, 385:22, 387:23, 392:8, 409:15, 410:3, 412:2, 412:21, 412:22, 421:19, 421:20, 422:20, 427:16, 427:19, 430:3, 435:4, 448:21, 452:24, 462:3, 462:25, 463:5, 468:7, 468:8, 469:24, 480:12
**captain's** [1] - 480:11
**captain/manager** [1] - 285:25
**captaining** [1] - 286:19
**captains** [22] - 286:18, 286:24, 286:25, 326:9, 326:24, 335:4, 338:3, 347:8, 360:20, 396:3, 397:12, 406:16, 409:9, 413:18, 415:16, 419:21, 428:19, 430:11, 465:16, 467:2, 477:18, 483:11
**captains/service** [1] - 422:5
**car** [1] - 401:25
**carb** [1] - 413:8
**card** [26] - 297:17, 297:21, 299:10, 329:24, 330:8, 330:13, 337:1, 427:24, 427:25, 428:2, 428:3, 428:5, 429:11, 432:13, 432:19, 448:19, 458:6, 458:7, 458:15, 459:5, 460:6, 468:4, 468:5, 468:10, 479:16, 479:23
**Card** [1] - 458:18
**cards** [7] - 298:4, 299:6, 299:16, 299:19, 432:2, 432:16, 468:11
**care** [10] - 313:7, 338:19, 341:2, 345:18, 387:11, 388:9, 419:20, 438:25, 470:15, 482:3
**career** [1] - 399:9
**carried** [1] - 403:13
**carve** [5] - 328:10, 423:9, 424:16, 425:12
**carved** [2] - 328:15, 464:15
**carving** [1] - 466:16
**case** [25] - 291:3, 292:19, 305:8, 308:7, 309:25, 313:21, 319:7, 348:11, 352:14, 354:5, 355:6, 367:15, 393:13, 398:7, 433:12, 438:1, 438:13, 441:10, 463:5, 471:20, 477:13, 485:21, 486:22, 487:1
**case-by-case** [1] - 367:15
**cases** [4] - 320:13, 320:15, 357:10, 398:6
**Cash** [1] - 458:18
**cash** [58] - 336:22, 336:24, 337:2, 361:19, 385:20, 387:3, 388:21, 388:22, 388:24, 389:4, 389:9, 427:25, 448:13, 448:17, 448:20, 448:25, 449:11, 449:20, 450:1, 450:3, 450:6, 450:10, 450:14, 457:12, 457:15, 457:24, 458:3, 458:4, 458:6, 458:14, 458:15, 458:21, 459:1, 459:8, 459:10, 460:7, 461:4, 461:5, 461:7, 461:10, 461:13, 461:20, 463:8, 463:13, 480:4, 480:5, 480:8, 480:13, 480:15, 480:16, 480:19, 480:20, 481:2, 482:5, 482:6, 482:8, 482:10
**category** [3] - 359:2, 359:13, 363:7
**catering** [5] - 281:17, 284:20, 285:11, 285:14, 325:14
**CATHY** [1] - 278:3
**Cathy** [2] - 487:13, 487:22
**cathy_Pepper@laed.uscourts.gov** [1] - 278:6
**Cathy_Pepper@laed.uscourts.gov** [1] - 487:24
**Catlett** [2] - 471:24, 480:2
**CATLETT** [20] - 277:19, 353:5, 353:9, 353:12, 353:16, 356:18, 357:22, 358:10, 362:24, 371:23, 372:12, 372:20, 372:24, 373:2, 375:8, 382:3, 382:7, 382:20, 391:2, 393:1
**CATLETT..................** [2] - 279:10, 279:13
**causes** [1] - 348:13
**CCR** [2] - 278:3, 487:22
**celebrating** [1] - 431:8
**certain** [21] - 298:17, 299:2, 318:17, 333:11, 369:12, 376:1, 380:5, 403:24, 409:7,

409:8, 409:9, 427:1, 431:21, 433:2, 434:7, 440:5, 449:24, 461:14, 470:10
**certainly** [3] - 381:5, 389:13, 392:6
**CERTIFICATE** [1] - 487:11
**certification** [5] - 455:12, 473:10, 473:17, 473:18, 473:23
**CERTIFIED** [1] - 278:3
**Certified** [3] - 487:13, 487:14, 487:22
**certified** [1] - 425:2
**certify** [2] - 425:4, 487:17
**cessation** [1] - 373:11
**chain** [1] - 358:21
**chairs** [2] - 425:22, 426:9
**chambers** [1] - 487:4
**champagne** [1] - 362:22
**chance** [3] - 284:14, 286:4, 329:7
**change** [20] - 301:18, 303:7, 304:2, 316:24, 330:3, 333:23, 368:6, 371:25, 372:2, 406:17, 409:24, 447:11, 448:9, 449:20, 449:23, 468:17, 480:10, 480:14, 481:9, 481:10
**changed** [17] - 282:13, 282:21, 291:24, 292:1, 298:1, 301:6, 365:16, 371:21, 372:1, 409:14, 410:1, 410:3, 418:8, 418:17, 420:20, 468:6, 468:8
**changes** [15] - 300:9, 300:10, 300:22, 303:5, 303:25, 304:7, 304:8, 304:12, 304:14, 310:9, 361:8, 364:20, 385:12, 386:25, 410:23
**charge** [7] - 338:23, 339:1, 339:5, 411:16, 427:17, 439:4, 460:25
**charged** [1] - 389:2
**charges** [5] - 315:3, 315:4, 338:12, 428:10, 428:21
**chart** [3] - 396:25, 397:8, 397:22
**check** [18] - 290:1, 325:17, 337:2, 338:8, 338:12, 385:7, 388:22, 388:24, 402:4, 408:13, 427:11, 427:16, 427:21, 427:22, 454:15, 459:13, 486:16
**check-out** [4] - 290:1, 388:22, 388:24, 459:13
**checked** [1] - 375:3
**checking** [2] - 387:11, 423:2
**checkout** [3] - 459:16, 461:1, 470:4
**checks** [2] - 421:16, 421:18
**chef** [15] - 416:15, 416:19, 416:22, 417:7, 417:9, 425:5, 438:5, 452:15, 478:12, 478:13, 478:16, 478:24, 478:25
**Chicago** [5] - 284:13, 371:4, 375:18, 375:19
**choice** [1] - 435:10
**choose** [1] - 420:25
**chose** [2] - 470:20
**circumstance** [5] - 331:20, 426:18, 437:18, 444:25, 447:23
**circumstances** [7] - 307:21, 429:15, 431:6, 434:9, 435:22, 436:8, 475:24
**cite** [1] - 485:19
**cities** [2] - 365:21, 368:13
**city** [7] - 380:25, 399:22, 399:24, 402:3, 402:6, 404:12
**City** [2] - 358:24, 384:7
**CIVIL** [1] - 277:5
**claim** [1] - 395:2
**clarify** [4] - 304:5, 381:11, 396:10, 431:12
**clarity** [1] - 392:14
**clashed** [1] - 464:23
**class** [1] - 337:14
**classification** [1] - 298:15
**classifications** [2] - 294:5, 363:8
**classified** [1] - 298:21
**clean** [7] - 360:14, 362:9, 411:18, 426:21, 445:6, 463:21, 463:25
**cleaned** [2] - 445:7, 445:8
**cleaning** [4] - 384:3, 423:4, 426:9, 452:22
**cleanliness** [1] - 385:4
**clear** [14] - 290:12, 298:11, 310:22, 333:20, 395:10, 397:21, 407:7, 412:24, 420:5, 430:14, 434:12, 449:5, 454:19, 464:7
**cleared** [1] - 426:5
**clearing** [4] - 385:6, 422:15, 425:20
**clearly** [1] - 351:25
**clerical** [1] - 363:25
**CLERK** [12] - 280:7, 280:23, 281:6, 348:15, 348:17, 357:23, 358:5, 382:8, 382:15, 393:15, 394:7, 487:6
**Clerk** [4] - 281:5, 358:4, 382:14, 399:1
**clientele** [6] - 339:12, 342:24, 343:8, 343:24, 347:11, 347:13
**clock** [12] - 311:8, 311:11, 311:13, 311:15, 311:18, 311:22, 312:2, 312:11, 336:8, 349:8, 374:24, 462:18
**clocked** [2] - 349:6, 349:24
**clocking** [1] - 374:25
**clocks** [1] - 312:10
**close** [9] - 295:12, 361:11, 387:5, 393:6, 395:7, 397:25, 412:8, 426:9, 474:6
**closed** [9] - 334:10, 412:13, 425:24, 425:25, 427:2, 427:7, 427:8, 487:1
**closer** [1] - 338:17
**closes** [2] - 426:1, 437:4
**closing** [3] - 426:19, 427:5, 436:15
**closing-type** [1] - 426:19
**coax** [1] - 367:12
**cocktail** [1] - 420:13
**cocktails** [3] - 379:10, 379:11, 421:15
**coffee** [2] - 362:11, 384:19
**colleague** [1] - 340:3
**colleagues** [1] - 379:15
**collect** [1] - 449:24
**collected** [2] - 290:17, 408:11
**collecting** [2] - 459:20, 460:25
**college** [1] - 358:20
**column** [8] - 290:14, 291:15, 291:18, 292:5, 374:5, 390:8, 460:6
**columns** [1] - 373:12
**coming** [13] - 315:11, 316:19, 331:14, 351:8, 365:4, 413:15, 440:12, 440:13, 440:23, 447:5, 464:18, 467:22, 472:5
**comment** [1] - 431:9
**common** [4] - 377:23, 435:25, 449:3, 482:21
**communication** [4] - 422:12, 422:17, 447:9, 452:19
**Comp** [2] - 404:22, 456:17
**comp** [1] - 468:23
**company** [16] - 281:17, 282:1, 286:15, 306:10, 306:16, 315:15, 346:2, 346:4, 346:10, 400:8, 417:23, 417:25, 469:12, 469:18, 470:6, 470:15
**comparable** [1] - 369:16
**compared** [3] - 369:23, 376:11, 427:25
**competition** [1] - 400:11
**complain** [5] - 322:9, 448:8, 453:15, 454:20, 464:10
**complained** [2] - 332:5, 453:7
**complaint** [1] - 444:3
**complaints** [2] - 453:10, 453:16
**complete** [6] - 293:12, 293:16, 293:20, 294:1, 348:24, 349:16
**completed** [3] - 293:25, 349:16, 430:2
**completely** [2] - 369:17, 426:5
**completing** [1] - 460:25
**compromise** [1] - 394:25
**compulsory** [1] - 395:3
**COMPUTER** [1] - 278:8
**computer** [1] - 385:3
**COMPUTER-AIDED** [1] - 278:8
**concept** [17] - 402:15, 407:19, 407:23, 408:1, 421:6, 422:23, 425:1, 432:10, 439:6, 457:5, 461:16, 463:24, 464:9, 465:1, 465:4, 469:2, 469:3
**concern** [4] - 354:2, 357:4, 388:14, 460:20
**concerned** [2] - 462:1, 487:2
**concerns** [4] - 351:19, 370:6, 406:20, 483:19
**concluded** [1] - 487:8
**conclusion** [6] - 306:9, 306:11, 306:15, 318:4, 318:10, 425:23
**conclusions** [1] - 485:23
**conducted** [4] - 291:4, 364:23, 442:1, 472:9
**confidence** [1] - 339:13
**confirm** [1] - 477:17
**confronted** [3] - 443:16, 443:22, 479:18

**confused** [2] - 298:10, 381:11
**confusing** [1] - 456:7
**confusion** [8] - 304:24, 409:20, 409:25, 410:2, 430:14, 437:7, 468:18
**conjunction** [2] - 329:25, 332:8
**connected** [1] - 456:20
**connection** [2] - 428:17, 428:19
**consider** [2] - 355:6, 398:17
**considerable** [1] - 381:17
**considered** [1] - 456:13
**considering** [1] - 370:24
**constantly** [1] - 453:15
**constructing** [1] - 486:4
**construction** [1] - 403:3
**consult** [14] - 304:7, 309:17, 318:25, 343:15, 344:15, 393:7, 404:18, 417:6, 455:3, 455:8, 456:11, 480:1, 485:10
**consulting** [7] - 309:18, 310:3, 310:18, 310:21, 310:23, 319:2, 319:3
**contact** [2] - 341:21, 484:14
**contain** [1] - 349:10
**contained** [1] - 349:8
**container** [1] - 480:6
**contains** [1] - 349:2
**content** [1] - 364:22
**context** [7] - 304:22, 330:14, 331:24, 439:24, 443:15, 452:12, 453:10
**contexts** [1] - 357:14
**continue** [2] - 399:3, 445:23
**continued** [1] - 384:5
**CONTINUED** [1] - 278:1
**continuity** [1] - 368:18
**contrary** [2] - 345:11, 454:9
**contribute** [1] - 325:25
**contributing** [1] - 335:3
**control** [7] - 329:14, 364:18, 364:22, 386:23, 392:19, 475:23, 475:25
**controlled** [1] - 445:9
**conversate** [1] - 338:1
**conversation** [14] - 296:12, 304:25, 306:3, 306:4, 306:8, 309:9, 331:9, 331:10, 331:11, 383:10, 383:11, 383:18, 383:21, 453:13
**conversations** [2] - 301:24, 337:24
**convey** [1] - 425:7
**Convey** [1] - 444:20
**cook** [5] - 314:15, 314:16, 314:19, 314:21, 413:1
**cooked** [2] - 347:3, 347:8
**cooking** [1] - 314:23
**coordinator** [1] - 327:17
**copious** [2] - 485:24, 486:4
**correct** [87] - 281:20, 287:14, 291:19, 297:24, 300:2, 300:22, 311:4, 315:4, 330:16, 333:3, 338:2, 343:13, 350:1, 350:7, 350:24, 354:21, 356:12, 370:15, 374:6, 375:13, 375:14, 375:18, 375:21, 376:22, 379:1, 380:17, 381:3, 391:5, 391:6, 392:10, 394:20, 396:1, 397:24, 400:21, 402:16, 403:6, 405:1, 406:2, 407:22, 410:12, 419:1, 422:12, 423:17, 426:13, 427:4, 428:4, 428:11, 428:24, 429:12, 430:5, 430:23, 431:1, 431:17, 431:23, 434:21, 434:23, 434:24, 437:24, 439:8, 442:5, 447:22, 449:18, 449:19, 451:12, 453:5, 457:13, 457:14, 457:25, 458:1, 458:21, 460:21, 461:2, 461:5, 461:9, 461:11, 464:16, 467:10, 472:2, 472:21, 473:7, 473:17, 474:25, 479:5, 481:4, 482:4, 483:16, 487:17
**correctly** [1] - 391:23
**correspond** [1] - 390:5
**Costa** [18] - 368:11, 400:25, 401:11, 401:20, 401:22, 402:7, 402:9, 402:13, 404:13, 407:23, 408:2, 454:3, 482:25, 483:5, 483:9, 483:15
**counsel** [5] - 280:10, 454:16, 456:16, 485:14, 487:4
**counseling** [3] - 456:16, 456:21, 456:23
**count** [6] - 317:21, 318:21, 361:19, 385:20, 404:14, 413:22
**country** [7] - 303:20, 303:21, 359:2, 359:7, 368:13, 417:5, 478:11
**couple** [12] - 289:23, 340:8, 378:8, 383:16, 403:23, 408:16, 418:10, 423:19, 431:8, 443:7, 476:5, 482:13
**course** [24] - 318:7, 343:9, 360:15, 380:21, 381:10, 396:7, 397:1, 406:1, 409:7, 409:19, 424:5, 428:3, 433:11, 435:23, 439:23, 443:3, 449:7, 450:20, 451:15, 452:14, 473:24, 477:14, 481:25, 485:4
**court** [3] - 486:8, 486:13, 486:20
**Court** [30] - 280:25, 326:16, 328:6, 331:23, 336:16, 348:16, 357:24, 382:9, 384:10, 391:12, 393:16, 402:17, 403:10, 409:18, 416:18, 424:11, 427:7, 429:15, 431:6, 432:3, 433:12, 435:21, 439:19, 445:25, 451:13, 487:14, 487:15, 487:16, 487:23, 487:24
**COURT** [129] - 277:1, 278:3, 280:4, 280:8, 280:18, 283:23, 284:1, 284:3, 284:5, 286:24, 305:18, 313:20, 320:21, 322:24, 323:7, 323:10, 323:13, 340:8, 340:12, 340:15, 340:17, 340:21, 340:23, 341:3, 341:8, 341:12, 341:15, 342:4, 342:6, 346:6, 346:18, 347:5, 348:6, 348:9, 348:18, 349:20, 349:23, 350:2, 350:5, 350:8, 350:12, 350:16, 350:19, 350:22, 350:25, 351:2, 351:11, 351:16, 351:18, 352:2, 352:8, 352:10, 352:15, 352:18, 352:22, 353:3, 353:7, 353:11, 353:15, 353:21, 354:12, 354:17, 355:8, 355:17, 355:21, 355:25, 356:9, 356:24, 357:7, 357:17, 362:4, 370:13, 370:16, 370:19, 372:18, 372:22, 372:25, 378:20, 382:2, 382:4, 392:25, 393:2, 393:9, 394:4, 394:8, 394:12, 394:15, 394:18, 394:20, 395:1, 395:5, 395:11, 395:13, 395:16, 395:24, 396:2, 396:9, 396:14, 396:19, 396:23, 397:9, 397:16, 397:19, 398:1, 398:16, 399:3, 399:6, 454:25, 455:24, 456:6, 457:19, 482:13, 483:2, 483:8, 483:15, 483:17, 484:6, 484:11, 484:20, 484:23, 485:1, 485:12, 485:20, 485:25, 486:6, 486:9, 486:16, 486:23, 487:3
**courtroom** [1] - 394:12
**cover** [7] - 350:9, 351:11, 352:4, 427:18, 446:22, 466:24, 477:18
**covered** [6] - 351:13, 393:8, 427:9, 447:17, 455:22
**CPA** [3] - 456:1, 456:4, 456:5
**Crab** [1] - 358:21
**create** [2] - 409:22, 453:13
**created** [5] - 451:19, 457:24, 459:12, 459:15, 460:16
**creates** [2] - 468:18
**creating** [2] - 409:24, 459:17
**credit** [15] - 337:1, 356:6, 427:24, 427:25, 428:1, 428:5, 429:10, 448:19, 458:6, 458:7, 458:15, 459:5, 460:6, 479:16, 479:23
**Credit** [1] - 458:18
**CROSS** [8] - 279:7, 279:11, 279:14, 279:17, 325:19, 375:9, 391:3, 455:1
**CROSS-EXAMINATION** [8] - 279:7, 279:11, 279:14, 279:17, 325:19, 375:9, 391:3, 455:1
**crossed** [2] - 443:22, 444:3
**crossing** [1] - 444:2
**crowd** [1] - 418:12

**CRR** [2] - 278:3, 487:22
**crucial** [1] - 423:24
**crumbs** [1] - 362:8
**culture** [1] - 371:8
**Cupp** [9] - 348:7, 351:16, 353:1, 355:8, 375:11, 394:20, 395:17, 397:9, 398:2
**CUPP** [64] - 277:23, 325:20, 338:8, 338:10, 340:7, 340:16, 348:8, 351:17, 351:19, 352:5, 352:9, 352:17, 352:20, 352:23, 355:11, 355:19, 355:24, 356:2, 356:14, 356:22, 357:2, 357:10, 370:12, 372:13, 372:16, 372:21, 375:10, 378:22, 382:1, 391:4, 392:24, 394:21, 395:4, 395:18, 396:1, 396:6, 396:16, 396:21, 396:24, 397:15, 397:18, 398:4, 398:23, 399:5, 399:7, 450:21, 450:23, 451:9, 451:10, 454:15, 454:17, 454:24, 455:19, 455:21, 457:21, 481:19, 481:21, 482:12, 485:18, 485:22, 486:3, 486:7, 486:19, 487:1
**CUPP....................** [1] - 279:18
**CUPP.......................** [3] - 279:7, 279:11, 279:14
**customer** [24] - 299:4, 307:22, 330:11, 333:3, 333:8, 380:14, 380:16, 380:18, 380:21, 381:7, 405:21, 412:10, 419:23, 419:24, 421:3, 428:5, 429:1, 432:24, 443:16, 444:11, 445:11, 464:17, 470:9, 477:23
**customers** [31] - 299:9, 339:24, 377:5, 401:22, 404:14, 411:18, 412:16, 415:2, 419:5, 420:8, 423:18, 426:1, 426:21, 427:3, 431:4, 432:5, 445:4, 468:13, 469:15, 474:23, 476:22, 476:24, 477:3, 477:7, 477:8, 477:13, 478:5, 478:6, 482:2, 484:14
**cut** [12] - 286:4, 320:5, 424:18, 424:21, 424:22, 425:12, 437:3, 437:8, 464:22, 470:7, 473:13
**cuts** [3] - 424:15, 424:17, 424:20
**cutting** [1] - 436:17
**cycling** [1] - 287:12

## D

**daily** [5] - 326:17, 438:22, 438:24, 461:22, 482:23
**damage** [5] - 354:4, 373:5, 373:22, 389:25, 390:24
**damages** [7] - 354:24, 355:1, 374:3, 394:17, 394:23, 398:13, 398:18
**danger** [1] - 436:11
**data** [5] - 349:3, 349:12, 355:15, 357:15
**date** [9] - 349:5, 349:6, 349:24, 390:4, 397:7, 434:19, 461:16, 481:12, 486:14
**dates** [4] - 281:24, 302:10, 354:1, 397:23
**DAVID** [3] - 279:12, 382:12, 382:17
**David** [5] - 382:7, 382:17, 382:21, 390:1, 390:2
**DAY** [1] - 277:10
**day-by-day** [1] - 352:16
**days** [16] - 286:2, 286:5, 350:20, 354:9, 354:15, 364:8, 378:8, 383:13, 383:16, 402:2, 404:3, 408:16, 452:10, 465:24, 485:17
**deadline** [2] - 486:2, 486:18
**deal** [5] - 371:16, 417:8, 436:7, 438:15, 479:1
**dealing** [3] - 363:19, 375:22, 462:21
**deals** [1] - 417:12
**debit** [1] - 428:3
**December** [6] - 284:23, 350:11, 350:13, 350:15, 350:19, 352:12
**decent** [1] - 451:17
**decide** [13] - 305:3, 316:15, 316:17, 362:25, 366:8, 387:7, 393:6, 396:2, 446:11, 481:10, 486:6, 486:16
**decided** [15] - 284:16, 285:17, 286:15, 319:1, 326:20, 333:24, 389:10, 402:6, 443:9, 449:25, 451:24, 470:7, 478:25, 481:2, 481:9
**decision** [18] - 304:6, 307:7, 307:15, 339:10, 342:2, 344:16, 347:4, 347:7, 365:23, 409:18, 419:9, 438:14, 442:6, 442:12, 442:15, 443:11, 444:10, 451:13
**decisions** [3] - 340:25, 341:20, 366:5
**deduct** [2] - 290:23, 292:6
**deduction** [1] - 290:23
**deep** [1] - 356:22
**defeat** [1] - 312:8
**DEFENDANT** [1] - 277:22
**defendants** [6] - 313:12, 325:14, 349:1, 373:1, 393:12, 395:1
**defense** [2] - 398:2, 487:1
**defer** [1] - 398:19
**definitely** [10] - 401:15, 425:13, 438:5, 438:25, 439:11, 440:6, 441:23, 452:23, 485:9, 485:10
**Del** [1] - 384:8
**delegate** [1] - 377:9
**delegating** [1] - 360:13
**delegation** [2] - 327:19, 327:21
**Deli** [1] - 358:21
**deli** [1] - 384:4
**delicacy** [1] - 468:10
**delivering** [2] - 385:2, 385:7
**demonstrative** [4] - 353:2, 354:9, 355:10, 372:23
**Demonstrative** [2] - 373:4, 389:24
**demotion** [1] - 330:6
**denied** [3] - 447:25, 448:1, 448:10
**Department** [2] - 375:25, 406:9
**deposition** [6] - 305:8, 305:11, 305:14, 471:19, 471:23
**DEPUTY** [12] - 280:7, 280:23, 281:6, 348:15, 348:17, 357:23, 358:5, 382:8, 382:15, 393:15, 394:7, 487:6
**deputy** [1] - 394:13
**describe** [15] - 326:15, 328:6, 331:23, 333:7, 336:16, 342:17, 388:22, 403:10, 416:18, 417:11, 427:6, 429:15, 432:3, 445:25
**described** [6] - 286:8, 356:12, 388:16, 415:14, 483:8
**describing** [1] - 297:2
**deserve** [2] - 340:5, 377:5
**deserving** [1] - 335:8
**designated** [4] - 294:14, 294:17, 298:5, 299:6
**desperate** [2] - 440:4, 467:20
**dessert** [2] - 431:10, 468:25
**desserts** [1] - 470:10
**detail** [2] - 405:12, 432:25
**detail-oriented** [1] - 405:12
**determine** [4] - 354:14, 373:20, 376:1, 479:22
**determines** [2] - 354:25, 355:2
**develop** [1] - 345:13
**developing** [1] - 343:24
**diagram** [1] - 397:10
**Diego** [1] - 384:9
**difference** [2] - 335:13, 477:11
**differences** [1] - 298:7
**different** [64] - 284:13, 287:10, 301:5, 307:13, 309:14, 310:1, 319:21, 324:12, 324:13, 330:25, 333:10, 342:9, 342:15, 351:7, 357:14, 359:10, 359:23, 363:4, 363:7, 363:22, 363:23, 363:24, 365:21, 365:22, 366:2, 366:21, 368:13, 369:18, 371:8, 377:2, 377:23, 388:7, 392:5, 392:6, 395:19, 402:14, 405:6, 406:23, 413:6, 414:24, 415:1, 416:11, 417:5, 418:8, 418:17, 422:19, 424:14, 424:15, 424:17, 424:22, 433:6, 433:13, 435:5, 437:18, 446:9, 446:10, 447:8, 469:5, 477:6, 484:3
**differently** [3] - 313:19, 324:17, 326:10
**difficult** [2] - 299:21, 484:5
**dine** [1] - 405:13
**dined** [1] - 415:11
**dining** [13] - 329:15, 332:25, 333:3, 342:18, 358:24, 367:6, 383:9, 414:6,

414:8, 415:12, 422:7, 425:11, 483:12
**Dining** [3] - 414:6, 414:7, 414:11
**dinner** [2] - 362:18, 431:11
**diploma** [1] - 473:12
**direct** [3] - 377:3, 377:13, 484:14
**DIRECT** [6] - 279:6, 279:10, 279:13, 281:10, 358:9, 382:19
**directed** [1] - 398:6
**directing** [4] - 392:11, 392:12, 425:17, 425:19
**direction** [1] - 441:24
**directly** [2] - 370:23, 450:4
**director** [5] - 363:10, 363:18, 366:22, 377:22, 420:19
**dirt** [1] - 362:8
**dirty** [4] - 296:11, 463:19, 463:20, 464:7
**disagree** [1] - 468:19
**disagreement** [1] - 355:9
**discharge** [2] - 442:7, 443:14
**discharged** [2] - 443:14, 444:20
**discipline** [9] - 378:2, 444:22, 444:23, 445:1, 445:3, 445:13, 445:17, 445:24, 463:19
**discount** [1] - 445:11
**discounts** [2] - 468:21, 468:23
**discretion** [3] - 315:6, 338:25, 428:14
**discuss** [7] - 280:13, 304:8, 304:14, 353:6, 365:6, 380:8, 486:25
**discussed** [9] - 280:14, 318:5, 319:24, 345:1, 348:24, 390:13, 394:22, 461:12, 479:25
**discussing** [3] - 322:20, 385:2, 463:8
**discussion** [3] - 317:7, 484:11, 484:15
**dish** [4] - 421:17, 452:17, 452:20
**dishes** [3] - 296:11, 297:6, 401:15
**dishwashers** [12] - 295:15, 295:24, 295:25, 297:7, 297:9, 297:11, 297:15, 442:21, 452:8, 452:13, 452:16, 479:9
**dispute** [5] - 355:24, 402:8, 459:12, 459:15, 459:19
**disregard** [4] - 354:23, 355:1, 355:7, 357:9
**distributed** [1] - 389:1
**distributing** [1] - 459:20
**DISTRICT** [3] - 277:1, 277:1, 277:11
**District** [3] - 487:16, 487:24
**dive** [1] - 402:24
**divide** [3] - 292:19, 430:7, 437:12
**divided** [7] - 292:14, 293:3, 408:11, 414:5, 430:10, 430:12
**DMNO** [4] - 277:7, 353:17, 372:11, 451:2
**doctor's** [1] - 374:21
**document** [3] - 348:20, 348:21, 351:22
**documents** [7] - 280:14, 351:5, 351:9, 355:16, 357:2, 357:14, 457:8
**dollar** [1] - 380:23
**dollars** [2] - 296:21, 329:5
**done** [16] - 288:7, 327:3, 336:4, 389:3, 402:12, 418:9, 433:22, 434:1, 446:15, 446:17, 449:15, 452:14, 454:16, 459:20, 462:9, 462:11
**DONTAY** [3] - 279:5, 281:3, 281:8
**Dontay** [25] - 280:22, 281:8, 305:16, 305:18, 305:19, 325:21, 328:20, 364:10, 366:18, 366:19, 366:20, 367:1, 367:21, 368:25, 386:11, 386:16, 432:2, 444:6, 447:12, 447:24, 468:8, 468:19, 468:20, 476:1, 476:12
**Dontay's** [2] - 367:12, 468:4
**door** [4] - 335:18, 404:12, 406:19, 432:17
**doors** [3] - 340:5, 403:7, 403:8
**Dori** [6] - 400:9, 400:24, 401:25, 417:7, 438:21, 438:24
**Dori's** [1] - 438:22
**Doris** [89] - 281:19, 284:24, 285:7, 285:16, 288:13, 290:2, 297:18, 297:22, 307:14, 307:25, 310:25, 324:11, 325:25, 327:10, 327:18, 327:24, 328:7, 329:5, 329:9, 331:9, 331:11, 333:2, 333:7, 333:12, 334:23, 340:5, 348:3, 358:11, 358:13, 359:12, 363:9, 364:6, 365:17, 366:5, 366:8, 366:12, 366:15, 367:21, 367:25, 368:3, 369:7, 369:13, 369:16, 370:3, 370:7, 373:10, 373:19, 374:11, 376:12, 376:20, 378:13, 380:21, 382:21, 383:19, 384:10, 386:8, 386:17, 386:19, 386:22, 387:2, 387:15, 387:19, 387:24, 388:2, 388:11, 390:6, 391:17, 391:25, 392:2, 400:14, 400:15, 401:5, 402:15, 405:8, 405:12, 407:18, 409:4, 410:7, 422:23, 427:25, 432:9, 439:25, 440:4, 440:9, 440:24, 451:2, 451:6, 454:20, 471:25
**DORIS** [1] - 400:14
**double** [11] - 345:4, 411:21, 427:13, 475:8, 475:12, 475:13, 475:15, 475:19, 481:22, 481:24
**double-seating** [2] - 475:8, 481:24
**down** [35] - 285:18, 286:5, 286:6, 304:5, 307:14, 307:18, 309:24, 313:17, 316:12, 316:13, 316:18, 324:3, 332:16, 332:23, 333:24, 356:22, 361:2, 365:10, 371:8, 371:13, 371:14, 381:13, 383:3, 383:9, 388:15, 396:6, 406:13, 412:8, 425:24, 429:22, 437:4, 476:15, 476:16, 476:17
**downtime** [1] - 334:14
**draw** [1] - 441:23
**drawer** [15] - 389:5, 389:12, 389:13, 389:18, 389:19, 450:1, 450:6, 450:8, 461:5, 461:8, 461:10, 461:13, 461:15, 463:15, 481:3
**drink** [6] - 421:9, 431:11, 443:6, 476:2, 476:6, 478:23
**drinker** [1] - 420:13
**drinking** [1] - 443:6
**drinks** [1] - 423:25
**drove** [1] - 402:1
**drunk** [1] - 436:13
**due** [2] - 373:24, 475:14
**dug** [1] - 356:22
**duly** [4] - 281:4, 358:3, 382:13, 398:25
**duration** [1] - 372:4
**during** [37] - 280:14, 283:2, 288:25, 294:21, 310:2, 314:5, 326:3, 356:24, 364:6, 368:14, 375:6, 378:23, 383:18, 383:21, 410:10, 411:15, 414:19, 415:2, 415:13, 417:24, 420:21, 422:4, 423:21, 425:16, 427:20, 432:1, 433:7, 434:10, 435:24, 437:25, 445:9, 452:16, 452:19, 468:20, 474:4, 474:12, 477:8
**duties** [9] - 327:19, 330:1, 341:4, 372:2, 384:25, 410:2, 426:19, 469:7
**duty** [10] - 336:5, 343:18, 343:22, 385:1, 389:3, 420:1, 420:2, 423:8, 426:16, 431:19
**dynamic** [1] - 475:9

## E

**e-mail** [4] - 300:18, 301:1, 311:17, 436:6
**e-mails** [2] - 433:24, 447:12
**early** [5] - 404:3, 408:6, 436:18, 462:2, 481:12
**earn** [5] - 337:11, 375:4, 408:24, 408:25, 437:14
**earned** [3] - 441:19, 441:22, 451:22
**easier** [2] - 332:9, 450:15
**easily** [1] - 427:16
**Easter** [4] - 282:1, 282:3, 282:15, 302:8
**Eastern** [1] - 487:16
**EASTERN** [1] - 277:1
**easy** [2] - 427:22, 429:23
**eat** [3] - 412:20, 413:2, 413:3
**eating** [1] - 413:5
**educate** [2] - 379:14, 485:2
**educated** [2] - 371:6, 485:7
**efficient** [2] - 364:1, 424:2
**efficiently** [1] - 377:9
**effort** [2] - 402:11, 402:13

**eight** [4] - 282:9, 295:2, 415:24, 452:2
**eight-hour** [1] - 452:2
**Either** [1] - 461:15
**either** [16] - 295:6, 301:15, 302:5, 304:3, 307:20, 310:19, 320:8, 331:15, 342:1, 370:16, 371:24, 379:8, 447:24, 463:13, 467:25, 480:20
**elaborate** [1] - 378:1
**Eli** [9] - 398:5, 398:23, 399:3, 432:21, 450:24, 453:6, 454:2, 481:22, 482:13
**ELI** [1] - 398:24
**ELI.............................** [1] - 279:16
**eligible** [1] - 469:10
**eliminate** [1] - 410:1
**ELIRAN** [2] - 279:16, 398:24
**Elmo** [1] - 281:14
**emergency** [1] - 411:12
**employee** [12] - 315:11, 348:23, 348:25, 349:4, 349:13, 349:17, 349:18, 350:8, 352:3, 354:12, 356:5, 442:7
**Employee** [1] - 349:21
**employees** [5] - 360:21, 365:14, 385:9, 412:15, 440:3
**employers** [1] - 313:4
**empty** [1] - 477:21
**en** [1] - 362:12
**encompassed** [1] - 455:17
**encouraged** [2] - 401:22
**end** [20] - 336:16, 380:23, 386:6, 388:23, 399:11, 401:8, 403:1, 427:6, 433:3, 436:6, 441:12, 448:18, 449:14, 461:23, 462:14, 462:18, 463:9, 474:5, 480:19, 485:16
**ended** [1] - 288:24
**engage** [8] - 326:16, 327:19, 328:12, 381:6, 423:7, 426:15, 431:23, 445:3
**engaged** [4] - 330:12, 336:18, 378:23, 426:18
**engaging** [2] - 328:21, 432:6
**engineer** [2] - 349:12, 351:8
**enhance** [1] - 380:15
**enjoy** [3] - 328:11, 424:16, 426:3
**enjoying** [1] - 426:4
**entertaining** [1] - 425:13
**entertainment** [1] - 424:16
**entire** [8] - 299:23, 350:18, 351:11, 351:14, 352:4, 368:1, 437:13
**entitled** [3] - 313:16, 355:23, 487:19
**entrees** [1] - 421:13
**envelope** [2] - 389:6, 480:24
**envelopes** [1] - 480:19
**environment** [1] - 399:15
**envision** [1] - 403:1
**equal** [1] - 312:24
**equally** [6] - 391:14, 391:19, 409:1, 430:9, 430:10, 430:12
**equals** [1] - 313:2
**equipment** [1] - 327:25
**Eric** [2] - 293:9, 293:10
**error** [2] - 429:18, 429:19
**especially** [7] - 403:15, 407:1, 421:6, 424:12, 424:20, 443:19, 472:8
**ESQUIRE** [3] - 277:15, 277:23, 277:23
**essential** [1] - 452:1
**essentially** [3] - 319:5, 471:14, 474:11
**establish** [1] - 337:11
**established** [2] - 434:18, 459:22
**establishing** [1] - 408:7
**estimate** [1] - 418:23
**estimation** [1] - 451:5
**ET** [2] - 277:4, 277:7
**evaluation** [3] - 365:13, 387:18
**evaluations** [1] - 365:8
**evening** [9] - 333:18, 334:7, 334:15, 412:17, 416:3, 418:13, 427:6, 433:7, 450:19
**eventually** [1] - 302:23
**evidence** [4] - 354:9, 354:15, 354:18, 394:9
**exact** [2] - 397:23, 461:15
**exactly** [11] - 281:24, 305:22, 306:25, 316:14, 397:21, 449:9, 460:24, 482:16, 483:4, 483:10
**exam** [1] - 446:14
**EXAMINATION** [40] - 279:6, 279:7, 279:8, 279:10, 279:11, 279:13, 279:14, 279:17, 279:18, 281:10, 281:16, 284:7, 287:2, 305:20, 313:22, 321:3, 323:14, 325:19, 338:10, 342:7, 346:9, 346:19, 347:6, 358:9, 362:24, 371:23, 373:2, 375:9, 378:22, 382:19, 391:3, 399:7, 450:23, 451:10, 454:17, 455:1, 456:9, 457:22, 480:3, 481:20
**examined** [4] - 281:5, 358:4, 382:14, 399:1
**example** [10] - 296:20, 363:8, 366:2, 368:24, 406:24, 410:9, 410:10, 410:16, 411:20, 458:23
**excellence** [1] - 402:14
**excellent** [1] - 405:24
**exception** [1] - 391:15
**excerpts** [1] - 394:10
**exchange** [1] - 432:19
**exclusively** [1] - 297:7
**excuse** [6] - 311:5, 311:6, 395:22, 408:24, 410:20, 427:25
**excused** [4] - 348:9, 382:4, 393:2, 485:13
**execute** [2] - 422:22, 433:2
**executive** [1] - 344:16
**exemplary** [1] - 369:21
**exercise** [1] - 372:17
**Exhibit** [23] - 289:22, 297:20, 300:14, 352:25, 353:15, 353:16, 354:13, 355:9, 355:18, 355:22, 356:21, 372:10, 372:11, 372:22, 372:24, 373:4, 389:24, 394:14, 394:16, 457:11, 457:19, 457:20
**exhibit** [3] - 355:10, 457:19, 458:24
**exhibits** [2] - 352:1, 454:10
**exist** [4] - 404:7, 460:10, 473:10, 473:18
**existence** [2] - 446:2, 446:3
**exit** [1] - 436:10
**expand** [1] - 355:2
**expansion** [1] - 401:19
**expect** [7] - 380:22, 380:25, 381:2, 381:5, 381:8, 404:11, 418:21
**expectation** [2] - 369:17, 381:4
**expected** [3] - 284:13, 285:19, 481:23
**expecting** [2] - 411:14, 413:12
**expensive** [2] - 380:24, 386:2
**experience** [33] - 319:18, 329:8, 329:15, 332:25, 333:3, 333:12, 335:7, 340:4, 358:16, 363:4, 366:21, 367:8, 369:13, 377:17, 379:14, 381:7, 381:9, 383:25, 384:11, 399:10, 401:9, 402:10, 403:11, 405:16, 415:12, 425:13, 431:23, 440:10, 440:17, 450:16, 474:25, 486:19
**experienced** [4] - 329:10, 378:9, 429:16, 443:25
**experiences** [1] - 404:13
**explain** [19] - 298:7, 330:6, 379:3, 399:8, 402:17, 409:18, 424:11, 431:6, 433:12, 435:21, 439:19, 442:9, 446:9, 453:10, 463:1, 466:23, 472:19, 472:20, 473:2
**explained** [6] - 458:13, 467:13, 472:22, 473:11, 483:4, 484:16
**explaining** [1] - 421:10
**explains** [2] - 421:11
**explanation** [1] - 307:13
**express** [1] - 483:5
**expressed** [1] - 468:9
**extended** [2] - 384:18, 387:10
**extent** [3] - 349:14, 360:25, 366:17
**extra** [2] - 345:12, 358:22
**extraordinarily** [1] - 386:2
**extraordinary** [4] - 401:10, 411:12, 436:2, 438:8
**extreme** [1] - 438:13
**eye** [1] - 335:19

## F

**F-E-I-T-H** [1] - 382:18
**fact** [11] - 336:13, 339:13, 342:12, 354:7, 354:11, 378:16, 378:19, 388:12, 411:17, 440:22, 485:23
**factor** [1] - 394:23
**factors** [1] - 355:5
**fair** [20] - 286:6, 290:19, 290:25,

296:16, 299:9, 299:21, 313:12, 313:23, 317:9, 319:12, 342:9, 346:20, 347:24, 401:14, 426:25, 437:11, 451:16, 451:22, 452:6, 456:19
**faith** [6] - 354:23, 354:25, 355:7, 357:9, 357:12, 398:18
**familiar** [1] - 371:7
**family** [3] - 328:8, 412:19, 412:24
**far** [21] - 304:18, 330:22, 348:21, 352:13, 354:16, 355:11, 366:10, 369:3, 373:20, 374:8, 384:3, 389:14, 404:11, 417:12, 438:7, 439:5, 442:10, 459:17, 462:1, 482:21, 487:1
**fare** [2] - 339:8, 427:10
**February** [3] - 284:4, 334:18, 358:12
**federal** [2] - 384:23, 406:9
**Feed** [3] - 328:7, 424:7, 424:10
**feet** [1] - 376:13
**Feith** [4] - 382:7, 382:17, 390:1, 391:5
**FEITH** [1] - 382:12
**FEITH..................................** [1] - 279:12
**fell** [3] - 296:3, 399:15, 402:3
**felt** [19] - 322:16, 326:11, 330:2, 332:8, 338:5, 338:13, 342:1, 345:2, 345:3, 345:10, 439:23, 449:24, 450:3, 450:10, 450:12, 453:14, 464:11, 468:14, 469:18
**few** [23] - 352:24, 364:8, 368:11, 393:6, 402:2, 403:16, 403:22, 404:15, 409:4, 413:7, 425:3, 429:22, 433:5, 440:18, 450:12, 452:10, 460:2, 470:25, 471:8, 472:8, 472:14, 481:19
**fewer** [2] - 467:5, 467:7
**figure** [11] - 318:1, 318:3, 318:4, 336:21, 336:22, 344:9, 344:12, 350:6, 356:3, 356:20, 486:8
**figured** [5] - 336:19, 348:20, 435:7, 484:2, 484:25
**figuring** [1] - 318:10
**filed** [4] - 350:23, 406:1, 406:5, 481:14
**filing** [1] - 355:3
**fill** [2] - 293:16, 309:20
**filling** [4] - 321:25, 362:21, 425:21, 475:7
**fills** [1] - 429:1
**findings** [1] - 485:22
**fine** [9] - 280:18, 330:4, 338:6, 342:18, 358:24, 398:10, 419:16, 462:19, 483:7
**finer** [1] - 379:13
**finger** [1] - 481:12
**finish** [4] - 303:5, 311:12, 462:2, 463:3
**finished** [2] - 316:6, 399:10
**fire** [11] - 295:24, 304:18, 305:7, 308:21, 309:3, 361:4, 364:16, 378:5, 385:9, 386:20, 444:9
**fired** [8] - 304:20, 304:21, 305:5, 305:7, 307:3, 307:18, 308:25, 318:17
**firing** [6] - 308:23, 309:6, 341:24, 442:10, 442:14, 471:25
**first** [47] - 280:20, 281:4, 288:11, 289:21, 291:25, 302:24, 302:25, 309:9, 318:1, 322:11, 325:23, 329:13, 332:2, 333:21, 358:3, 368:1, 368:6, 372:10, 372:16, 373:11, 382:13, 383:16, 399:18, 403:22, 404:15, 405:14, 408:9, 411:16, 416:15, 417:1, 417:4, 419:24, 423:18, 425:8, 435:2, 440:6, 440:9, 443:18, 444:2, 451:18, 452:14, 452:22, 456:1, 459:15, 460:2, 472:8
**FISHER** [1] - 277:22
**fit** [2] - 306:10, 402:5
**five** [13] - 286:2, 312:19, 359:1, 359:7, 360:2, 360:19, 388:18, 391:24, 393:7, 404:4, 411:5, 457:20
**fix** [2] - 405:17, 429:24
**flame** [1] - 425:9
**flawless** [1] - 422:11
**flexibility** [2] - 286:1, 286:7
**flexible** [2] - 285:23, 285:24
**floor** [17] - 316:9, 377:22, 420:21, 422:19, 423:1, 430:25, 452:20, 452:24, 453:4, 465:21, 465:22, 465:24, 466:1, 466:5, 466:8, 469:17, 470:13
**flow** [4] - 396:25, 397:8, 422:10, 464:18
**FLSA** [1] - 396:5
**fluent** [1] - 296:13
**Fluffy** [5] - 444:11, 444:13, 479:15, 479:20
**fly** [2] - 442:3, 475:11
**focus** [8] - 285:7, 285:18, 363:11, 363:23, 380:21, 392:18, 413:14, 425:6
**folded** [2] - 335:21, 389:5
**folks** [2] - 311:8, 476:15
**follow** [1] - 481:19
**following** [8] - 342:23, 342:24, 343:24, 345:13, 345:16, 347:11, 347:13, 444:18
**followings** [1] - 326:20
**follows** [4] - 281:5, 358:4, 382:14, 399:2
**food** [15] - 333:5, 360:11, 361:1, 377:1, 385:5, 401:9, 413:1, 413:6, 421:1, 421:12, 423:9, 440:1
**FOR** [2] - 277:15, 277:22
**force** [1] - 449:13
**forego** [1] - 344:21
**foregoing** [1] - 487:17
**forget** [2] - 311:18, 356:8
**form** [16] - 293:20, 293:24, 294:1, 296:15, 336:17, 408:10, 408:12, 410:23, 433:23, 450:18, 457:23, 458:10, 459:23, 460:1, 461:1
**formal** [2] - 441:14, 449:2
**formality** [2] - 447:4, 448:4
**format** [1] - 351:7
**formatted** [1] - 408:4
**forms** [7] - 290:1, 290:24, 293:13, 293:16, 459:18, 460:8, 460:16
**formula** [4] - 356:4, 389:2, 430:7, 448:21
**formulating** [1] - 408:7
**forward** [1] - 324:2
**four** [17] - 283:19, 294:23, 302:15, 312:19, 327:22, 334:5, 360:2, 384:2, 404:4, 411:22, 412:23, 413:5, 422:2, 424:13, 433:17, 435:24, 437:20
**four-year-old** [1] - 384:2
**fraction** [1] - 369:19
**frame** [4] - 287:5, 287:17, 397:24, 461:12
**Francisco** [6] - 359:5, 359:14, 359:19, 375:20, 376:12, 376:16
**frankly** [1] - 371:13
**FRCP** [1] - 351:5
**free** [1] - 431:3
**French** [10] - 362:13, 369:23, 402:19, 403:12, 405:9, 407:21, 418:22, 439:13, 441:13, 454:4
**frequently** [1] - 447:15
**Friday** [12] - 301:6, 322:16, 333:22, 333:25, 334:1, 334:6, 418:11, 420:18, 443:19, 444:5, 444:18
**Fridays** [2] - 303:2, 384:5
**friend** [9] - 306:3, 307:10, 307:11, 307:12, 307:13, 440:13, 441:6, 441:9, 441:11
**friends** [8] - 304:23, 306:1, 330:15, 367:2, 367:3, 415:12, 446:23, 476:2
**Frisco's** [1] - 384:8
**front** [6] - 296:16, 328:18, 335:18, 360:25, 376:24, 388:3
**full** [5] - 320:5, 322:1, 324:3, 330:18, 470:12
**full-time** [1] - 330:18
**fun** [2] - 423:25, 431:23
**function** [3] - 379:4, 417:11, 474:12
**functionality** [1] - 396:16
**functioned** [1] - 293:20
**functions** [1] - 379:18

## G

**gain** [1] - 380:13
**gaining** [1] - 440:16
**Gandy** [3] - 443:13, 479:15, 479:23
**gather** [1] - 413:11
**general** [20] - 338:11, 340:9, 340:18, 347:14, 397:3, 397:5, 419:18,

422:18, 434:16, 434:17, 434:19, 453:25, 454:1, 465:23, 466:3, 466:4, 472:7, 474:16, 474:17, 474:18
**generally** [2] - 430:22, 475:22
**generated** [1] - 391:14
**generates** [1] - 417:16
**George's** [1] - 384:14
**Georges** [5] - 358:25, 359:19, 363:14, 366:23, 376:25
**Georges'** [2] - 384:7, 391:10
**Gilford** [3] - 286:23, 287:8, 386:11
**girlfriend** [1] - 284:17
**given** [8] - 301:9, 312:24, 365:20, 367:19, 447:20, 470:23, 480:19, 484:1
**glass** [1] - 385:5
**glasses** [4] - 362:1, 429:22, 453:2, 463:23
**glassware** [4] - 362:6, 386:2, 423:14, 452:21
**GM** [5] - 435:2, 435:8, 435:9, 435:13, 465:17
**go-to** [1] - 420:18
**go-with-it** [1] - 324:4
**goal** [2] - 326:21, 419:18
**government** [2] - 365:24, 406:10
**gradually** [1] - 480:22
**grain** [1] - 424:22
**Gras** [7] - 332:1, 332:2, 332:15, 333:24, 343:19, 344:1, 344:9
**grat** [1] - 428:21
**gratuities** [1] - 380:19
**gratuity** [1] - 429:2
**great** [3] - 369:23, 428:20, 440:25
**greatest** [1] - 360:23
**greatly** [1] - 363:11
**greet** [8] - 420:3, 422:14, 474:21, 474:22, 476:1, 476:22, 477:14, 477:23
**greeted** [5] - 383:5, 420:9, 453:12, 477:10, 477:11
**greeting** [3] - 385:2, 431:22, 477:7
**gregarious** [1] - 367:11
**grew** [1] - 403:17
**Grille** [1] - 384:8
**Gross** [1] - 290:14
**gross** [2] - 291:4, 291:7
**ground** [1] - 455:22
**group** [5] - 329:15, 409:8, 409:9, 412:10
**groups** [2] - 482:2
**guarantee** [1] - 428:17
**guaranteed** [1] - 339:4
**guess** [17] - 296:5, 313:14, 313:15, 317:4, 329:6, 331:1, 342:19, 346:14, 353:21, 364:13, 365:14, 371:17, 386:11, 464:12, 485:21, 486:1, 486:7
**guest** [15] - 327:7, 327:8, 333:12, 344:7, 360:6, 366:20, 368:24, 369:17, 381:4, 381:8, 387:12, 405:19, 423:14, 443:23, 461:7
**guests** [15] - 298:8, 298:10, 327:2, 330:5, 365:4, 366:20, 367:6, 367:13, 376:13, 401:9, 410:24, 411:15, 420:3, 426:6
**guidelines** [1] - 447:20
**GULFPORT** [1] - 277:25
**guy** [1] - 416:13
**Guys** [1] - 444:8
**guys** [2] - 440:19, 467:15

## H

**H-A-G-L-I-L-I-T** [1] - 400:1
**H-A-R-T-L-A-N-D** [1] - 418:3
**HaGlilit** [1] - 399:25
**half** [10] - 281:22, 283:1, 302:15, 312:19, 314:5, 374:23, 376:16, 422:2, 435:24
**hand** [13] - 280:24, 290:25, 309:19, 317:21, 330:8, 389:16, 404:15, 405:20, 420:4, 432:7, 475:2, 476:20, 477:10
**handed** [3] - 329:24, 330:13, 383:5
**handful** [1] - 435:24
**handing** [2] - 432:13, 432:16
**handle** [7] - 303:8, 303:10, 318:18, 344:10, 344:12, 387:3, 473:13
**handled** [6] - 304:10, 304:11, 388:23, 416:25, 449:22, 463:9
**handling** [2] - 388:21, 449:20
**hands** [8] - 296:4, 296:5, 319:24, 369:2, 406:21, 416:21, 428:5, 470:8
**hands-on** [3] - 319:24, 406:21, 416:21
**happier** [1] - 469:19
**happy** [8] - 345:19, 345:20, 345:21, 345:22, 380:18, 452:3, 472:24
**hard** [11] - 300:2, 300:3, 314:3, 326:25, 332:3, 346:15, 346:21, 346:23, 346:25, 403:1, 481:11
**harder** [2] - 331:2, 342:10
**Hartland** [3] - 418:1, 418:4, 418:5
**Hatzor** [1] - 399:25
**HATZOR** [1] - 399:25
**head** [8] - 287:23, 294:11, 305:15, 311:24, 375:24, 376:8, 396:1, 424:9
**hear** [6] - 289:25, 328:16, 367:24, 387:23, 450:2, 467:19
**HEARD** [1] - 277:11
**heard** [28] - 368:1, 368:2, 368:3, 368:4, 375:15, 378:7, 402:2, 408:16, 408:17, 409:13, 416:7, 424:6, 424:7, 426:14, 428:9, 430:13, 432:1, 433:11, 437:2, 439:17, 440:18, 443:13, 450:5, 452:7, 481:1, 481:7, 481:8, 483:6
**hearing** [1] - 313:8
**hearsay** [1] - 370:10
**heart** [1] - 418:4
**HEARTLAND** [1] - 418:2
**held** [2] - 341:18, 374:17
**help** [31] - 312:8, 325:14, 334:9, 336:3, 353:1, 397:10, 405:20, 405:22, 420:22, 420:25, 422:13, 422:14, 422:22, 427:19, 434:6, 451:24, 452:5, 456:17, 464:4, 464:25, 465:1, 465:2, 465:12, 474:11, 475:21, 480:11, 480:12, 481:23
**helped** [2] - 296:1, 447:10
**helpful** [1] - 458:19
**helping** [9] - 328:2, 328:3, 422:6, 464:10, 465:4, 465:8, 465:10
**hereby** [1] - 487:16
**herself** [1] - 421:8
**hi** [1] - 453:12
**hide** [1] - 454:14
**high** [6] - 380:23, 401:8, 403:1, 433:3, 440:3, 441:12
**high-end** [5] - 380:23, 401:8, 403:1, 433:3, 441:12
**higher** [5] - 284:9, 380:18, 384:22, 388:8, 437:21
**highest** [1] - 360:21
**highly** [2] - 366:18, 367:2
**himself** [1] - 307:20
**hire** [22] - 295:24, 308:2, 308:10, 308:13, 308:15, 308:19, 309:16, 310:3, 310:16, 310:21, 361:4, 364:16, 378:4, 383:22, 385:9, 386:20, 442:11, 467:12, 467:18, 470:23, 470:24, 471:4
**hired** [30] - 284:18, 302:8, 307:21, 307:25, 308:6, 310:22, 358:13, 363:8, 363:9, 381:13, 382:24, 383:1, 383:2, 383:10, 388:15, 397:4, 403:16, 435:11, 439:19, 440:8, 440:10, 441:1, 467:15, 467:24, 468:2, 472:6, 472:15
**hiring** [7] - 309:11, 310:11, 439:18, 442:3, 442:10, 471:25, 473:6
**historical** [1] - 418:25
**hits** [1] - 396:21
**hold** [6] - 296:1, 296:6, 320:3, 335:14, 341:19, 374:11
**home** [30] - 309:5, 309:9, 317:6, 317:10, 317:14, 317:17, 317:22, 325:4, 331:20, 332:9, 332:13, 343:13, 343:16, 343:17, 343:25, 344:17, 363:1, 401:17, 435:20, 436:4, 436:16, 436:22, 436:25, 437:9, 437:13, 437:23, 444:24, 461:21, 462:2, 479:1
**homes** [1] - 401:23
**honest** [1] - 321:17
**honestly** [3] - 405:5, 444:1, 483:21
**Honor** [18] - 338:8, 340:7, 352:11, 352:25, 375:8, 382:1, 382:3, 391:2, 392:24, 393:1, 398:4, 399:5, 451:9, 454:15, 454:24, 455:19, 481:19, 482:12
**honor** [1] - 446:14

**HONORABLE** [1] - 277:11
**hope** [2] - 414:17, 428:23
**hopefully** [1] - 380:18
**hoping** [1] - 414:21
**Horrors** [1] - 424:10
**host** [4] - 419:25, 420:8, 475:23, 477:10
**host's** [2] - 420:1, 420:2
**hosts** [2] - 420:6, 476:19
**hour** [19] - 312:6, 312:7, 312:9, 314:25, 317:3, 317:12, 356:7, 356:9, 365:20, 374:23, 375:2, 378:14, 378:16, 451:25, 452:2, 465:25, 470:20
**hourly** [5] - 365:16, 365:17, 365:18, 384:20, 469:23
**hours** [26] - 314:1, 314:6, 349:6, 349:10, 349:11, 349:25, 350:6, 351:8, 352:18, 352:19, 354:20, 355:13, 355:22, 355:23, 372:13, 372:19, 372:20, 374:7, 374:9, 390:10, 390:17, 407:5, 422:1, 422:2, 423:19
**House** [1] - 424:10
**house** [9] - 327:17, 391:7, 391:13, 401:14, 401:16, 408:17, 408:20, 417:22, 456:23
**Houston** [8] - 359:15, 407:11, 407:12, 407:14, 435:10, 435:17, 439:9, 465:15
**huge** [5] - 421:6, 422:17, 425:10, 477:11, 477:19
**human** [1] - 429:18
**hundred** [4] - 288:18, 311:10, 375:1, 407:5
**Hunt** [5] - 453:22, 453:23, 459:15, 464:21
**Hunt's** [2] - 459:12, 470:3
**hurt** [1] - 318:2
**hyphen** [1] - 382:18

**I**

**ice** [1] - 362:21
**idea** [5] - 403:13, 404:12, 419:2, 419:18, 446:4
**identical** [1] - 483:14
**identify** [1] - 297:24
**ideology** [1] - 403:14
**illegal** [1] - 388:13
**immediately** [3] - 399:15, 436:5, 438:9
**impact** [1] - 332:21
**impeccable** [1] - 333:3
**implemented** [2] - 402:12, 446:16
**important** [9] - 333:2, 406:23, 413:14, 413:15, 419:20, 423:23, 424:2, 436:9, 468:10
**impose** [1] - 343:22
**impression** [1] - 381:17
**improper** [1] - 454:8
**improve** [2] - 365:6, 365:12
**in-house** [2] - 417:22, 456:23
**incident** [2] - 443:1, 443:8
**incidents** [2] - 442:20
**include** [1] - 333:5
**included** [12] - 338:3, 347:21, 351:25, 359:12, 364:4, 364:5, 364:14, 364:15, 370:6, 386:16, 403:20, 420:6
**includes** [1] - 349:23
**including** [3] - 381:3, 409:5, 437:23
**inclusion** [1] - 371:25
**incomplete** [1] - 350:1
**increase** [1] - 469:24
**indicate** [2] - 316:20, 458:12
**indicated** [1] - 396:8
**indicates** [1] - 349:5
**indicating)** [1] - 418:4
**indication** [3] - 458:10, 458:17, 459:4
**individual** [1] - 354:19
**individually** [1] - 365:11
**individuals** [1] - 355:22
**industry** [14] - 298:16, 316:7, 358:18, 358:20, 360:1, 362:12, 366:1, 377:17, 378:10, 383:24, 384:1, 414:20, 419:17, 449:4
**inference** [7] - 349:19, 351:5, 353:4, 353:23, 353:24, 357:5
**inferences** [1] - 353:3
**information** [3] - 401:13, 455:15, 457:6
**informed** [1] - 443:14
**inhouse** [1] - 456:21
**inputting** [1] - 385:3
**inside** [1] - 416:22
**insofar** [1] - 376:13
**inspired** [1] - 401:14
**instance** [14] - 410:24, 433:19, 439:10, 442:18, 446:13, 447:23, 451:19, 458:20, 473:8, 478:4, 478:15, 478:18, 478:19, 485:9
**instances** [5] - 291:6, 471:2, 472:4, 472:14, 472:15
**instead** [3] - 429:18, 451:23, 475:17
**instruction** [3] - 336:10, 438:9, 448:23
**intend** [1] - 469:2
**intent** [1] - 405:9
**interact** [5] - 326:22, 343:9, 476:24, 477:23, 478:6
**interacted** [1] - 367:19
**interacting** [1] - 469:5
**interaction** [12] - 326:16, 330:11, 335:9, 335:11, 343:10, 366:17, 421:3, 443:20, 469:15, 470:12, 477:3, 477:9
**interactions** [1] - 343:5
**interested** [2] - 450:17, 484:2
**interfere** [1] - 464:18
**interview** [2] - 441:14, 467:15
**interviewing** [1] - 441:2
**interviews** [3] - 440:11, 442:1, 472:10
**intoxicated** [5] - 309:2, 436:2, 436:12, 436:17, 479:20
**introduce** [1] - 383:7
**introduces** [1] - 421:8
**investigated** [1] - 479:22
**involve** [1] - 421:3
**involved** [19] - 363:11, 363:18, 366:19, 366:20, 366:24, 367:9, 367:15, 368:7, 368:8, 368:23, 416:20, 424:3, 425:6, 448:13, 453:15, 470:9, 474:18, 474:19, 475:14
**Israel** [7] - 368:12, 399:11, 399:21, 402:12, 408:1, 408:3, 482:25
**Israeli** [2] - 401:13, 401:14
**Israeli-inspired** [1] - 401:14
**issue** [25] - 280:11, 280:15, 286:7, 341:22, 355:14, 355:25, 357:5, 357:7, 357:12, 370:21, 396:20, 398:20, 416:24, 433:11, 447:18, 475:13, 475:14, 478:14, 479:15, 479:17, 479:22, 481:5, 481:6, 481:7
**issued** [1] - 445:13
**issues** [8] - 296:10, 297:5, 306:13, 306:14, 396:6, 398:7, 398:9, 455:16
**issuing** [2] - 444:22, 444:25
**ITAI** [2] - 279:16, 398:24
**Itai** [42] - 296:7, 296:8, 296:13, 301:15, 303:1, 303:2, 303:12, 303:20, 303:21, 304:3, 304:8, 306:8, 306:10, 307:11, 307:15, 307:18, 307:20, 308:5, 308:13, 308:24, 309:22, 324:20, 331:16, 336:10, 340:18, 341:4, 341:12, 341:16, 341:19, 341:21, 341:25, 342:4, 368:6, 369:1, 370:22, 381:13, 383:15, 397:1, 399:8, 406:14, 437:25
**Itai's** [2] - 307:7, 368:5
**Itamar** [14] - 322:7, 322:13, 323:15, 324:20, 340:24, 340:25, 348:24, 370:23, 397:1, 400:24, 417:7, 417:12, 427:24, 438:18
**Itamar's** [2] - 402:1, 417:11
**items** [1] - 468:23
**itself** [5] - 395:19, 395:20, 409:10, 434:10, 443:18

**J**

**jaded** [1] - 371:18
**JAKLYN** [1] - 277:23
**JAMES** [1] - 277:4
**James** [11] - 304:20, 304:23, 304:25, 305:21, 305:23, 305:24, 306:2, 306:14, 306:15, 307:21
**January** [4] - 350:14, 350:22, 352:6, 352:12
**Jason's** [1] - 358:21
**Jean** [8] - 358:25, 359:19, 363:14, 366:23, 376:25, 384:7, 384:14, 391:10
**Jean-George's** [1] - 384:14
**Jean-Georges** [5] - 358:25, 359:19, 363:14, 366:23, 376:25

**Jean-Georges'** [2] - 384:7, 391:10
**Jessica** [1] - 281:12
**JESSICA** [1] - 277:15
**job** [32] - 283:6, 284:9, 284:11, 293:15, 305:1, 305:24, 306:6, 306:7, 306:23, 307:5, 307:11, 314:12, 314:13, 314:14, 327:22, 330:18, 347:1, 379:20, 383:6, 399:12, 419:15, 434:5, 436:14, 442:4, 453:21, 462:2, 466:9, 466:14, 467:23, 470:1, 470:2, 476:16
**Joe's** [1] - 358:21
**John** [1] - 363:17
**join** [1] - 337:14
**Jones** [3] - 300:18, 301:1, 331:19
**joyfully** [1] - 383:5
**Judge** [10] - 355:15, 356:14, 395:18, 396:7, 399:8, 435:21, 443:15, 450:22, 452:12, 453:10
**judge** [2] - 351:19, 396:24
**JUDGE** [1] - 277:11
**June** [1] - 485:16
**JUNE** [3] - 277:6, 280:2, 394:2
**justified** [1] - 345:14

## K

**K-I-N-C-H-E-N** [1] - 281:9
**K-Paul's** [2] - 384:10, 391:11
**K-U-R-G-A-N** [1] - 416:17
**Kantor** [2] - 383:4, 440:21
**Katzavim** [1] - 400:14
**KATZAVIM** [1] - 400:14
**keep** [11] - 332:3, 332:16, 335:19, 343:19, 345:15, 408:25, 437:11, 447:10, 450:5, 470:1, 480:18
**kept** [10] - 389:4, 389:5, 408:12, 461:13, 463:14, 468:3, 480:4, 480:6, 480:15, 484:19
**key** [1] - 365:4
**keys** [16] - 295:12, 361:11, 378:5, 385:14, 387:5, 416:8, 416:10, 416:11, 416:12, 416:13, 416:14, 479:4, 479:7, 479:9, 479:11, 479:13
**Kinchen** [5] - 280:22, 281:8, 281:12, 364:10, 386:11
**KINCHEN** [1] - 281:3
**KINCHEN.....................................** [1] - 279:5
**kind** [40] - 287:10, 287:24, 296:3, 297:2, 308:12, 319:10, 319:14, 321:2, 324:6, 328:10, 329:17, 359:12, 359:16, 359:25, 363:6, 365:13, 367:10, 367:12, 367:15, 368:22, 369:2, 369:4, 369:5, 370:9, 370:11, 370:21, 370:25, 371:18, 371:20, 377:6, 403:17, 404:23, 405:16, 420:10, 435:5, 440:1, 440:10, 451:25, 481:1, 484:15
**kinds** [1] - 425:20
**Kingslake** [1] - 293:9
**kitchen** [17] - 412:8, 412:13, 415:22, 415:23, 415:24, 415:25, 416:2, 416:14, 416:22, 425:23, 425:24, 426:1, 426:3, 439:1, 452:15, 452:18
**knives** [1] - 453:2
**knowing** [1] - 457:4
**knowledge** [8] - 291:24, 311:8, 321:16, 374:4, 377:23, 380:13, 469:8
**knowledgeable** [1] - 360:9
**known** [1] - 383:5
**knows** [4] - 310:12, 336:4, 422:21, 476:2
**Konrad** [3] - 383:4, 440:21, 440:22
**Kurgan** [1] - 416:16

## L

**LA** [3] - 277:17, 277:21, 278:5
**labor** [1] - 484:21
**Labor** [2] - 375:25, 406:9
**lack** [4] - 354:22, 355:5, 357:8, 447:9
**lacking** [1] - 365:5
**ladies** [1] - 337:18
**language** [1] - 468:3
**larger** [9] - 338:22, 376:18, 380:4, 380:10, 414:7, 414:8, 424:12, 470:21, 483:12
**largest** [1] - 470:14
**Larry** [2] - 464:21, 464:23
**last** [24] - 281:8, 283:23, 284:4, 285:13, 287:1, 325:4, 331:21, 331:25, 332:6, 334:2, 334:4, 344:3, 344:13, 359:17, 374:22, 378:8, 403:9, 408:16, 413:23, 416:16, 452:10, 459:24, 474:5, 474:15
**late** [17] - 315:11, 316:22, 317:3, 317:8, 317:12, 317:16, 317:17, 317:22, 384:4, 403:19, 404:8, 407:15, 443:3, 443:5, 473:21, 475:17, 481:12
**LAURA** [1] - 277:19
**Laura** [1] - 393:8
**law** [10] - 355:6, 371:7, 375:25, 376:7, 376:9, 406:7, 454:5, 454:8, 483:20, 485:23
**LAW** [2] - 277:15, 277:19
**laws** [7] - 365:22, 371:6, 375:22, 376:3, 376:4, 402:8, 484:21
**lawsuit** [5] - 406:1, 406:5, 409:19, 453:17, 485:9
**lawyers** [2] - 456:24, 485:10
**layers** [3] - 402:14, 409:4, 484:17
**lead** [5] - 365:2, 379:9, 392:17, 406:24, 439:9
**leader** [1] - 377:6
**learned** [1] - 485:9
**lease** [3] - 284:14, 403:5, 403:6
**least** [15] - 308:13, 309:7, 351:22, 393:7, 397:8, 398:12, 404:14, 410:16, 411:25, 412:13, 414:22, 415:21, 438:11, 473:3, 486:9
**leave** [6] - 286:15, 336:23, 368:10, 423:19, 461:24, 463:4
**leaves** [2] - 334:4, 449:15
**leaving** [4] - 300:7, 386:12, 432:17, 480:21
**led** [6] - 365:1, 379:6, 379:7, 379:9, 379:12
**ledger** [1] - 352:23
**left** [15] - 283:9, 283:14, 286:13, 290:25, 292:2, 292:17, 306:4, 332:14, 364:9, 382:22, 396:2, 443:23, 458:6, 459:5, 480:24
**Left** [1] - 458:18
**left-hand** [1] - 290:25
**legal** [3] - 456:16, 483:23
**legality** [1] - 483:22
**less** [3] - 437:1, 469:8, 478:9
**lesser** [1] - 360:24
**letting** [2] - 305:2, 442:11
**level** [20] - 330:6, 343:5, 343:8, 360:5, 367:18, 369:10, 369:17, 370:1, 379:15, 385:4, 388:4, 388:5, 388:9, 409:3, 416:18, 434:7, 435:19, 439:19, 469:3, 473:3
**levels** [2] - 469:5, 484:17
**liability** [3] - 395:24, 461:18, 461:19
**liable** [1] - 395:25
**life** [4] - 324:7, 368:1, 410:6, 433:17
**likelihood** [1] - 398:8
**likely** [1] - 412:14
**limited** [2] - 319:18, 357:3
**line** [8] - 418:15, 423:22, 443:22, 444:2, 444:4, 446:5, 446:24, 471:24
**lined** [2] - 362:3, 411:18
**lines** [1] - 362:19
**liquidated** [4] - 355:1, 394:23, 398:13, 398:18
**list** [1] - 469:9
**listed** [3] - 290:25, 293:24, 389:2
**listen** [1] - 377:11
**literally** [3] - 296:1, 323:19, 440:12
**litigate** [1] - 371:8
**litigation** [2] - 337:15, 404:6
**live** [2] - 407:7, 407:10
**LLC** [1] - 277:7
**local** [2] - 326:20, 399:12
**locale** [1] - 365:24
**locally** [1] - 369:24
**located** [2] - 402:18, 480:16
**location** [3] - 402:20, 407:21, 407:24
**locations** [2] - 368:14, 439:7
**lock** [3] - 389:13, 449:25, 480:7
**locked** [7] - 389:14, 461:5, 461:10, 461:13, 461:15, 480:6, 481:3
**logged** [2] - 349:5, 486:13
**logic** [1] - 470:18
**login** [2] - 301:20, 301:21
**logistically** [2] - 477:23, 478:5
**look** [17] - 289:22, 300:16, 305:21,

307:15, 353:13, 355:9, 356:2, 356:3, 397:1, 401:21, 408:15, 419:3, 430:3, 446:18, 460:5, 471:9
**Look** [4] - 304:20, 305:16, 307:18, 323:17
**lookback** [1] - 355:3
**looked** [3] - 354:18, 397:16, 429:21
**looking** [17] - 289:24, 297:20, 333:13, 342:22, 351:17, 357:2, 383:6, 392:14, 397:13, 401:19, 401:24, 402:22, 425:10, 432:25, 435:9, 439:4, 485:5
**looks** [3] - 309:21, 362:2, 425:8
**loop** [1] - 447:10
**Los** [2] - 371:4, 402:1
**lose** [1] - 332:25
**losing** [1] - 305:1
**loud** [1] - 289:24
**Louisiana** [10] - 404:21, 404:24, 405:4, 455:13, 455:18, 482:15, 482:20, 484:7, 487:15, 487:16
**LOUISIANA** [2] - 277:1, 277:5
**love** [10] - 313:17, 313:18, 346:4, 346:10, 346:11, 399:15, 402:3, 470:11, 476:13
**loved** [1] - 443:25
**low** [3] - 434:7, 466:12, 473:3
**low-level** [1] - 434:7
**lower** [2] - 284:11, 388:8
**LRA** [7] - 404:21, 455:10, 456:13, 456:14, 457:2, 457:6, 484:7
**lunch** [9] - 333:21, 334:1, 334:12, 334:14, 348:12, 356:25, 393:9, 443:19, 444:5
**luncheon** [1] - 393:16
**LUNCHEON** [1] - 279:15
**lunches** [1] - 333:25

## M

**ma'am** [40] - 281:18, 284:21, 291:14, 291:17, 291:20, 292:12, 292:18, 292:24, 293:14, 293:18, 294:7, 294:9, 294:13, 295:8, 295:11, 295:14, 295:16, 296:19, 297:16, 297:19, 297:23, 300:8, 300:17, 300:20, 300:23, 311:5, 325:13, 325:24, 341:7, 346:1, 346:22, 347:23, 348:8, 372:24, 395:4, 399:4, 465:19, 471:21, 484:16, 485:18
**Ma'am** [1] - 346:1
**macro** [1] - 368:22
**mail** [4] - 300:18, 301:1, 311:17, 436:6
**mails** [2] - 433:24, 447:12
**main** [2] - 414:5, 447:18
**maintain** [1] - 425:22
**maintaining** [3] - 385:4, 386:4
**maintenance** [2] - 416:13, 438:25
**malfeasance** [1] - 436:16
**man** [1] - 312:10
**manage** [3] - 285:7, 385:1, 433:18
**managed** [4] - 287:14, 291:6, 310:6, 327:16
**management** [8] - 309:4, 309:6, 310:18, 319:23, 333:10, 342:15, 342:17, 454:12
**manager** [150] - 282:7, 282:12, 282:18, 284:25, 286:10, 287:13, 287:16, 287:25, 289:16, 290:20, 291:16, 293:20, 293:24, 295:6, 296:17, 297:18, 297:24, 298:5, 298:12, 298:15, 298:22, 299:6, 300:7, 302:6, 302:19, 302:22, 304:8, 306:1, 307:9, 311:23, 319:9, 319:13, 320:2, 320:4, 320:16, 320:20, 321:4, 321:6, 321:14, 321:19, 326:15, 327:10, 327:17, 327:18, 328:12, 333:14, 334:17, 339:16, 339:23, 340:3, 340:10, 340:18, 340:21, 343:18, 344:14, 347:18, 363:6, 363:10, 363:16, 363:17, 363:20, 364:24, 365:2, 365:13, 366:17, 370:16, 370:18, 371:11, 371:25, 377:17, 377:21, 377:22, 377:24, 377:25, 378:1, 378:11, 380:6, 381:8, 383:4, 383:20, 389:3, 389:11, 389:15, 389:16, 396:14, 397:3, 397:5, 400:8, 403:20, 404:1, 409:14, 409:15, 411:10, 411:14, 415:20, 426:18, 427:1, 430:19, 431:10, 433:13, 433:14, 434:16, 434:17, 434:20, 435:20, 438:16, 442:6, 442:23, 443:2, 443:4, 444:19, 448:16, 460:25, 462:5, 462:6, 462:10, 462:21, 463:10, 463:20, 463:25, 465:20, 465:22, 465:23, 466:1, 466:2, 466:3, 466:4, 466:5, 466:6, 466:7, 468:3, 468:5, 468:21, 472:23, 475:13, 475:21, 477:9, 477:22, 478:12, 478:20, 480:12, 484:18
**Manager** [2] - 290:19, 291:8
**manager's** [2] - 427:2, 453:21
**Manager's** [1] - 290:4
**manager/service** [2] - 299:22, 344:20
**managerial** [5] - 285:15, 368:18, 372:3, 378:6, 484:13
**managers** [108] - 289:17, 290:25, 295:6, 308:7, 309:14, 310:1, 318:5, 319:12, 320:6, 321:21, 324:14, 326:1, 326:5, 326:9, 335:5, 335:8, 335:18, 342:10, 346:20, 346:23, 347:11, 347:21, 347:25, 348:2, 361:17, 363:5, 363:23, 364:4, 364:6, 365:16, 366:5, 366:8, 366:11, 366:13, 366:14, 367:20, 368:7, 368:20, 368:25, 369:5, 370:4, 370:6, 370:8, 371:1, 372:3, 381:3, 381:6, 386:9, 386:15, 386:19, 386:22, 387:2, 387:15, 387:16, 388:12, 388:17, 389:1, 396:3, 396:11, 396:12, 396:13, 397:11, 406:16, 409:9, 411:6, 416:7, 422:5, 422:8, 422:24, 423:7, 424:3, 425:1, 426:15, 426:20, 430:12, 431:3, 431:18, 432:22, 433:8, 434:3, 439:18, 440:20, 445:3, 446:4, 452:7, 453:7, 453:11, 453:14, 462:16, 464:10, 465:4, 465:11, 465:14, 465:16, 466:7, 467:8, 468:19, 469:11, 470:16, 473:4, 474:2, 476:5, 476:11, 477:6, 477:17, 478:16, 484:13
**managers'** [2] - 290:6, 372:2
**managers/service** [2] - 347:8, 396:3
**managing** [18] - 286:14, 288:12, 288:14, 288:15, 293:12, 293:15, 319:21, 329:19, 339:23, 339:25, 385:6, 399:19, 400:12, 433:16, 434:11, 465:6, 466:11
**mandatory** [14] - 310:25, 311:17, 312:16, 315:2, 315:3, 318:14, 318:15, 336:8, 374:11, 374:13, 375:6, 379:6, 399:11, 428:9
**manually** [9] - 404:10, 447:7, 459:21, 459:22, 459:25, 460:1, 460:3, 460:7, 460:19
**map** [6] - 315:21, 316:7, 316:20, 316:24, 317:4
**March** [7] - 302:2, 350:24, 382:23, 386:13, 406:2, 438:2, 439:21
**Marcus** [1] - 444:9
**Mardi** [7] - 332:1, 332:2, 332:15, 333:24, 343:19, 344:1, 344:9
**Mark** [2] - 443:13, 444:20
**married** [3] - 313:7, 313:13, 324:8
**mashed** [1] - 287:24
**match** [1] - 430:3
**matches** [1] - 430:4
**materials** [1] - 353:8
**math** [9] - 293:17, 293:25, 323:3, 323:4, 335:1, 356:11, 429:19, 448:21
**mathematical** [1] - 356:4
**matter** [16] - 281:13, 289:19, 312:5, 324:5, 324:6, 324:9, 329:19, 398:8, 403:14, 414:23, 431:21, 440:22, 448:17, 449:8, 452:24, 487:19

**matters** [1] - 446:20
**max** [1] - 404:4
**maximize** [2] - 377:13
**meal** [4] - 412:20, 412:24, 461:4, 468:24
**meals** [1] - 468:21
**mean** [162] - 282:25, 283:22, 287:18, 287:22, 293:22, 294:18, 295:1, 295:17, 295:19, 295:21, 296:5, 296:6, 296:10, 298:10, 298:14, 298:24, 299:2, 299:13, 302:22, 303:11, 303:14, 303:16, 304:9, 305:2, 305:7, 307:21, 308:9, 308:23, 309:6, 309:8, 310:4, 310:5, 310:9, 310:11, 310:19, 310:20, 311:10, 311:14, 311:24, 311:25, 312:3, 313:3, 313:4, 313:7, 313:10, 314:11, 314:14, 315:18, 315:25, 316:3, 316:5, 316:11, 317:2, 317:12, 317:15, 317:16, 317:18, 318:1, 318:6, 318:11, 318:12, 319:10, 319:19, 319:23, 320:22, 320:23, 320:25, 321:9, 323:11, 324:8, 326:10, 326:18, 326:19, 327:21, 327:24, 327:25, 328:14, 328:17, 329:5, 329:13, 330:5, 330:22, 330:23, 331:3, 332:15, 332:23, 333:9, 334:3, 336:1, 336:2, 336:20, 338:7, 339:3, 339:4, 340:2, 340:24, 341:17, 341:19, 342:20, 343:9, 344:23, 345:15, 346:7, 346:10, 346:13, 347:13, 359:23, 360:18, 360:20,

361:25, 363:6, 365:21, 368:18, 368:25, 369:8, 369:11, 369:16, 369:17, 370:1, 370:2, 370:8, 373:20, 374:13, 377:20, 380:2, 380:24, 387:10, 406:25, 408:19, 411:17, 413:10, 416:11, 423:11, 434:8, 436:20, 440:25, 441:1, 445:6, 445:23, 446:8, 447:15, 454:1, 456:23, 456:24, 458:11, 460:18, 462:5, 462:22, 464:13, 465:3, 465:23, 466:20, 467:19, 472:12, 476:8, 476:16, 483:23
**means** [14] - 298:19, 315:20, 315:24, 316:1, 316:2, 343:1, 343:2, 362:13, 363:10, 377:21, 400:14, 423:13, 426:9
**meant** [8] - 380:15, 385:1, 396:14, 462:25, 463:1, 463:2, 468:15, 469:22
**meat** [15] - 328:6, 328:9, 424:8, 424:9, 424:15, 424:21, 425:6, 425:10, 464:15, 464:22, 466:17, 473:10, 473:13, 473:19, 473:23
**meats** [1] - 424:18
**MECHANICAL** [1] - 278:7
**meet** [5] - 402:14, 422:13, 469:12, 477:23, 487:4
**meeting** [26] - 296:7, 306:12, 306:13, 306:15, 306:17, 306:18, 311:18, 312:11, 312:16, 322:4, 322:6, 322:7, 322:10, 323:15, 324:4, 336:8, 365:3, 379:9, 379:12, 380:4, 380:10,

380:17, 394:17, 471:4, 477:6
**meetings** [36] - 296:1, 296:6, 296:14, 297:2, 297:7, 297:8, 297:13, 310:25, 311:3, 312:2, 318:14, 318:15, 336:7, 341:18, 341:19, 364:22, 364:23, 365:1, 368:20, 373:25, 374:11, 374:14, 375:6, 378:3, 378:4, 378:23, 378:24, 379:4, 379:5, 379:6, 379:7, 379:22, 380:5, 380:15, 395:22, 450:21
**meets** [2] - 411:16, 466:14
**Melissa** [54] - 286:14, 287:11, 287:14, 290:10, 291:6, 291:13, 301:15, 303:17, 303:22, 304:3, 304:7, 304:10, 304:11, 308:9, 308:11, 309:3, 310:2, 310:5, 310:10, 310:12, 310:13, 321:11, 321:14, 340:9, 340:23, 341:3, 341:13, 342:15, 343:4, 364:10, 365:10, 367:9, 367:21, 368:17, 368:25, 379:8, 386:10, 386:15, 387:22, 397:2, 420:17, 420:21, 432:2, 433:19, 434:19, 434:22, 434:25, 447:12, 447:24, 465:17, 465:23, 468:20
**Melissa's** [2] - 321:13, 434:13
**member** [1] - 442:17
**members** [6] - 392:20, 416:14, 436:21, 442:14, 442:16
**memories** [1] - 397:20
**menial** [1] - 360:14
**mention** [1] - 396:24
**mentioned** [19] - 341:9, 366:23, 367:20, 381:16, 386:15, 386:20,

386:23, 391:15, 414:3, 423:4, 423:11, 434:13, 438:10, 438:18, 448:13, 449:17, 463:9, 463:10, 467:15
**menu** [4] - 413:6, 420:24, 421:11, 469:8
**menus** [3] - 412:4, 420:4, 476:20
**MERIT** [1] - 278:4
**Merit** [2] - 487:14, 487:23
**message** [1] - 444:20
**met** [2] - 300:1, 383:14
**Metropolitan** [55] - 281:19, 284:24, 288:13, 290:2, 297:18, 297:22, 307:14, 307:25, 310:25, 324:11, 348:3, 358:11, 358:13, 359:12, 363:9, 364:6, 365:17, 366:5, 366:8, 366:12, 366:15, 367:21, 367:25, 368:3, 369:7, 370:3, 370:7, 373:10, 373:19, 374:11, 376:20, 378:13, 382:21, 383:19, 386:8, 386:17, 386:19, 386:22, 387:2, 387:15, 387:19, 387:24, 388:2, 388:11, 390:6, 391:17, 401:5, 407:18, 409:4, 410:7, 422:23, 439:25, 440:9, 451:6, 471:25
**Miami** [4] - 401:23, 401:24, 402:1, 402:5
**Michael's** [3] - 384:8, 384:13, 391:10
**Michelin** [1] - 358:25
**microphone** [2] - 338:17, 340:15
**middle** [3] - 290:14, 359:12, 451:7
**might** [16] - 287:22, 363:16, 363:24, 363:25, 368:11, 369:13, 377:10, 392:17, 408:15, 411:22, 440:23,

448:2, 453:1, 454:1, 478:8
**military** [1] - 399:11
**million** [1] - 329:5
**mind** [2] - 404:23, 483:25
**mine** [2] - 288:6, 329:17
**miniature** [1] - 353:13
**minimal** [2] - 365:22, 436:13
**minimum** [7] - 311:9, 354:4, 384:23, 384:24, 395:8, 395:14, 415:1
**minute** [3] - 375:17, 377:16, 487:5
**minutes** [7] - 316:22, 317:2, 393:6, 393:7, 413:24, 470:25, 478:8
**mise** [1] - 362:12
**missed** [3] - 316:4, 374:20, 427:8
**missing** [12] - 280:14, 315:17, 316:3, 326:13, 349:17, 350:14, 350:25, 353:6, 353:23, 423:2, 449:25, 481:2
**mistakes** [4] - 429:13, 429:16, 429:17, 429:24
**misunderstanding** [1] - 462:20
**mix** [1] - 480:17
**moment** [6] - 422:15, 436:3, 436:6, 454:13, 478:25, 480:1
**Monday** [16] - 311:1, 312:15, 312:16, 364:23, 373:25, 374:11, 374:17, 378:23, 378:24, 379:4, 379:5, 379:6, 379:7, 394:17, 395:22, 450:21
**money** [34] - 296:18, 296:25, 312:2, 312:5, 312:8, 312:12, 312:14, 322:17, 323:22, 324:10, 324:11, 329:2, 335:3, 336:3, 339:3, 345:5, 345:9, 358:22, 388:12, 389:7, 399:13, 408:10, 408:14, 441:16, 441:17,

450:13, 450:18, 451:17, 451:21, 461:7, 469:17, 469:21, 470:1, 470:17
**month** [5] - 283:4, 284:8, 284:14, 408:6, 486:21
**months** [15] - 282:9, 282:16, 282:18, 283:19, 289:4, 312:21, 334:24, 350:10, 403:23, 404:15, 418:10, 472:8, 486:15
**mood** [1] - 332:21
**morally** [1] - 345:2
**MORGAN** [1] - 277:11
**morning** [19] - 280:9, 281:12, 314:20, 314:21, 322:14, 323:18, 323:20, 325:21, 325:22, 332:5, 334:3, 344:23, 345:4, 345:6, 347:3, 347:8, 348:10, 368:2, 375:11
**mornings** [3] - 322:12, 322:16
**Most** [1] - 455:20
**most** [29] - 296:8, 312:13, 338:14, 338:15, 338:18, 339:2, 360:7, 360:9, 360:12, 360:22, 360:23, 370:8, 380:24, 398:6, 412:14, 412:18, 418:21, 419:13, 420:4, 420:17, 433:16, 436:13, 437:11, 438:4, 440:19, 445:15, 455:12, 463:2, 470:13
**mostly** [3] - 414:14, 432:20, 446:18
**mother's** [1] - 384:2
**motion** [1] - 398:17
**motivated** [1] - 405:23
**move** [9] - 283:5, 283:19, 340:16, 340:17, 346:18, 398:6, 407:12, 407:14, 445:24
**moved** [9] - 282:18, 282:25, 283:2, 284:8, 284:17, 284:18, 286:15, 435:17, 439:12
**moves** [1] - 447:11
**movie** [2] - 330:21, 331:12
**moving** [3] - 327:24, 366:6, 425:22
**MR** [67] - 279:7, 279:11, 279:14, 279:18, 325:20, 338:8, 338:10, 340:7, 340:16, 348:8, 351:17, 351:19, 352:5, 352:9, 352:17, 352:20, 352:23, 355:11, 355:19, 355:24, 356:2, 356:14, 356:22, 357:2, 357:10, 370:12, 372:13, 372:16, 372:21, 375:10, 378:22, 382:1, 391:4, 392:24, 394:21, 395:4, 395:18, 396:1, 396:6, 396:16, 396:21, 396:24, 397:15, 397:18, 398:4, 398:23, 399:5, 399:7, 450:21, 450:23, 451:9, 451:10, 454:15, 454:17, 454:24, 455:19, 455:21, 457:21, 481:19, 481:21, 482:12, 485:18, 485:22, 486:3, 486:7, 486:19, 487:1
**MS** [82] - 277:25, 279:6, 279:8, 279:10, 279:13, 279:17, 280:13, 280:21, 281:11, 281:14, 281:16, 284:7, 287:2, 305:20, 313:22, 321:3, 323:14, 325:18, 342:8, 346:9, 346:19, 347:6, 348:5, 348:21, 349:22, 350:1, 350:4, 350:7, 350:10, 350:13, 350:18, 350:21, 350:24, 351:1, 351:3, 351:13, 352:11, 352:25, 353:5, 353:9, 353:12, 353:16, 353:24, 354:14, 354:21, 356:11, 356:18, 357:22, 358:10, 362:24, 371:23, 372:12, 372:20, 372:24, 373:2, 375:8, 382:3, 382:7, 382:20, 391:2, 393:1, 393:5, 394:10, 394:14, 394:16, 394:19, 395:6, 395:12, 395:14, 396:10, 396:17, 397:25, 398:22, 455:2, 456:8, 456:9, 457:20, 457:22, 480:1, 480:3, 481:18, 486:11
**multiple** [1] - 295:4
**must** [2] - 302:9, 409:4

## N

**name** [41] - 281:6, 281:8, 281:12, 286:21, 287:1, 290:9, 293:9, 301:2, 301:11, 301:12, 304:16, 316:10, 323:20, 337:19, 358:5, 358:7, 372:15, 372:16, 375:11, 382:15, 382:17, 389:7, 397:5, 400:13, 401:3, 401:5, 405:5, 407:17, 407:18, 410:1, 416:16, 440:20, 443:4, 444:11, 447:8, 468:10, 472:17, 472:19
**Name** [1] - 290:4
**named** [4] - 287:7, 363:17, 394:18, 394:19
**names** [6] - 290:6, 293:8, 316:12, 389:6, 403:25
**nation** [1] - 384:6
**nationwide** [2] - 375:25, 376:2
**natural** [1] - 435:10
**nature** [2] - 362:23, 365:7
**near** [1] - 466:5
**nearly** [1] - 466:1
**necessarily** [3] - 377:10, 405:22, 449:3
**necessary** [3] - 422:9, 423:7, 480:14
**necessity** [3] - 431:20, 440:3, 442:3
**need** [52] - 299:2, 318:24, 320:3, 326:23, 331:2, 336:3, 343:15, 344:15, 353:5, 360:14, 360:15, 393:5, 393:7, 405:12, 406:17, 421:16, 428:21, 431:24, 433:1, 433:2, 433:5, 437:18, 439:3, 440:15, 441:6, 441:9, 442:11, 446:14, 447:21, 448:20, 448:22, 452:20, 452:21, 453:1, 453:2, 453:19, 464:2, 464:4, 467:1, 467:16, 467:17, 467:20, 473:13, 473:16, 474:4, 482:3, 486:25
**needed** [24] - 297:14, 303:7, 314:12, 317:6, 320:3, 327:4, 380:8, 386:7, 412:4, 422:15, 423:10, 425:22, 427:18, 427:20, 442:15, 451:15, 465:3, 467:14, 468:13, 470:5, 471:11, 471:13, 472:21, 474:12
**needs** [8] - 309:10, 327:8, 363:21, 388:8, 406:25, 429:4, 433:22, 441:13
**negative** [6] - 318:2, 332:19, 332:20, 332:23, 332:24, 332:25
**negatively** [1] - 311:24
**net** [1] - 292:7
**never** [33] - 293:23, 293:24, 300:1, 303:23, 308:3, 317:17, 319:19, 319:20, 324:16, 326:8, 329:13, 344:23, 348:4, 348:24, 364:5, 368:2, 368:3, 370:5, 375:3, 375:19, 387:25, 389:13, 392:19, 406:8, 406:12, 406:15, 409:22, 443:25, 448:1, 450:4, 475:15, 482:7
**new** [9] - 319:9, 319:10, 319:13, 368:13, 425:21, 468:6, 482:1, 482:2, 482:19
**New** [32] - 358:24, 359:14, 359:15, 370:24, 371:1, 371:4, 371:10, 371:20, 375:18, 375:22, 376:7, 376:12, 376:17, 384:7, 384:9, 384:13, 384:22, 392:9, 401:6, 401:17, 402:2, 402:13, 402:15, 403:8, 404:17, 407:8, 418:22, 441:20, 441:22, 441:23, 454:3, 483:6
**NEW** [4] - 277:5, 277:17, 277:21, 278:5
**next** [16] - 318:7, 336:23, 356:25, 357:20, 360:15, 382:5, 383:13, 386:5, 393:3, 400:22, 400:23, 420:8, 421:9, 426:12, 463:14, 475:19
**nice** [1] - 283:1
**nickname** [1] - 444:12
**night** [51] - 292:15, 293:5, 293:7, 293:21, 294:22, 294:23, 294:25, 299:23, 312:13, 314:19, 320:25, 321:5, 321:7, 326:21, 334:6, 334:10, 336:23, 344:24, 362:15, 367:19, 374:15, 380:7, 386:7, 388:23, 389:10, 389:11, 389:15, 410:6, 410:10,

410:19, 411:15, 412:5, 413:12, 415:13, 415:19, 418:12, 419:2, 419:8, 419:10, 425:16, 425:23, 430:24, 436:6, 437:5, 443:5, 446:24, 448:19, 463:9, 478:7, 480:20
**nightly** [1] - 326:17
**nights** [2] - 389:16, 418:21
**NO.16-2708** [1] - 277:5
**nobody** [2] - 417:8, 438:13
**nomenclature** [2] - 409:14, 468:3
**none** [4] - 325:2, 347:4, 347:7, 347:11
**nontraditional** [1] - 401:15
**norm** [6] - 480:25, 483:22, 484:2, 484:7, 484:9, 484:10
**normally** [2] - 428:8, 482:19
**northern** [1] - 399:21
**notes** [5] - 338:9, 474:21, 485:24, 486:4, 486:14
**nothing** [13] - 281:1, 313:9, 350:16, 357:25, 369:21, 372:1, 382:10, 440:11, 445:23, 454:13, 463:7, 482:12
**notice** [2] - 325:7, 406:5
**noticed** [1] - 323:17
**notification** [2] - 447:1, 447:3
**notify** [2] - 315:12, 315:14
**November** [2] - 382:22, 407:15
**nuances** [1] - 359:24
**number** [17] - 292:23, 349:24, 350:6, 352:19, 359:6, 367:18, 376:13, 376:14, 388:25, 394:24, 395:15, 395:19, 395:20, 429:23, 451:8
**Number** [4] - 414:6, 414:7, 414:11
**numbered** [1] - 487:19
**numbers** [6] - 293:16, 356:3, 356:7, 356:8, 427:22, 461:1

**O**

**o'clock** [6] - 334:5, 412:19, 412:23, 413:5, 433:17, 437:9
**O'Dwyer** [22] - 286:12, 287:19, 310:15, 319:16, 341:10, 364:9, 365:10, 367:14, 368:17, 370:9, 370:14, 383:2, 383:18, 383:21, 386:10, 387:22, 388:15, 467:25, 470:24, 471:7, 472:16, 473:7
**oath** [5] - 281:5, 358:4, 382:14, 399:1, 399:3
**object** [1] - 468:11
**objection** [6] - 370:12, 370:19, 398:21, 398:22, 455:21
**obligations** [1] - 446:11
**obviously** [21] - 296:18, 326:13, 359:23, 367:5, 367:16, 368:2, 369:16, 394:22, 395:22, 398:11, 403:13, 405:14, 433:22, 435:10, 436:25, 468:17, 475:15, 484:25, 485:8, 485:18, 485:24
**occasion** [4] - 411:9, 419:19, 445:16, 453:6
**occasionally** [2] - 429:13, 475:16
**occasions** [2] - 367:1, 434:8
**occupation** [1] - 419:14
**occupied** [1] - 367:7
**occupy** [1] - 327:15
**occupying** [2] - 326:17, 434:23
**occurred** [1] - 443:15
**occurrence** [1] - 444:24
**occurs** [1] - 436:1
**October** [5] - 403:9, 403:19, 404:8, 471:20
**October/November** [1] - 397:6
**OF** [2] - 277:1, 277:10
**offer** [5] - 424:13, 424:17, 462:3, 462:6, 473:19
**offered** [2] - 314:13, 314:14
**office** [6] - 433:8, 443:6, 459:21, 460:14, 479:24, 480:5
**OFFICE** [1] - 277:15
**OFFICIAL** [1] - 278:3
**Official** [2] - 487:15, 487:23
**often** [4] - 320:21, 320:22, 414:20, 482:23
**old** [2] - 384:2, 468:11
**on-line** [3] - 418:15, 446:5, 446:24
**once** [25] - 286:13, 286:15, 292:22, 318:4, 362:17, 368:16, 369:5, 409:10, 409:19, 414:22, 421:15, 428:7, 428:17, 434:5, 437:19, 443:16, 443:22, 446:7, 446:15, 447:2, 447:11, 448:2, 455:13
**One** [1] - 353:2
**one** [109] - 284:14, 289:18, 293:8, 293:10, 295:6, 295:20, 299:13, 309:23, 316:4, 319:22, 320:3, 320:7, 320:25, 324:21, 326:19, 328:15, 330:3, 331:15, 332:23, 333:1, 337:18, 337:20, 338:8, 341:21, 347:5, 351:19, 353:5, 355:5, 355:13, 359:2, 359:7, 360:3, 360:7, 360:12, 360:16, 363:24, 363:25, 364:2, 367:2, 368:25, 369:20, 370:23, 372:10, 373:14, 374:19, 374:20, 376:15, 379:9, 380:17, 380:24, 381:14, 381:15, 381:20, 381:21, 396:24, 397:1, 398:4, 401:23, 402:13, 404:15, 411:9, 412:1, 412:21, 414:7, 414:8, 414:14, 417:10, 417:17, 418:8, 418:17, 419:17, 423:3, 430:17, 430:19, 432:5, 432:9, 434:12, 437:9, 437:11, 437:20, 438:10, 438:18, 439:4, 439:25, 440:7, 446:3, 447:7, 459:7, 467:8, 472:9, 472:19, 474:20, 477:22, 478:4, 478:16, 478:20, 478:21, 480:1, 480:21, 480:23, 480:24, 480:25, 485:23, 486:20
**one-day** [1] - 486:20
**ones** [11] - 315:16, 351:7, 353:19, 355:11, 355:18, 361:15, 361:16, 372:9, 391:15, 416:10, 452:16
**ongoing** [1] - 423:20
**open** [17] - 295:12, 333:16, 333:21, 334:8, 334:11, 361:11, 387:5, 389:18, 401:1, 401:23, 403:8, 406:19, 408:14, 412:6, 414:19, 467:14, 480:13
**Open** [1] - 418:15
**opened** [20] - 284:25, 342:21, 403:7, 403:10, 403:19, 404:7, 404:10, 404:14, 404:17, 406:4, 407:15, 408:6, 416:15, 421:14, 423:16, 438:1, 439:12, 439:21, 439:24, 484:23
**opening** [10] - 333:22, 370:24, 400:23, 407:2, 435:10, 451:7, 456:10, 456:11, 456:12, 460:2
**operate** [1] - 482:21
**operated** [2] - 405:8, 464:21
**operates** [1] - 405:15
**operating** [2] - 400:2, 435:25
**opportunities** [1] - 439:5
**opportunity** [6] - 283:6, 357:11, 372:7, 375:4, 384:12, 485:14
**opt** [1] - 315:8
**opted** [2] - 314:7, 314:9
**option** [6] - 328:7, 328:9, 338:13, 424:7, 424:14
**optional** [1] - 413:4
**oral** [1] - 348:11
**ORDER** [2] - 280:4, 394:4
**order** [38] - 343:15, 345:13, 349:11, 352:1, 354:6, 360:8, 360:17, 377:4, 385:3, 405:11, 408:9, 409:2, 409:23, 409:24, 410:25, 412:3, 412:16, 419:4, 420:13, 421:12, 422:20, 422:21, 424:12, 424:23, 431:11, 431:13, 433:2, 446:4, 453:13, 453:18, 461:21, 464:6, 464:14, 470:17, 485:19
**ordering** [3] - 426:2, 433:24, 460:16
**orders** [5] - 327:6, 327:7, 362:22, 417:16, 421:9
**ordinarily** [1] - 341:5
**organization** [1] - 460:16
**organized** [1] - 393:11
**oriented** [3] - 363:15, 363:25, 405:12
**original** [1] - 331:8
**ORLEANS** [4] - 277:5, 277:17, 277:21, 278:5
**Orleans** [14] - 359:15, 384:9, 401:6,

401:17, 402:2, 402:13, 402:15, 403:8, 404:17, 407:8, 418:22, 441:23, 454:3, 483:6
**otherwise** [1] - 397:16
**ought** [1] - 456:6
**ourselves** [1] - 296:13
**outcome** [1] - 324:18
**outs** [1] - 351:24
**outside** [3] - 328:1, 416:22, 469:24
**outsource** [2] - 417:23, 417:25
**overall** [2] - 333:12, 401:9
**overcooked** [1] - 368:24
**overlap** [1] - 353:22
**overlooking** [1] - 295:9
**overruled** [2] - 370:19, 455:24
**overseeing** [1] - 467:9
**overtime** [33] - 313:23, 314:6, 314:9, 314:12, 353:18, 353:25, 354:1, 354:3, 354:10, 354:13, 354:15, 355:23, 356:1, 356:5, 356:10, 357:3, 372:20, 373:12, 373:14, 373:19, 373:23, 374:5, 374:7, 389:22, 390:8, 390:10, 390:14, 390:17, 390:20, 390:23, 395:8, 395:11, 395:21
**overview** [1] - 368:23
**owe** [1] - 395:21
**owed** [2] - 356:9, 374:6
**own** [22] - 281:17, 284:20, 312:2, 346:3, 359:24, 388:7, 400:2, 400:6, 400:23, 406:24, 408:24, 408:25, 433:3, 442:6, 464:19, 464:20, 464:22, 470:10, 484:21
**owner** [3] - 400:9, 417:7, 451:2
**owner/manager** [2] - 406:22, 485:3
**owners** [6] - 309:17, 310:3, 310:23, 318:5, 318:25, 319:5
**ownership** [4] - 308:5, 310:8, 325:2, 336:11
**owning** [1] - 400:6

**P**

**p.m** [1] - 487:7
**pace** [1] - 422:11
**pacing** [2] - 475:14, 475:20
**PAGE** [1] - 279:3
**page** [3] - 373:23, 390:22, 471:23
**pages** [1] - 349:11
**paid** [19] - 287:25, 288:5, 288:20, 311:8, 314:23, 336:15, 346:12, 356:15, 356:16, 370:4, 375:2, 378:14, 378:16, 378:19, 451:11, 469:4, 469:12, 470:5, 482:22
**pair** [1] - 421:1
**Palace** [4] - 327:14, 327:16, 327:20, 347:20
**palace** [2] - 452:17, 452:20
**paper** [3] - 316:8, 316:9, 316:13
**paperwork** [4] - 309:20, 321:25, 433:9
**part** [27] - 285:10, 312:13, 317:13, 330:11, 343:24, 376:23, 380:4, 380:17, 384:17, 392:6, 399:21, 420:4, 421:5, 421:6, 422:17, 422:20, 427:9, 431:15, 439:11, 453:21, 459:24, 465:6, 465:7, 466:9, 469:16, 475:7, 477:1
**participate** [4] - 297:14, 364:25, 396:12, 483:3
**participated** [2] - 297:10, 367:22
**participating** [1] - 324:15
**particular** [8] - 295:7, 296:21, 309:25, 373:24, 411:1, 436:9, 476:7, 483:18
**particularly** [4] - 357:14, 367:9, 388:10, 445:3
**parties** [6] - 394:16, 398:9, 422:3, 424:13, 428:13
**partner** [4] - 400:8, 400:24, 401:25, 438:19
**partners** [2] - 438:10, 438:18
**parts** [1] - 392:16
**party** [5] - 367:3, 421:24, 422:1, 422:2, 424:1
**pass** [2] - 380:13, 454:24
**passive** [1] - 367:11
**past** [1] - 426:6
**patio** [4] - 410:11, 410:14, 410:17, 410:20
**Patrice** [7] - 300:18, 301:1, 301:9, 325:4, 331:19, 332:11, 343:12
**patron** [2] - 405:13, 425:7
**Paul's** [2] - 384:10, 391:11
**pay** [22] - 313:12, 335:14, 346:13, 365:17, 373:11, 384:20, 384:22, 390:9, 428:5, 448:25, 450:14, 451:14, 451:25, 458:6, 469:18, 469:22, 469:23, 470:15, 470:19, 470:20
**paying** [2] - 284:9, 284:11
**payment** [3] - 360:17, 428:7, 458:5
**payments** [1] - 404:20
**payroll** [14] - 352:5, 352:15, 352:21, 353:10, 353:11, 353:12, 363:19, 372:6, 372:8, 372:10, 417:17, 417:19, 417:21, 418:6
**pays** [1] - 461:7
**people** [127] - 292:20, 298:16, 298:17, 299:23, 301:24, 304:9, 308:10, 308:15, 308:19, 308:21, 308:25, 310:1, 310:16, 311:11, 311:13, 311:14, 311:15, 311:17, 313:8, 313:15, 313:17, 317:16, 317:22, 318:2, 319:16, 319:22, 327:23, 328:8, 328:16, 328:17, 329:15, 329:21, 333:10, 333:11, 335:21, 336:13, 336:23, 338:15, 338:19, 338:22, 339:4, 342:23, 343:1, 343:5, 343:10, 345:19, 345:22, 346:16, 360:3, 360:13, 364:2, 365:19, 366:6, 367:7, 367:20, 369:19, 371:2, 371:14, 378:2, 378:3, 380:25, 392:6, 392:11, 397:22, 404:11, 405:6, 408:22, 414:10, 415:11, 415:23, 415:24, 418:15, 419:4, 419:7, 420:25, 422:25, 423:22, 423:25, 429:22, 432:16, 433:2, 433:5, 435:5, 436:12, 437:1, 439:18, 440:4, 440:15, 440:17, 440:23, 441:1, 441:18, 441:23, 442:4, 442:11, 442:21, 442:24, 447:15, 447:19, 447:20, 449:24, 450:12, 451:8, 456:24, 467:16, 467:20, 467:21, 467:22, 469:20, 470:2, 470:13, 471:13, 472:4, 472:15, 472:21, 472:23, 474:6, 474:8, 479:4, 482:22, 484:3, 484:5, 484:9, 486:4
**people's** [4] - 332:25, 389:6, 397:20, 480:18
**Pepper** [3] - 487:13, 487:21, 487:22
**PEPPER** [1] - 278:3
**per** [4] - 292:22, 292:23, 315:14, 388:24
**percent** [60] - 289:10, 289:13, 290:24, 291:11, 291:13, 291:23, 291:25, 293:3, 311:10, 320:5, 321:15, 321:16, 321:21, 321:23, 322:2, 322:9, 322:25, 323:1, 323:5, 323:6, 323:16, 323:24, 323:25, 324:1, 339:6, 339:14, 339:17, 344:21, 374:18, 374:20, 375:1, 388:16, 388:17, 391:25, 417:2, 421:7, 428:1, 428:17, 428:25, 429:2, 430:8, 430:9, 430:11, 430:15, 430:18, 430:20, 430:21, 447:17, 448:14, 448:22, 465:18, 468:24, 469:11, 470:4, 470:7
**percentage** [7] - 291:21, 322:12, 322:13, 427:24, 430:17, 451:23, 469:14
**percentages** [3] - 322:20, 392:5, 469:4
**perfect** [2] - 405:17, 422:9
**perfectly** [1] - 483:7
**perform** [9] - 336:5, 341:5, 361:14, 378:5, 385:17, 385:23, 387:15, 436:13, 467:5
**performance** [1] - 387:18
**performed** [3] - 341:4, 377:7, 387:21
**performing** [4] - 341:16, 412:16, 433:9, 474:13
**performs** [1] - 469:3
**perhaps** [3] - 392:6, 476:1, 476:2
**period** [23] - 296:4, 326:3, 349:5,

349:23, 350:9, 351:12, 351:14, 352:4, 352:6, 352:13, 365:9, 368:12, 373:11, 387:10, 390:9, 397:13, 415:2, 417:24, 422:4, 438:1, 438:14, 468:20, 486:21
**periodic** [1] - 365:8
**periods** [2] - 359:10, 368:10
**permission** [3] - 468:9, 471:6, 471:17
**persist** [1] - 428:7
**person** [31] - 287:12, 292:23, 293:15, 301:12, 317:24, 319:7, 319:25, 324:4, 326:25, 327:24, 327:25, 329:6, 329:15, 332:23, 333:1, 338:5, 341:25, 347:14, 384:19, 412:1, 419:24, 435:8, 435:12, 436:4, 436:9, 437:7, 437:23, 457:1, 483:6
**personable** [1] - 367:14
**personal** [1] - 284:12
**personality** [4] - 328:16, 332:20, 367:11
**personalize** [2] - 432:12, 432:14
**personalized** [4] - 432:7, 466:15, 475:2, 476:6
**personally** [3] - 324:13, 357:10, 450:24
**personnel** [1] - 416:2
**perspective** [3] - 369:4, 414:20, 485:5
**petty** [5] - 450:14, 480:4, 480:5, 480:15, 480:20
**PHILLIPS** [1] - 277:22
**phone** [7] - 304:25, 306:17, 306:18, 306:19, 342:3, 420:3, 436:4
**phonetically)** [1] - 293:9
**physically** [6] - 301:16, 301:17, 308:6, 309:19, 330:4, 423:1
**pick** [6] - 328:11, 353:1, 436:20, 446:25, 447:2, 480:23
**picking** [1] - 301:9
**picky** [2] - 333:11
**picture** [2] - 368:23, 483:23
**piece** [2] - 316:9, 316:13
**PIERCE** [3] - 279:12, 382:12, 382:18
**Pierce** [4] - 382:7, 382:17, 390:1, 391:5
**Pierce-Feith** [4] - 382:7, 382:17, 390:1, 391:5
**PIERCE-FEITH** [1] - 382:12
**PIERCE-FEITH..........** ........................ [1] - 279:12
**pinpoint** [1] - 446:1
**pit** [1] - 452:17
**place** [18] - 307:23, 317:18, 322:11, 327:22, 329:14, 344:1, 344:3, 362:13, 362:14, 371:16, 371:20, 402:1, 402:18, 403:2, 405:17, 412:4, 432:19, 433:25
**places** [6] - 324:10, 326:7, 330:23, 384:18, 386:1, 405:19
**Plaintiff** [2] - 280:19, 287:3
**plaintiff** [5] - 351:25, 354:19, 357:20, 382:5, 394:8
**plaintiff's** [2] - 313:13, 348:22
**Plaintiff's** [3] - 352:25, 353:16, 372:11
**PLAINTIFFS** [1] - 277:15
**plaintiffs** [16] - 281:13, 313:14, 349:9, 353:4, 353:25, 354:19, 355:1, 393:3, 394:18, 394:19, 397:25, 398:16, 426:15, 453:17, 472:18, 473:22
**plan** [2] - 315:21, 316:9
**planning** [2] - 348:13, 483:18
**plate** [1] - 362:14
**plates** [1] - 425:21
**plateware** [1] - 423:14
**play** [1] - 376:5
**pleased** [1] - 440:21
**pocket** [1] - 296:22
**podium** [1] - 353:7
**point** [43] - 284:20, 288:25, 289:18, 299:11, 302:14, 307:8, 316:17, 318:11, 318:12, 321:19, 324:2, 327:23, 330:3, 333:23, 348:22, 355:9, 359:1, 381:11, 394:11, 400:5, 400:10, 403:24, 404:2, 407:7, 409:14, 409:23, 413:13, 422:24, 425:7, 428:6, 430:17, 434:12, 436:10, 440:5, 444:2, 449:24, 450:2, 461:14, 461:24, 468:14, 468:16, 482:1
**Point** [5] - 417:15, 421:13, 422:13, 430:1, 445:10
**pointed** [1] - 454:18
**pointing** [1] - 335:21
**points** [2] - 379:13, 380:8
**policing** [1] - 449:8
**policy** [4] - 315:14, 437:3, 437:6, 449:5
**polish** [5] - 362:1, 362:6, 386:1
**polishers** [1] - 384:18
**polishing** [4] - 296:11, 297:3, 297:6
**pool** [60] - 289:10, 317:13, 320:5, 320:18, 324:15, 325:25, 335:4, 338:4, 344:22, 345:14, 347:22, 347:25, 348:3, 360:24, 364:4, 364:14, 364:15, 367:22, 367:23, 370:7, 371:2, 371:11, 371:25, 376:2, 386:16, 391:11, 391:12, 392:7, 396:12, 396:18, 396:20, 403:20, 404:25, 405:7, 405:8, 408:20, 408:21, 408:23, 420:6, 437:12, 437:13, 437:15, 450:25, 451:3, 451:19, 451:24, 452:5, 453:24, 454:1, 454:8, 454:21, 455:4, 455:15, 457:5, 469:6, 477:1, 483:15, 483:16, 483:19, 483:24
**pooled** [4] - 391:7, 391:13, 408:17, 408:20
**pooling** [4] - 375:23, 392:4, 392:5, 403:14
**pools** [3] - 483:3, 484:7, 484:12
**popular** [2] - 347:14, 425:2
**popularity** [1] - 440:16
**portion** [7] - 290:6, 291:19, 321:6, 392:7, 469:10, 470:14, 470:21
**POS** [5] - 417:13, 417:14, 429:5, 430:4, 445:10
**position** [27] - 283:18, 283:19, 285:15, 302:4, 326:17, 339:23, 358:13, 359:19, 360:1, 360:10, 360:21, 366:2, 368:18, 370:16, 382:24, 383:19, 395:17, 395:18, 412:18, 416:11, 434:22, 434:23, 435:1, 438:22, 440:9, 451:19, 468:20
**positions** [5] - 327:15, 359:21, 363:23, 435:5, 482:21
**positive** [2] - 332:3, 343:19
**possibility** [1] - 301:16
**possible** [4] - 300:1, 366:25, 410:1, 478:6
**possibly** [1] - 482:19
**post** [2] - 446:24, 485:15
**post-trial** [1] - 485:15
**posttrial** [1] - 398:19
**potentially** [1] - 415:3
**pour** [4] - 327:7, 360:15, 463:23, 464:19
**poured** [2] - 326:19, 464:22
**pouring** [2] - 367:4, 466:16
**POYDRAS** [3] - 277:16, 277:20, 278:4
**practice** [1] - 449:3
**pre** [13] - 365:1, 365:3, 378:4, 379:22, 380:4, 380:5, 412:23, 413:9, 413:10, 413:11, 413:16, 413:23, 414:1
**pre-shift** [12] - 365:1, 365:3, 378:4, 379:22, 380:4, 380:5, 412:23, 413:9, 413:10, 413:11, 413:23, 414:1
**pre-shifts** [1] - 413:16
**precise** [2] - 397:7, 434:19
**precisely** [1] - 455:22
**preface** [1] - 410:9
**prefer** [1] - 486:13
**preference** [1] - 420:10
**preferences** [1] - 419:16
**preferred** [1] - 485:8
**prep** [2] - 416:3, 416:14
**prepare** [1] - 413:7
**preparing** [1] - 412:17
**presence** [2] - 438:11, 466:4
**present** [5] - 368:8, 380:11, 393:12, 427:21, 464:25
**presentation** [2] - 425:14, 473:10
**presented** [1] - 454:10
**presents** [2] - 427:10
**preserve** [1] - 398:12
**presumption** [1] - 354:8
**pretrial** [2] - 352:1, 354:6
**pretty** [23] - 283:22, 287:8, 294:15, 302:16, 303:18,

308:23, 309:22, 331:25, 341:18, 361:2, 361:25, 364:11, 366:4, 368:19, 377:15, 397:24, 416:20, 421:25, 434:18, 460:5, 462:8, 467:13, 481:17
**previously** [3] - 351:7, 398:25, 446:9
**pride** [1] - 469:16
**primarily** [2] - 297:14, 420:21
**primary** [3] - 363:11, 385:1, 419:14
**print** [1] - 460:17
**printed** [1] - 460:1
**prioritize** [1] - 452:22
**prioritizing** [1] - 453:1
**priority** [1] - 469:22
**pristine** [1] - 386:3
**private** [1] - 383:9
**Private** [3] - 414:7, 414:13, 414:15
**proactive** [1] - 435:6
**problem** [6] - 341:22, 348:13, 362:3, 406:6, 440:5, 478:16
**problems** [1] - 475:20
**procedure** [1] - 388:16
**proceed** [1] - 399:5
**proceedings** [2] - 487:7, 487:19
**PROCEEDINGS** [4] - 277:10, 278:7, 280:1, 394:1
**process** [12] - 296:3, 423:23, 424:3, 424:5, 426:12, 427:5, 427:6, 427:7, 428:7, 448:13, 454:11, 456:11
**processed** [2] - 429:3, 429:10
**processes** [1] - 360:17
**produce** [2] - 355:15, 460:13
**PRODUCED** [1] - 278:8
**produced** [15] - 349:13, 349:14, 349:16, 351:6, 351:7, 351:10, 351:21, 351:25, 352:2, 352:5, 352:7, 355:15, 357:15, 460:11
**product** [2] - 328:13, 328:15
**production** [1] - 348:21
**productions** [1] - 348:20
**professional** [1] - 456:24
**professionally** [1] - 384:3
**professionals** [3] - 456:12, 456:13, 456:20
**proficient** [1] - 366:1
**promoted** [9] - 300:4, 302:18, 302:19, 399:17, 400:7, 400:9, 403:24, 435:2, 435:11
**promotion** [1] - 326:21
**promptly** [1] - 385:5
**pronunciation** [1] - 391:5
**proper** [5] - 362:2, 404:19, 426:23, 454:5, 474:8
**properly** [2] - 424:19, 439:2
**protected** [1] - 398:14
**protein** [1] - 413:7
**provide** [6] - 366:14, 377:4, 387:9, 424:12, 432:23, 485:16
**providing** [4] - 329:25, 401:8, 431:15, 453:3
**punch** [10] - 336:11, 336:13, 351:23, 351:24, 413:5, 417:15, 421:13, 429:6, 429:18, 429:25
**punch-in** [1] - 351:23
**punch-outs** [1] - 351:24
**punches** [2] - 349:9
**punching** [1] - 414:1
**purchased** [1] - 461:4
**purportedly** [1] - 353:18
**purpose** [3] - 408:7, 420:23, 434:25
**purposes** [1] - 410:17
**push** [1] - 290:12
**put** [39] - 303:12, 303:17, 303:20, 303:23, 304:6, 304:16, 315:8, 316:16, 317:4, 325:6, 328:2, 328:3, 330:14, 330:23, 337:1, 337:2, 338:14, 338:15, 338:17, 338:18, 338:22, 339:1, 339:3, 339:10, 345:12, 353:22, 397:2, 397:10, 406:5, 410:24, 425:9, 428:12, 428:14, 434:22, 434:25, 449:17, 467:21, 481:2, 481:12
**putting** [2] - 378:24, 408:8

## Q

**Qua** [3] - 359:5, 359:19, 359:20
**qualified** [9] - 440:17, 441:18, 441:25, 442:2, 469:20, 470:2, 471:10, 471:13, 472:25
**Quarter** [10] - 369:23, 402:19, 403:12, 405:9, 407:21, 418:22, 422:24, 439:13, 441:13, 454:4
**questioned** [3] - 324:16, 324:23, 337:21
**questions** [14] - 289:23, 325:18, 340:8, 346:8, 348:5, 348:7, 365:15, 392:24, 408:15, 453:25, 473:1, 481:18, 482:14, 482:24
**quick** [1] - 383:8
**quicker** [1] - 285:20
**quickly** [3] - 292:1, 300:7, 371:21
**quite** [2] - 371:13, 444:1

## R

**R'evolution** [1] - 369:25
**R-E-S-Y** [1] - 418:20
**raise** [9] - 280:24, 288:25, 289:3, 365:20, 366:2, 370:6, 379:15, 388:14, 405:20
**raised** [1] - 430:18
**ran** [4] - 341:18, 377:1, 391:17, 413:22
**ranked** [1] - 359:6
**rare** [4] - 388:13, 444:24, 448:7, 482:8
**rarely** [2] - 417:9, 478:2
**rate** [7] - 311:9, 365:16, 365:17, 365:18, 384:22, 451:11
**rather** [5] - 319:25, 436:22, 448:5, 483:12, 483:22
**reach** [2] - 357:1, 401:21
**react** [1] - 475:11
**reaction** [2] - 405:14, 417:5
**read** [2] - 429:20, 429:23
**readily** [1] - 349:12
**ready** [10] - 280:19, 328:2, 331:13, 362:23, 371:7, 393:6, 393:12, 423:14, 426:12, 434:4
**real** [1] - 368:23
**realize** [5] - 347:7, 409:24, 464:6, 468:18, 485:11
**realized** [2] - 446:22, 485:5
**really** [45] - 285:18, 295:22, 302:14, 310:20, 317:5, 319:21, 319:22, 322:7, 324:4, 331:4, 336:2, 336:3, 336:14, 337:24, 338:15, 338:18, 339:3, 341:17, 368:16, 371:14, 377:10, 402:3, 404:10, 404:12, 404:15, 410:22, 425:8, 426:20, 438:4, 439:23, 440:3, 440:15, 440:16, 444:3, 445:19, 446:19, 447:5, 447:10, 463:24, 464:9, 472:3, 472:12, 480:21, 481:11
**REALTIME** [1] - 278:3
**Realtime** [2] - 487:13, 487:22
**reason** [11] - 332:19, 343:25, 346:10, 354:2, 371:3, 407:14, 432:4, 433:1, 435:21, 454:7, 470:3
**reasonably** [2] - 351:6, 351:8
**reasons** [1] - 284:12
**receive** [3] - 314:9, 387:18, 465:17
**received** [11] - 288:25, 289:3, 289:10, 289:12, 289:13, 292:7, 344:22, 350:10, 409:19, 429:25, 448:17
**receiving** [1] - 293:10
**recently** [4] - 418:8, 418:17, 435:17, 486:19
**recess** [2] - 348:16, 393:17
**RECESS....................................** [1] - 279:15
**rechecks** [1] - 323:4
**recite** [1] - 375:24
**reckless** [4] - 354:23, 355:1, 355:7, 357:9
**recklessness** [2] - 357:13, 396:5
**recollection** [5] - 302:12, 389:14, 404:18, 448:8, 453:24
**recommend** [3] - 442:12, 443:8, 456:16
**recommendation** [1] - 442:24
**recommendations** [3] - 431:2, 441:3, 442:13
**recommended** [1] - 476:13
**reconciliation** [11] - 336:17, 337:3, 361:14, 385:18, 404:5, 409:21, 427:6, 430:2, 448:12, 449:15, 450:17
**record** [17] - 281:7, 333:20, 351:4, 352:8, 358:6, 374:10, 379:3,

382:16, 395:6, 395:10, 396:10, 397:9, 398:12, 398:14, 412:24, 420:5, 487:18
**recorded** [3] - 457:24, 458:21, 460:22
**RECORDED** [1] - 278:7
**records** [10] - 348:22, 352:5, 352:15, 354:23, 355:5, 357:8, 372:6, 372:8, 372:10, 372:21
**redirect** [2] - 382:2, 392:25
**REDIRECT** [4] - 279:8, 279:18, 342:7, 481:20
**refer** [6] - 289:22, 410:6, 438:12, 456:22, 457:11, 471:23
**reference** [2] - 424:10, 437:2
**referenced** [1] - 472:5
**referencing** [1] - 353:1
**referral** [1] - 456:19
**referred** [4] - 290:20, 403:25, 424:6, 426:16
**referring** [5] - 287:3, 287:4, 397:9, 412:25, 434:15
**refers** [2] - 285:10, 285:11
**reflect** [2] - 353:18, 397:23
**refresh** [1] - 302:12
**regard** [4] - 337:6, 361:14, 365:16, 429:16
**regarding** [7] - 297:5, 404:23, 431:3, 455:3, 455:15, 456:12, 464:3
**regardless** [5] - 367:18, 367:23, 374:14, 465:21, 467:24
**regards** [1] - 371:19
**region** [1] - 380:3
**register** [3] - 480:8, 480:13, 480:20
**REGISTERED** [1] - 278:4
**registered** [2] - 404:21, 487:23
**Registered** [1] - 487:13
**regular** [10] - 299:12, 307:22, 348:12, 401:16, 443:17, 443:19, 444:9, 444:14, 452:16, 458:8
**regulations** [1] - 376:1
**rehired** [1] - 283:7
**related** [11] - 285:14, 409:10, 413:17, 433:23, 434:10, 445:5, 445:9, 453:3, 466:12, 473:5, 473:6
**relates** [1] - 445:4
**relative** [2] - 369:11, 451:22
**relatively** [1] - 477:20
**relax** [1] - 329:22
**relevant** [2] - 417:24, 438:1
**remain** [1] - 280:23
**remainder** [1] - 437:4
**remember** [26] - 280:12, 297:17, 302:10, 303:3, 305:8, 310:15, 337:18, 340:12, 370:9, 374:25, 379:10, 379:12, 384:20, 405:2, 405:5, 405:6, 416:8, 440:12, 441:10, 453:16, 459:17, 461:15, 461:16, 470:25, 471:19, 471:22
**remind** [2] - 311:15, 311:22
**renovation** [1] - 439:3
**rephrase** [2] - 461:6, 462:23
**replace** [1] - 435:11
**replaced** [1] - 287:11
**Report** [2] - 349:2, 351:23
**report** [14] - 280:11, 349:4, 349:8, 349:13, 349:15, 350:2, 351:11, 352:11, 430:3, 436:5, 448:18, 448:24, 449:6, 449:10
**reported** [4] - 325:2, 457:13, 457:15, 457:16
**reporter** [1] - 486:8
**REPORTER** [4] - 278:3, 278:3, 278:4, 362:4
**Reporter** [7] - 487:13, 487:14, 487:15, 487:22, 487:23, 487:23
**REPORTER'S** [1] - 487:11
**reporters** [1] - 486:13
**reporting** [3] - 460:21, 461:1, 482:9
**reports** [9] - 348:23, 348:25, 349:17, 349:18, 352:4, 404:5, 404:7, 417:13, 417:16
**represent** [3] - 281:13, 356:11, 455:12
**representation** [3] - 351:21, 373:18, 374:3
**representative** [1] - 452:23
**request** [6] - 420:14, 446:12, 446:14, 446:16, 447:3, 448:9
**requested** [5] - 298:1, 298:4, 367:2, 392:17, 485:14
**requests** [3] - 446:6, 446:8, 446:10
**required** [3] - 297:8, 413:3, 413:4
**requirement** [1] - 436:14
**research** [1] - 380:3
**researched** [1] - 380:11
**reservation** [5] - 418:15, 475:17, 475:18, 477:12, 477:15
**reservations** [5] - 410:23, 413:13, 420:2, 436:20, 476:20
**reset** [2] - 425:21, 426:10
**resetting** [1] - 422:15
**resolution** [1] - 357:1
**respect** [9] - 297:11, 297:14, 298:14, 377:10, 397:11, 398:12, 398:18, 433:13, 476:17
**respects** [1] - 359:22
**responded** [1] - 306:25
**response** [2] - 337:22, 453:20
**response)** [6] - 285:2, 315:1, 341:6, 426:17, 449:19, 452:9
**responsibilities** [4] - 392:16, 396:15, 484:13, 485:2
**responsibility** [3] - 377:12, 392:21, 427:1
**responsible** [1] - 392:23
**rest** [5] - 332:12, 351:2, 437:12, 468:16, 469:12
**restaurant** [178] - 295:12, 298:12, 299:1, 326:5, 327:11, 327:13, 329:3, 330:22, 331:7, 331:17, 332:22, 333:8, 333:14, 333:16, 333:21, 334:8, 335:7, 337:12, 338:11, 339:19, 339:21, 341:18, 344:5, 345:17, 358:25, 359:6, 359:23, 360:1, 360:18, 361:2, 361:11, 361:13, 363:3, 363:13, 363:21, 363:24, 365:19, 366:21, 367:17, 368:3, 368:13, 369:12, 370:24, 376:4, 376:17, 377:17, 378:5, 380:16, 380:22, 381:2, 381:9, 383:3, 384:1, 384:3, 385:15, 386:5, 387:5, 388:6, 388:7, 388:9, 391:24, 392:3, 399:9, 399:10, 399:12, 399:16, 399:19, 400:3, 400:6, 400:7, 400:10, 400:13, 400:20, 400:21, 400:22, 400:23, 400:25, 401:1, 401:3, 401:4, 401:7, 401:18, 401:20, 401:21, 402:9, 402:23, 403:1, 403:12, 404:7, 404:17, 406:4, 407:2, 407:15, 407:17, 408:21, 410:11, 410:21, 411:15, 412:6, 413:25, 414:5, 415:7, 415:14, 415:15, 416:3, 416:8, 416:10, 416:12, 416:13, 416:14, 416:19, 416:21, 416:23, 417:11, 418:12, 418:16, 419:4, 419:23, 420:16, 421:24, 422:18, 423:13, 424:17, 433:7, 433:13, 433:15, 433:18, 433:20, 433:21, 434:11, 434:20, 435:16, 436:1, 436:10, 436:18, 436:21, 437:13, 437:25, 438:2, 438:20, 439:9, 439:21, 439:24, 441:12, 443:25, 444:14, 448:16, 449:21, 450:11, 450:16, 451:24, 454:2, 455:9, 455:11, 455:16, 456:3, 456:6, 456:12, 460:2, 465:11, 465:15, 471:13, 472:8, 475:9, 475:14, 477:18, 477:19, 479:4, 479:7, 479:9, 479:11, 479:13, 482:6, 484:24, 485:3
**Restaurant** [6] - 369:25, 404:21, 405:4, 441:20, 441:22, 482:15
**restaurants** [36] - 327:15, 329:10, 358:21, 358:24, 359:1, 359:3, 359:7, 359:11, 359:15, 361:3, 361:10, 361:18, 369:15, 369:20, 369:24, 376:11, 376:15, 376:21, 380:20, 380:25, 384:6, 384:10, 400:10, 400:12, 401:8, 402:11, 405:14, 432:10, 432:11, 433:16, 439:1, 455:13, 455:17,

456:15, 456:18, 482:21
**result** [1] - 306:19
**resumé** [2] - 383:6, 383:8
**Resy** [2] - 418:18, 418:19
**return** [1] - 283:11
**revenue** [2] - 415:11, 421:7
**reverse** [2] - 349:12, 351:8
**review** [2] - 372:7, 445:13
**reviewed** [2] - 348:22, 372:9
**reviewing** [2] - 355:6, 390:2
**revise** [1] - 485:23
**Rica** [15] - 368:11, 400:25, 401:11, 401:20, 401:22, 402:7, 402:13, 404:13, 408:2, 454:3, 482:25, 483:5, 483:9
**Rican** [2] - 402:9, 407:23
**rights** [2] - 371:5, 371:15
**rise** [6] - 280:7, 348:15, 348:17, 393:15, 394:7, 487:6
**RMR** [2] - 278:3, 487:22
**road** [1] - 396:22
**Rogers** [4] - 364:10, 365:10, 386:10, 387:22
**role** [9] - 320:19, 320:20, 321:9, 321:10, 321:15, 363:15, 366:24, 368:5, 368:6
**roles** [2] - 377:7
**roll** [1] - 466:1
**room** [10] - 295:1, 295:2, 316:16, 316:17, 316:18, 367:6, 383:9, 414:9, 425:11, 483:12
**Room** [6] - 414:6, 414:7, 414:11, 414:13, 414:15
**ROOM** [1] - 278:4
**rooms** [2] - 414:6, 422:8
**rough** [2] - 440:7, 451:8
**routine** [1] - 413:23
**rubber** [1] - 396:21
**rule** [4] - 317:18, 338:11, 396:4, 472:7
**rule's** [1] - 317:16
**run** [12] - 352:11, 368:19, 369:9, 400:9, 404:24, 411:6, 413:21, 422:11, 423:9, 454:11, 454:21, 482:20
**runner** [1] - 361:1
**runners** [2] - 377:1, 384:17
**running** [9] - 315:16, 315:20, 315:24, 400:5, 415:14, 422:17, 433:15, 450:16, 454:8
**Ryan** [49] - 286:12, 286:14, 286:15, 287:18, 287:19, 302:22, 303:9, 303:10, 303:16, 303:22, 304:3, 304:7, 304:10, 304:11, 308:9, 308:15, 310:15, 319:16, 319:20, 341:10, 341:12, 341:13, 347:13, 364:9, 365:10, 367:14, 367:21, 368:16, 368:17, 370:9, 370:14, 383:2, 383:7, 383:8, 383:18, 383:21, 386:10, 386:15, 387:22, 388:15, 447:13, 467:25, 468:20, 470:24, 471:7, 472:16, 473:7
**résumé** [1] - 308:4

**S**

**S-A-U-V-A-I-N** [1] - 397:5
**s/Cathy** [1] - 487:21
**SA** [3] - 292:2, 292:6, 293:1
**SA's** [1] - 479:11
**safe** [3] - 363:3, 365:25, 373:9
**sake** [2] - 362:20, 436:4
**salad** [1] - 413:8
**salary** [2] - 283:11, 287:25
**Sale** [5] - 417:15, 421:13, 422:13, 430:1, 445:10
**Sales** [1] - 458:18
**sales** [8] - 421:5, 427:25, 448:13, 457:15, 458:4, 459:1, 459:10
**San** [7] - 359:5, 359:14, 359:19, 375:20, 376:12, 376:16, 384:9
**SAs** [4] - 293:8, 378:13, 384:17, 388:17
**sat** [5] - 307:18, 381:13, 383:3, 383:9, 388:15
**Saturday** [12] - 333:22, 334:1, 334:6, 410:6, 410:10, 410:19, 412:5, 415:13, 419:2, 420:18, 425:16, 430:24
**Sauvain** [2] - 397:5, 435:15
**save** [1] - 399:13
**savings** [1] - 388:18
**saw** [13] - 290:24, 299:10, 329:24, 383:3, 388:25, 439:14, 439:15, 442:21, 447:11, 447:12, 451:20, 457:12, 473:7
**scenario** [1] - 483:23
**scenes** [2] - 362:11, 369:3
**schedule** [41] - 285:21, 285:23, 285:24, 286:1, 295:23, 300:9, 300:10, 301:6, 303:1, 303:2, 303:4, 303:7, 303:13, 303:17, 303:21, 303:23, 303:25, 304:1, 304:6, 304:7, 304:8, 304:10, 304:12, 304:14, 330:24, 331:1, 361:8, 363:18, 364:18, 364:20, 385:12, 386:23, 386:25, 419:8, 419:9, 419:16, 446:15, 447:7, 467:21, 478:3
**scheduled** [2] - 374:15, 448:9
**Schedulefly** [13] - 300:18, 300:21, 301:1, 301:19, 302:17, 302:21, 302:23, 304:16, 445:25, 446:2, 446:16, 447:24
**schedules** [4] - 361:6, 378:4, 385:11, 419:12
**scheduling** [6] - 286:7, 286:8, 300:21, 363:19, 419:3, 452:14
**scouting** [2] - 368:13, 439:7
**scrambling** [1] - 362:17
**scratched** [1] - 389:8
**season** [1] - 410:11
**seasons** [1] - 415:6
**seat** [3] - 348:18, 423:22, 427:13
**seated** [3] - 280:8, 394:8, 482:2
**seating** [9] - 411:21, 414:23, 418:14, 426:7, 475:8, 475:12, 475:13, 481:22, 481:24
**seatings** [1] - 419:6
**seats** [1] - 420:8
**second** [14] - 310:10, 314:12, 314:13, 314:14, 320:3, 338:8, 353:2, 373:23, 390:22, 399:25, 413:9, 444:3, 454:15, 474:20
**section** [39] - 295:10, 316:18, 317:5, 360:2, 362:2, 362:7, 362:12, 366:9, 366:11, 385:1, 386:4, 386:5, 387:7, 405:21, 411:22, 426:5, 426:6, 426:8, 426:25, 427:1, 427:2, 427:7, 427:18, 432:14, 433:2, 462:2, 462:9, 462:11, 463:3, 463:4, 465:2, 477:20, 477:21, 480:18, 482:3
**sections** [10] - 295:9, 316:18, 366:13, 380:7, 405:19, 414:4, 425:25, 427:8, 466:21, 477:17
**secure** [1] - 450:8
**see** [49] - 280:10, 288:22, 290:4, 290:15, 291:3, 292:3, 292:11, 292:16, 301:2, 301:9, 301:10, 302:2, 309:25, 316:14, 319:6, 331:4, 351:13, 353:22, 355:10, 356:22, 373:6, 373:12, 373:14, 390:8, 396:2, 401:16, 405:14, 405:21, 408:10, 408:13, 411:16, 417:13, 425:10, 430:13, 431:24, 436:20, 443:6, 447:15, 457:23, 458:23, 458:24, 459:2, 459:7, 459:9, 459:10, 468:15, 478:7, 486:16
**seeing** [3] - 335:7, 423:2, 442:11
**seek** [2] - 343:1, 343:6
**sees** [2] - 371:11, 419:24
**select** [1] - 442:1
**selection** [1] - 420:24
**selective** [3] - 441:16, 441:24, 472:10
**sell** [3] - 328:15, 464:19, 470:11
**selling** [4] - 328:13, 329:3, 329:4
**send** [13] - 309:5, 317:6, 317:9, 325:4, 343:12, 343:15, 343:17, 344:17, 431:10, 435:20, 436:4, 446:12, 479:1
**sending** [3] - 436:15, 436:16, 444:24
**sense** [4] - 298:25, 347:24, 409:5, 470:15
**sent** [8] - 309:9, 317:14, 317:17, 317:22, 331:20, 332:9, 343:25, 437:8
**separate** [2] - 294:5, 480:18
**September** [5] - 340:10, 390:16,

397:3, 407:13, 434:20
**series** [1] - 384:17
**serious** [4] - 323:21, 333:9, 442:12, 442:15
**serve** [10] - 316:5, 320:2, 320:4, 374:15, 412:11, 412:19, 413:12, 423:10, 434:6, 440:1
**served** [8] - 281:21, 283:18, 286:14, 327:16, 421:15, 437:9, 437:19, 464:15
**Server** [1] - 292:10
**server** [182] - 281:20, 281:25, 282:5, 282:6, 282:16, 283:20, 284:1, 284:2, 284:3, 285:6, 285:14, 285:22, 286:4, 286:7, 290:1, 291:18, 291:22, 292:3, 292:6, 292:14, 292:22, 293:1, 293:4, 293:6, 294:8, 294:10, 294:14, 294:21, 294:24, 296:17, 296:21, 296:22, 299:12, 308:24, 314:18, 315:6, 315:11, 316:3, 316:4, 316:19, 316:22, 320:11, 320:16, 321:5, 321:15, 323:9, 324:25, 325:23, 326:3, 326:14, 326:18, 332:3, 332:18, 334:18, 334:23, 334:25, 335:3, 335:24, 336:4, 336:5, 338:13, 338:24, 338:25, 339:10, 339:21, 358:14, 360:3, 365:11, 365:20, 366:3, 366:6, 376:24, 377:3, 378:13, 379:1, 379:2, 379:19, 379:24, 380:1, 380:3, 380:11, 382:25, 388:3, 388:22, 389:1, 392:17, 399:18, 405:20, 409:7, 411:4, 411:21, 411:24, 413:17, 414:8, 415:17, 419:13, 419:21, 420:9, 420:12, 421:8, 421:10, 421:19, 421:20, 421:22, 424:24, 425:17, 426:8, 428:16, 429:4, 430:10, 431:9, 432:22, 433:3, 433:4, 435:20, 436:2, 436:17, 437:19, 441:5, 441:8, 441:10, 442:21, 445:7, 445:13, 445:14, 446:19, 446:21, 446:22, 447:1, 447:8, 449:10, 449:14, 451:5, 451:11, 451:14, 451:15, 451:18, 451:25, 453:12, 454:20, 459:13, 459:16, 461:1, 461:21, 462:17, 462:24, 463:2, 463:20, 463:22, 464:3, 464:5, 464:7, 466:2, 466:19, 466:21, 466:24, 467:2, 467:4, 469:6, 469:7, 469:11, 469:23, 470:4, 470:19, 475:7, 475:21, 478:21, 480:23, 481:23, 482:22, 483:13, 484:18
**server-wise** [1] - 334:25
**servers** [130] - 286:24, 292:7, 292:15, 292:16, 292:21, 294:5, 294:18, 294:19, 296:17, 297:8, 309:2, 311:1, 315:21, 323:8, 324:24, 328:4, 328:20, 335:24, 336:18, 339:18, 339:19, 343:19, 345:18, 345:19, 360:5, 360:19, 361:14, 361:19, 363:1, 364:24, 365:8, 365:10, 366:13, 371:5, 371:11, 376:22, 377:3, 379:18, 379:19, 379:24, 380:1, 385:18, 385:20, 387:3, 388:25, 391:14, 391:19, 391:24, 396:11, 397:12, 403:17, 403:22, 404:2, 406:13, 409:8, 411:1, 413:18, 413:25, 415:17, 419:13, 419:21, 422:12, 425:3, 425:18, 426:7, 427:12, 427:13, 428:18, 429:9, 429:25, 430:6, 430:8, 431:2, 432:22, 437:17, 440:12, 440:17, 441:3, 441:16, 441:17, 443:1, 443:6, 443:7, 446:9, 446:10, 446:18, 446:21, 448:24, 449:10, 450:17, 451:5, 452:4, 453:6, 453:14, 460:4, 462:8, 464:10, 464:15, 464:16, 465:9, 465:12, 466:18, 466:19, 466:22, 466:24, 467:1, 467:2, 467:9, 467:23, 469:13, 469:19, 469:21, 469:25, 470:13, 470:17, 471:2, 474:13, 476:8, 476:11, 478:21, 479:13, 480:10, 482:6, 482:22, 483:11
**servers'** [3] - 292:25, 295:4, 470:21
**service** [331] - 281:21, 282:8, 282:13, 282:21, 282:23, 283:3, 284:25, 285:17, 285:22, 285:25, 286:1, 286:16, 286:17, 286:18, 286:19, 286:24, 286:25, 290:21, 298:2, 298:11, 298:13, 298:15, 298:16, 298:18, 299:5, 299:12, 299:13, 299:15, 299:18, 299:23, 302:5, 312:13, 315:2, 315:3, 315:16, 315:17, 315:19, 315:20, 315:24, 316:3, 320:19, 320:20, 322:18, 322:25, 325:12, 326:1, 326:4, 326:5, 326:8, 326:14, 326:15, 326:24, 327:18, 328:12, 329:9, 329:25, 332:21, 333:8, 333:14, 334:17, 335:4, 335:8, 335:12, 335:18, 338:3, 338:11, 338:23, 339:1, 339:4, 339:16, 339:23, 339:24, 339:25, 340:2, 341:3, 347:16, 347:19, 358:18, 358:20, 360:5, 362:18, 363:10, 363:11, 363:15, 363:17, 363:24, 365:5, 365:9, 366:1, 366:14, 366:22, 366:24, 367:18, 367:24, 369:7, 369:10, 369:13, 370:17, 377:5, 377:13, 377:21, 378:3, 378:10, 379:13, 380:8, 380:15, 380:18, 380:21, 380:25, 381:2, 381:3, 381:6, 381:8, 383:24, 387:9, 387:10, 387:16, 387:23, 388:1, 388:4, 388:5, 397:12, 399:11, 401:9, 402:9, 402:11, 402:14, 403:11, 403:20, 403:25, 404:19, 405:12, 405:24, 406:16, 406:19, 408:13, 408:22, 408:24, 408:25, 409:3, 409:4, 409:8, 409:9, 409:10, 409:11, 409:14, 409:15, 410:2, 410:3, 410:14, 410:17, 410:20, 411:6, 411:7, 411:10, 411:14, 411:16, 411:19, 411:24, 411:25, 412:2, 412:6, 412:16, 412:21, 412:22, 413:6, 413:14, 413:17, 413:18, 414:19, 415:16, 416:7, 417:19, 418:7, 419:5, 419:21, 421:19, 421:20, 422:4, 422:5, 422:8, 422:9, 422:10, 422:14, 422:18, 422:20, 422:22, 422:24, 423:7, 423:20, 423:21, 424:3, 425:1, 425:16, 426:15, 426:18, 426:20, 426:23, 426:24, 426:25, 427:2, 427:16, 427:19, 427:20, 428:9, 428:19, 428:21, 430:3, 430:11, 430:19, 431:3, 431:9, 431:15, 431:18, 431:21, 432:8, 432:11, 432:15, 432:21, 432:22, 432:23, 433:3, 433:7, 433:8, 433:13, 433:22, 433:23, 434:1, 434:3, 434:4, 434:5, 434:10, 434:16, 435:4, 435:20, 438:7, 438:16, 439:18, 441:18, 442:6, 442:23, 443:2, 443:4, 444:19, 445:2, 445:4, 445:5, 445:9, 446:3, 447:21, 448:16, 448:20, 452:7, 452:17, 452:19, 452:24, 453:3, 453:7, 453:11, 453:14, 453:15, 453:21, 456:19, 462:3, 462:5, 462:10, 462:21, 463:5, 463:9, 463:10, 463:25, 465:4, 465:6, 465:7, 465:16, 466:1, 466:5, 466:7, 466:9, 466:10, 466:11, 466:13, 466:14, 466:16, 467:2,

467:5, 468:7, 468:8,
469:4, 469:11,
469:23, 470:10,
470:16, 473:5,
473:6, 474:4, 474:5,
474:9, 474:12,
474:13, 474:18,
474:19, 475:2,
477:2, 477:9, 478:6,
478:20, 480:11,
480:12, 484:1,
484:13, 484:17,
484:18
**service-wise** [1] -
322:18
**services** [1] - 456:15
**servicing** [1] - 363:12
**serving** [6] - 281:22,
283:17, 295:3,
329:19, 411:15,
412:15
**set** [19] - 316:2,
337:10, 362:7,
362:11, 362:16,
378:4, 386:5,
411:18, 421:25,
423:11, 423:12,
423:13, 423:15,
477:20, 484:21,
486:2, 486:14
**set-up** [1] - 423:15
**setoff** [1] - 395:2
**sets** [1] - 415:1
**setting** [7] - 317:2,
344:4, 404:19,
405:8, 455:9,
455:16, 486:18
**settled** [1] - 348:12
**setup** [1] - 423:23
**seven** [9] - 282:9,
282:15, 282:18,
320:24, 322:18,
411:3, 415:24,
437:9, 483:11
**several** [8] - 349:11,
359:10, 363:4,
405:6, 433:2, 486:15
**Shachar** [3] - 416:16,
416:20, 417:6
**SHACHAR** [1] -
416:16
**Shack** [1] - 358:21
**shake** [1] - 369:2
**shakes** [1] - 311:24
**shape** [1] - 433:23
**share** [11] - 347:25,
360:23, 391:25,
437:1, 437:4,
437:21, 469:24,
470:22, 476:14

**shared** [7] - 326:1,
335:4, 391:14,
391:19, 408:25,
409:2, 430:9
**shares** [1] - 339:17
**sharing** [3] - 289:15,
289:17, 348:2
**sheet** [9] - 292:16,
323:21, 336:17,
388:22, 388:24,
408:8, 430:2,
448:23, 460:5
**sheets** [7] - 337:3,
408:4, 409:15,
409:21, 459:13,
459:16
**Shift** [2] - 290:19,
291:8
**shift** [59] - 290:20,
291:16, 293:16,
293:24, 293:25,
294:3, 294:4, 295:7,
296:17, 296:24,
301:9, 317:25,
325:9, 328:2,
331:21, 332:15,
333:18, 334:1,
334:7, 334:9,
334:10, 334:12,
334:14, 334:15,
335:25, 336:17,
344:12, 365:1,
365:2, 365:3, 378:4,
379:22, 380:4,
380:5, 381:14,
381:20, 386:5,
411:2, 412:23,
413:9, 413:10,
413:11, 413:23,
414:1, 416:3,
419:22, 435:20,
436:23, 446:22,
446:25, 447:6,
447:21, 447:25,
449:14, 452:2,
461:23, 477:25,
478:1
**shifted** [2] - 399:18,
427:3
**shifts** [8] - 301:5,
334:2, 381:15,
381:21, 386:6,
413:16, 447:16,
448:3
**shoot** [1] - 331:12
**shoots** [1] - 330:22
**short** [3] - 296:4,
320:10, 450:12
**shorted** [2] - 450:3,
450:10

**shortly** [1] - 397:4
**show** [12] - 300:13,
317:25, 318:15,
352:20, 356:25,
368:19, 374:13,
425:8, 447:6, 459:7,
460:23
**showed** [6] - 349:1,
351:9, 372:9, 435:4,
446:17, 447:12
**shown** [4] - 355:18,
355:22, 357:3, 404:6
**shows** [1] - 355:12
**side** [11] - 290:25,
293:8, 337:18,
361:21, 361:23,
385:22, 385:25,
386:6, 399:12,
424:2, 426:16
**sidebar** [1] - 351:20
**signed** [3] - 403:5,
403:6, 479:16
**significant** [4] -
312:23, 357:15,
363:3, 384:11
**significantly** [1] -
437:21
**silverware** [8] - 297:5,
297:6, 362:1, 362:6,
362:15, 423:14,
425:21, 452:21
**similar** [4] - 359:21,
359:22, 432:10
**simply** [1] - 482:9
**simultaneously** [5] -
471:15, 472:22,
473:16, 476:12,
478:2
**single** [7] - 299:22,
318:24, 366:14,
367:16, 387:9,
388:22, 477:23
**sit** [16] - 324:3,
335:18, 336:20,
346:4, 349:10,
365:10, 406:13,
411:21, 421:23,
422:24, 475:15,
476:2, 476:6,
476:15, 476:16,
476:17
**sits** [1] - 425:11
**sitting** [12] - 307:14,
313:17, 328:18,
330:8, 373:20,
375:12, 411:23,
415:2, 423:18,
433:8, 475:19, 477:8
**situation** [14] - 298:23,
417:8, 436:1, 436:8,

443:9, 443:18,
443:25, 445:20,
475:8, 475:20,
478:23, 479:2,
479:3, 481:24
**situations** [4] - 299:2,
299:3, 310:1, 475:9
**six** [16] - 286:2, 289:4,
315:3, 320:23,
338:22, 338:24,
350:10, 356:21,
410:24, 411:3,
411:5, 422:3,
428:13, 428:18,
483:11
**six-top** [2] - 338:24,
410:24
**size** [4] - 360:19,
363:21, 376:16,
376:17
**skip** [1] - 450:22
**slash** [1] - 290:9
**slightly** [1] - 376:17
**slip** [3] - 429:20,
479:16, 479:23
**slips** [3] - 429:5,
430:5, 448:19
**slow** [5] - 436:18,
437:8, 477:24, 478:1
**slower** [2] - 342:19,
362:4
**slowly** [1] - 399:17
**small** [5] - 294:17,
294:18, 336:1,
341:20, 480:7
**smaller** [1] - 376:16
**smoking** [1] - 442:22
**SoBou** [4] - 440:19,
440:21, 440:23,
472:23
**sold** [4] - 400:11,
400:20, 400:21
**solemnly** [3] - 280:24,
357:23, 382:8
**solo** [3] - 464:16,
464:19, 464:22
**someone** [35] - 287:4,
298:20, 299:11,
299:12, 299:14,
304:2, 304:3,
304:18, 309:24,
312:25, 315:17,
318:25, 319:1,
320:24, 321:1,
321:2, 321:9,
332:16, 336:7,
337:14, 355:12,
365:25, 389:7,
389:9, 427:14,
427:23, 428:23,

434:2, 436:16,
437:3, 445:16,
448:17, 450:2,
450:10, 476:7
**someplace** [1] -
369:25
**sometime** [2] -
282:16, 463:15
**sometimes** [24] -
290:6, 295:1,
296:10, 315:8,
317:20, 318:2,
330:23, 331:2,
334:4, 334:5, 345:8,
360:4, 364:24,
380:11, 397:19,
415:4, 429:17,
429:18, 464:11,
475:24, 477:19,
486:12
**somewhere** [4] -
283:6, 331:12,
427:13, 459:21
**sommelier** [4] - 377:2,
420:15, 420:23,
476:10
**sommeliers** [2] -
420:16, 420:20
**sooner** [1] - 486:14
**sorry** [27] - 282:2,
285:4, 288:15,
300:14, 300:24,
303:5, 305:21,
320:14, 334:13,
338:18, 346:1,
350:13, 362:5,
375:20, 395:21,
399:23, 400:4,
441:22, 451:9,
455:6, 457:20,
457:21, 459:24,
471:12, 485:4
**sort** [25] - 353:13,
378:7, 378:9,
399:18, 422:6,
422:19, 424:22,
426:11, 428:17,
431:25, 434:3,
436:16, 437:3,
438:24, 440:18,
442:3, 444:22,
445:1, 445:9,
445:12, 453:19,
456:15, 464:18,
473:16, 480:25
**sounds** [4] - 352:3,
355:21, 364:11,
483:7
**sous** [1] - 452:15
**sous-chef** [1] - 452:15

**span** [1] - 353:17
**Spanish** [2] - 296:9, 296:13
**speaking** [10] - 304:2, 306:1, 310:13, 346:22, 471:15, 472:22, 473:16, 476:12, 478:2, 478:13
**specials** [4] - 365:4, 380:9, 385:2, 413:13
**specific** [15] - 331:20, 437:11, 437:14, 438:14, 439:3, 441:10, 442:18, 472:4, 475:18, 476:13, 481:12, 483:2, 483:25, 484:11, 484:15
**specifically** [6] - 376:15, 379:5, 405:7, 453:16, 468:23, 472:22
**specifics** [1] - 388:8
**spell** [4] - 281:6, 358:5, 382:15, 418:19
**spelled** [1] - 293:9
**spend** [3] - 329:5, 380:23, 391:22
**spending** [3] - 369:19, 369:20, 453:7
**spent** [1] - 482:5
**spiel** [3] - 328:16, 369:2, 470:10
**spieling** [1] - 367:4
**spiels** [1] - 328:18
**spinach** [1] - 384:3
**spirits** [2] - 360:11, 379:11
**split** [5] - 290:11, 296:23, 449:1, 458:5, 458:15
**splitting** [2] - 458:10, 482:10
**spot** [11] - 301:18, 308:3, 308:13, 309:7, 309:12, 309:17, 402:23, 467:18, 467:24, 468:2, 470:24
**spreadsheet** [2] - 353:14, 373:5
**square** [1] - 376:13
**staff** [12] - 332:17, 406:24, 412:18, 413:1, 436:21, 442:14, 442:16, 442:17, 452:15, 454:11, 477:22
**staffed** [1] - 320:10
**stains** [1] - 362:9
**stand** [5] - 313:8, 348:9, 398:23, 417:14, 485:13
**standard** [6] - 361:2, 361:25, 365:13, 366:4, 388:3, 388:5
**standards** [2] - 411:17, 466:15
**standing** [2] - 280:23, 313:8
**standpoint** [1] - 414:20
**stands** [1] - 397:7
**stared** [1] - 288:23
**stars** [1] - 358:25
**start** [11] - 280:16, 325:14, 383:11, 412:17, 426:8, 426:9, 435:23, 440:14, 441:14, 456:6
**started** [47] - 282:1, 282:6, 282:9, 282:11, 284:20, 288:6, 288:9, 288:11, 288:12, 288:14, 288:15, 291:25, 322:20, 324:2, 325:9, 325:12, 333:21, 358:12, 358:20, 364:8, 368:6, 373:7, 382:22, 383:14, 384:2, 384:4, 384:5, 397:21, 399:10, 399:12, 401:11, 401:20, 401:21, 403:16, 408:5, 409:11, 425:1, 434:5, 437:6, 442:4, 451:20, 454:2, 456:2, 460:18, 473:21, 480:21
**starting** [2] - 454:3, 474:6
**starts** [1] - 350:19
**state** [12] - 281:6, 358:5, 376:3, 376:4, 376:7, 376:9, 382:15, 384:23, 455:21, 456:12, 457:18, 486:20
**State** [1] - 487:14
**statement** [1] - 442:16
**STATES** [2] - 277:1, 277:11
**States** [4] - 402:8, 484:20, 487:15, 487:24
**station** [5] - 362:11, 386:1, 408:13, 415:23, 429:6
**stations** [1] - 415:25
**status** [1] - 331:6
**statutory** [1] - 352:13
**Stavros** [17] - 303:11, 308:17, 308:19, 308:21, 319:16, 319:20, 364:8, 364:9, 381:12, 381:13, 381:18, 403:24, 467:11, 470:5, 470:8, 473:7
**stay** [10] - 284:16, 423:18, 423:25, 426:1, 436:23, 449:14, 461:17, 461:22, 461:23, 462:18
**stayed** [1] - 464:14
**steak** [5] - 368:24, 380:23, 401:14, 401:16, 453:2
**Steakhouse** [4] - 384:8, 384:14, 391:10
**steakhouse** [3] - 369:9, 369:22, 388:9
**Stella** [1] - 441:12
**STENOGRAPHY** [1] - 278:7
**step** [5] - 285:18, 320:15, 321:2, 321:9, 481:23
**Stephen** [1] - 403:25
**stepped** [5] - 320:2, 320:4, 321:5, 321:10, 321:15
**Steve** [7] - 375:11, 467:11, 467:25, 470:5, 470:24, 471:7, 472:16
**STEVEN** [1] - 277:23
**still** [44] - 282:10, 283:24, 283:25, 298:15, 298:21, 299:5, 299:16, 299:18, 313:17, 313:18, 317:17, 319:14, 321:8, 322:3, 322:4, 323:5, 326:18, 326:19, 329:19, 331:3, 334:9, 337:8, 340:24, 340:25, 342:20, 342:21, 346:13, 350:14, 352:2, 352:4, 354:5, 354:8, 355:25, 357:7, 367:21, 401:5, 412:11, 426:21, 426:24, 435:16, 457:5, 465:17, 468:11
**stint** [1] - 334:23
**stipulate** [4] - 355:14, 372:12, 373:3, 394:16
**stipulated** [5] - 356:19, 372:25, 378:18, 389:21, 395:11
**stipulating** [2] - 372:18, 394:23
**stipulation** [9] - 354:3, 354:5, 354:7, 356:20, 394:14, 395:7, 395:18, 395:19, 395:20
**stipulations** [1] - 395:9
**stop** [3] - 318:7, 320:15, 383:21
**stopped** [2] - 397:21, 402:2
**stopping** [1] - 387:11
**strata** [1] - 388:9
**STREET** [4] - 277:16, 277:20, 277:24, 278:4
**street** [1] - 441:19
**strictly** [2] - 327:19, 342:18
**strong** [3] - 368:7, 403:14, 409:5
**structure** [2] - 406:17, 432:21
**structured** [3] - 402:9, 403:11, 475:10
**struggle** [1] - 403:15
**struggled** [1] - 440:16
**struggling** [1] - 472:9
**stuck** [1] - 424:9
**study** [2] - 419:15, 446:14
**stuff** [6] - 280:17, 295:21, 361:25, 362:11, 417:12, 454:1
**style** [9] - 319:21, 328:8, 329:9, 342:15, 342:17, 369:7, 388:1, 401:7, 401:8
**styles** [2] - 319:23, 333:10
**subject** [1] - 371:21
**subjects** [1] - 405:6
**submit** [6] - 394:10, 446:5, 446:8, 446:16, 447:2, 447:3
**submitted** [2] - 372:6, 372:8
**subsequently** [1] - 358:23
**subset** [1] - 380:10
**success** [1] - 362:17
**successful** [2] - 392:23, 401:20
**suggested** [1] - 485:22
**suit** [4] - 350:23, 355:3, 369:1, 481:14
**SUITE** [3] - 277:16, 277:20, 277:24
**summaries** [2] - 353:10, 353:12
**summer** [1] - 401:23
**Sunday** [3] - 333:22, 334:1, 334:6
**supervised** [1] - 295:15
**supervising** [4] - 295:17, 466:10, 466:18, 466:19
**supervision** [2] - 471:16, 474:12
**supervisor** [1] - 399:19
**supervisors** [1] - 399:16
**support** [1] - 401:24
**supposed** [24] - 289:18, 289:20, 311:3, 315:14, 317:18, 321:23, 322:1, 322:2, 322:5, 322:8, 322:21, 322:22, 323:25, 327:3, 331:9, 336:11, 347:1, 347:2, 374:13, 374:19, 390:13, 430:22, 449:6, 449:11
**surprise** [1] - 378:18
**SUSIE** [1] - 277:11
**suspended** [1] - 318:11
**suspicion** [1] - 482:9
**swear** [3] - 280:24, 357:23, 382:8
**sweating** [4] - 327:1, 342:12, 342:13
**sweep** [2] - 426:10, 474:2
**sweetheart** [2] - 345:23, 345:25

**swell** [1] - 462:6
**switch** [7] - 300:24, 436:15, 446:21, 447:16, 448:1, 448:3
**switched** [2] - 447:9, 461:14
**swore** [1] - 305:11
**sworn** [4] - 281:4, 358:3, 382:13, 398:25
**system** [11] - 337:6, 371:15, 385:3, 417:15, 418:14, 430:1, 446:1, 446:2, 446:5, 447:14, 451:15

**T**

**table** [113] - 298:18, 298:21, 299:22, 315:3, 317:5, 326:16, 326:21, 326:22, 328:10, 328:12, 328:21, 328:25, 329:1, 329:16, 329:25, 330:1, 330:9, 334:4, 335:9, 335:11, 338:24, 339:16, 340:4, 360:8, 360:14, 360:17, 366:14, 366:15, 366:16, 366:17, 366:25, 367:17, 367:18, 377:4, 381:6, 385:2, 385:4, 385:6, 385:7, 387:9, 387:10, 387:11, 387:15, 392:18, 392:19, 408:22, 410:2, 412:1, 414:22, 415:2, 415:7, 420:4, 421:15, 421:20, 422:14, 422:21, 423:13, 424:15, 425:11, 425:12, 425:16, 425:20, 425:21, 425:22, 426:10, 427:11, 427:17, 428:18, 428:20, 429:7, 431:16, 431:18, 431:22, 432:20, 437:9, 437:12, 437:14, 437:20, 445:6, 445:7, 451:21, 453:12, 453:15, 453:18, 463:4, 463:18, 463:19, 463:21, 463:23, 463:25, 464:6, 464:8, 464:11, 464:18, 466:16, 469:7, 470:11, 470:12, 474:6, 474:15, 475:18, 476:1, 476:3, 476:6, 476:7, 477:2, 477:9, 477:16, 478:8, 484:1
**Table** [1] - 418:15
**table-service** [1] - 410:2
**Tableau** [2] - 327:14, 327:17
**tablecloths** [1] - 362:8
**tables** [55] - 294:16, 294:21, 294:24, 295:2, 295:4, 315:22, 316:5, 316:15, 316:16, 316:20, 325:11, 325:12, 326:19, 327:4, 327:7, 328:22, 329:20, 335:15, 338:21, 338:22, 342:21, 345:7, 360:2, 363:12, 366:19, 367:9, 367:19, 376:14, 377:2, 410:19, 410:20, 410:22, 410:25, 411:17, 411:22, 411:23, 411:24, 414:4, 414:21, 419:7, 423:2, 426:7, 437:20, 453:8, 458:5, 463:3, 466:24, 467:5, 474:7, 474:21, 474:22, 475:4, 475:7, 475:22, 476:8
**tableside** [3] - 328:10, 424:16, 469:6
**tardy** [1] - 316:19
**tasks** [6] - 360:14, 378:6, 409:7, 409:8, 409:9
**taste** [3] - 424:14, 476:9, 476:14
**taxes** [1] - 448:25
**tea** [1] - 384:19
**team** [21] - 361:15, 361:16, 361:19, 376:23, 377:13, 384:15, 384:18, 391:11, 392:16, 392:17, 392:20, 392:22, 392:23, 402:12, 405:13, 405:19, 405:23, 406:19, 433:1, 437:12, 441:18
**teams** [4] - 403:11, 404:19, 408:24, 408:25
**teamwork** [6] - 403:14, 409:5, 463:24, 464:9, 469:2, 469:3
**technical** [1] - 432:11
**technique** [2] - 329:17, 424:18
**teens** [1] - 384:4
**ten** [1] - 388:18
**tenure** [3] - 364:7, 372:4, 373:10
**term** [15] - 290:20, 362:13, 367:24, 377:16, 377:17, 377:18, 387:23, 408:16, 408:17, 408:19, 411:20, 413:9, 423:4, 423:11, 423:12
**terms** [2] - 283:9, 409:20
**testified** [22] - 281:5, 321:20, 354:1, 358:4, 359:18, 366:18, 375:17, 382:14, 399:1, 407:4, 427:23, 433:19, 449:15, 453:22, 467:11, 468:22, 472:18, 475:6, 476:19, 478:12, 481:7
**testify** [3] - 375:15, 397:22, 410:17
**testimonies** [2] - 439:23, 440:18
**testimony** [28] - 280:24, 326:13, 353:9, 357:24, 375:13, 378:7, 382:9, 394:25, 397:11, 397:20, 409:13, 416:7, 416:8, 424:6, 426:14, 428:9, 430:13, 430:15, 432:1, 434:13, 439:17, 443:13, 452:7, 452:10, 459:12, 470:3, 484:6
**Texas** [1] - 407:11
**text** [2] - 383:22, 436:5
**TGI** [1] - 384:5
**THAT** [1] - 313:23
**THE** [184] - 277:11, 277:15, 277:22, 280:7, 280:8, 280:18, 280:23, 281:2, 281:6, 281:8, 283:23, 283:25, 284:1, 284:2, 284:3, 284:4, 284:5, 284:6, 286:24, 286:25, 305:18, 305:19, 313:20, 320:21, 320:22, 322:24, 323:2, 323:7, 323:8, 323:10, 323:11, 323:13, 340:8, 340:11, 340:12, 340:14, 340:15, 340:17, 340:20, 340:21, 340:22, 340:23, 340:24, 341:3, 341:6, 341:8, 341:10, 341:12, 341:14, 341:15, 341:17, 342:4, 342:5, 342:6, 346:6, 346:7, 346:18, 347:5, 348:6, 348:9, 348:15, 348:17, 348:18, 349:20, 349:23, 350:2, 350:5, 350:8, 350:12, 350:16, 350:19, 350:22, 350:25, 351:2, 351:11, 351:16, 351:18, 352:2, 352:8, 352:10, 352:15, 352:18, 352:22, 353:3, 353:7, 353:11, 353:15, 353:21, 354:12, 354:17, 355:8, 355:17, 355:21, 355:25, 356:9, 356:24, 357:7, 357:17, 357:23, 358:1, 358:5, 358:7, 362:5, 370:13, 370:15, 370:16, 370:18, 370:19, 370:20, 372:15, 372:18, 372:22, 372:25, 378:20, 382:2, 382:4, 382:8, 382:11, 382:15, 382:17, 392:25, 393:2, 393:9, 393:15, 394:7, 394:8, 394:12, 394:15, 394:18, 394:20, 395:1, 395:5, 395:11, 395:13, 395:16, 395:24, 396:2, 396:9, 396:14, 396:19, 396:23, 397:9, 397:16, 397:19, 398:1, 398:16, 399:3, 399:4, 399:6, 454:25, 455:20, 455:24, 456:5, 456:6, 457:19, 482:13, 482:18, 483:2, 483:4, 483:8, 483:10, 483:15, 483:16, 483:17, 483:21, 484:6, 484:8, 484:11, 484:16, 484:20, 484:22, 484:23, 484:25, 485:1, 485:4, 485:12, 485:20, 485:25, 486:6, 486:9, 486:16, 486:23, 487:3, 487:6
**thems** [1] - 443:21
**themselves** [7] - 294:15, 423:2, 430:9, 449:1, 463:25, 466:22, 482:10
**thereabouts** [1] - 334:21
**thereafter** [1] - 397:4
**therefore** [6] - 419:7, 422:22, 469:8, 469:10, 469:25, 470:14
**they've** [2] - 287:12, 313:6
**thinking** [1] - 440:13
**thinks** [2] - 435:11, 435:12
**third** [1] - 287:12
**thirds** [1] - 486:10
**three** [26] - 281:19, 283:18, 286:5, 287:9, 292:19, 292:21, 294:23, 327:22, 350:20, 355:3, 360:5, 360:19, 383:13, 398:13, 401:19, 411:22, 412:19, 414:5, 414:10,

415:4, 415:20, 422:2, 436:12, 437:20, 478:8, 483:13
**three-year** [2] - 355:3, 398:13
**thrive** [1] - 432:7
**thrives** [1] - 409:11
**throughout** [4] - 360:1, 402:10, 409:13, 439:17
**Thursday** [1] - 446:13
**tier** [2] - 359:11
**Tiffanie** [1] - 394:11
**timecard** [6] - 348:23, 348:25, 349:4, 349:13, 349:17, 349:18
**Timecard** [1] - 349:21
**timecards** [2] - 350:8, 352:3
**timeline** [1] - 287:24
**timestamps** [2] - 350:4, 350:5
**Tip** [1] - 458:18
**tip** [118] - 289:10, 293:3, 317:13, 320:5, 320:18, 324:15, 325:25, 329:6, 335:4, 335:8, 336:17, 337:2, 337:3, 338:4, 339:13, 339:16, 344:22, 345:14, 347:22, 347:25, 348:3, 356:6, 360:22, 360:24, 361:14, 364:4, 364:14, 364:15, 367:22, 367:23, 370:7, 371:2, 371:11, 371:25, 375:23, 376:2, 377:14, 385:17, 386:16, 388:12, 388:16, 391:11, 391:12, 392:3, 392:5, 392:7, 396:4, 396:12, 396:20, 403:14, 403:20, 404:5, 404:24, 404:25, 405:7, 405:8, 405:23, 408:4, 408:8, 408:20, 408:21, 408:23, 409:15, 409:21, 420:6, 427:5, 428:8, 429:2, 429:6, 429:10, 430:1, 437:1, 437:5, 437:11, 437:12, 437:13, 437:14, 437:15, 437:20, 437:22, 443:23, 448:12, 448:17, 449:11, 450:25, 451:3, 451:19, 451:24, 452:5, 453:24, 454:1, 454:8, 454:21, 455:4, 455:15, 457:5, 458:6, 458:10, 459:4, 461:17, 465:18, 469:6, 469:24, 470:14, 477:1, 479:16, 479:19, 479:25, 483:3, 483:15, 483:16, 483:19, 483:24, 484:7, 484:12
**tip-out** [9] - 336:17, 388:12, 388:16, 392:7, 408:4, 408:8, 409:15, 409:21, 465:18
**tipped** [4] - 339:15, 356:5, 360:20, 465:14
**tips** [63] - 289:10, 290:17, 291:19, 323:18, 326:9, 336:24, 337:1, 370:4, 375:4, 388:21, 388:23, 388:24, 389:2, 389:4, 389:9, 389:12, 389:15, 389:19, 391:19, 391:25, 395:3, 408:24, 408:25, 427:24, 428:23, 429:5, 429:25, 430:6, 443:16, 448:20, 448:25, 449:6, 449:20, 449:24, 450:3, 450:11, 450:24, 451:3, 457:12, 457:15, 457:24, 458:3, 458:14, 458:21, 459:8, 460:6, 460:7, 460:21, 461:13, 461:20, 462:4, 462:18, 462:21, 463:8, 463:13, 480:15, 480:19, 480:22, 482:5, 482:6, 482:8, 482:10, 482:24
**title** [10] - 282:12, 282:21, 294:8, 298:1, 330:2, 330:3, 347:1, 363:9, 366:22, 468:6
**titled** [2] - 299:12, 299:13
**titles** [1] - 363:22
**TO** [2] - 280:4, 394:4
**today** [4] - 348:12, 396:25, 397:7, 430:13
**today's** [1] - 375:13
**together** [9] - 310:6, 328:11, 353:8, 397:10, 400:24, 408:8, 410:25, 421:1
**tomorrow** [2] - 440:14, 480:23
**tonight** [3] - 413:15, 446:23, 467:22
**took** [28] - 291:19, 296:16, 300:4, 305:8, 313:7, 320:8, 321:5, 321:18, 321:21, 322:3, 322:25, 333:7, 348:16, 368:17, 379:9, 386:3, 388:12, 389:7, 401:25, 402:23, 408:2, 451:3, 464:11, 464:14, 471:19, 485:23
**top** [12] - 287:23, 289:9, 292:16, 338:24, 359:3, 359:8, 359:11, 375:24, 376:8, 390:4, 410:24, 469:22
**Total** [1] - 290:14
**total** [7] - 290:17, 291:4, 291:15, 292:8, 293:3, 321:20, 358:19
**totally** [3] - 330:4, 369:18, 462:19
**totals** [2] - 291:7, 292:3
**touch** [2] - 366:25, 452:24
**touching** [2] - 335:15, 388:18
**towards** [2] - 292:16, 390:16
**town** [6] - 331:14, 340:25, 438:19, 446:11, 478:11, 482:19
**train** [2] - 379:16, 379:17
**training** [5] - 319:14, 379:19, 403:17, 424:23, 424:25
**transactions** [1] - 428:1
**TRANSCRIPT** [2] - 277:10, 278:7
**transcript** [6] - 485:19, 485:20, 486:1, 486:12, 486:17, 487:17
**TRANSCRIPTION** [1] - 278:8
**transition** [1] - 334:17
**translation** [2] - 400:16, 400:17
**transparency** [2] - 408:9, 460:20
**transparent** [9] - 337:6, 454:9, 454:11, 454:12, 457:9, 458:2, 458:9, 458:17, 460:4
**Travis** [3] - 397:5, 435:15, 435:16
**trend** [1] - 418:25
**trial** [10] - 280:14, 352:24, 355:11, 408:16, 409:13, 432:1, 439:17, 485:15, 486:20
**TRIAL** [1] - 277:10
**tried** [2] - 319:10, 402:22
**trip** [1] - 399:13
**true** [11] - 345:11, 354:11, 366:19, 370:11, 381:19, 465:20, 465:21, 472:3, 472:12, 472:14, 487:17
**truly** [1] - 454:13
**truth** [11] - 280:25, 281:1, 305:11, 305:14, 357:25, 382:10
**try** [18] - 289:24, 290:12, 318:2, 375:1, 379:15, 405:16, 413:20, 414:16, 414:22, 417:9, 424:17, 432:12, 438:10, 446:14, 446:17, 475:15, 475:16, 485:2
**trying** [13] - 285:13, 293:23, 302:12, 330:24, 345:15, 356:20, 357:6, 364:2, 405:9, 417:1, 425:7, 473:15, 479:23
**TUESDAY** [3] - 277:6, 280:2, 394:2
**turn** [6] - 281:14, 414:21, 414:22, 415:4, 422:7, 479:24
**turned** [1] - 309:24
**turns** [2] - 414:25, 415:8
**tweaked** [1] - 301:5
**twice** [3] - 414:23, 415:5, 440:24
**two** [73] - 281:22, 283:1, 287:7, 287:10, 288:20, 288:22, 290:6, 290:24, 295:6, 304:9, 308:25, 325:6, 333:15, 334:13, 349:4, 349:23, 355:2, 359:3, 359:21, 360:4, 364:2, 369:15, 372:11, 376:15, 381:15, 381:21, 383:13, 389:15, 398:13, 400:9, 400:12, 408:6, 410:25, 411:8, 411:23, 411:24, 414:12, 414:22, 414:24, 414:25, 415:1, 415:20, 415:23, 420:17, 420:20, 422:1, 422:2, 427:8, 430:20, 430:25, 436:12, 443:21, 465:25, 467:8, 467:22, 470:16, 475:7, 477:18, 478:3, 478:5, 478:8, 482:1, 482:2, 483:11, 483:12, 486:10, 486:21
**two-month** [1] - 486:21
**two-thirds** [1] - 486:10
**two-week** [2] - 349:4, 349:23
**two-year** [1] - 355:2
**type** [13] - 324:10, 326:16, 338:21, 385:25, 392:3, 413:6, 418:12, 425:19, 426:19,

432:23, 445:2, 445:3, 452:12
**types** [2] - 363:4, 429:17
**typically** [10] - 360:7, 360:9, 360:16, 363:6, 374:22, 374:25, 376:23, 379:7, 380:2, 416:25

## U

**U.S** [1] - 483:20
**ubiquitous** [2] - 363:7, 377:18
**ultimate** [1] - 438:2
**unclear** [1] - 454:18
**uncomfortable** [4] - 330:7, 443:17, 443:24
**under** [15] - 291:16, 349:13, 351:5, 372:10, 381:16, 398:8, 399:3, 406:6, 422:23, 435:22, 454:5, 454:8, 458:18, 458:24, 483:20
**underneath** [6] - 291:18, 292:2, 292:10, 292:25, 392:11
**understandable** [1] - 429:23
**understood** [3] - 298:12, 391:23, 409:19
**unfortunately** [1] - 371:9
**unhappy** [1] - 443:8
**unique** [12] - 329:9, 347:24, 348:1, 348:3, 369:7, 369:8, 369:10, 370:3, 370:4, 388:2, 388:4, 388:10
**United** [4] - 402:8, 484:20, 487:15, 487:24
**UNITED** [2] - 277:1, 277:11
**universal** [1] - 359:25
**unlawfully** [1] - 454:22
**unless** [6] - 294:3, 294:4, 311:5, 311:6, 348:13, 477:12
**unlike** [1] - 363:17
**unlock** [1] - 389:12
**unlocked** [1] - 463:15
**unpaid** [1] - 390:14
**unprecedented** [1] - 388:13
**unusual** [1] - 447:13
**up** [96] - 282:18, 286:15, 289:7, 290:12, 299:4, 301:9, 305:25, 306:14, 307:16, 312:24, 313:2, 316:2, 317:2, 317:25, 318:15, 318:16, 318:19, 318:20, 318:25, 319:1, 319:3, 319:4, 319:5, 319:20, 319:22, 319:25, 322:10, 325:1, 328:3, 329:3, 344:5, 345:3, 351:18, 353:2, 353:7, 357:13, 362:3, 362:7, 362:11, 362:12, 362:16, 362:21, 364:1, 370:22, 370:24, 371:2, 371:19, 371:24, 372:2, 374:14, 386:5, 387:11, 404:19, 405:8, 406:4, 407:4, 407:7, 408:2, 408:9, 411:18, 423:11, 423:12, 423:13, 423:15, 425:21, 427:8, 430:6, 430:14, 432:1, 434:12, 436:20, 446:25, 447:2, 447:6, 447:11, 450:4, 450:11, 454:19, 455:9, 455:16, 456:8, 459:21, 460:14, 463:15, 463:25, 480:17, 480:23, 481:19, 481:23, 486:6
**ups** [1] - 318:18
**upset** [1] - 444:7
**upstairs** [1] - 323:4
**urgent** [1] - 467:20
**usable** [1] - 351:6

## V

**value** [2] - 424:16, 432:14
**varies** [1] - 431:20
**various** [3] - 398:7, 404:6, 426:14
**vary** [2] - 361:25, 366:16
**VASQUEZ** [57] - 277:15, 277:15, 280:13, 280:21, 281:11, 281:14, 281:16, 284:7, 287:2, 305:20, 313:22, 321:3, 323:14, 325:18, 342:8, 346:9, 346:19, 347:6, 348:5, 348:21, 349:22, 350:1, 350:4, 350:7, 350:10, 350:13, 350:18, 350:21, 350:24, 351:1, 351:3, 351:13, 353:24, 354:14, 354:21, 356:11, 393:5, 394:10, 394:14, 394:16, 394:19, 395:6, 395:12, 395:14, 396:10, 396:17, 397:25, 398:22, 455:2, 456:8, 456:9, 457:20, 457:22, 480:1, 480:3, 481:18, 486:11
**Vasquez** [3] - 281:12, 455:22, 486:21
**VASQUEZ................** [1] - 279:8
**VASQUEZ.................** [1] - 279:6
**VASQUEZ.................** .. [1] - 279:17
**venture** [2] - 400:22, 400:23
**venue** [4] - 313:7, 313:13, 346:11, 401:24
**verdict** [1] - 398:7
**version** [1] - 459:15
**versus** [1] - 298:12
**VERSUS** [1] - 277:5
**vertebral** [1] - 318:13
**vested** [1] - 338:25
**view** [2] - 337:4, 348:22
**violate** [1] - 396:4
**violation** [1] - 398:14
**visioner** [1] - 439:14
**visit** [1] - 486:23
**void** [1] - 445:11
**volume** [1] - 404:11
**volunteer** [1] - 436:22
**volunteers** [1] - 436:24

## W

**wage** [5] - 311:9, 354:4, 365:22, 395:8, 395:14
**wages** [2] - 337:10, 337:11
**wait** [13] - 305:18, 336:21, 336:23, 347:5, 350:12, 350:16, 389:10, 424:1, 462:18, 463:13, 486:14
**waiter** [4] - 360:25, 361:1, 388:3, 392:18
**waiters** [1] - 384:17
**waiting** [3] - 338:24, 423:22, 480:22
**wake** [1] - 345:3
**walk** [11] - 329:16, 369:1, 404:11, 418:23, 418:24, 420:3, 420:25, 476:23, 476:25, 477:14
**walk-ins** [2] - 418:23, 418:24
**walked** [5] - 344:8, 383:3, 383:8, 477:10, 477:11
**walking** [3] - 423:1, 425:10, 432:16
**wants** [2] - 446:25, 462:17
**waste** [1] - 312:7
**watch** [3] - 426:22, 474:7, 474:8
**watched** [1] - 308:25
**watching** [1] - 474:5
**water** [10] - 294:15, 295:3, 360:15, 411:19, 412:3, 420:10, 420:11, 425:22, 463:23
**ways** [3] - 313:10, 329:13
**wayside** [1] - 442:4
**weather** [1] - 410:15
**website** [1] - 418:16
**wedding** [1] - 346:12
**Wednesday** [1] - 446:13
**weed** [1] - 442:22
**week** [25] - 286:5, 288:3, 288:5, 288:6, 288:7, 288:8, 288:9, 314:1, 349:4, 349:23, 352:18, 354:13, 355:13, 355:23, 372:14, 373:6, 373:14, 373:16, 383:17, 390:9, 407:5, 420:22, 446:13
**weekend** [2] - 403:9, 420:22
**weekly** [1] - 482:23
**weeks** [7] - 288:20, 288:21, 288:22, 354:17, 368:11, 403:22, 460:2
**weeks'** [1] - 325:6
**weight** [1] - 355:4
**welcome** [1] - 413:2
**well-established** [1] - 459:22
**well-run** [1] - 369:9
**whatnot** [1] - 357:13
**whereas** [1] - 343:4
**WHEREUPON** [3] - 348:16, 393:16, 487:7
**whistle** [1] - 442:17
**whole** [13] - 280:25, 302:21, 332:5, 357:25, 359:2, 382:10, 391:22, 402:10, 409:22, 436:23, 466:1, 470:18, 477:18
**wife** [1] - 284:16
**willful** [1] - 398:13
**Williams** [1] - 420:19
**Windsor** [2] - 384:10, 391:12
**wine** [40] - 326:19, 327:7, 342:21, 360:9, 360:12, 367:4, 379:8, 380:3, 380:12, 385:2, 385:5, 411:19, 420:13, 420:14, 420:19, 420:24, 420:25, 421:1, 421:5, 421:6, 421:14, 422:14, 423:10, 426:3, 429:22, 453:2, 453:13, 464:15, 464:19, 464:20, 464:22, 466:16, 469:9, 476:2, 476:6, 476:9, 476:13, 476:15
**wise** [2] - 322:18,

334:25
**Witness** [2] - 294:11, 305:15
**witness** [12] - 280:15, 280:20, 281:4, 311:24, 357:21, 358:3, 382:6, 382:13, 393:4, 398:5, 398:25, 454:24
**WITNESS** [45] - 281:2, 281:8, 283:25, 284:2, 284:4, 284:6, 286:25, 305:19, 320:22, 323:2, 323:8, 323:11, 340:11, 340:14, 340:20, 340:22, 340:24, 341:6, 341:10, 341:14, 341:17, 342:5, 346:7, 358:1, 358:7, 362:5, 370:15, 370:18, 370:20, 372:15, 382:11, 382:17, 399:4, 455:20, 456:5, 482:18, 483:4, 483:10, 483:16, 483:21, 484:8, 484:16, 484:22, 484:25, 485:4
**witnesses** [4] - 393:5, 393:7, 398:3, 404:6
**wondered** [1] - 323:13
**word** [8] - 308:23, 308:25, 363:6, 368:1, 383:8, 400:1, 441:19, 465:7
**words** [1] - 406:24
**worker** [3] - 300:2, 300:3, 314:3
**Workers'** [2] - 404:22, 456:17
**works** [5] - 327:3, 346:25, 408:21, 440:13, 440:22
**world** [7] - 346:17, 359:3, 359:6, 359:15, 369:16, 369:24, 405:16
**worst** [1] - 359:16
**worth** [1] - 323:22
**WRIGLEY** [3] - 277:23, 352:11, 352:25
**Wrigley** [1] - 454:18
**write** [11] - 316:9, 316:13, 318:18, 319:1, 319:3, 319:4, 319:5, 319:20, 429:22
**write-up** [2] - 319:4, 319:5
**write-ups** [1] - 318:18
**writing** [3] - 316:11, 319:22, 319:25
**written** [8] - 318:13, 318:16, 318:19, 318:20, 459:22, 459:25
**wrote** [1] - 318:24

## Y

**y'all** [2] - 316:7, 404:7
**year** [21] - 281:21, 283:1, 284:4, 284:15, 288:10, 324:9, 333:24, 350:18, 355:2, 355:3, 381:22, 384:2, 398:13, 400:18, 403:2, 403:6, 435:3, 440:6, 440:9, 441:21
**yearly** [1] - 365:14
**years** [18] - 281:20, 281:22, 283:1, 302:15, 312:18, 312:19, 358:19, 359:4, 359:17, 378:9, 384:1, 388:18, 401:19, 402:24, 418:14, 435:24, 450:2
**yesterday** [17] - 280:10, 280:14, 313:20, 348:24, 349:2, 351:9, 351:19, 353:6, 353:9, 368:2, 405:2, 407:4, 427:23, 449:16, 455:23, 457:12, 472:18
**yesterday's** [1] - 375:13
**York** [16] - 358:24, 359:14, 370:24, 371:1, 371:4, 371:10, 371:20, 375:18, 375:22, 376:7, 376:12, 376:17, 384:7, 384:13, 384:22, 392:9
**young** [1] - 337:18
**yourself** [7] - 285:8, 285:11, 303:23, 304:6, 343:22, 419:12, 485:2

## Z

**Zach** [3] - 358:11, 372:16, 373:6
**Zachary** [10] - 286:23, 287:1, 287:8, 301:10, 357:22, 358:7, 373:5, 443:4, 443:5
**ZACHARY** [3] - 279:9, 358:2, 358:7
**zero** [1] - 296:21
**zone** [2] - 294:15, 294:17